ARGUMENT NOT YET SCHEDULED
APPEAL NO. 24-3006


UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT


UNITED STATES OF AMERICA,                                    APPELLEE,

v.

PETER K. NAVARRO,                                      APPELLANT.


APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

## APPELLANT'S APPENDIX

## VOLUME I of VII

[Counsel on Next Page]

Stan M. Brand
(D.C. Bar No. 213082)
Stanley E. Woodward, Jr.
(D.C. Bar No. 997320)
BRAND WOODWARD LAW, LP
400 Fifth Street, NW
Suite 350
Washington, DC  20001
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

John S. Irving
(D.C. Bar No. 460068)
E&W Law, LLC
1455 Pennsylvania Avenue, NW
Suite 400
Washington, D.C. 20004
202-280-6362 (telephone)
john.irving@earthandwatergroup.com

John P. Rowley, III
(D.C. Bar No. 392629)
Secil Law, PLLC
1701 Pennsylvania Avenue, NW
Suite 200
Washington, D.C.  20006
202-417-8232 (telephone)
jrowley@secillaw.com

*Counsel for Defendant-Appellant Peter K. Navarro*

## TABLE OF CONTENTS (ALL VOLUMES)
## VOLUME I

Page:

1. Docket Entries, 1:22-cr-00200-APM-1 ......................................................0001

2. Indictment, United States of America v. Navarro, 1:22-cr-00200-APM-1

    Filed June 2, 2022.....................................................................................0027

3. Motion for Documents Pertaining to Arrest (Pro se)

    Filed June 10, 2022..................................................................................0034

4. United States Response to Defendant's Motion for Discovery

    Filed June 13, 2022..................................................................................0037

5. Defendant's Motion to Compel Discovery

    Filed August 4, 2022................................................................................0040

6. United States Opposition to Defendant's Motion to Compel Discovery

    Filed August 15, 2022..............................................................................0084

7. Defendant's Motion to Dismiss the Indictment

    Filed August 17, 2022..............................................................................0106

8. Defendant's Notice Pursuant to Fed R. Crim. P. 12.3 of Defenses of Entrapment by Estoppel and Public Authority

    Filed August 17, 2022..............................................................................0150

9. Defendant's Reply to Government's Opposition to Defendant's Motion to Compel Discovery

    Filed August 23, 2022..............................................................................0154

10. United States' Opposition to Defendant's Motion to Dismiss

    Filed August 31, 2022..............................................................................0176

    Exhibit 1 to Opposition............................................................................0213

    Exhibit 2 to Opposition............................................................................0215

    Exhibit 3 to Opposition............................................................................0226

    Exhibit 4 to Opposition............................................................................0228

    Exhibit 5 to Opposition............................................................................0230

    Exhibit 6 to Opposition............................................................................0232

    Exhibit 7 to Opposition............................................................................0234

**Exhibit 8 to Opposition**................................................................**0235**

**Exhibit 9 to Opposition**................................................................**0237**

**11. United States' Response to Defendant's Notice Under Federal Rule of Procedure 12.3**

**Filed August 31, 2022**................................................................**0239**

**12. Transcript of Motion Hearing Proceedings**

**Dated August 31, 2022**................................................................**0243**

**13. Defendant's Reply to the Government's Opposition to Defendant's Motion to Dismiss the Indictment**

**Filed September 9, 2022** ................................................................**0316**

**14. Defendant's Supplement to Motion to Compel Discovery Regarding Possible Selective Prosecution**

**Filed September 9, 2022** ................................................................**0342**

**Exhibit 1 to Supplement to Motion** ................................................**0353**

**Exhibit 2 to Supplement to Motion** ................................................**0362**

**15. United States' Response to Defendant's Supplemental Brief in Support of His Motion to Compel**

**Filed September 12, 2022** ................................................................**0364**

**16. United States' Omnibus Motion in Limine**

**Filed September 28, 2022** ................................................................**0367**

**Exhibit 1** ................................................................................**0382**

**Exhibit 2** ................................................................................**0384**

**VOLUME II**

**17. Defendant's Opposition to the Government's Omnibus Motion in Limine**

**Filed October 12, 2022** ................................................................**0473**

**18. United States' Reply to Defendant's Opposition to Government's Omnibus Motion in Limine**

**Filed October 17, 2022** ................................................................**0498**

**19. Transcript of Motion Hearing Proceedings**

**Dated November 4, 2022** ................................................................**0510**

**iv**

20. **Defendant's Motion to Reconsider, for an Evidentiary Hearing, and to Compel Material Discovery**

    **Filed January 24, 2023**................................................................**0599**

    **Exhibit A to Motion to Reconsider**...............................................**0621**

    **Exhibit B to Motion to Reconsider**...............................................**0624**

21. **United States' Opposition to Defendant's Motion to Reconsider, for an Evidentiary Hearing, and to Compel Material Discovery**

    **Filed January 25, 2023**................................................................**0628**

22. **Transcript of Pretrial Conference Proceedings**

    **Dated January 27, 2023**..............................................................**0633**

23. **United States' Brief on Defendant Navarro's Unsupported Claims of Executive Privilege and Testimonial Immunity**

    **Filed March 14, 2023**.................................................................**0725**

    **Exhibit 1 to Brief**......................................................................**0751**

    **Exhibit 2 to Brief**......................................................................**0791**

    **Exhibit 3 to Brief**......................................................................**0792**

    **Exhibit 4 to Brief**......................................................................**0809**

24. **Defendant's Response to the Government's Brief**

    **Filed April 18, 2023**...................................................................**0810**

25. **United States' Reply Brief Regarding Defendant Navarro's Unsupported Claims of Privilege and Immunity**

    **Filed April 28, 2023**...................................................................**0822**

26. **Transcript of Motion Hearing Proceedings**

    **Dated June 21, 2023**..................................................................**0828**

**VOLUME III**

27. **United States' Supplemental Briefing on Due Process**

     Filed June 28, 2023....................................................................................0941

28. **Defendant's Supplemental Notice Pursuant to Fed. R. Crim. P. of Defenses of Public Authority and Entrapment by Estoppel**

     Filed July 5, 2023.......................................................................................0946

29. **Government's Response to Defendant's Supplemental R. 12.3 Notice**

     Filed July 10, 2023.....................................................................................0951

30. **Government's Supplement to its Pending Motion to Preclude Evidence of Entrapment by Estoppel**

     Filed July 10, 2023.....................................................................................0953

31. **Peter K. Navarro's Due Process Response**

     Filed July 12, 2023.....................................................................................0959

32. **Motion of Defendant Peter Navarro for a Continuance of Evidentiary Hearing and Trial**

     Filed August 7, 2023..................................................................................0966

     Attachment A to Motion .........................................................................0971

33. **United States' Opposition to Defendant's Motion for a Continuance**

     Filed August 8, 2023..................................................................................0974

     Exhibit 1 to Opposition...........................................................................0978

     Exhibit 2 to Opposition [REDACTED] ...............................................0979

     Exhibit 3 to Opposition...........................................................................0980

     Exhibit 4 to Opposition...........................................................................0981

     Exhibit 5 to Opposition...........................................................................0983

34. **Reply to Government Opposition to Motion for a Continuance of Evidentiary Hearing and Trial**

     Filed August 10, 2023................................................................................0984

35. **Motion for Reconsideration**

     Filed August 25, 2023................................................................................0989

     Exhibit 1 to Motion [REDACTED] ......................................................0995

     Exhibit 2-A to Motion .............................................................................0996

Exhibit 2-B to Motion ..................................................................0998

Exhibit 3 to Motion ......................................................................1004

Exhibit 4 to Motion ......................................................................1007

**36. Government's Opposition to Defendant's Motion for the Court to Reconsider its Denial of Defendant's Motion to Continue**

Filed August 26, 2023 ..................................................................1011

**37. Transcript of Evidentiary Hearing Proceedings**

Dated August 28, 2023 .................................................................1013

**38. Transcript of Pretrial Conference Proceedings**

Dated August 30, 2023 .................................................................1163

**39. Motion in Limine**

Filed September 5, 2023 ...............................................................1221

**40. Government's Opposition to Defendant's Motion in Limine Regarding Executive Privilege**

Filed September 5, 2023 ...............................................................1230

**41. Transcript of Jury Selection Proceedings (AM)**

Dated September 5, 2023 ..............................................................1239

**VOLUME IV**

**42. Transcript of Jury Selection Proceedings (PM)**

Dated September 5, 2023 ..............................................................1417

**43. Transcript of Jury Trial Proceedings**

Dated September 6, 2023 ..............................................................1576

**VOLUME V**

44. Transcript of Jury Trial Proceedings, Charge, and Closing Arguments

Dated September 7, 2023 ..........................................................................1846

45. Transcript of Sentencing Proceedings

Dated January 25, 2024 ..........................................................................1916

46. Notice of Appeal

Filed January 25, 2024..........................................................................2026

47. Judgment

Filed January 25, 2024..........................................................................2029

48. Amended Judgment

Filed February 11, 2024..........................................................................2033

**VOLUME VI**

**EXHIBITS TO AUGUST 28, 2023 EVIDENTIARY HEARING
ORDERED BY ADMISSION INTO EVIDENCE**

49. Defense Exhibit 6 (Dated February 9, 2022) ..........................................2038

50. Defense Exhibit 1.15 (Dated November 18, 2021) ..................................2039

51. Defense Exhibit 18 (Dated October 22, 2021 to November 21, 2021) ....2048

52. Defense Exhibit 1.16 (Dated November 18, 2021) ..................................2217

53. Defense Exhibit 1.1 (Dated November 19, 2021) ....................................2225

54. Defense Exhibit 1.17 (Dated November 19, 2021) ..................................2233

55. Defense Exhibit 1 (Dated November 20, 2021) ........................................2235

56. Defense Exhibit 2 (Dated December 7, 2021) ..........................................2236

57. Defense Exhibit 2.1 [mislabeled on document as 2.2] (Dated December 11, 2021)

..........................................................................................................2238

58. Defense Exhibit 4 (Dated December 15, 2021) ........................................2244

59. Defense Exhibit 3 (Dated December 14, 2021) ........................................2248

60. Defense Exhibit 5 (Dated February 9, 2022) ..........................................2253

61. Defense Exhibit 7 (Dated February 9, 2022) ..........................................2263

62. Defense Exhibit 9 (Dated March 1, 2022) ................................................2264

63. Defense Exhibit 12.1 (Dated March 1, 2022) ..........................................2265

64. Defense Exhibit 12.2 (Dated March 26, 2022) ........................................2267

65. Defense Exhibit 12.4 (Dated April 6, 2022) .................................................2268

66. Defense Exhibit 22 (Dated March 28, 2022) ...............................................2270

67. Defense Exhibit 13 (Dated May 23, 2022) ..................................................2272

68. Defense Exhibit 31 (Dated January 23, 2023) .............................................2360

69. Defense Exhibit 12.3 (Dated March 29, 2022) ............................................2362

70. Defense Exhibit 23 (Dated June 9, 2022) ...................................................2546

## VOLUME VII

71. Grand Jury Transcript of Justin Clark (Partially Redacted)

(Dated May 12, 2022) ...................................................................................2548

72. Grand Jury Transcript of Elizabeth Harrington (Partially Redacted)

(Dated June 2, 2022) ....................................................................................2588

## EXHIBITS TO SEPTEMBER 6, 2023 JURY TRIAL

## ORDERED BY ADMISSION INTO EVIDENCE

73. Exhibit 1 .................................................................................................2617

74. Exhibit 2 .................................................................................................2631

75. Exhibit 3 .................................................................................................2644

76. Exhibit 4 .................................................................................................2645

77. Exhibit 5 .................................................................................................2647

78. Exhibit 6 .................................................................................................2649

79. Exhibit 7, p. 1 .........................................................................................2651

USCA Case #24-3006      Document #2064276        Filed: 07/12/2024      Page 10 of 481

APPEAL,CAT B,CLOSED,FIRSTSTEP

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:22-cr-00200-APM-1

Case title: USA v. NAVARRO                          Date Filed: 06/02/2022

---

Assigned to: Judge Amit P. Mehta

Appeals court case number: 24-3006

**Defendant (1)**

**PETER K. NAVARRO**                 represented by   **John S. Irving , IV**
EARTH & WATER LAW LLC
1455 Pennsylvania Avenue, N.W., Suite 400
Washington, DC 20004
301-807-5670
Email: jirving1@verizon.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**John P. Rowley , III**
JPROWLEY LAW PLLC
8639 Chase Glen Circle
Fairfax Station, DC 22039
(703) 402-8800
Email: john.rowley@jprowleylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Stanley McKennett Brand**
BRAND WOODWARD LAW
3 Pebble Ridge Court
Rockville, MD 20854
202-258-6597
Email: stanleymbrand@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Stanley Edmund Woodward , Jr.**
BRAND WOODWARD LAW, LP
400 Fifth Street, Northwest
Washington, DC 20001
202-996-7447
Fax: 202-996-0113
Email: stanley@brandwoodwardlaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**-0001-**

| **Pending Counts** | **Disposition** |
|---|---|
| 2:192; CONGRESSIONAL CONTEMPT - REFUSE TO TESTIFY; Contempt of Congress (Papers). (1) | Sentenced to four (4) months of imprisonment. This term of imprisonment shall run concurrently with the sentence imposed as to Count 2. Special assessment imposed as to this count in the amount of $25, for a total special assessment of $50. Fine imposed as to both counts in the total amount of $9500. |
| 2:192; CONGRESSIONAL CONTEMPT - REFUSE TO TESTIFY; Contempt of Congress (Testimony). (2) | Sentenced to four (4) months of imprisonment. This term of imprisonment shall run concurrently with the sentence imposed as to Count 1. Special assessment imposed as to this count in the amount of $25, for a total special assessment of $50. Fine imposed as to both counts in the total amount of $9500. |

**Highest Offense Level (Opening)**

Misdemeanor

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

| **Movant** | | |
|---|---|---|
| **UNITED STATES HOUSE OF REPRESENTATIVES** | represented by | **Douglas N. Letter** |

**Douglas N. Letter**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
5140 O'Neill House Office Building
Washington, DC 20515
202-225-9700
Email: dletter@bradyunited.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Eric Randal Columbus**
District of Columbia
1716 Seaton St NW
20009
Washington, DC 20009

**-0002-**

347-886-6669
Email: eric.columbus@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Todd Barry Tatelman**
U.S. HOUSE OF REPRESENTATIVES
Office of General Counsel
5140 O'Neill House Office Building
Washington, DC 20515
202-225-9700
Email: todd.tatelman@mail.house.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Plaintiff**

**USA**                          represented by   **Amanda Rose Vaughn**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 4th Street NW
Washington, DC 20001
202-252-1793
Email: amanda.vaughn@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Elizabeth Ann Aloi**
U.S. ATTORNEY'S OFFICE/DISTRICT
OF COLUMBIA
555 4th Street, NW
Washington, DC 20003
(202) 252-7212
Email: elizabeth.aloi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**John Crabb , Jr.**
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Room 11-844
Washington, DC 20530
(202) 252-1794
Email: John.D.Crabb@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

## -0003-

USCA Case #24-3006       Document #2064276       Filed: 07/12/2024       Page 13 of 481

**Molly Gulland Gaston**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-7803
Email: molly.gaston@usdoj.gov
*TERMINATED: 09/26/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Raymond N. Hulser**
UNITED STATES ATTORNEY'S OFFICE
601 D Street, NW
Washington, DC 20530
202-252-7726
Email: raymond.hulser2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/02/2022 | 1 | INDICTMENT as to PETER K. NAVARRO (1) count(s) 1, 2. (zhsj) Modified Text on 6/3/2022 (zhsj). (Entered: 06/03/2022) |
| 06/02/2022 | 3 | MOTION to Seal Indictment and Related Filings and to Delay Entry on the Public Docket by USA as to PETER K. NAVARRO. (Attachments: # 1 Text of Proposed Order) (zhsj) (Entered: 06/03/2022) |
| 06/02/2022 | 4 | ORDER granting 3 Motion to Seal Indictment and Related Filings and to Delay Entry on the Public Docket as to PETER K. NAVARRO (1). Signed by Magistrate Judge Zia M. Faruqui on 6/2/2022. (zhsj) (Entered: 06/03/2022) |
| 06/03/2022 | | MINUTE ORDER. Based on the government's representation to the Court that the unsealing event has occurred, this matter is automatically unsealed. Signed by Magistrate Judge Zia M. Faruqui on 6/3/2022. (zcll) (Entered: 06/03/2022) |
| 06/03/2022 | | Case unsealed as to PETER K. NAVARRO. (zcll) (Entered: 06/03/2022) |
| 06/03/2022 | 5 | NOTICE OF ATTORNEY APPEARANCE Elizabeth Ann Aloi appearing for USA. (Aloi, Elizabeth) (Entered: 06/03/2022) |
| 06/03/2022 | 6 | NOTICE OF ATTORNEY APPEARANCE Amanda Rose Vaughn appearing for USA. (Vaughn, Amanda) (Entered: 06/03/2022) |
| 06/03/2022 | | ORAL MOTION for Speedy Trial by PETER K. NAVARRO. (zcll) (Entered: 06/03/2022) |
| 06/03/2022 | | Arrest of PETER K. NAVARRO. (zcll) (Entered: 06/06/2022) |
| 06/03/2022 | 8 | Arrest Warrant Returned Executed on 06/03/2022 as to PETER K. NAVARRO. (zcll) (Entered: 06/06/2022) |
| 06/03/2022 | | Minute Entry for proceedings held before Magistrate Judge Zia M. Faruqui: Return on Arrest Warrant/Initial Appearance as to PETER K. NAVARRO (1) held on 6/3/2022. Defendant present in the courtroom. The Court advised the Government of its due process |

**-0004-**

USCA Case #24-3006      Document #2064276           Filed: 07/13/2024       Page 14 of 481

| | | |
|---|---|---|
| | | obligation under Rule 5 (f). The Court appointed counsel to assist temporarily, as defendant wishes to proceed Pro Se. Oral Motion for Speedy Trial by PETER K. NAVARRO (1); heard and granted. Government objects to speedy trial. Speedy Trial excluded from 6/03/2022 to 06/17/2022 for reasons set forth on the record. Arraignment/Status hearing set for 6/17/2022 at 10:00 AM by Telephonic/VTC before Judge Amit P. Mehta. Bond Status of Defendant: Defendant Released on Personal Recognizance; Court Reporter: FTR - GOLD/Jan Dickman; FTR Time Frame: Ctrm 4 [2:53:51 - 4:06:06]; Defense Attorney: Ubong Akpan; US Attorney: Amanda Vaughn and Elizabeth Aloi; Pretrial Officer: Christine Schuck. (zcll) (Entered: 06/06/2022) |
| 06/03/2022 | | MINUTE ORDER: As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland and its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges and contempt proceedings. Signed by Magistrate Judge Zia M. Faruqui on 06/03/2022. (zcll) (Entered: 06/06/2022) |
| 06/03/2022 | 9 | ORDER Setting Conditions of Release as to PETER K. NAVARRO (1) Personal Recognizance. Signed by Magistrate Judge Zia M. Faruqui on 06/03/2022. (Attachments: # 1 Appearance Bond) (zcll) (Entered: 06/06/2022) |
| 06/06/2022 | 10 | TRANSCRIPT OF PROCEEDINGS in case as to PETER K. NAVARRO before Magistrate Judge Zia M. Faruqui held on 6/3/2022. Page Numbers: 1-56. Date of Issuance: June 6, 2022. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 6/27/2022. Redacted Transcript Deadline set for 7/7/2022. Release of Transcript Restriction set for 9/4/2022.(Dickman, Janice) Modified to add hearing date on 6/6/2022 (znmw). (Entered: 06/06/2022) |
| 06/07/2022 | | NOTICE OF HEARING as to PETER K. NAVARRO: The Arraignment and Status Conference set for 6/17/2022 at 10:00 AM before Judge Amit P. Mehta will proceed in-person in Courtroom 10. The public access line will be connected for this hearing and may be accessed by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. (zjd) (Entered: 06/07/2022) |
| 06/08/2022 | 11 | MOTION for Protective Order *and to Disclose Grand Jury Testimony* by USA as to PETER K. NAVARRO. (Attachments: # 1 Text of Proposed Order)(Vaughn, Amanda) (Entered: 06/08/2022) |
| 06/08/2022 | 12 | LETTER to Court Re: Request for 45-day extension of arraignment and status conference by PETER K. NAVARRO. "Leave to file GRANTED" by Judge Amit P. Mehta on 6/8/2022. (zjd) Modified "leave to file" docket text and to include letter subject on 6/8/2022 (zjd). (Entered: 06/08/2022) |

USCA Case #24-3006      Document #2064276          Filed: 07/12/2024      Page 15 of 481

| 06/08/2022 | 16 | MOTION to Disclose Grand Jury Testimony by USA as to PETER K. NAVARRO. (See docket entry 11 to view document.)(zltp) (Entered: 06/10/2022) |
| 06/09/2022 | 13 | RESPONSE by USA as to PETER K. NAVARRO re 12 Letter, (Attachments: # 1 Exhibit 1)(Vaughn, Amanda) (Entered: 06/09/2022) |
| 06/09/2022 | 15 | LETTER to Court by PETER K. NAVARRO. "Leave to file GRANTED" by Judge Amit P. Mehta on 6/9/2022. (zjd) (Entered: 06/09/2022) |
| 06/09/2022 | | MINUTE ORDER as to PETER K. NAVARRO. In the last two days, Defendant has twice communicated with the court by emailing the courtroom deputy, without copying government counsel. This is not proper. Defendant is not permitted to have ex parte communications with the court -- that is, communications outside the presence of government counsel -- absent the court's consent. If Defendant wishes to communicate with the court, he shall do so through a written filing submitted through the clerk's office. Alternatively, he can seek permission to obtain filing privileges for the court's online filing system. Securing such privileges will require Defendant to follow Local Criminal Rule 49(b)(2). The District Court's Local Rules are available on its website. The court assumes that Defendant was unaware of the prohibition on ex parte communications and trusts that they will cease going forward. Signed by Judge Amit P. Mehta on 6/9/2022. (lcapm2) (Entered: 06/09/2022) |
| 06/10/2022 | | MINUTE ORDER as to PETER K. NAVARRO. The court is in receipt of a document titled "Motion for Documents Pertaining to Arrest." The document was emailed to government counsel and copied to the courtroom deputy. The court cannot discern whether Defendant intends this to be an actual motion or a Rule 16(a)(1) discovery demand directed to the government. Out of an abundance of caution, the court treats the filing as a motion and will docket it accordingly. Signed by Judge Amit P. Mehta on 6/10/2022. (zjd) (Entered: 06/10/2022) |
| 06/10/2022 | 17 | MOTION for Documents Pertaining to Arrest by PETER K. NAVARRO. (zjd) (Entered: 06/10/2022) |
| 06/13/2022 | 18 | RESPONSE by USA as to PETER K. NAVARRO re 17 MOTION for Discovery (Vaughn, Amanda) (Entered: 06/13/2022) |
| 06/13/2022 | 19 | ORDER denying the requests contained within Defendant's 12 letter dated June 8, 2022, and granting the government's 11 Motion for Protective Order and to Disclose Grand Jury Testimony as to PETER K. NAVARRO. See attached Order for additional details. Signed by Judge Amit P. Mehta on 6/13/2022. (lcapm2) (Main Document 19 replaced on 6/13/2022) (zjd, ). (Entered: 06/13/2022) |
| 06/13/2022 | 20 | ORDER entering Protective Order Governing Discovery and Authorizing Disclosure of Grand Jury Testimony, ECF No. 11-1, as to PETER K. NAVARRO. See attached Order for additional details. Signed by Judge Amit P. Mehta on 6/13/2022. (lcapm2) (Entered: 06/13/2022) |
| 06/13/2022 | | MINUTE ORDER denying 17 Motion for Documents Pertaining to Arrest as to PETER K. NAVARRO. In light of the court's entry of a protective order, ECF No. 20, and the government's commitment to produce the requested discovery, if available, Defendant's motion is denied as moot. Signed by Judge Amit P. Mehta on 6/13/2022. (lcapm2) (Entered: 06/13/2022) |
| 06/13/2022 | 21 | LETTER by PETER K. NAVARRO. "Leave to file GRANTED" by Judge Amit P. Mehta on 6/13/2022. (zjd) (Entered: 06/13/2022) |
| 06/16/2022 | | NOTICE OF HEARING as to PETER K. NAVARRO: The arraignment set for 6/17/2022 at 10:00 AM before Judge Amit P. Mehta will now proceed in Courtroom 24. (smc) |

**-0006-**

USCA Case #24-3006  Document #2064276  Filed: 07/12/2024  Page 16 of 481

| | | |
|---|---|---|
| 06/16/2022 | 23 | NOTICE OF ATTORNEY APPEARANCE: John P. Rowley, III appearing for PETER K. NAVARRO (Rowley, John) (Entered: 06/16/2022) |
| 06/16/2022 | 24 | NOTICE OF ATTORNEY APPEARANCE: John S. Irving, IV appearing for PETER K. NAVARRO (Irving, John) (Entered: 06/16/2022) |
| 06/17/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Arraignment as to PETER K. NAVARRO held on 6/17/2022. Plea of Not Guilty entered as to Counts 1 and 2. Rule 12 Motions due by 8/17/2022. Oppositions due by 8/31/2022. Replies due by 9/9/2022. Hearing on Rule 12 Motions set for 9/23/2022 at 2:00 PM in Courtroom 10 before Judge Amit P. Mehta. Jury Trial set for 11/17/2022 at 9:00 AM before Judge Amit P. Mehta. Status Conference set for 7/15/2022 at 10:00 AM in Courtroom 10 before Judge Amit P. Mehta. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Irving and John Rowley; US Attorneys: Amanda Vaughn and Elizabeth Aloi. (zjd) (Entered: 06/17/2022) |
| 06/17/2022 | 25 | PRETRIAL ORDER as to PETER K. NAVARRO. Trial is set to commence in this matter on November 16, 2022, at 9:30 a.m. The following deadlines shall govern this matter: (1) Defendant shall file motions pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A) (D) on or before August 17, 2022; oppositions shall be filed on or before August 31, 2022; and replies shall be filed on or before September 9, 2022. Counsel shall appear on September 23, 2022, at 2:00 p.m., in Courtroom 10 for a hearing on Rule 12 pretrial motions. (2) The United States shall make any required expert disclosures pursuant to Rule 16(a)(1)(G) by September 14, 2022; any reciprocal expert disclosure by Defendant shall be made by September 28, 2022. (3) The United States shall identify the evidence it will seek to introduce under Federal Rule of Evidence 404(b) on or before September 21, 2022. (4) Except as otherwise noted in this Pretrial Order, motions in limine shall be filed on or before September 28, 2022; oppositions shall be filed on or before October 12, 2022; and replies shall be filed on or before October 19, 2022. If the United States wishes to file a motion in limine with respect to any defense expert, it may do so by filing a motion by October 12, 2022; any opposition to such motion shall be filed by October 19, 2022. (5) Defendant shall satisfy his reciprocal discovery obligations, if any, under Rule 16(b) (except as to experts, as noted above) by September 14, 2022. The court will consider any motion in limine with respect to reciprocal discovery after such discovery is received. Any such motion shall be filed by September 28, 2022; any opposition to such motion shall be filed by October 12, 2022. (6) The United States should endeavor to make grand jury and Jencks Act disclosures as to each witness it expects to call in its case-in-chief on or before November 4, 2022. Any Brady material not already disclosed also must be disclosed by this date. (7) On or before November 2, 2022, counsel shall file a Joint Pretrial Statement. (8) Counsel shall appear on November 9, 2022, at 2:00 p.m., in Courtroom 10 for a Pretrial Conference. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 6/17/2022. (lcapm2) (Entered: 06/17/2022) |
| 07/14/2022 | 27 | MOTION to Modify *Protective Order* by PETER K. NAVARRO. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Irving, John) (Entered: 07/14/2022) |
| 07/15/2022 | | NOTICE OF HEARING as to PETER K. NAVARRO: The public access line will be connected for the status hearing scheduled for 7/15/2022 may be accessed by dialing: (877) 848-7030, access code 321-8747. (zjd) (Entered: 07/15/2022) |
| 07/15/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference as to PETER K. NAVARRO held on 7/15/2022. Defendant's 27 Motion to Modify Protective Order is denied as moot, for the reasons stated on the record. Status Conference set for 8/11/2022 at 9:00 AM in Courtroom 10 before Judge Amit P. Mehta. The public access line will be connected for this status hearing and may be accessed by dialing: (877) 848- |

| | | |
|---|---|---|
| | | 7030, access code 321-8747. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Irving and John Rowley; US Attorney: Elizabeth Aloi. (zjd) (Entered: 07/15/2022) |
| 08/04/2022 | [31](#) | MOTION to Compel *(Redacted)* by PETER K. NAVARRO. (Attachments: # [1](#) Text of Proposed Order, # [2](#) Exhibit 4, # [3](#) Exhibit 5, # [4](#) Exhibit 6, # [5](#) Exhibit 7, # [6](#) Exhibit 8, # [7](#) Exhibit 9)(Irving, John) (Entered: 08/04/2022) |
| 08/11/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference as to PETER K. NAVARRO held on 8/11/2022. Government's Opposition to [31](#) Motion to Compel Discovery due by 8/15/2022. Defendant's Reply due by 8/23/2022. Hearing on [31](#) Motion to Compel Discovery set for 8/26/2022 at 2:30 PM in Courtroom 10 before Judge Amit P. Mehta. The public access line will be connected for this hearing and may be accessed by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Irving and John Rowley; US Attorneys: Elizabeth Aloi and Molly Gaston. (zjd) (Entered: 08/11/2022) |
| 08/12/2022 | [32](#) | TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on July 15, 2022; Page Numbers: 1-24. Date of Issuance: August 12, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the [Transcript Order Form](#)<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/2/2022. Redacted Transcript Deadline set for 9/12/2022. Release of Transcript Restriction set for 11/10/2022.(wz) (Entered: 08/12/2022) |
| 08/15/2022 | [33](#) | Memorandum in Opposition by USA as to PETER K. NAVARRO re [31](#) Motion to Compel *(Redacted)* (Attachments: # [1](#) Exhibit Discover Index (Sealed))(Aloi, Elizabeth) (Entered: 08/15/2022) |
| 08/17/2022 | [34](#) | MOTION to Dismiss Case *(redacted)* by PETER K. NAVARRO. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2, # [3](#) Text of Proposed Order)(Irving, John) (Entered: 08/17/2022) |
| 08/17/2022 | [36](#) | NOTICE *of Public Authority Defense per Fed. R. Cr. P. 12.3* by PETER K. NAVARRO (Irving, John) (Entered: 08/17/2022) |
| 08/23/2022 | [37](#) | REPLY TO OPPOSITION to Motion by PETER K. NAVARRO re [31](#) MOTION to Compel *(Redacted)* (Irving, John) (Entered: 08/23/2022) |
| 08/24/2022 | [39](#) | TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on August 11, 2022; Page Numbers: 1-23. Date of Issuance: August 24, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the [Transcript Order Form](#) |

**-0008-**

USCA Case #24-3006    Document #2064276    Filed: 07/12/2024    Page 18 of 481

| | | |
|---|---|---|
| | | For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public termina l or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/14/2022. Redacted Transcript Deadline set for 9/24/2022. Release of Transcript Restriction set for 11/22/2022.(wz) (Entered: 08/24/2022) |
| 08/25/2022 | | NOTICE OF HEARING as to PETER K. NAVARRO: The Hearing on 31 Motion to Compel Discovery set for August 26, 2022 is hereby vacated and continued to August 31, 2022 at 2:00 PM in Courtroom 10. The public access line will be connected for this hearing and may be accessed by dialing the court's toll-free public access line: (877) 848-7030, access code 321-8747.(zjd) (Entered: 08/25/2022) |
| 08/31/2022 | 44 | Memorandum in Opposition by USA as to PETER K. NAVARRO re 34 Motion to Dismiss Case (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit)(Aloi, Elizabeth) (Entered: 08/31/2022) |
| 08/31/2022 | 45 | NOTICE OF ATTORNEY APPEARANCE: Stanley McKennett Brand appearing for PETER K. NAVARRO (Brand, Stanley) (Entered: 08/31/2022) |
| 08/31/2022 | 46 | NOTICE OF ATTORNEY APPEARANCE: Stanley Edmund Woodward, Jr appearing for PETER K. NAVARRO (Woodward, Stanley) (Entered: 08/31/2022) |
| 08/31/2022 | 47 | REPLY by USA as to PETER K. NAVARRO re 36 Notice (Other) *(Rule 12.3)* (Aloi, Elizabeth) (Entered: 08/31/2022) |
| 08/31/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Hearing re 31 Motion to Compel as to PETER K. NAVARRO held on 8/31/2022. Arguments heard and taken under advisement. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Irving, John Rowley, Stanley Brand, and Stanley Woodward; US Attorneys: Elizabeth Aloi, Amanda Vaughn, and Molly Gaston. (zjd) (Entered: 08/31/2022) |
| 09/02/2022 | 48 | RESPONSE by PETER K. NAVARRO re: 49 *House General Counsel's Motion for Leave to File Amicus Curiae Brief* (Attachments: # 1 Exhibit A)(Woodward, Stanley) Modified text and included linkage on 9/9/2022 (zltp). (Entered: 09/02/2022) |
| 09/06/2022 | 49 | MOTION for Leave to File by UNITED STATES HOUSE OF REPRESENTATIVES as to PETER K. NAVARRO. "Let This be Filed" by Judge Amit P. Mehta on 9/6/2022. (Attachments: # 1 Text of Proposed Order, # 2 Brief as Amicus Curiae In Support of the Department of Justice)(zltp) (Entered: 09/07/2022) |
| 09/09/2022 | 50 | TRANSCRIPT OF MOTION HEARING PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on August 31, 2022; Page Numbers: 1-73. Date of Issuance: September 9, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, |

**-0009-**

USCA Case #24-3006      Document #2064276      Filed: 07/12/2024      Page 19 of 481

| | | |
|---|---|---|
| | | the transcript may be accessed via PACER. Other transcript formats, (multi-page, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/30/2022. Redacted Transcript Deadline set for 10/10/2022. Release of Transcript Restriction set for 12/8/2022.(wz) (Entered: 09/09/2022) |
| 09/09/2022 | 51 | NOTICE OF ATTORNEY APPEARANCE: Douglas N. Letter appearing for *amicus curiae* the UNITED STATES HOUSE OF REPRESENTATIVES. (Letter, Douglas) Modified on 9/12/2022 (zjd). (Entered: 09/09/2022) |
| 09/09/2022 | 52 | REPLY TO OPPOSITION to Motion by PETER K. NAVARRO re 34 MOTION to Dismiss Case *(redacted)* (Irving, John) (Entered: 09/09/2022) |
| 09/09/2022 | 53 | SUPPLEMENT by PETER K. NAVARRO re 31 MOTION to Compel *(Redacted)* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Irving, John) (Entered: 09/09/2022) |
| 09/12/2022 | 54 | RESPONSE by USA as to PETER K. NAVARRO re 53 Supplement to any document *(MTC)* (Aloi, Elizabeth) (Entered: 09/12/2022) |
| 09/12/2022 | 55 | MEMORANDUM OPINION AND ORDER denying Defendant's 31 Motion to Compel Discovery. Please see attached Memorandum Opinion and Order for details. Signed by Judge Amit P. Mehta on 9/12/2022. (lcapm1) (Entered: 09/12/2022) |
| 09/13/2022 | | MINUTE ORDER granting United States House of Representative's 49 Motion for Leave to File Amicus Curiae Brief. The court accepts the House's amicus brief pursuant to Local Civil Rule 7(o). The amicus brief will be helpful to the court insofar as Defendant has moved to dismiss the indictment based on alleged flaws in both the composition of the Select Committee, Def.'s Mot. to Dismiss Indictment, ECF No. 35-2, at 17-27, and the subpoena issued to him by the Committee, id. at 30-31. Importantly, Defendant's arguments cite to and criticize positions taken by the House in an amicus brief accepted in United States v. Bannon (21-cr-670). See id. 22, 25. The court would benefit from the House's response to these arguments. Signed by Judge Amit P. Mehta on 9/13/2022. (lcapm2) (Entered: 09/13/2022) |
| 09/16/2022 | | NOTICE OF HEARING as to PETER K. NAVARRO: The hearing on Rule 12 Motions set for September 23, 2022 is hereby vacated and will be rescheduled for a date and time to be determined. (zjd) (Entered: 09/16/2022) |
| 09/26/2022 | 57 | NOTICE OF SUBSTITUTION OF COUNSEL as to USA. Attorney Hulser, Raymond N. added. Substituting for attorney Molly Gaston (Hulser, Raymond) (Entered: 09/26/2022) |
| 09/28/2022 | 58 | MOTION in Limine by USA as to PETER K. NAVARRO. (Hulser, Raymond) (Entered: 09/28/2022) |
| 10/12/2022 | 59 | Memorandum in Opposition by PETER K. NAVARRO re 58 Motion in Limine (Irving, John) (Entered: 10/12/2022) |
| 10/17/2022 | 60 | REPLY TO OPPOSITION to Motion by USA as to PETER K. NAVARRO re 58 MOTION in Limine (Hulser, Raymond) (Entered: 10/17/2022) |
| 10/31/2022 | | NOTICE OF HEARING as to PETER K. NAVARRO: Motion Hearing set for 11/4/2022 at 2:00 PM in Courtroom 23 before Judge Amit P. Mehta. (zjd) (Entered: 10/31/2022) |

| | | |
|---|---|---|
| 11/02/2022 | 61 | PRETRIAL MEMORANDUM *(Joint Pretrial Statement)* by USA as to PETER K. NAVARRO (Attachments: # 1 Exhibit Exhibit A: Joint Proposed Voir Dire, # 2 Exhibit Exhibit B: Joint Proposed Jury Instructions, # 3 Exhibit Exhibit C: Government's Witness List, # 4 Exhibit Exhibit D: Defendant's Witness List, # 5 Exhibit Exhibit E: Government's Exhibit List, # 6 Exhibit Exhibit F: Defendant's Exhibit List, # 7 Exhibit Exhibit G: Alternative Verdict Forms)(Aloi, Elizabeth) (Entered: 11/02/2022) |
| 11/03/2022 | | NOTICE OF HEARING as to PETER K. NAVARRO: The Oral Argument set for November 4, 2022 shall now proceed at 2:30 PM (same date, new time) in Courtroom 23 before Judge Amit P. Mehta. (zjd) (Entered: 11/03/2022) |
| 11/04/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Oral Argument held on 11/4/2022 as to PETER K. NAVARRO. Arguments heard and taken into consideration. Pretrial Conference reset to 11/10/2022 at 5:30 PM in Courtroom 23 before Judge Amit P. Mehta. The hearing originally set for 11/9/2022 is hereby vacated.Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Irving, John Rowley, Stanley Brand, and Stanley Woodward; US Attorneys: Elizabeth Aloi and Raymond Hulser. (zjd) (Entered: 11/08/2022) |
| 11/09/2022 | | NOTICE OF HEARING as to PETER K. NAVARRO: Status Conference set for November 10, 2022 at 4:00 PM in Courtroom 23 before Judge Amit P. Mehta. The Pretrial Conference set for November 10, 2022 is hereby vacated. (zjd) (Entered: 11/09/2022) |
| 11/10/2022 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference as to PETER K. NAVARRO held on 11/10/2022. With the defendant's consent, the Court finds in the interests of justice that the time from 11/11/2022 through and including 1/11/2023 shall be excluded in computing the date for speedy trial in this case. Pretrial Conference set for 1/4/2023 at 5:15 PM in Courtroom 10 before Judge Amit P. Mehta. Jury Selection set for 1/11/2023 at 9:30 AM in Courtroom 10 before Judge Amit P. Mehta. Bond Status of Defendant: remains on personal recognizance; Court Reporter: Nancy Meyer; Defense Attorneys: John Irving, Stanley Brand, and Stanley Woodward; US Attorneys: Raymond Hulser, and Elizabeth Aloi. (zjd) (Entered: 11/13/2022) |
| 12/14/2022 | | MINUTE ORDER entering REVISED PRETRIAL ORDER: Trial is set to commence in this matter on January 30, 2023 at 9:30 a.m. in Courtroom 10. Counsel shall appear on January 20, 2023 at 3:00 p.m. in Courtroom 10 for a final Pretrial Conference. Signed by Judge Amit P. Mehta on 12/14/2022. (lcapm2) (Entered: 12/14/2022) |
| 12/14/2022 | 64 | TRANSCRIPT OF MOTION HEARING PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on November 4, 2022; Page Numbers: 1-89. Date of Issuance: December 14, 2022. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public termina l or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

**-0011-**

USCA Case #24-3006      Document #2064376      Filed: 07/12/2024      Page 21 of 481

| | | Redaction Request due 1/4/2023. Redacted Transcript Deadline set for 1/14/2023. Release of Transcript Restriction set for 3/14/2023.(wz) (Entered: 12/14/2022) |
|---|---|---|
| 01/10/2023 | [67](#) | NOTICE OF ATTORNEY APPEARANCE John Crabb, Jr appearing for USA. (Crabb, John) (Entered: 01/10/2023) |
| 01/11/2023 | | MINUTE ORDER. Counsel shall appear on January 26, 2023, at 1 p.m. in Courtroom 10 for the pretrial conference. The pretrial conference scheduled for January 20, 2023, is hereby vacated. Signed by Judge Amit P. Mehta on 1/11/2023. (lcapm2) (Entered: 01/11/2023) |
| 01/19/2023 | [68](#) | MEMORANDUM OPINION AND ORDER denying Defendant's [34](#) Motion to Dismiss and granting in part the United States' [58](#) Motion in Limine. Please see attached Memorandum Opinion and Order for additional details. Signed by Judge Amit P. Mehta on 1/19/2022. (lcamp2) (Entered: 01/19/2023) |
| 01/21/2023 | [69](#) | NOTICE by PETER K. NAVARRO (Attachments: # [1](#) Exhibit A - Exhibit List, # [2](#) Exhibit B - Redline)(Irving, John) (Entered: 01/21/2023) |
| 01/23/2023 | [70](#) | MOTION in Limine *to Exclude Inadmissible Defense Exhibits* by USA as to PETER K. NAVARRO. (Attachments: # [1](#) Exhibit, # [2](#) Text of Proposed Order)(Aloi, Elizabeth) (Entered: 01/23/2023) |
| 01/24/2023 | | NOTICE OF HEARING as to PETER K. NAVARRO: The parties shall appear on January 27, 2023 at 9:00 AM in Courtroom 10 for the pretrial conference. The pretrial conference scheduled for January 26, 2023 is hereby vacated. (zjd) (Entered: 01/24/2023) |
| 01/24/2023 | [71](#) | MOTION for Reconsideration re [68](#) Order on Motion to Dismiss Case,, Order on Motion in Limine, , MOTION for Hearing *Evidentiary*, MOTION to Compel by PETER K. NAVARRO. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Text of Proposed Order) (Woodward, Stanley) (Entered: 01/24/2023) |
| 01/25/2023 | [74](#) | Memorandum in Opposition by USA as to PETER K. NAVARRO re [71](#) Motion for Reconsideration,, Motion for Hearing,, Motion to Compel, (Aloi, Elizabeth) (Entered: 01/25/2023) |
| 01/27/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Pretrial Conference as to PETER K. NAVARRO held on 1/27/2023. The Jury Trial scheduled for January 30, 2023 is hereby vacated. Government's Brief due by February 28, 2023. Defendant's Response due by 3/21/2023. Government's Reply due by March 31, 2023. In the interests of justice, and for the reasons stated on the record, the time from 1/28/2023 through and including 2/28/2023 shall be excluded in computing the date for speedy trial in this case. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: Stanley Woodward, John Irving, John Rowley, and Stanley Brand; US Attorneys: John Crabb and Elizabeth Aloi. (zjd) (Entered: 01/27/2023) |
| 01/30/2023 | [76](#) | TRANSCRIPT OF PRETRIAL CONFERENCE PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on January 27, 2023; Page Numbers: 1-92. Date of Issuance: January 30, 2023. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the [Transcript Order Form](#) <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public ter minal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter. |

**-0012-**

USCA Case #24-3006    Document #2064376    Filed: 07/12/2024    Page 22 of 481

**NOTICE REGARDING REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 2/20/2023. Redacted Transcript Deadline set for 3/2/2023. Release of Transcript Restriction set for 4/30/2023.(wz) (Entered: 01/30/2023)

| | | |
|---|---|---|
| 02/02/2023 | | MINUTE ORDER. For the reasons stated on the record on January 27, 2023, Defendant's [71](#) Motion for Reconsideration is denied. Signed by Judge Amit P. Mehta on 2/2/2023. (lcapm2) (Entered: 02/02/2023) |
| 02/25/2023 | [77](#) | Unopposed MOTION to Continue *Briefing Deadline* by USA as to PETER K. NAVARRO. (Attachments: # [1](#) Text of Proposed Order)(Aloi, Elizabeth) (Entered: 02/25/2023) |
| 02/27/2023 | [78](#) | ORDER granting United States' [77](#) Unopposed Motion to Continue Briefing Deadline. The United States' brief is now due on or before March 14, 2023. Defendant's opposition brief is due on or before April 4, 2023. The United States' reply brief is due on or before April 14, 2023. Please see attached Order for additional details. Signed by Judge Amit P. Mehta on 2/26/2023. (lcapm2) (Entered: 02/27/2023) |
| 03/14/2023 | [79](#) | RESPONSE TO ORDER OF THE COURT by USA as to PETER K. NAVARRO re Pretrial Conference,,,, Speedy Trial - Excludable Start,,,, Set Deadlines,,, (Attachments: # [1](#) Exhibit, # [2](#) Exhibit, # [3](#) Exhibit, # [4](#) Exhibit)(Aloi, Elizabeth) (Entered: 03/14/2023) |
| 03/30/2023 | [80](#) | Consent MOTION for Extension of Time to File Response/Reply by PETER K. NAVARRO. (Attachments: # [1](#) Text of Proposed Order)(Rowley, John) (Entered: 03/30/2023) |
| 03/31/2023 | | MINUTE ORDER granting Defendant's [80](#) Unopposed Motion to Extend Briefing Response Date. Defendant's Response to the Government's [79](#) Brief shall now be due on or before April 18, 2023. Signed by Judge Amit P. Mehta on 3/31/2023. (lcapm2) (Entered: 03/31/2023) |
| 04/03/2023 | | MINUTE ORDER. The Government's reply brief shall now be due on or before April 28, 2023. Signed by Judge Amit P. Mehta on 4/3/2023. (lcapm2) (Entered: 04/03/2023) |
| 04/18/2023 | [81](#) | RESPONSE by PETER K. NAVARRO re [79](#) Response to Order of the Court (Woodward, Stanley) (Entered: 04/18/2023) |
| 04/28/2023 | [82](#) | REPLY by USA as to PETER K. NAVARRO (Aloi, Elizabeth) (Entered: 04/28/2023) |
| 05/11/2023 | | MINUTE ORDER as to PETER K. NAVARRO. The parties shall appear for a status conference on May 30, 2023, at 11 a.m. in Courtroom 10 before Judge Amit P. Mehta. Signed by Judge Amit P. Mehta on 05/11/2023. (lcapm2) (Entered: 05/11/2023) |
| 05/11/2023 | | Set/Reset Hearings as to PETER K. NAVARRO: Status Conference set for 5/30/2023 at 11:00 AM in Courtroom 10 before Judge Amit P. Mehta. (zjd) (Entered: 05/11/2023) |
| 05/25/2023 | [84](#) | MOTION for Order To Set Trial Date by USA as to PETER K. NAVARRO. (Aloi, Elizabeth) (Entered: 05/25/2023) |
| 05/30/2023 | | MINUTE ORDER entering REVISED PRETRIAL ORDER: Trial is set to commence in this matter on September 5, 2023, at 9:30 a.m. in Courtroom 10. Counsel shall appear on August 30, 2023, at 9:30 a.m. for a final pre-trial conference. Defendant's motion to dismiss shall be due on or before May 31, 2023. The Government's opposition shall be |

**-0013-**

USCA Case #24-3006    Document #2064376    Filed: 07/12/2024    Page 23 of 481

| | | |
|---|---|---|
| | | due on or before June 6, 2023. Defendant's Reply shall be due on or before June 13, 2023. The parties shall appear for a motions hearing on June 21, 2023, at 10:00 a.m. in Courtroom 10 before Judge Amit P. Mehta. As the ends of justice outweigh the best interests of the defendant and the public in a speedy trial, and for the reasons stated on the record, the time from May 30, 2023, through and including September 5, 2023, shall be excluded in computing the date for speedy trial in this case. Signed by Judge Amit P. Mehta on 5/30/2023. (lcapm2) (Entered: 05/30/2023) |
| 05/30/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference as to PETER K. NAVARRO held on 5/30/2023. In the interests of justice, and for the reasons stated on the record, the time from 5/30/2023 through and including 9/5/2023 shall be excluded in computing the date for speedy trial in this case. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Irving, John Rowley, Stanley Brand, and Stanley Woodward; US Attorneys: Elizabeth Aloi and John Crabb. (zjd) (Entered: 05/30/2023) |
| 06/01/2023 | 85 | MOTION to Dismiss Case by PETER K. NAVARRO. (Attachments: # 1 Text of Proposed Order)(Woodward, Stanley) (Entered: 06/01/2023) |
| 06/06/2023 | 86 | Memorandum in Opposition by USA as to PETER K. NAVARRO re 85 Motion to Dismiss Case (Crabb, John) (Entered: 06/06/2023) |
| 06/14/2023 | 87 | REPLY in Support by PETER K. NAVARRO re 85 MOTION to Dismiss Case (Woodward, Stanley) (Entered: 06/14/2023) |
| 06/16/2023 | 88 | TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on May 30, 2023; Page Numbers: 1-20. Date of Issuance: June 16, 2023. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/7/2023. Redacted Transcript Deadline set for 7/17/2023. Release of Transcript Restriction set for 9/14/2023.(wz) (Entered: 06/16/2023) |
| 06/20/2023 | | NOTICE OF HEARING as to PETER K. NAVARRO: Motion Hearing set for 6/21/2023 at 10:00 AM in Courtroom 10 before Judge Amit P. Mehta. (zjd) (Entered: 06/20/2023) |
| 06/21/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Motion Hearing as to PETER K. NAVARRO held on 6/21/2023. Arguments heard and taken under advisement. Defendant's 85 Motion to Dismiss was denied for the reasons stated on the record. Defendant's Notice due by 7/5/2023. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Irving, IV, John Rowley, III, Stanley Brand, and Stanley Woodward; US Attorneys: Elizabeth Aloi and John Crabb, Jr. (zjd) (Entered: 06/21/2023) |

USCA Case #24-3006     Document #2064276     Filed: 07/12/2024     Page 24 of 481

| | | |
|---|---|---|
| 06/26/2023 | 90 | TRANSCRIPT OF MOTION HEARING PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on June 21, 2023; Page Numbers: 1-113. Date of Issuance: June 26, 2023. Court Reporter/Transcriber: William P. Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/17/2023. Redacted Transcript Deadline set for 7/27/2023. Release of Transcript Restriction set for 9/24/2023.(wz) (Entered: 06/26/2023) |
| 06/28/2023 | 91 | SUPPLEMENT by USA as to PETER K. NAVARRO re 79 Response to Order of the Court *concerning Due Process* (Aloi, Elizabeth) (Entered: 06/28/2023) |
| 07/05/2023 | 92 | NOTICE *Suppl. Public Authority & Entrapment by Estoppel Defenses* by PETER K. NAVARRO (Rowley, John) (Entered: 07/05/2023) |
| 07/10/2023 | 93 | REPLY by USA as to PETER K. NAVARRO re: 92 NOTICE Suppl. Public Authority & Entrapment by Estoppel Defenses (Crabb, John) Modified text to include link on 7/11/2023 (zltp). (Entered: 07/10/2023) |
| 07/10/2023 | 94 | SUPPLEMENT by USA as to PETER K. NAVARRO re 58 MOTION in Limine (Crabb, John) Modified text to include link on 7/11/2023 (zltp). (Entered: 07/10/2023) |
| 07/12/2023 | 95 | RESPONSE by PETER K. NAVARRO re 91 Supplement to any document (Woodward, Stanley) (Entered: 07/12/2023) |
| 07/28/2023 | 96 | MEMORANDUM OPINION AND ORDER re: 71 Motion for Evidentiary Hearing and Motion to Compel. Please see attached Memorandum Opinion and Order for additional details. Signed by Judge Amit P. Mehta on 7/28/2023. (lcapm2) (Entered: 07/28/2023) |
| 07/28/2023 | 97 | MEMORANDUM OPINION AND ORDER re: 92 Defendant's Supplemental Notice Pursuant to Fed. R. Crim. P. 12.3 of Defenses of Public Authority and Entrapment by Estoppel. Please see attached Memorandum Opinion and Order for additional details. Signed by Judge Amit P. Mehta on 7/28/2023. (lcapm2) (Entered: 07/28/2023) |
| 07/28/2023 | 99 | ORDER granting in part and denying in part the United States' 70 Motion in Limine. Please see attached Order for additional details. Signed by Judge Amit P. Mehta on 7/28/2023. (lcapm2) (Entered: 07/28/2023) |
| 08/07/2023 | 101 | MOTION to Continue *Redacted* by PETER K. NAVARRO. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Woodward, Stanley) (Entered: 08/07/2023) |
| 08/08/2023 | | NOTICE OF HEARING as to PETER K. NAVARRO: A scheduling conference is hereby set for August 11, 2023 at 4:30 PM via videoconference before Judge Amit P. Mehta. (zjd) (Entered: 08/08/2023) |

| 08/08/2023 | 103 | Memorandum in Opposition by USA as to PETER K. NAVARRO re 101 Motion to Continue *Redacted* (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Aloi, Elizabeth) (Entered: 08/08/2023) |
|---|---|---|
| 08/10/2023 | 105 | REPLY in Support by PETER K. NAVARRO re 101 MOTION to Continue *Redacted* (Woodward, Stanley) (Entered: 08/10/2023) |
| 08/10/2023 | 106 | NOTICE *of Waiver of Appearance* by PETER K. NAVARRO (Woodward, Stanley) (Entered: 08/10/2023) |
| 08/11/2023 |  | Minute Entry for proceedings held before Judge Amit P. Mehta: Status Conference as to PETER K. NAVARRO held via videoconference on 8/11/2023. Bond Status of Defendant: appearance waived, remains on personal reconzigance; Court Reporter: William Zaremba; Defense Attorneys: John Irving, John Rowley, Stanley Brand, and Stanley Woodward; US Attorneys: Elizabeth Aloi and John Crabb. (zjd) (Entered: 08/11/2023) |
| 08/13/2023 |  | MINUTE ORDER denying 101 Motion For A Continuance of Evidentiary Hearing and Trial. For the reasons stated during the hearing held on August 11, 2023, Defendant's motion is denied. The evidentiary hearing shall be held on August 28, 2023, and trial shall begin on September 5, 2023 as scheduled. Signed by Judge Amit P. Mehta on 08/13/2023. (lcapm1) (Entered: 08/13/2023) |
| 08/15/2023 | 109 | TRANSCRIPT OF STATUS CONFERENCE VIA ZOOM PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on August 11, 2023; Page Numbers: 1-13. Date of Issuance: August 15, 2023. Court Reporter/Transcriber: William P. Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 9/5/2023. Redacted Transcript Deadline set for 9/15/2023. Release of Transcript Restriction set for 11/13/2023.(wz) (Entered: 08/15/2023) |
| 08/23/2023 |  | Set/Reset Hearings as to PETER K. NAVARRO: Evidentiary Hearing set for 8/28/2023 at 9:30 AM in Courtroom 10 before Judge Amit P. Mehta. (zjd) (Entered: 08/23/2023) |
| 08/25/2023 | 110 | MOTION to Exclude *Exhibits* by USA as to PETER K. NAVARRO. (Attachments: # 1 Exhibit Defendant Exhibits, # 2 Exhibit Defendant Exhibit List)(Aloi, Elizabeth) (Entered: 08/25/2023) |
| 08/25/2023 | 111 | MOTION for Reconsideration re 101 MOTION to Continue *Redacted* filed by PETER K. NAVARRO, Order on Motion to Continue, by PETER K. NAVARRO. (Attachments: # 1 Exhibit 1 (Filed Under Seal), # 2 Exhibit 2-A, # 3 Exhibit 2-B, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Text of Proposed Order)(Woodward, Stanley) (Entered: 08/25/2023) |
| 08/26/2023 | 114 | RESPONSE by USA as to PETER K. NAVARRO re 111 MOTION for Reconsideration re 101 MOTION to Continue *Redacted* filed by PETER K. NAVARRO, Order on Motion |

-0016-

| | | to Continue, (Crabb, John) (Entered: 08/26/2023) |
|---|---|---|
| 08/28/2023 | | MINUTE ORDER granting 112 Sealed Motion for Leave to File Document Under Seal. Exhibit 1 to Dr. Navarro's Motion for Reconsideration (ECF No. 111) shall be FILED UNDER SEAL by the Clerk of the Court and said documents shall be remained sealed until further order of the Court. Signed by Judge Amit P. Mehta on 08/28/2023. (lcapm1) (Entered: 08/28/2023) |
| 08/28/2023 | 116 | ORDER granting 113 Sealed Motion for Leave to File Document Under Seal. Dr. Navarro's Motion in Limine and for Disclosure shall be FILED UNDER SEAL by the Clerk of the Court and said documents shall be remained sealed until further order of the Court. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 08/28/2023. (lcapm1) (Entered: 08/28/2023) |
| 08/28/2023 | | Minute Entry for Evidentiary Hearing as to PETER K. NAVARRO held on 8/28/2023 before Judge Amit P. Mehta. denying 111 Motion for Reconsideration re 111 MOTION for Reconsideration re 101 MOTION to Continue *Redacted* filed by PETER K. NAVARRO, Order on Motion to Continue, filed by PETER K. NAVARRO as to PETER K. NAVARRO (1). Bond Status of Defendant: Personal Recognizance; Court Reporter: William Zaremba Defense Attorney: John Irving, John Rowley, Stanley Brand, and Stanley Woodward; US Attorney: Elizabeth Aloi and John Crabb. (zjch, ) (Entered: 08/28/2023) |
| 08/28/2023 | 117 | EXHIBIT LIST by PETER K. NAVARRO (Attachments: # 1 Exhibit, # 2 Exhibit)(zjch, ) (Entered: 08/28/2023) |
| 08/30/2023 | | NOTICE OF HEARING as to PETER K. NAVARRO: The Pretrial Conference set for August 30, 2023 in Courtroom 10 before Judge Amit P. Mehta shall now begin at 10:00 AM. (zjd) (Entered: 08/30/2023) |
| 08/30/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Pretrial Conference as to PETER K. NAVARRO held on 8/30/2023. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Irving, John Rowley, Stanley Brand, and Stanley Woodward; US Attorneys: Elizabeth Aloi and John Crabb. (zjd) (Entered: 08/30/2023) |
| 08/30/2023 | 118 | Proposed Jury Instructions by USA as to PETER K. NAVARRO (Aloi, Elizabeth) (Entered: 08/30/2023) |
| 09/05/2023 | 120 | MOTION in Limine by PETER K. NAVARRO. (Attachments: # 1 Text of Proposed Order)(Woodward, Stanley) (Entered: 09/05/2023) |
| 09/05/2023 | 121 | Memorandum in Opposition by USA as to PETER K. NAVARRO re 120 Motion in Limine (Aloi, Elizabeth) (Entered: 09/05/2023) |
| 09/05/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Jury Selection as to PETER K. NAVARRO held on 9/5/2023. A panel of twelve jurors and two alternates was selected but not sworn. The Court denies Defendant's 120 Motion in Limine for the reasons stated on the record. Jury Trial set for 9/6/2023 at 9:30 AM in Courtroom 10 before Judge Amit P. Mehta. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba (a.m.) and Lisa Moreira (p.m.); Defense Attorneys: John Irving, John Rowley, Stanley Brand, and Stanley Woodward; US Attorneys: Elizabeth Aloi and John Crabb. (zjd) (Entered: 09/05/2023) |
| 09/06/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Jury Trial on All Counts as to PETER K. NAVARRO held on 9/6/2023. A panel of twelve jurors and two alternate jurors was sworn. The Government and Defense rest their cases. Defendant's Rule 29 Motion for Judgment of Acquittal was heard and denied, for the reasons stated on the |

**-0017-**

USCA Case #24-3006     Document #2064276        Filed: 07/12/2024      Page 27 of 481

| | | |
|---|---|---|
| | | record. Jury Trial/Closing Arguments set for 9/7/2023 at 9:30 AM in Courtroom 10 before Judge Amit P. Mehta. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Irving, John Rowley, Stanley Brand, and Stanley Woodward; US Attorneys: Elizabeth Aloi and John Crabb; Government Witnesses: David Buckley, Daniel George, and Marc Harris. (zjd) (Entered: 09/06/2023) |
| 09/06/2023 | | MINUTE ORDER as to PETER K. NAVARRO: The Court having impaneled the jury in this action, it is hereby ORDERED that during trial and deliberations all meals for said jury shall be paid by the Clerk of the Court for the U.S. District Court for the District of Columbia. Approved by Judge Amit P. Mehta on 9/6/2023. (zjd) (Entered: 09/22/2023) |
| 09/07/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Jury Trial and Jury Deliberations on All Counts as to PETER K. NAVARRO held on 9/7/2023. Same panel of twelve (12) jurors and two (2) alternate jurors. The alternate jurors were excused upon the start of jury deliberations. Jury Verdict of Guilty on Counts 1 and 2. REFERRAL TO PROBATION OFFICE for Presentence Investigation as to PETER K. NAVARRO. Sentencing set for 1/12/2024 at 2:30 PM in Courtroom 10 before Judge Amit P. Mehta. Bond Status of Defendant: remains on personal recognizance; Court Reporters: William Zaremba (a.m.) and Lisa Moreira (p.m.); Defense Attorneys: John Irving, John Rowley, Stanley Brand, and Stanley Woodward; US Attorneys: Elizabeth Aloi and John Crabb. (zjd) (Entered: 09/07/2023) |
| 09/07/2023 | 124 | EXHIBIT LIST by USA as to PETER K. NAVARRO. (zjd) (Entered: 09/07/2023) |
| 09/07/2023 | 125 | ATTORNEYS' ACKNOWLEDGMENT OF TRIAL EXHIBITS as to PETER K. NAVARRO. (zjd) (Entered: 09/07/2023) |
| 09/07/2023 | 126 | Jury Note as to PETER K. NAVARRO. (zjd) (Entered: 09/07/2023) |
| 09/07/2023 | 127 | **Signature Page of Foreperson** as to PETER K. NAVARRO in Jury Note. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.) (zjd) (Entered: 09/07/2023) |
| 09/07/2023 | 128 | JURY VERDICT as to PETER K. NAVARRO. (zjd) (Entered: 09/07/2023) |
| 09/07/2023 | 129 | **Signature Page of Foreperson** as to PETER K. NAVARRO in Jury Verdict. (Access to the PDF Document is restricted pursuant to the E-Government Act. Access is limited to Counsel of Record and the Court.) (zjd) (Entered: 09/07/2023) |
| 09/08/2023 | | NOTICE OF HEARING as to PETER K. NAVARRO: A hearing is set for September 13, 2023 at 8:30 AM in Courtroom 10 before Judge Amit P. Mehta. (zjd) (Entered: 09/08/2023) |
| 09/13/2023 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Hearing as to PETER K. NAVARRO held on 9/13/2023. Bond Status of Defendant: remains on personal recognizance; Court Reporter: William Zaremba; Defense Attorneys: John Rowley and Stanley Brand; US Attorneys: Elizabeth Aloi and John Crabb. (zjd) Modified on 9/13/2023 (zjd). (Entered: 09/13/2023) |
| 09/13/2023 | 130 | EXHIBIT LIST by PETER K. NAVARRO. (zjd) (Main Document 130 replaced on 9/13/2023) (zjd) (Entered: 09/13/2023) |
| 09/13/2023 | 131 | DRAFT JURY INSTRUCTIONS. (lcapm1) (Entered: 09/13/2023) |

USCA Case #24-3006     Document #2064276       Filed: 07/12/2024     Page 28 of 481

| | | |
|---|---|---|
| 09/13/2023 | 132 | REVISED DRAFT JURY INSTRUCTIONS. (lcapm1) (Entered: 09/13/2023) |
| 09/13/2023 | 133 | FINAL JURY INSTRUCTIONS. (lcapm1) (Entered: 09/13/2023) |
| 09/18/2023 | 134 | PROTECTIVE ORDER authorizing disclosure of videotape from courthouse security cameras as to PETER K. NAVARRO. Signed by Judge Amit P. Mehta on 9/18/2023. (zjd) (Entered: 09/18/2023) |
| 09/20/2023 | 135 | MOTION for Extension of Time to File *Motion for New Trial* by PETER K. NAVARRO. (Attachments: # 1 Text of Proposed Order Proposed Order)(Rowley, John) (Entered: 09/20/2023) |
| 09/21/2023 | | MINUTE ORDER granting 135 Defendant's Motion to Extend Time for Filing of Motion for New Trial, ECF No. 135. Defendant shall file his motion for new trial by October 6, 2023. The government's opposition shall be due by October 27, 2023. Signed by Judge Amit P. Mehta on 09/21/2023. (lcapm1) (Entered: 09/21/2023) |
| 10/06/2023 | 136 | MOTION to Travel *Redacted* by PETER K. NAVARRO. (Attachments: # 1 Text of Proposed Order)(Woodward, Stanley) (Entered: 10/06/2023) |
| 10/06/2023 | 138 | MOTION pursuant to Rule 33 for new trial by PETER K. NAVARRO. (Attachments: # 1 Text of Proposed Order)(Woodward, Stanley) (Entered: 10/06/2023) |
| 10/10/2023 | | MINUTE ORDER. The government shall respond to Defendant's Motion for Leave to Travel, ECF No. 136, by October 11, 2023. Signed by Judge Amit P. Mehta on 10/10/2023. (lcapm1) (Entered: 10/10/2023) |
| 10/10/2023 | | MINUTE ORDER. Defendant's Motion for New Trial, ECF No. 138, asserts that "[t]he video footage confirms that several protestors held signs that related to the content of the information sought from Dr. Navarro by Congress, including inflammatory statements such as 'Bro, Should've Pled the 5th... Peter 4 Prison,' 'Defend Democracy,' and 'Free J6 Political Prisoners Now.'" Id. at 34. The motion further asserts that "[n]either publicly available footage of the incident, nor the Courthouse CCTV footage clearly capture the protestors there that day, but it is undisputed that they were present when the jury was paraded past the gathered crowd." Id. at 6. Neither statement is sourced to any evidence accompanying the motion. Defendant shall produce by October 11, 2023, the evidence he contends "confirms" and makes "undisputed" that protestors were actually present in the John Marshall Park, and carrying the signs he identifies, when the jurors took their break on the afternoon of September 7, 2023. Signed by Judge Amit P. Mehta on 10/10/2023. (lcapm1) (Entered: 10/10/2023) |
| 10/10/2023 | 140 | RESPONSE by USA as to PETER K. NAVARRO re 136 MOTION to Travel *Redacted* (Aloi, Elizabeth) (Entered: 10/10/2023) |
| 10/12/2023 | 141 | SUPPLEMENT by PETER K. NAVARRO re 138 MOTION pursuant to Rule 33 for new trial (Woodward, Stanley) (Entered: 10/12/2023) |
| 10/12/2023 | 142 | ORDER granting 136 139 Motion for Leave to Travel. Defendant may travel to the international destination indicated in his motion between October 15, 2023, and October 23, 2023. Before his travel, Defendant shall provide his itinerary to Pretrial Services, including the address where he intends to stay and a telephone number where he can be reached. Defendant shall continue to report as instructed by Pretrial Services during his international travel. See the attached Order for additional details. Signed by Judge Amit P. Mehta on 10/12/2023. (lcapm1) (Entered: 10/12/2023) |
| 10/27/2023 | 143 | Memorandum in Opposition by USA as to PETER K. NAVARRO re 138 Motion pursuant to Rule 33 for new trial (Aloi, Elizabeth) (Entered: 10/27/2023) |

**-0019-**

USCA Case #24-3006    Document #2064276    Filed: 07/12/2024    Page 29 of 481

| 11/03/2023 | [144](#) | REPLY in Support by PETER K. NAVARRO re [138](#) MOTION pursuant to Rule 33 for new trial (Woodward, Stanley) (Entered: 11/03/2023) |
|---|---|---|
| 11/08/2023 | | MINUTE ORDER as to PETER K. NAVARRO. Sentencing in this matter shall now proceed on January 25, 2024 at 10:00 AM. The Final Presentence Investigation Report shall be due on or before January 11, 2024. The Parties' Sentencing Memoranda shall be due on or before January 18, 2024. Replies, if any, shall be due on or before January 22, 2024. Reply briefs shall be limited to five pages. The hearing scheduled for January 12, 2024 is hereby vacated. Signed by Judge Amit P. Mehta on 11/8/2023. (zjd) (Entered: 11/08/2023) |
| 01/02/2024 | [147](#) | TRANSCRIPT OF ARRAIGNMENT PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on June 17, 2022; Page Numbers: 1-25. Date of Issuance: January 2, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the [Transcript Order Form](#) <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(Zaremba, William) (Entered: 01/02/2024) |
| 01/02/2024 | [148](#) | TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on August 28, 2023; Page Numbers: 1-150. Date of Issuance: January 2, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the [Transcript Order Form](#) <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(Zaremba, William) (Entered: 01/02/2024) |

USCA Case #24-3006     Document #2064276     Filed: 07/12/2024     Page 30 of 481

| 01/02/2024 | 149 | TRANSCRIPT OF PRETRIAL CONFERENCE PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on August 30, 2023; Page Numbers: 1-58. Date of Issuance: January 2, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(Zaremba, William) (Entered: 01/02/2024) |
| 01/02/2024 | 150 | TRANSCRIPT OF JURY SELECTION PROCEEDINGS - DAY 1 MORNING SESSION in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on September 5, 2023; Page Numbers: 1-178. Date of Issuance: January 2, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(Zaremba, William) (Entered: 01/02/2024) |
| 01/02/2024 | 151 | TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on September 5, 2023; Page Numbers: 179-337. Date of Issuance:January 2, 2024. Court Reporter/Transcriber Lisa A. Moreira, RDR, CRR, Telephone number (202) 354-3187, Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. |

**-0021-**

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(Moreira, Lisa) (Entered: 01/02/2024)

| 01/02/2024 | 152 | TRANSCRIPT OF JURY TRIAL PROCEEDINGS - DAY 2 in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on September 6, 2023; Page Numbers: 338-607. Date of Issuance: January 2, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(Zaremba, William) (Entered: 01/02/2024) |
| 01/02/2024 | 153 | TRANSCRIPT OF JURY TRIAL/CHARGE AND CLOSING ARGUMENTS PROCEEDINGS - DAY 3 in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on September 7, 2023; Page Numbers: 608-677. Date of Issuance: January 2, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(Zaremba, William) (Entered: 01/02/2024) |
| 01/02/2024 | 154 | TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on September 7, 2023; Page Numbers: 678- |

**-0022-**

| | | |
|---|---|---|
| | | 696. Date of Issuance: January 2, 2024. Court Reporter/Transcriber Lisa A. Moreira, RDR, CRR, Telephone number (202) 354-3187, Transcripts may be ordered by submitting the [Transcript Order Form](#)<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 1/23/2024. Redacted Transcript Deadline set for 2/2/2024. Release of Transcript Restriction set for 4/1/2024.(Moreira, Lisa) (Entered: 01/02/2024) |
| 01/16/2024 | [158](#) | MEMORANDUM OPINION AND ORDER denying [138](#) Motion pursuant to Rule 33 for a New Trial as to PETER K. NAVARRO. See the attached Memorandum Opinion and Order for additional details. Signed by Judge Amit P. Mehta on 01/16/2024. (lcapm1) (Entered: 01/16/2024) |
| 01/18/2024 | [159](#) | SENTENCING MEMORANDUM by USA as to PETER K. NAVARRO (Attachments: # [1](#) Exhibit, # [2](#) Exhibit, # [3](#) Exhibit)(Aloi, Elizabeth) (Entered: 01/18/2024) |
| 01/18/2024 | [160](#) | SENTENCING MEMORANDUM by PETER K. NAVARRO (Woodward, Stanley) (Entered: 01/18/2024) |
| 01/22/2024 | [161](#) | MOTION to Amend/Correct , MOTION for Leave to File Excess Pages by USA as to PETER K. NAVARRO. (Attachments: # [1](#) Text of Proposed Order, # [2](#) Exhibit, # [3](#) Exhibit A, # [4](#) Exhibit B, # [5](#) Exhibit C)(Crabb, John) (Entered: 01/22/2024) |
| 01/22/2024 | [162](#) | NOTICE *Reply ISO Sentencing Memorandum* by PETER K. NAVARRO re [160](#) Sentencing Memorandum (Woodward, Stanley) (Entered: 01/22/2024) |
| 01/25/2024 | [164](#) | NOTICE OF APPEAL - Final Judgment by PETER K. NAVARRO Filing fee $ 605, receipt number ADCDC-10644009. Fee Status: Fee Paid. Parties have been notified. (Woodward, Stanley) (Entered: 01/25/2024) |
| 01/25/2024 | | Minute Entry for proceedings held before Judge Amit P. Mehta: Sentencing held on 1/25/2024 as to PETER K. NAVARRO. As to Counts 1 and 2, Defendant sentenced to concurrent terms of four (4) months of imprisonment. Fine imposed as to both counts in the total amount of $9500.Defendant's Response re issue of release pending appeal due in seven days. Bond Status of Defendant: remains on pretrial release; Court Reporter: William Zaremba; Defense Attorneys: Stanley Woodward, Stanley Brand, John Irving, John Rowley; US Attorneys: John Crabb and Elizabeth Aloi; Probation Officer: Sherry Baker. (zjd) (Entered: 01/25/2024) |
| 01/25/2024 | | MINUTE ORDER. Defendant's response to the government's arguments concerning release pending appeal, ECF No. 162, at 8-14, shall be filed on or before February 1, 2024. The memorandum shall be no longer than seven, double-spaced pages. Signed by Judge Amit P. Mehta on 01/25/2024. (lcapm1) (Entered: 01/25/2024) |
| 01/25/2024 | [165](#) | JUDGMENT as to PETER K. NAVARRO. Statement of Reasons Not Included. Signed by Judge Amit P. Mehta on 1/25/2024. (zltp) (Entered: 01/26/2024) |

USCA Case #24-3006      Document #2064276      Filed: 07/12/2024      Page 33 of 481

| 01/25/2024 | 166 | STATEMENT OF REASONS as to PETER K. NAVARRO. re 165 Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. Signed by Judge Amit P. Mehta on 1/25/2024. (zltp) (Entered: 01/26/2024) |
| --- | --- | --- |
| 01/26/2024 | 167 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid as to PETER K. NAVARRO re 164 Notice of Appeal - Final Judgment. (zltp) (Entered: 01/26/2024) |
| 01/31/2024 | | USCA Case Number as to PETER K. NAVARRO 24-3006 for 164 Notice of Appeal - Final Judgment filed by PETER K. NAVARRO. (zltp) (Entered: 02/09/2024) |
| 02/01/2024 | 168 | REPLY by PETER K. NAVARRO re 159 Sentencing Memorandum (Woodward, Stanley) (Entered: 02/01/2024) |
| 02/08/2024 | 169 | MEMORANDUM OPINION AND ORDER as to PETER K. NAVARRO. Defendant's request for release pending appeal is denied. Unless this Order is stayed or vacated by the D.C. Circuit, Defendant shall report to the designated Bureau of Prisons (BOP) facility on the date ordered by the BOP. See attached Memorandum Opinion and Order for additional details. Signed by Amit P. Mehta on 02/08/2024. (lcapm1) (Entered: 02/08/2024) |
| 02/11/2024 | 170 | AMENDED JUDGMENT as to PETER K. NAVARRO. Signed by Judge Amit P. Mehta on 2/11/2024. (zltp) (Entered: 02/13/2024) |
| 02/11/2024 | 171 | REASON FOR AMENDMENT as to PETER K. NAVARRO. re 170 Amended Judgment Access to the PDF Document is restricted per Judicial Conference Policy. Access is limited to Counsel of Record and the Court. (zltp) (Entered: 02/13/2024) |
| 02/29/2024 | 172 | TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on September 13, 2023; Page Numbers: 1-36. Date of Issuance: February 29, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/21/2024. Redacted Transcript Deadline set for 3/31/2024. Release of Transcript Restriction set for 5/29/2024.(Zaremba, William) (Entered: 02/29/2024) |
| 03/05/2024 | 173 | TRANSCRIPT OF SENTENCING PROCEEDINGS in case as to PETER K. NAVARRO before Judge Amit P. Mehta held on January 25, 2024; Page Numbers: 1-110. Date of Issuance: March 5, 2024. Court Reporter/Transcriber: William Zaremba; Telephone number: (202) 354-3249. Transcripts may be ordered by submitting the Transcript Order Form |

**-0024-**

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, PDF or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/26/2024. Redacted Transcript Deadline set for 4/5/2024. Release of Transcript Restriction set for 6/3/2024.(Zaremba, William) (Entered: 03/05/2024)

| | | |
|---|---|---|
| 04/01/2024 | 174 | TRANSCRIPT OF STATUS CONFERENCE in the case as to PETER K. NAVARRO before the Honorable Amit P. Mehta held on 11/10/2022. Page Numbers: 1-11. Date of Issuance: 04/01/2024. Stenographic Court Reporter: Nancy J. Meyer. Telephone Number: 202-354-3118. Email: nancymeyercourtreporter@gmail.com. Transcripts may be ordered by going to www.dcd.uscourts.gov (left-hand side under Transcript Requests). For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats (multi-page, condensed, CD, or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have 21 days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 4/22/2024. Redacted Transcript Deadline set for 5/2/2024. Release of Transcript Restriction set for 6/30/2024.(Meyer, Nancy J.) (Entered: 04/01/2024) |
| 05/09/2024 | 175 | Emergency MOTION to Reduce Sentence re First Step Act of 2018 by PETER K. NAVARRO. (Attachments: # 1 Text of Proposed Order)(Woodward, Stanley) (Entered: 05/09/2024) |
| 05/15/2024 | 176 | ORDER denying Defendant's 175 Motion for Resentencing as to PETER K. NAVARRO (1). See attached Order for additional details. Signed by Judge Amit P. Mehta on 05/15/2024. (lcapm1) (Entered: 05/15/2024) |
| 05/20/2024 | 177 | AMENDED ORDER as to PETER K. NAVARRO. The court has amended its Order of May 15, 2024, ECF No. 176, by deleting footnote 2 on page 2. The order otherwise is unchanged. Signed by Judge Amit P. Mehta on 05/20/2024. (lcapm1) (Entered: 05/20/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/09/2024 15:47:50 | | |
| **PACER Login:** | marcusp2895 | **Client Code:** | |

**-0025-**

USCA Case #24-3006      Document #2064376      Filed: 07/17/2024      Page 35 of 481

| Description: | Docket Report | Search Criteria: | 1:22-cr-00200-APM |
|---|---|---|---|
| Billable Pages: | 24 | Cost: | 2.40 |

**-0026-**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term

### Grand Jury Sworn in on February 15, 2022

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO. 22-cr-** |
| | : | |
| v. | : | **GRAND JURY ORIGINAL** |
| | : | |
| PETER K. NAVARRO, | : | **VIOLATIONS:** |
| | : | |
| Defendant. | : | **Count 1: 2 U.S.C. § 192** |
| | : | **(Contempt of Congress—Papers)** |
| | : | |
| | : | **Count 2: 2 U.S.C. § 192** |
| | : | **(Contempt of Congress—Testimony)** |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates

and at the approximate times stated below:

## BACKGROUND

### The Select Committee

1.      On June 30, 2021, the U.S. House of Representatives (the "House") adopted House

Resolution 503, which established the Select Committee to Investigate the January 6th Attack on

the United States Capitol (the "Select Committee").

2.      According to House Resolution 503, the Select Committee's purpose was, in part:

To investigate and report upon the facts, circumstances, and causes relating to the
January 6, 2021, domestic terrorist attack upon the United States Capitol Complex
(hereafter referred to as the "domestic terrorist attack on the Capitol") and relating
to the interference with the peaceful transfer of power, including facts and causes
relating to the preparedness and response of the United States Capitol Police and
other Federal, State, and local law enforcement agencies in the National Capital
Region and other instrumentalities of government, as well as the influencing factors

-0027-

that fomented such an attack on American representative democracy while engaged in a constitutional process.

3. One of the Select Committee's functions, as set forth in House Resolution 503, was

to:

investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to . . . (B) influencing factors that contributed to the domestic terrorist attack on the Capitol and how technology, including online platforms, financing, and malign foreign influence operations and campaigns may have factored into the motivation, organization, and execution of the domestic terrorist attack on the Capitol; and (C) other entities of the public and private sector as determined relevant by the Select Committee for such investigation.

4. House Resolution 503 provided that the Select Committee would issue a final report to the House, which would include recommendations for corrective measures, including possible "changes in law, policy, procedures, rules, or regulations that could be taken" to prevent future similar acts and "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

5. To accomplish the Select Committee's purposes and fulfill its functions, House Resolution 503, with reference to the rules of the House, authorized the Select Committee, through the Chair of the Select Committee, "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memoranda, papers, and documents as it considers necessary."

## The Select Committee Subpoenas Peter K. Navarro

6. PETER K. NAVARRO was a private citizen. From January 20, 2017, until January 20, 2021, during the administration of former President Donald J. Trump, NAVARRO worked in the Executive Branch as an advisor on various trade and manufacturing policies.

2

-0028-

7.    On February 9, 2022, the Select Committee served NAVARRO with a subpoena

for documents and testimony relating to its inquiry.

8.    The cover letter to the subpoena stated:

Based on publicly available information and information produced to the Select
Committee, we believe that you have documents and information that are relevant
to the Select Committee's investigation. For example, you, then a White House
trade advisor, reportedly worked with Steve Bannon and others to develop and
implement a plan to delay Congress's certification of, and ultimately change the
outcome of, the November 2020 presidential election. In your book, you reportedly
described this plan as the "Green Bay Sweep" and stated that it was designed as the
"last, best chance to snatch a stolen election from the Democrats' jaws of deceit."
In an interview, you reportedly added that former President Trump was "on board
with the strategy", as were "more than 100" members of Congress . . . . You also
released on your website a three-page report . . . repeating many claims of purported
fraud in the election that have been discredited in public reporting, by state officials,
and courts. And, because you have already discussed these and other relevant
issues in your recently published book, in interviews with reporters, and, among
other places, on a podcast, we look forward to discussing them with you, too.
Accordingly, the Select Committee seeks documents and a deposition regarding
these and other matters that are within the scope of the Select Committee's inquiry.

9.    As described further below, the subpoena required NAVARRO to appear and

produce documents to the Select Committee on February 23, 2022, and to appear for a deposition

before the Select Committee on March 2, 2022.

*The Documents Commanded by the Subpoena*

10.    The Select Committee's subpoena commanded NAVARRO to appear on February

23, 2022, at 10:00 a.m., at an office in the U.S. Capitol Complex and "produce the things identified

on the attached schedule touching matters of inquiry committed to [the Select Committee]" and

"not to depart without leave of [the Select Committee]."

11.    The schedule attached to the subpoena identified ten categories of "documents and

communications" that NAVARRO was required to produce relevant to the Select Committee's

authorized investigation of the January 6th attack on the U.S. Capitol.

3

-0029-

12.     The subpoena also included instructions for compliance with the document

demand, titled, "DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS." The

instructions directed that, if NAVARRO could not comply fully with the subpoena by the return

date, he should comply "to the extent possible by that date" and provide an explanation and date

certain for full compliance; that, if NAVARRO withheld any documents and communications, he

should provide a detailed log of which records were withheld and why; and that, upon completion

of NAVARRO'S response to the subpoena, he should provide a written certification that a diligent

search had been completed and all responsive documents had been produced.

*The Deposition Commanded by the Subpoena*

13.     The subpoena also commanded that NAVARRO appear on March 2, 2022, at 10:00

a.m., at the United States Capitol Building or by videoconference and "testify at a deposition

touching matters of inquiry committed to [the Select Committee]" and "not to depart without leave

of [the Select Committee]."

14.     The subpoena included a copy of the House's "Regulations for Use of Deposition

Authority," which provided, in part, that during a deposition:

> The witness may refuse to answer a question only to preserve a privilege. When
> the witness has refused to answer a question to preserve a privilege, members or
> staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent
> time, seek a ruling from the Chair either by telephone or otherwise. If the Chair
> overrules any such objection and thereby orders a witness to answer any question
> to which an objection was lodged, the witness shall be ordered to answer. . . . A
> deponent who refuses to answer a question after being directed to answer by the
> chair may be subject to sanction . . . .

## NAVARRO'S Refusal to Comply with the Subpoena

15.     On February 23, 2022, at 10:00 a.m., NAVARRO did not appear before the Select

Committee and produce documents and communications or a log of withheld records as required

by the subpoena. He also did not request an extension of time or certify that he had conducted a

4

-0030-

diligent search for responsive records. In fact, NAVARRO had not communicated with the Select Committee in any way after receiving the subpoena on February 9, 2022.

16.    On February 24, 2022, the Select Committee wrote to NAVARRO by email, reminding him that, "[t]he subpoena required you to produce documents to the Select Committee by yesterday, February 23, 2022" and confirming that "[w]e have not received any documents or an indication that you have no documents that are responsive to the subpoena's document schedule." The email also reminded NAVARRO that "the date for your deposition is Wednesday, March 2, 2022, at 10:00 AM, and we will convene in a room in the House office buildings." The Select Committee asked NAVARRO to contact the Select Committee at his earliest convenience to discuss the details of his deposition, or alternatively, to let the Select Committee know if he did not plan to appear on March 2.

17.    NAVARRO wrote to the Select Committee by email on February 27, 2022. In the email, NAVARRO wrote, in part, "President Trump has invoked Executive Privilege in this matter . . . . Accordingly, my hands are tied."

18.    The Select Committee responded by email the same day, rejecting NAVARRO's stated reason for noncompliance with the subpoena and directing NAVARRO to appear for his deposition as required. The Select Committee stated, in part, "[t]here are topics, including those discussed in the [subpoena's cover letter], that the Select Committee believes it can discuss with you without raising any executive privilege concerns at all. In any event, you must appear to assert any executive privilege objections on a question-by-question basis during the deposition."

19.    The next day, on February 28, 2022, NAVARRO emailed the Select Committee, stating that the "privilege is not mine to waive" and that it would be "incumbent on the Committee

5

-0031-

to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter." In his email, NAVARRO also included a copy of his February 27, 2022, email.

20.     In an email response, on March 1, 2022, the Select Committee again rejected NAVARRO's stated reason for noncompliance with the subpoena and informed NAVARRO again that he could assert any objections he may have on the record, on a question-by-question basis. The Select Committee also confirmed that it planned to proceed with the March 2, 2022, deposition and provided NAVARRO with the location to appear.

21.     On March 2, 2022, at 10:00 a.m., NAVARRO did not appear before the Select Committee to testify.

## COUNT ONE
### (Contempt of Congress (Papers)—2 U.S.C. § 192)

22.     The allegations in paragraphs 1 through 21 are realleged and incorporated as if fully set forth herein.

23.     On February 23, 2022, in the District of Columbia and elsewhere, the defendant,

### PETER K. NAVARRO,

having been summoned as a witness by the authority of the U.S. House of Representatives to produce papers upon a matter under inquiry before a committee of the House, did willfully make default—that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, NAVARRO refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way with a subpoena dated February 9, 2022, issued by the Select Committee and commanding NAVARRO to produce, at 10:00 a.m. on February 23, 2022, documents and communications as delineated therein.

(In violation of Title 2, United States Code, Section 192)

-0032-

## COUNT TWO
### (Contempt of Congress (Testimony)—2 U.S.C. § 192)

24. The allegations in paragraphs 1 through 21 are realleged and incorporated as if fully set forth herein.

25. On March 2, 2022, in the District of Columbia and elsewhere, the defendant,

### PETER K. NAVARRO,

having been summoned as a witness by the authority of the U.S. House of Representatives to give testimony upon a matter under inquiry before a committee of the House, did willfully make default—that is, in a matter under inquiry before the House Select Committee to Investigate the January 6th Attack on the United States Capitol, NAVARRO refused to appear to give testimony as required by a subpoena dated February 9, 2022, issued by the Select Committee and commanding NAVARRO to appear for a deposition at 10:00 a.m. on March 2, 2022.

(In violation of Title 2, United States Code, Section 192)

A TRUE BILL

FOREPERSON

Matthew M. Graves

MATTHEW M. GRAVES
ATTORNEY FOR THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA

7

-0033-

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA


**UNITED STATES OF AMERICA**

$\qquad$ **CRIMINAL NO. 22-cr-200**

**v.**


**PETER K. NAVARRO,**

**Defendant.**


### MOTION FOR DOCUMENTS PERTAINING TO ARREST

To determine key facts in this case, including facts related to the defendant's motion requesting a continuance, the defendant moves that the prosecution immediately provide: (1) all video and audio recordings of the defendant's arrest from the jetway at Reagan airport to the FBI holding facility, (2) full transcripts of the conversations that took place, (3) all notes that contributed to the report issued on June 6, 2022 by Special Agents Walter Giardina and Special Agent Sebastian Gardner; and (4) signed affidavits from Special Agents Walter Giardina and Sebastian Gardner denying the defendant requested a call for legal advice on the jetway where he was taken and stating that he was read his Miranda rights from a written sheet of paper.

The defendant further moves that the prosecution reveal any role it may have played, and provide any associated documents, in the assignment of a public defender mere minutes before the arraignment in lieu of allowing the defendant to call for legal advice during his hours of incarceration prior to the magistrate's hearing after the defendant specifically requested the ability to do so immediately upon his arrest in the jetway.

**Background**

The prosecution has made it a key point of its opposition to the defendant's request for a continuance that the defendant has consistently indicated pro se representation and no need or desire for outside counsel.  As noted in its motion to opposing the request for continuance:

> *The Defendant bases his request for a continuance, in part, on his accusations that the Government is attempting to deprive him of counsel—for example, by allegedly denying him a call to counsel upon his arrest and filing motions in the normal course of proceeding with this case. The Defendant's claims are false.*

It is the prosecution's claim that is both false and misleading.  In their report date of entry June 6, 2022, Special Agents Walter Giardina and Special Agent Sebastian Gardner omit any reference to the fact that the defendant asked immediately at the time of his arrest in the jetway and several times to make a phone call to obtain legal advice.

As soon as the defendant asked to call for legal advice, the agents should have read from a written card the defendant his Miranda rights and done everything within their power to allow him a phone call to seek legal advice as he requested well prior to his court appearance.  They did not do so and thereby deprived the defendant of appropriate legal counsel.

Instead of acknowledging in their report that the defendant immediately requested the opportunity to call for legal advice, the report falsely implies that it was Giardina who first raised the issue of whether the defendant wanted to call an attorney.  This is a serious form of misdirection.

As further deflection, Giardina and Gardner create the false impression that the only person the defendant wanted to call was a TV producer expecting the defendant to arrive for an interview in Nashville.  Requesting a courtesy call to a TV producer that the defendant would not be available does not mean that the defendant did not ask repeatedly to call for legal advice yet that is the impression this report created for the media.

Because Giardina did not act upon the defendant's repeated request at the time of the arrest to make a call for legal advice or arrange for such a call at the jail cell, the defendant spent several hours in that jail cell out of communication with anyone and was surprised when just minutes before his appearance before a magistrate, he was told he could meet with a public defender.  At this point, the defendant was concerned that if he refused to agree to a public defender, he might not be released in a timely manner.

While the public defender was a fine person, she had little command of the facts in the case as would be expected.  This put the defendant at a far greater disadvantage during the hearing than if he had been able to speak to legal counsel, and it is an open question as to whether that was the prosecution's intent.

The defendant also notes for the record that he provided Deputy Attorney Patricia Aloi <u>two days prior to the arrest</u> with the name of an attorney to call to negotiate with.  This document was also read by Agent Giardina so Giardina had both the name and number of that attorney as well.

Aloi chose not to contact that attorney prior to the arrest despite the defendant's good faith efforts at seeking a modus vivendi that might have avoided the need for the arrest (more about that in a separate motion).  In addition, Aloi made no effort to alert that attorney of the defendant's arrest and pending appearance before the magistrate, thereby leaving him effectively without counsel.

The defendant does not recall the agents reading his Miranda rights from any written text but rather delivering the notice in a casual and improvisational manner, perhaps designed to lull the defendant into complaceny. It would be useful to have clarity on this matter to determine whether the defendant's Fourth Amendment rights were violated.

With regard to the public release of the FBI report, the defendant finds it necessary now to set the record straight with respect to the false and misleading impressions that report gave and which were seized upon by a left wing media.

Fact: the defendant was in a jail cell in leg irons for several hours at the courthouse after a strip search without access to counsel.  Fact: A request for water was denied.  Fact: There was no food available.  The fact that the defendant was out of FBI custody doesn't mean all this didn't happen; and the media needs to report this accurately.

As a final note in consideration of this motion, the defendant was contacted by a former high-ranking FBI agent who described the way he was taken into custody as "outrageous," "far outside the norms," and yet another example of "the FBI once again allowed themselves to be used as a political pawn by the DOJ."

In the discussion, this former FBI agent indicated that it is common practice for white collar defendants charged with fraud for which flight risk is low to arrange a voluntary surrender.  In cases like the defendant's where there is no fraud alleged but simply a technical violation, it is unheard of to conduct the kind of punitive operation the FBI performed in lieu of a voluntary surrender.

In fact, the defendant called Giardana two days before the arrest and in a cordial conversation indicated clearly to the agent he would be happy to comply with any subpoena or other matter and they did not need to come banging on his door in the early hours of the morning – just call him.

If the defendant had simply been allowed to voluntarily surrender, he would have been able to have access to the legal advice he sought at the time of his arrest and this issue would be moot. Instead, he became yet another object of the kind of intimidation and humiliation the FBI has gotten into the practice of inflicting on Trump allies, a practice which in this case may also have included a leak to the press of the arrest while the defendant was in solitary confinement.

For the reasons set forth in this motion, the defendant therefore requests that this motion be granted and the information be provided forthwith and well in advance of the scheduled arraignment.


Respectfully submitted,

Peter Navarro, Pro se actively seeking counsel

CERTIFICATE OF SERVICE

I certify that on June10, 2022, I sent this motion to all relevant parties via email.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **CRIMINAL NO. 22-cr-200** |
| **v.** | **:** | |
| | **:** | |
| **PETER K. NAVARRO,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

### UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY

The Defendant, Peter K. Navarro, has moved for the production of various records relating to his arrest. Specifically, the Defendant seeks video and audio recordings from his arrest, transcripts of all conversations that took place, notes used to create the FBI report memorializing the arrest, and signed affidavits from FBI Special Agents describing the arrest. To the Government's knowledge, aside from agent notes relating to the FBI report memorializing the Defendant's arrest, the materials the Defendant seeks do not exist or, to the extent they may exist, are not in the possession, custody, or control of the prosecution team—for example, any video recordings Reagan National Airport might make of its jetways. In any event, none of the material the Defendant seeks is discoverable under Federal Rule of Evidence 16 or *Brady v. Maryland* and its progeny. The Defendant was not questioned upon his arrest, *see* Fed. R. Crim. P. 16(a)(1)(A) & (B), and none of the other information is relevant or material to either the Government's case-in-chief or the Defendant's response to it, *see* Fed. R. Crim. P. 16(a)(1)(E); *United States v. Armstrong*, 517 U.S. 456, 462 (1996); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Nevertheless, the Government is, and has been, prepared to provide the agent notes, along with the discovery in this matter, as soon as its motion for a protective order is resolved.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Amanda R. Vaughn*
       Molly Gaston (VA 78506)
       Amanda R. Vaughn (MD)
       Elizabeth Aloi (D.C. 1015864)
       Assistant United States Attorneys
       United States Attorney's Office
       601 D Street, N.W.
       Washington, D.C. 20530
       (202) 252-1793 (Vaughn)
       amanda.vaughn@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that, on June 13, 2022, I provided a copy of the United States' Response to the Defendant's Motion for Discovery to the Defendant by email.

/s/ *Amanda R. Vaughn*
Amanda R. Vaughn
Assistant United States Attorney

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | **Criminal No. 1:22-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DEFENDANT'S MOTION TO COMPEL DISCOVERY

Defendant Peter K. Navarro, by and through the undersigned counsel, and pursuant to Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), *Kyles v. Whitley*, 514 U.S. 419 (1995), and Rule 5.1 of the Local Criminal Rules of the District Court for the District of Columbia, respectfully moves this Court for an Order compelling the Government to comply with its obligations and provide discovery that is material to the preparation of Dr. Navarro's defense.

## I. INTRODUCTION

> "We shouldn't be disqualifying people just because they believe the work of the committee or the functioning of government is important."

> - Assistant United States Attorney Molly Gaston *Voire Dire; United States v. Stephen K. Bannon* [1]/

The Government's view of this case is perhaps best encapsulated in this one sentence and is forborne in the minimal discovery – just 633 documents and 2,664 pages – produced by the Government to date. In short, *the Government* has determined that the U.S. House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select

---

[1]/ Spencer S. Hsu and Devlin Barrett, *Opening Statements Soon in Bannon Trial After Judge Rejects Delay*, *The Washington Post* (July 19, 20220, *available at* https://www.washingtonpost.com/dc-md-va/2022/07/18/steve-bannon-trial-jury/.

Committee") was properly constituted. *The Government* determined the subpoena the Select Committee issued Dr. Navarro was valid and enforceable. *And the Government* determined that former President Trump's invocation of Executive Privilege as to his closest aides and advisors was of no consequence. All this *before* either this Court or Dr. Navarro has had an opportunity to scrutinize the Government's rationale or its conclusions. This is not a simple misdemeanor prosecution. It is a test of the Separation of Powers as between the Executive Branch and the Legislative Branch. And *the only* forum for this dispute to be resolved is *this Court*. The prosecution of Dr. Navarro cannot stand if both the United States Congress and the United States Department of Justice have failed to follow *every* procedural process to which he is *entitled* under the law.

## II.  PROCEDURAL BACKGROUND

### A.  The Prosecution of Dr. Navarro by the Department of Justice Departs from Long-Standing Historical Precedent.

This case is far more than a simple misdemeanor prosecution: it stems from the intersection of congressional investigative power attempted to be enforced against this defendant, and the doctrine of executive privilege asserted by Presidents since the founding of the Republic and validated for over four decades by the Department of Justice Office of Legal Counsel opinions from 1984 to the present. While the criminal contempt statute, 2 U.S.C. § 192, was invoked hundreds of times by both the House and Senate against private parties during the McCarthy era, *see* Carl Beck, *Contempt of Congress: A Study of the Prosecutions Initiated By The Committee on House Un-American Activities*, 1945-1957 (The Hauser Press, New Orleans 1959) at 241-243, the vast majority of those cases resulted in dismissal, acquittal or reversal on appeal. *Id.* at 186.

More significantly, in the post-McCarthy era and since the 1982 certification for contempt of then EPA Administrator Anne Gorsuch (Burford) for refusing to turn over documents

subpoenaed by a committee relating to administration of the Superfund Act, no high-ranking cabinet or White House official has been charged under the statute. Instead of presenting the contempt certification from the House to the Grand Jury pursuant to 2 USC § 194, the Department of Justice filed a civil action against the House and its constitutional officers seeking injunctive and declaratory relief to "prevent any further action to enforce the outstanding subpoena," Complaint at 7-8, *United States v. United States House of Representatives* (D.D.C 1983) (Civ. Action No. 82-3583). Upon a motion to dismiss filed by the House, the U.S. District Court for the District of Columbia granted the motion. *United States v. United States House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983). In so ruling, the court stated that the Executive branch's "constitutional claims [of executive privilege] and other objections to congressional investigatory procedure may be raised as defenses in a criminal prosecution." *Id*. at 152.

Since that time forward, in an unbroken line of OLC opinions in both Republican and Democratic administrations spanning more than five decades, the Department of Justice has steadfastly and consistently declined to use the statute against close aides to the President, concluding that such aides are immune from congressional process as "alter egos" of the President. In the Department's view, prosecution under the statute for these officials would place a "heavy burden" upon the assertion of executive privilege. Plaintiff's Points & Authorities in Support of Plaintiff's Motion for Summary Judgment and In Opposition to Motion to Dismiss at 36 n. ** in *United States v United States House of Representatives*.

Since the *Gorsuch* case in 1983, no other White House aide acting under a Presidential assertion of privilege has been charged under the statute despite numerous Executive-Legislative disputes involving both testimony and documents. *See Comm. on the Judiciary, United States House of Representatives v Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008); *House Comm. On Oversight v. Holder*, 979 F. Supp. 2d 1 (2013). In fact, it is because of the Department's practical nullification

of the statute to prosecute Cabinet and White House officials that the House has attempted to utilize civil suits to enforce its subpoenas. *See e.g., House Comm. on the Judiciary v McGhan,* 973 F. 3d 121 (D. C. Cir. 2020).

It is against this background that Dr. Navarro seeks to compel discovery based on the Department's clear and seemingly inexplicable departure from its settled policy. Through such discovery, we seek to ascertain whether: (1) selective or disparate treatment of his case from other similarly situated high ranking White House officials has occurred; (2) the Grand Jury process was abused through undue political interference from the current White House in contravention of defendant's right to the appearance of impartiality in the prosecution of his case; and (3) the procedures employed to obtain the indictment contravened his right to due process

## B. Dr. Navarro Has Steadfastly Honored the President's Invocation of Executive Privilege.

On February 9, 2022, the Select Committee served Dr. Navarro with a subpoena calling for his production documents and appearance for deposition.[2]/ In response, on March 9, he notified the Select Committee – as he had advised the U.S. House of Representatives Select Subcommittee on the Coronavirus Crisis ("COVID Subcommittee") in response to a subpoena it issued in November 2021— that President Donald Trump had publicly directed him as a Senior Advisor to the President to "protect executive privilege."[3]/

---

[2]/ The Select Committee's subpoena failed to specify the place for the deposition beyond stating that it would be held at the "United States Capitol Building, Washington DC 20515 or by videoconference".

[3]/ Dr. Navarro, a layman who at the time was not represented by counsel, understood President Trump's instructions to be equivalent to an assertion of testimonial immunity. He advised the Coronavirus Subcommittee that he could not comply with its subpoena and suggested that it resolve the privilege issues directly with President Trump. The Subcommittee did not pursue the matter, which confirmed to Dr. Navarro his understanding that, in the absence of agreement between the Executive and Legislative branches, he was not obligated to comply with the subpoena.

> President Trump has invoked Executive Privilege; and it is not my privilege to waive. [The Select Committee] should negotiate any waiver of the privilege with the president and his attorneys directly, not through me.

House Report 117-284 (March 29, 2022) ("House Report") at 3.

The objection Dr. Navarro tendered to the Select Committee's subpoena can be more accurately described as one of the immunity from Congressional process that the Department of Justice has recognized for the past fifty years.[4] For example, in 2019 the House Committee on Oversight and Reform issued a subpoena that sought to compel Kellyanne Conway, Assistant and Senior Counselor to President Trump, to testify concerning allegations that she had violated the Hatch Act by using her position to influence the 2018 midterm elections and 2020 Presidential election through media appearances and social media. The Department of Justice's Office of Legal Counsel ("OLC") was asked to opine whether Ms. Conway was required to respond to the committee. Relying on established precedent, OLC determined that, as a senior advisor to President Trump, Ms. Conway was "absolutely immune" from compelled congressional testimony. *Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, O.L.C. Letter Opinion for the Counsel to the President, July 12, 2019. OLC's opinion is in line with the legal principles it has endorsed over the course of eight Democrat and Republican presidential administrations.[5]

On February 27, 2022, in response to an email from the Select Committee staff, Dr. Navarro again stated that

---

[4] Attorney General Janet Reno described testimonial immunity as "a separate legal basis that would support a claim of executive privilege for the entirety of the Counsel's testimony, thereby eliminating any need for her to appear at the hearing." 23 Op. O.L.C. at 4.

[5] This immunity continues even *after* the tenure of a particular advisor to the President because, absent a guarantee of lasting confidentiality, a "President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duty depends." *Nixon v. Admin'r of Gen Servs.*, 433 U.S. 425, 449 (1977).]

President Trump has invoked [e]xecutive [p]rivilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied. Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter.

House Report at 3.

Although the Committee claimed that Dr. Navarro did not provide any evidence that President Trump had ever invoked executive privilege, it ignored the fact that President Trump had previously and publicly instructed him to "protect executive privilege" in response to process from the Coronavirus Subcommittee. Dr. Navarro understood those instructions applied to all Congressional process and requested that the Select Committee resolve the matter through negotiations with President Trump and his counsel. House Report at 3 & 4.

Inexplicably, the Select Committee and its staff never contacted President Trump or his attorneys to attempt to work through the executive privilege issues raised by Dr. Navarro.[6] He was thus unfairly caught between a dispute between the Executive and Legislative branches of government and placed on the horns of a dilemma: follow the explicit instructions he had received from the President he served as a senior advisor for four years or risk being held in contempt by the Select Committee. As *Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir. 1962) notes: "Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights."

---

[6] The discovery provided thus far by the Government indicates that the Select Committee counsel who was the point of contact with Dr. Navarro did not communicate Dr. Navarro's assertion of executive privilege to Chairman Thompson or his designee. Counsel acknowledged that he did not know of any attempt by the Select Committee to negotiate the privilege issue with President Trump or his lawyers and he seems to have concluded on his own accord that Dr. Navarro did not have the right to invoke the privilege on behalf of the former President.  FBI Interview of Dan George (June 3, 2022)(US-000435).

On February 9, 2022, the United States House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") served Dr. Navarro with a subpoena directing him to produce documents on February 23, 2022, and appear for deposition on March 2, 2022. Indictment ¶¶ 7, 10 & 13. Dr. Navarro responded to the Select Committee on February 27, 2022, stating, in part, that "President Trump has invoked Executive Privilege in this matter… Accordingly, my hands are tied." Indictment ¶ 17. The next day, on February 28, Dr. Navarro reiterated by email to the Select Committee that he was unable to comply with the subpoena because the "privilege is not mine to waive" and it is "incumbent on the Select Committee to directly negotiate with President Trump and his attorneys" regarding the matter. Indictment ¶ 18. The Select Committee did not contact President Trump or his attorneys to attempt to resolve the privilege issues, a long-standing practice strongly encouraged by the United States Supreme Court.[7] Instead, the Select Committee moved forward with a recommendation that the House of Representatives hold Dr. Navarro in contempt of Congress.

On June 2, 2022, a federal Grand Jury returned an indictment against Dr. Navarro charging him with two misdemeanor counts for Contempt of Congress (Papers and Testimony) in violation of 2 U.S.C. §192,[8] and alleging that he failed to comply with the Select Committee's subpoena.

---

[7] *See Trump v. Mazars*, LLP, 591 U.S. __, 140 S.Ct. 2019 (2020)(". . . Congress and the Executive have nonetheless managed for over two centuries to resolve such disputes among themselves without the benefit of guidance from us. Such longstanding practice 'is a consideration of great weight' in cases concerning 'the allocation of power between [the] two elected branches of Government,' and it imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that [those] branches . . . themselves have reached.'" (internal quotations and citations omitted)).

[8] Each of the two counts is punishable by a fine of not more than $1,000 nor less than $100 and imprisonment for not less than one month nor more than twelve months. 2 U.S.C. §192.

On June 17, this Court arraigned Dr. Navarro on the indictment and ordered him to file his Rule 12 motions by August 17. The Court also set November 16, 2022, as the date for trial. At a status hearing on July 15, the Court encouraged the parties to resolve discovery issues and scheduled a hearing on August 11 if those issues could not be resolved without the intervention of the Court.

The parties have had extensive discussions regarding discovery and are unable to reach agreement concerning Dr. Navarro's rights to discovery in this case.

### C. The Government's Presentation to the Grand Jury Highlights the Uniqueness of Dr. Navarro's Prosecution.





9

USCA Case #24-3006   Document #2064276   Filed: 07/12/2024   Page 58 of 481







**D.  The Government Has Refused to Negotiate in Good Faith With Dr. Navarro.**

On June 27, 2022, after the Government provided its initial discovery production, Dr.

Navarro's counsel sent a Rule 16 letter requesting specific materials that are necessary to his

defense (Exhibit 4). The letter requested that the Government produce, among other things:

(1) documents relating to the Government's arrest of Dr. Navarro on June 3
including  the decision by the FBI and/or the Department of Justice to arrest
Dr. Navarro at Ronald Reagan Washington National Airport and place him in
security restraints (*i.e.,* "leg irons");

(2) communications between the  Department of Justice and the House Select
Committee that reference or relate to Dr. Navarro;

(3) documents provided to the Select Committee by the White House Office of Counsel to the President, including Jonathan C. Su, that reference or relate to Dr. Navarro;

(4) communications and/or other evidence related to the application to Dr. Navarro or any other senior advisor to former President Donald J. Trump of the opinions of the Office of Legal Counsel of the Department of Justice;

(5) correspondence between the House Select Committee on the Coronavirus Crisis and Dr. Navarro in which Dr. Navarro claimed, asserted, or invoked Executive Privilege on behalf of President Donald J. Trump; and

(6) documents and other evidence establishing that the Select Committee was properly established pursuant to House Resolution 503. *See* Indictment ¶ 1.

On July 11, 2022, the Government responded and represented that it already provided any discoverable material that is in the possession, custody, or control of the "prosecution team." (Exhibit 5).

By letter of July 20, 2022, counsel for Dr. Navarro objected to the Government's attempt to restrict the definition of "prosecution team" to the individual prosecutors and agents assigned to this case and he renewed the discovery requests made in his Rule 16 letter. (Exhibit 6). That letter requested, among other things, documents relating to communications between the Department of Justice and the Select Committee (Item #9), and communications between the Select Committee and the White House Office of Counsel to President Biden (Item #10). Dr. Navarro explained that discovery of those matters is necessary so that the defense counsel can assess the veracity of any potential claim of improper political influence regarding the decision to hold Dr. Navarro in contempt of Congress. On July 22, 2022, the Government sent a letter to counsel for Dr. Navarro repeating its position that it had provided all discoverable materials. (Exhibit 7).

On July 26, 2022, counsel for Dr. Navarro again challenged the Government's representation that it had provided all discoverable information. The letter noted that it would be

premature for Dr. Navarro to make any definitive assertion with respect to the composition of the "prosecution team" but that "[t]o the extent that [Deputy Counsel to President Biden Jonathan] Su and the Department of Justice corresponded concerning the application of executive privilege as to *any former senior aide* to President Trump referred by the Select Committee for prosecution" then such communications potentially render him and/or his Office an arm of the prosecution team whose records are properly the subject of discovery in this case. (Exhibit 8).

On July 27, 2022, the Government responded that it did not have any correspondence between the White House, the Select Committee, and the Department of Justice *that is responsive* to Dr. Navarro's discovery requests. The Government further advised that, "if there are additional materials you believe may exist and to which you believe you are entitled in discovery, we should proceed to whatever motions you deem appropriate." (Exhibit 9). In short, the Government is unwilling to make any determination as to whether the records Dr. Navarro seeks exist such that the instant motion is unnecessary.

### III.  APPLICABLE DISCOVERY PRINCIPLES

Federal Rule of Criminal Procedure 16(a)(1)(E) provides that:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i)    the item is material to preparing the defense;
> (ii)   the government intends to use the item in its case-in-chief at trial; or
> (iii)  the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1). The D.C. Circuit has emphasized that the prosecution must disclose evidence which is material "to the preparation of the defendant's defense." *United States v. Marshall,* 132 F.3d 63, 67 (D.C. Cir. 1998). The Government must disclose both inculpatory and exculpatory evidence. *Id.* "Inculpatory evidence, after all, is just as likely to assist in 'the

preparation of the defendant's defense' as exculpatory evidence" because "it is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths." *Marshall*, 132 F.3d at 67; *accord United States v. O'Keefe*, No. 06-0249 (PLF), 2007 WL 1239204, at *2 (Apr. 27, 2007).

The Government's discovery obligations are "intended to provide a criminal defendant 'the widest possible opportunity to inspect and receive such materials in the possession of the Government as may aid him in presenting his side of the case.'" *O'Keefe*, 2007 WL 1239204, at *2 (quoting *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989)); *see also United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (materiality standard "is not a heavy burden" – information is material and must be disclosed if it has the potential to play an "important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal"); *United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991) (discovery materiality hurdle "is not a high one").

"As a general matter, Rule 16 establishes the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." *United States v. Apodaca*, 287 F. Supp. 3d 21, 39 (D.D.C. 2017); *see also United States v. Karak*e, 281 F. Supp. 2d 302, 306 (D.D.C. 2003). Moreover, "the government cannot take a narrow reading of the term material in making its decisions on what to disclose under Rule 16." *O'Keefe*, *supra*, 2007 WL 1239204, at *2.

Government disclosure of exculpatory and impeachment evidence is essential to the constitutional guarantee to a fair trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Because *Brady* and *Giglio* are constitutional obligations, *Brady/Giglio*

evidence must be disclosed regardless of whether the defendant makes a request for the information. *See Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995). Since it is sometimes difficult to assess the materiality of evidence before trial, prosecutors must err on the side of disclosure. *Kyles*, 514 U.S. at 439.  *See also* Local Rule Crim. P. 5.1(b); Justice Manual § 9-5.001.

## IV.  ARGUMENT

Given the allegations in the indictment and applicable law, the Government is required to search for additional sources of potentially discoverable information and disclose it to Dr. Navarro so he can prepare his defense. Instead, here, the Government has apparently deliberately shielded itself from the knowledge of information that would be pertinent to several of the potential defenses defense counsel are contemplating. *See Marshall*, 132 F.3d at 69 ("[A] prosecutor may not sandbag a defendant by 'the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial.'" (*quoting United States v. Brazel*, 102 F.3d 1120, 1150 (11th Cir. 1997)).

### A.  The Government May Not Limit the Prosecution Team so as to Avoid Knowledge of Discoverable Information.

The Government has asserted in response to several of Dr. Navarro's discovery requests that it has produced all discoverable information "in [its] possession, custody, or control," or "in the possession, custody, or control of the prosecution team." In its July 22, 2022, letter to defense counsel, the Government stated that:

> As an initial matter, your letter appears to suggest that President Biden, the White House Counsel's Office, the House Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee"), and the House Select Committee on the Coronavirus Crisis are part of the prosecution team in this case. They are not. We have provided all discoverable materials we have received from those parties and thus have nothing more to provide in response to request in which you seek information in their possession.

Whether information is within the Government's possession, custody, or control is a fact-intensive inquiry that must be resolved on a case-by-case basis. *United States v. Libby*, 429 F. Supp. 2d 1, 9 (D.D.C. 2006) citing *United States v. Brazel*, 102 F.3d 1120, 1150 n. 19 (11th Cir. 1997). In determining whether records in the possession of other Executive Branch offices are discoverable, this Court has examined the extent to which those "different arms of the government" contributed to the criminal investigation and are closely aligned with it.

In *Libby*, Judge Reggie Walton held that the defendant in that case was entitled to information from both the Office of the Vice President and the CIA in an obstruction and false statements prosecution arising from the defendant's alleged disclosure of a CIA officer's identity. There, the White House Counsel's office directed all personnel to cooperate with the investigation and produce information to the Office of Special Counsel. In addition to producing documents to the Special Counsel, the CIA "undertook internal deliberations regarding whether to refer the alleged unauthorized disclosure of classified information to the Department of Justice for criminal investigation, created "pre-decisional preliminary evaluations and recommendations of government officials and also a legal analysis and opinion prepared by a CIA attorney, as well as communications between the CIA attorney and the Department of Justice." *Id*. at 10 (internal quotations omitted). The Court determined that the Office of the Vice President and the CIA "contributed significantly to the investigation" and were "closely aligned with the prosecution" based on the nature of their relationship with the Office of Special Counsel. *Id*. at 15.

In reaching his decision in *Libby,* Judge Walton considered decisions by other courts in similar cases. The Fifth Circuit, for example, held that a defendant accused of bribing a U.S. Postal Service employee was entitled to the personnel file of that employee, who was a prosecution witness. *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973). The Ninth Circuit required the Government to provide a defendant charged with murdering a fellow prison inmate with the files

of several government witnesses from the Bureau of Prisons. *United States v. Santiago*, 46 F.3d 885, 893 (9th Cir. 1995). A defendant in the W.R. Grace prosecution in the District of Montana was entitled to "documents that were in the physical possession of government agencies that were not part of a criminal investigation jointly undertaken by the Department of Justice and the Environmental Protection Agency, but who had provided files to the prosecution team and allowed their employees to be interviewed by the prosecution as part of that investigation." *United States v. W.R. Grace*, 401 F. Supp. 2d 1065, 1078-79 (D. Mont. 2005). Judge Paul Friedman of this District similarly held in the prosecution of David Safavian, that "'the government' includes any and all agencies and departments of the Executive Branch or the government and their subdivisions, not just the Justice Department, the FBI … and other law enforcement agencies." *United States v. Safavian*, 233 F.R.D. 12 at *2 (D.D.C. 2005), *quoted in Libby*, 429 F. Supp 2d at 6 n.10.  *See also United States v. Safavian*, 233 F.R.D. 205 at *2 n.1 ("While, in this Court's view, the term "government" encompasses all Executive Branch agencies and departments and the obligation to search files extends beyond agencies "closely aligned" with the prosecution, it should be apparent that prosecutors are not required to search, or cause to be searched, the files of all Executive Branch agencies and departments in every criminal case. Both the duty to search and the imputation of knowledge necessarily are bounded by a rule of reason.").

In Dr. Navarro's case, there is compelling evidence that several government entities beyond the typical core group of prosecutors and agents contributed significantly to the investigation and were closely aligned with the prosecution. The FBI interviewed Select Committee Senior Investigative Counsel, Dan George, who explained his communications with Dr. Navarro, his responses to Dr. Navarro's assertion of executive privilege, and confirmed that the Select Committee failed to negotiate that issue with former President Trump or his lawyers.

As discussed more fully below, Jonathan Su, Deputy Counsel to President Biden, sent Dr.

Navarro an unsolicited letter on February 28, 2022 (just two days before the deposition testimony date in the Select Committee's subpoena) notifying him about President Biden's decision not to assert executive privilege. Mr. Su also cooperated with the Government's investigation and was interviewed by the FBI. ███████████████████

██████████████████████████████

██████████████████████

Dr. Navarro also received a letter dated June 1, 2022 – the day before the Grand Jury returned an indictment against him – from the Deputy Director of the Justice Department's Civil Division, Federal Programs Branch, threatening to initiate civil litigation with respect to a demand for Presidential Records from the National Archives and Records Administration ("NARA"). The records sought by the Department's Civil Division pertained primarily to documents that the COVID Subcommittee had unsuccessfully sought to obtain from Dr. Navarro by subpoena six months earlier. Now, within a week of reaching an impasse with defense counsel concerning the appropriate scope of discovery in *this* case, the Department of Justice has civilly sued Mr. Navarro seeking these records.[12]/

---

[12]/ The Presidential Records Act, by its plain language, applies only to Presidential records consigned to the National Archives for curation and preservation following the expiration of an incumbent's term in office. *Trump v. Thompson*, 20 F. 4th 10, 27 (D.C. Cir. 2022). The Act does not control the question of whether testimony by the President's closest aides is subject to Congressional process, nor has the Supreme Court resolved this important issue. At a minimum, the question is unsettled: nonetheless the Supreme Court did hold in *United States v. Nixon*, 418 U.S. 683, 696 (1974), that communications between the President and his closest aides are entitled to a presumptive privilege of confidentiality which can be overcome only by a particularized showing of need in a criminal case. No case has held that such communications are subject to Congressional process and to hold otherwise would implicate significant separation of powers principals, especially since the doctrine of executive privilege articulated in *Nixon* arises from the Constitution itself. As the Court explained in *Trump v. Mazars*, 140 S. Ct. 2019, 2034 (2020), the congressional subpoena power has limits in the context of a broad subpoena of a former President's personal business records because although the subpoena did not seek any official records, its impact was nevertheless an inter branch dispute that threatened "imperious control" of the President by the Legislature.

Until the Government conducts a diligent inquiry in order to determine what agents of *the United States* were doing to presage its prosecution of Dr. Navarro, it cannot definitively claim that it has "already provided you with any discoverable material that is in the possession, custody, or control of the prosecution team." To the extent the other relevant information is within the possession, custody, and control of *the United States* – the White House, the Justice Department, and NARA – that would explain the coincidence and timing of these events and allow him to seek appropriate relief, as discussed further below.[13]/

### B. The Government Must Provide Information That is Material to the Preparation of Dr. Navarro's Defense.

Predictably, the Government downplays the significance of the Constitutional issues involved in this case and attempts to characterize its prosecution as simple and straightforward.[14]/ Counsel for Dr. Navarro has a very different view. In a number of important respects, this is a case of first impression involving fundamental Constitutional issues, including the Separation of Powers between the Office of the President and Congress and the immunity from Congressional

---

[13]/ We acknowledge that with respect to information in the possession of Congress that "it is settled that the government generally need not produce documents that are in the possession, custody or control of a separate branch of government such as Congress … or a state or local government." *Libby* at 7 citing *Safavian*, 233 F.R.D. 12 at *2; *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir.) (noting an exception for the D.C. Metropolitan Police Department). We submit, however, that the level of interaction between the Legislative and Executive Branches in this matter warrants a scrupulous inquiry into the communications as between these Branches.

[14]/ Based on the position it took in *United States v. Bannon*, the Government seems to believe that to establish a criminal violation of 2 U.S.C. § 192, it need only prove that Dr. Navarro knew the dates specified in the subpoena for the production of documents and deposition testimony and failed to comply. However, issues implicating the Separation of Powers between the Executive and Legislative branches are rarely that simple. This is the first time in our nation's history that the Department of Justice – in direct contradiction of its own established policies – is prosecuting a full-term senior advisor to a President for refusing on executive privilege grounds to comply with a Congressional subpoena.

process that has been recognized by Administrations of both political parties for the past fifty years.

### 1. The Government Must Provide Information that Tends to Show that the Indictment was Invalid Because the Subpoena was Unenforceable

Dr. Navarro is entitled to information that would tend to demonstrate, and allow him to argue, that the Special Committee's subpoena was invalid because the Special Committee was improperly constituted and issued its subpoena in violation of House Rules and Resolutions, and because the subpoena was invalid on its face.

### a. The Subpoena was Unenforceable because the Select Committee was Improperly Constituted and Issued Its Subpoena Unlawfully.

The information presently available to Dr. Navarro indicates that the actions by the Select Committee were not in accordance with the authority conferred by the U.S. House of Representatives in Rules and Resolutions. House Resolution 503, the Resolution that established the Select Committee, provides that "[t]he Speaker *shall* appoint 13 members to the Select Committee, 5 of whom *shall* be appointed after consultation with the minority leader. (Emphasis added). This was not done despite the mandatory language of the Resolution. Additionally, the Committee's legal authority to issue subpoenas and conduct depositions is limited by H. Res 503, and the general Rules of the House of Representatives, which are incorporated by reference into that Resolution. That authority limits certain actions concerning subpoenas and depositions by requiring consultation with, and notice to, the ranking minority member of the Select Committee.[15]/ *See e.g.,* Amicus Curia Brief filed on May 24, 2022, in *United States v. Bannon* by

---

[15]/ "The chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena." H. Res. 503, Sec. 5 Procedure (c)(6)(A) (Emphasis added).

U.S. House of Representatives Minority Leader O. Kevin McCarthy and U.S. House of Representatives Minority Whip Stephen J. Scalise.



As the Justice Manual provides: "It is the policy of the Department of Justice, . . . that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that

directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person." *Id.* at § 9-11.233. The Department has long recognized that this principle applies to invocations of executive privilege by a putative defendant. For example, in this testimony before the House Committee on Public Works and Transportation House of Representatives in 1983, former United States Attorney Stanley S. Harris, advised that "While I am not free to discuss the merits of the Burford contempt matter, illustratively the grand jury would be entitled to know that she was following the instructions of the President of the United States in conducting herself as she did.[16]/

The information presented to the Grand Jury is obviously the prerogative of the Government ▬ ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████ In view of the Committee's role, and that of the House of Representatives in initiating this prosecution, the Government is obligated to make inquiry of those whose actions precipitated this prosecution, and to disclose any information that is material to the preparation of Dr. Navarro's defense.

### b. The Subpoena was Invalid on its Face

The Select Committee's subpoena, issued on its behalf by Chairman Bennie Thompson, failed to properly specify the place for Dr. Navarro's deposition beyond indicating that it would be held (somewhere) at the "United States Capitol Building, Washington DC 20515 or by

---

[16]/ "Examining and Reviewing the Procedures That Were Taken By The Office of the U. S. Attorney for the District of Columbia in Their Implementation of a Contempt Citation That Was Voted by the Full House of Representatives Against the Then Administrator of the Environmental Protection Agency, Anne Gorsuch Burford," Hearing Before the House Committee on Public Works and Transportation, 98th Cong., 1st Session. 29 (statement of Stanley S. Harris, U. S. Attorney for the District of Columbia) (1983).

videoconference".[17] By omitting any understandable description of where the deposition was to

occur, the Committee eliminated any possibility that Dr. Navarro's nonappearance can support a

criminal prosecution for contempt. However, the Committee muddled the issue even further when,

on March 1, 2022 – the day before the deposition was to occur – Committee Counsel Dan George,

sent Dr. Navarro an email that changed the place of the deposition to the O'Neil House Office

Building.[18]

House Resolution 503, which created the Select Committee, provides that Rule XI of the

Rules of the House of Representatives shall apply to the Committee.[19] Paragraph (3)(A)(i) of Rule

XI states in pertinent part that "Except as provided in subdivision (A)(ii) [Committee on Ethics],

a subpoena may be authorized and issued by a committee or subcommittee under subparagraph

(1)(B) in the conduct of an investigation or series of investigations or activities *only when*

*authorized by the committee or subcommittee, a majority being present.* The power to authorize

and issue subpoenas under subparagraph (1)(B) may be delegated to the chair of the committee

under such rules and under such limitations as the committee may prescribe. *Authorized subpoenas*

*shall be signed by the chair of the committee or by a member designated by the committee*."

(Emphasis added).

The Select Committee, with "a majority [of the members] being present", did not reissue

the subpoena to move the location of the deposition from the Capitol Building to the O'Neill House

---

[17] The Capitol building has over 1.5 million square feet, more than 600 rooms, and miles of corridors. https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building.

[18] Mr. George's email said that: "We plan to proceed with the deposition at 10 AM in the O'Neil House Office Building at 200 C Street, SW, Washington, D.C. 20024. Please feel free to contact me when you arrive so someone can escort you to the conference room."

[19] SEC. 5 PROCEDURE … (c) APPLICABILITY OF RULES GOVERNING PROCEDURES OF COMMITTEES.—Rule XI of the Rules of the House of Representatives shall apply to the Select Committee [except as provided].

Office Building. Moreover, in making the change the Committee violated its rule requiring only the Committee itself or the designee of the Chair may issue a subpoena. There is no evidence that a majority of the members of the Committee, or Chairman Thompson authorized Mr. George to change place of deposition specified by the subpoena.

In *Liveright v. United State*s, 347 F.2d 473 (1965), the D.C. Circuit held that a subcommittee's failure to comply with its authorizing resolution is a valid defense to a prosecution for contempt of Congress under 2 U.S.C. § 192. The subpoena in *Liveright* was issued by subcommittee chairman without first consulting with the other members as required by the subcommittee's authorizing resolution. The failure to comply with subcommittee's resolution rendered the subpoena invalid and it could not provide the basis for a prosecution for criminal contempt of Congress. *Id.,* at 474-75. *See also, Shelton v. United States,* 327 F.2d 601,606 (1963) (holding that the subcommittee's authorizing resolution required that the subcommittee itself, and not in any individual member, held "the *power and the responsibility* of deciding who shall be called" by subpoena)

It appears that Mr. George made a material change to the subpoena that may not have been authorized by the Select Committee or its Chair. The facts concerning his actions are relevant to whether the subpoena can provide the basis for a prosecution for contempt of Congress. Dr. Navarro is entitled to know whether the Committee formally authorized the change or whether it was made exclusively by Committee staff, and any communications as between the Select Committee and the Department of Justice concerning the efficacy of Mr. Navarro's subpoena are not just relevant, but material, to his defense..

**2. The Unprecedented Posture of this Case Gives Rise to a Number of Potential Challenges to the Indictment.**

Ignoring decades of prudential policy, as expressed in numerous Office of Legal Counsel opinions that hold that senior advisors to a President are immune from compelled process by the Congress, the Department elected to charge Dr. Navarro with *criminal* contempt of Congress. It did so after its *Chief* Executive publicly opined that those in Dr. Navarro's position should be prosecuted. It did so despite choosing *not to* prosecute those similarly situated with Dr. Navarro.

███████████████████████████████████████████████████████

████████████████████████████████

**a. The Government Should be Required to Provide Information Regarding the Possible Effect of Unlawful Political Interference. on the Grand Jury**

"[A]n agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge." *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 n.9 (1981)). Instead of attempting to resolve the privilege issues with the Executive to whom the privilege belongs, the Select Committee recommended to the Democrat-controlled House of Representatives that it hold Dr. Navarro in contempt of Congress. The House did so and then referred the matter to the Department of Justice for prosecution.

We do not know why the Department of Justice decided to ignore years of established precedent. A possible reason is that President Biden, the chief law enforcement official to whom the Department reports, publicly and improperly stated that the Department should prosecute all individuals who defy congressional subpoenas issued by the Select Committee. As reported by *The Hill* on October 15, 2021, President Biden told reporters, "I hope that the committee goes after them and holds them accountable." Asked if they should be prosecuted, President Biden said, "I do, yes."

It was improper for President Biden to attempt to influence the Department of Justice's prosecutorial discretion regarding individuals who failed to comply with Select Committee subpoenas. It is entirely possible that political appointees or others at the Department interpreted President Biden's statement as a directive to prosecute. That may explain the Department's departure from the OLC's long-established position that a senior advisor to a President is "absolutely immune" from a subpoena issued by Congress. Moreover, aside from issues of testimonial immunity, the decision to *criminally* prosecute a senior advisor to a President for refusing to appear before congressional committee is without precedent and constitutes a major diversion from the way the Department of Justice has always handled such matters.

The prosecution team has thus far shielded from Dr. Navarro whether there *exists* any communications as between the Department of Justice, including the Office of Legal Counsel, and the Select Committee and/or the White House. The unusual circumstances of this case require transparency into any such contacts that may have affected the decision to prosecute Dr. Navarro.

### i. Communications between the Department of Justice and the Select Committee

The day after a federal Grand Jury in DC returned its indictment against him, FBI Special Agents arrested Dr. Navarro as he was boarding a flight for a business trip to Tennessee at Washington's Reagan National Airport. They waited to arrest him at the Airport even though they knew that he lived across the street from FBI Headquarters and had spoken with him as recently as two days earlier. With national media apparently alerted that morning to its intentions, the FBI agents arrested, handcuffed, and transported Dr. Navarro to the courthouse, where he was strip-searched, placed in a holding cell, and then in leg irons by the US Marshals Service for his initial appearance in Court.

The Government's refusal to allow Dr. Navarro to self-report to court after being charged with two non-violent misdemeanors is indeed unusual and demonstrates a selective animus towards him by the Government officials responsible for the decisions made in this case.[20]/ We do not know how much, if any, of this animus is the result of communications between the Department of Justice, the Select Committee, and/or the White House. However, it is undeniable that the Government handled the arrest of Dr. Navarro much differently than it normally does individuals charged with non-violent misdemeanor offenses.

There are additional indications about the contacts between the Department of Justice and the Select Committee. One of the most important and unresolved issues in this case is whether the Select Committee was created in accordance with H. Res. 503 regarding the number of its members and the appointment of a ranking member by the minority party. Despite the complexity of these issues and their relationship to historical congressional prerogatives and procedures, ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

---

[20]/ Neither Mark Meadows, the former Chief of Staff to President Trump, nor Dan Scavino, former senior advisor to President Trump, appeared before the Select Committee in response to subpoena. Nonetheless, on June 4, 2022, the Department of Justice notified them that it had declined to prosecute for contempt of Congress. https://www.cnn.com/2022/06/03/politics/justice-department-declines-charge-meadows-scavino-january-6/index.html The decision demonstrates an animus toward Dr. Navarro and raises questions about a selective prosecution of him motivated by improper purposes.

Dr. Navarro is entitled to discover any communications between the Department of Justice and the Select Committee that may have influenced the Government's decision to prosecute him for contempt of Congress.

### ii.  Contacts between the White House and the Department of Justice

On February 28, 2022, Jonathan C. Su, Deputy Counsel to President Biden, sent a letter to Dr. Navarro "regarding the subpoena issued [by the Select Committee]". In the letter, Mr. Su expressly noted certain subjects under investigation by the Select Committee and advised Dr. Navarro that "President Biden … has decided not to assert executive privilege as to your testimony regarding those subjects, or any documents he might possess that bear on them."

Mr. Su's instructions to Dr. Navarro were unusual since he had no prior contact with Dr. Navarro about the subpoena or anything else. When interviewed by the FBI, Mr. Su stated that he first heard "in the media" that the Select Committee had issued a subpoena to Dr. Navarro. Interview of Jonathan C. Su (June 6, 2022)(US-000485). He said that after learning about the subpoena, he contacted Dr. Navarro by email to advise him of President Biden's position regarding privilege. Mr. Su further said that he knew Dr. Navarro's email address from separate, unrelated investigation regarding January 6th.

These communications suggest that Mr. Su, or someone else at President Biden's White House, communicated with the Select Committee concerning its investigation and the subpoena to Dr. Navarro. It is also possible that the White House communicated with the Department of Justice regarding OLC's previously established position that a senior advisor to a President is absolutely immune from congressional process. It appears unlikely that on his own initiative Mr. Su would have contacted Dr. Navarro about President Biden's positions regarding executive privilege after learning of the subpoena "in the media" and without any other contact with the Committee or the Department. This possibility is made all the more likely given that Mr. Su had previously obtained

Dr. Navarro's email address from someone connected to the Select Committee. Interview of Jonathan C. Su (June 6, 2022)(US-000485).

It would be premature to suggest that Mr. Su or anyone else in the White House had improper contacts with the Select Committee or the Justice Department in an attempt to assert political influence over their decisions regarding Dr. Navarro. Nonetheless, the possibility exists, and Dr. Navarro is entitled to discovery of any such communications.

### 3. The Government Must Provide Information Regarding the Possibility that it has Engaged in the Selective Prosecution of Dr. Navarro.

"A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Fifth Amendment. *United States v. Armstrong,* 517 U.S. 456, 464 (1996). Although a prosecutor has broad discretion to enforce the criminal laws, the decision to file charges may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* Improper arbitrary classifications include a defendant's "exercise of constitutional rights through participation in political activity." *Branch Ministries v. Rossotti,* 40 F. Supp. 2d 15, 21 (D. D. C. 1999), *aff'd* 211 F. 3D137 (D. C. Cir. 2000); *United States v. Judd,* 2021 WL 6134590 (D.D.C. 2021) (the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's "political beliefs").

A defendant alleging selective prosecution must show two things. *First,* he must establish that the prosecutorial policy "had a discriminatory *effect*" on him. *Armstrong,* 517 U.S. at 465 (Emphasis provided). To show that, he must establish that the Government afforded "different treatment" to persons "similarly situated" to him. *Id.* at 470. When a person's circumstances "present no distinguishable legitimate prosecutorial factors that might justify" different prosecutorial decisions between him and the defendant, that person is a similarly situated to the

defendant. *Branch Ministries,* 211 F. 3d at 145. *Second,* a defendant must show that the prosecutorial policy had "a discriminatory *purpose.*" *Armstrong,* 517 U.S. at 465 (Emphasis provided).

Discriminatory purpose may be established either with direct evidence of the prosecutor's intent or by "evidence concerning the unequal application of the law, statistical disparities and other indirect evidence of intent." *Branch Ministries v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997). A colorable claim is one that presents "some evidence tending to show the existence of the essential elements" of selective prosecution. *Armstrong,* 517 U.S. at 467.

> If a defendant establishes a *prima facia* case of selective prosecution, the burden shifts to the Government to try to prove that the filing of charges did not arise from discriminatory motives. *Att'y Gen. v. Irish People, Inc.*, 684 F. 2d 928, 932 n. 11 (D.C. Cir. 1982). If the Government cannot satisfy that burden, a court will require discovery of the Government's decision or dismiss the charges against the defendant. *In re Aiken County,* 725 F. 3d 255, 264 n. 7 (D.C. Cir. 2013). (Kavanaugh, Circuit Judge, presiding).

On December 14, 2021, the House of Representatives voted to refer former White House Chief of Staff Mark Meadows to the Department of Justice for prosecution based on his refusal to appear for deposition before the Select Committee and answer questions about the January 6th riot at the U.S. Capitol.[21]/ Four months later, on April, 2022, the House referred Dan Scavino and Peter Navarro to the Department for prosecution for their refusal to comply with subpoenas from the Select Committee directing that they produce documents and appear for deposition.[22]/ The House

---

[21]/ Addressing the House decision to refer Mr. Meadows for prosecution, Select Committee Chairman, Bennie Thompson said, "This is about Mr. Meadows refusing to comply with the subpoena to discuss the records he himself turned over." https://www.nbcnews.com/politics/congress/house-expected-vote-mark-meadows-criminal-contempt-referral-n1285908.

[22]/ Chairman Thompson explained the reason for the House's criminal referral, "Both of these men have refused to comply with the Select Committee's subpoenas in any way." https://www.cnn.com/2022/04/06/politics/house-vote-contempt-referrals-scavino-navarro/index.html.

of Representatives made its criminal referrals for all three men for essentially the same reason: they had asserted executive privilege on behalf of President Trump and refused on that basis to appear for deposition.[23]/

After the House referred the matters to the Department of Justice, However, the public record shows that the Department made a clear distinction regarding the treatment afforded these similarly situated individuals. It elected to prosecute Dr. Navarro but declined to do so for the same conduct by Mr. Meadows and Mr. Scavino.

On June 2, 2022, the Grand Jury returned its indictment against Dr. Navarro for Contempt of Congress. Two days later, on June 4, 2022, media sources reported that U.S. Attorney Matt Graves had notified Doug Letter, the House General Counsel, that the Justice Department had completed its review and had decided it "will not be initiating prosecutions for criminal contempt, as requested in the referral against Messrs. Meadows and Scavino."[25]/ The Department provided

---

[23]/ Mr. Meadows produced documents to the Committee but declined to appear for deposition. Neither Dr. Navarro nor Mr. Scavino produced documents or agreed to be deposed by the Select Committee.

[24]/ ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

[25]/ *See e.g.,* *https://www.cnn.com/2022/06/03/politics/justice-department-declines-charge-meadows-scavino-january-6/index.html.*

no reasons for its different treatment of Dr. Navarro and there is no apparent distinction between the conduct of the three individuals in their refusal to comply with the deposition subpoena for reasons of privilege.

In view of this disparity, Dr. Navarro believes that the Department of Justice's decision to file criminal charges against him while declining to prosecute Mr. Meadows and Mr. Scavino is based on unlawful and discriminatory reasons involving his public expression of political beliefs.[26] He can think of no other reason for the decision and requests that this Court order the Government to produce discovery regarding its decision.

Thus, even based on the limited record now available to Dr. Navarro, the Department's decision to prosecute Dr. Navarro, *but not* Messrs. Meadows and Scavino, had a discriminatory *effect* on him. All three men were similarly situated and referred to the Department by the Select Committee for their refusal to appear for deposition in response to subpoena. There is no meaningful difference between these individuals for the purpose of demonstrating discriminatory effect.

The second prong of the test established by *Armstrong* requires Dr. Navarro to show that Department had an improper discriminatory purpose in deciding to prosecute him but not Mr. Meadows or Mr. Scavino. He does not, of course, have access to direct evidence of the Department's motivation but the circumstantial evidence that is available is sufficient to raise an inference of discriminatory motive related to Dr. Navarro's public expression of his political beliefs.

---

[26] "In determining whether to commence or recommend prosecution or take action against a person, the attorney for the government should not be influenced by [t]he person's . . . political association, activities, or beliefs. . ." Justice Manual § 9-27.260.

Unlike Mr. Meadows and Mr. Scavino, who did not publicly discuss their views about the Select Committee or the Department of Justice, Dr. Navarro regularly exercised his First Amendment rights of free expression concerning the Government. The Select Committee report that referred Dr. Navarro for prosecution includes reference to several of his public statements. It indicates, for example, that "[w]ithin hours of receiving the subpoena, Dr. Navarro released a public statement that clearly indicated he had no intention of complying with the Select Committee …."[27]/ House Report at 3. The House Report states that Dr. Navarro also "appeared on national television on February 10, 2022, discussing subjects that with a focus of the Select Committee's subpoena to him (footnote omitted)." *Id.* The House Report goes on to say that rather than appear for his deposition, Dr. Navarro "issued a public statement regarding his deposition (footnote omitted)." House Report at 5.

Dr. Navarro's public objections to the Select Committee's subpoena, and his reasons for noncompliance, likely angered the Committee and its members. Dr. Navarro does not know whether the Committee communicated that anger to the Department of Justice before or after it made its criminal referral, but the Department seems to have acted in similar manner in response to Dr. Navarro's public expressions of dissent. It is highly unusual, and perhaps unprecedented, for the Department to not allow a defendant charged with nonviolent misdemeanors to self-report to court for arraignment.

---

[27]/ According to the Select Committee's report, Dr. Navarro's public statement said that "President Trump has invoked Executive Privilege; and it is not my privilege to waive.[The Select Committee] should negotiate any waiver of the privilege with the president and his attorneys directly, not through me. I refer to this tribunal to Chapter 21 of In Trump Time for what is in the public record about the Green Bay's we plan to insure [sic] election integrity []." House Report at 3.

The Government handled Dr. Navarro's arrest very differently from other cases. That, and the difference in treatment between Dr. Navarro and Messrs. Meadows and Scavino, satisfies *Armstrong's* requirement of a *prima facie* showing of both discriminatory effect and purpose. Dr. Navarro has demonstrated a colorable claim of selective prosecution and is entitled to discovery concerning the Government's motives in prosecuting this case.

### 4. The Government Must Provide Information that Tends to Show that the Indictment was Invalid Because the Government Abused the Grand Jury Process

A court may authorize the disclosure of Grand Jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the Grand Jury." Fed. R. Crim. P. 6(e)(3)(E)(i). It is the defendant's burden to establish that the Government abused the Grand Jury system, which can be met by showing that it engaged in misconduct. *United States v. Sitzmann*, 74 F. Supp. 3d 96 (D.D.C. 2014), *aff'd.* 893 F.3d 811 (D.C. Cir. 2018). "A defendant seeking to overturn an indictment based on alleged errors in Grand Jury proceedings faces a 'heavy burden' of demonstrating that any alleged deficiency had a 'substantial influence' on the outcome of the Grand Jury proceeding." *United States v. Barrow*, 2021 U.S. Dist. LEXIS 30925 at *19 quoting *United States v. Saffarina*, 424 F. Supp. 3d 46, 80 (D.D.C. 2020). "[T]he mere suspicion that the Grand Jury may not have been properly instructed with respect to the legal definition of contribution is insufficient to establish that [the defendant] is entitled either to dismissal of the indictment or to disclosure of Grand Jury materials." *Id*. at *20 quoting *United States v. Trie*, 23 F.Supp. 2d 55, 62 (D.D.C 1998).

"The prosecutor's responsibility is to advise the Grand Jury on the law and to present evidence for its consideration. In discharging these responsibilities, the prosecutor must be scrupulously fair to all witnesses and must do nothing to inflame or otherwise improperly influence the grand jurors." Justice Manual § 9-11.010. A prosecutor may not, for example, opine as to the

sufficiency of evidence or credibility of witnesses. Federal Grand Jury Practice Manual at p. 165 (1983) citing *United States v*. Samango, 607 F.2d 827 (9th Cir. 1979); *United States v. Wells*, 163 F.2d 313 (D. Idaho 1908). While a prosecutor's failure to present exculpatory evidence to a Grand Jury generally does not require dismissal of an indictment, *United States v. Williams*, 504 U.S. 36 (1992), "it is the policy of the Department of Justice … that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person."  Justice Manual § 9-11.233.





The fact that the law places a "heavy burden" on the defendant to demonstrate a "substantial influence" on the outcome of the Grand Jury proceedings weighs in favor of further discovery that would provide the defendant with the information necessary to evaluate whether to seek relief from the Court.

## V.  CONCLUSION

Wherefore, for the reasons set forth above, Dr. Navarro respectfully requests an Order compelling the Government to produce the following requested discovery materials so that he may prepare a defense to the charges in this matter:

1. Any written or recorded statement or admission made by Mr. Navarro that is within the Government's possession, custody or control, the existence of which is known, or by the exercise of due diligence may become known, to the government, including but not limited to any statements Mr. Navarro made to the House Select Committee on the Coronavirus Crisis regarding invocations of Executive Privilege. *See* Fed. Crim. P. 16(a)(1)(B)(i). (Exhibit 4 at ¶ A; Exhibit 6 at p. 2 ).

2. All books, papers, documents, data, photographs, video recordings, or tangible objects, or copies or portions thereof, that are material to preparing Mr. Navarro's defense, including but not limited to the following items, see Fed. R. Crim. P. 16(a)(1)(E)(i). (Exhibit 4 at ¶ C(1); Exhibit 6 at pp. 3-4):

   a. With respect to any information produced or required to be produced in discovery in this case, all subpoenas or formal or informal requests for information by the Government to which the information was responsive, all information concerning communications relating to such subpoenas or requests, and any written responses by the producing party, including but not limited to cover letters, inventories, and/or privilege logs. (Exhibit 4 at ¶ C(4); Exhibit 6 at p. 3).

   b. All documents, records and reports relating to the Government's arrest of Mr. Navarro on June 3, 2022 including, but not limited to, the decision by the FBI and/or the Department of Justice to arrest Mr. Navarro at Ronald Reagan Washington National Airport and place him in security restraints (i.e., "leg irons"). (Exhibit 4 at ¶ C(7); Exhibit 6 at p. 2).

c. All documents, records, or reports relating to communications between the Department of Justice and the House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee") referencing or relating to Mr. Navarro. (Exhibit 4 at ¶ C(9); Exhibit 6 at pp. 3).

d. To the extent not already included in the above requests, all documents, records, or information provided to the Select Committee by the White House Office of Counsel to the President, including Jonathan C. Su, that reference or relate to Mr. Navarro. (Exhibit 4 at ¶ C(10); Exhibit 6 at pp. 3).

e. To the extent not already included in the above requests, any documents, records, or information referencing communications between former President Donald J. Trump or his counsel, Justin Clark and/or Alex Cannon, and White House Office of Counsel to President Joseph R. Biden, including Jonathan C. Su, that reference or relate to Mr. Navarro. (Exhibit 4 at ¶ C(11); Exhibit 6 at pp. 3).

f. Any communications and/or other evidence related to the application to Mr. Navarro or any other senior advisor to former President Donald J. Trump of the opinions of the Office of Legal Counsel of the Department of Justice including, but not limited to, Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101 (1984); Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena, 38 Op. O.L.C. *5 (July 15, 2014); Assertion of Executive Privilege With Respect to Clemency Decision, 23 Op. O.L.C. 1 (1999); Immunity of the Former Counsel to the President From Compelled Congressional Testimony, 31 Op. O.L.C. 191, 192 (2007); Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena, 38 Op. O.L.C. at *5 (July 15, 2014); and Testimonial Immunity Before Congress of the Former Counsel to the President, 43 Op. O.L.C. __ (May 20, 2019). (Exhibit 4 at ¶ C(12); Exhibit 6 at pp. 3-4).

g. All correspondence between the House Select Committee on the Coronavirus Crisis (and/or any other House Committee or Subcommittee) and Mr. Navarro in which Mr. Navarro claimed, asserted, or invoked Executive Privilege on behalf of President Donald J. Trump. (Exhibit 4 at ¶ C(16); Exhibit 6 at p. 4).

h. All correspondence between Representative James E. Clyburn, Chairman of the House Select Committee on the Coronavirus Crisis and Mr. Navarro in which Mr. Navarro claimed, asserted, or invoked Executive Privilege on behalf of President Donald J. Trump. (Exhibit 4 at ¶ C(17); Exhibit 6 at pp. 3-4).

i. All documents, including communications, in which Representative James E. Clyburn, Chairman of the House Select Committee on the Coronavirus Crisis, or other members of that Committee discussed, indicated that Mr. Navarro had claimed, asserted, or invoked Executive Privilege on behalf of President Donald J. Trump. (Exhibit 4 at ¶ C(18); Exhibit 6 at p. 4).

3. All Reports of investigation (ROIs) related to or concerning the Select Committee, including but not limited to any ROIs related to Steve Bannon, Mark Meadows, and Dan Scavino. Exhibit 4 at ¶ D; Exhibit 6 at pp. 4-5).

4. All documents that are favorable to the defense or that would tend to exculpate Mr. Navarro with respect to the charges in the Indictment or that are relevant to the issue of sentencing pursuant to the United States Constitution and relevant case law interpreting its protections, including *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giles v. Maryland*, 386 U.S. 66 (1967), the Due Process Protections Act, Rule 5 of the Federal Rules of Criminal Procedure, and Rule 3.8 of the District of Columbia Rules of Professional Conduct, including but not limited to the following:

a. All documents and other evidence establishing that the Select Committee was properly established pursuant to House Resolution 503. See Indictment at 1 ¶ 1. (Exhibit 4 at ¶ G(1); Exhibit 6 at p. 5).

b. All documents and other evidence establishing that "[o]n February 9, 2022, the Select Committee served NAVARRO with a subpoena for documents and testimony relating to its inquiry." Indictment at 3 ¶ 7. (Exhibit 4 at ¶ G(2); Exhibit 6 at p. 5).

c. All documents and other evidence establishing that "the subpoena required NAVARRO to appear and produce documents" and/or "to appear for a deposition" including, but not limited to, all documents and other evidence establishing that the subpoena was, or was reasonably known to be, lawfully issued and otherwise enforceable. Indictment at 3 ¶ 9. (Exhibit 4 at ¶ G(3); Exhibit 6 at p. 5).

d. All documents and other evidence establishing that "[t]he Select Committee's subpoena commanded NAVARRO to appear on February 23, 2022, at 10:00 a.m., at an office in the U.S. Capitol Complex," including, but not limited to, documents sufficient to identify the office where Mr. Navarro was allegedly commanded to appear as well as all documents sufficient to support the allegation that such office was part of the U.S. Capitol Complex. *See* Indictment at 3 ¶ 10. (Exhibit 4 at ¶ G(4); Exhibit 6 at p. 5).

e. All documents and other evidence sufficient to establish that the categories of "documents and communications" delineated within the Select Committee's

subpoena were "relevant" to the Select Committee's investigation. *See* Indictment at 3 ¶ 11. (Exhibit 4 at ¶ G(5); Exhibit 6 at p. 5).

f.   All documents and other evidence sufficient to establish that the investigation of the Select Committee's investigation was "authorized." Indictment at 3 ¶ 11. (Exhibit 4 at ¶ G(6); Exhibit 6 at p. 5).

g.   All documents and other evidence sufficient to establish the enforceability of the "instructions for compliance and with document demand" referenced in the Indictment. Id. at 4 ¶ 12. (Exhibit 4 at ¶ G(7); Exhibit 6 at p. 6).

h.   All documents and other evidence sufficient to establish that, "[t]he subpoena also commanded that NAVARRO appear . . . and 'testify at a deposition.'" Indictment at 4 ¶ 13. (Exhibit 4 at ¶ G(8); Exhibit 6 at p. 6).

i.   All documents and other evidence sufficient to establish that Mr. Navarro was put on notice of the place he was to appear for a deposition pursuant to the Select Committee's subpoena, including, but not limited to, documents sufficient to establish whether Mr. Navarro was to appear personally "or by videoconference." See Indictment at 4 ¶ 13. (Exhibit 4 at ¶ G(9); Exhibit 6 at p. 6).

j.   All documents and other evidence sufficient to establish that the Select Committee subpoena was lawfully issued and otherwise enforceable such that it "required" anything by Mr. Navarro. See Indictment at 4-5 ¶ 14. (Exhibit 4 at ¶ G(10); Exhibit 6 at p. 6).

k.   All documents and other evidence sufficient to establish that Mr. Navarro had any obligation to "certify that he had conducted a diligent search for responsive records" as alleged by the Indictment. Id. at 4-5 ¶ 15. (Exhibit 4 at ¶ G(11); Exhibit 6 at p. 6).

l.   All documents and other evidence sufficient to establish that Mr. Navarro was required to "appear" to "assert any executive privilege objections on a question-by-question basis." Indictment at 5, ¶ 18. (Exhibit 4 at ¶ G(12); Exhibit 6 at p. 6).

m.   All documents and other evidence sufficient to establish that "[o]n March 2, 2022, at 10:00 a.m., NAVARRO did not appear before the Select Committee to testify," including, but not limited to, all documents sufficient to establish that Mr. Navarro was legally required to appear. Indictment at 21 ¶ 21. (Exhibit 4 at ¶ G(13); Exhibit 6 at p. 6).

n.   All documents and other evidence sufficient to establish that Mr. Navarro was "summoned as a witness," that the Select Committee had any lawful "authority" to

summon Mr. Navarro, and/or that the "papers" Mr. Navarro had been summoned to produce related to a "matter under inquiry" by the Select Committee." Indictment at 6 ¶ 23. (Exhibit 4 at ¶ G(14); Exhibit 6 at p. 6).

o. All documents and other evidence sufficient to establish that Mr. Navarro "refused to produce documents and communications, provide a log of any withheld records, certify a diligent search for records, and comply in any way" with the Select Committee subpoena. Indictment at 6 ¶ 23. (Exhibit 4 at ¶ G(15); Exhibit 6 at p. 6).

p. To the extent not already provided by a prior request, all documents and other evidence sufficient to establish that Mr. Navarro was "summoned as a witness," that the Select Committee had any lawful "authority" to summon Mr. Navarro, and/or that the testimony compelled was "upon a matter under inquiry" before the Select Committee. Indictment at 7 ¶ 25. (Exhibit 4 at ¶ G(16); Exhibit 6 at p. 7).

q. All documents and other evidence sufficient to establish that Mr. Navarro "did willfully make default" and/or "refused to appear to give testimony" and/or that any such testimony was "required" by the Select Committee subpoena. Indictment at 7 ¶ 25. (Exhibit 4 at ¶ G(17); Exhibit 6 at p. 8).

5. The early production of any statements of prospective Government witnesses that are in the Government's possession and that relate to the subject matter concerning which the witness will testify, so that any issues involving disclosure may be resolved in advance, counsel will have adequate time to review the material, and there will be no delay in court proceedings while counsel reviews the same. *See Jencks v. United States*, 353 U.S. 657 (1957). (Exhibit 4 at ¶ I); Exhibit 6 at p. 8).

6. The following specific additional requests listed in Defendant's letter to the Government dated July 20, 2022 (Exhibit 6 at pp. 7-8):





j.   All warrants and subpoenas used by the Government to obtain information in this case.



l.   All correspondence between the Justice Department and Jonathan Su and/or anyone else with the White House Counsel's Office.


Dated: August 4, 2022                    Respectfully Submitted,

                                         E&W Law, LLC

                                         _____/s/ John S. Irving_____
                                         John S. Irving (D.C. Bar No. 460068)
                                         1455 Pennsylvania Avenue, N.W., Suite 400
                                         Washington, D.C. 20004
                                         Telephone: (301) 807-5670
                                         Email: john.irving@earthandwatergroup.com


                                         SECIL LAW PLLC

                                         _____/s/ John P. Rowley, III_____
                                         John P. Rowley, III  (D.C. Bar No. 392629)
                                         1701 Pennsylvania Ave., N.W., Suite 200
                                         Washington, D.C. 20006
                                         Telephone: (703) 417-8652
                                         Email: jrowley@secillaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | **Criminal No. 1:23-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## <u>CERTIFICATE OF SERVICE</u>

On August 4, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed under seal via the CM/ECF system and copies were electronically mailed to counsel for the government and Chambers.


_____/s/ John S. Irving_____
John S. Irving (D.C. Bar No. 460068)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 22-cr-200** |
| **v.** | : | |
| | : | |
| **PETER K. NAVARRO,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL

In his Motion to Compel Discovery, the Defendant, Peter K. Navarro, suggests that the Government is holding back on its discovery obligations because there has been "minimal discovery . . . produced by the Government to date." ECF No. 31 at 1. The Defendant's suggestion is incorrect. The Government has exceeded its discovery obligations and already provided the Defendant all discoverable material in its possession, custody, or control. While the volume of discovery might be small, its volume is not a reflection of its thoroughness. Instead, it reflects the straightforward nature of this case—the Defendant received a subpoena, ignored the subpoena's document demand, and refused to appear for testimony despite the admonition that he must. Having received all the information to which he is entitled under the rules and controlling law, the Defendant's motion seeks discovery on defenses that are unavailable to him under the law, attempts to force the Government to go fishing for irrelevant information in far-flung government files by erroneously expanding the prosecution team, and demands discovery on collateral and grand jury matters without making the threshold showing that he is entitled to such information. The Defendant's motion should be denied.

## I.      Background

On February 9, 2022, the House Select Committee to Investigate the January 6th Attack on the United States Capitol ("the Committee"), after the Defendant confirmed he would accept it, issued a subpoena to the Defendant for documents, due February 23, 2022, and for a deposition on March 2, 2022.  See Indictment, ECF No. 1, ¶ 7-9.  On February 23, the Defendant defaulted on the subpoena's document requirement.  By that date, he had not produced a single record, had not provided the Committee with a log of records withheld because of a privilege, and had not communicated with the Committee in any way since receiving the subpoena.  *Id.* ¶ 15.  The day after the Defendant's complete default on the subpoena's document demands, Committee staff emailed the Defendant reminding him that he had been required to produce records and that he was still required to appear for a deposition on March 2.  *Id.* ¶ 16.  Several days later, the Defendant responded by email and claimed that the former President had "invoked Executive Privilege in this matter."  *Id.*  Thereafter, Committee staff repeatedly rejected the Defendant's claims regarding executive privilege and instructed him that he was required to appear before the Committee and assert any privileges and objections in person, on a question-by-question basis.  *Id.* ¶¶ 18-20.  On March 2, the Defendant did not appear for a deposition as required.  *Id.* ¶ 21.

On June 2, 2022, a federal grand jury in the District of Columbia returned an indictment charging the Defendant with two counts of contempt of Congress, in violation of 2 U.S.C. § 192, for refusing to comply in any way with the Committee's subpoena.

## II.     The Government Has Exceeded its Discovery Obligations.

Beginning on June 14, 2022—the day after this Court entered a protective order governing discovery—the Government has provided the Defendant with discovery that has met and exceeded its obligations.  This includes all testimony and exhibits presented to the grand jury in the

investigation leading to the pending charges; reports of all witness interviews conducted during the Government's investigation, regardless of whether the witness will be called at trial; all records that the Committee voluntarily produced to the Government during the investigation; all records that the White House Counsel's Office voluntarily produced to the Government during the investigation; and all records obtained pursuant to grand jury subpoenas and a court order issued pursuant to 18 U.S.C. § 2703(d). *See* Ex. 1 (discovery index). The Government has produced all discoverable material of which, to date, it is aware or that is in its possession, custody, or control, as well as material for which no discovery obligation exists.

Accordingly, as the Government informed the Defendant in its correspondence, *see* Exs. 5, 7, & 9, Def.'s Mot. to Compel, ECF Nos. 31-3, 31-5, 31-7, the Government has provided all discoverable material in its possession responsive to his specific requests and has even provided information in response to his prior requests and the requests he makes again in his motion to which the law does not entitle him, such as the statements of witnesses who may never be called at trial.

The Defendant nevertheless moves for the production of information about which the Government already has provided any responsive information in its possession. For example, the Defendant seeks discovery "that would tend to demonstrate . . . the [Select] Committee was improperly constituted and issued its subpoena in violation of House Rules and Resolutions, and because the subpoena was invalid on its face." ECF No. 31 at 21-25. The Government has disclosed all the information it possesses about the Committee's authority to issue the Defendant's subpoena. And, in any event, the objections to the Committee's authority that the Defendant hopes to raise, and for which he seeks additional discovery, appear to all be claims that the Committee did not follow its operational rules. But he has waived these claims and thus cannot present them

at trial because they all were either known or available to him at the time he defaulted but he did not raise them before the Committee as a basis for noncompliance.[1]  *See McPhaul v. United States*, 364 U.S. 372, 378-79 (1960) (finding defendant waived objection to compliance based on fact he did not have records where he did not raise it before the relevant committee); *United States v. Bryan*, 339 U.S. 323, 330-334 (1950) (finding defendant waived objection regarding a "defect in composition" of the issuing committee—lack of quorum—because she raised it for the first time at her contempt trial); *Liveright v. United States*, 347 F.2d 473, 475-76 (D.C. Cir. 1965) (describing the "Bryan-McPhaul rule" for waiver of objections where the basis for the objection was apparent at the time of default); July 11, 2022, Hearing Transcript, *United States v. Bannon*, Case No. 21-cr-670-CJN, at 126-30 (D.D.C.) (excluding as a defense at trial claims that the Select Committee did not comply with its rules where the Defendant was on notice of the rules but did not raise them at the time of his default).  In addition to having waived the objections, the Defendant's supposed objections are based on interpretations of the Select Committee's rules that are contrary to the House's interpretation and thus cannot be presented to the jury on that basis as well.  *See Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) ("Accordingly, we accept the House's interpretation of its own rules . . . , thus eliminating any risk of running afoul of either the Rulemaking Clause or separation-of-powers principles."); July 11, 2022, Hearing Transcript, *Bannon*, at 130-32 (finding objections to the Select Committee's composition and ranking minority member were not appropriate questions for the jury because the House Committee had articulated

---

[1] Claims that the Committee did not follow its operational rules are defenses that, where not waived, must be proven at trial by the Defendant.  They are not elements of the offense that the Government must prove.  *See, e.g.*, *Yellin v. United States*, 374 U.S. 109, 123 (1963) (finding an alleged rules violation could be a defense to contempt of Congress "were [the defendant] able to prove his defense"); *Liveright*, 347 F.2d at 474-75, 475 n.5 (noting that treating rules violation as a potential defense was consistent with Supreme Court precedent that rules compliance is not essential to the offense but potentially valid defenses).

its reading of the relevant rules and the Defendant's proffered claims were contrary to that reading).
These issues being unavailable to the Defendant as defenses at trial, even if additional records
existed relating to them, neither Rule 16 nor *Brady* would provide a basis for their production. *See
United States v. Armstrong*, 517 U.S. 456, 462 (1996) (finding information is only material to the
defense under Rule 16 if it is related to the Defendant's "response to the Government's case in
chief"); *Brady v. Maryland*, 373 U.S. 83 (1963) (defining discoverable material as information
favorable to a defendant that is "material to either guilt or punishment"); *United States v. Blackley*,
986 F. Supp. 600, 603 (D.D.C. 1997) (finding *Brady* material is "not material that would only
support jurisdictional challenges, claims of selective prosecution, or any other collateral attacks on
the indictment, because prevailing on those claims would not prove defendant free from fault, guilt
or blame").

As another example, the Defendant requests early disclosure of Jencks material. ECF No.
31 at 42 (Request No. 5). The Jencks Act, 18 U.S.C. § 3500, however, only requires the production
of statements of testifying witnesses. The Government has not identified its trial witnesses yet,
but has nevertheless disclosed the grand jury transcripts and interview reports of every witness
questioned in relation to the instant charges. It has also disclosed all communications in its
possession between witnesses it interviewed or who testified in the grand jury and the Defendant.
As trial preparations commence, the Government will update its disclosures to provide any Jencks
material, to the extent it may exist and has not already been provided. *See United States v. Sutton*,
Case No. 21-cr-0598-PLF, 2022 WL 1202741, at *9 (D.D.C. Apr. 22, 2022), on reconsideration
in part, Case No. 21-cr-0598-1-PLF, 2022 WL 2828995 (D.D.C. July 20, 2022) (Rule 16 of the
Federal Rules of Criminal Procedure expressly "does not authorize the discovery or inspection of
statements made by prospective government witnesses except as provided by the Jencks Act, 18

U.S.C. § 3500. . . . To compel the disclosure of witness statements before trial – a defendant must demonstrate that (1) portions of those statements contain the substance of any relevant written or oral statements made by the defendant that are disclosable under Rule 16(a)(1)(A) or (B); or (2) they are exculpatory or favorable, so-called *Brady* material." (internal quotations omitted)).

Finally, the Defendant seeks several categories of records that, to the extent they may exist, relate only to internal Department deliberations, *see, e.g.*, ECF No. 31 at 39 (Request No. 2(f) (requesting records relating to how Office of Legal Counsel opinions might apply to the Defendant)), or do not contain any evidence relating to the issues to be decided at trial, *see, e.g.*, *id.* at 38 (Request No. 2(a) (requesting the Government be required to produce copies of requests for information it may have issued and to which it received information it later produced in discovery); *id.* at 40 (Request No. 3 (requesting all interview reports relating to investigations of individuals that have no known involvement in the Defendant's contempt)). With respect to the former, Rule 16(a)(1)(E), however, "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). Nor does *Brady*. *See United States v. Naegele*, 468 F. Supp. 2d 150, 155 (D.D.C. 2007) ("To the extent that defendant seeks documents or records reflecting the internal deliberations of the Department of Justice leading to the decision to seek an indictment, he is not entitled to them under *Brady*, even if some prosecutor 'expressed doubts' that defendant's conduct 'amounts to a crime or warrants prosecution.'"). And with respect to the latter category, as described above, *supra* at 5, the universe of discoverable material is that related to the Defendant's guilt or innocent at trial. There is nothing more, therefore, to order the Government to provide on these or similarly non-discoverable or irrelevant matters.

Having provided all the discoverable information in its possession to date, the Defendant's various requests under Rule 16, *Brady* and its progeny, and the Jencks Act are moot. The Government understands it discovery obligations, takes them seriously, and will continue to comply with those obligations as soon as possible should the Government become aware of any additional discoverable information.

**III.    The Committee, the White House, the Justice Department's Civil Division, and the National Archives and Records Administration are Not Part of the Prosecution Team under Federal Rule of Criminal Procedure 16 or *Brady* and its Progeny.**

Despite the Government's full discovery, the Defendant claims that the Government's discovery obligations are not satisfied until it has searched the records of the Committee, the White House, the Justice Department's Civil Division, and the National Archives and Records Administration ("NARA") for discoverable material. ECF No. 31 at 18-20; *see also, e.g.*, *id.* at 38-39 (Request Nos. 2(d), 2(e), 6(d) and 6(g)). The Government's obligations under Federal Rule of Criminal Procedure 16 and *Brady* only extend, however, to those agencies that are "closely aligned with the prosecution." *United States v. Libby*, 429 F. Supp. 2d 1, 5-6 (D.D.C. 2006) (finding this standard applicable to the government's obligations under Fed. R. Crim. P. 16(a)(1)(E)) (quoting *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1993) (holding the standard applied to the government's *Brady* obligations)). They do not extend to material "possessed by agencies which had no part in the criminal investigation or when the prosecution had no control over the agency officials who physically possessed the documents." *Id.* at 6; *see also Brooks*, 966 F.2d at 1503 (holding that the D.C. Metropolitan Police Department was "closely aligned" with the prosecution for purposes of triggering the government's obligations to search its files where it had a "close working relationship" with the prosecutor's office and that relationship was "obviously at work in this prosecution"). Moreover, "it is settled that the government

generally need not produce documents that are in the possession, custody, or control of a separate branch of government such as Congress." *Libby*, 429 F. Supp 2d at 7 (internal citations omitted); *see also United States v. Safavian*, 233 F.R.D. 12, 14 (2005) ("[The government] does not, however, include a committee of the United States Senate (or the House of Representatives) because the Congress is a separate branch of the government and was not intended by the Rules writers to be included within Rule 16."); Mar. 16, 2022, Hearing Transcript, *Bannon*, at 95 (finding the prosecution team in a contempt of Congress case did not include the Committee or the entirety of the government).

Here, the Committee is part of a separate branch of government and neither the White House, the Civil Division, nor NARA has any ongoing close working relationship with the U.S. Attorney's Office or FBI or had any role in the criminal investigation leading to the charges in this case. Indeed, the Defendant appears to concede the matters in relation to which the Defendant has been engaged with the Civil Division and NARA are related to an entirely different congressional committee. ECF No. 31 at 19. The Defendant asserts that the White House, on the other hand, is part of the prosecution team, because, during its criminal investigation, the Government interviewed a witness in the White House Counsel's Office who had direct communications with the Defendant in relation to the subpoena at issue after it was served and before the Defendant defaulted on its testimonial demands and obtained a voluntary production of that witness's communications with the Defendant. *Id*. at 18-19. By arguing that this converts the White House into part of the prosecution team, however, the Defendant appears to be arguing for a standard under which any government official or entity that is a mere witness in a criminal investigation automatically enlists their agency as a member of the prosecution team. Such a standard runs contrary to even the cases on which the Defendant relies to support his claims. In each of the cases

the Defendant cites, the other executive branch agencies the courts found to be part of the prosecution team actively participated in collecting evidence during the criminal investigation, were directly affected by the criminal conduct at issue, provided analysis and review of criminal allegations, had previously provided open-file access to the prosecuting office, and/or had a unique, close relationship with the prosecutor's office. *See, e.g.*, *United States v. Santiago*, 46 F.3d 885, 893-94 (9th Cir. 1995) (finding Bureau of Prisons inmate files in the possession of the prosecution team where the prosecution team had previously obtained inmate files in the case, BOP had collected evidence in the investigation, and BOP and the U.S. Attorney's Office were part of the same executive branch agency); *United States v. Deutsch*, 475 F.2d 55, 57-58 (5th Cir. 1973) (finding personnel file of USPS employee who was target of charged bribery scheme was in prosecutor's possession where the two agencies were "so closely connected . . . for the purpose of this case" and prosecutor appeared to have access to the file); *Libby*, 429 F. Supp. 2d at 10-11 (finding the Office of the Vice President and the CIA to be "closely aligned" with the prosecution team for discovery purposes where there had been a free flow of information from the agencies and it was unlikely an indictment would have been secured without the information).[2]  None of those circumstances are present here.

Even aside from the fact that the other agencies from which the Defendant seeks records

---

[2] In support of his claims, the Defendant also cites the broad standard applied by one court in this district in *United States v. Safavian*, in which the court held that the "prosecution team" includes "any and all agencies and departments of the Executive Branch."  233 F.R.D. 12, at *2 (D.D.C. 2005).  In a later opinion in the same case, the court recognized this standard "extends beyond agencies 'closely aligned' with the prosecution," *see United States v. Safavian*, 233 F.R.D. 205, at *2 n.1 (D.D.C. 2006), seeming to run contrary, therefore, to the D.C. Circuit's holding in *Brooks*.  Indeed, it does not appear the *Safavian* standard has been adopted by other courts in this district and has been questioned by at least one, *see Libby*, 429 F. Supp. 2d at 6 n.10 (noting that the standard appeared to go even beyond the Ninth Circuit's broad standard for discovery in *Santiago* and that "[t]his Court need not (nor does it believe it could) adopt such a broad reading of the applicable caselaw in this Circuit to properly resolve the pending motions").

are not closely aligned with the prosecution team in this case, the Defendant seeks only records that are either irrelevant to the questions to be determined at trial or about the existence of which he merely speculates.  Neither category entitles him to send the Government on a search in another agency's records.

First, as described above, the Defendant is only entitled to information that goes to matters that will be at issue at trial.  *See Armstrong*, 517 U.S. at 462; *Brady v. Maryland*, 373 U.S. at 87; *Blackley*, 986 F. Supp. at 603.  Yet, the Defendant seeks materials from other government agencies that are untethered from the elements of the offense or available defenses.  For example, the Defendant seeks communications about the Defendant between the White House Counsel's Office and former President Donald Trump or the Committee would relate to issues a jury must decide at trial.  *See* ECF No. 31 at 39 (Request Nos. 2(d) and 2(e)).  The question at trial is whether the Defendant was subpoenaed to provide documents and testimony in relation to the Committee's authorized investigation and whether his default was willful.  *See* Final Jury Instr., *Bannon*, ECF No. 129 at 27-28 (instruction on elements of contempt of Congress).  The Defendant does not explain how the communications he seeks would go to proving or disproving either.  Nor could he—the White House does not control the authorized scope of the Committee's investigation, the subpoena and the Committee's communications with the Defendant speak for themselves with respect to the Defendant's obligations, and communications to which the Defendant was not a party could not provide any evidence of his intent.

Second, speculation is not sufficient to force the Government to search in other agency files for material that may or may not exist and that may or may not be material or favorable under Rule 16 or *Brady*.  *See, e.g.*, *Brooks*, 966 F.2d at 1504; *United States v. Apodaca*, 287 F. Supp. 3d 21, 40 (D.D.C. 2017) (citing *United States v. Williams–Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996);

*United States v. Sims*, 508 F. App'x 452, 460–61 (6th Cir. 2012)).  Yet, for example, the Defendant suggests that, simply because of coincidental timing, there may be some relevance to this case of records in an entirely unrelated civil suit against the Defendant about a different congressional committee and his refusal to provide records that belong to NARA.  *See, e.g.*, ECF No. 31 at 19; *id*. at 38 (Request No. 1).

Accordingly, even under a broad definition of the "prosecution team," the records the Defendant seeks are not sufficiently connected to his trial defense to send the Government on the speculative, irrelevant search he desires.  *See Brooks*, 966 F.2d at 1503-04 ("Where the file's link to the case is less clear, the court must also consider whether there was enough of a prospect of exculpatory materials to warrant a search. . . . As the burden of the proposed examination rises, clearly the likelihood of a pay-off must also rise before the government can be put to the effort.").  His efforts to expand the prosecution team must be rejected.

## IV.    The Defendant Has Failed to Demonstrate He is Entitled to Discovery to Support a Selective Prosecution Claim.

The Defendant claims he is entitled to information relating to whether the White House or the Select Committee exerted improper political influence over the decision to seek an indictment against the Defendant, ECF No. 31 at 26-30, and whether the Defendant's prosecution is the result of selective prosecution, *id*. at 26-35.  The information the Defendant seeks does not go to the elements of the offense or answering the government's proof of them at trial and thus is not discoverable under Rule 16 or *Brady*.  *See United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000) (finding Rule 16 did not entitle the defendant to discovery relating to his double jeopardy claim because the claim related "not to refutation of the government's case in chief but to establishment of an independent constitutional bar to the prosecution"); *Blackley*, 986 F. Supp. at 603 (finding *Brady* material is "not material that would only support jurisdictional challenges,

claims of selective prosecution, or any other collateral attacks on the indictment"). The only case the Defendant cites in support of his first claim for discovery, relating to supposed improper political interference, does not discuss the requirements for criminal discovery at all but instead addresses only whether a court should enforce an administrative subpoena issued by the Securities and Exchange Commission. *See* ECF No. 31 at 26 (citing *SEC v. Wheeling-Pittsburg Steel Corp.*, 648 F.2d 118 (3d Cir. 1981)). Despite citing no legal authority for the request, however, it appears it is an extension of his later selective prosecution claim. *See, e.g.*, ECF No. 31 at 29 (claiming he is "entitled to any communications between the Department of Justice and the Select Committee that may have influenced the Government's decision to prosecute the Defendant for contempt of Congress").[3]

To be entitled to discovery relating to a selective prosecution claim, the Defendant must offer "some evidence tending to show the existence of the essential elements of the defense," *Armstrong*, 517 U.S. at 468 (citation omitted), that is, "some evidence of both discriminatory effect and discriminatory intent," *United States v. Bass*, 536 U.S. 862, 863 (2002). The showing the Defendant must make is a "rigorous" one, *Armstrong*, 517 U.S. at 468, and "a defendant must provide something more than mere speculation or 'personal conclusions based on anecdotal evidence,'" *United States v. Stone*, 394 F. Supp. 3d 1, 31 (D.D.C. 2019) (quoting *Armstrong*, 517 U.S. at 470). Moreover, if the Defendant fails to show either discriminatory effect or discriminatory intent, he is not entitled to discovery. *See United States v. Blackley*, 986 F. Supp. 616, 618 (D.D.C. 1997) (citing *Attorney General of U.S. v. Irish People, Inc.*, 684 F.2d 928, 947

---

[3] The Defendant also suggests that he is entitled to contacts between the White House and Select Committee because the "possibility exists" that the White House exerted "political influence over [the Committee's] decisions regarding" the Defendant. ECF No. 31 at 30. The Committee's decisions regarding the Defendant, however, can have no relation to any selective prosecution claim since it is a separate branch of government with no prosecuting authority.

(D.C. Cir. 1982)). The Defendant has failed to make the requisite showing to be entitled to discovery for a selective prosecution claim.

First, the Defendant fails to show discriminatory effect. To show discriminatory effect, the Defendant must show some evidence "that the Government afforded 'different treatment' to persons 'similarly situated' to him." *United States v. Judd*, -- F. Supp. 3d --, 2021 WL 6134590, at *2 (D.D.C. 2021) (quoting *Armstrong*, 517 U.S. at 470). "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *United States v. Khanu*, 664 F. Supp. 2d 28, 32 (D.D.C. 2009) (quoting *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008)) (internal quotation marks omitted).

The Defendant claims that Mark Meadows and Daniel Scavino, two other individuals who did not comply with a Select Committee subpoena and were not prosecuted are similarly situated to him. ECF No. 31 at 32-33. He claims that the discriminatory classification differentiating him from Meadows and Scavino is the Defendant's "public expression of political beliefs." *Id* at 31. But the Defendant does not explain or demonstrate how this places him in a protected class of which Meadows and Scavino are not a part. Based on public reporting and their social media pages, Meadows and Scavino both appear to also frequently make public statements about their political beliefs.[4]  Having failed to identify any similarly situated individuals that have not exercised the constitutional right for which the Defendant claims he has been chosen for prosecution, he cannot meet his burden to show discriminatory effect.

Moreover, even if the Defendant had shown Meadows and Scavino to be outside the

---

[4] *See, e.g.*, https://twitter.com/markmeadows; https://twitter.com/DanScavino (last accessed Aug. 15, 2022).

protected class of which the Defendant claims he is a part, he has not shown that they have committed "roughly the same crime under roughly the same circumstances." *Khanu*, 664 F. Supp. 2d at 32. The only similarities the Defendant identifies is the fact that he, Meadows, and Scavino all defied a Select Committee subpoena and all invoked executive privilege in doing so. The similarities, however, end there. Meadows, unlike the Defendant, did produce records to the Committee. And, as is clear from the House reports reciting the facts of Meadows's and Scavino's failures to comply with their subpoenas,[5] the circumstances of their communications with the Committee and refusals to comply were different in almost every way from the Defendant's. Having failed to show discriminatory effect, the Defendant's request for discovery relating to selective prosecution can be denied without further analysis.

In any event, the Defendant also has failed to show the second prong of the test—discriminatory intent. To do so, he must demonstrate that "the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, or was designed to prevent or paralyze his exercise of constitutional rights." *United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982) (internal citations and quotation marks omitted); *see also Wayte v. United States*, 470 U.S. 598, 610, (1985) (noting that discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group" (citations and internal quotation marks omitted) (alteration in original)). Here, the Defendant claims that

---

[5] *See* H. Rep. 117-216, Resolution that the House of Representatives find Mark Randall Meadows in Contempt of Congress, *available at* https://www.congress.gov/117/crpt/hrpt216/CRPT-117hrpt216.pdf (last accessed Aug. 15, 2022); H. Rep. 117-284, Resolution that the House of Representatives find Peter K. Navarro and Daniel Scavino, Jr. in Contempt of Congress, https://www.congress.gov/117/crpt/hrpt284/CRPT-117hrpt284.pdf (last accessed Aug. 15, 2022).

discriminatory purpose is evident in the Committee's reference in its criminal contempt report to the Defendant's public statements that he was not going to comply with the subpoena. ECF No. 31 at 34. But the Committee is not part of the prosecution team—indeed it is not part of the Executive Branch tasked with enforcing the laws. It certainly has no role in the Department of Justice's prosecutorial decisionmaking. It is the prosecuting authority that the Defendant must show acted with discriminatory purpose. The Committee's report can provide no evidence of the prosecutors' intent. *See Stone*, 394 F. Supp. 3d at 36 ("If one seeks permission to embark on discovery related to selective prosecution, it is not enough to simply state that the prosecutor was biased. Defendant must *show* that in his case, the decisionmaker acted with a discriminatory purpose." (emphasis in original)).

The Defendant also appears to claim that there is some evidence of discriminatory intent because, 1) according to the Defendant, this prosecution departs from Office of Legal Counsel opinions, *id*. at 26; 2) months before the Defendant was served with the subpoena, President Biden made statements that individuals who unlawfully defy congressional subpoenas should be prosecuted, ECF No. 31 at 26; 3) the Defendant was not allowed to self-surrender after being indicted, *id*. at 28; 4) ██████████████████████████████████████ ████████████████████████, *id*.; and 5) the White House Counsel's Office informed the Defendant before he defaulted on the subpoena's testimonial demand that President Biden would not be invoking executive privilege, *id*. at 29.

None of these claims carries the weight of meeting the Defendant's burden to show that the prosecutors in this case sought an indictment to discriminate against the Defendant because he exercised his constitutional rights. First, this case does not depart from Office of Legal Counsel ("OLC") opinions. There is no OLC opinion holding that former White House staff members can

invoke executive privilege of their own accord.  Nor is there one that holds that, even where a president invokes executive privilege in response to a congressional subpoena the summonsed witness can then withhold all responsive records, whether privileged or not.  Nor is there an OLC opinion holding that a former White House staff member to a former President has absolute testimonial immunity when summonsed by Congress.  Indeed, there is not even an OLC opinion holding that all current White House staff members have such immunity—OLC has only ever found such immunity to apply to a limited group of immediate advisers based on a fact-intensive review of those advisers' roles.  *See, e.g.*, *See Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *55 (Jan. 8, 2021) ("[I]n determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President. . . . most members of the White House staff do not qualify for immunity from compelled testimony.").

Second, the Defendant's continuing claims about his arrest are based on a misrepresentation of the facts and his posture toward the Government at the time of his arrest.  He claims that it was unprecedented and unusual that he was not permitted to self-report.  ECF No. 31 at 28.  Contrary to the Defendant's claims, however, it is not law enforcement's normal practice to ask combative, unrepresented subjects to self-surrender.  At the time he was indicted and arrested, the Defendant was not represented.  And only a few days before, when the case agents attempted to interview him and serve him with a subpoena at his residence, the Defendant at first refused to open the door and then, when he did, told the agents to "get the f*** out of here."[6]  The Defendant also has an extensive history of seeking out news coverage.  To avoid a media circus,

---

[6] This interaction was recorded and produced in discovery to the Defendant on June 14, 2022.  The Government can provide it to the Court if needed.

therefore, the arresting agents encountered the Defendant in a discrete location on the jet-bridge at the airport, removed him to the tarmac, and took him to be booked from there—all out of sight of the public.  Moreover, the "strip search" and "leg irons" of which the Defendant repeatedly complains is, to the Government's understanding, the U.S. Marshal's standard procedure for all arrestees—whether they self-surrender or not.  The Defendant seeks to have this Court attribute discriminatory intent to an arrest operation aimed at safely and efficiently handling an unrepresented, unpredictable subject without a media frenzy.  His claims are meritless.

Finally, the Defendant's remaining claims relate to two events that occurred even before the crime had been committed, ECF No. 31 at 26, 29,



Nevertheless, the Defendant asserts that these events and testimony reflect some improper pressure being applied by the Committee or the White House to the career prosecutors in this case, forcing them to make improper discriminatory decisions.  But his claims are based on pure speculation.  And the prosecution team is unaware of any such pressure campaigns.  Being unaware, any additional communications between the Department of Justice and/or the White House and/or the Select Committee, to the extent they even exist, could not have influenced the Government's decision to prosecute the Defendant.[7]  The Defendant's speculation

---

[7] In his motion, the Defendant accuses the Government of shielding from him the existence of any communications between the Department of Justice, including the Office of Legal Counsel, and the Select Committee and/or the White House.  ECF No. 31 at 27.  This is not true.  On July 27, 2022, prior to the Defendant's motion, the Government informed counsel that, "[w]e do not have any correspondence between the White House, the Select Committee, and the Department of

that it is otherwise cannot meet his burden.  *See Stone*, 394 F. Supp. 3d at 11 ("There is no precedent that would authorize the dismissal of an indictment based on pure conjecture.").

Having provided no evidence of discriminatory intent on the part of the actual prosecutorial decisionmakers, the Defendant has failed to make the requisite showing for discovery relating to a selective prosecution claim.

**V.     The Defendant is Not Entitled to Discovery of Additional Grand Jury Material.**

The Defendant seeks copies of  To justify these requests, the Defendant claims a "ground may exist to dismiss the indictment because of a matter that occurred before the Grand Jury."  *Id*. at 35.  Specifically, the Defendant suggests that the Government did not present to the grand jury what he claims to be exculpatory material relating to the Committee's composition, *id*. at 36, did not present supposedly exculpatory evidence of the Defendant's only now purported reliance on OLC opinions, *id*. at 36-37, and improperly instructed the grand jury on the law, *id*. at 37.

The Defendant's requests must be denied, because he has failed to meet his burden to show a particularized need.  "Federal Rule of Criminal Procedure 6(e) 'makes quite clear that disclosure of matters occurring before the grand jury is the exception and not the rule.'"  *McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019) (citation omitted).  Accordingly, to pierce the secrecy of grand

---

Justice that is responsive to your request *and we are not aware of any*."  *See* ECF No. 31-7 at 1 (emphasis added).

jury proceedings, the Defendant must demonstrate a particularized need for the material. *United States v. Saffarinia*, 424 F. Supp. 3d 46, 81 (D.D.C. 2020); *Apodaca*, 287 F. Supp. 3d at 47; *United States v. Wilkerson*, 656 F. Supp. 2d 22, 34 (D.D.C. 2009) ("Fed. R. Crim. P. 6(e)(3)(E)(i) allows district courts to authorize disclosure of grand jury matters "in connection with a judicial proceeding" if the party requesting disclosure demonstrates a "particularized need" or "compelling necessity" for the testimony."). "[D]isclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and . . . the burden of demonstrating this balance rests upon the private party seeking disclosure." *United States v. Borda*, 905 F. Supp. 2d 201, 204 (D.D.C. 2012) (internal citation omitted). The Defendant does not meet his burden here.

To show that a ground may exist for dismissing the indictment because of an issue relating to the grand jury, the Defendant must meet a high bar. "Grand jury proceedings are 'accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.'" *Borda*, 905 F. Supp. 2d at 204 (quoting *United States v. Mechanik,* 475 U.S. 66, 75 (1986) (O'Connor, J., concurring)). "An indictment valid on its face may not be challenged on the ground that the grand jury acted on the basis of inadequate, unreliable or incompetent evidence." *Id*. (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261 (1988)). The standard for dismissing an indictment for an error in the grand jury "is so high that dismissal of an otherwise valid indictment is inappropriate even where the government failed to disclose substantial exculpatory evidence it possessed at the time of the grand jury." *Id*. (internal citation omitted). Accordingly, "conclusory or speculative allegations of misconduct do not meet the particularized need standard; a factual basis is required." *Naegele*, 474 F. Supp. 2d at 10.

The Defendant does not explain how issued grand jury subpoenas, judicial orders to testify, and testimony that may have been provided in other matters could shed any light on the

Defendant's claims of purported error.  Having failed to establish that the requested information would do anything to advance his planned claims for dismissal based on evidence not presented to the grand jury or the Government's instructions to the grand jury, the Defendant has failed to make the factual showing necessary to meet the particularized need standard.  In any event, the Government has already provided the Defendant all records obtained in response to grand jury subpoenas and all witness testimony and exhibits presented to the grand jury in this matter.  He has all he needs to be able to make claims about what supposedly exculpatory evidence was and was not presented to the grand jury.

Moreover, the Defendant has failed to make any factual showing of error in the first place. His assertion that the jury was not properly instructed is nothing but speculative.  The indictment properly alleges the elements of the offense—which the Defendant does not appear to dispute— and he provides no reason to believe the grand jury was instructed on the law in any way contrary to those allegations.  This is fatal to the Defendant's claim of particularized need for any grand jury materials in relation to claims about the grand jury charge.  *See Saffarinia*, 424 F. Supp. 3d at 81 (denying request for grand jury minutes where defendant's claim that grand jury was improperly instructed on the law was speculative and indictment sufficiently alleged essential elements); *United States v. North*, 708 F. Supp. 370, 371-72 (D.D.C. 1988) ("[T]here is no requirement that the grand jury be instructed on every aspect of the law. . . . Never have prosecutors had to present all possible legal defenses to a grand jury.").

In addition, the "exculpatory" evidence the Defendant claims was withheld from the grand jury is not, in fact, exculpatory.  As described above, the Defendant's claims relating to the composition of the Committee have been waived as a defense, *supra* at 3-4, and the Defendant's post-indictment claim that he relied on OLC opinions—notably, he identifies none that he believes

should have been presented to the grand jury—cannot provide a defense because the contempt of Congress statute does not require that the Defendant have acted in bad faith or with knowledge that his conduct was unlawful, *see Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947) (affirming jury instruction on "willful" in contempt of Congress statute); Order, *Bannon*, ECF No. 49 (granting Government's motion to exclude good-faith reliance defenses in contempt of Congress case); July 11, 2022, Hearing Transcript, *id.*, at 117 (noting that arguments that defendant thought he was legally excused from compliance with congressional subpoena "would not go to any aspect of willfully, as the Court of Appeals has defined it"). In any event, even if the information were truly exculpatory—and it is the Government's practice to present true, materially exculpatory information to the grand jury—the law does not require the Government to present exculpatory evidence to the grand jury. *United States v. Williams*, 504 U.S. 36, 52-53 (1992).[8]

## VI.    Conclusion

The Government has met and exceeded its discovery obligations, and the Government will continue to comply with its obligations as required. The Defendant has failed to demonstrate that he is entitled to anything more and his motion to compel should be denied.

---

[8] The Defendant relies repeatedly on Justice Manual provisions to support his argument that failure to present exculpatory information is error justifying disclosure of grand jury material. ECF No. 31 at 36. But as he also concedes, the Justice Manual's requirements of presenting exculpatory information to the grand jury are not reflected in controlling law. *Id.* Moreover, while the Government takes it obligations under the Justice Manual seriously, it does not create any rights for the Defendant in this case. *See United States v. Blackley*, 167 F.3d 543, 549 (D.C. Cir. 1999) ("[V]iolations of Manual policies by DOJ attorneys or other federal prosecutors afford a defendant no enforceable rights."); *United States v. Kember*, 648 F.2d 1354, 1370 (D.C. Cir. 1980) ("[W]e do not believe the general guidelines established by the Manual are judicially enforceable."); Justice Manual § 1-1.200, *available at* https://www.justice.gov/jm/jm-1-1000-introduction#1-1.200 (last accessed Aug. 18, 2022) (stating the Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.").

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/  Elizabeth Aloi*
       Molly Gaston (VA 78506)
       Amanda R. Vaughn (MD)
       Elizabeth Aloi (D.C. 1015864)
       Assistant United States Attorneys
       United States Attorney's Office
       601 D Street, N.W.
       Washington, D.C. 20530
       (202) 252-1793 (Vaughn)
       amanda.vaughn@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) **Criminal No. 1:22-cr-00200-APM** |
| | ) |
| v. | ) |
| | ) |
| PETER K. NAVARRO, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Defendant Peter K. Navarro, by and through the undersigned counsel, and pursuant to Rule 12(b)(3)(A) and (3)(B) of the Federal Rules of Criminal Procedure, respectfully moves this Court for an Order dismissing the indictment. In support thereof, Dr. Navarro states as follows:

### I. INTRODUCTION

Dr. Peter Navarro served as a Senior Adviser to President Donald J. Trump during the former President's entire term in office, from January 2017 through January 2022. His positions in the Trump Administration included Deputy Assistant, and then Assistant, to the President, Director of Trade and Manufacturing Policy, Director of the White House National Trade Council (and then the Office of Trade and Manufacturing Policy), and Defense Production Act policy coordinator during the COVID-19 pandemic. Through the performance of these and other duties, Dr. Navarro was one of a small group of senior advisors "who customarily meet with the President on a regular or frequent basis [and] should be deemed absolutely immune from testimonial compulsion by congressional committee"[1]/

---

[1]/ *Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, Re: Executive Privilege* at 5 (May 23, 1977). The Department of Justice Office of Legal Counsel ("OLC") has recognized for the last eight presidential administrations that senior advisors to a President are "absolutely immune" from congressional process. *See Memorandum For Pat A. Cipollone Counsel To The President,* 43 Op. O.L.C. __ (May 20, 2019).

Nonetheless, and in direct contradiction of decades of Department of Justice policy and precedent, on June 2, 2022, the government charged Dr. Navarro with criminal Contempt of Congress in violation of 18 U.S.C. § 192 based on his non-compliance with a subpoena issued by the Select Committee[2]/ for the production of documents and deposition testimony. For the reasons stated herein, Dr. Navarro moves this Court for entry of an order dismissing the indictment pursuant to Fed. R. Crim. P. 12(b)(3)(A) (due to defects in instituting the prosecution) and Fed. R. Crim. P. 12(b)(3)(B) (defects in the indictment).[3]/

## II. PROCEDURAL BACKGROUND

### A. This Prosecution Is A Significant Departure From Long- Standing Department Of Justice Policy And Precedent.

The prosecution of Dr. Navarro is far more than a simple misdemeanor prosecution: it stems from the intersection of congressional investigative power attempted to be enforced against this defendant, and the doctrine of Executive Privilege asserted by Presidents since the founding of the Republic and validated for over five decades by the Department of Justice Office of Legal Counsel (OLC) opinions from 1984 to the present. While the criminal contempt statute, 2 U.S.C. § 192, was invoked hundreds of times by both the House and Senate against private parties during the McCarthy era, *see* Carl Beck, *Contempt of Congress: A Study of the Prosecutions Initiated by The Committee on House Un-American Activities*, 1945-1957 (The Hauser Press, New Orleans

---

[2]/ The United States House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee")

[3]/ On August 4, 2022, Dr. Navarro filed a Motion to Compel Discovery from the government (Dkt. 31). The motion is currently pending before the Court and as noted during a status hearing on August 11, 2022, Dr. Navarro reserves the right to amend this Motion to Dismiss based on addition discovery the Court may order the government to provide him.

1959) at 241-243, the vast majority of those cases resulted in dismissal, acquittal or reversal on appeal. *Id.* at 186.

More significantly, in the post-McCarthy era and since the 1982 certification for contempt of then EPA Administrator Anne Gorsuch (Burford) for refusing to turn over documents subpoenaed by a committee relating to administration of the Superfund Act, (1) no high-ranking cabinet or White House official has been subjected to a lawsuit brought under the statute. And, *a fortiori*, (2) prior to the present case no senior advisor to a President has *ever* been criminally prosecuted for non-compliance with a congressional subpoena.[4]

From that time forward, in an unbroken line of OLC opinions in both Republican and Democratic administrations spanning more than five decades, the Department of Justice has steadfastly and consistently declined to use the statute against senior advisers to the President, concluding that they are immune from congressional process as "alter egos" of the President. In the Department's view, prosecution under the statute for these officials would place a "heavy burden" upon the assertion of Executive Privilege. United States' Mot. Summ. J. 36 n. **. *United States v United States House of Representatives*, No. 82-cv-3583. Following this Court's admonition in 1983 that "Compromise and cooperation, rather than confrontation, should be the aim of the parties," *United States v. United States House of Representatives*, 556 F. Supp. 150, 153 (D.D.C. 1983), no other White House aide acting under a Presidential assertion of privilege has been prosecuted under the statute despite numerous interbranch conflicts as between the executive and the legislature involving both testimony and documents. *See Comm. on the Judiciary, United States House of Representatives v Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008); *House Comm. On*

---

[4] Arguably, the sole exception is *United States v. Stephen Bannon*. But the circumstances of *Bannon* are very different from the present case involving Dr. Navarro, who served as a Senior Advisor to President Trump for all four years of his term in office.

*Oversight v. Holder*, 979 F. Supp. 2d 1 (2013). In fact, it is because of the Department's practical nullification of the statute as applied to senior advisers to the President that the House has attempted to utilize civil suits to enforce its subpoenas. *See e.g., House Comm. on the Judiciary v McGhan,* 973 F. 3d 121 (D. C. Cir. 2020).

The present case is a substantial departure from the Department's long-established recognition that a senior aide to President is "absolutely immune" from compulsion to respond to a congressional subpoena.[5]/ DOJ has taken that questionable departure even farther by now, for the first time in our nation's history, instituting a criminal prosecution of Dr. Navarro for acting in accordance with the direction of former President Trump and despite decades of established Department precedent. Rather than pursue civil remedies to sort through the implications of the former President's privilege assertions so as to obtain Dr. Navarro's documents and/or testimony, the Department has chosen to punish his, "obedience to an assertion of Executive Privilege by the President from whom [his] governmental authority derives." As the Department of Justice has previously advised, a subpoenaed senior adviser to the president:

> is not really being prosecuted for conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. *It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute*, at least where there is an alternative means for vindicating congressional investigative interests and forgetting the legal issues into court.

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege,* __ Op. O.L.C. __ n. 39 (May 30, 1984) (emphasis added) *citing* former Solicitor General Rex Lee in *Executive Privilege, Congressional Subpoena Power, and Judicial*

---

[5]/ This immunity continues even *after* the tenure of a particular advisor to the President because, absent a guarantee of lasting confidentiality, a "President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duty depends." *Nixon v. Admin'r of Gen Servs.*, 433 U.S. 425, 449 (1977).]

*Review: Three Branches, Three Powers, and Some Relationships*, 1978 B.Y.U. L. Rev. 231, 259 (emphasis added).[6/]

**B. The Prosecution Of Dr. Navarro Is Improperly Based On His Obedience To President Trump's Invocation Of Executive Privilege.**

To that end, former President Trump has perhaps no more clearly instructed Dr. Navarro to assert the President's applicable privileges than any other senior presidential adviser subpoenaed by Congress. In November 2021, the House Select Committee on the Coronavirus Crisis ("COVID Subcommittee") issued a subpoena to Dr. Navarro for documents and testimony. Then, on November 20, 2021, former President Trump issued a press release advising that, "I'm telling Peter Navarro to protect Executive Privilege and not let these unhinged Democrats discredit our great accomplishments." Press Release, Donald J. Trump (Nov. 20, 2021).[7/] Accordingly, Dr. Navarro responded by letter of December 7, 2021, to Chairman James E. Clyburn stating that he was "unable to respond to the subpoena based on former President Trump's invocation of Executive Privilege with respect to the very topic covered by the subpoena." Dr. Navarro described the instructions as "a direct order" from the President. Although Chairman Clyburn told Dr. Navarro that he had "no valid basis for refusing to comply with the subpoena" he and the COVID Subcommittee seemingly dropped the matter.[8/] The COVID Subcommittee's apparent acceptance

---

[6/] The Department should be judicially estopped from pursuing this prosecution in contravention of the constitutional principles it has followed for decades. This Motion asks the Court to enforce the fundamental precepts of fairness that the Department now, for some reason, has chosen to ignore.

[7/] *Available at* https://twitter.com/realLizUSA/status/1462157208699953156?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1462157208699953156%7Ctwgr%5Ea798e29eb7c9f63e09c7d67f7b82d1dcda054a4c%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.businessinsider.com%2Fdonald-trump-tells-peter-navarro-to-defy-house-covid-19-probe-2021-11 (last visited Aug. 17, 2022).

[8/] Indeed, the COVID Subcommittee did not raise the matter again until *seven months* later, on July 27, 2022. Coincidentally, or not, after remaining silent for some seven months, the COVID Subcommittee contacted Dr. Navarro on July 27, 2022, via his counsel, within hours after the undersigned counsel emailed a Rule 16 letter to the government in the present case requesting all correspondence between the COVID Subcommittee and Dr. Navarro.

of Dr. Navarro's invocation of Executive Privilege on behalf of President Trump confirmed for him that Congress did not dispute that he was "immune" from the congressional subpoena. He accordingly responded in similar manner when, several months later, the Select Committee served him with another subpoena.

On February 9, 2022, Select Committee staff emailed Dr. Navarro, asking if he would accept service of its subpoena and whether he had an attorney. Dr. Navarro replied: "yes. No counsel. Executive privilege." House Report 117-284 (March 29, 2022) ("House Report") at 3. Later that day, Dr. Navarro released a public statement which said in pertinent part that,

> President Trump has invoked Executive Privilege; and [it] is not my privilege to waive. [The Select Committee] should negotiate any waiver of the privilege with the President and his attorneys directly, not through me.

House Report at 3.

On February 24, 2022, Select Committee staff again contacted Dr. Navarro about the subpoena. He responded on February 27, 2022, stating, in part, that "President Trump has invoked Executive Privilege in this matter … Accordingly, my hands are tied." Indictment ¶ 17. The next day, on February 28, Dr. Navarro reiterated by email to the Select Committee that he was unable to comply with the subpoena because the "privilege is not mine to waive" and it is "incumbent on the Select Committee to directly negotiate with President Trump and his attorneys" regarding the matter. Indictment ¶ 18.

Inexplicably, neither the Select Committee nor its staff ever contacted President Trump or his attorneys to attempt to resolve the privilege issues, a long-standing practice[9] strongly

---

[9] *See Trump v. Mazars*, LLP, 591 U.S. __, 140 S.Ct. 2019 (2020)(". . . Congress and the Executive have nonetheless managed for over two centuries to resolve such disputes among themselves without the benefit of guidance from us. Such longstanding practice 'is a consideration of great weight' in cases concerning 'the allocation of power between [the] two elected branches of Government,' and it imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that [those] branches . . . themselves have reached.'" (internal quotations and citations omitted)).

encouraged by the Supreme Court. Instead, the Select Committee moved forward with a recommendation that the House of Representatives hold Dr. Navarro in contempt of Congress, which it did and then referred Dr. Navarro to the Department of Justice for Criminal Prosecution.[10]/

On June 2, 2022, a federal grand jury returned an indictment against Dr. Navarro charging him with two misdemeanor counts for Contempt of Congress (Papers and Testimony) in violation of 2 U.S.C. §192,[11]/ and alleging that he failed to comply with the Select Committee's subpoena.

Dr. Navarro has been unfairly caught in a dispute between the executive and legislative branches of our government and placed on the horns of a dilemma: follow the explicit instructions from the President he served as a senior advisor for four years, or risk being held in Contempt of Congress and criminally prosecuted by the Department of Justice. This is a Hobson's Choice and, as the D.C. Circuit noted in *Tobin v. United States*, 306 F.2d 270 (D.C. Cir. 1962): "Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights." *Id.* at 276.

**C**. **The Government's Presentation To The Grand Jury Underscores The Unusual Way the Department Has Approached this Prosecution.**

To date, the Government has disclosed █████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[10]/ The discovery provided thus far by the Government indicates that the Select Committee counsel who was the point of contact with Dr. Navarro did not communicate Dr. Navarro's assertion of Executive Privilege to Chairman Thompson or his designee. Counsel acknowledged that he did not know of any attempt by the Select Committee to negotiate the privilege issue with President Trump or his lawyers and he seems to have concluded on his own accord that Dr. Navarro did not have the right to invoke the privilege on behalf of the former President. FBI Interview of Dan George (June 3, 2022)(US-000435).

[11]/ Each of the two counts is punishable by a fine of not more than $1,000 nor less than $100 and imprisonment for not less than one month nor more than twelve months. 2 U.S.C. §192.



### III.  STANDARD OF REVIEW

A party may raise by pretrial motion any defense, objection, or request that the court can

determine without a trial on the merits. Fed. R. Crim. P. 12(b)(1). A criminal defendant may move

to dismiss an indictment based on a "defect in the indictment," including for "lack of specificity" and "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii) & (v). A motion to dismiss "allows a district court to review the sufficiency of the government's pleadings, but it is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 154 (D.D.C. 2015).

When considering a motion to dismiss, a court will assume the truth of the factual allegations that are pled in the indictment. *See Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952); *United States v. Ballestas,* 795 F.3d 138 (DC Cir. 2015). Defects that are subject to attack include the failure of an indictment to charge an offense, including constitutional challenges to the statute creating the offense. *United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated in part on reh'g on other grounds,* 898 F.3d 36 (D.C. Cir. 2018); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973). Dismissal of the indictment is the appropriate remedy where errors in the grand jury process rise to the level of constitutional violations, *i.e.,* where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 254 (1988) *citing Vasquez v. Hillery*, 474 U.S. 254, 260-264 (1986)(racial discrimination in selection of grand jurors); *Ballard v. United States*, 329 U.S. 187 (1946)(women excluded from the grand jury).

Grand jury errors that do not rise to the level of constitutional violations are reviewed by a harmless error analysis under Fed. R. Crim. P. 52(a), where "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations. *Bank of Nova Scotia,* 487 U.S. at 254 (harmless error where Sixth Amendment violations (interviews of bank employees without counsel) occurred after

the indictment, and other violations (*e.g.*, calling witnesses for the sole purpose of having them invoke the Fifth Amendment, prosecutors arguing with an expert witness during a recess after the witness gave testimony adverse to the government, conferring immunity without a court order, and causing an IRS agent to mischaracterize prior testimony) did not amount to a "significant infringement on the grand jury's ability to exercise independent judgment.") (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986)(O'Connor, J. concurring) (harmless error where the government violated Fed. R. Crim. P. 6(d) by having two agents testify at the same time before a grand jury, but defendant's challenge came after his conviction by a trial jury)).

## IV. ARGUMENT

### A.  The Indictment Violates the United States Constitution

"Historically, disputes over congressional demands for presidential documents" have not involved the courts but, instead, "have been hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Thompson*, 20 F. 4th 10, 25 (D.C. Cir. 2021) (quoting *Mazars USA LLP*, __ U.S. __, 140 S. Ct. at 2019, 2029 (2020). Indeed, the last irreconcilable dispute between the legislative and the Executive branches of our government over the compulsory testimony of a senior presidential adviser occurred forty (40) years ago with the contempt referral of President Reagan's senior presidential advisor, EPA Administrator Anne Gorsuch (Buford). Despite protracted negotiations the executive and legislative branches were unable to reach an agreement and the Department of Justice, on behalf of the executive branch, brought suit against Congress seeking a declaratory judgment concluding that then Administrator Gorsuch's non-compliance with an otherwise validly issued Congressional subpoena was "lawful." Second Amended Complaint at 10, *United States v. United States House of Representatives*, No. 82-cv-3583 (attached hereto as Exhibit 1). As applied to a senior executive branch Official, the Department of Justice asserted, 18 U.S.C. § 192 was unconstitutional insofar

as it required the deprivation of liberty for an official who at all times acted consistent with the directive of the President. The Department of Justice described that conflict:

> The Executive Branch has both the constitutional and a common law privilege to ensure the confidentiality of its law enforcement files and its deliberative process. Producing to the Subcommittee the documents [requested] would contravene those privileges. Accordingly, even if the Subpoena were deemed to require Administrator Gorsuch to produce those documents, her refusal to do so was lawful in all respects.

*Id.* at 9 ¶ 38. Executive Privilege preserves the fundamental principle of separation of powers, "which is at the heart of our constitution." *Buckley v. Valeo*, 424 U.S. 1, 119 (1976) (*per curiam*). The judiciary acts as an important safeguard as against the other branches where:

> An assumption by one branch of powers that are central or essential to the operation of a coordinate branch, provided also that the assumption disrupts the coordinate branch in the performance of its duties and is unnecessary to implement a legitimate policy of the Government.

*Chadha v. Immigration and Naturalization Service*, 634 F.2d 408, 425 (9th Cir. 1980). *See Buckley*, 424 U.S. at 118-24 ("This Court has not hesitated to enforce the principle of separation of powers embodied in the Constitution when its application has proved necessary for the decisions of cases or controversies properly before it."); *United States v. Nixon*, 481 U.S. 683, 118-24 (1974); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself"); *Myers v. United States*, 272 U.S. 52 (1926) ("All legislative powers herein granted shall be vested in a congress of the United States." In that which grants the Executive power, the expressions are "The executive power shall be vested in a President of the United States."). Judicial intervention in these disputes was essential in order to maintain the delicate balance of powers among the branches created by the Constitution.

A prosecution for Contempt of Congress following a legitimate assertion of Executive Privilege precluding Dr. Navarro's appearance before the Select Committee, the prosecution of

Dr. Navarro for contempt of congress necessarily violates the doctrine of Separation of Powers and is unconstitutional. The question thus presented is whether a former President can assert Executive Privilege as to his Administration's former senior presidential advisers in response to an otherwise lawful congressional subpoena. The answer necessarily must be yes. As Justice Kavanaugh recently emphasized, "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanaugh, J., respecting denial).

> If Presidents and their advisers that that their privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a potential opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of a continuing confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

*Id.* at 681. Practically speaking, there can be no real question that were Donald J. Trump the incumbent president, the Department of Justice would similarly refuse to prosecute Dr. Navarro for Congressional contempt. *Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, _ Op. O.L.C. _ (2019) ("The Assistant to the President and Senior Counselor to the President is absolutely immune from compelled congressional testimony in her capacity as senior adviser to the President [and] [t]he President may lawfully direct her not to appear [for her deposition] and she may not be penalized for following such a direction.") Nor can there be any real question that the prerogatives of former President Trump and incumbent President Biden diverge – to whit, President Biden, through the Department of Justice, has now advised a court in this District that he alone has the authority to determine whether the Executive Privilege applies to the compelled testimony of a former close presidential aide.

Again, the question presented is therefore whether an incumbent president may unilaterally determine the application of Executive Privilege as to the senior presidential advisers of the incumbent President's predecessor and political rival. The answer is unequivocally no – to hold otherwise would contravene the purpose of Executive Privilege.

Although the government will undoubtedly cite a number of overly semantic arguments in an effort to avoid this Court reaching such a conclusion, these arguments not only place form over substance but have no real merit. Dr. Navarro has been caught between an inter-branch dispute where the incumbent President has chosen not to assert the privileges of his political adversary and in so doing the government – the Department of Justice – has forced this Court to decide whether an incumbent President has the sole authority to determine the application of testimonial immunity and Executive Privilege and to evaluate the impact on Separation of Powers as between our executive and legislative branches in an era where political divisiveness has never been greater.

### 1. The Power of Congress to Investigate is Not Absolute.

Congress does have the power to investigate. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927) ("[T]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function."). The power is broad, but it is not without limitations. *Watkins v. United States*, 354 U.S. 178, 187 (1957). Accordingly, Congress and its duly authorized committees may issue a subpoena where the information sought "is related to, and in furtherance of, a legitimate task of Congress," *Watkins v. United States*, 354 U.S. 178, 187 (1957), and the subpoena serves a "valid legislative purpose." *Quinn v. United States*, 349 U.S. 155, 161 (1955). At the same time, because Congress's subpoena power "is justified as an adjunct to the legislative process, it is subject to several limitations," *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020), limitations which stem directly from the Constitution. *Kilbourn v. Thompson*, 103 U.S. 168, 182-89 (1880). As the Supreme Court observed in *Barenblatt v. United States*, 360 U.S. 109

(1959): "Lacking the judicial power given to the Judiciary, it cannot inquire into matters that are exclusively the concern of the Judiciary. Neither can it supplant the Executive in what exclusively belongs to the Executive." *Id.* at 112 (emphasis added).

### 2. The Department of Justice Has Long-Held that the President Can Invoke Testimonial Immunity to Preclude a Close Advisor from Testifying.

The constitutional rationale for prohibiting congressional subpoenas to senior advisers to the President is straightforward.  As Attorney General Janet Reno explained, "[s]ubjecting a senior presidential advisor to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 5 (1999). "Absent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain." *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. at *5 (July 15, 2014).

This rationale suffers no diminution because the subpoena recipient was a close adviser to a former president. *See Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 192-93 (2007) ("Separation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers."). Indeed, without a guarantee of continuing confidentiality, "a President could not expect to receive the full and frank submissions of facts and

opinions upon which effective discharge of his duties depends." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977).

Thus, in 1982, the Department of Justice took the unprecedented step of initiating a civil action against the U.S. House of Representatives. In its motion for summary judgment, the Department described the suit as follows: "This case is unique. There has rarely been a sharper confrontation between the Legislature and the Executive, and never one quite like this. Accordingly, while we are seeking what may appear to be extraordinary relief, that is because this is an extraordinary situation." Mot. Summary Judgment at 17, *United States v. United States House of Representatives*, No. 82-383 (attached hereto as Exhibit 2). The Department went on to note that:

> Only the Judiciary can resolve the resulting constitutional controversy, which reached a total impasse when the House of Representatives took the unprecedented step of citing an Executive official for contempt of Congress solely for following the instructions of the President that certain documents not be disclosed in order to preserve the ability of the Executive Branch to faithfully to execute the law.

*Id.* at 24. And, the Department concluded, "the criminal prosecution of an Executive official for complying in good faith with the President's instructions to withhold documents *could well be unconstitutional in any event, since it imposes a heavy burden on the assertion of Executive Privilege.*" *Id.* at 36 n.2 (emphasis added) (citing *Senate Select Committee v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974). Thus, for decades, the Department of Justice had concluded that the criminal prosecution of a close presidential advisor such as Dr. Navarro presented an unconstitutional burden on the assertion of the Executive Privilege.

Ultimately, this Court dismissed the Department's lawsuit against Congress without addressing the constitutionality of 18 U.S.C. § 192 as applied to the close aide of a President who directed the aide not to comply with an otherwise valid Congressional subpoena:

> The gravamen of [the Department of Justice's] complaint is that Executive Privilege is a valid defense to congressional demands for sensitive law enforcement information from the EPA. [The Department of Justice] ha[s], thus, raised this Executive Privilege defense as the basis for affirmative relief. Judicial resolution of this constitutional claim, however, will never become necessary unless Administrator Gorsuch becomes a defendant in either a criminal contempt proceeding or other legal action taken by Congress. The difficulties apparent in prosecuting Administrator Gorsuch for contempt of Congress should encourage the two branches to settle their differences without further judicial involvement. Compromise and cooperation, rather than confrontation, should be the aim of the parties. The Court, therefore, finds that to entertain this declaratory judgement action would be an improper exercise of the discretion granted by the Declaratory Judgment Act. In light of this determination, the Court will not address the additional grounds for dismissal raised by the defendants.

*United States v. United States House of Representatives*, 556 F. Supp. 150, 153 (D.D.C. 1983).

Here, the government – the Department of Justice – has taken a position contrary to decades of its own opinions on the subject. Of note, concomitantly with the initiation of litigation against the House, the Department's Office of Legal Counsel issued what is generally considered the founding authority supporting the Department's conclusion that senior presidential advisers are immune from testimonial compulsion from a Congressional committee. *See* Memorandum, Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (July 23, 1982) ("A Congressional demand for testimony from a close adviser to the President directly implicates a basic concern underlying the Executive Privilege, 'the valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties." (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)).

Importantly, courts have previously recognized that the Executive Privilege shields senior presidential advisers from compelled testimony when properly invoked. In *Senate Select Committee v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974), the D.C. Circuit concluded, "it is the responsibility of the courts to decide whether and to what extent Executive Privilege applies." *Id.* at 729. Until now, every assertion of Executive Privilege to shield senior presidential advisers

from congressional inquiry has been endorsed by the Department of Justice so as to avoid unconstitutional interference with the doctrine of separation of powers. *See Trump v. Mazars USA, LLP*, 140 S. Ct. at 2034 ("[C]ongressional subpoenas for the President's information unavoidably pit the political branches against one another."). Therefore, when a former president invokes Executive Privilege as to a senior presidential advisor, that advisor cannot thereafter be prosecuted for contempt of congress despite the prosecutorial prerogatives of the former president's political opponent.

### B. The Indictment Must Be Dismissed Because The Select Committee Is Not Properly Constituted.

For nearly two-hundred-fifty years, the experiment of our democracy has persisted despite frequent challenges to the "genius" that is the doctrine of separation of powers inherent in our constitution. "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 5 U.S. 137 (1803). The prosecution of one for violation of 2 U.S.C. § 192 is unique in that Congress has delegated to the judiciary the authority to punish for contempt:

> The power of the Congress to punish for contempt of its authority is . . . rooted in history.  It has been acknowledged by [the Supreme Court] since 1821.  Until 1857, Congress was content to punish for contempt through its own process.  By the Act of January 24, 1857, as amended by the Act of January 24, 1862, Congress provided that, 'in addition to the pains and penalties now existing' (referring of course to the power of Congress itself to punish for contempt), 'contumacy in a witness called to testify is a matter properly under consideration by either House, and deliberately refusing to answer questions pertinent thereto, shall be a misdemeanor against the United States.'  This legislation is now 2 U.S.C. § 192.  *By thus making the federal judiciary the affirmative agency for enforcing the authority that underlies the congressional power to punish for contempt, Congress necessarily brings into play the specific provisions of the Constitution relating to the prosecution of offenses and those implied restrictions under which courts function.*

*Watkins v. United States*, 354 U.S. 178, 216-217 (1957) (Frankfurter, J., concurring) (citations omitted) (emphasis added).

Having delegated to the judiciary the task of enforcing the authority that "underlies the congressional power to punish for contempt," *Watkins*, 354 U.S. at 216 (Frankfurter, J., concurring), the House has "limited" its role in any subsequent prosecution. *Marbury v. Madison*, 5 U.S. 137, 176 (1803)("The powers of the legislature are defined, and limited; and those limits may not be mistaken, or forgotten, the constitution is written."). Of course, the judiciary is itself bound by the "restrictions" imposed upon it by, *inter alia*, the Due Process Clause of the Fifth Amendment to the Constitution and any defendant in a prosecution for criminal contempt of congress is entitled to, "the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Watkins*, 354 U.S. at 209. Thus, whereas here, an indictment relies upon the failure of the House to adhere to its own rules, it violates the Due Process Clause of the Constitution and must be stricken. *United States v. Linder*, 2013 U.S. Dist. LEXIS 29641, at *79-90 (N.D. Il. Mar. 5, 2013) (explaining in detail authority of federal courts to dismiss an indictment).

To that end, the judicial scrutiny of "what rules the House has established and whether they have followed them," *Christoffel v. United States*, 338 U.S. 84, 88-89 (1949), including those rules conferring the lawful authorization of any inquiry, *Gojack v. United States*, 384 U.S. 702, 708 (1966) ("There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry which was never properly authorized."), is permissible where said rules are "sufficiently clear." *United States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C. Cir. 1995). *See Christoffel*, 338 at 88-89 ("The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has established and whether they have followed them."). *See also Yellin v. United States*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to

require that the Committee be equally as meticulous in obeying its own rules."). However, "[w]here . . . a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone." *Rostenkowski*, 59 F.3d at 1306-1307.

Judge Kelly's finding in *Republican Nat'l Comm. v. Pelosi*, No. 22-cv-659, 2022 U.S. Dist. LEXIS 78501 (D.D.C. May 1, 2022), is not inapposite. There, Judge Kelly was asked by the Republican National Committee to nullify a subpoena issued to a vendor. Because, Judge Kelly concluded, "the Court must give great weight to the [House's] present construction of its own rules,' particularly when that construction has arrived before the 'events in controversy,' the Rulemaking Clause of Article I of the Constitution precluded him from adopting an interpretation of H. Res. 503 that contradicted the House's own interpretation. *Id.* at *42. Judge Kelly's rationale is inapplicable here, where the criminal nature of this action *requires* the Court to scrutinize whether the House followed its own rules. *See Yellin v. United States*, 374 U.S. at 124 ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to require that the Committee be equally as meticulous in obeying its own rules.").

Put differently, as the Supreme Court has recognized, in "criminal prosecutions," "[d]ifferent problems [are] presented" than in "attempts by private parties to impede congressional action," which necessarily implicates the important doctrine of separation of powers. *Eastland*, 421 U.S. at 509 n.16. Thus, in criminal prosecutions, "[the court's] task [is] to perform the judicial function in criminal prosecutions, and we [may] properly scrutinize[] the predicates of [such] criminal prosecutions." *Id. See also Christoffel*, 338 U.S. at 88-89 ("The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has

established and whether they have been followed."). Where a House Rule is "sufficiently clear" such that the court, "can be confident of [its] interpretation," "the risk of the court introducing into the sphere of influence reserved to the legislative branch under the Constitution . . . is acceptably low." *Rostenkowski*, 59 F.3d at 1306.

Here, the Court may either conclude that the rules in question were unambiguous or "sufficiently clear" and, if so, find that they have been appropriately followed, *Christoffel*, 338 U.S. at 88-89, or find that that the rules are ambiguous such that they cannot give rise to a prosecution under § 192 for failing to meet the exacting standards of the Due Process Clause of the Constitution. *Watkins*, 354 U.S. at 209. *See Rostenkowski*, 59 F.3d at 1306-1307.[12]

Accordingly, the indictment cannot stand based upon the House referral as to Dr. Navarro because: (i) H. Res. 503 requires the appointment of thirteen (13) Members to in order for the Select Committee to function, or is at least sufficiently ambiguous so as to preclude a contempt conviction based upon any assertion that the Resolution requires otherwise; or (ii) the Select Committee lacked a Ranking Member necessary to issue a subpoena and/or to conduct a deposition, or the House Rules are at least sufficiently ambiguous so as to preclude a contempt conviction based upon any assertion that a Ranking Member was unnecessary for the issuance of a subpoena and/or the taking a deposition pursuant to House Rules.

---

[12] Judge Nichols, therefore, understandably mistook the appropriate standard for challenging the sufficiency of an indictment under the Due Process Clause of the Constitution for the standard permitting "private parties to impede congressional action," which necessarily implicates the important doctrine of separation of powers. *Eastland*, 421 U.S. at 509 n.16. Dismissing the indictment as to Dr. Navarro does not, as Judge Nichols contemplated, mean that Congress would be precluding from enforcing any of the subpoenas issued by the Select Committee. It may preclude the government from depriving those found not to have properly complied with a Select Committee subpoena of their liberty, but the House of course may still seek enforcement of the Select Committee's subpoenas in a civil action. See *Comm. on the Judiciary of the United States House of Representatives v. McGahn*, 968 F.3d 755, 766 (D.C. Cir. 2020) ("[T]he OLC, in opinions never withdrawn, has stated that a House of Congress can file a civil action to seek enforcement of its subpoenas."). Alternatively, the House Speaker could appoint all thirteen (13) Members to the Select Committee as was dictated by the passage of House Resolution 503, amend Resolution 503 so as to specify whether the appointment of 13 Members is required and/or clarify what role the Ranking Member and/or the Vice Chair is to play in accordance with House Rules.

1. **The Competence of the House Select Committee Requires the Appointment of Thirteen Members.**

Here, the word "shall" in House Resolution 503 § 2(a) is not permissive; it does not mean "may." The House, through a vote of its Members in the House Chamber, established the Select Committee, dictated its composition, and described its purposes and functions. This Court has no obligation to defer to the post-hac rationalization of the House now that it has been delegated the task of enforcing the authority that "underlies the congressional power to punish for contempt." *Watkins*, 354 U.S. at 216 (Frankfurter, J., concurring). *See also Rostenkowski*, 59 F.3d at1305 ("[I]t is perfectly clear that the Rulemaking Clause is not an absolute bar to judicial interpretation of the House Rules." (citing *Yellin*, 374 U.S. at 114 (1963)); *Yellin*, 374 at 114 ("It has long been settled . . . that rules of Congress and its committees are judicially cognizable."); *Eastland*, 421 U.S. at 509 n.16 ("Our task [is] to perform the judicial function in criminal prosecutions, and we [may] properly scrutinize[] the predicates of [such] criminal prosecutions."). More than merely finding congressional rules cognizable, the Supreme Court has held that when a rule relates to the lawful authorization for an inquiry, rules "must be strictly observed." *Gojack*, 384 U.S. at 708.

House Resolution 503 § 2(a) provides: "The Speaker *shall* appoint 13 Members to the Select Committee, 5 of whom *shall* be appointed after consultation with the minority leader." (Emphasis added). It is undisputed that the Speaker of the House failed to appoint 13 Members to the Select Committee and failure of the House Speaker to "appoint 13 Members to the Select Committee" deprives the Select Committee of its competence and no criminal prosecution arising from conduct (or lack thereof) before the Select Committee can lie. *United States v. Reinecke*, 524 F.2d 435, 440 n.15 (D.C. Cir. 1975) ("[T]he competence of the tribunal must be proved as an independent element of the crime. If the competence is not shown, the crime of perjury is not established regardless of whether the witness relied on the absence of a quorum."). *See Christoffel*,

338 U.S. at 90 ("A tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction."). That a congressional committee must adhere to applicable Rules in pursuit of the enforcement of its subpoenas has similarly resulted in convictions for contempt of congress being overturned. *See Yellin v. United States*, 374 U.S. 109 (1963). Indeed, the House Speaker herself has acknowledged the "unprecedented" approach to forming the Select Committee and it is therefore not at all extraordinary that the House failed to contemplate the possibility of less than thirteen (13) Members being appointed upon passage of Resolution 503. *See* The Editorial Board, *Pelosi Blows Up Her Jan. 6 Committee*, The Wall St. J. (July 21, 2021).[13]/

Both Judge Kelly and Judge Nichols concluded that use of the word "shall" in H. Res. 503 does not preclude a finding that Congress could have – as it asserts, Amicus Curiae Brief of U.S. House Majority, *United States v. Bannon*, No. 21-cr-670 (May 24, 2022) (ECF No. 75) – intended the word to mean "may." *See English v. Trump*, 279 F. Supp. 3d 307, 323 (D.D.C. 2018), *cited in RNC v. Pelosi*, [insert cite] at *44 ("[A]lthough 'shall' is usually understood as mandatory,' the word is 'a semantic mess' and is sometimes used 'to mean "should," "will," or even "may."'"); *Gutierrez De Martinez v. Lamagno*, 515 U.S. 417, 434 (1995), *cited in* Hr'g T. at 114:22-25, 115:1-3, *United States v. Bannon*, No. 21-cr-670 (June 15, 2022). In short, what both courts concluded was that use of the word "shall" does not preclude an interpretation that Congress did not intend to require that *all* thirteen Members be appointed to the Select Committee for it to be "lawfully authorized." *Gojack*, 384 U.S. at 708 ("There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry which was never properly authorized.").

---

[13]/ Available at https://www.wsj.com/articles/nancy-pelosi-vetoes-republicans-january-6-committee-11626904913.

This conclusion, however, misstates the legal standard applicable to a criminal prosecution for Congressional contempt. "The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has established and whether they have been followed." *Christoffel*, 338 U.S. at 88-89. Where a House Rule is "sufficiently clear" such that the court, "can be confident of [its] interpretation," "the risk of the court introducing into the sphere of influence reserved to the legislative branch under the Constitution . . . is acceptably low." *Rostenkowski*, 59 F.3d at 1306. Where, however, "a court cannot be confident that its interpretation [of a Rule giving rise to criminal prosecution] is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone." *Rostenkowski*, 59 F.3d at 1306.

Moreover, as Judge Kelly observed, "that the resolution states Speaker Pelosi 'shall' appoint thirteen members to the Select Committee *is not conclusive* as to whether thirteen members are required for it to lawfully operate" and went on to describe the Select Committee's authorization as "this mess." *RNC v. Pelosi*, __ F.Supp.3d __, 2022 WL 1294509 *15 (2022) (emphasis added). Similarly, Judge Nichols concluded:

> So the fact that House Resolution 503 uses the word 'shall' is not conclusive to proving that 13 members are required for the Select Committee to lawfully operate. And *given this potential ambiguity*, the Court agrees with Judge Kelly that it must give great weight to the interpretation of the House members charged with implementing the resolution and the House itself.

Hr'g T. at 115:4-10, *United States v. Bannon*, No. 21-cr-670 (June 15, 2022) (emphasis added). Thus, both Judge Kelly and Judge Nichols concluded the language of H. Res 503 § 2(a) was "not conclusive" or "ambiguous." As a result, in any criminal prosecution for Congressional contempt necessarily reliant on such ambiguous language and the resulting committee composition – "this

mess" as Judge Kelly described it – the Court "cannot be confident that its interpretation is correct. *Rostenkowski*, 59 F.3d at 1306-1307. As a result, the Court cannot simply defer to the interpretation by the House, but rather, any prosecution for Congressional contempt based upon such ambiguity would deprive Dr. Navarro of "the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Watkins*, 354 U.S. at 209. Accordingly, this Court must dismiss the indictment as unconstitutional. *United States v. Linder*, 2013 U.S. Dist. LEXIS 29641, at *79-90.

### 2. "Ranking Minority Member" is a Term Sufficiently Ambiguous so as to Render it Non-Justiciable.

With respect to the taking of depositions, House Resolution 503 provides, in pertinent part, that: "The chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8 . . . ." (Emphasis added). House Resolution 8 Section 3(b)(1), in turn, provides, in relevant part, that: "the chair of a standing committee . . ., *upon consultation with the ranking minority member of such committee*, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee." (Emphasis added). Finally, the regulations governing the taking of depositions as issued by the chair of the Committee on Rules reference the role to be played by the ranking minority member in such depositions no less than eight (8) separate times. 167 Cong. Rec. H41 (daily ed. Jan. 4, 2021) (117th Cong. Reguls. For Use of Dep. Auth.) ("Consultation with the *ranking minority member* shall include three days' notice before any deposition is taken;" "Only members, committee staff designated by the chair or *ranking minority member*, an official reporter, the witness, and the witness's counsel are permitted to attend;" "If [designation of a deposition as part of a joint investigation between committees] is made, the chair

and *the ranking minority member* of the additional committee(s) may designate committee staff to attend pursuant to regulation 3;" "A deposition shall be conducted by any member or committee counsel designated by the chair or *ranking minority member* of the Committee that noticed the deposition;" "In each round [of deposition questioning], the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by *the ranking minority member* shall ask questions second;" "The chair and *the ranking minority member* shall be provided with a copy of the transcripts of the deposition at the same time;" "The chair and the *ranking minority member* shall consult regarding the release of deposition testimony, transcripts, or recording, and portions thereof." (emphasis added)).

It is again undisputed that the Select Committee has no "Ranking Member." The House has asserted that, "Representative Cheney, by virtue of being the first minority party Member appointed to the Select Committee, is, by definition, the senior ranking minority member of the Select Committee." Amicus Curiae Brief of U.S. House Majority, *United States v. Bannon*, No. 21-cr-670 (May 24, 2022) (ECF No. 75). Yet nowhere in the House Rules, Resolution 503, or the House deposition regulations is the term "ranking minority member" defined. Even the Democratic caucus[14] and Republican conference rules[15] differ on the practical use of "ranking member." Speaker Pelosi herself has acknowledged the "unprecedented" nature of the Select Committee's formation. *See* The Editorial Board, *Pelosi Blows Up Her Jan. 6 Committee*, The Wall St. J. (July 21, 2021).[16] Importantly, this distinction is not without a difference. Minority leadership on any

---

[14] House Democratic Caucus Rules Rule 21 (D)(1)(a) discusses selecting Ranking Member and Vice-Ranking member by election or secret ballot, with no reference to order of appointment to the Committee.

[15] House Republican Conference Rules Rule 14 (e) discusses term limits of Chairs or Ranking Members to no more than three terms with no reference to seniority or order of appointment to the Committee.

[16] *Available at* https://www.wsj.com/articles/nancy-pelosi-vetoes-republicans-january-6-committee-11626904913.

given committee ensures that deponents are afforded oversight of adherence to congressional rules, precedents, and established decorum. *See* Constitution, Jefferson's Manual and Rules of the House of Representatives, H.R. Doc. No. 116-177, 117th Cong., 2d Sess., § 284 ("So far the maxim is certainly true and is founded in good sense that as it is always in the power of the majority, by their numbers, to stop any improper measures proposed on the part of their opponents, the only weapons by which the minority can defend themselves against similar attempts from those in power are the firms and rules of proceeding which have been adopted as they were found necessary, from time to time, and are become law of the House by a strict adherence to which the weaker party can only be protected from these irregularities which these forms were intended to check and which the wantonness of power is but too often apt to suggest to large and successful majorities.").

The Select Committee's authority is limited to its authorizing resolution and had the House desired the Select Committee's subpoena authority to function otherwise, the House should have explicitly so stated. The D.C. Circuit has similarly observed that House rules limiting authority serve an important purpose: "[B]y requiring all decisions to compel attendance of witnesses to be made by the Subcommittee, and not by an individual member thereof, the resolution served to protect the right of all persons to be free from unnecessary invasions of their privacy." *Liveright v. United States*, 347 F.2d 473, 475 (D.C. Cir. 1965) (reversing conviction under 2 U.S.C. § 192 despite the deponent's failure to object to the propriety of the subpoena's authorization at the time of his deposition). Absent unambiguity, "judicial interpretation . . . runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution. *Rostenkowski*, 59 F.3d at 1307. Accordingly, any prosecution for Congressional contempt based upon the lack of a "ranking member" would necessarily deprive the Due Process protections to

which Dr. Navarro is entitled and the indictment must be dismissed as unconstitutional. *United States v. Linder*, 2013 U.S. Dist. LEXIS 29641, at *79-90.

### 3. Dr. Navarro Has Not Waived Any Objections.

Even were *Bryan* nevertheless applicable today, the Court's rationale stands for the exactly the opposite position proffered by the government. Here, the House has repeatedly insisted it need not have appointed thirteen members and it need not have a formally designated ranking member. Thus, had Dr. Navarro objected at the time of his deposition, his objections would have been ignored. We know this because when both Mark Meadows and Dan Scavino raised these objections the Select Committee rejected their concerns out-of-hand.

The information presently available to Dr. Navarro indicates that the actions by the Select Committee were not in accordance with the authority conferred by the U.S. House of Representatives in Rules and Resolutions. House Resolution 503, the Resolution that established the Select Committee, provides that "[t]he Speaker *shall* appoint 13 members to the Select Committee, 5 of whom *shall* be appointed after consultation with the minority leader. (Emphasis added). This was not done despite the mandatory language of the Resolution. Additionally, the Committee's legal authority to issue subpoenas and conduct depositions is limited by H. Res 503, and the general Rules of the House of Representatives, which are incorporated by reference into that Resolution. That authority limits certain actions concerning subpoenas and depositions by requiring consultation with, and notice to, the ranking minority member of the Select Committee.[17]/ *See e.g.,* Amicus Curia Brief filed on May 24, 2022, in *United States v. Bannon* by

---

[17]/ "The chair of the Select Committee, *upon consultation with the ranking minority member*, may order the taking of depositions, including pursuant to subpoena." H. Res. 503, Sec. 5 Procedure (c)(6)(A) (emphasis added).

U.S. House of Representatives Minority Leader O. Kevin McCarthy and U.S. House of Representatives Minority Whip Stephen J. Scalise.

### C.  The Select Committee's Subpoena Fails to Satisfy the Rigors of Due Process.

*As noted,* Congress does have the power to investigate, *McGrain*, 273 U.S. at 174, but that power is not without limitation. *Watkins*, 354 U.S. at 187. In a prosecution for contempt of congress, "courts must accord . . . defendants every right which is guaranteed to defendants in all other criminal cases," "including knowledge of the subject to which the interrogation is deemed pertinent." *Id.* at 208-209.  In addition, in a prosecution for contempt of congress pursuant to 2 U.S.C. § 192, the government must also establish a nexus between the information sought and the otherwise pertinent inquiry of Congress. *See Deutch v. United States*, 367 U.S. 456, 467-469 (1961) ("As our cases make clear, two quite different issues regarding pertinency may be involved in a prosecution under 2 U. S. C. § 192. One issue reflects the requirement of the Due Process Clause of the Fifth Amendment that the pertinency of the interrogation to the topic under the congressional committee's inquiry must be brought home to the witness at the time the questions are put to him. . . .  The other and different pertinency issue stems from the prosecution's duty at the trial to prove that the questions propounded by the congressional committee were in fact 'pertinent to the question under inquiry' by the committee. . . .  These two basically different issues must not be blurred by treating them as a single question of 'pertinency.'").

Here, the indictment fails to establish that the information sought by the Select Committee was in fact pertinent to the matter under inquiry of the Select Committee. Although the D.C. Circuit has concluded that the Select Committee "plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had," *Thompson*, 20 F. 4th at 41 (citing examples), the Select Committee, and therefore the indictment, fail to show how the information Dr. Navarro is believed to have relate to any proffered "valid legislative purpose" of the Select

Committee. Dr. Navarro is not, for example, alleged to have "engage[d] in violence to prevent the work of governmental institutions." *Thompson*, 20 F. 4th at 42. Nor is Dr. Navarro alleged to have had any knowledge of the "security posture of the United States Capitol Complex." *Id.* at 42. Therefore, the only "valid legislative purpose" for which Dr. Navarro could arguably have been on notice is the possibility that Congress could, "amend the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential election." *Id.* The indictment cherry-picks but one assertion of pertinency by the Select Committee: "we believe you have documents and information that are relevant to the Select Committee's investigation [based on] your book [and] your website." Indictment at 3 ¶ 8 (June 6, 2022) (ECF No. 1). This assertion, however, ignores the broad categories – ten (10) in total – of information sought of Dr. Navarro for none of which did he have the requisite level of notice for how such information would necessarily have been "pertinent to the question under inquiry." *Deutch*, 267 U.S. at 467-469.

Because the indictment fails to allege that the Select Committee provided Dr. Navarro with the requisite knowledge of how the information it sought pertained to the legitimate legislative inquiry of the matters of inquiry being investigated by the Select Committee, it fails to allege an essential element of § 192 and must be dismissed. Fed. R. Crim. P. 12(b)(3)(A)(v).

### D.  The Indictment Must Be Dismissed Due To Fatal Constitutional And Procedural Defects

The indictment must be dismissed due to additional defects in instituting the prosecution pursuant to Fed. R. Crim. P. 12(b)(3)(A), as well as defects in the indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B). Those additional grounds include the fact that the Select Committee's subpoena was flawed on its face and procedural flaws in the grand jury process. Dr. Navarro submits that there is a basis to believe that the prosecution was also the product of unlawful political interference and selective prosecution. Those topics feature prominently in Dr. Navarro's

Motion to Compel Discovery (Dkt. 31 filed on August 4, 2022), which remains pending before the Court.

The Select Committee's subpoena, issued on its behalf by Chairman Bennie Thompson, failed to properly specify the place for Dr. Navarro's deposition beyond indicating that it would be held (somewhere) at the "United States Capitol Building, Washington DC 20515 or by videoconference".[18] By omitting any understandable description of where the deposition was to occur, the Committee eliminated any possibility that Dr. Navarro's non-appearance can support a criminal prosecution for contempt. However, the Committee muddled the issue even further when, on March 1, 2022 – the day before the deposition was to occur – Committee Counsel Dan George, sent Dr. Navarro an email that changed the place of the deposition to the O'Neil House Office Building.[19]

House Resolution 503, which created the Select Committee, provides that Rule XI of the Rules of the House of Representatives shall apply to the Committee.[20] Paragraph (3)(A)(i) of Rule XI states in pertinent part as follows:

> Except as provided in subdivision (A)(ii) [Committee on Ethics], a subpoena may be authorized and issued by a committee or subcommittee under subparagraph (1)(B) in the conduct of an investigation or series of investigations or activities *only when authorized by the committee or subcommittee, a majority being present.* The power to authorize and issue subpoenas under subparagraph (1)(B) may be delegated to the chair of the committee under such rules and under such limitations as the committee may prescribe. *Authorized subpoenas shall be signed by the chair of the committee or by a member designated by the committee.*" (Emphasis added).

---

[18] The Capitol building has over 1.5 million square feet, more than 600 rooms, and miles of corridors. https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building.

[19] Mr. George's email said that: "We plan to proceed with the deposition at 10 AM in the O'Neil House Office Building at 200 C Street, SW, Washington, D.C. 20024. Please feel free to contact me when you arrive so someone can escort you to the conference room."

[20] SEC. 5 PROCEDURE … (c) APPLICABILITY OF RULES GOVERNING PROCEDURES OF COMMITTEES.—Rule XI of the Rules of the House of Representatives shall apply to the Select Committee [except as provided].

The Select Committee, with "a majority [of the members] being present", did not reissue the subpoena to move the location of the deposition from the Capitol Building to the O'Neill House Office Building. Moreover, in making the change the Committee violated its own rule requiring only the Committee itself or the designee of the Chair may issue a subpoena. There is no evidence that a majority of the members of the Committee, or Chairman Thompson  authorized Mr. George to change place of deposition specified by the subpoena.

In *Liveright v. United Stat*es, 347 F.2d 473 (1965), the D.C. Circuit held that a subcommittee's failure to comply with its authorizing resolution is a valid defense to a prosecution for contempt of Congress under 2 U.S.C. § 192. The subpoena in *Liveright* was issued by subcommittee chairman without first consulting with the other members as required by the subcommittee's authorizing resolution. The failure to comply with subcommittee's resolution rendered the subpoena invalid and it could not provide the basis for a prosecution for criminal contempt of Congress. *Id.,* at 474-75. *See also, Shelton v. United States,* 327 F.2d 601,606 (1963) (holding that the subcommittee's authorizing resolution required that the subcommittee itself, and not in any individual member, held "the *power and the responsibility* of deciding who shall be called" by subpoena).

In his Motion to Compel Discovery, Dr. Navarro seeks additional information to be able to determine whether the Select Committee of its Chair authorized Mr. George to make a material change to the subpoena. Either way, whether it be because the original subpoena failed to specify a location for Dr. Navarro's deposition, or because Mr. George lacked the authority to change that location while again failing to specify a room number, the Special Committee's subpoena cannot provide a basis for a criminal prosecution as stated in Count Two of the indictment.

### E. The Indictment Must be Dismissed Due to Selective Prosecution / Undue Political Influence

Dr. Navarro has sought additional discovery that would support an argument that the government's prosecution of him was the result of unlawful selective prosecution and undue political interference. Dr. Navarro submits the following facts in support of his argument that the indictment should be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(A) because selective prosecution and undue political interference are defects in instituting the prosecution, but he acknowledges the need for additional information and reserves the right to supplement his argument.

"A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Fifth Amendment. *United States v. Armstrong,* 517 U.S. 456, 464 (1996). Although a prosecutor has broad discretion to enforce the criminal laws, the decision to file charges may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* Improper arbitrary classifications include a defendant's "exercise of constitutional rights through participation in political activity." *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 21 (D. D. C. 1999), *aff'd* 211 F. 3D137 (D. C. Cir. 2000); *United States v. Judd,* 2021 WL 6134590 (D.D.C. 2021) (the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's "political beliefs"). The decision to prosecute may not be based upon the exercise of protected statutory and constitutional rights. *See United States v. Goodwin*, 457 U.S. 368, 372 (1982).

A defendant alleging selective prosecution must show two things. *First,* he must establish that the prosecutorial policy "had a discriminatory *effect*" on him. *Armstrong,* 517 U.S. at 465 (Emphasis provided). To show that, he must establish that the Government afforded "different

treatment" to persons "similarly situated" to him. *Id.* at 470. When a person's circumstances "present no distinguishable legitimate prosecutorial factors that might justify" different prosecutorial decisions between him and the defendant, that person is a similarly situated to the defendant. *Branch Ministries,* 211 F. 3d at 145. *Second,* a defendant must show that the prosecutorial policy had "a discriminatory *purpose*." *Armstrong,* 517 U.S. at 465 (Emphasis provided).

Discriminatory purpose may be established either with direct evidence of the prosecutor's intent or by "evidence concerning the unequal application of the law, statistical disparities and other indirect evidence of intent." *Branch Ministries v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997). A colorable claim is one that presents "some evidence tending to show the existence of the essential elements" of selective prosecution. *Armstrong,* 517 U.S. at 467.

> If a defendant establishes a *prima facia* case of selective prosecution, the burden shifts to the Government to try to prove that the filing of charges did not arise from discriminatory motives. *Att'y Gen. v. Irish People, Inc.*, 684 F. 2d 928, 932 n. 11 (D.C. Cir. 1982). If the Government cannot satisfy that burden, a court will require discovery of the Government's decision or dismiss the charges against the defendant. *In re Aiken County,* 725 F. 3d 255, 264 n. 7 (D.C. Cir. 2013). (Kavanaugh, Circuit Judge, presiding).

Undue political interference is evidence of a discriminatory purpose. For example, "[A]n agency could be found to be abusing the court's process if it vigorously pursued a charge because of the influence of a powerful third party without consciously and objectively evaluating the charge." *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 n.9 (3d Cir. 1981)).

### 1. The Discriminatory Effect of This Prosecution of Dr. Navarro

On December 14, 2021, the House of Representatives voted to refer former White House Chief of Staff Mark Meadows to the Department of Justice for prosecution based on his refusal to appear for deposition before the Select Committee and answer questions about the January 6th riot

at the U.S. Capitol.[21]/ Four months later, on April, 2022, the House referred Dan Scavino and Peter Navarro to the Department for prosecution for their refusal to comply with subpoenas from the Select Committee directing that they produce documents and appear for deposition.[22]/ The House of Representatives made its criminal referrals for all three men for essentially the same reason: they had asserted Executive Privilege on behalf of President Trump and refused on that basis to appear for deposition.[23]/

  After the House referred the matters to the Department of Justice,  the public record shows that the Department made a clear distinction regarding the treatment afforded these similarly situated individuals. It elected to prosecute Dr. Navarro but declined to do so for the same conduct by Mr. Meadows and Mr. Scavino.

_____

[21]/ Addressing the House decision to refer Mr. Meadows for prosecution, Select Committee Chairman, Bennie Thompson said, "This is about Mr. Meadows refusing to comply with the subpoena to discuss the records he himself turned over." https://www.nbcnews.com/ politics/congress/house-expected-vote-mark-meadows-criminal-contempt-referral-n1285908.

[22]/ Chairman Thompson explained the reason for the House's criminal referral, "Both of these men have refused to comply with the Select Committee's subpoenas in any way." https:// www.cnn.com/2022/04/06/politics/house-vote-contempt-referrals-scavino-navarro/index html.

[23]/ Mr. Meadows produced documents to the Committee but declined to appear for deposition. Neither Dr. Navarro nor Mr. Scavino produced documents or agreed to be deposed by the Select Committee.

[24]/ ███████████████████████████████████████████

On June 2, 2022, the grand jury returned its indictment against Dr. Navarro for Contempt of Congress. Two days later, on June 4, 2022, media sources reported that U.S. Attorney Matt Graves had notified Doug Letter, the House General Counsel, that the Justice Department had completed its review and had decided it "will not be initiating prosecutions for criminal contempt, as requested in the referral against Messrs. Meadows and Scavino."[25]/ The Department provided no reasons for its different treatment of Dr. Navarro and there is no apparent distinction between the conduct of the three individuals in their refusal to comply with the deposition subpoena for reasons of privilege.

Thus, even based on the limited record now available to Dr. Navarro, the Department's decision to prosecute Dr. Navarro, *but not* Messrs. Meadows and Scavino, had a discriminatory *effect* on him. All three men were similarly situated and referred to the Department by the Select Committee for their refusal to appear for deposition in response to subpoena.

## 2. The Discriminatory Purpose of This Prosecution of Dr. Navarro

In view of this disparity, Dr. Navarro believes that the Department of Justice's decision to file criminal charges against him while declining to prosecute Mr. Meadows and Mr. Scavino is based on unlawful and discriminatory reasons involving his public expression of political beliefs.[26]/ Dr. Navarro does not, of course, yet have access to direct evidence of the Department's motivation but the circumstantial evidence that is available is sufficient to raise an inference of discriminatory motive related to Dr. Navarro's public expression of his political beliefs.

---

[25]/ *See e.g., https://www.cnn.com/2022/06/03/politics/justice-department-declines-charge-meadows-scavino-january-6/index.html.*

[26]/ "In determining whether to commence or recommend prosecution or take action against a person, the attorney for the government should not be influenced by [t]he person's . . . political association, activities, or beliefs. . ." Justice Manual § 9-27.260.

### a. Dr. Navarro's Expression of his Political Beliefs

Unlike Mr. Meadows and Mr. Scavino, who did not widely discuss their views about the Select Committee or the Department of Justice, Dr. Navarro regularly exercised his First Amendment rights of free expression concerning the Government. The Select Committee report that referred Dr. Navarro for prosecution includes reference to several of his public statements. It indicates, for example, that "[w]ithin hours of receiving the subpoena, Dr. Navarro released a public statement that clearly indicated he had no intention of complying with the Select Committee …."[27]/ House Report at 3. The House Report states that Dr. Navarro also "appeared on national television on February 10, 2022, discussing subjects that with a focus of the Select Committee's subpoena to him (footnote omitted)." *Id.* The House Report goes on to say that rather than appear for his deposition, Dr. Navarro "issued a public statement regarding his deposition (footnote omitted)." House Report at 5.

Dr. Navarro's public objections to the Select Committee's subpoena, and his reasons for noncompliance, likely angered the Committee and its members. Dr. Navarro does not know whether the Committee communicated that anger to the Department of Justice before or after it made its criminal referral, but the Department seems to have acted in similar manner in response to Dr. Navarro's public expressions of dissent. It is highly unusual, and perhaps unprecedented, for the Department to not allow a defendant charged with nonviolent misdemeanors to self-report to court for arraignment.

---

[27]/ According to the Select Committee's report, Dr. Navarro's public statement said that "President Trump has invoked Executive Privilege; and it is not my privilege to waive.[The Select Committee] should negotiate any waiver of the privilege with the president and his attorneys directly, not through me. I refer to this tribunal to Chapter 21 of In Trump Time for what is in the public record about the Green Bay's we plan to insure [sic] election integrity []. House Report at 3.

### b.  The Circumstances of Dr. Navarro's Arrest

The Government handled Dr. Navarro's arrest very differently from other cases. That, and the difference in treatment between Dr. Navarro and Messrs. Meadows and Scavino, satisfies *Armstrong's* requirement of a *prima facie* showing of both discriminatory effect and purpose.  The day after a federal grand jury in DC returned its indictment against him, FBI Special Agents arrested Dr. Navarro as he was boarding a flight for a business trip to Tennessee at Washington's Reagan National Airport. They waited to arrest him at the Airport even though they knew that he lived across the street from FBI Headquarters and had spoken with him as recently as two days earlier. With national media apparently alerted that morning to its intentions, the FBI agents arrested, handcuffed, and transported Dr. Navarro to the courthouse, where he was strip-searched, placed in a holding cell, and then in leg irons by the US Marshals Service for his initial appearance in Court.

The Government's refusal to allow Dr. Navarro to self-report to court after being charged with two non-violent misdemeanors is indeed unusual and demonstrates a selective animus towards him by the Government officials responsible for the decisions made in this case.[28] We do not know how much, if any, of this animus is the result of communications between the Department of Justice, the Select Committee, and/or the White House. However, it is undeniable that the Government handled the arrest of Dr. Navarro much differently than it normally does individuals charged with non-violent misdemeanor offenses.

---

[28] Neither Mark Meadows, the former Chief of Staff to President Trump, nor Dan Scavino, former senior advisor to President Trump, appeared before the Select Committee in response to subpoena. Nonetheless, on June 4, 2022, the Department of Justice notified them that it had declined to prosecute for contempt of Congress. https://www.cnn.com/2022/06/03/politics/justice-department-declines-charge-meadows-scavino-january6/index.html. The decision demonstrates an animus toward Dr. Navarro and raises questions about a selective prosecution of him motivated by improper purposes.

### c. Undue Political Influence and Ignoring Decades of Legal Precedent

Even with the information currently available, it is clear that the Justice Department ignored decades of its own legal precedent in order to bring the first criminal prosecution of Dr. Navarro under a statute that it has long held to be inapplicable to senior presidential advisers. That action, especially in light of evidence of undue political influence, provides further circumstantial evidence of the government's discriminatory purpose.

A possible reason for the Justice Department's decision to ignore years of established precedent is that President Biden, the chief law enforcement official to whom the Department reports, publicly and improperly stated that the Department should prosecute all individuals who defy congressional subpoenas issued by the Select Committee. As reported by *The Hill* on October 15, 2021, President Biden told reporters, "I hope that the committee goes after them and holds them accountable." Asked if they should be prosecuted, President Biden said, "I do, yes."

It was improper for President Biden to attempt to influence the Department of Justice's prosecutorial discretion regarding individuals who failed to comply with Select Committee subpoenas. It is entirely possible that political appointees or others at the Department interpreted President Biden's statement as a directive to prosecute. That may explain the Department's departure from the OLC's long-established position that a senior advisor to a President is "absolutely immune" from a subpoena issued by Congress. Moreover, aside from issues of testimonial immunity, the decision to *criminally* prosecute a senior advisor to a President for refusing to appear before congressional committee is without precedent and constitutes a major diversion from the way the Department of Justice has always handled such matters.

There are additional indications about the contacts between the Department of Justice and the Select Committee. One of the most important and unresolved issues in this case is whether the Select Committee was created in accordance with H. Res. 503 regarding the number of its members

and the appointment of a ranking member by the minority party. Despite the complexity of these issues and their relationship to historical congressional prerogatives and procedures, █

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

    There is also evidence of improper communications between the White House and the Department of Justice. On February 28, 2022, Jonathan C. Su, Deputy Counsel to President Biden, sent a letter to Dr. Navarro "regarding the subpoena issued [by the Select Committee]." In the letter, Mr. Su expressly noted certain subjects under investigation by the Select Committee and advised Dr. Navarro that "President Biden … has decided not to assert Executive Privilege as to your testimony regarding those subjects, or any documents he might possess that bear on them."

    Mr. Su's instructions to Dr. Navarro were unusual since he had no prior contact with Dr. Navarro about the subpoena or anything else. When interviewed by the FBI, Mr. Su stated that he first heard "in the media" that the Select Committee had issued a subpoena to Dr. Navarro. Interview of Jonathan C. Su (June 6, 2022) (US-000485). He said that after learning about the subpoena, he contacted Dr. Navarro by email to advise him of President Biden's position regarding privilege. Mr. Su further said that he knew Dr. Navarro's email address from separate, unrelated investigation regarding January 6th.

    These communications suggest that Mr. Su, or someone else at President Biden's White House, communicated with the Select Committee concerning its investigation and the subpoena to Dr. Navarro. It is also possible that the White House communicated with the Department of Justice

regarding OLC's previously established position that a senior advisor to a President is absolutely immune from congressional process. It appears unlikely that on his own initiative Mr. Su would have contacted Dr. Navarro about President Biden's positions regarding Executive Privilege after learning of the subpoena "in the media" and without any other contact with the Committee or the Department. This possibility is made all the more likely given that Mr. Su had previously obtained Dr. Navarro's email address from someone connected to the Select Committee. Interview of Jonathan C. Su (June 6, 2022) (US-000485).

Dr. Navarro has sought additional information about the reasons for the Government's decision to ignore decades of its own policy and legal precedent, as well as about communications between the Justice Department, the White House, and the Select Committee. Dr. Navarro intends to supplement his argument after obtaining that information.

### F.  The Indictment Must be Dismissed Because of Fatal Procedural Flaws in the Grand Jury Process

Ignoring decades of prudential policy, as expressed in numerous Office of Legal Counsel opinions that hold that senior advisors to a President are immune from compelled process by the Congress, the Department elected to charge Dr. Navarro with *criminal* contempt of Congress. It did so after its *Chief* Executive publicly opined that those in Dr. Navarro's position should be prosecuted. It did so despite choosing *not to* prosecute those similarly situated with Dr. Navarro.

██████████████████████████████████████████

████████████████████

While a prosecutor's failure to present exculpatory evidence to a grand jury generally does not require dismissal of an indictment, *United States v. Williams*, 504 U.S. 36 (1992), dismissal is appropriate where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Bank of*

*Nova Scotia, supra,* 487 U.S. at 254. Dismissal of an indictment is also appropriate where a violation "substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.*

    The evidence provided to the defense thus far indicates ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

41



\* \* \*

In summary, the novel question with which this Court is confronted, following the failure of the Legislative and Executive Branches to otherwise reach an agreement, is what effect does a former president's assertion of Executive Privilege have over the desire of Congress to exercise its investigative powers to explore the deliberative processes of that President. Were this Court, for the very first time in American History, to conclude that the assertion of Executive Privilege by a former President is not controlling, then the doctrine of lenity nevertheless should be invoked because "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleveland v. United States*, 531 U.S. 12, 25 (2000). "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota v. United States*, 471 U.S. 419, 427 (1985). Before depriving senior presidential aides of their liberty for following the directive of a former President asserting the

constitutional Executive Privilege intended by presidents – including dating back to George

Washington – intending to protect the doctrine of separation of powers, such former, current, and

future advisers must be put on due notice of the limitations of that privilege. *United States v.*

*Lanier*, 520 U.S. 259, 266 (1997) ("Due process bars courts from applying a novel construction of

a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly

disclosed to be within its scope."). Thus, this Court should require that Congress should have

spoken in language that is clear and definite, and the government's interpretation of the effect of

the assertion of Executive Privilege by a former President should be rejected in favor of the

doctrine of lenity. *See Yates v. United States*, 574 U.S. 528, 548 (2015) (plurality opinion).

## IV.  CONCLUSION

Wherefore, for the reasons set forth above, Dr. Navarro respectfully requests an Order

dismissing the indictment with prejudice.

Dated: August 17, 2022                     Respectfully Submitted,

E&W Law, LLC

_____/s/ John S. Irving_____
John S. Irving (D.C. Bar No. 460068)
1455 Pennsylvania Avenue, N.W., Suite 400
Washington, D.C. 20004
Telephone: (301) 807-5670
Email: john.irving@earthandwatergroup.com

SECIL LAW PLLC

_____/s/ John P. Rowley, III_____
John P. Rowley, III  (D.C. Bar No. 392629)
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
Telephone: (703) 417-8652
Email: jrowley@secillaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **Criminal No. 1:23-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

<u>**CERTIFICATE OF SERVICE**</u>

On August 17, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed under seal via the CM/ECF system and copies were electronically mailed to counsel for the government and Chambers.

_____/s/ John S. Irving_____
John S. Irving (D.C. Bar No. 460068)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | **Criminal No. 1:22-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DEFENDANT'S NOTICE PURSUANT TO FED R. CRIM. P. 12.3**
**OF DEFENSES OF ENTRAPMENT BY ESTOPPEL AND PUBLIC AUTHORITY**

Defendant Peter K. Navarro, by and through the undersigned counsel, and pursuant to Rule 12.3 of the Federal Rules of Criminal Procedure, hereby gives notice of his intent to assert a defense of actual or believed exercise of public authority on behalf of the federal government, as well as a defense of entrapment by estoppel. In support of this Motion, Dr. Navarro states as follows:

The Government charged Dr. Navarro with two counts of violating 2 U.S.C. § 192, which prohibits "willfully" making default in response to a subpoena for documents and testimony from the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee"). The United States Supreme Court and the District of Columbia Circuit have repeatedly explained that "willfully" requires specific intent, *i.e.*, that a defendant acted with knowledge that his actions were unlawful. *Ratzlaf v. United States*, 510 U.S. 135, 137-138 (1994); *Bryan v. United States*, 524 U.S. 184, 191-196 (1988). *See also United States v. Burden*, 934 F.3d 675, 692 (D.C. Cir 2019); *United States v. Zeese*, 437 F. Supp. 3d 86, 94 (D.D.C. 2020).

At all times relevant, Dr. Navarro operated with respect to the Select Committee's subpoena at the direction of former President Donald J. Trump. Dr. Navarro informed the Select

Committee of his understanding that the President was asserting Executive Privilege, that he was unable to comply with its subpoena, and that the Select Committee should negotiate the parameters of Dr. Navarro's compliance, which it never attempted to do.

Dr. Navarro acted with public authority when, in November and December 2021, he notified the House Select Subcommittee on the Coronavirus Crisis that he could not comply with the Subcommittee's subpoena due President Trump's instructions to invoke Executive Privilege as a former Senior Advisor to the President. Dr. Navarro again acted with public authority when he notified the Select Committee in February 2022, and thereafter, that he could not comply with the Committee's subpoena due to President Trump's direction to assert Executive Privilege.

Dr. Navarro's actions were entirely consistent with the principles of Separation of Powers, Executive Privilege, and absolute immunity of Senior Presidential Aides from congressional process that have been articulated in over fifty years of opinions form the U.S. Department of Justice's Office of Legal Counsel.  While not an attorney, Dr. Navarro's actions with respect to the Select Committee's subpoena were based on his correct and reasonable understanding that he was not required to comply, and was unable to comply, in light of the instructions he had received from President Trump.

In the event that the Court declines to grant Dr. Navarro's Motion to Dismiss the Indictment on the basis that he did not commit the charged offenses as a matter of law, Dr. Navarro intends to assert a defense of entrapment by estoppel – *i.e.*, that a government official committed an error, and he violated the law while relying on that error.[1] Alternatively, Dr. Navarro intends to assert that his actions did not violate the statute because he lacked criminal intent due to a mistake of fact

---

[1] *See* "Public Authority Defense," *U.S. Department of Justice Criminal Resource Manual* at 2055 (archived), available at https://www.justice.gov/archives/jm/criminal-resource-manual-2055-public-authority-defense. *See also* discussion of entrapment by estoppel in *See United States v. Chrestman*, 525 F.Supp. 3d 14 (D.C.C. 2021).

– *i.e.*, that he honestly, albeit mistakenly, believed that he performed the charged offenses in cooperation with the government. Dr. Navarro also intends to assert what is more often referred to as the defense of public authority – *i.e.*, that he acted in reasonable reliance upon a grant of actual or apparent authority by a government official.

Dated: August 17, 2022                     Respectfully Submitted,

                                            E&W Law, LLC

                                            _____/s/ John S. Irving_____
                                            John S. Irving (D.C. Bar No. 460068)
                                            1455 Pennsylvania Avenue, N.W., Suite 400
                                            Washington, D.C. 20004
                                            Telephone: (301) 807-5670
                                            Email: john.irving@earthandwatergroup.com

                                            SECIL LAW PLLC

                                            _____/s/ John P. Rowley, III_____
                                            John P. Rowley, III  (D.C. Bar No. 392629)
                                            1701 Pennsylvania Ave., N.W., Suite 200
                                            Washington, D.C. 20006
                                            Telephone: (703) 417-8652
                                            Email: jrowley@secillaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Criminal No. 1:23-cr-00200-APM** |
| v. | ) | |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

On August 17, 2022, the undersigned hereby certifies that a true and correct copy of the

foregoing was electronically filed via the CM/ECF system and copies were electronically mailed

to counsel for the government and Chambers.

_____/s/ John S. Irving_____
John S. Irving (D.C. Bar No. 460068)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Criminal No. 1:22-cr-00200-APM** |
| **v.** | ) | |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION TO COMPEL DISCOVERY**

*Ipsit Dixit.* The Government would have this Court conclude that Dr. Navarro is not entitled to the discovery he seeks because, it asserts, he cannot prevail in any argument that he was selectively prosecuted and/or that the Government abused the grand jury process because it says so. Despite the opportunity to explain why the law favors its position, why the factual irregularities highlighted by Dr. Navarro are meaningless, or why the discovery Dr. Navarro seeks would not aid in his defense the Government does not. It does not because it cannot. Rather, in response to Dr. Navarro's Motion to Compel Discovery, the Government represented that it has "exceeded its discovery obligations and already provided the Defendant all discoverable material in its possession, custody, or control. While the volume of discovery might be small, its volume is not a reflection of its thoroughness." Opposition ("Opp.") at 1. This assurance by the Government that it had fully satisfied its discovery obligations followed similar statements in response to Dr. Navarro's Rule 16 requests.[1]/ Dr. Navarro has no basis to dispute that the Assistant U.S. Attorneys

---

[1]/ For example, on July 22, 2022, counsel for the Government advised the undersigned counsel as follows: "As an initial matter, your letter appears to suggest that President Biden, the White House Counsel's Office, the [Select Committee], and the [House Subcommittee on the Coronavirus Crisis] are part of the prosecution team in this case. They are not. We have provided all discoverable materials we have received from those parties and thus had nothing more to provide in response to requests in which you seek information in their possession."

who made those responses believe them to be true. Recent disclosures, however, reveal that the Government's representation in *this case* may not have been fully accurate.

Yesterday evening, Monday, August 22, 2022, defense counsel and Dr. Navarro learned for the first time that in April 2022, a member of the White House Counsel's Office engaged in conversations with the Department of Justice, the FBI, and the National Archives and Records Administration ("NARA"), in which the Biden Administration empowered NARA to waive any claims to executive privilege that President Trump might assert against any assertion of applicable privileges to the Department.[2] Specifically, we now know that White House Deputy Counsel, Jonathan Su, conveyed to NARA that President Biden would not object to waiving former President Trump's claims to executive privilege. NARA's Acting Archivist discussed the issue with the Department's Assistant Attorney General for the Office of Legal Counsel ("OLC") and then notified counsel for President Trump that she would not honor the former President's "protective" claim of privilege.[3] This correspondence occurred roughly at the same time that Mr. Su was conveying to President's Trump counsel that OLC memoranda did not preclude Dr. Navarro from testifying before the Select Committee.[4] Indeed, on February 28, 2022, two weeks after the Select Committee issued its subpoena to Dr. Navarro, White House Deputy Counsel, Jonathan Su, sent an unsolicited letter to him advising that President Biden had waived former

---

[2] https://justthenews.com/politics-policy/all-things-trump/biden-white-house-facilitated-dojs-criminal-probe-against-trump.

[3] Apparently, this was done so that the Department could obtain a grand jury subpoena compelling President Trump to turn over materials he possessed from his presidency.

[4] At the direction of former President Trump, Dr. Navarro invoked executive privilege as the basis of his refusal to respond to the Select Committee's subpoena.

President Trump's executive privilege in an attempt to neutralize Dr. Navarro's invocations to the Select Committee.[5]

The interplay between the White House and the Department indicates a greater level of coordination than was previously disclosed by the Government to Dr. Navarro. The correspondence between the White House, OLC, and NARA may help explain why the Department suddenly abandoned fifty years precedent by administrations of both parties that held that senior advisers to a President are "absolutely immune" from Congressional process. The disclosure of these coordinated activities is relevant to Dr. Navarro's defense and entitles him to discovery of related matters pursuant to Rule 16.[6]

## ARGUMENT

The positions taken by the Government in its Opposition to Dr. Navarro's discovery requests flow from a fundamental misunderstanding of the nature of this case, which the Government wrongly asserts is "straightforward," and that the only "question at trial is whether the Defendant was subpoenaed to provide documents and testimony in relation to the Committee's authorized investigation and whether his default was willful." (Dkt. No. 33 at 1, 10). Not surprisingly, that erroneous premise, which effectively short circuits any additional discovery, has led to the Government's flawed conclusions regarding the  Dr. Navarro's rights to discovery.

This is a case of first impressions with important historical and policy implications: This case stems from the intersection of a partisan weaponization of the House of Representative's investigatory powers clashing with the doctrine of executive privilege asserted by Presidents since

---

[5] When interviewed by the FBI on June 1, 2022, Mr. Su stated that he had first heard in the media that the Select Committee had issued a subpoena to Dr. Navarro. He also claimed to know Dr. Navarro's email address "from a separate, unrelated investigation regarding [January 6th]." (FBI 302 - 06/06/22).

[6] Communications among the White House, the Department, and NARA also are relevant to how the "prosecution team" is defined for purposes of the Government's discovery in this case. The significance of that matter is further discussed *infra*.

the founding of the Republic and validated for over five decades by the Department of Justice's OLC opinions from 1984 to the present. It is a test of the Separation of Powers between the Executive Branch and the Legislative Branch, where the criminal prosecution of a senior aide to the President should be barred as a matter of law or, at a minimum, be permitted to introduce evidence of his reliance on the Department's own legal positions in his defense at trial.[7]

This case also presents novel issues about a former President's authority to invoke executive privilege, whether the absolute immunity from congressional inquiry long recognized by the OLC continues to apply to senior advisers after they leave the White House, and the extent to which a President may waive those protections asserted by a former President. The Government appears to have decided those questions in a manner that is unfavorable to former President Trump and to Dr. Navarro; but those conclusions are also inconsistent with the Department's long-standing policies and legal rationale and changed without reasonable notice to Dr. Navarro. While the Government may be entitled to change its mind, it should not be permitted to move the goalposts in the middle of a game by criminally prosecuting Dr. Navarro for long established positions taken by the Department itself. It is this changing of the rules, potentially for improper political reasons, that entitles Dr. Navarro to further discovery about the interactions between the White House, the Department, NARA, and the Select Committee.

The information sought by Dr. Navarro in his Motion to Compel Discovery is not limited to information that either party may wish to use at trial. Fed. R. Crim. P. 16(a)(1)(E)(i) is the minimum standard that entitles Dr. Navarro to information that "is material to preparing the defense." A defendant also has a right to both inculpatory and exculpatory information that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United*

---

[7]/ Dr. Navarro recently provided Notice pursuant to Fed. R. Crim. P. 12.3 of his intent to assert defenses of entrapment by estoppel and public authority (Dkt. No. 36).

*States*, 405 U.S. 150, 154 (1972). The Government argues that Dr. Navarro is not entitled to information that would support collateral attacks, such as a claim of selective prosecution, because such issues are not "material to preparing a defense." While not conceding that is true – surely there are situations where information might be helpful to the defense in both ways – Dr. Navarro has met the additional threshold of showing a discriminatory effect of the Government's prosecution in this case, as well as the likelihood of a discriminatory purpose.

Dr. Navarro therefore seeks information that would support his arguments that: (1) the indictment itself is invalid and must be dismissed: (2) he is a target of selective or disparate treatment of his case from other similarly situated high ranking White House officials; (3) the Grand Jury process was abused, including through undue political interference from the current White House in contravention of defendant's right to the appearance of impartiality in the prosecution of his case; and (4) the procedures employed to obtain the indictment contravened his right to due process.

A.      Discovery that Negates "Willful" Mens Rea

The Government's argument that the term "willful" in the contempt of Congress statute does not require evidence that a defendant acted in bad faith or with knowledge that his conduct was unlawful (Dkt. 33 at p. 21) flies in the face of decades of jurisprudence interpreting that term to require specific intent. The Government relies on the D.C. Circuit's 1947 decision in *Fields v. United States*, 164 F.2d 97 (D.C. Cir. 1947), for the proposition that Dr. Navarro's claim that he relied on the OLC opinions, "cannot provide a defense because the contempt of Congress statute does not require that the Defendant have acted in bad faith or with knowledge that his conduct was unlawful. (Dkt. No. 33 at p. 21).[8]/

---

[8]/ The Government also references Judge Carl J. Nichols's Order and proceedings in *U.S. v. Bannon* without acknowledging that its argument in that case, and that Court's reluctant agreement, relied heavily on *Licavoli v. United*

*Fields,* however, involved a defendant's failure to produce records that were in his control after repeatedly representing to the committee that he would do so. Reasoning that "[t]he apparent objective of the statute involved here would be largely defeated if … a person could appear before a congressional investigating committee and by professing willingness to comply with its requests for information escape the penalty for subsequent default." *Id.* at 100. In contrast, Dr. Navarro's response to the Select Committee's subpoena was determined not by choice, but by his adherence to the direction of the President he had served for four years that he assert all applicable privileges and immunities.

Subsequent decisions in this Circuit and the Supreme Court have interpreted the term "willfully" to require a specific intent *mens rea*, where the Government must prove that a defendant understood that his actions were unlawful, and where a defendant is entitled to introduce evidence to the contrary. *See Bryan v. United States*, 524 U.S. 184, 191-192 (1998); *Ratzlaf v. United States,* 510 U.S. 135, 137 (1994); *United States v. Burden*, 934 F.3d 675, 692-692 (D.C. Cir. 2019) (acknowledging the Supreme Court's progression toward reading "willfully" as requiring proof that a defendant had a "culpable state of mind" and knew that his acts were unlawful); *United States v. Zeese*, 437 F. Supp. 3d 86, 94 (D.D.C. 2020) ("Generally, 'in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'"). Thus, Dr. Navarro is entitled to the discovery of information that might tend to exculpate him – *i.e.,* that may show that he relied on decades of Department policy when he asked the Select Committee to work through those issues with former President Trump in lieu of complying with its subpoena.

---

*States*, 294 F.2d 207 (D.C. Cir. 1961). Dr. Navarro submits that Licavoli is abrogated by subsequent decisions in this Circuit and the United States Supreme Court. In any event, Licavoli is inapplicable here, as it did not involve the constitutional implications of an assertion of Executive Privilege and absolute testimonial immunity by a close adviser to the President, and it did involve an assertion of attorney-client privilege that is not at issue here.

### B.      Application of OLC Memoranda

In its Opposition, the Government engages in spectacular acrobatics in support of its assertion that "this case does not depart from the [OLC] opinions." (Dkt. No. 33 at p. 15).  It argues that "There is no OLC opinion holding that former White House staff members can invoke executive privilege or their own accord."[9]/ Dr. Navarro does not contend otherwise; he received President Trump's instruction to invoke executive privilege and communicated that to the Select Committee.

The Government argues that there is no OLC opinion "that holds that, even where a president invokes executive privilege … the summoned witness can then withhold all responsive records, whether privileged or not.  It ignores the fact that Dr. Navarro never took that position. Rather, his response to the Select Committee was that it should negotiate the parameters of any such production with President Trump and his attorneys. The Government also fails to acknowledge this Court's ruling nearly forty years ago – that "constitutional claims [of executive privilege] and other objections to congressional investigatory procedure may be raised as defenses in a criminal prosecution" – in a case where former EPA Administrator Anne Gorsuch refused to turn over subpoenaed documents. *United States v. United States House of Representatives*, 556 F. Supp. 150 (D.D.C. 1983).

The Government also argues that there is "no OLC opinion holding that a former White House staff member to a former President has absolute testimonial immunity when summonsed by Congress," and that, "Indeed, there is not even an OLC opinion holding that all current White House staff members have such immunity—OLC has only ever found such immunity to apply to

---

[9]/ President Trump publicly directed Dr. Navarro to assert privilege ion his behalf. To the extent that the Government may mean that President Trump's lawyers did not provide Dr. Navarro with a formal letter directing him to assert privilege, it cites no authority that requires a President to follow any specific process for the invocation of Executive Privilege.

a limited group of immediate advisers based on a fact-intensive review of those advisers' roles."
(Dkt. No. 33 at p. 16).

Dr. Navarro agrees that this case presents the novel issue of whether absolute immunity applies to a criminal prosecution in the context of a *former* adviser to a *former* president, but common sense and decades of OLC opinions clearly support an affirmative answer to that question.[10]/ The common sense basis for that answer is acknowledged by OLC opinions and court decisions dating back to the 1970s and 1980s. In his 1982 Memorandum for the Attorney General, for example, Theodore Olson acknowledged that "[t]he necessity for confidentiality in the advisory relationships between Cabinet advisers and the President, and their respective aides, is of both constitutional and practical significance. 6 Op. O.L.C. 481 at 484 (1982), *citing United States v. Nixon*, 418 U.S. 683 (additional citations omitted). *Such a protection would be of little value if it evaporated when a president leaves office, leaving his confidential communications fair game for his successor and political rival and committees of Congress controlled by the opposing party.*

That reasoning is echoed in a series of OLC opinions applying testimonial immunity to *former* advisers of *sitting* Presidents. Harriet Miers was a *former* White House Counsel when the House Judiciary Committee subpoenaed her to testify about the termination of several U.S. Attorneys. *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (2007). Donald McGahn was also a *former* White House Counsel when the House Judiciary Committee subpoenaed him to testify about matters described in the Mueller Report. *Testimonial Immunity Before Congress of the Former Counsel to the President*,

---

[10]/ However, the OLC has acknowledged on at least one occasion that "testimonial immunity continues after the tenure of a particular Counsel to the President. … The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which the effective discharge of his duties depends." *Memorandum For Pat A. Cipollone Counsel To The President,* _ Op. OLC at 11 (May 20, 2019) citing *Nixon v. Adm'r of Gen.Servs.,* 433 U.S. 425, 449 (1997) and *United States v. Johnson*, 383 U.S. 169 (1966).

43 Op. O.L.C. ___ (May 20, 2019). Robert Porter was a *former* Assistant to the President and Staff Secretary, and Rick Dearborn was a *former* Assistant to the President and Deputy Chief of Staff for Policy Implementation, when the House Judiciary Committee subpoenaed them to testify about matters described in the Mueller Report. *OLC Letters to Pat. A. Cipollone* (Sept. 16, 2019).

Dr. Navarro clearly qualifies as the type of close presidential adviser to whom executive privilege and immunity should apply. As the Government points out, the OLC considers "the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President …" in determining whether immunity applies. During the time period at issue in the Select Committee's investigation (generously meaning November 1, 2020, through January 20, 2021), Dr. Navarro was nearing the end the Administration which he had served from its beginning in 2017. His title at that point was Assistant to the President and Director of the White House Office of Trade and Manufacturing Policy. During his tenure, he also served as the Defense Production Act policy coordinator during the COVID-19 pandemic. Dr. Navarro had close, almost daily, interaction directly with the President on a range of issues, including the fallout from the 2020 election. Indeed, it is precisely for that reason that the Select Committee sought his testimony, as articulated in the Select Committee's February 9, 2022, letter accompanying its subpoena: "For example, you, then a White House trade advisor, reportedly worked with Steve Bannon and others to develop and implement a plan to delay Congress's certification of, and ultimately change the outcome of, the November 2020 presidential election." Put simply, there can be no real question that were Donald J. Trump the incumbent president, Dr. Navarro would be instructed, by OLC, that he need not appear in response to the Select Committee's subpoena.

Indeed, Dr. Navarro's position and interaction with the President was at least the same as that of a number of past White House advisers, to whom OLC has determined executive privilege and immunity have been extended. Those include: the EPA Administrator (8 Op. O.L.C. 101

(1984)); four current and former White House Counsels (20 Op. O.L.C. 308 (1996), 23 Op. O.L.C. 1 (1999), 31 Op. O.L.C. 191 (2007) and 43 Op. O.L.C. __(2019)); the Pardon Attorney (20 Op. O.L.C. 308 (1996)); an Assistant to the President and Director of the Office os Political Strategy and Outreach (38 Op. O.L.C. 5 (2014)a former Assistant to the President and Deputy Chief of Staff for Policy Implementation (2019); a former Assistant to the President and Staff Secretary (2019), and an Assistant to the President and Senior Counselor to the President (2019). As such, Dr. Navarro fits squarely within the reach of executive privilege and immunity discussed in decades of OLC memoranda.

### C.       The "Prosecution Team"

We now understand that there was a concerted effort between the White House, the Justice Department's Office of Legal Counsel, and NARA to deprive President Trump of his ability to assert executive privilege over documents recently seized by the FBI at Mar-a-Lago. The article published yesterday reported that Jonathan Su of the White House Counsel's Office was engaged in conversations with the Department, the FBI, and the National Archives and Records Administration ("NARA") whereby the Biden Administration empowered NARA to waive any claims to executive privilege that President Trump might assert against the Department.[11]/ According to the article, by May 2022 White House Deputy Counsel Jonathan Su conveyed to NARA that President Biden would not object to waiving former President Trump's claims to executive privilege. Apparently, this was done so that the Department could obtain a grand jury subpoena compelling President Trump to turn over materials he possessed from his presidency. The article further stated that NARA made that decision "in consultation with the Assistant Attorney General for the Office of Legal Counsel.

---

[11]/ https://justthenews.com/politics-policy/all-things-trump/biden-white-house-facilitated-dojs-criminal-probe-against-trump.

The same actors feature prominently in Dr. Navarro's case.  The same Mr. Su wrote the unsolicited letter to Dr. Navarro just days before his deposition date to inform him that President Biden was not asserting executive privilege over his testimony. It is unlikely that he would have even known to do so without discussions with the Select Committee.  The same NARA prompted DOJ's Civil Division to issue a litigation demand letter to Dr. Navarro the day before his indictment seeking documents sought by the Coronavirus Subcommittee that had gone unaddressed for approximately six months.  It is not unreasonable to think that politics played a role in any of this and in the OLC's decision to change course from decades of memoranda and the legal basis behind them.  Dr. Navarro should be permitted to at least explore whether that is so.

### D.      Dr. Navarro Has Shown that he is Entitled to Discovery Regarding his Claim of Selective Prosecution and Undue Political Influence

The Government implausibly asserts in its Opposition that Dr. Navarro is not entitled to discovery of his selective prosecution claim because that information "does not go to the elements of the offense or answering the Government's proof of them at trial." Opp. at 11. This fundamentally misunderstands that a claim for selective prosecution is "not a defense on the merits to the criminal charge itself, but an *independent assertion* that the prosecutor has brought the charge for reasons forbidden by" the equal protection component of the Fifth Amendment. *United States v. Armstrong,* 517 U.S. 456, 464 (1996) (Emphasis added).

The Government recognizes, as it must under *Armstrong,* that Dr. Navarro is entitled to discovery on his claim of selective prosecution if he can offer "some evidence of both discriminatory effect and discriminatory intent."[12]/ Opp. at 12. Admittedly, this is a challenging

---

[12]/ A defendant alleging selective prosecution must show two things. *First,* he must establish that the prosecutorial policy "had a discriminatory *effect*" on him. *Armstrong,* 517 U.S. at 465 (Emphasis provided). To show that, he must establish that the Government afforded "different treatment" to persons "similarly situated" to him. *Id.* at 470. When

standard because the Government rarely, if ever, concedes that it acted improperly in bringing criminal charges against a defendant. However, the circumstantial evidence currently available to Dr. Navarro more than satisfies the "rigorous" standard required by *Armstrong*.

The Government conflates what is discoverable as a matter of right from what is discoverable upon a requisite threshold showing of "necessary to obtain discovery in support of such a claim." *Armstrong*, 517 U.S. at 468. In *Armstrong*, the Court concluded, "the required threshold – a credible showing of different treatment of similarly situated persons – adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id.* at 470. Unlike in *Armstrong*, the showing is readily met here. It is hard to imagine a more credible showing of disparate treatment than the one presented by this case.

Three individuals who served as senior advisers to the President at the time of the events that are relevant to the Select Committee's subpoenas – Mark Meadows, Dan Scavino and Dr. Navarro – were referred by the House of Representatives for contempt following their refusal to comply with those subpoenas.[13]/ It has charged only one of those individuals, Dr. Navarro. Although the Government makes a half-hearted attempt to differential between the three men, Opp. at 14, the near identical situations of all three is beyond serious dispute. As a purported reason

---

a person's circumstances "present no distinguishable legitimate prosecutorial factors that might justify" different prosecutorial decisions between him and the defendant, that person is a similarly situated to the defendant. *Branch Ministries*, 211 F. 3d at 145. *Second*, a defendant must show that the prosecutorial policy had "a discriminatory *purpose*." *Armstrong*, 517 U.S. at 465 (Emphasis provided). Discriminatory purpose may be established either with direct evidence of the prosecutor's intent or by "evidence concerning the unequal application of the law, statistical disparities and other indirect evidence of intent." *Branch Ministries v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997). A colorable claim is one that presents "some evidence tending to show the existence of the essential elements" of selective prosecution. *Armstrong*, 517 U.S. at 467.

[13]/ The Government implausibly claims that a violation of 2 U.S.C. § 192, the criminal Contempt of Congress statue, has occurred when a defendant receives a subpoena and does not comply – without regard to any of the surrounding circumstances. Opp. at 1.

for declining to prosecute Messrs. Meadows and Scavino, while prosecuting Dr. Navarro, the Government suggests that Mr. Meadows's production of records to the Committee, or Mr. Scavino's protracted correspondence with Committee counsel, are differentiators. But the fact remains that (1) all three individuals declined to appear for the purportedly duly issued subpoenas, (2) all three were subsequently referred for contempt/[14]; and (3) 18 U.S.C. § 194 provides that the U.S. Attorney's Office for the District of Columbia *shall* refer all three to the Grand Jury for return of an indictment.[15]/ Dr. Navarro has thus met *Armstrong's* threshold showing of "different treatment of similarly situated persons."

The Government's *ipsit dixit* claim that Dr. Navarro cannot establish a defense of selective prosecution is, at best, premature before the transparency afforded by discovery. It is interesting, and we think highly significant, that the only one of the three similarly situated individuals to be charged is the same person who repeatedly publicly spoke out about his disdain for the Biden Administration and the Select Committee.[16]/ As the D.C. Circuit reiterated just last week, the Government is precluded from, "abridging the freedom of speech." *Guffey v. Mauskopf,* --- F.4th

---

[14]/ The House referred Mr. Scavino to the Department of Justice at the same time it referred Dr. Navarro for prosecution.

[15]/ The Government erroneously urges the Court to accept that this prosecution is "straightforward" and requires it to prove only that Dr. Navarro "received a subpoena, ignored the subpoenas document demand, and refused to appear for testimony despite the admonition that he must." Opp. at 1. Yet, both Mr. Meadows and Mr. Scavino were served with subpoenas and they refused to appear before the Select Committee for deposition. Upon referral by the House of Representatives, the Department declined to prosecute them under a statute that seemingly required it to do so. Fifty years of Department policy and OLC precedent support those decisions. The prosecution of Dr. Navarro is an outlier that the Department has thus far failed to adequately explain.

[16]/ This of course was Dr. Navarro's right under the First Amendment to the Constitution. Unfortunately, this prosecution is sadly reminiscent of political trials that occur in countries without the same democratic traditions as those in the United States. Can there be any doubt that the Department of Justice in a Republican administration would have declined to prosecute Dr. Navarro? Similarly, there was no criminal referral to the Department when then-Attorney General Eric Holder defied a subpoena from the Republican led House Oversight Committee which sought information from the Democrat controlled Department of Justice. Up until now, political prosecutions arising from disputes between the Executive and Legislative branches have been avoided by administrations of both political parties. It would be tragic if that moment in our Nation's history has passed.

--- 2022 WL 3364545 (Aug 16, 2022). A prosecution of that is motivated by Dr. Navarro's political speech would unequivocally be a violation of his First Amendment rights and compelling evidence of selective prosecution where others otherwise similarly situated were not so prosecuted. *See id.* at 7 ("Time and again, the Supreme Court has held that political speech must receive 'the highest level of First Amendment protection'" (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 443 (2015)).[17]

Similarly, this prosecution of Dr. Navarro arguably conflicts with his protection from discrimination based on political affiliation. Specifically, the DC Human Rights Act prohibits discrimination based on one's political affiliation. *See Blodgett v. Univ. Club*, 930 A.2d 210, 222 (D.C. 2007). Here, the Government's prosecution is overtly discriminatory in that it punishes Dr. Navarro for being outspokenly critical of the Biden Administration, the opponent of the party with whom he affiliates politically.

The Government contends that Dr. Navarro has failed to show that its prosecution of him is without discriminatory *effect* even though Mark Meadows and Dan Scavino, who also were senior advisors to President Trump, did not comply with the Select Committee's deposition subpoenas for reason of executive privilege. Searching for a way to explain its disparate treatment of these similarly situated[18] individuals, the Government feebly contends that "the circumstances

---

[17] The Government's meager assertion that Messrs. Meadows and Scavino "appear to also frequently make public statements about their political beliefs" does not adequately rebut Dr. Navarro's assertion that his prosecution is discriminatory based upon his *expression* of his political affiliation. The fact of the matter is that neither Messrs. Meadows, Scavino or Navarro appeared for deposition at the time indicated in their subpoenas. Yet, the only one of these to be prosecuted was openly outspoken about the Select Committee and the Biden Administration. *See Gay Rights Coalition of Georgetown University Law Center v. Georgetown University*, 536 A.2d 1, 43 (D.C. 1987) (Pryor, J., concurring) ("By incorporating these exceptions into the Human Rights Act, the District of Columbia Council signaled its awareness of the special role that religious and political belief plays in our constitutional order.").

[18] Messrs. Meadows and Scavino are not simply "similarly situated" to Dr. Navarro. All three individuals notified the Select Committee that they could not appear for deposition because they had been instructed by President Trump to invoke executive privilege on his behalf. In that sense they were *identically* situated.

of their communications with the Committee and refusal to comply were different in almost every way" from that of Dr. Navarro. This is simply false. Indeed, how the "circumstances" were different and why that is relevant to a discriminatory *effect* analysis the Government does not say. In reality, its decision to decline prosecution of Messrs. Meadows and Scavino evidences a discriminatory effect on Dr. Navarro for the identical conduct which the Department declined to prosecute.

The House of Representatives made its criminal referrals for all three men for exactly the same reason: they had asserted executive privilege on behalf of President Trump and declined on that basis to appear for deposition.[19] After the House referred the matters to the Department of Justice, ██████████████████████████████████████████████████████████

██████████████████████████████████ █████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ It elected to prosecute Dr. Navarro but declined to do so for the same conduct by Mr. Meadows and Mr. Scavino.

Having identified no meaningful distinction in the discriminatory *effect* of the prosecution against Dr. Navarro, the Government next argues that he has failed to satisfy the second prong of

---

[19] Mr. Meadows produced documents to the Committee but refused to appear for deposition. Neither Dr. Navarro nor Mr. Scavino produced documents or agreed to be deposed by the Select Committee.

[20] ███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

the *Armstrong* test, discriminatory *purpose*.[21]/ Here too, the Government's position fails to adequately address Dr. Navarro's colorable claim of improper intent. The courts have recognized that direct evidence of discriminatory purpose is rarely available so they permit defendants to use statistical disparities or other indirect evidence to show intent. *See United States v. Khanu,* 664 F. Supp. 2d 28, 22 (D.D.C. 2009). Before discovery is allowed, a defendant must present "at least a colorable claim" of selective prosecution, *Att'y Gen. v. Irish People, Inc.,* 684 F.2 d 928, 932 (D.C. Cir. 1982), that presents "some evidence tending to show the existence of the essential elements. *Armstrong*, 517 US at 468; *United States v. Judd,* WL 6134590 (D.D.C. 2021).

Dr. Navarro has good reason to believe that the Government's decision to file criminal charges against him, while declining to prosecute Mr. Meadows and Mr. Scavino, was based on unlawful and discriminatory reasons involving his public expression of political beliefs. If we assume that the Government's decision was not entirely irrational, there must be some understandable reason it decided to prosecute only Dr. Navarro. He does not, of course, yet have access to direct evidence of the Government's motivation but the circumstantial evidence that is available raises an inference of discriminatory motive related to Dr. Navarro's public expression of his political beliefs.

Unlike Mr. Meadows and Mr. Scavino, who did not widely discuss their views about the Select Committee or the Government, Dr. Navarro regularly exercised his First Amendment rights of free expression concerning the Committee's investigation and its issuance of the subpoena. The Select Committee report that referred Dr. Navarro for prosecution includes reference to several of

---

[21]/ Although a prosecutor has broad discretion to enforce the criminal laws, the decision to file charges may not be based on improper arbitrary classifications such as a defendant's "exercise of constitutional rights through participation in political activity." *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 21 (D. D. C. 1999), *aff'd* 211 F. 3D137 (D. C. Cir. 2000); *United States v. Judd,* 2021 WL 6134590 (D.D.C. 2021) (the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's "political beliefs"). The decision to prosecute may not be based upon the exercise of protected statutory and constitutional rights. *See United States v. Goodwin*, 457 U.S. 368, 372 (1982).

his public statements. It indicates, for example, that "[w]ithin hours of receiving the subpoena, Dr. Navarro released a public statement that clearly indicated he had no intention of complying with the Select Committee …."[22]/ House Report at 3. The House Report states that Dr. Navarro also "appeared on national television on February 10, 2022, discussing subjects that with a focus of the Select Committee's subpoena to him (footnote omitted)." *Id.* The House Report goes on to say that rather than appear for his deposition, Dr. Navarro "issued a public statement regarding his deposition (footnote omitted)." House Report at 5.

The Government attempts in its Opposition to ignore this evidence by arguing that the Select Committee, not the Department of Justice, made the statements. Nonetheless, the Committee's public statements regarding Dr. Navarro helped create an environment in which the Government made its prosecution decision, clearly signaling that such a prosecution was expected. Dr. Navarro's public objections to the Select Committee's subpoena, and his reasons for noncompliance, likely angered the Committee and its members and may have influenced the Government's decision to prosecute him. Dr. Navarro does not know whether the Committee communicated that anger to the Department of Justice before or after it made its criminal referral, but the Department seems to have acted in similar manner in response to Dr. Navarro's public expressions of dissent.

    **E.**       **The Government Must Provide Information that Tends to Show that the Indictment was Invalid Because the Government Abused the Grand Jury Process.**

---

[22]/ According to the Select Committee's report, Dr. Navarro's public statement said that "President Trump has invoked Executive Privilege; and it is not my privilege to waive.[The Select Committee] should negotiate any waiver of the privilege with the president and his attorneys directly, not through me. I refer to this tribunal to Chapter 21 of In Trump Time for what is in the public record about the Green Bay's we plan to insure [sic] election integrity []. House Report at 3.

Based on the limited discovery the Government has thus far made available to the defense,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

At this stage of the case, the Government has provided only a small amount of information

regarding proceedings before the Grand Jury and Dr. Navarro therefore is unable to formally

challenge those proceedings. Nonetheless, the discovery provided thus far raises the possibility

████████████████████████████████████████████████████

██████. As noted in Dr. Navarro's opening Motion, a prosecutor has the responsibility to advise the Grand Jury on the law and to present evidence for its consideration. Justice Manual § 9-11.010. When a prosecutor conducting a Grant Jury inquiry is personally aware of substantial evidence that directly negates the guilt of the subject of the investigation, he or she must present or otherwise disclose such evidence to the Grand Jury before seeking an indictment against such a person." Justice Manual § 9-11.23.

Dr. Navarro's concerns about the Grand Jury proceedings in this respect go well beyond a "mere suspicion" that it was improperly instructed on the law, or that exculpatory evidence was not provided by the prosecutor. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

The Government as a litigant is, of course, subject to the rules of discovery. *See e.g., United States v. Procter & Gamble,* 356 U.S. 677, 681 (1958). The present case involves important issues that can only be developed by the defense with sufficient information concerning the matters that

occurred before the Grand Jury. Based on the limited information the Government has disclosed

to date, ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████ This information, or the absence thereof, is most certainly included in the

minutes of the Grand Jury proceedings Indictment in this case.

Dr. Navarro understands that minutes of Grand Jury proceedings are not discoverable in

the absence of a showing of "particularized need". However, the Supreme Court has long held that

there are occasions, *see United States v. Procter & Gamble,* 356 U.S. at 683 (disclosure will be

authorized in instances of compelling necessity that outweigh the usual policy of Grand Jury

secrecy if the defendant shows "particularized need") when the trial judge may in the exercise of

his or her discretion order the minutes of a grand jury witness produced to the defendant. Certainly

'disclosure is wholly proper where the ends of justice require it.' *United States v. Socony-Vacuum

Oil Co., supra,* 310 U.S. at page 234, 60 S.Ct. at page 849. The burden, however, is on the defense

to show that 'a particularized need' exists for the minutes which outweighs the policy of

secrecy. *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 400 (1959).

The Government claims that it has already provided Dr. Navarro with all records obtained

in response to Grant Jury subpoenas and all witness testimony and exhibits presented to the Grand

Jury. Opp. at 20. This, it says, is all Dr. Navarro needs to be able to make claims about ██████

██████████████████████████████████████████████ *Id.* This is clearly

insufficient and fails to satisfy the Government's discovery obligations. Dr. Navarro is entitled to

██████████████████████████████████████████████████████

██████████████████████████████████ The defense is unable to determine that on

the current record and has made a sufficient showing of "particularized need" to support discovery of the proceedings before the grand jury.[23]/

## CONCLUSION

For the foregoing reasons, Defendant Peter K Navarro, respectfully requests that this Court compel the Government to comply with its discovery obligations and provide the materials identified in this Motion to Compel Discovery.

Dated: August 23, 2022                          Respectfully Submitted,

                                                E&W Law, LLC

                                                _____/s/ John S. Irving_____
                                                John S. Irving (D.C. Bar No. 460068)
                                                1455 Pennsylvania Avenue, N.W., Suite 400
                                                Washington, D.C. 20004
                                                Telephone: (301) 807-5670
                                                Email: john.irving@earthandwatergroup.com

                                                SECIL LAW PLLC

                                                _____/s/ John P. Rowley, III_____
                                                John P. Rowley, III  (D.C. Bar No. 392629)
                                                1701 Pennsylvania Ave., N.W., Suite 200
                                                Washington, D.C. 20006
                                                Telephone: (703) 417-8652
                                                Email: jrowley@secillaw.com

---

[23]/ In determining whether to dismiss an indictment for errors in grand jury proceedings, a court must assess if the alleged violation " 'substantially influenced the grand jury's decision to indict,' or if there [was] 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (quoting *United States v. Mechanik,* 475 U.S. 66, 78, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986)) (applying "harmless error" standard where dismissal sought for non-constitutional error).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | **Criminal No. 1:23-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**<u>CERTIFICATE OF SERVICE</u>**

On August 23, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed under seal via the CM/ECF system and copies were electronically mailed to counsel for the Government and Chambers.


_____/s/ John S. Irving_____
John S. Irving (D.C. Bar No. 460068)

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 22-cr-200** |
| **v.** | : | |
| | : | |
| **PETER K. NAVARRO,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The Defendant, Peter K. Navarro, is charged with two counts of contempt of Congress for his total defiance of a subpoena issued to him by the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("the Committee") which required him to produce documents and provide testimony relating to his and others' efforts to prevent the peaceful transfer of power between presidential administrations. Now, facing the consequences of his complete disregard for the rule of law, he asks this Court to dismiss the Indictment. To support his motion for dismissal, the Defendant relies on his false claim to the Committee that executive privilege had been invoked in response to its subpoena, an erroneous understanding of the law of contempt, and rank speculation about government misconduct. The Defendant's efforts to dismiss the Indictment are meritless and this Court should deny the Defendant's motion.

### I.    FACTUAL BACKGROUND

On June 30, 2021, the U.S. House established the Committee to investigate the facts, circumstances, and causes of the January 6, 2021, attack on the U.S. Capitol. Indictment, ECF No. 1, ¶¶ 1-3. The resolution establishing the Committee also tasked it with, at the conclusion of its investigation, making recommendations for corrective measures to protect the United States' democracy against future domestic attacks. *Id.* ¶ 4.

As part of its investigation, the Committee identified the Defendant as someone with information relevant to its inquiry.  Accordingly, on February 9, 2022, a Committee staff member emailed the Defendant and asked if the Defendant would accept service of a subpoena from the Committee by email.  Ex. 1 at US-000498.[1]  The Defendant responded within three minutes and stated only, "yes. no counsel. Executive privilege."  *Id*.  Later that day, the staff member emailed the Defendant the subpoena at issue in this case.  Indictment ¶ 7; Ex. 1 at US-000497.  The subpoena required the Defendant to appear on February 23, 2022, and produce various documents relating to the Defendant's role in the lead-up to and events of January 6 and to appear on March 2, 2022, for deposition testimony.  *Id.* ¶ 9, *see also* Ex. 2 (Subpoena and attachments).  In a cover letter accompanying the subpoena, the Committee gave the Defendant some examples of why the Committee believed the Defendant had relevant information, including that it had been reported that the Defendant had worked with various individuals to change the outcome of the 2020 presidential election and that the Defendant had publicly repeated discredited claims of election fraud.  Indictment ¶ 8.

Between the time the subpoena was served and the deadline for the document production on February 23, 2022, the Defendant did not communicate with the Committee in any way, and he did not produce a single document by the deadline.  *Id.* ¶ 15.

On February 24, 2022, the Committee emailed the Defendant and confirmed he was in default of the subpoena's document demand.  *Id.* ¶ 16; *see also* Ex. 1 at US-000497.  In the same email, the Committee also confirmed the Defendant still was required to appear for his deposition

---

[1] Although the Court is limited to deciding the Indictment's sufficiency based on the allegations within the Indictment's four corners, the Government provides additional information regarding the Defendant's communications with the Committee to provide this Court with the relevant factual record relating to the Defendant's claims of executive privilege.

and instructed the Defendant to contact the Committee to confirm the details. *Id*. The Defendant responded three days later and stated that former President Donald J. Trump had "invoked Executive Privilege in this matter" and that he would not, therefore, comply. Indictment ¶ 17; Ex. 3 at US-000506. In response to the Defendant's email, the Committee rejected the Defendant's wholesale refusal to comply on the basis of executive privilege, instructed him to appear for his deposition as required and, to the extent the Defendant believed there were privileged matters, to invoke privilege on a question-by-question basis. Indictment ¶ 18; Ex. 3 at US-000505-06.

On February 28, 2022, the Defendant again refused to comply, asserting the "privilege is not mine to waive." Indictment ¶ 19; Ex. 4 at US-000500-01. Later that same day, the White House Counsel's Office sent the Defendant a letter, notifying him that President Joseph R. Biden had "determined that an assertion of executive privilege is not in the national interest, and therefore is not justified, with respect to the particular subjects within the purview of the Select Committee." Ex. 5 at US-000945. After listing several of the subjects over which President Biden had decided not to invoke privilege, the letter continued:

> President Biden accordingly has decided not to assert executive privileged as your [sic] testimony regarding those subjects, or any documents you may possess that bear on them. For the same reasons underlying his decision on executive privilege, President Biden has determined that he will not assert immunity to preclude you from testifying before the Select Committee.

*Id*.

Despite the letter from President Biden and an additional admonition to comply from the Committee on March 1, 2022, Indictment ¶ 20; Ex. 4 at US-000500, the Defendant did not appear as required for his deposition on March 2. Indictment ¶ 21. At no time did the Defendant provide the Committee with any evidence supporting his assertion that the former President had invoked executive privilege over the information the Committee's subpoena sought from the Defendant.

For the Defendant's deliberate refusal to comply, a grand jury sitting in the District of Columbia returned the pending Indictment.  The Indictment charges the Defendant with two counts of contempt of Congress.  Count One charges the Defendant with refusing to provide documents and Count Two charges him with refusing to appear for testimony.  *Id*. ¶¶ 22-23, 24-25.

## II.   EXECUTIVE PRIVILEGE DID NOT EXCUSE THE DEFENDANT'S NONCOMPLIANCE WITH THE COMMITTEE'S SUBPOENA.

The Defendant claims that the Indictment must be dismissed because "when a former president invokes Executive Privilege as to a senior presidential advisor, the advisor cannot thereafter be prosecuted."  ECF No. 34 at 17.  The Government does not dispute, and agrees, that executive privilege can provide a defense to contempt of Congress in certain circumstances, as might any constitutional privilege.  *See Watkins v. United States,* 354 U.S. 178 at 195-97 (1957) (noting that constitutional privileges place limits on Congress's ability to compel testimony); *Barenblatt v. United States*, 360 U.S. 109 at 112 (1959) ("[T]he Congress, in common with all branches of the Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action").  Moreover, whether executive privilege does, in fact, provide a complete defense is a legal question properly resolved at the pretrial stage.[2]  *Cf. United States v. Covington*, 395 U.S. 57, 59-60 (1969) (finding that, where the Fifth Amendment privilege against self-incrimination excused an individual from complying with a federal marijuana tax

---

[2] The Government notes that, while a valid assertion of executive privilege may provide a defense, a subpoenaed witness's mistaken belief that executive privilege was asserted or excused compliance is not. *United States v. Sinclair*, 279 U.S. 263, 299 (1929) ("There is no merit in appellant's contention that he is entitled to a new trial because the court excluded evidence that in refusing to answer he acted in good faith on the advice of competent counsel. The gist of the offense is refusal to answer pertinent questions. No moral turpitude is involved. Intentional violation is sufficient to constitute guilt . . . The refusal to answer was deliberate . . . His mistaken view of the law is no defense.").

payment law, the question of whether the privilege actually excused compliance and therefore provided a basis for dismissal of criminal charges for not paying the tax was a question of law for the court to decide pretrial under Fed R. Crim. P. 12); *United States v. Bulger*, 816 F.3d 137, 146-48 (1st Cir. 2016) (finding the judge was the proper factfinder to determine if the defendant had been given immunity from prosecution by the government in a pretrial decision).  Executive privilege does not, however, provide a defense here, because there is no evidence it was ever invoked, in any way, with respect to the subpoena the Committee issued to the Defendant.

### A.    The Defendant Has Failed to Demonstrate that Executive Privilege Was Invoked with Respect to the Defendant's Subpoena.

In his communications with the Committee, the Defendant acknowledged that executive privilege was not his to waive.  *See* Indictment ¶ 19.  Just as the privilege is not his to waive, it is also not his to invoke.  *See Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (noting that the privilege resides with the current President and that former presidents have been recognized to "retain for some period of time a right to assert executive privilege over documents generated during their administrations" (internal citation omitted)); *Trump v. Thompson*, 573 F. Supp. 3d 1, 14 (D.D.C. 2201) (Executive privilege "can neither be claimed nor waived by a private party" (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953) (addressing the state secrets privilege))). Even assuming the former President could invoke the privilege in this circumstance—something this Court does not have to decide under the facts of this case—the Defendant has failed to show that the former President even attempted to do so.  The only evidence of a president—former or current—making an executive privilege determination with respect to the Committee's subpoena to the Defendant is the White House's letter to the Defendant on February 28, 2022, notifying him that President Biden was not invoking privilege.  Executive privilege is not a privilege that simply applies absent invocation—it must be asserted.  *See Trump*, 573 F. Supp. 3d at 16-17 (D.D.C.

2021), *aff'd*, 20 F.4th 10 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022) ("[H]istory is replete with examples of past Presidents declining to assert the privilege. . . . President Biden's decision not to assert executive privilege . . . is consistent with historical practice and his constitutional power."); *United States v. Nixon*, 418 U.S. 683, 713 (1974) (finding potential presidential communications became presumptively privileged "[u]pon receiving a claim of privilege from the Chief Executive"). Accordingly, having failed to demonstrate that executive privilege was invoked, the Defendant cannot rely on it as a defense to either of the pending charges.

The Defendant nevertheless claims that a November 20, 2021, press release by the former President, issued well over two months before the Committee even contacted the Defendant, constituted an invocation of executive privilege over the information sought by the Committee's not-yet-issued subpoena.  ECF No. 34 at 5.  But the Defendant acknowledges that the former President issued the November 20 press release shortly after the Defendant was subpoenaed on November 18, 2021, by the U.S. House Committee on Oversight and Reform's Select Subcommittee on the Coronavirus Crisis ("the Coronavirus Subcommittee") to provide records and testimony relating to the coronavirus pandemic.  As is clear from the Coronavirus Subcommittee subpoena, Ex. 6,[3] which the Defendant does not provide with his motion to dismiss, the information sought by that subpoena had nothing to do with the information sought by the Committee's subpoena here.  Ex. 2.

The Defendant does not explain how any invocation of executive privilege, to the extent the press release constitutes one, relating to information regarding the response to the coronavirus

---

[3] The Government found the subpoena on the Coronavirus Subcommittee's website when responding to the Defendant's motion to dismiss.  *See* Subpoena to Peter K. Navarro from U.S. House Committee on Oversight and Reform, Select Subcommittee on the Coronavirus Crisis, *available at* https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Subpoena%20to%20Navarro.pdf (last accessed Aug. 30, 2022).

pandemic could possibly be read as an invocation with respect to information relating to the

January 6, 2021, attack on the Capitol to stop the peaceful transfer of power.  Instead, in his motion,

the Defendant selectively quotes from the press release to suggest that the former President made

some kind of prospective, blanket assertion of privilege over all information that might ever be

sought from the Defendant relating to the time period of the Trump administration, regardless of

topic.  *See* ECF No. 34 at 5 (quoting as evidence of the relevant assertion of privilege for this case

only the portion of the press release stating, "I'm telling Peter Navarro to protect Executive

Privilege and not let these unhinged Democrats discredit our great accomplishments.").  The

Defendant's attempt to contort the press release into a valid assertion of executive privilege

relevant to this case fails.

As an initial matter, there is no basis in law to find that such a broad, undefined assertion,

had it been made, constitutes a valid assertion allowing non-disclosure in perpetuity, regardless of

the information requested.  Such a finding would run counter to the Supreme Court's admonition

that "[e]xecutive privilege is an extraordinary assertion of power 'not to be lightly invoked.'"

*Cheney v. U.S. Dist. Ct. for Dist. of Colum.*, 542 U.S. 367, 389 (2004) (quoting *United States v.

Reynolds*, 345 U.S. 1, 7 (1953)); *see also Reynolds*, 345 U.S. at 7-8 ("There must be formal claim

of privilege, lodged by the head of the department which has control over the matter, after actual

personal consideration by that officer.").  Even where the presidential communications privilege

is at issue, a presumptive privilege falling under the umbrella of executive privilege, the relevant

president has always invoked the privilege with respect to the specific communications sought

before courts proceeded to decide whether the privilege provided a basis for non-disclosure.  *See

Nixon v. Sirica*, 487 F.2d 700, 716-17 (D.C. Cir. 1973); *Senate Select Committee on Presidential

Campaign Activities v. Nixon*, 498 F.2d 725, 727, 730-31 (D.C. Cir. 1974) (noting that then-

President Richard Nixon, in response to a congressional subpoena, had identified specific categories of information sought by the subpoena over which he was not asserting executive privilege and specific categories over which he was asserting).  And, in ultimately finding an invocation of privilege to be effective against disclosure, courts have required particularized assertions.  *See, e.g.*, *Dellums v. Powell*, 642 F.2d 1351, 1363 (D.C. Cir. 1980) ("We think it abundantly clear . . . that any claim of privilege, whether of executive or Presidential privilege . . . , must be made with particularity.") (reviewing executive privilege claim in civil litigation); *Senate Select Committee*, 498 F.2d at 731 (D.C. Cir. 1974) (noting that, once the presidential communications privilege is invoked and the relevant committee shows sufficient need, the president would need to make particularized claims).

In any event, the entire November 20, 2021, press release, issued two days after the Defendant was served with the Coronavirus Subcommittee's subpoena, makes clear that the former President did not purport to make the broad, unbounded assertion of privilege the Defendant suggests—in fact, the statement does not purport to assert executive privilege with respect to any information beyond that sought by the Coronavirus Subcommittee.  The text of the entire press release identified by the Defendant reads as follows:

> The Communist Democrats are engaging in yet another Witch Hunt, this time going after my Administration's unprecedented and incredible coronavirus response, despite the fact that, sadly, more Americans have died this year from Covid than in all of 2020.  It is a Witch Hunt that's been going on for years.  Why don't they investigate Crooked Hillary, when so much has now been proven about her and her campaign's lies and dealings with Russia to smear me and spy on my campaign?  I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments.  The Witch Hunt must end!

Ex. 7.

Even the Defendant understood the narrow scope of the former President's purported November 20, 2021, privilege assertion at the time the press release was issued.  On December 7, 2021, the Defendant sent a letter to the Coronavirus Subcommittee in which he stated:

> I write in response to the subpoena, dated November 18, 2021 (the "Subpoena") issued to me by the Committee on Oversight and Reform, Subcommittee on the Coronavirus Crisis (the "Subcommittee").
>
> At this time, I am unable to respond to the Subpoena based on former President Trump's invocation of executive privilege *with respect to the very topic covered by the Subpoena*.  Specifically, *in response to the Subpoena*, on November 20, 2021, President Trump stated, "I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments."
>
> *Not only is this a direct, proper, and explicit invocation of executive privilege provided by a President of the United States as it relates to an important policy matter* during his tenure in office.  It is a direct order that I should not comply.

Ex. 8 (emphasis added).[4]   Indeed, it appears that, consistent with his communications to the Coronavirus Subcommittee, in his communications with the Committee, the Defendant recognized that an assertion of executive privilege must relate to some specific information, as he falsely asserted to the Committee that the former President has asserted executive privilege "in this matter."  Indictment ¶ 17.  As is apparent from the total absence of evidence, the former President did not.

Moreover, it would be improper for the Court to apply the former President's purported invocation over the information sought by the Coronavirus Subcommittee to the different

---

[4] The Government found this letter when writing its response to the Defendant's motion to dismiss on the Coronavirus Crisis Subcommittee's website.  *See* Letter to Hon. James E. Clyburn, *available at* https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/Letter%20to%20Clyburn%20Committee%2012%207%2021.pdf (last accessed Aug. 30, 2022)*.*  Although the Defendant purports to quote from the letter in his motion, ECF No. 34 at 5, he does not appear to acknowledge or explain his sudden change in position with respect to the scope of the purported invocation in the former President's November 20 press release or to have provided the Government or this Court with the full text of the letter.

information sought by the Committee.  Were it to do so, the Court, not the executive, would be deciding to invoke executive privilege in the face of an explicit refusal to do so by the sitting President and the apparent decision not to do so by the former President.  The Supreme Court long ago recognized that executive privilege exists for the public interest, not for any one individual, by protecting the functioning of the Executive Branch.  *E.g.*, *Nixon v. Administrator of General Services*, 433 U.S. 425, 449 (1977) ("GSA") ("[T]he privilege is not for the benefit of the President as an individual, but for the benefit of the Republic.").  Given the purpose it serves, the Court has recognized that it is a president, by being in the best position to weigh the interests of the Executive Branch, who properly decides whether executive privilege should be invoked with respect to any particular information.  *Id.* at 449 ("[I]t must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly."); *see also Thompson*, 20 F.4th at 33-34 (noting President Biden "has made the considered determination that an assertion of executive privilege is not in the best interests of the United States given the January 6th Committee's compelling need to investigate and remediate an unprecedent and violent attack on Congress itself").  This principle is no different when considered in the context of a former President.  *See GSA*, 433 U.S. at 425 (finding a former President can retain some ability to invoke executive privilege under certain circumstances because the interests underlying the privilege survive that President's tenure).  Neither this Court, nor the Defendant, can decide *sua sponte* that executive privilege should be asserted over the information sought by the Committee.  Because executive privilege never was invoked, it cannot provide a defense to the pending charges.

Despite failing to provide any evidence that executive privilege was ever claimed by the privilege holder or the former President in relation to the subpoena he defied, the Defendant asserts

that "[t]he present case is a substantial departure from the Department's long-established recognition that a senior aide to President [sic] is 'absolutely immune' from compulsion to respond to a congressional subpoena."  ECF No. 34 at 4.  Throughout his motion, he repeatedly cites Department Office of Legal Counsel ("OLC") opinions that he claims support this notion.  The Defendant is wrong.

The Department has never found that any White House officials have "absolute immunity" to simply ignore congressional subpoenas wholesale, even if there were an invocation of executive privilege.  In fact, it has admonished the opposite.  *See, e.g.*, *Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *59 (Jan. 8, 2021) ("It has long been the Executive Branch's policy to 'comply with Congressional requests for information to the fullest extent consistent with the constitutional and statutory obligations of the Executive Branch." (citation omitted)).  Nor has OLC ever addressed an invocation by a former President over information sought from a former advisor.  *See* Statement of Interest of the United States, *Meadows v. Pelosi*, 21-cv-3217 (CJN), ECF No. 42, at 1-2 (July 15, 2022).

Moreover, OLC has consistently recognized that there are limits to executive privilege, *see, e.g.*, *Congressional Oversight of the White House* at *32 (describing the deliberative process, attorney-client communications and work-product, and presidential communications components of executive privilege as protecting from disclosure "internal communications and information concerning presidential and other executive branch decision-making"); *id*. at * 57 (noting that the various components of the privilege "vary in scope and the extent of protection from disclosure").  Implementing these principles, OLC has only found the contempt of Congress statute to be inapplicable to congressional document demands where there is a clear assertion of executive privilege over a particular, identified group of records and a clear direction from the President to

the official at issue to withhold them.  *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* [hereinafter *Prosecution for Contempt of Congress*], 8 Op. O.L.C. 101, 142 (1984) ("In the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon the written legal advice of the Attorney General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official.").  And OLC has been clear that whether executive privilege excuses a particular White House official from appearing for testimony is not to be presumed.  Instead whether an official qualifies is a fact-intensive inquiry undertaken by the Office of Legal Counsel with respect to the specific individual subpoenaed.  *Congressional Oversight of the White House*, 45 Op. O.L.C. __, at *55 ("[I]n determining whether a person qualifies for this immunity, we have considered the day-to-day responsibilities of the adviser and the extent of his or her regular interaction with the President.")

The Defendant claims he relied on OLC opinions, but he does not appear to have read them.  And, as discussed below, mistaken relance is not a defense to contempt.  His efforts to suggest to this Court that the Department is departing from its own policies by prosecuting an individual who falsely claimed a privilege to defy a valid congressional subpoena in violation of the law are meritless.  There was no invocation of executive privilege over the documents and testimony required by the subpoena the Committee issued to the Defendant.  The Defendant's attempt to hide behind a privilege that is not his should be rejected.

**B.      The Defendant's Erroneous Claim of Executive Privilege Does Not Provide a Basis for Dismissal Under the Rule of Lenity.**

The Defendant claims that if the Court determines executive privilege did not excuse the Defendant's compliance with the Committee's subpoena, then the Court should nevertheless dismiss the Indictment under the rule of lenity because, according to the Defendant, he did not have notice that executive privilege would not provide a defense.  ECF No. 42-43.  The rule of lenity does not support dismissal of the Indictment.

First, the Defendant's argument is based on his assertion that executive privilege was, in fact, asserted.  ECF No. 34 at 42 ("[T]he novel question with which this Court is confronted, following the failure of the Legislative and Executive Branches to otherwise reach an agreement, is what effect does a former president's assertion of Executive Privilege have.").  But, as described above, there is no evidence executive privilege ever was asserted—because it was not.  The Defendant's assumption that the former President might come to his aid in defying the subpoena is no substitute for it.  Thus, there is not even an erroneously believed invocation.

In any event, the Defendant's claims are based on a misapplication of the rule of lenity. The rule of lenity applies "only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute."  *Shular v. United States*, 140 S.Ct. 779, 787 (2020) (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994)).  An ambiguous statute is one for which more than one meaning could be attributed to its statutory terms.  Under those circumstances, the rule of lenity requires that the "tie must go to the defendant."  *United States v. Santos*, 553 U.S. 507, 514 (2008).  Here, the Defendant does not explain how the contempt statute is ambiguous.  He does not even identify which relevant terms in the statute he believes are subject to different interpretations that leave ambiguity or which of several interpretations he believes is the one that should be adopted.

At bottom, the Defendant's argument is nothing more than a claim that defendants in contempt cases should be treated differently based on the law or privilege on which they claim to have relied to refuse compliance.  That is not how the criminal law works.  *See Santos*, 553 U.S. at 522 (opinion of Scalia, J.) ("[T]he meaning of words in a statute cannot change with the statute's application.") (citing *Clark v. Martinez*, 543 U.S. 371, 378 (2005)); *cf. Ratzlaf v. United States* 510 U.S. 135, 143 (1994) ("We have even stronger cause to construe a single formulation, here § 5322(a), the same way each time it is called into play.") (rejecting argument that the penalty provision applicable to multiple offenses takes on a different meaning depending on the offense to which it is applied).  It has been settled precedent for decades that erroneous reliance on the law does not provide a defense to contempt of Congress, because all that is required to meet the intent element is that the defendant act deliberately and intentionally.  *See Sinclair v. United States*, 279 U.S. 263, 299 (1929), *overruled on other grounds*, *United States v. Gaudin*, 515 U.S. 506 (1995) (finding the defendant in a contempt of Congress case "was bound rightly to construe the statute. His mistaken view of the law is no defense").[5]  As long as the failure to comply was deliberate and intentional, the reasoning behind it does not matter.  *E.g.*, *Fields v. United States*, 164 F.2d 97, 100 (D.C. Cir. 1947).  That the Defendant chose to justify his deliberate defiance by citing one area of the law versus another does not render the statute ambiguous.

## III.   THE DEFENDANT HAS WAIVED HIS OBJECTIONS TO THE SUBPOENA BASED ON THE COMMITTEE'S COMPOSITION, AND THEY PROVIDE NO BASIS FOR DISMISSAL

For the first time before this Court, the Defendant objects to the subpoena on which he defaulted, and seeks dismissal of the Indictment, on the basis that the Committee is not properly

---

[5] Although the *Sinclair* court was deciding the intent requirements for refusing to answer a question from a committee, the D.C. Circuit has found the same intent standard applies to a willful default.  *Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961) .

constituted.  ECF No. 34 at 17-27.  In particular, the Defendant now objects to the fact that the Committee operates with fewer than 13 members, *id*. at 21-24, and that the most senior Republican Member of the Committee—Rep. Liz Cheney—uses the title "Vice Chair" rather than the term "Ranking Minority Member," *id*. at 24-27.  But because the Defendant failed to raise these objections to the Committee at the time of his noncompliance, he has waived the right to raise them before this Court, and they provide no basis for dismissal of the Indictment.  Even if the Defendant had not waived his objections, the rules the Defendant claims were violated were not and, in arguing otherwise, the Defendant encourages the Court to violate the Constitution's Rulemaking Clause by adopting an interpretation of the rules that are contrary to the House's own interpretation.  The Defendant's claims regarding his objections to the Committee's operating rules fail.

**A.    The Defendant Waived Objections To The Number of Members the Committee Needs to Operate And The Title Of Its Ranking Minority Member When He Failed to Raise Them Before the Committee.**

In the face of a congressional subpoena, a witness who fails to raise an evident objection or privilege before the issuing Committee waives his ability to later make that claim before a Court.  The Supreme Court first made this clear in *United States v. Bryan,* 339 U.S. 323, 330-34 (1950).  There, after being charged with contempt of Congress for refusing to provide documents in response to a congressional subpoena, the defendant claimed for the first time before the trial court that she could not be required to comply due to a "defect in composition" of the Committee.  *Id*.  The Court found that by not raising the objection to the Committee's composition at the time of default, the defendant in that case had waived it as a defense.  *Id*. at 332-33 ("[I]f respondent had legitimate reasons for failing to produce the records of the association, a decent respect for the House of Representatives, by whose authority the subpoenas issued, would have required that she

state her reasons for noncompliance upon the return of the writ. . . . To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of authority and an obstruction of its processes." (citation omitted)). The Court has affirmed this holding. *See Hutcheson v. United States*, 369 U.S. 599, 608-611 (1962) (stating that a constitutional objection "must be adequately raised before the inquiring committee if [it]is to be fully preserved for review in this Court. To hold otherwise would enable a witness to toy with a congressional committee in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the grounds on which a witness asserts a right of refusal to answer." (internal citations omitted)); *McPhaul v. United States*, 364 U.S. 372, 378-79 (1960) (finding that the defendant could not raise a defense that he did not possess subpoenaed records because he had never made the claim before the issuing committee).

On the other hand, a witness does not waive an objection based on a procedural defect that he did not and could not have known about at the time the subpoena was pending. In *Yellin v. United States*, the Supreme Court considered the situation of a witness who, upon being subpoenaed by a congressional committee for public testimony, wrote to the committee to ask instead to testify in executive, or private, session. 374 U.S. 109, 111 (1963). A committee staffer rejected the defendant's request. *Id*. But what the defendant did not know, and thus could not raise as an objection, was that the committee's members—rather than the staffer—had not considered the witness's request before it was rejected, as required in the committee's rules. *Id*. at 120-123. The Court held that the witness had not waived an objection or privilege that he could not have known about. *Id*. at 122-123; *see also id*. 122 n.8 (collecting cases "in which a witness' defense has been rejected because he failed to make timely objection"); *Liveright v. United States*,

347 F.2d 473, 474-76 (D.C. Cir. 1965) (no waiver where defendant could not have been aware of improper issuance of his subpoena).

Both of the issues to which the Defendant now objects—the number of Members of Congress sitting on the Committee, and Rep. Cheney's title as Vice Chair instead of Ranking Minority Member—were apparent at the time that he received and defaulted on the subpoena, but the Defendant did not raise them.  The Committee's authorizing resolution, on the deviation from which the Defendant claims his objections are based, was a public law and posted in its entirety on the Committee's website.[6]  The resolution, passed on June 30, 2021, well before the Defendant was subpoenaed, states that the House Speaker "shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader," and that various Committee actions could be taken by the Committee's Chair, upon or after consultation with "the ranking minority member."  H. Res. 503 §§ 2(a), 5(c)(6)(A).

 Further, it was a matter of public record when the Defendant defaulted on his subpoena that the Committee operated with nine members and used the title of Vice Chair for Rep. Cheney, its ranking minority member.

With respect to the Defendant's objection regarding the number of Committee members, the fashion in which the Committee's nine Members were appointed was discussed on the House floor and covered in the news media, as the Defendant concedes. ECF No. 34 at 25 (citing to a July 21, 2021, Wall Street Journal editorial discussing the Committee's composition); *see also, e.g.*, Jacqueline Alemany and Tom Hamburger, *The January 6 committee: What it has done and where it is headed,* Wash. Post, January 4, 2022.[7]   And the cover letter of the subpoena the

---

[6] "About," Select Committee to Investigate the January 6th Attack on the United States Capitol, https://january6th.house.gov/about (last accessed August 29, 2022).

[7] *Available at* https://www.washingtonpost.com/politics/2022/01/04/january-6-

Committee issued to the Defendant listed all of the Members of the Committee—9 of them, rather than 13.  Ex. 9.  The Defendant cannot claim he did not or could not know, at the time of his default, that the Committee had a different number of members than anticipated in its authorizing resolution.

Similarly, by the time the Defendant received his subpoena on February 9, 2022, Rep. Cheney had been operating using the title of "Vice Chair" for the Committee since September 2021; when Rep. Cheney accepted the title and role, the Committee announced it in a press release. *See* "Chairman Thompson Announces Representative Cheney Select Committee Vice Chair," Select Committee to Investigate the January 6th Attack on the United States Capitol.[8] Accordingly, even were the Defendant's procedural and semantic objections to the subpoena on these bases legitimate, he waived them when he failed to raise them to the Committee.

The Defendant claims—tellingly, without engaging at all with the binding legal precedent described above—that he has not waived his objections because "had [he] objected at the time of his deposition, his objections would have been ignored."  ECF No. 34 at 27.  But that is not a sound legal argument—it is a complaint that the law is what it is, and it is also a concession that the Defendant failed to raise these plainly apparent issues as a reason for his noncompliance with the subpoena.  Indeed, the Defendant did not raise them at the time because they were not in fact the reason he refused to comply—that reason, as has been made clear by the Defendant's briefing in this case, was the Defendant's desire to avoid compliance by hiding behind a false claim that executive privilege had been invoked.  *See Bryan*, 339 U.S. 333-334 ("[T]he fact that the alleged

---

committee-explainer/ (last accessed August 30, 2022).

[8] *Available at* https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair (last accessed August 29, 2022).

defect upon which respondent now insists is, in her own estimation, an immaterial one, is clearly shown by her reliance before the Committee upon other grounds for failing to produce the records. She does not deny . . . that she would not have complied with the subpoenaed no matter how the Committee had been constituted at the time."). Accordingly, the Defendant has waived objections to the subpoena based on the number of Committee members or Rep. Cheney's title, and they provide no basis for dismissal of the indictment.

### B. The Defendant's Objections Do Not Bear On An Element of the Offense And Do Not Pertain To Committee Rule Violations Denying Him Rights.

Even if the Defendant had not waived his objections to the Committee's composition, he misstates and overstates the nature and import of his eleventh-hour objections. The Defendant cites multiple inapposite cases to claim that his objections provide a basis to dismiss the Indictment under the Due Process Clause. ECF No. 34 at 18-20. The Defendant does not clearly identify why the Indictment would be deficient if the Committee had violated its rules. It appears the Defendant's claim is that an allegation for contempt only can be sustained if the Committee has followed all of its rules and that, because, according to the Defendant, the rules were violated here, the allegations of the Indictment cannot stand. But this claim is founded on a misstatement of the elements of the offense and an erroneous understanding of the Court's ability to interpret House rules differently from how the House interprets them.

### 1. *Compliance with a congressional committee's rules is not an element of the offense.*

First, the Defendant's claim is based on the erroneous suggestion that rules compliance is an element of the offense that must be properly alleged and proven. *See* ECF No. 34 at 18 (claiming that "judicial scrutiny" is appropriate of "rules conferring lawful authorization of any inquiry"). This is incorrect. The Supreme Court in *Yellin* made clear that a rules violation could

be a defense to contempt of Congress "were [the defendant] able to prove his defense." 374 U.S. 109, 123 (1963). The burden is on the Defendant to prove unwaived rules violations. On the other hand, if rules compliance were an essential element of the offense, the Government would bear the burden of proving compliance and its failure to do so would be sufficient for acquittal. *See United States v. Bailey*, 209 F. Supp. 3d 55, 63 (D.D.C. 2016) (noting that "the burden of proof rest[s] upon the Government to prove guilt to [the jury's] satisfaction beyond a reasonable doubt, [and] that this burden extend[s] to each and all essential elements of the offense charged" (quoting *Lawson v. United States*, 248 F.2d 654, 655 (D.C. Cir. 1957) (internal quotation marks omitted) (alterations in original)). The D.C. Circuit affirmed rules violations were only potential defenses in *Liveright* noting that it had previously found a subcommittee's failure to comply with its authorizing resolution's requirement that all members be consulted before issuance of a subpoena could provide a "defense" to contempt and that this was consistent with Supreme Court precedent finding that rules violations are not essential to the offense but potentially valid defenses. 347 F.2d at 474-75, 475 n.5 (D.C. Cir. 1965) (citing *Bryan*, 339 U.S. 323 (1950); *Shelton v. United States*, 327 F.2d 601, 606 (D.C. Cir. 1963)).

The cases on which the Defendant relies and from which he selectively quotes to suggest otherwise, ECF 34 at 18, do not help him. *Christoffel v. United States* was a perjury case in which the rules violation in question—a lack of committee quorum—was an element of the charged offense. 69 S.Ct. 1447, 1449 (1949). The Supreme Court has expressly found that *Christoffel* can tell nothing about the rules requirements for a contempt of Congress case, stating in *Bryan*: "The Christoffel case is inapposite. For that decision, which involved a prosecution for perjury before a congressional committee, rests in part upon the proposition that the applicable perjury statute

requires that a 'competent tribunal be present' when the false statement is made.  There is no such

requirement in [the contempt of Congress statute]." *Bryan*, 339 U.S. at 329.

The Defendant is no more successful in his misplaced reliance on *Gojack v. United States*,

a contempt of Congress case in which the Supreme Court reversed the defendant's conviction

because it found that the inquiry in relation to which the relevant subcommittee had issued his

subpoena had not been properly authorized.  384 U.S. 702, 708 (1996).  The Defendant cites

*Gojack* for the proposition that an issue to be decided affirmatively in this case is whether the

Committee followed "those rules conferring the lawful authorization of any inquiry."  ECF No. 34

at 18.  But the "authorization" element of contempt is not about a committee's operational rules.

As *Gojack* and other cases make clear the "authority" element of the offense of contempt of

Congress—the one that the Government will have to prove in the Defendant's trial—is a question

of whether the Committee had the authority to investigate the particular subject matter to which

the subpoena relates.  *See Gojack*, 384 U.S. at 708 ("[A] specific, properly authorized subject of

inquiry is an essential element of the offense under Section 192.");  *Russell v. United States*, 369

U.S. 749, 771-72 (1962) (finding contempt of Congress indictments insufficient where they did

not allege the subject matter which the relevant committee was investigating);  *Barenblatt*, 360

U.S. at 116-23 (1959) (examining authorized subject matter of investigation to determine whether

it was authorized to compel information sought);  *United States v. Rumley*, 345 U.S. 41, 42-44

(1953) (determining whether committee was authorized to obtain information it sought by

examining the authorizing resolution describing the subject matter of the authorized inquiry);  Final

Jury Instructions, *United States v. Bannon*, 21-CR-670 (CJN), ECF No. 129, at 27 (D.D.C. July

22, 2022) (instructing that the second element of the offense of contempt of Congress is "that the

subpoena sought testimony or information pertinent to the investigation that the Select Committee

was authorized to conduct").   At trial in this case, the Government will prove the authority element—that is, the authorized scope of the Committee's investigation—through the Committee's authorizing resolution, which describes the specific purpose for which the Committee was created:  to investigate the facts and circumstances leading to the January 6, 2021, attack on the U.S. Capitol, and to generate recommendations to prevent any such event from occurring again. H. Res. 503.   Neither *Gojack* nor any other case stands for the proposition that the Defendant implies—that, in order for the Committee to be "lawfully authorized," the Government must prove that the Committee followed every procedural rule.

The Defendant also selectively quotes *Yellin* to support his erroneous claim that rules compliance is an essential element of the offense, ECF No. 34 at 18-19, but, as described above, the *Yellin* court only found the alleged rules violation to be a potential defense.

The Defendant's seeks to further support his due process claim with an erroneous suggestion that the purported rules violations to which he now objects go to protections he was owed as a subpoenaed witness because "[m]inority [party] leadership on any given committee ensures that deponents are afforded oversight of adherence to congressional rules, precedents, and established decorum."  ECF No. 34 at 25-26.   And, indeed, it is only violations of rules that create specific protections for witnesses before congressional committees that can be used as defenses at trial.  *See Yellin*, 374 U.S. at 123 (if defendant "had expressly rested his refusal to answer upon a violation of [the rule] and the Committee nevertheless proceeded, he would be entitled to acquittal, were he able to prove his defense.  Otherwise, if Yellin could be convicted of contempt of Congress notwithstanding the violation . . . he would be deprived of the only remedy he has for protecting his reputation."); *Liveright*, 347 F.2d at 475 (D.C. Cir. 1965) (noting that where a rule "served to protect the right of all persons to be free from unnecessary invasions of their privacy," allowing a

defense to prosecution for contempt based on a violation of that rule gave effect to the concern that such procedures be followed before anyone was required to forfeit the right).  But neither objection the Defendant raises in his motion relate to any Committee rule that provides witnesses with procedural protections.  Neither House Resolution 503 nor any other Committee rule require 13 Committee members to be sitting to take any action with respect to the Defendant.  Moreover, there is no rule requiring certain titles to be used by the ranking minority member and the Defendant does not explain why Rep. Cheney's title of Vice Chair deprived him of any protections before the Committee.

    **2.**    *The Court cannot interpret House rules in a manner different from the House.*

The Rulemaking Clause of the Constitution provides that "[e]ach House [of Congress] may determine the Rules of its Proceedings."  U.S. Const., Art. I, § 5, cl. 2.  To the extent that a House rule is ambiguous—that is, subject to more than one interpretation—there is risk in the Judicial Branch attempting to interpret it.  *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir. 1995) ("[J]udicial interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution . . .Where, however, a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.").  Accordingly, where the House has made clear its interpretation of a rule, the Court should defer to that interpretation.  *United States v. Barker*, 921 F.3d 1130 ("Accordingly, we accept the House's interpretation of its own rules . . . , thus eliminating any risk of running afoul of either the Rulemaking Clause or separation-of-powers principles.").

The House has made clear its view of both of the issues that the Defendant has raised. First, the House has expressed its view implicitly through ratification of the Committee's actions. Since the House created the Committee, the Committee has never operated in any other way than the one that it operated regarding the Defendant—that is, the Committee has always operated with nine members and with a ranking minority member who uses the title of Vice Chair.  In apparent approval of the Committee's procedures, the House voted on and approved contempt resolutions of the Defendant and several other individuals.  *See* H. Res. 851, H. Res. 730; *Repub. Nat'l Comm. ("RNC") v. Pelosi*, 22-CV-659 (TJK), 2022 WL 1294509 at *15 (D.D.C. May 1, 2022) ("[T]he House views the Select Committee to be duly constituted and empowered to act under its authorizing resolution, even though the Select Committee has only nine members.  This understanding is reflected by the House's adoption of the Select Committee subpoenas.").

More to the point, however, in the face of similar claims to the Defendant's, the House of Representatives filed an amicus brief in *Bannon* in which it provided its explicit view of the two issues the Defendant now raises.  *See* Amicus Brief, *Bannon*, ECF No. 76-2; *see also Barker*, 921 F.3d at 1130-32 (relying on the House's court filings to determine its position on its rules).  With respect to the Defendant's claim about the title of the ranking minority member of the Committee, and any consultations required with that individual, the House stated Rep. Cheney "is, by definition, the senior ranking minority member of the Select Committee" and that House Resolution 503's "consultation requirement was satisfied by the Chair's consultation with Vice Chair Liz Cheney."  Amicus Brief, *Bannon*, at 15-16; *see also RNC*, 2022 WL 1294509 at *16 ("True, for whatever reason the Select Committee did not give [Rep. Cheney]—or anyone else— the formal title "ranking member."  But to the extent there is any uncertainty about whether she

fits the bill, on this record the Court must defer to the Select Committee's decision to treat Representative Cheney as the ranking minority member for consultation purposes.").

Regarding the Defendant's claim about the number of Members of the Committee, the House stated that its interpretation of House Resolution 503 is that it "does not require that all thirteen Members be appointed in order for the Select Committee to function," nor does its provision for filling vacancies on the Committee provide a deadline for filling them. Amicus Brief, *Bannon*, at 10-11; *see also RNC*, 2022 WL 1294509 at *15 (rejecting RNC's argument that Committee lacked authorization because it had only nine members, stating that "for a few reasons, especially given the House's own reading of the authorizing resolution, the Court cannot agree"). In sum, the House of Representatives interprets its own resolution to allow for the Committee to operate with nine members, and for Rep. Cheney, the Committee's ranking minority member, to use the title of Vice Chair. The Court cannot reach a different interpretation.

## IV.   THE DEFENDANT'S CLAIMS ABOUT THE PLACE THE DEFENDANT WAS REQUIRED TO APPEAR UNDER THE SUBPOENA PROVIDE NO BASIS FOR DISMISSING THE INDICTMENT.

The Defendant claims that the Indictment must be dismissed because the subpoena did not specify where in the U.S. Capitol the Defendant had to appear for his deposition and the location was changed. ECF No. 34 at 30. Neither claim supports a motion to dismiss the Indictment.

As an initial matter, the Defendant's assertions do not go to the subpoena's document demand. Accordingly, even if they had merit, they would provide no basis to dismiss Count One of the Indictment.

Moreover, any claim that the Defendant's failure to appear for the deposition was the result of supposedly vague instructions from the Committee or the subpoena about where to go, *see* ECF No. 34 at 30 ("By omitting any understandable description of where the deposition was to occur,

the Committee eliminated any possibility that Dr. Navarro's non-appearance can support a criminal prosecution for contempt."), is nothing more than a claim about whether the Government will be able to prove at trial the Indictment's allegation that the Defendant's default was willful, *see* Indictment ¶ 24-25. Such factual disputes are for the jury, not for the Court at the motion to dismiss stage. *See United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015) ("When considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations."); *United States v. Safavian*, 429 F. Supp. 2d 156, 158 (D.D.C. 2006) ("The government therefore 'is usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal under Rule 29.'" (quoting *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005))).

The Defendant also argues that, when Committee staff identified the location for the deposition as the O'Neill House Office Building on March 1, 2022, it constituted a change to the subpoena that, according to the Defendant, had to be authorized by a majority of the Committee pursuant to clause 2(m)(3)(A)(i) of Rule XI of the Rules of House of Representatives. ECF No. 34 at 30-31. According to the Defendant, without evidence that it was so authorized, Count Two must be dismissed. *Id*. This claim also fails.

First, the Defendant misreads the rules governing the Committee. House Resolution 503, which established the Committee, expressly states that the Chair of the Committee may authorize and issue subpoenas pursuant to clause 2(m). H. Res. 503, Sec. 5(c)(4). There is no requirement, therefore, that a majority of the Committee be involved in the issuance of subpoenas as the Defendant claims. The subpoena, on its face, is authorized by the Chair of the Committee. To the extent the Defendant objects to compliance with the subpoena because he wishes to challenge what

is apparent on its face, such is the location of the deposition, he has waived this claim because it was available to him at the time. *See supra* at Section III(A).

Second, the Defendant provides no basis for concluding that changing the location for his deposition from the U.S. Capitol to the O'Neil Office Building constituted a new subpoena requiring authorization from the Chair. There is no rule that the Government can find, and none that the Defendant cites, that requires a new subpoena be issued if the location of the deposition is altered. Moreover, even if such a rule existed, the Defendant points to an email he received on March 1, 2022, from a Committee staffer notifying him of the change of location as the evidence of the improper location change. Again, that information was known to the Defendant at the time he failed to appear and he did not object on that basis. He has, like his other objections, therefore, waived it as a defense in this case.

In addition, as described above, compliance with a committee's rules is not an essential element of the contempt offense that the Government must sufficiently plead and prove to meet its burden at trial. *Liveright*, 347 F.2d at 475 n.5. Instead, a failure to comply with a committee rule is available as a defense, if not waived, only if the defendant is able to prove the violation and his reliance on compliance with the rule at trial. *Yellin*, 374 U.S. at 123 (1963) (noting a defendant "would be entitled to acquittal" based on a rules violation "were he able to prove his defense"). Accordingly, even to the extent the Defendant had preserved the objection to the location change— whether by properly raising it before the Committee at the time he refused to comply or by it being a procedural violation about which he could not have known—whether it provides a defense is a question for the jury, not a basis to conclude the Indictment is deficient.

## V. THE INDICTMENT SUFFICIENTLY PLEADS PERTINENCE, AND THE DEFENDANT CANNOT CHALLENGE THE SUFFICIENCY OF THE GOVERNMENT'S EVIDENCE AT THIS STAGE.

The Defendant suggests that the Indictment is legally insufficient because it does not explain how the information the subpoena sought from the Defendant is pertinent to the Committee's investigation. ECF No. 34 at 28. The Defendant is correct that pertinence is an element of the charged offense. *See Russell*, 369 U.S. 749, 755 (1962) ("[I]t is 'incumbent on the United States to plead and show that the question ([the Defendant] refused to answer) pertained to some matter under investigation.'"); *United States v. McSurely*, 473 F.2d 1178, 1203 (D.C. Cir. 1972) ("one of the necessary elements of [the Government's] case" is "pertinency of its demands to the valid subject of the legislative inquiry"); Final Jury Instructions, *Bannon*, at 27 (instructing jury that "[i]n order for you to find that the information was pertinent, the government must prove to you, beyond a reasonable doubt, that at the time the Select Committee issued the subpoena, the testimony or information sought could have related to the Select Committee's investigation in some way . . . It does not matter whether the information the Defendant allegedly had would have been pertinent to the authorized investigation. All that matters is that it could have been pertinent at the time that the Select Committee sought the information."). Contrary to the Defendant's claims, the Indictment sufficiently alleges this element.

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). Here, the Indictment more than meets this standard with respect to the pertinency by providing detailed factual allegations. First, the Indictment clearly sets forth that the Committee's authorized investigation was "to investigate and report upon the

facts, circumstances, and causes relating to the January 6, 2021, domestic terrorist attack on the United States Capitol Complex."  Indictment ¶ 2.  It then alleges that "[o]n February 9, 2022, the Select Committee served [the Defendant] with a subpoena for documents and testimony relating to its inquiry," *id*. ¶ 7, and quotes from the cover letter the Committee sent to the Defendant which explained some of the reasoning as to why the Committee believed he had relevant information, *id*. ¶ 8.  The paragraphs tracking the statutory language also allege that the Defendant was subpoenaed "to produce papers upon a matter under inquiry," *id*. ¶ 23, and "to give testimony upon a matter under inquiry," *id*. ¶ 25.  Nothing more is required.

In the face of the detailed Indictment, the Defendant's sufficiency arguments amount to an improper attempt to challenge, at this stage, the sufficiency of the evidence that the Government will present at trial.  *See, e.g.*, ECF No. 34 at 28 (arguing that the Indictment "fails to *establish* pertinency (emphasis added)).  But a motion to dismiss "is not a permissible vehicle for addressing the sufficiency of the government's evidence."  *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000).  The Defendant has provided no basis to conclude the Indictment insufficiently alleges pertinence.

## VI.   THE DEFENDANT FAILS TO MAKE THE HIGH EVIDENTIARY SHOWING NECESSARY TO ESTABLISH SELECTIVE PROSECUTION, AND HIS MOTION TO DISMISS ON THIS BASIS FAILS.

The Defendant claims that the indictment should be dismissed because his prosecution was the result of "unlawful selective prosecution and undue political interference."  ECF No. 34 at 32.  He bases this argument on mere speculation, rather than on facts, and thus fails to meet the high threshold necessary to prevail in such a claim.

"The standard applicable to a claim of selective prosecution 'is a demanding one,'" and the presumption of regularity underlying prosecutorial decisions can be overcome only by "clear

evidence to the contrary." *United States v. Rhodes*, No. 22-CR-15 (APM), 2022 WL 3042200, at

*4 (D.D.C. Aug. 2, 2022) (quoting *United States v. Armstrong*, 517 U.S. 456, 463 (1996)).  To

make such a showing, the Defendant must establish that the Government's actions "had a

discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong*, 517 U.S.

at 465 (citation and internal quotation marks omitted).  The Defendant here has failed to provide

"clear evidence" of either discriminatory effect or discriminatory purpose.  He has provided

instead only his own speculative personal conclusions.  His claims of selective prosecution should

be rejected.

First, the Defendant's claim of discriminatory effect fails because he provides no evidence

that others outside the protected class of which the Defendant claims he is a part were similarly

situated to him but were treated differently.  He must show that there were "no distinguishable

legitimate prosecutorial factors that might justify making different prosecutorial decisions with

respect to" him as opposed to others similarly situated.  *Branch Ministries v. Rossotti*, 211 F.3d

137, 145 (D.C. Cir. 2000) (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997));

*see also United States v. Khanu*, 664 F. Supp. 2d 28, 32 (D.D.C. 2009) (explaining that a similarly

situated individual is "one outside the protected class who has committed roughly the same crime

under roughly the same circumstances but against whom the law has not been enforced" (citation

and internal quotation marks omitted)).  The Defendant claims discriminatory effect because he

was prosecuted for contempt of Congress and Mark Meadows and Dan Scavino were not.  ECF

No. 34 at 33-34.  The Defendant's motion, however, relies only on a conclusory claim that he

engaged in protected activity and Messrs. Meadows and Scavino did not to satisfy the requirement

that he identify some individual in a protected class different form his own.  Moreover, the

Defendant provides no evidence that there were "no distinguishable legitimate prosecutorial

factors" that might justify the Government's charging decisions with respect to Messrs. Meadows and Scavino.  Indeed, the Defendant does not attempt to account for the differences between his situation and these other individuals', because if he were to do so he would not be able to establish discriminatory effect.  *See* H. Rept. 117-216, at 12-19 (117th Cong.) (describing individual circumstances of Mr. Meadows's compliance with a Committee subpoena); H. Rept. 117-284, at 12-13, 25-28 (117th Cong.) (describing individual circumstances of Mr. Scavino's and the Defendant's compliance with Committee subpoenas). Based on this failure alone, the Defendant's selective prosecution claim is unsuccessful.

Second, the Defendant fails to provide any evidence whatsoever in support of his claim that the Government's actions were motivated by a discriminatory purpose.  To satisfy this prong, the Defendant must show that the prosecution was "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, or was designed to prevent or paralyze his exercise of constitutional rights." *United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982) (internal citations and quotation marks omitted).  And he must show this deliberate selection was made by the prosecutorial authorities handling his case. *Khanu*, 664 F.Supp.2d at 34-35 (finding that defendant's claims of government-wide discrimination was "too far removed from the actual prosecuting authorities in this case to allow the Court to infer a discriminatory purpose."). For his evidence of discriminatory intent, the Defendant claims that he "believes" the Government brought this prosecution because of the Defendant's "public expression of political beliefs." ECF No. 34 at 35.  But just repeating the purported protected class of which the Defendant claims he is a part does not provide any evidence of the prosecutors' intent.  And the Defendant provides nothing more.  Instead, he speculates that his "public objections to the Select Committee's subpoena . . . likely angered the Committee and its members," ECF No. 34 at

36; concedes that he "does not know whether the Committee communicated that anger" to the Government, *id.*; reiterates that he objects to the circumstances of his arrest, *id.* at 37; erroneously claims that the Government ignored "decades of its own legal precedent," *id.* at 38; hypothesizes that it was "possible" that the prosecutors were affected by a public statement by President Biden, *id.* at 38; and speculates that it is "possible" that the White House communicated with the some unidentified individual in the Department about OLC positions that do not exist, *id.* at 39-40.

None of the Defendant's speculative claims constitute "clear evidence" or withstand scrutiny. The Defendant's claims about the motivations of the Committee are irrelevant because the Committee is not the prosecuting authority that the Defendant must show acted with a discriminatory purpose. The Government has already explained in its Opposition to the Defendant's Motion to Compel, ECF No. 33, at 16-17, that the Defendant was arrested by the FBI in a discreet manner commensurate with the circumstances. As described above, there are no Department policies allowing individuals to wholly ignore a congressional subpoena. *See supra* at Section 11-12. And, finally, the Defendant's rank speculation about communications among the Committee, President Biden, the White House, and some unidentified person in the Department does not present evidence—it presents fantasy. The Defendant fails to furnish any evidence in support of his claim of discriminatory purpose, and he fails to meet the second prong of the selective prosecution test.

The Defendant has not met his demanding burden to establish selective prosecution and his claims for dismissal on this basis should be denied.

**VII.   THERE WERE NO ERRORS IN THE GRAND JURY PRESENTATION.**

The Defendant claims the Indictment must be dismissed because what he asserts to be exculpatory evidence was not presented to the grand jury. ECF No. 34 at 41-42. The Defendant

also suggests there must have been some error in any instructions given to the grand jury on the meaning of "willful" under the statute. *Id*. at 42. The Defendant has failed to establish that there was any error before the grand jury or that dismissal is appropriate.

"Grand jury proceedings are 'accorded a presumption of regularity, which generally may be dispelled only upon a particularized proof of irregularities in the grand jury process.'" *United States v. Saffarinia*, 424 F. Supp. 3d 46, 80 (D.D.C. 2020) (quoting *United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring)). "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). Prejudicial errors are those that "substantially influenced the grand jury's decision to indict" or that raise "'grave doubt' that the decision to indict was free from the substantial influence" of the errors. *Id*. at 256 (quoting *Mechanik*, 475 U.S. at 78 (O'Connor, J., concurring)).

The Defendant also asserts that dismissal is appropriate where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing a presumption of prejudice." ECF No. 34 at 40 (quoting *Bank of Nova Scotia*, 487 U.S. at 257) (internal quotation marks omitted). But this standard has no application in this case. As an example of the cases in which this standard may apply, the Supreme Court in *Bank of Nova Scotia* cited instances in which grand juries were selected using racial or sex discrimination. 487 U.S. at 257 (citing *Vasquez v. Hillary*, 474 U.S. 254, 260-64 (1986); *Ballard v. United States*, 329 U.S. 187 (1946)). As the Supreme Court explained, such "isolated exceptions to the harmless-error rule" exist where the error is of "a constitutional magnitude" and "any inquiry into harmless error would have required unguided speculation." *Id*. The Defendant claims no similar type of error here.

Instead, the Defendant claims two, non-constitutional errors subject to harmless error review.  His claims fail, however, because what he claims to be error is not error at all.  First, the Defendant claims the Government erred by not presenting evidence to the grand jury of his claimed defenses that the Committee was not operating pursuant to its rules and that he relied on unidentified Department of Justice policy regarding executive privilege in refusing to comply.  ECF No. 34 at 41-42.  But, as the Defendant acknowledges, *id*. at 40, the Government is not required to present even "substantial exculpatory evidence" to the grand jury, *United States v. Williams*, 504 U.S. 36, 53 (1992).  And an indictment valid on its face cannot be challenged in a motion to dismiss based on claims relating to the sufficiency of the evidence presented to the grand jury.  *Costello v. United States*, 350 U.S. 359, 362-63 (1956).  Here, the Indictment is valid on its face.  It alleges each element of the offense, tracks the statutory language, and includes detailed factual allegations that support the charges.  *See United States v. Espy*, 23 F. Supp. 2d 1, 9-10 (D.D.C. 1998) (finding an indictment facially valid where it met Federal Rule of Criminal Procedure 7(c) pleading requirements and gave the defendant adequate notice of the acts it alleged he committed).  Not only can there be no error, therefore, in not presenting the Defendant's claimed defenses to the grand jury, but given the facially valid indictment, there is no basis to question the evidence presented in the first place.

Moreover, even if the Government had to present potential defenses to a grand jury, the claimed defenses the Defendant argues should have been presented are not defenses.  As described above, the Defendant has waived his claims regarding the operations of the Committee.  *Supra* at Section III(A).  In addition, the Defendant's purported mistaken reliance on inapposite Department policy on executive privilege provides no defense to his deliberate decision to refuse to comply with the subpoena.  A willful default is one that is deliberate and intentional.  *Licavoli*, 294 F.2d

at 209 (D.C. Cir. 1961) ("All that is needed . . . is a deliberate intention to do the act.").  The

Defendant's belief—even if held in good faith—that he could refuse to comply based on executive

privilege or the Department's interpretation of it does not provide a defense.  *See, e.g.*, *Yellin*, 374

U.S. at 123 (1963) ("Of course, should Yellin have refused to answer in the mistaken but good-

faith belief that his rights had been violated, his mistake of law would be no defense."); *Bryan*,

339 U.S. at 330 (finding the government had "made out a prima facie case of wilful default" where

"respondent had been validly served with a lawful subpoena directing her to produce records . . .

and that on the day set out in the subpoena she intentionally failed to comply"); *Licavoli*, 294 F.2d

at 209 ("In the case at bar there can be no serious dispute about the deliberate intention of Licavoli

not to appear before the Committee pursuant to its subpoena.  That he meant to stay away was

made abundantly clear.  That he did so upon the advice of a lawyer is no defense."); *Fields*, 164

F.2d at 100 (D.C. Cir. 1947) ("The word 'willful' does not mean that the failure or refusal to

comply with the order of the committee must necessarily be for an evil or a bad purpose.  The

reason or the purpose of failure to comply or refusal to comply is immaterial, so long as the refusal

was deliberate and intentional and was not a mere inadvertence or an accident.  We uphold that

differentiation in our view of the purpose of the statute."); Order, *Bannon*, 2022 WL 2900620,

ECF No. 49 (Apr. 6, 2022) (excluding evidence and argument of good-faith reliance defenses in

contempt of Congress case because only a deliberate and intentional failure to comply was required

under the intent element of the statute).  In any event, there is no evidence that, when he refused

to comply with the Committee's subpoena, the Defendant was acting in reliance on any

Department policy, even if there were on-point policy here.  It is not clear, therefore, what the

Defendant wishes to have been presented to the grand jury in the first place.

The Defendant also suggests that the Indictment must be dismissed because he does not know what instructions were provided to the grand jury on the intent element of the offense.  ECF No. 34 at 42.  He does not know what instructions were provided because he has not shown a particularized need for any instructions—on the intent element or any other, *see id*. (claiming he has moved for production of instructions on his claimed defenses and the intent element).[9]  The Indictment sufficiently and properly alleges the essential elements of the offense.  Any errors in the Government's instruction, even if they occurred, therefore, would be harmless and could not provide a basis for dismissal.  *See Saffarinia*, 424 F. Supp. 3d at 81.  The Defendant's speculation that the grand jury was improperly instructed cannot overcome the facially valid indictment to support either dismissal or discovery of the grand jury charge.  *Id*.; *see also Espy*, 23 F. Supp. 2d at 9-10; *United States v. Trie*, 23 F. Supp. 2d 55, 61-62 (D.D.C. 1998).

## VIII.  CONCLUSION

None of the arguments that the Defendant makes in his Motion to Dismiss prevail. Executive privilege did not excuse his non-compliance with the Committee's subpoena.  There was no purported assertion of the privilege in the first place.  The Defendant's eleventh-hour objections to the Committee's rules cannot secure dismissal of the Indictment because he waived them by not raising them before the Committee at the time of his non-compliance.  His claims about pertinence and the location for his deposition improperly ask the Court to assess the sufficiency of the Government's evidence.  And, finally, the Defendant's speculative allegations of selective prosecution and grand jury abuse fail entirely to meet the high threshold showings for such claims.  The Defendant's Motion to Dismiss should be denied.

---

[9] The Government has reviewed the Defendant's motion to compel and has been unable to identify where he makes this request.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Elizabeth Aloi*
        Molly Gaston (VA 78506)
        Amanda R. Vaughn (MD)
        Elizabeth Aloi (D.C. 1015864)
        Assistant United States Attorneys
        United States Attorney's Office
        601 D Street, N.W.
        Washington, D.C. 20530
        (202) 252-7212 (Aloi)
        elizabeth.aloi@usdoj.gov

| | |
|---|---|
| **From:** | George, Dan |
| **To:** | pknavarro |
| **Subject:** | RE: U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol |
| **Date:** | Thursday, February 24, 2022 4:06:00 PM |

Mr. Navarro —

I'm following up on the Select Committee's subpoena to you.

The subpoena required you to produce documents to the Select Committee by yesterday, February 23, 2022. We have not received any documents or an indication that you have no documents that are responsive to the subpoena's document schedule.

Also, the date for your deposition is Wednesday, March 2, 2022, at 10:00 AM, and we will convene in a room in the House office buildings. Please contact me at your earliest convenience to discuss the details. Alternatively, please let me know if you do not plan to appear on March 2.

Thank you,
Dan


Daniel George

Senior Investigative Counsel

Select Committee to Investigate the January 6th Attack
on the United States Capitol
U.S. House of Representatives

---

**From:** George, Dan
**Sent:** Wednesday, February 9, 2022 4:21 PM
**To:** pknavarro <pknavarro@protonmail.com>
**Subject:** RE: U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol

Mr. Navarro —

As promised, attached is a subpoena from the Select Committee, issued today.

Please let me know if you have any questions or would like to discuss.

Thanks,
Dan

Daniel George

Senior Investigative Counsel

Select Committee to Investigate the January 6th Attack

**Sel. Comm. 0001**

-0213-

US-000497

on the United States Capitol
U.S. House of Representatives

---

**From:** George, Dan
**Sent:** Wednesday, February 9, 2022 2:20 PM
**To:** pknavarro <pknavarro@protonmail.com>
**Subject:** RE: U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol

Thank you for the quick response. I'll send you the subpoena shortly at this email address and please let me know if you'd prefer service another way.

Thanks again,
Dan

---

**From:** pknavarro <pknavarro@protonmail.com>
**Sent:** Wednesday, February 9, 2022 2:19 PM
**To:** George, Dan <Dan.George@mail.house.gov>
**Subject:** Re: U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol

yes. no counsel.
Executive privilege

Sent with ProtonMail Secure Email.


------- Original Message -------
On Wednesday, February 9th, 2022 at 2:16 PM, George, Dan <Dan.George@mail.house.gov> wrote:

> Mr. Navarro –
>
> I am a Senior Investigative Counsel for the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol. The Select Committee is seeking your deposition testimony and documents relevant to issues it is examining. Please confirm whether you are willing to accept service of a subpoena over email. If you are represented by counsel, please let me know his or her name and contact information and we will reach out as soon as possible.
>
> Thank you,
> Dan
>
> Daniel George
> Senior Investigative Counsel
> Select Committee to Investigate the January 6th Attack
> on the United States Capitol
> U.S. House of Representatives

**Sel. Comm. 0002**

-0214-

US-000498

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

To   Peter K. Navarro

You are hereby commanded to be and appear before the

Select Committee to Investigate the January 6th Attack on the United States Capitol

of the House of Representatives of the United States at the place, date, and time specified below.

[✓] **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 1540A Longworth House Office Building, Washington, DC 20515

Date: February 23, 2022                    Time: 10:00 AM

[✓] **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: United States Capitol Building, Washington, DC 20515, or by videoconference

Date: March 2, 2022                    Time 10:00 AM

[ ] **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____                    Time _____

To any authorized staff member or the United States Marshals Service

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 9th      day of February                    , 20 22 .

_____
*Chairman or Authorized Member*

Attest _____

*Clerk*

**-0215-**

US-000539

# PROOF OF SERVICE

Subpoena for

Peter K. Navarro

Address 801 Pennsylvania Ave., NW, Apt. 1021

Washington, DC 20004

before the  Select Committee to Investigate the January 6th Attack on the United States Capitol

*U.S. House of Representatives*
*117th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address

**-0216-**

US-000540

Mr. Peter Navarro
Page 3

## SCHEDULE

In accordance with the attached definitions and instructions, you, Peter Navarro, are hereby required to produce all documents and communications in your possession, custody, or control—including any such documents or communications stored or located on personal devices (e.g., personal computers, cellular phones, tablets, etc.), in personal accounts, and/or on personal applications (e.g., email accounts, contact lists, calendar entries, etc.)— referring or relating to the following items. If no date range is specified below, the applicable dates are for the time period September 1, 2020, to present.

1. All documents and communications referring or relating in any way to plans, efforts, or discussions regarding challenging, decertifying, delaying the certification of, overturning, or contesting the results of the 2020 Presidential election.

2. All communications, and documents related to communications, in which you were a participant or witness, relating in any way to the security of election systems in the United States.

3. All communications, documents, and information that are evidence of the claims of purported fraud in the three-volume report you wrote, *The Navarro Report.*

4. All documents and communications referring or relating to, Steve Bannon, Members of Congress, state and local officials, White House officials/employees, representatives of the Trump reelection campaign, and national and local party officials relating to election fraud or malfeasance, as well as delaying or preventing the certification of the November 2020 election. This includes all documents and communications related to the creation or implementation of what you have described publicly as the "Green Bay Sweep."

5. Final or draft press releases, letters, reports, or other documents that you, or someone on your behalf, released addressing election fraud or malfeasance, as well as delaying or preventing the certification of the election.

6. All documents and communications referring or relating in any way to electoral votes in the 2020 presidential election, including, but not limited to, drafts or final versions of documents purporting to be or related to Electoral College votes, meetings and preparations for meetings of purported electors for former President Trump and former Vice President Pence on or about December 14, 2020, and the actual or potential selection of an alternate slate of electors by any state legislature or executive.

7. All documents and communications referring or relating in any way to John Eastman, Rudolph Giuliani, Boris Epshteyn, Bernard Kerik, Jenna Ellis, or Mark Martin.

8. All documents and communications relating in any way to protests, marches, public assemblies, rallies, or speeches in Washington, D.C., on November 14, 2020, December 12, 2020, January 5, 2021, or January 6, 2021 (collectively, "Washington Rallies").

US-000543

Mr. Peter Navarro
Page 4

9. All documents and communications referring or relating to the financing or fundraising associated with the Washington Rallies and any individual or organization's travel to or accommodation in Washington, D.C., to attend or participate in the Washington Rallies.

10. All documents and communications related to the January 6, 2021, attack on the U.S. Capitol.

US-000544

**<u>DOCUMENT PRODUCTION DEFINITIONS AND INSTRUCTIONS</u>**

1.  In complying with this request, produce all responsive documents, regardless of classification level, that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.  Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Committee').

3.  In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.  The Committee's preference is to receive documents in a protected electronic form (i.e., password protected CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions. With specific reference to classified material, you will coordinate with the Committee's Security Officer to arrange for the appropriate transfer of such information to the Committee. This includes, but is not necessarily limited to: a) identifying the classification level of the responsive document(s); and b) coordinating for the appropriate transfer of any classified responsive document(s).

5.  Electronic document productions should be prepared according to the following standards:

    a.  If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    b.  All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

    BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD, INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

US-000545

6.     Documents produced to the Committee should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

7.     Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

8.     When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

9.     The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

10.    The pendency of or potential for litigation shall not be a basis to withhold any information.

11.    In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

12.    Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

13.    If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production, as well as a date certain as to when full production will be satisfied.

14.    In the event that a document is withheld on any basis, provide a log containing the following information concerning any such document: (a) the reason it is being withheld, including, if applicable, the privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the withholding.

15.    If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control. Additionally, identify where the responsive document can now be found including name, location, and contact information of the entity or entities now in possession of the responsive document(s).

16.    If a date or other descriptive detail set forth in this request referring to a document

**-0220-**

US-000546

is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

17. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

18. All documents shall be Bates-stamped sequentially and produced sequentially.

19. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and
(2) all documents located during the search that are responsive have been produced to the Committee.

### Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of classification level, how recorded, or how stored/displayed (e.g. on a social media platform) and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, computer or mobile device screenshots/screen captures, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

US-000547

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, through a social media or online platform, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4. The term "including" shall be construed broadly to mean "including, but not limited to."

5. The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6. The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7. The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8. The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, assignee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9. The term "individual" means all natural persons and all persons or entities acting on their behalf.

**-0222-**

US-000548

health, safety, and well-being of others present in the Chamber and surrounding areas. Members and staff will not be permitted to enter the Hall of the House without wearing a mask. Masks will be available at the entry points for any Member who forgets to bring one. The Chair views the failure to wear a mask as a serious breach of decorum. The Sergeant-at-Arms is directed to enforce this policy. Based upon the health and safety guidance from the attending physician and the Sergeant-at-Arms, the Chair would further advise that all Members should leave the Chamber promptly after casting their votes. Furthermore, Members should avoid congregating in the rooms leading to the Chamber, including the Speaker's lobby. The Chair will continue the practice of providing small groups of Members with a minimum of 5 minutes within which to cast their votes. Members are encouraged to vote with their previously assigned group. After voting, Members must clear the Chamber to allow the next group a safe and sufficient opportunity to vote. It is essential for the health and safety of Members, staff, and the U.S. Capitol Police to consistently practice social distancing and to ensure that a safe capacity be maintained in the Chamber at all times. To that end, the Chair appreciates the cooperation of Members and staff in preserving order and decorum in the Chamber and in displaying respect and safety for one another by wearing a mask and practicing social distancing. All announced policies, including those addressing decorum in debate and the conduct of votes by electronic device, shall be carried out in harmony with this policy during the pendency of a covered period.

## 117TH CONGRESS REGULATIONS FOR USE OF DEPOSITION AUTHORITY

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(b) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding the conduct of depositions by committee and select committee counsel for printing in the Congressional Record.

Sincerely,

JAMES P. McGOVERN,
*Chairman, Committee on Rules.*

REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by personal, nongovernmental counsel to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's counsel are permitted to attend. Observers or counsel for other persons, including counsel for government agencies, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side, and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's counsel may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's counsel during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's counsel shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(b) of H. Res. 8, 117th Congress, and these regulations.

## REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8, 117TH CONGRESS

COMMITTEE ON RULES,
HOUSE OF REPRESENTATIVES,
*Washington, DC, January 4, 2021.*
Hon. NANCY PELOSI,
*Speaker, House of Representatives,*
*Washington, DC.*

MADAM SPEAKER: Pursuant to section 3(s) of House Resolution 8, 117th Congress, I hereby submit the following regulations regarding remote committee proceedings for printing in the Congressional Record.

Sincerely,

JAMES P. McGOVERN,
*Chairman,*
*Committee on Rules.*

REMOTE COMMITTEE PROCEEDINGS REGULATIONS PURSUANT TO HOUSE RESOLUTION 8

A. PRESENCE AND VOTING

1. Members participating remotely in a committee proceeding must be visible on the software platform's video function to be considered in attendance and to participate unless connectivity issues or other technical problems render the member unable to fully participate on camera (except as provided in regulations A.2 and A.3).

2. The exception in regulation A.1 for connectivity issues or other technical problems does not apply if a point of order has been made that a quorum is not present. Members participating remotely must be visible on the software platform's video function in order to be counted for the purpose of establishing a quorum.

3. The exception in regulation A.1 for connectivity issues or other technical problems does not apply during a vote. Members participating remotely must be visible on the software platform's video function in order to vote.

4. Members participating remotely off-camera due to connectivity issues or other technical problems pursuant to regulation A.1 must inform committee majority and minority staff either directly or through staff.

5. The chair shall make a good faith effort to provide every member experiencing connectivity issues an opportunity to participate fully in the proceedings, subject to regulations A.2 and A.3.

US-000549

# H. Res. 8

## *In the House of Representatives, U. S.,*

*January 4, 2021.*

*Resolved,*

### SECTION 1. ADOPTION OF THE RULES OF THE ONE HUNDRED SIXTEENTH CONGRESS.

The Rules of the House of Representatives of the One Hundred Sixteenth Congress, including applicable provisions of law or concurrent resolution that constituted rules of the House at the end of the One Hundred Sixteenth Congress, are adopted as the Rules of the House of Representatives of the One Hundred Seventeenth Congress, with amendments to the standing rules as provided in section 2, and with other orders as provided in this resolution.

### SEC. 2. CHANGES TO THE STANDING RULES.

(a) CONFORMING CHANGE.—In clause 2(i) of rule II—

(1) strike the designation of subparagraph (1); and

(2) strike subparagraph (2).

(b) OFFICE OF DIVERSITY AND INCLUSION AND OFFICE OF THE WHISTLEBLOWER OMBUDS.—

US-000550

Case 1:22-cr-00200-APM   Document 44-2   Filed 08/31/22   Page 11 of 11
USCA Case #24-3006   Document #2064276      Filed: 07/12/2024      Page 234 of 481

16

**SEC. 3. SEPARATE ORDERS.**

(a) MEMBER DAY HEARING REQUIREMENT.—During the first session of the One Hundred Seventeenth Congress, each standing committee (other than the Committee on Ethics) or each subcommittee thereof (other than a subcommittee on oversight) shall hold a hearing at which it receives testimony from Members, Delegates, and the Resident Commissioner on proposed legislation within its jurisdiction, except that the Committee on Rules may hold such hearing during the second session of the One Hundred Seventeenth Congress.

(b) DEPOSITION AUTHORITY.—

(1) During the One Hundred Seventeenth Congress, the chair of a standing committee (other than the Committee on Rules), and the chair of the Permanent Select Committee on Intelligence, upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee.

(2) Depositions taken under the authority prescribed in this subsection shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record.

(c) WAR POWERS RESOLUTION.—During the One Hundred Seventeenth Congress, a motion to discharge a measure introduced pursuant to section 6 or section 7 of the War

•HRES 8 EH

US-000551

| | |
|---|---|
| **From:** | George, Dan |
| **To:** | pknavarro |
| **Subject:** | RE: Navarro |
| **Date:** | Sunday, February 27, 2022 6:13:00 PM |

Mr. Navarro —

No, it will not be public or open to the press. It will be a staff-led deposition, which members of the Select Committee may also join and in which they may participate.

If you have a scheduling conflict with that date, please let me know and we would be happy to work with to find a date to be scheduled within a reasonable time. Also, please let me know when you anticipate providing documents that are responsive to the subpoena schedule, or a log of specific documents that you are withholding and the basis for withholding, such as executive privilege.

Thank you,
Dan

**From:** pknavarro <pknavarro@protonmail.com>
**Sent:** Sunday, February 27, 2022 4:43 PM
**To:** George, Dan <Dan.George@mail.house.gov>
**Subject:** RE: Navarro

Will this event be open to the public and press?

Sent with ProtonMail Secure Email.

------- Original Message -------
On Sunday, February 27th, 2022 at 4:27 PM, George, Dan <Dan.George@mail.house.gov> wrote:

> Mr. Navarro —
>
> Thank you for your email. There are topics, including those discussed in the Chairman's letter, that the Select Committee believes it can discuss with you without raising any executive privilege concerns at all. In any event, you must appear to assert any executive privilege objections on a question-by-question basis during the deposition. This will enable the Select Committee to better understand your objections and, if necessary, take any additional steps to address them.
>
> With that in mind, can you please let us know whether you intend to appear for deposition testimony on Wednesday, March 2, 2022, at 10:00 AM as scheduled by the subpoena? For convenience, I'm also attaching my email to you dated Thursday, February 24, 2022.
>
> Thank you again for your email.

**Sel. Comm. 0009**

US-000505

Dan

Daniel George
Senior Investigative Counsel
Select Committee to Investigate the January 6th Attack
on the United States Capitol
U.S. House of Representatives

---

**From:** pknavarro <pknavarro@protonmail.com>
**Sent:** Sunday, February 27, 2022 4:00 PM
**To:** George, Dan <Dan.George@mail.house.gov>
**Cc:** pknavarro <pknavarro@protonmail.com>
**Subject:** Navarro

March 1, 2022

Daniel George
Senior Investigative Counsel
Select Committee to Investigate the January 6 Attack
US House of Representatives

Dear Mr. George:

Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied.

Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter.

In closing, I note that the United States government is in possession of all my official White House communications which your committee has requested. While I do not give my permission for your Select Committee to access this information as it involves privilege, I am at least advising you of this fact.

Thank you,

Peter Navarro

**Sel. Comm. 0010**

US-000506

| | |
|---|---|
| **From:** | George, Dan |
| **To:** | pknavarro |
| **Subject:** | RE: Navarro |
| **Date:** | Tuesday, March 1, 2022 9:43:00 PM |
| **Attachments:** | RE Navarro.msg |
| | RE U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol.msg |

Mr. Navarro —

Thank you for your email. As I mentioned to you in the attached emails, there are topics that the
Select Committee believes it can discuss with you without raising any executive privilege concerns at
all, including, but not limited to, questions related to your public three-part report about purported
fraud in the November 2020 election and the plan you described in your book called the "Green Bay
Sweep." If there are specific questions that raise executive privilege concerns, you can assert your
objections on the record and on a question-by-question basis.

It is unclear from your correspondence whether you plan attend tomorrow's deposition, as required
by the subpoena. We plan to proceed with the deposition at 10 AM in the O'Neill House Office
Building at 200 C Street SW, Washington DC 20024. Please feel free to contact me when you arrive
so someone can escort you to the conference room.

Thank you,
Dan

---

**From:** pknavarro <pknavarro@protonmail.com>
**Sent:** Monday, February 28, 2022 11:32 AM
**To:** George, Dan <Dan.George@mail.house.gov>
**Subject:** RE: Navarro

Please be advised I have been clear in my communications on this matter.  Below is my response.  As I note,
privilege is not mine to waive and it is incumbent on the Committee to directly negotiate with President Trump and his
attorneys regarding any and all things related to this matter.

March 1, 2022

Daniel George
Senior Investigative Counsel
Select Committee to Investigate the January 6 Attack
US House of Representatives

Dear Mr. George:

Please be advised that President Trump has invoked Executive Privilege in this matter; and it
is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands
are tied.

**Sel. Comm. 0004**

US-000500

Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter.

In closing, I note that the United States government is in possession of all my official White House communications which your committee has requested. While I do not give my permission for your Select Committee to access this information as it involves privilege, I am at least advising you of this fact.

Thank you,


Peter Navarro

**Sel. Comm. 0005**

US-000501

## Letter

| | |
|---|---|
| **To:** | pknavarro@protonmail.com |
| **Date:** | Mon, 28 Feb 2022 16:54:09 -0500 |
| **Attachments:** | Navarro Letter 022822 as sent.pdf (122.43 kB) |

Dear Mr. Navarro:  Please see the attached letter.  Many thanks.

Jonathan C. Su
Deputy Counsel to the President
The White House

US-000944



THE WHITE HOUSE
WASHINGTON

February 28, 2022

Peter K. Navarro
pknavarro@protonmail.com

Dear Mr. Navarro:

I write regarding a subpoena issued to you by the Select Committee to Investigate the
January 6th Attack on the United States Capitol (the "Select Committee").

As you are aware, in light of unique and extraordinary nature of the matters under
investigation, President Biden has determined that an assertion of executive privilege is not in
the national interest, and therefore is not justified, with respect to particular subjects within the
purview of the Select Committee. These subjects include: events within the White House on or
about January 6, 2021; attempts to use the Department of Justice to advance a false narrative that
the 2020 election was tainted by widespread fraud; and other efforts to alter election results or
obstruct the transfer of power. President Biden accordingly has decided not to assert executive
privilege as your testimony regarding those subjects, or any documents you may possess that
bear on them. For the same reasons underlying his decision on executive privilege, President
Biden has determined that he will not assert immunity to preclude you from testifying before the
Select Committee.

In light of President Biden's determination not to assert executive privilege with respect
your testimony, we are not requesting that agency counsel be permitted to attend the deposition.
Should you have any questions about the issues addressed in this letter, please contact me at
(202) 456-1414.

Sincerely,

Jonathan C. Su
Deputy Counsel to the President

cc:     Kristin L. Amerling
        Chief Counsel and Deputy Staff Director
        Select Committee to Investigate the January 6th Attack on the United States Capitol

WHCO-NAVARRO-000002

US-000945

## SUBPOENA

### BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To*    Peter K. Navarro

You are hereby commanded to be and appear before the

| Committee on Oversight and Reform | ▾ |
| --- | --- |
| Select Subcommittee on the Coronavirus Crisis | ▾ |

of the House of Representatives of the United States at the place, date, and time specified below.

☑    **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production:   2157 Rayburn House Office Building, Washington, D.C. 20515

Date:   12/8/2021                    Time:   12:00 p.m. ET (noon)

☑    **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:   2157 Rayburn House Office Building, Washington, D.C. 20515

Date:   12/15/2021                    Time:   9:00 a.m. ET

☐    **to testify at a hearing**  touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:   _____

Date:   _____    Time:   _____

*To*   any authorized staff member of The U.S.
Marshals Service                                    to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this  18  day of  November  , 20 21.

Chairman or Authorized Member

Attest: _____

Clerk

**-0232-**

**SCHEDULE**

**In accordance with the attached schedule instructions you, Peter K. Navarro, are required to produce all records and information described below:**

1.  All documents and communications in your possession, custody, or control related to your involvement in the federal government's response to the coronavirus, including but not limited to communications with any official, employee, or volunteer in the White House, federal agencies, contractors, or others related to your duties at the White House Office of Trade and Manufacturing Policy or as an advisor to President Trump.

2.  Documents sufficient to identify each official, employee, or volunteer in the White House or any federal agency who used a non-government-issued or personal account for official business related to the federal government's response to the coronavirus, including any non-government-issued or personal email address(es), cell phone number(s), username(s), or contact information for other messaging account(s) or application(s) used by these individuals for official business.

3.  Documents sufficient to identify any steps that you took to timely comply with the Presidential Records Act with respect to any documents or communications that you sent or received using a non-government-issued or personal account related to the federal government's response to the coronavirus.



- November 20, 2021 -

## Statement by Donald J. Trump, 45th President of the United States of America

The Communist Democrats are engaging in yet another Witch Hunt, this time going after my Administration's unprecedented and incredible coronavirus response, despite the fact that, sadly, more Americans have died this year from Covid than in all of 2020. It is a Witch Hunt that's been going on for years. Why don't they investigate Crooked Hillary, when so much has now been proven about her and her campaign's lies and dealings with Russia to smear me and spy on my campaign? I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments. The Witch Hunts must end!

December 7, 2021

Hon. James E. Clyburn, Chair
Committee on Oversight and Reform
Subcommittee on the Coronavirus Crisis
2157 Rayburn House Office Building
Washington, DC 20515

Dear Representative Rayburn:

I write in response to the subpoena, dated November 18, 2021 (the "Subpoena") issued to me by the Committee on Oversight and Reform, Subcommittee on the Coronavirus Crisis (the "Sub-Committee").

At this time, I am unable to respond to the Subpoena, based on former President Trump's invocation of executive privilege with respect to the very topic covered by the Subpoena. Specifically, in response to the Subpoena, on November 20, 2021, President Trump stated "I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments."

Not only is this is a direct, proper, and explicit invocation of the executive privilege provided by a President of the United States as it relates to an important policy matter during his tenure in office. It is a direct order that I should not comply with the Subpoena based on the aforementioned Subpoena.

Therefore, until such time as the scope of the privilege is negotiated or negotiated, this matter is out of my hands and something that the Sub-Committee should discuss with President Trump's counsel.

With respect to the specific documents requested in the Subpoena, I submit the following response:

**1. All documents and communications in your possession, custody, or control related to your involvement in the federal government's response to the coronavirus, including but not limited to communications with any official, employee, or volunteer in the White House, federal agencies, contractors, or others related to your duties at the White House Office of Trade and Manufacturing Policy or as an advisor to President Trump.**

**Response:** In response to this request, I rely on President Trump's assertion of executive privilege with respect to my communications with him on this matter, as detailed *supra*. Accordingly, I cannot respond to this request at this time. Moreover, I do not have access to documents and communications sent to and from my government-issued account related to the subject matter contained in this request.

**2. Documents sufficient to identify each official, employee, or volunteer in the White House or any federal agency who used a non-government-issued or personal account for official business related to the federal government's response to the coronavirus, including any non-government-issued or personal email address(es), cell phone number(s), username(s), or contact information for other messaging account(s) or application(s) used by these individuals for official business.**

**Response:** In response to this request, I rely on President Trump's assertion of executive privilege with respect to my communications with him on this matter. Accordingly, I cannot respond to this request, as written. Moreover, notwithstanding the foregoing assertion of executive privilege, I do not have knowledge of each official, employee, or volunteer at the White House or any federal agency who used a non-government-issued or personal account to conduct business related to the response to the Coronavirus, to extent there are any such individuals.

**3. Documents sufficient to identify any steps that you took to timely comply with the Presidential Records Act with respect to any documents or communications that you sent or received using a non-government-issued or personal account related to the federal government's          response          to          the          coronavirus.**

**Response:** : In response to this request, I rely on President Trump's assertion of executive privilege with respect to my communications with him on this matter. Accordingly, I cannot respond to this request, as written. I further object to this request because it is vague and presupposes that there are documents in existence that set forth the steps I took to comply with the Presidential Records Act with respect to documents and communications set forth in the request.

*** 

I submit this response to this Subpoena with reservations of all rights, including my right for assert attorney-client and Fifth Amendment privileges. I reserve the right to amend, supplement and revise my responses to the Subpoena.

Submitted,

Peter Navarro

BENNIE G. THOMPSON, MISSISSIPPI
CHAIRMAN

ZOE LOFGREN, CALIFORNIA
ADAM B. SCHIFF, CALIFORNIA
PETE AGUILAR, CALIFORNIA
STEPHANIE N. MURPHY, FLORIDA
JAMIE RASKIN, MARYLAND
ELAINE G. LURIA, VIRGINIA
LIZ CHENEY, WYOMING
ADAM KINZINGER, ILLINOIS



U.S. House of Representatives
Washington, DC 20515

January6th.house.gov
(202) 225-7800

## One Hundred Seventeenth Congress
### Select Committee to Investigate the January 6th Attack on the United States Capitol

February 9, 2022

VIA ELECTRONIC MAIL

Peter Navarro
801 Pennsylvania Ave NW
Apt. 1021
Washington, DC 20004

Dear Mr. Navarro:

Pursuant to the authorities set forth in House Resolution 503 and the rules of the House of Representatives, the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee") hereby transmits a subpoena that compels you to produce the documents set forth in the accompanying schedule by February 23, 2022, and to appear for a deposition on March 2, 2022.

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power, in order to identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules, or regulations. The inquiry includes examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021.

Based on publicly available information and information produced to the Select Committee, we believe that you have documents and information that are relevant to the Select Committee's investigation. For example, you, then a White House trade advisor, reportedly worked with Steve Bannon and others to develop and implement a plan to delay Congress's certification of, and ultimately change the outcome of, the November 2020 presidential election.[1] In your book, you reportedly described this plan as the "Green Bay Sweep" and stated that it was designed as the "last, best chance to snatch a stolen election from the Democrats' jaws of deceit."[2] In an interview, you reportedly added that former President Trump was "on board with the strategy", as were "more than 100" members of Congress including Representative Paul Gosar and Senator Ted Cruz.[3] That, of course, was not the first time you publicly addressed purported fraud in the election. You also released on your website a three-part report, dubbed the "Navarro

---

[1] Tim Dickinson, ROLLING STONE, *Trump Adviser Worried He's Not Getting Enough Credit for Trying to Ruin American Democracy* (December 28, 2021) available at https://www.rollingstone.com/politics/politics-news/jan6-peter-navarro-ted-cruz-green-bay-sweep-1276742/.
[2] *Id.*
[3] Jose Pagliery, THE DAILY BEAST, *Trump Adviser Peter Navarro Lays Out How He and Bannon Planned to Overturn Biden's Electoral Win* (December 27, 2021) available at https://www.thedailybeast.com/trump-advisor-peter-navarro-lays-out-how-he-and-steve-bannon-planned-to-overturn-bidens-electoral-win.

**Sel. Comm. 0003**

US-000517

Mr. Peter Navarro
Page 2

Report", repeating many claims of purported fraud in the election that have been discredited in public reporting, by state officials, and courts.[4] And, because you have already discussed these and other relevant issues in your recently published book, in interviews with reporters, and, among other places, on a podcast,[5] we look forward to discussing them with you, too.

Accordingly, the Select Committee seeks documents and a deposition regarding these and other matters that are within the scope of the Select Committee's inquiry. A copy of the rules governing Select Committee depositions, and document production definitions and instructions are attached. Please contact staff for the Select Committee at 202-225-7800 to arrange for the production of documents.

Sincerely,

Bennie G. Thompson
Chairman

---

[4] Peter Navarro, *The Navarro Report* available at https://peternavarro.com/the-navarro-report/; *see also* Joe Walsh, FORBES, *White House Advisor Peter Navarro Releases Dubious Voter Fraud Report* (December 17, 2020) available at https://www.forbes.com/sites/joewalsh/2020/12/17/white-house-advisor-peter-navarro-releases-dubious-voter-fraud-report/?sh=23b88c221205.

[5] Ewan Palmer, *Steve Bannon Was 'The Heron on Jan. 6,' Says Peter Navarro* (December 17, 2021) available at https://www.newsweek.com/peter-navarro-steve-bannon-hero-january-6-capitol-riots-1660421.

**Sel. Comm. 0004**

-0238-

US-000518

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 22-cr-200** |
| **v.** | : | |
| | : | |
| **PETER K. NAVARRO,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' RESPONSE TO DEFENDANT'S**
**NOTICE UNDER FEDERAL RULE OF PROCEDURE 12.3**

The Defendant has filed a Notice, pursuant to Federal Rule of Criminal Procedure 12.3, stating that he intends to assert public authority and entrapment-by-estoppel defenses at trial. *See* ECF No. 36. The Defendant's Notice is deficient, and neither defense is available to excuse the Defendant's contempt of Congress.

First, pursuant to Federal Rule of Criminal Procedure 12.3(3), the Government denies that the Defendant exercised public authority when he willfully defied the subpoena that the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("the Committee") issued to him. The Defendant was not directed by a law enforcement agent to engage in total noncompliance. *See, e.g.*, *United States v. Fulcher*, 250 F.3d 244, 253-54 (4th Cir. 2001) ("The public authority defense allows 'the defendant [to] seek[ ] exoneration based on the fact that he reasonably relied'" on the "actual authority of a government official to engage him in a covert activity." (citations omitted)). And the Defendant fails to identify any law enforcement agency or federal intelligence agency official directing his noncompliance. Having received no direction from law enforcement to engage in contempt, a public-authority defense is unavailable to the Defendant and any evidence or argument the Defendant proposes in furtherance of that defense should be excluded.

Second, the Defendant's Notice is deficient because it fails to identify "the [law enforcement] agency member on whose behalf [he] claims to have acted." Fed. R. Crim. P. 12.3(2)(B); *see also United States v. Abcasis*, 785 F. Supp. 1113, 1117 (E.D.N.Y. 1992) (explaining "that the government has a strong interest in being apprised of a claimed authorization defense" because "it is possible for Defendants, in the closing moments of trial, to offer testimony that a particular law enforcement officer authorized their acts" and, "[i]n the absence of notice, the government might have difficulty rebutting that testimony"). The Defendant's Notice asserts that he defaulted on the subpoena under the authority of former President Trump citing only a vague reference to acting at some unidentified instruction of the former president. *See* ECF No. 36 at 1-2. But the former President was not a government official at the time of the Defendant's willful default. He was a private citizen. The Defendant fails to identify any government official with whom he consulted on his decision to default, much less one who authorized him to do so.

The Defendant also noticed his intent to mount an entrapment-by-estoppel defense. That defense is distinct from a public-authority defense, *see United States v. Chrestman*, 525 F. Supp. 3d 14, 29–30 (D.D.C. 2021) (explaining that the entrapment-by-estoppel defense "arises when an individual criminally prosecuted for an offense reasonably relied on statements made by a government official charged with 'interpreting, administering, or enforcing the law defining the offense' and those statements actively misled the individual to believe that his or her conduct was legal"), and not subject to Rule 12.3. Moreover, it is not available here, because the Government never sanctioned the Defendant's contempt.[1]

---

[1] There being no evidence to support them, the Government plans to file a motion at the appropriate time to exclude evidence and argument relating to these defenses at trial.

Finally, in support of his erroneous claim that the public-authority and entrapment-by-estoppel defenses apply, the Defendant's Notice cites to *Ratzlaf v. United States*, 510 U.S. 135 (1994) and *Bryan v. United States*, 524 U.S. 184 (1988) for the proposition that the Government must prove that the Defendant acted with knowledge that his actions were unlawful. This is incorrect. To prove willfulness, the Government must prove only that the Defendant's failure to comply with the subpoena was deliberate and intentional. It is not a defense to contempt of Congress that the Defendant did not comply with the subpoena because of his understanding or belief of what the law allowed, or because of his understanding or belief that he had a legal privilege, such as executive privilege, that excused him from complying. *See* Final Jury Instr., *United States v. Bannon*, No. 1:21-CR-00670 (CJN), ECF No. 129 at 27-28 (instruction on elements of contempt of Congress); *Bannon*, No. 1:21-CR-00670 (CJN), 2022 WL 2900620, at *1 (D.D.C. Apr. 6, 2022) (reaffirming the willfulness standard applicable in contempt prosecutions). In any event, the public-authority and entrapment-by-estoppel defenses are affirmative defenses for which a defendant bears the burden. *E.g.*, *United States v. Theunick*, 651 F.3d 578, 590 (6th Cir. 2011) (public-authority defense); *United States v. Khanu*, 664 F. Supp. 2d 35, 41 (D.D.C. 2009) (entrapment by estoppel) Neither claim negates intent and a defendant must make a pre-trial showing of the elements of each defense before he can present them to a jury. *E.g.*, *United States v. Alvarado*, 808 F.3d 474, 485 (11th Cir. 2015) ("[A] defendant will not be allowed to assert the [public-authority] defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites."); *United States v. Pardue*, 385 F.3d 101, 108 (1st Cir. 2004) (affirming exclusion of entrapment-by-estoppel defense at trial where defendant could not make prima facie case) As described above, the Defendant never will be able to make the requisite showing in this case.

The Defendant's Notice of his claimed public-authority defense is deficient, and there is nothing that can be done to rectify it because the Defendant's decision to default was not an exercise of public authority or the product of entrapment—the decision was his own.  Neither defense is available to excuse his contempt of Congress.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Elizabeth Aloi*
Elizabeth Aloi (D.C. Bar No. 1015864)
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7212 (Aloi)
elizabeth.aloi@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )    CR No. 22-200
                                   )    Washington, D.C.
        vs.                        )    August 31, 2022
                                   )    2:07 p.m.
PETER K. NAVARRO,                  )
                                   )
          Defendant.               )
_____)
```

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          Amanda Vaughn
                            Elizabeth Ann Aloi
                            Molly Gaston
                            U.S. ATTORNEY'S OFFICE
                            DISTRICT OF COLUMBIA
                            555 4th Street, NW
                            Washington, D.C. 20003
                            (202) 252-7212
                            Email:
                            elizabeth.aloi@usdoj.gov
                            Email: molly.gaston@usdoj.gov

APPEARANCES CONTINUED:

For the Defendant:          John S. Irving, IV
                            EARTH & WATER LAW LLC
                            1455 Pennsylvania Avenue, NW
                            Suite 400
                            Washington, D.C. 20004
                            (301) 807-5670
                            Email: jirving1@verizon.net

                            John P. Rowley, III
                            JPROWLEY LAW PLLC
                            8639 Chase Glen Circle
                            Fairfax Station,
                            Virginia 22039
                            (703) 402-8800
                            Email:
                            john.rowley@jprowleylaw.com

                            Stanley McKennett Brand
                            BRAND WOODWARD LAW
                            3 Pebble Ridge Court
                            Rockville, MD 20854
                            (202) 258-6597
                            Email: stanleymbrand@gmail.com

                            Stanley Edmund Woodward, Jr.
                            BRAND WOODWARD LAW
                            1808 Park Road NW
                            Washington, D.C. 20010
                            (202) 996-7447
                            Email:
                            stanley@brandwoodwardlaw.com

Court Reporter:             William P. Zaremba
                            Registered Merit Reporter
                            Certified Realtime Reporter
                            Official Court Reporter
                            E. Barrett Prettyman CH
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1                      P R O C E E D I N G S
 2            COURTROOM DEPUTY:  All rise.  The Honorable
 3   Amit P. Mehta presiding.
 4            THE COURT:  Please be seated.
 5            COURTROOM DEPUTY:  Good morning, Your Honor.
 6   This is criminal case No. 22-200, United States of America
 7   versus Peter K. Navarro.
 8            Amanda Vaughn, Elizabeth Aloi, and Molly Gaston
 9   for the government.
10            John Irving, John Rowley, Stanley Brand, and
11   Stanley Woodward for the defense.
12            The defendant is appearing in person for these
13   proceedings.
14            THE COURT:  Okay, Counsel.  Good afternoon.
15            Mr. Navarro, welcome.  Good afternoon to you, sir.
16            THE DEFENDANT:  Good afternoon to you.
17            THE COURT:  Okay.  So we're here this afternoon to
18   talk about Mr. Navarro's motion to compel discovery.  The
19   parties have exchanged briefs and I've obviously read
20   everything the parties have submitted.
21            I think I'd like to begin with just some
22   questions, and primarily direct those questions to
23   government counsel, just so I can get the factual framework
24   that I think may ultimately inform some of the legal issues
25   that have come up.  So if I could just have government
```

1   counsel approach the lectern.  And I just had a few

2   questions in terms of what's been turned over to Mr. Navarro

3   so far.

4          So much of what at least is seeming to be a

5   subject of the motion are communications with the Select

6   Committee and the White House.  So starting with

7   communications between the Department of Justice and the

8   Select Committee, have any such communications, if they

9   exist, been turned over?

10          MS. ALOI:  Yes, Your Honor.

11          The communications between -- the discoverable

12   communications between the Department -- the prosecution

13   team and the Select Committee have been turned over.

14          There are some logistical emails that have not.

15          THE COURT:  And just out of curiosity, how do you

16   define "logistical emails"?  What do you mean by that?

17          MS. ALOI:  The Department had made a request for

18   information, and there may have been some back and forth on

19   when we would be getting the information, for example.

20          THE COURT:  Okay.

21          MS. ALOI:  All of the materials obtained from the

22   Select Committee at our request have been turned over.

23          THE COURT:  And the materials that you received

24   from the Select Committee, were those materials provided

25   specifically at the request of the Department of Justice or

```
 1   materials that the Select Committee voluntarily provided you
 2   or some combination of the two?
 3                MS. ALOI:  They were provided at our request.
 4                THE COURT:  Okay.
 5                MS. ALOI:  And the specific requests, just as we
 6   would with grand jury information -- grand jury subpoenas,
 7   have not been turned over.  The requests themselves versus
 8   the materials received in receipt.
 9                THE COURT:  I'm sorry, so the request itself has
10   not been turned over?
11                MS. ALOI:  That's correct.
12                THE COURT:  Okay.
13                And I take it the request for, perhaps, obvious
14   reasons, didn't take the form of a subpoena.  Was it a
15   letter, email, how was it communicated?
16                MS. ALOI:  That's correct, it was a letter
17   communicated by email, and the Committee voluntarily
18   provided information.
19                THE COURT:  Okay.
20                And are there any outstanding requests -- well,
21   let me ask a different question first.
22                Were there any categories of material that the
23   Department of Justice sought that it believes the Committee
24   declined to produce?
25                MS. ALOI:  No.
```

```
 1                THE COURT:  And are there any outstanding records
 2     you're waiting on?
 3                MS. ALOI:  No.
 4                THE COURT:  Let's talk then about the White House
 5     and the Department of Justice.  To the extent that there are
 6     communication between the White House and the Department of
 7     Justice, were those produced?
 8                MS. ALOI:  Similarly, the Department had made --
 9     or the prosecution team had made a request to the
10     White House for documents.  Everything received in response
11     to that request was produced, but the precise request was
12     not.
13                THE COURT:  Okay.
14                And was there more than one request or just the
15     one request?
16                MS. ALOI:  Just the one request.
17                THE COURT:  And can you share with me to which
18     component of the White House the request was directed?
19                MS. ALOI:  It went to the White House Counsel's
20     office.
21                THE COURT:  And did the White House Counsel's
22     office withhold any of the information that was otherwise
23     responsive and requested on any privilege or any other
24     grounds?
25                MS. ALOI:  No, Your Honor.
```

```
 1              THE COURT:  And to the extent that you all

 2   received information from the White House Counsel's office,

 3   has all of that been turned over?

 4              MS. ALOI:  Yes, Your Honor.

 5              THE COURT:  And other than the request, were there

 6   any other communications between the Department of Justice

 7   and the White House?  Other than of the logistical type that

 8   you mentioned?

 9              MS. ALOI:  Other than of a logistical nature, no.

10              THE COURT:  Okay.

11              So the next question then is, insofar as

12   White House communications to the Select Committee, if there

13   were any, would such communications have been covered by

14   your request if there were any?

15              MS. ALOI:  No.

16              THE COURT:  So as you stand here today, do you

17   have any knowledge of whether there were any communications

18   between the White House and the Select Committee?

19              MS. ALOI:  I do not beyond what may have been

20   referenced in the defendant's briefing.

21              THE COURT:  And what's the government's position

22   on, if there were such communications, whether those would

23   be discoverable?  Is it primarily that the White House and

24   the White House Counsel's office is not part of the

25   prosecution team?  Is that the primary argument?
```

1          MS. ALOI:  Your Honor, I think it's both.  The

2     White House had -- it is both that they're not part of the

3     prosecution team and that those communications are not

4     material to the defense.

5          THE COURT:  Okay.

6          MS. ALOI:  Here, the White House had no role

7     whatsoever in the investigation of this case beyond that

8     essentially of a witness, and so they are not part of the

9     prosecution team.  And any information exchanged between the

10    White House and the Select Committee could not have informed

11    either the defendant nor the prosecution's intent here,

12    having had no knowledge of those communications.

13         THE COURT:  And insofar as the investigation as it

14    involved the White House Counsel's office, you've identified

15    a single request that was made and then you received

16    documents back.  And was that the only -- I think you said

17    that's the only request that the Department of Justice made.

18         MS. ALOI:  There was also a request for an

19    interview, and the interview --

20         THE COURT:  I was about to get to that in a

21    moment.

22         So in terms of documents, there was one document

23    request, there was a response.

24         In terms of interviews, can you -- and I'm not

25    asking you to identify names.  Can you just share with me

```
 1    the extent to which there were requests made for interviews
 2    and how many members of the Counsel's office or some other
 3    entity within the Executive Office of the White House were
 4    interviewed?
 5              MS. ALOI:  There was a request to the White House
 6    Counsel's office for them to make available the person with
 7    whom the government -- the investigation team, the
 8    investigators, had reason to believe might have information
 9    relevant to the elements of the offense, and that person was
10    made available and interviewed.
11              THE COURT:  Okay.
12              And was anybody else interviewed other than that
13    individual?
14              MS. ALOI:  No.
15              THE COURT:  Okay.
16              I think my question covered this, but to the
17    extent that you have received -- well, let me ask this
18    directly:  Are you in receipt of any communications between
19    the Select Committee and the White House, either from the
20    production from the Select Committee or the production from
21    the White House Counsel's office?
22              MS. ALOI:  Well, as a starting point, anything we
23    have received has been turned over.
24              THE COURT:  Okay.
25              MS. ALOI:  There was a letter from the White House
```

```
 1   to Mr. Navarro that we received in production and that he is

 2   both in possession of and which we disclosed.

 3               THE COURT:  Okay.

 4               But to your knowledge then, not with the Select

 5   Committee?

 6               MS. ALOI:  Other than the communications that we

 7   had received and turned over.

 8               THE COURT:  Right.  Okay.

 9               MS. ALOI:  To make sure it's clear, there were

10   email communications between the Select Committee and

11   Mr. Navarro which were provided to us voluntarily and which

12   we have disclosed.

13               THE COURT:  Right.

14               No, my question was as between the White House and

15   the Select Committee because that's one of the broad subject

16   areas that they have made an inquiry about.

17               I think those were the questions that I wanted to

18   raise as a preliminary to our broader discussion.

19               MS. ALOI:  Your Honor, one clarification.

20   I believe the Select Committee was actually CCed, or copied,

21   on the letter that the White House sent to the defendant.

22               THE COURT:  Okay.

23               All that, I think, is helpful.

24               So why don't I turn now to Mr. Navarro's counsel

25   and let's try and work through some of these categories of
```

```
 1   material that they think they're entitled to.
 2               MR. ROWLEY:  Your Honor, good afternoon.
 3   John Rowley for Dr. Navarro.
 4               THE COURT:  Hi, Mr. Rowley.
 5               MR. ROWLEY:  Your Honor, I certainly accept
 6   counsel's representations to the Court; however, I think
 7   that the chances are extremely good that counsel here may
 8   not know about additional correspondence and communications
 9   that occurred.
10               For example, Your Honor --
11               THE COURT:  Hang on.
12               Between whom?
13               MR. ROWLEY:  Well, between the White House and the
14   Justice Department; and specifically, the Office of Legal
15   Counsel, OLC.
16               We know, Your Honor -- well, we learned last week
17   from a media article by John Solomon that apparently
18   Jonathan Su, the Deputy General Counsel at the White House
19   who sent Dr. Navarro an unsolicited letter on February 28th,
20   saying that President Biden had waived President Trump's
21   executive privilege, was extremely busy.
22               According to the article -- and, again,
23   Your Honor, I'm only referring to the article because
24   I don't have this information, but the article says that
25   there were memos -- several memos and emails exchanged
```

1    between Jonathan Su and various agencies in the spring of

2    2022 and that the memos show that Mr. Su was engaged in

3    conversations with the FBI, the DOJ, and NARA, as early as

4    April of 2022.

5         Now, Your Honor, that's extremely important

6    because unless there is -- if Dr. Navarro had invoked --

7         THE COURT:  Can I interrupt you?

8         To the extent that -- does the article specify

9    that those communications or memos relate to Mr. Navarro?

10        MR. ROWLEY:  The article does not say that,

11   Your Honor.

12        THE COURT:  Okay.

13        MR. ROWLEY:  But nevertheless, I think the article

14   references matters that are extremely relevant to this case

15   nevertheless.

16        For example, the communications between the

17   White House and the OLC, as Your Honor knows from our

18   papers, the OLC, for some 50 years, has said that someone of

19   Mr. Navarro's stature as a senior advisor to the President

20   is an alter ego to the President and is not subject to

21   compelled testimony by congressional subpoena.  Somehow that

22   changed in his case.

23        And if we look at --

24        THE COURT:  Can I ask you how any of that is

25   relevant here, other than to the extent that Mr. Navarro

```
 1    might say that he relied on OLC memos to refuse to appear?

 2            MR. ROWLEY:  Well, it's certainly relevant for

 3    that reason, Your Honor, going to Dr. Navarro's mens rea.

 4            But I think it is also relevant to the question of

 5    potential, I say potential, improper influence by the

 6    White House on the Justice Department, because without that

 7    change of policy, and apparently a policy that changed after

 8    there was communication between Jonathan Su and the OLC,

 9    there could not be a prosecution of Dr. Navarro.  There

10    hasn't been a prosecution for some 50 years of a senior

11    advisor and yet all of a sudden we have one.

12            THE COURT:  Well, but am I right that none of

13    those OLC memos cover former advisers, former senior

14    advisors?

15            MR. ROWLEY:  Your Honor, the government has said

16    that in an OLC memo to Pat Cipollone in May of 2019.  There

17    is a reference to former advisers to a former President, and

18    that says a lot.

19            THE COURT:  And it says what?

20            MR. ROWLEY:  And that references the Nixon versus

21    GSA case, which also stands for the proposition that

22    unless --

23            THE COURT:  But you're not answering my question.

24            What does the OLC memo say, if anything, about the

25    prosecutability of a former adviser to a former President's
```

1  refusal to respond to a subpoena?

2          MR. ROWLEY:  Your Honor, the memos speak in terms

3  of whether or not a senior adviser is subject to compelled

4  process by Congress and not -- some of them do, going back

5  some years, talk about a prosecution.

6          But the Cipollone memo that I've made reference to

7  in May of 2019 simply says that executive privilege exists

8  for a former senior advisor to a former President.

9          THE COURT:  Okay.

10          MR. ROWLEY:  And I know the government contests

11  that.  I'm not sure that I have the OLC memo with me, but

12  I'd be more than happy to submit that to the Court.

13          THE COURT:  But the memo does not say that the

14  former advisor can refuse to appear or refuse to produce

15  non- -- or records not covered by executive privilege?

16          MR. ROWLEY:  Well, Your Honor, it speaks in terms

17  of being absolutely immune from congressional testimonial

18  process.

19          THE COURT:  Of a former official?

20          MR. ROWLEY:  Yes, Your Honor, I believe that

21  that's what it says.  I wish I had it with me.

22          THE COURT:  Okay.  I'll at some point dig it up

23  and read it.

24          MR. ROWLEY:  Oh, we have it?

25          Okay.  From the memo -- thank you, Mr. Woodward.

1   In addition -- I'm quoting from the memo now, Your Honor:

2   "In addition, we have recognized that testimonial immunity

3   continues after the tenure of a particular counsel to the

4   president.  As we explained in 2007, 'separation of powers

5   principles dictate that former Presidents and former senior

6   Presidential advisers remain immune from compelled

7   congressional testimony about official matters that occurred

8   during their time as President or senior Presidential

9   advisers.'"

10          And then it goes on to say that the Supreme Court

11  has explicitly recognized this principle in the context of

12  executive privilege.  And there's a cite to then, as I said,

13  Nixon versus the administrator of the GSA, which is a 1977

14  Supreme Court case adopting the view of the then-Solicitor

15  General.

16          THE COURT:  Okay.

17          So going back then to my question of what does it

18  matter, your response, I think, was, the change in position,

19  if, in fact, it's a change in position, I don't think the

20  Department of Justice seems to think otherwise, but that

21  it would be evidence of what, potential -- the change in

22  position is output of potential political influence, in your

23  view?

24          MR. ROWLEY:  Yes, Your Honor.

25          THE COURT:  And what's your basis for believing

1    that?

2            MR. ROWLEY:  Well, the basis is that the Justice

3    Department had one position for some 50 years and then in

4    Mr. Navarro's case shortly before he was indicted, it

5    changed position.  And it changed position, we know now from

6    Mr. Solomon's article, that that change occurred within a

7    matter of weeks after the Deputy White House Counsel

8    contacted the OLC and contacted NARA.

9            THE COURT:  And say hypothetically the facts were

10   to bear out your theory of political influence, that's not a

11   trial defense, right?

12           MR. ROWLEY:  Well, improper influence, I think,

13   could result in a dismissal of the indictment.

14           THE COURT:  Right, but I asked you whether it was

15   a trial defense, not dismissal of the indictment.

16           MR. ROWLEY:  I'd have to think about that,

17   Your Honor.

18           THE COURT:  Okay.

19           Because what I'm trying to figure out is what

20   basket this falls in.  You know, is it material to the

21   preparation of the defense in the Rule 16 sense of the term

22   in which it relates to the government's case, preparing a

23   potential defense, or does it fall outside of Rule 16 and

24   relate more to the kind of discovery you're seeking in the

25   selective prosecution context, which is not governed by

1    Rule 16, and arguably requires a more demanding standard.

2            You know, if, for example, this is, say, a species

3    of vindictive prosecution, then that is not subject to the

4    Rule 16 standard, and the Circuit has said as much, and that

5    it actually is -- the standard that is articulated in the

6    1996 case from the Supreme Court about selective

7    prosecution, the name of which is escaping me right now, but

8    that's the standards; in other words, that you've got to

9    come forward with evidence showing -- *Armstrong*, you've got

10   to come forward with some evidence showing that this, in

11   fact, is likely what motivated the prosecution, as opposed

12   to mere speculation that that could have been at play.

13           MR. ROWLEY:  Understood, Your Honor.

14           And maybe the answer to that question has to do

15   with the type of communication, the substance of the

16   communication that actually occurred, whether it was

17   directed towards Mr. Navarro directly or other people in his

18   position, and, therefore, carried with it the type of

19   discriminatory purpose that the cases speak to in the

20   context of selective prosecution or something else.

21           But until we know exactly what happened, again,

22   I'm relying primarily on this news article from about a week

23   ago, because this information was not disclosed to us by the

24   government.  There may or may not be memos and emails as

25   referenced in the article.  The government didn't tell us

```
 1    that; I'm getting that from the article.

 2             If those memos and emails do exist, I think

 3    they're highly relevant to the issues that we're discussing

 4    here today.

 5             THE COURT:  Okay.

 6             Well, let me ask government counsel while we're on

 7    the subject, are you aware -- well, let me ask you if you'd

 8    like to respond to what counsel has just suggested may exist

 9    and to the extent that you are aware or not aware of any

10    such material.

11             MS. ALOI:  Yes, Your Honor.

12             An article of two weeks ago about something

13    unrelated to Mr. Navarro cannot form a basis for a selective

14    prosecution claim.

15             To the extent the communications that the

16    government -- that the defendant is seeking even exist, and

17    the prosecution does not know if they exist, because we are

18    wholly unaware of them; they could not have informed our

19    intent.

20             And to the extent that Mr. Navarro's intent was

21    informed by an OLC opinion that he relied on, he has it.

22             THE COURT:  Well, I think the issue is a slightly

23    different one that counsel has raised, which is that --

24    well, let me get at this differently.

25             Counsel has suggested that the Department of
```

| | |
|---|---|
| 1 | Justice has changed its view -- and let me say this at the |
| 2 | outset.  I'm not sure it matters to me as a legal matter and |
| 3 | whatever I instruct this jury what the OLC's position has |
| 4 | been for 50 years or not.  Ultimately it's my decision to |
| 5 | determine whether there is some privilege that -- |
| 6 | testimonial privilege that allows an adviser to the |
| 7 | President of the United States, either current or former, to |
| 8 | refuse to appear, and to my knowledge, there's no court of |
| 9 | law that has ever said that that is a privilege that's |
| 10 | recognized.  So the fact that the OLC has said that for |
| 11 | 50 years is not binding on me. |
| 12 | But leave that to the side, is it -- do you share |
| 13 | the view that the OLC -- or the Department of Justice has |
| 14 | changed its position with respect to compelled testimony and |
| 15 | compelled production of records from a former advisor to a |
| 16 | former President? |
| 17 | MS. ALOI:  No, the Department has not changed its |
| 18 | position. |
| 19 | As a starting point here, we don't even reach |
| 20 | these questions unless there has been an invocation of |
| 21 | executive privilege or proper invocation of executive |
| 22 | prejudice. |
| 23 | For all the reasons that we have laid out in our |
| 24 | response to the defendant's motion to dismiss, there was |
| 25 | none in this case.  So the Department's position and the |

1    decisions that were made to prosecute Mr. Navarro have

2    nothing to do with the OLC opinions.  Mistake of law here is

3    not a defense of the elements of the contempt claim.

4            THE COURT:  Okay.

5            And so why do you take a view that's different

6    than what I just heard Mr. Rowley suggest was the Department

7    of Justice's position no more than two, three years ago?

8            MS. ALOI:  Well, I think Mr. Rowley is misstating

9    the Department's position.  And I don't think there is an

10   OLC opinion that is analogous to the facts of this case such

11   that our behavior would be bound by it in any way, if that

12   even were the case.

13           THE COURT:  Were you quoting from an OLC opinion

14   or were you quoting just from some communication to the

15   former White House Counsel?

16           MR. ROWLEY:  OLC.

17           THE COURT:  An OLC opinion?

18           MS. ALOI:  Your Honor, it's a piece of an OLC

19   opinion in which the facts presented to OLC are different

20   than the facts that are presented here today.

21           THE COURT:  Okay.

22           MR. ROWLEY:  It's a May 20, 2019, OLC opinion.

23           THE COURT:  So let me ask the factual question,

24   which is, to what extent are you -- do you have any

25   knowledge of any communications between the White House and

1    OLC about this sort of body of OLC opinions that have been

2    the subject of this and other cases?

3              MS. ALOI:  No.

4              THE COURT:  Okay.

5              Have you asked?

6              MS. ALOI:  Your Honor, have I asked what

7    specifically?

8              THE COURT:  Have you asked OLC whether any such

9    communications exist?

10             MS. ALOI:  Has the prosecution team asked OLC if

11    communications between the White House and Mr. Navarro --

12             THE COURT:  No.

13             MS. ALOI:  -- or, I'm sorry, White House and OLC

14    exist with regard to the application of the OLC opinions to

15    Mr. Navarro?

16             THE COURT:  Correct.

17             MS. ALOI:  No.

18             THE COURT:  Okay.  So you've not asked.

19             MS. ALOI:  No, we've not.

20             THE COURT:  Okay.  Mr. Rowley.

21             MR. ROWLEY:  Your Honor, that's just it.

22             Again, these individual prosecutors may very well

23    not know about conversations or communications that occurred

24    at some other level of the Department, whether they be the

25    OLC or the DAAGs office with the White House pertaining to

1    Mr. Navarro directly or pertaining to matters that are

2    highly relevant to this case.  And unless counsel looks, we

3    can't expect counsel is going to find anything.  And

4    I'm not sure that that's happened.

5            I might also say, Your Honor, that there also --

6    unfortunately, this case occurs in a highly politically

7    charged environment, and there also is at least some

8    evidence of what could at least potentially be improper

9    communications between congressional committees and the

10   Justice Department.

11           As an example, as Your Honor knows, I believe, and

12   will hear more about in this case, Mr. Navarro first

13   received a subpoena from the Coronavirus Subcommittee in

14   November of 2021.  He invoked executive privilege pursuant

15   to President Trump's instructions, and the Committee did not

16   pursue the matter for some seven months.

17           Fast-forward to June 26th -- June 27th, sorry, of

18   this year, we sent our Rule 16 letter to the government

19   requesting a variety of information, including information

20   about Dr. Navarro's contacts with the Coronavirus

21   Subcommittee.  That happened at 12:00 on June 26th -- June

22   27th, sorry.

23           Four hours later, we received a contact from the

24   Coronavirus Subcommittee asking about Dr. Navarro and

25   whether or not he intended to appear for a deposition before

```
 1   that Committee.

 2         Now, Your Honor, coincidence is a possible, but,

 3   frankly, at this point in my career, I don't believe in

 4   coincidences.  I think there must have been some contact

 5   between the Justice Department and the Coronavirus

 6   Subcommittee that resulted in the Subcommittee counsel

 7   contacting me.

 8         Now, to be fair, to be accurate, I asked counsel

 9   at the Subcommittee whether she had spoken with the Justice

10   Department and she, after a long pause, said no.  Taking her

11   at her word, that doesn't mean that somebody else at the

12   Subcommittee didn't have that conversation.

13         We also know, for example, with respect to the J6

14   Committee, that they have --

15         THE COURT:  And even -- but say I were to -- say

16   there was such a communication, again, what does it matter?

17         MR. ROWLEY:  Well, it matters, Your Honor -- and

18   I can't say that it matters at this point on this record,

19   but I think we're entitled to discovery to see whether it

20   does matter, because if it does matter, it could be another

21   indication of undue political influence.

22         THE COURT:  But this is why I asked you what I

23   asked you earlier, which is, is this a trial defense or is

24   this something outside of trial defense?  Because if it's

25   outside a trial defense, the mere possibility that a
```

```
 1   communication exists and that the communication may reflect
 2   undue political influence, that's not the kind of
 3   evidentiary basis that you've got to come forward with for
 4   me to order that kind of extraordinary discovery.
 5           MR. ROWLEY:  Well, Your Honor, I think it could be
 6   a trial defense, because it at least potentially goes to the
 7   integrity of the prosecution here.
 8           THE COURT:  I'm not aware of -- I'm not sure what
 9   you mean by that.  I mean, I'm not sure there's a trial
10   defense you can -- you have to help me, explain that.
11           MR. ROWLEY:  And if I might, Your Honor, may I ask
12   Mr. Woodward to come up and see?  He may have some thoughts
13   on that that I've not expressed to the Court.
14           MR. WOODWARD:  Good to see you, Judge.
15           THE COURT:  Mr. Woodward.
16           MS. ALOI:  The argument would be that in
17   cross-examination of any agent that the government puts up
18   to establish the fact -- the case-in-chief in their case,
19   that we would be in a position to challenge the integrity of
20   the agent's investigation in advance of its prosecution of
21   Mr. Navarro.
22           This is quite similar to the effect on the
23   listener exception to the hearsay rule.  So our posture
24   would be, well, what did you look at, agent, and what did
25   you investigate.
```

**-0266-**

1          THE COURT:  Well, that's fine, but what does that

2    have to do with contact to a different committee?

3          MS. ALOI:  Well, it all falls into the same

4    overall narrative, which is, what exactly was happening

5    here?  Why was there a contempt referral prosecuted as

6    against Mr. Navarro in the context of the January 6th

7    Committee, not in the context of the Coronavirus Select

8    Committee?

9          And so why did Mr. Navarro believe that he did not

10   have to appear and provide testimony when --

11         THE COURT:  But you can't mount a trial defense

12   based on his non-prosecution in a different case.

13         MR. WOODWARD:  Well --

14         THE COURT:  If anything, that helps the Department

15   of Justice, right?  Or I don't know if they ever got a

16   referral from that committee.

17         MR. WOODWARD:  They did not.

18         THE COURT:  Right.

19         So I'm not quite sure why we would be comparing

20   the two to begin with.

21         MR. WOODWARD:  Well, Your Honor, discovery isn't

22   about what is going to be admissible in presenting our

23   defense, it's about --

24         THE COURT:  But it is about whether it goes to

25   something that is a trial defense or, you know -- I'm not

```
 1    hearing the fact that there may have been some communication
 2    with somebody between an agent -- I mean, you'll get Jencks
 3    material, right?  I don't know whether you've gotten it so
 4    far or not.  But if the agent that testifies did have an
 5    email communication or a written communication with somebody
 6    from the committee, whether it's the Select Committee or
 7    another one, presumably you'd get that as Jencks material.
 8            MR. WOODWARD:  I'm not at all surprised to hear
 9    Your Honor frustrated at the amount of speculation that has
10    gone into some of these requests, I appreciate that.
11            Part of what we are hamstrung by is the amount of
12    limited information.  The government, in its investigatory
13    prerogative, has limited the prosecution to a handful of
14    individuals, prosecutors and FBI agents.
15            THE COURT:  But that's what they usually do.
16            You're making it sound like the government usually
17    goes out and adopts a whole bunch of different -- finds a
18    bunch of different agencies to include in a prosecution.
19    Sometimes that's true when there's a subject-matter specific
20    prosecution, but it's not the ordinary course.
21            MR. WOODWARD:  Nor is this an ordinary case.  This
22    is far from an ordinary case.
23            And we know, based on public reporting, that there
24    is communication between the White House, the Justice
25    Department, and Congress.
```

1          In fact, just yesterday, Attorney General Garland

2    put out a DOJ-wide memo advising all DOJ employees not to

3    communicate with Congress.  Why would the Attorney General

4    be putting out a memo like that if he didn't have concern

5    for what communications were happening between Congress and

6    the Justice Department?

7          I understand that the normal case is for a small

8    prosecution team to investigate and prosecute the case.  But

9    here we have the former senior Presidential advisor being

10   prosecuted for contempt with a mandatory 30-day minimum for

11   each count.

12         And there's just no doubt that if President Trump

13   was still President, the OLC would have issued a memoranda

14   directing him not to comply with Congress's subpoena.

15         So this is an incredibly novel case that

16   Your Honor has been confronted with.  And the only way for

17   us to ensure that we have properly explored all the

18   available defenses is for us to look at what those

19   communications were.  If we don't want to -- we're not

20   asking the Court to --

21         THE COURT:  Sure.  But, again, you all -- I mean,

22   you say "the communications."  I mean, what specific

23   communication -- I mean, you've asked for a lot of

24   communications.

25         MR. WOODWARD:  Yes.

1          THE COURT:  So when you say "the communications,"

2    I've already asked counsel whether every communication

3    between, to their knowledge, between the Department of

4    Justice and the Select Committee has been turned over.  She

5    said it has been.  Every communication between the

6    Department of Justice and the White House, it has been.

7          MR. WOODWARD:  Respectfully, Your Honor, she

8    caveated her statement.  She said "all discoverable

9    communications."

10          THE COURT:  Right, because --

11          MR. WOODWARD:  And she's limiting --

12          THE COURT:  Well, because she excluded scheduling

13    communications.  She wasn't suggesting there was anything

14    else withheld.

15          MR. WOODWARD:  Well, she's also limiting with whom

16    the communications were exchanged.  So she's limiting the

17    communications to the prosecution team, she's limiting the

18    communications to those that the government has determined

19    are material.

20          And just, yes, by way of example, she's confirmed

21    that she did not disclose the requests to either Congress or

22    to the White House, neither of which would be protected by

23    Rule 6, and so it's not clear why those, at a minimum, can't

24    be disclosed.  And we've highlighted a number of other

25    limited set of documents.

1          We understand your Honor is not going to order DOJ

2    to do a firm-wide, if you will, search for references to

3    Navarro, and we are willing to take this piecemeal, one step

4    at a time.  And if the results that we get from an

5    incremental production process show that there is no

6    evidence of political interference, that there is no

7    evidence of changing the rules, if that's what happened,

8    then we'll accept that.

9          But as we stand on this record, our access to

10   documents and information is incredibly limited based on

11   this narrow definition of the prosecution team in an

12   incredibly novel and complex case.

13          I'll defer back to Mr. Rowley.

14          THE COURT:  Okay.

15          Can I just get one more clarification from

16   government counsel, and that is, with respect to

17   communications between the Department of Justice, have you

18   included any case agents from the FBI in that group?

19          MS. ALOI:  Certainly, the case agents from the FBI

20   who have investigated this matter --

21          THE COURT:  Right.

22          MS. ALOI:  -- were privy to and involved in the

23   communications.  But they did not have other communications.

24   Is that what you're asking?

25

1          THE COURT:  No.  It was a simpler question, which

2    is that your earlier representation about communications

3    between the Select Committee and the White House and the

4    Department of Justice, I wanted to just ensure that that

5    would include the FBI case agents assigned to work with you

6    all.

7          MS. ALOI:  Yes, they are a part of our prosecution

8    team.

9          THE COURT:  All right.  I just wanted to make sure

10   that that was clear.  Okay.

11         All right.  Mr. Rowley, anything?

12         MR. ROWLEY:  Your Honor, just one further point

13   about potential for political influence.  I talked about the

14   Coronavirus Subcommittee.

15         With respect to the subcommittee, Your Honor, a

16   quick point about that.  I think that that is highly

17   relevant.

18         THE COURT:  Which subcommittee?

19         MR. ROWLEY:  I'm sorry, the Coronavirus

20   Subcommittee.

21         THE COURT:  Okay.

22         MR. ROWLEY:  And Dr. Navarro invokes executive

23   privilege on behalf of President Trump, and the subcommittee

24   doesn't fallow up on that.  That is certainly relevant

25   evidence to his mens rea when he gets a subpoena from the

1    J6 Committee and invokes executive privilege.

2              THE COURT:  But -- okay.  Fine.

3              Even if I were to allow what you say, I'm still at

4    a loss to understand how communications that he was never

5    privy to bear on his state of mind.

6              MR. ROWLEY:  Well, again, two different issues,

7    Your Honor.  I was just making the point about state of mind

8    and mens rea.

9              THE COURT:  Okay.

10             MR. ROWLEY:  The other issue is the potential for

11   undue political influence between that committee and the

12   Justice Department.  And I gave the example of the Rule 16

13   letter and the contact I got back the same day from the

14   Coronavirus Subcommittee.

15             One other point, Your Honor, with respect to the

16   J6 Committee, now, again, Your Honor, as I think most of us

17   know, maybe all of us know, this prosecution is occurring in

18   a politically charged environment, there's just no question

19   about that given other things that are not directly relevant

20   to this case that are going on at the moment.

21             And we know that there were voices at the

22   J6 Committee that were clamoring for a prosecution, they

23   were very public about it.  And now we have, as of

24   yesterday -- well, we have President Biden also, as we

25   discussed last time, Your Honor, who said that the --

```
 1    anybody who refused to comply with one of the J6 Committee
 2    subpoenas should be prosecuted.
 3              And then as of yesterday, we have a motion that's
 4    filed by the House of Representatives, where they want to
 5    participate in this case.  They want to file an amicus brief
 6    and they want to offer to the Court their views on
 7    congressional process and procedure as it pertains to this
 8    case.
 9              And now, according to the motion, the Justice
10    Department said that the Justice Department didn't need
11    their assistance; nevertheless, they're trying to get into
12    this case, and, I think, Your Honor, that it's possible.
13              THE COURT:  Isn't that because you're trying to
14    inject it into the case?
15              MR. ROWLEY:  Well --
16              THE COURT:  I mean, you've written in your papers
17    that one of the defenses that you think you can raise is the
18    propriety of how the Committee was constituted, whether the
19    Committee properly issued the subpoena.
20              MR. ROWLEY:  That's --
21              THE COURT:  I mean, it seems like you've opened
22    the door to the Department -- to the House of
23    Representatives coming in and providing information as to
24    why they haven't run afoul of any of the rules that you
25    suggest they have run afoul of.
```

1         MR. ROWLEY:  We certainly have raised the issue,

2  Your Honor, but we have competent government counsel that

3  can respond to that.  Without the House of

4  Representatives --

5         THE COURT:  I think they did the same thing in

6  Mr. Bannon's case, right?

7         MR. ROWLEY:  Yeah, I think so, I think so.

8         But in any event, Your Honor, in just simply

9  looking at the issue of potential --

10        THE COURT:  I mean, look, you can't sort of --

11  I mean, I don't want to be difficult here, but you can't

12  throw up a lot of stuff and say, hey, look, there's undue

13  political influence here.  I mean, take a strand here, take

14  a strand there, it doesn't make a picture.

15        And, you know, the fact that the House of

16  Representatives now wants to come in and do the very same

17  thing they did in Mr. Bannon's case seems like a nothing

18  burger to me.

19        MR. ROWLEY:  I'm only suggesting, Your Honor, that

20  there are a lot of dots here, and when those dots are

21  connected, Dr. Navarro has a right to know whether or not

22  there's undue political influence in this case.

23        I'm not suggesting at this point that there was

24  anything wrong with anything that we're discussing here

25  today, we simply don't know, but we believe that we've

```
 1   established the right to find out.
 2             THE COURT:  Okay.
 3             MR. ROWLEY:  And, Your Honor, if the Court please,
 4   Mr. Irving would like to address some other issues
 5   pertaining to the grand jury as referenced in our briefing.
 6             THE COURT:  Before we get there, though, let me
 7   just confirm that you agree with the following, which is
 8   that neither I or nor the Department of Justice can compel
 9   the Select Committee or any other committee of Congress to
10   produce anything that you're asking for?
11             MR. ROWLEY:  I think that's correct.
12             THE COURT:  Okay.  So to the extent that any of
13   the information you're seeking is in the possession of the
14   Select Committee, nothing I can do about that, right?
15             MR. ROWLEY:  Well, I'd hesitate to go that far,
16   Your Honor, but I understand your point.  And if that
17   information is somewhere in the bowels of the
18   Justice Department, the Justice Department --
19             THE COURT:  Right.  I'm talking about anything
20   that's exclusively in the possession of the congressional
21   committees.
22             MR. ROWLEY:  I agree with that.
23             THE COURT:  Okay.
24             I think I had one other question for you and it's
25   escaping me right now.  It may come to me.  Thanks,
```

1    Mr. Rowley.

2             MR. ROWLEY:  Thank you, Your Honor.

3             THE COURT:  Mr. Irving.

4             MR. IRVING:  Thank you, Your Honor.

5    Good afternoon.

6             THE COURT:  Good afternoon.

7             MR. IRVING:  So Your Honor hasn't asked any

8    questions about selective prosecution or the grand jury

9    issues.

10            THE COURT:  Because we haven't gotten there yet.

11            MR. ROWLEY:  I don't want to get ahead of the

12   Court.

13            You know, just, I can suffice it to say that for

14   all the reasons that you've been discussing with Mr. Rowley,

15   you know, I think that there is -- that we've made the

16   requisite showing to be entitled to some -- at least some

17   discovery on both of those issues.

18            THE COURT:  Can I ask you about selective

19   prosecution for a moment?

20            MR. ROWLEY:  Sure.

21            THE COURT:  Let me start on the back end, or at

22   least what I think about as the back end.

23            Can you affirmatively say that neither Dan Scavino

24   nor Mark Meadows have made any public statements about the

25   Select Committee?

1          MR. ROWLEY:  No, but I can say that -- only

2  because I don't know.

3          But I can say that --

4          THE COURT:  But shouldn't you know?  Somebody's

5  got to tell me affirmatively -- I mean, the basis of your

6  motion is that Mr. Navarro has spoken publicly and they have

7  not.

8          So my question to you is, can you say with a

9  degree of certainty that Mr. Scavino and/or Mr. Meadows have

10  not made public statements about the Select Committee,

11  because at least the government has suggested that

12  Mr. Scavino has, although the link that they provided was

13  just to a Twitter page and I wasn't going to go through all

14  of Mr. Scavino's tweets.

15          MR. IRVING:  Right.  And clearly I should have.

16          But standing here, can I proffer, you know, an

17  example of Mr. Scavino or Mr. Meadows saying something about

18  the Committee?  I can.  I'm happy to try to supplement that.

19          I think it's --

20          THE COURT:  Well, I'm asking you to represent a

21  negative, which is harder, I admit, which is the absence of

22  communications.

23          MR. ROWLEY:  Sure.

24          THE COURT:  But if you're aware of communications,

25  that would be a relevant thing for me to know.

1          MR. IRVING:  I can certainly --

2          THE COURT:  I don't mean communications, I mean

3    public statements.

4          MR. IRVING:  Sure.

5          Yeah, I'm happy to look further into that.

6          I think it's clear, though, that, you know,

7    under -- through any lens, Dr. Navarro is particularly

8    outspoken, both with respect to the Committee and with

9    respect to its investigation, and, frankly, just about

10   everything else.

11         To the extent that Mr. Scavino or Mr. Meadows --

12         THE COURT:  And can I ask you, are there any more

13   statements -- I mean, you've identified three in your

14   papers, the three that were cited in the congressional

15   report.  There was a statement Mr. Navarro made declining to

16   appear.  Then you referenced a television interview he gave

17   shortly thereafter.  And then there was a second statement,

18   public statement, again, declining either to appear or

19   produce records.  Anything else other than that?

20         MR. IRVING:  I'm certain there are.  Again, I'd be

21   happy to supplement the record with that.

22         THE COURT:  Okay.

23         MR. ROWLEY:  I think, Your Honor, at the end of

24   the day, we've made the requisite showing -- putting Rule 16

25   aside, I think in the context of selective prosecution and

```
 1    grand jury abuse -- and I'll echo what Mr. Rowley said, that
 2    I'm not making those assertions, I'm not casting any
 3    aspersions on government counsel, you know, I think, at this
 4    stage, we're talking about additional discovery, and we've
 5    shown enough that it walks like a duck and quacks like a
 6    duck.  We're asking for the Court's assistance in letting us
 7    determine whether or not it is, in fact, a duck.
 8              THE COURT:  And so why in your view is Mr. Navarro
 9    not similarly situated?  Or I should say, he's -- that he
10    is -- he's not similarly situated from Mr. Meadows and
11    Mr. Scavino in two important respects; one is, both of those
12    gentlemen received a letter from the President's counsel
13    directing them to invoke privileges and assert privileges
14    with respect to the Select Committee's subpoena.
15    Mr. Navarro did not get such a letter; two, Mr. Meadows had
16    extensive communications with the committee and produced
17    documents.  And Mr. Scavino's counsel, who is sitting right
18    here at this table, also had extensive communications with
19    the committee.
20              Your client chose not to be represented, that's
21    his right.  But other than refusals, I don't have a record
22    before me that would suggest that he engaged in the kind of
23    dialogue with the committee that those two gentlemen did
24    through their counsel.
25              MR. IRVING:  Yes, Your Honor.
```

```
 1              Well -- so starting first with the President's

 2    letter --

 3              THE COURT:  By the way, how do we have

 4    Mr. Woodward -- this is a separate issue, Mr. Woodward, but

 5    you did represent Mr. Scavino, right?

 6              MR. WOODWARD:  Yes, sir.

 7              THE COURT:  And you're asking for information

 8    about why he wasn't prosecuted while you're representing

 9    Mr. Navarro?

10              MR. WOODWARD:  Yes, sir.

11              THE COURT:  Okay.

12              Have you obtained -- well, okay.  Anyway, we can

13    talk about that later, but go ahead.

14              MR. IRVING:  I was simply going to say,

15    Your Honor -- so starting with the letter from the

16    President, there's no set way that a President of the

17    United States has to assert executive privilege.  There's no

18    form that he has to sign, there's no, you know, law that

19    says it has to be by some fancy letter.

20              Dr. Navarro was -- did communicate with the

21    committee as best he knew how, he was relying on

22    instructions from the President, and he was relying on his

23    understanding that a person in his position --

24              THE COURT:  But am I correct -- I don't want to be

25    definitely.
```

```
 1              MR. IRVING:  Yeah, sure.

 2              THE COURT:  But the facts matter.

 3              Am I correct in understanding that, to the extent

 4    there was a communication from the President, it was in

 5    connection with the subpoena from the COVID-19 Subcommittee

 6    that your colleague referred to earlier.

 7              MR. IRVING:  That's the public statement from the

 8    President, yes --

 9              THE COURT:  Right.  Okay.

10              MR. IRVING:  -- that had to do with the

11    Coronavirus Committee.

12              THE COURT:  Different committee, different

13    subpoena, right?

14              MR. IRVING:  Yes.

15              THE COURT:  Okay.

16              MR. IRVING:  Same understanding by Mr. Navarro

17    that the President had told him.

18              THE COURT:  But that goes to his state of mind,

19    right?  That's a different issue.  What's in his state of

20    mind is a different issue than the communication he actually

21    received and whether it's a communication that's comparable

22    to what Mr. Scavino received and Mr. Meadows received.

23              MR. ROWLEY:  Right.  We're talking about whether

24    or not they were similarly situated.

25              THE COURT:  Right.
```

```
 1              MR. IRVING:  And the fact that one communication

 2     that we have from the President having to do with executive

 3     privilege deals with the Coronavirus Committee doesn't, at

 4     least in my head, put him in a different category for

 5     Mr. Scavino and Mr. Meadows.

 6              And the communications with the Committee --

 7     I mean, Mr. Navarro told the Committee, the January 6th

 8     Committee, that he was asserting executive privilege, that

 9     they were going to -- he was telling them to work it out

10     with the President, you know, my hands are tied.  So I --

11              THE COURT:  Did the President communicate or

12     assert executive privilege directly to the Committee on

13     behalf of any of the three gentlemen, Mr. Navarro,

14     Mr. Meadows, and Mr. Scavino?

15              Either the President, through his counsel, was

16     there a communication with the Committee to your knowledge?

17              MR. IRVING:  I don't know the answer to that.

18              MR. WOODWARD:  No.

19              MR. ROWLEY:  My co-counsel says no.

20              THE COURT:  Okay.

21              MR. IRVING:  So Dr. Navarro was doing the best he

22     could, as an unrepresented person, relying on years of OLC

23     opinions, whether or not he had actually, you know, become

24     an OLC opinion scholar, he was operating on the information

25     that he had.
```

1           And it's fundamentally unfair for the government

2    to move the goalposts in the middle of the game.

3           THE COURT:  Okay.

4           Anything else on the Select Committee prosecution?

5           MR. IRVING:  Not unless Your Honor has any

6    questions.

7           THE COURT:  I don't.

8           MR. IRVING:  Thank you.

9           THE COURT:  Counsel, I'll give the government an

10   opportunity to respond if you'd like.

11          MS. ALOI:  Thank you, Your Honor.

12          The government has not moved any goalposts.  The

13   defendant just appears to not like the fact that he is

14   hamstrung by the law here.

15          Nothing he has said today gives any basis for

16   additional Rule 16 discovery, and it's quite clear that

17   there was no instruction from the President to invoke

18   executive privilege.

19          THE COURT:  But isn't there something to his

20   argument that -- and I'd be curious what your response is --

21   and, you know, he says, look, I am similarly situated to

22   these other officials, both high-ranking officials to the

23   President of the United States, both were subpoenaed, okay,

24   Mr. Meadows produced some documents, but neither Mr. Scavino

25   nor Mr. Meadows -- Mr. Scavino didn't produce anything, and

| 1 | Mr. Scavino and Mr. Meadows, neither of them showed up for |
| 2 | their depositions, they just blanketly refused just like |
| 3 | I did.  So why isn't he in the exact same boat as the two of |
| 4 | them? |
| 5 | MS. ALOI:  So, Your Honor, we're here on a motion |
| 6 | to compel and what you're describing is a selective |
| 7 | prosecution argument. |
| 8 | THE COURT:  Right. |
| 9 | MS. ALOI:  It is not subject to Rule 16. |
| 10 | THE COURT:  Agreed. |
| 11 | MS. ALOI:  To obtain discovery, the defendant must |
| 12 | show some evidence tending to show the existence of the |
| 13 | essential elements of that claim. |
| 14 | And so here, the elements of that specific claim |
| 15 | include discriminatory effect and intent, and that's |
| 16 | *Armstrong*, as you previously noted. |
| 17 | THE COURT:  Right. |
| 18 | MS. ALOI:  So to show discriminatory effect, the |
| 19 | defendant must make a credible showing of different |
| 20 | treatment of similarly situated persons. |
| 21 | And the defendant also must be in a protected |
| 22 | class and the similarly situated offenders must be outside |
| 23 | that protected class and committing roughly the same crime. |
| 24 | And as was discussed, that's actually just not what happened |
| 25 | on the facts here. |

```
 1                THE COURT:  So to cut to the chase, which is how
 2    is Mr. Meadows differently situated, in the government's
 3    view, and how is Mr. Scavino differently situated than
 4    Mr. Navarro?
 5                MS. ALOI:  So just as starting point, both
 6    Mr. Meadows and Mr. Scavino had -- were vocal about their
 7    political beliefs.  Mr. Meadows' lawyer --
 8                THE COURT:  I'm sorry, I didn't hear you.
 9                MS. ALOI:  They were both vocal about their
10    political briefs, and Mr. Meadows' lawyer actually wrote an
11    op-ed in The Washington Post about executive privilege.  So
12    the starting point here is that they are all -- they all
13    share that; they all are vocal about their political
14    beliefs.
15                But the defendant has not shown that they
16    committed the same crime for a couple of reasons.
17    Mr. Meadows produced records to the Committee, the defendant
18    did not.
19                And the House reports that recite the failure of
20    both Mr. Meadows and Mr. Scavino to reply to the subpoena in
21    other respects show that their refusals were quite
22    different; there was a level of engagement that did not
23    occur here.
24                But setting that aside, in order to obtain
25    discovery on a selective prosecution --
```

```
 1              THE COURT:  Before you keep going, I don't want to
 2   set that aside, because that's important.
 3              So is that -- I mean, as you stand here today and
 4   you want me to conclude that Mr. Meadows and Mr. Scavino are
 5   differently situated than Mr. Navarro, and the two grounds
 6   you've identified is that Mr. Meadows produced records and
 7   that the refusal was different for those two gentlemen than
 8   it was for Mr. Navarro.  Is there anything else?
 9              MS. ALOI:  Well, they also must be outside the
10   protected class.  And here --
11              THE COURT:  No, no, I get that point.
12              But I'm asking you about the reasons that you
13   think they're differently situated.  Let's assume for a
14   moment that their argument is right that the other two
15   remain silent and it's only Mr. Navarro that has been
16   outspoken.
17              MS. ALOI:  So, Your Honor, first, just as a
18   starting point, the government doesn't have to refute that,
19   it's their burden to show that they are similarly situated
20   and that there's one outside the protective class --
21              THE COURT:  I know, but you've raised issues in
22   your opposition.
23              MS. ALOI:  -- so they've not met that burden.
24              You know, the government is not going to opine on
25   the internal deliberation over whether and why to bring a
```

1    criminal prosecution.

2            But here the public record shows that there was a

3    different level of engagement despite them both being in the

4    same protected class with the Committee, and, as you have

5    noted, there was a different way in which Mr. Meadows,

6    Mr. Navarro, Mr. Scavino, claimed that executive privilege

7    was invoked.

8            THE COURT:  Okay.

9            MS. ALOI:  So they also have to show

10   discriminatory impact, and that is important because it is

11   necessary for them to obtain additional discovery, which is

12   the matter before the Court here today.

13           And to do that, they have to show that --

14   Mr. Navarro would have to show that his selection was based

15   on an unjustifiable standard.  And the only evidence he

16   offered to that effect is the committee referral, and the

17   committee referral cannot itself provide evidence of the

18   prosecutor's intent.  These other allegations that there

19   must have been some sort of undue political influence are

20   just speculation, they're not evidence, and speculation is

21   insufficient to obtain discovery on a selective prosecution

22   claim.

23           THE COURT:  Okay.

24           Are you aware of -- I mean, you've mentioned the

25   op-ed that was written by Mr. Meadows' counsel.  Are you

1    aware of any other statements, either by Mr. Meadows, his

2    representative, or Mr. Scavino and his representatives?

3            MS. ALOI:  Am I aware of any other statements?

4            THE COURT:  Public statements that were made about

5    the Select Committee?

6            MS. ALOI:  I cannot recite any particular ones

7    today.  But we did do a review, and as noted in our brief,

8    we had identified some on Twitter.

9            THE COURT:  Okay.  So you think there's some on

10   Twitter from Mr. Scavino directly?

11           MS. ALOI:  Yes, I believe so.

12           You know, they may not be --

13           THE COURT:  I don't follow Mr. Scavino on Twitter

14   or anyone, for that matter.

15           MS. ALOI:  Your Honor, part of the challenge of

16   answering that question is that the defendant really hasn't

17   identified a specific political belief that he claims puts

18   him in this protected class.  He says generally that he

19   is --

20           THE COURT:  Well, he hasn't said it's -- I guess

21   in his reply, he's mentioned or alluded to political beliefs

22   under the D.C. statute.

23           But at least in his primary brief, in his opening

24   brief, it was that, I have been a more vocal critic of the

25   Committee than these other two gentlemen.  That is what he

1    claims is the difference.  And essentially he's saying, I've

2    been retaliated against for being more vocal than these

3    other two former officials.

4            MS. ALOI:  And today I'm just prepared to say that

5    Mr. Meadows and Mr. Scavino have also been vocal about their

6    political beliefs.

7            THE COURT:  Okay.

8            MS. ALOI:  But in any event, you don't have to

9    reach this issue to find that he is not entitled to

10   additional discovery on this claim, because they didn't

11   commit similar crimes and there's no evidence of

12   discriminatory impact.

13           THE COURT:  Okay.

14           I mean, it's not that they committed similar

15   crimes, it's that they engaged in similar conduct.

16           MS. ALOI:  Similar conduct, that's right.

17           THE COURT:  One was prosecuted and the other two

18   have not been.  Okay.

19           MS. ALOI:  That's right.

20           THE COURT:  All right.

21           Mr. Irving, I think you wanted to say something

22   more about grand jury.  And if you want to reply, I'll give

23   you an opportunity to be heard as well, or rebuttal I should

24   say.

25           MR. IRVING:  Your Honor, if I may just address a

```
 1    couple of other points from a moment ago.

 2              With respect to, you know, whether these people

 3    are differently situated -- or similarly situated,

 4    government counsel suggested that this was not the same

 5    crime; that somehow Mark Meadows had produced some records;

 6    that there were different levels of engagement.  The

 7    government's theory of this whole case is that it's just a

 8    simple case that just has -- all they have to do is show

 9    that he was -- Mr. Navarro, Dr. Navarro was subpoenaed, he

10    didn't show up, that's that, he doesn't have any opportunity

11    to raise any kind of defenses about that because --

12              THE COURT:  But you wouldn't argue to me that it's

13    not within the Department of Justice's purview to make a

14    prosecutorial determination based upon some of the factors

15    they've identified?

16              MR. IRVING:  I'm sorry, I didn't catch that.

17              THE COURT:  In other words, say because of the

18    dialogue that was had between counsel for Mr. Scavino and

19    Mr. Meadows, you mean to say that the Department of Justice

20    doesn't have discretion to take that into account when

21    they're making a charging decision?

22              MR. IRVING:  I think that the government can take

23    a wide variety of things into account when they're making

24    charging decisions, but not when you have -- not just

25    similarly situated individuals.
```

1          THE COURT:  But do you think that's an

2  illegitimate consideration?

3          MR. IRVING:  That what, that --

4          THE COURT:  Right.

5          I mean, look, you've just heard from government

6  counsel that one of the reasons that they're dissimilarly

7  situated is that there was a greater level of engagement.

8  And I'm asking you, is that greater level of engagement an

9  illegitimate reason to not have prosecuted the other two

10  when they prosecuted Mr. Navarro?

11          MR. IRVING:  Yes, in particular when their

12  position is that this is a simple case that only requires

13  showing that the guy was subpoenaed and didn't show up.

14  I mean, neither one of them showed up.  So absolutely,

15  Your Honor.

16          THE COURT:  Okay.

17          MR. IRVING:  And just to address again very

18  quickly the discussion about discriminatory impact, I would

19  point to the animus, for example, showing -- in our view,

20  shown towards Mr. Navarro at his arrest, I don't mean to go

21  back over that yet again.  But, you know, certainly that was

22  an outlier in anything I've ever seen having to do with a

23  misdemeanor white-collar defendant essentially.

24          So I don't mean to take up more of the Court's

25  time on that.  If there's anything about grand jury, I'd be

1    happy to answer that.

2            THE COURT:  If there's anything you'd like to add

3    about grand jury, I'm happy to hear it.

4            MR. IRVING:  Well, just one thing on that,

5    Your Honor.

6            There seems to be some discussion about kind of no

7    harm, no foul, when, in the briefs when both parties were --

8    when the government was talking about grand jury.

9            And when I looked through those cases, there were

10   a number of cases that didn't involve constitutional errors.

11   There were cases that involved situations where a trial jury

12   had already found the defendant guilty, thereby making less

13   relevant what happened before a grand jury.  And some of the

14   information that counsel was seeking was -- didn't rise to

15   the level of what we're asking for.

16           THE COURT:  Can I just ask you to distill for me

17   and crystallize for me what you think -- what you will

18   contend the impropriety is that occurred before the grand

19   jury that would entitle you to the disclosure of information

20   that's otherwise protected by Rule 6(e) and that you're not

21   entitled to receive?

22           MR. IRVING:  Sure.  Any information -- we are

23   concerned that there were due-process violations here

24   through the -- and I'm trying to be careful with the whole

25   grand jury thing in an open courtroom -- we're concerned

 1    that there were due-process violations that --

 2            THE COURT:  In what respect?  Give me -- tell me

 3    exactly how Mr. Navarro's due-process rights were violated

 4    by the presentation of evidence to the grand jury that

 5    indicted him.

 6            Again, what you suspect.  What do you suspect

 7    happened that violated his grand jury rights -- I mean, his

 8    due-process rights.

 9            MR. IRVING:  I suspect that the grand jury was

10    incorrectly instructed as to the element of wilfulness, mens

11    rea, as to how and why executive privilege is asserted and

12    what it covers, as absolute immunity and as to the

13    Committee's, you know, Constitution.

14            We have very cursory information provided by the

15    agent.  And I'll stop there, I guess, before the microphone

16    there.

17            THE COURT:  Okay.  Anything else?

18            MR. IRVING:  No, sir.

19            THE COURT:  All right.  Thank you, Counsel.

20            MS. ALOI:  Your Honor, the defendant's

21    presentation begs the question as to whether the Department

22    exercised its discretion properly when it declined to charge

23    Mr. Scavino.

24            Just on the grand jury information, it's quite

25    clear that speculation of grand jury error alone is

1    insufficient to obtain disclosure of additional grand jury

2    material.

3         The defendant makes absolutely no showing of

4    particularized need.  The government is not the gatekeeper

5    of grand jury information.  And here, there's simply no

6    reason --

7         THE COURT:  It's not?

8         MS. ALOI:  Well, for some of the information --

9    for some of the information the defendant --

10        THE COURT:  I always thought it was.

11        MS. ALOI:  Some of the information the defendant

12    seeks, we'd have to go to the Chief Judge for.

13        THE COURT:  I understand that, but you've got a

14    pretty big key to open the gate.

15        MS. ALOI:  We sure do and that is why we did give

16    the defendant the grand jury information relevant to his

17    case and the material to any defense that he might make.

18        THE COURT:  So let me just ask you this.  I mean,

19    their theory is that, as I understand it, that there was

20    information withheld from the grand jury that it should have

21    received.

22        For example, that Mr. -- that OLC had, for 50

23    years, taken the view that Mr. Navarro and people in his

24    shoes were absolutely immune from being compelled to

25    testify.

1          They also take the view that the grand jury should

2     have been told or somehow advised or at least given the

3     facts about the Constitution of the Select Committee which,

4     in their view, was not properly constituted.

5          So why shouldn't the grand jury have had that

6     information and been able to make its own assessment on

7     those matters?

8          MS. ALOI:  Your Honor, so just taking a step back

9     for a minute, just as a starting point, the elements that we

10    are required to prove at trial are that the defendant was

11    summoned as a witness to give testimony or produce

12    information that the subpoena which summoned him was issued

13    by the authority of the Select Committee upon a matter under

14    their inquiry; that the information sought was pertinent to

15    that inquiry, and the defendant willfully made default,

16    wilfulness meaning that the defendant's default was

17    deliberate and intentional.

18         Here, there is no legal obligation to instruct the

19    grand jury on every aspect of the law or every possible

20    legal defense.  What matters is that the indictment is valid

21    on its face.  And here, it properly alleges the elements of

22    the offense.

23         And the defendant has actually offered no reason

24    to believe that the grand jury was instructed contrary to

25    those elements.

**-0296-**

```
 1              THE COURT:  Okay.

 2         All right.  Anything else?

 3              MS. ALOI:  Not on grand jury.

 4              THE COURT:  Okay.  Thank you, Counsel.

 5         All right.  Mr. Irving and counsel, anything else

 6   you'd like to add?

 7              MR. IRVING:  Thank you, Your Honor.

 8              I would just submit to the Court that it's -- the

 9   no-harm, no-foul kind of discussion around grand jury is

10   inappropriate where we're talking about potential

11   constitutional violations.

12              You know, it's disconcerting certainly to hear an

13   argument for the government that, you know, somehow this

14   would be that kind of situation, that there was -- this

15   case -- again, this case is a very simple case, all he had

16   to do was get subpoenaed, not show up.

17              There are -- there's the concept of fundamental

18   fairness in the government's role as supposedly the

19   non-biased advocate for the truth here, and it's -- you

20   know, it's not just me, it's former U.S. Attorney and later

21   Judge Stan Harris in a very similar situation and said that

22   the grand jury would be entitled to know this kind of

23   information.

24              And we're not asking all that much, frankly.

25   We're asking to see what happened here.  And if there's
```

1    nothing to see here, then maybe it isn't a duck.

2          THE COURT:  Okay.

3          MS. ALOI:  Your Honor, if I can respond.

4          The idea that the government did not present

5    speculation and information wholly irrelevant to the

6    elements of the offense and that may somehow have violated

7    the constitutional rights of the defendant is offensive.

8          The errors that he points to in his own motion for

9    why there was error in front of the grand jury involved

10   defenses that he has either waived or this post-indictment

11   claim that he relied on an OLC opinion which we've already

12   discussed he's not even entitled to additional discovery on.

13         The government does take its obligations to

14   present information to the grand jury very seriously,

15   including exculpatory information, but we have no obligation

16   to provide the grand jury with wholly irrelevant

17   information.

18         THE COURT:  Okay.  Thank you, Counsel.

19         All right, Counsel, thank you for your

20   presentations today.  I think I'm going to issue something

21   in writing.  So I'm not going to rule from the bench this

22   afternoon; I'll take it all under advisement and I'll strive

23   to get you something as soon as I possibly can.

24         So is there anything else either side would like

25   to raise before we adjourn?

1           Okay.

2           MR. ROWLEY:  No, Your Honor.

3           THE COURT:  I am going to ask the defense team and

4    Mr. Navarro to stay behind and I'm going to go into a closed

5    session with the defense team, all right?

6           MS. ALOI:  Thank you.

7           THE COURT:  Thank you.

8           (Sealed, ex parte session)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25











25    (Proceedings concluded at 3:24 p.m.)

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__September 3, 2022____    

           William P. Zaremba, RMR, CRR

USCA Case #24-3006    Document #2068156    Filed: 03/12/2024    Page 315 of 481

**COURTROOM**
**DEPUTY: [3]** 3/2 3/5
62/23
**MR. IRVING: [29]** 35/4
35/7 36/15 37/1 37/4
37/20 38/25 39/14 40/1
40/7 40/10 40/14 40/16
41/1 41/17 41/21 42/5
42/8 48/25 49/16 49/22
50/3 50/11 50/17 51/4
51/22 52/9 52/18 55/7
**MR. ROWLEY: [47]**
11/2 11/5 11/13 12/10
12/13 13/2 13/15 13/20
14/2 14/10 14/16 14/20
14/24 15/24 16/2 16/12
16/16 17/13 20/16
20/22 21/21 23/17 24/5
24/11 30/12 30/19
30/22 31/6 31/10 32/15
32/20 33/1 33/7 33/19
34/3 34/11 34/15 34/22
35/2 35/11 35/20 36/1
36/23 37/23 40/23
41/19 57/2
**MR. WOODWARD:**
**[18]** 24/14 25/13 25/17
25/21 26/8 26/21 27/25
28/7 28/11 28/15 39/6
59/11 60/8 60/25 62/22
**MS. ALOI: [69]**
**THE COURT: [167]**
**THE DEFENDANT: [7]**
3/16 61/17 62/3 62/9
62/11 62/14 62/21

**'**
**'separation [1]** 15/4

**1**
**12:00 [1]** 22/21
**1455 [1]** 2/3
**16 [9]** 16/21 16/23 17/1
17/4 22/18 31/12 37/24
42/16 43/9
**1808 [1]** 2/15
**19 [1]** 40/5
**1977 [1]** 15/13
**1996 [1]** 17/6

**2**
**20 [1]** 20/22
**200 [2]** 1/4 3/6
**20001 [1]** 2/21
**20003 [1]** 1/16
**20004 [1]** 2/4
**20010 [1]** 2/15
**2007 [1]** 15/4
**2019 [3]** 13/16 14/7
20/22
**202 [4]** 1/16 2/12 2/16
2/21
**2021 [1]** 22/14
**2022 [4]** 1/5 12/2 12/4
63/7
**20854 [1]** 2/12

**22-200 [2]** 1/4 3/6
**22039 [1]** 2/8
**252-7212 [1]** 1/16
**258-6597 [1]** 2/12
**26th [2]** 22/17 22/21
**27th [2]** 22/17 22/22
**28th [1]** 11/19
**2:07 [1]** 1/6

**3**
**30-day [1]** 27/10
**301 [1]** 2/4
**31 [1]** 1/5
**3249 [1]** 2/21
**333 [1]** 2/20
**354-3249 [1]** 2/21
**3:24 [1]** 62/25

**4**
**400 [1]** 2/3
**402-8800 [1]** 2/8
**4th [1]** 1/15

**5**
**50 [5]** 12/18 13/10 16/3
19/4 53/22
**50 years [1]** 19/11
**555 [1]** 1/15
**5670 [1]** 2/4

**6**
**6597 [1]** 2/12
**6th [2]** 25/6 41/7

**7**
**703 [1]** 2/8
**7212 [1]** 1/16
**7447 [1]** 2/16

**8**
**807-5670 [1]** 2/4
**8639 [1]** 2/7
**8800 [1]** 2/8

**9**
**996-7447 [1]** 2/16

**A**
**able [1]** 54/6
**about [56]** 3/18 6/4
8/20 10/16 11/8 13/24
14/5 15/7 16/16 17/6
17/22 18/12 21/1 21/23
22/12 22/20 22/24
25/22 25/23 25/24 30/2
30/13 30/13 30/16 31/7
31/19 31/23 34/14
34/19 35/8 35/18 35/22
35/24 36/10 36/17 37/9
38/4 39/8 39/13 40/23
44/6 44/9 44/11 44/13
45/12 47/4 48/5 48/22
49/11 50/18 50/25 51/3
51/6 51/8 54/3 55/10
**above [1]** 63/4
**above-titled [1]** 63/4
**absence [1]** 36/21
**absolute [1]** 52/12
**absolutely [4]** 14/17

50/14 53/3 53/24
**accuse [1]** 38/1
**accept [2]** 11/5 29/8
**access [1]** 29/9
**according [2]** 11/22
32/9
**account [2]** 49/20
49/23
**accurate [1]** 23/8
**actually [8]** 10/20 17/5
17/16 40/20 41/23
43/24 44/10 54/23
**add [2]** 51/2 55/6
**addition [2]** 15/1 15/2
**additional [7]** 11/8
38/4 42/16 46/11 48/10
53/1 56/12
**address [3]** 34/4 48/25
50/17
**adjourn [1]** 56/25
**administrator [1]**
15/13
**admissible [1]** 25/22
**admit [1]** 36/21
**adopting [1]** 15/14
**adopts [1]** 26/17
**advance [1]** 24/20
**advised [1]** 54/2
**advisement [1]** 56/22
**adviser [1]** 13/25 14/3
19/6
**advisers [3]** 13/13
13/17 15/6
**advisers.' [1]** 15/9
**advising [1]** 27/2
**advisor [6]** 12/19 13/11
14/8 14/14 19/15 27/9
**advisors [1]** 13/14
**advocate [1]** 55/19
**affirmatively [2]** 35/23
36/5
**aful [1]** 32/24 32/25
**after [4]** 13/7 15/3 16/7
23/10
**afternoon [8]** 3/14 3/15
3/16 3/17 11/2 35/5
35/6 56/22
**again [13]** 11/22 17/21
21/22 23/16 27/21 31/6
31/16 37/18 37/20
50/17 50/21 52/6 55/15
**against [1]** 25/6 48/2
**agencies [2]** 12/1
26/18
**agent [5]** 24/17 24/24
26/2 26/4 52/15
**agent's [1]** 24/20
**agents [4]** 26/14 29/18
29/19 30/5
**ago [4]** 17/23 18/12
20/7 49/1
**agree [2]** 34/7 34/22
**Agreed [1]** 43/10
**ahead [2]** 35/11 39/13
**aided [1]** 2/23
**all [32]** 3/2 4/21 7/1 7/3
10/23 13/11 19/23 25/3
26/8 27/2 27/17 27/21

28/8 30/6 30/9 30/11
44/12 44/12 44/12 44/13
44/21 49/8 52/19 55/2
55/5 55/15 55/24 56/19
56/22 57/5
**all right [1]** 57/5
**allegations [1]** 46/18
**alleges [1]** 54/21
**allow [1]** 31/3
**allows [1]** 19/6
**alluded [1]** 47/21
**Aloi [2]** 1/13 3/8
**alone [1]** 52/25
**already [3]** 28/2 51/12
56/11
**also [15]** 8/18 13/4
13/21 22/5 22/25 22/7
22/13 28/15 31/24
38/18 43/21 45/9 46/9
48/5 54/1
**alter [1]** 12/20
**although [1]** 36/12
**always [1]** 53/10
**am [6]** 13/12 39/24
40/3 42/21 47/3 57/3
**Amanda [1]** 1/13 3/8
**AMERICA [2]** 1/3 3/6
**amicus [1]** 32/5
**AMIT [2]** 1/10 3/3
**Amit P [1]** 3/3
**amount [2]** 26/9 26/11
**analogous [1]** 20/10
**animus [1]** 50/19
**Ann [1]** 1/13
**another [2]** 23/20 26/7
**answer [3]** 17/14 41/17
51/1
**answering [2]** 13/23
47/16
**any [43]** 4/8 5/20 5/22
6/1 6/22 6/23 6/23 7/6
7/13 7/14 7/17 7/17 8/9
9/18 12/24 18/9 20/11
20/24 20/25 21/8 24/17
29/18 32/24 33/8 34/9
34/12 35/7 35/24 37/7
37/12 38/2 41/13 42/5
42/12 42/15 47/1 47/3
47/6 48/8 49/10 49/11
51/22 53/17
**anybody [2]** 9/12 32/1
**anyone [1]** 47/14
**anything [21]** 9/22
13/24 22/3 25/14 28/13
30/11 33/24 33/24
34/10 34/19 37/19 42/4
42/25 45/8 50/22 50/25
51/2 52/17 55/2 55/5
56/24
**Anyway [1]** 39/12
**apparently [2]** 11/17
13/7
**appear [7]** 13/1 14/14
19/8 22/25 25/10 37/16
37/18
**APPEARANCES [2]**
1/12 1/18

**appearing [1]** 3/12
**appears [13]** 12/13
**application [1]** 21/14
**appreciate [1]** 26/10
**approach [1]** 4/1
**April [1]** 12/4
**are [40]** 4/5 4/14 5/20
6/1 6/5 8/3 8/8 9/18
11/7 12/14 18/7 18/9
18/17 20/19 20/20
20/24 22/1 26/11 28/19
29/3 30/7 31/19 31/20
33/20 33/20 37/12
37/20 41/10 44/12
44/13 45/4 45/19 46/19
46/24 46/25 49/3 51/22
54/10 54/10 55/17
**areas [1]** 10/16
**arguably [1]** 17/1
**argue [1]** 49/12
**argument [6]** 7/25
24/16 42/20 43/7 45/14
55/13
**Armstrong [2]** 17/9
43/16
**around [1]** 55/9
**arrest [1]** 50/20
**article [12]** 11/17 11/22
11/23 11/24 12/8 12/10
12/13 16/6 17/22 17/25
18/1 18/12
**articulated [1]** 17/5
**as [55]** 5/5 7/11 7/16
8/13 8/13 9/22 10/14
10/18 12/3 12/3 12/17
12/19 15/4 15/8 15/12
17/4 17/11 17/24 19/2
19/19 22/11 22/11 25/5
26/7 29/9 31/16 31/23
31/24 32/3 32/7 32/23
34/5 35/22 39/21 41/22
43/3 43/16 43/24 44/5
45/3 45/17 46/4 47/7
48/23 52/10 52/11
52/12 52/12 52/21
53/19 54/9 54/11 55/18
56/23 56/23
**aside [3]** 37/25 44/24
45/2
**ask [12]** 5/21 9/17
12/24 18/6 18/7 20/23
24/11 35/18 37/12
51/16 53/18 57/3
**asked [12]** 16/14 21/5
21/6 21/8 21/10 21/18
23/8 23/22 23/23 27/23
28/2 35/7
**asking [13]** 8/25 22/24
27/20 29/24 34/14
36/20 38/6 39/7 45/12
50/8 51/15 55/24 55/25
**aspect [1]** 54/19
**aspersions [1]** 38/3
**assert [3]** 38/13 39/17
41/12
**asserted [1]** 52/11
**asserting [1]** 41/8
**assertions [1]** 38/2

USCA Case #24-3806    Document #2064651    Filed: 05/24/2024    Page 316 of 481

**A**

assessment [1] 54/6
assigned [1] 30/5
assistance [2] 32/11 38/6
assume [1] 45/13
Attorney [3] 27/1 27/3 55/20
Attorney General [2] 27/1 27/3
ATTORNEY'S [1] 1/14
August [1] 1/5
authority [1] 54/13
available [3] 9/6 9/10 27/18
Avenue [2] 2/3 2/20
aware [8] 18/7 18/9 18/9 24/8 36/24 46/24 47/1 47/3

**B**

back [10] 4/18 8/16 14/4 15/17 29/13 31/13 35/21 35/22 50/21 54/8
Bannon's [2] 33/6 33/17
Barrett [1] 2/20
based [5] 25/12 26/23 29/10 46/14 49/14
basis [6] 15/25 16/2 18/13 24/3 36/5 42/15
basket [1] 16/20
be [42] 3/4 4/4 4/19 7/23 13/9 14/12 15/21 17/24 20/11 21/24 22/8 23/8 23/8 23/20 24/5 24/16 24/19 24/24 25/19 25/22 27/4 28/22 28/24 32/2 33/11 35/16 36/25 37/20 38/20 39/19 39/24 42/20 43/21 43/22 45/9 47/12 48/23 50/25 51/6 51/24 55/14 55/22
bear [2] 16/10 31/5
because [21] 10/15 11/23 12/6 13/6 16/19 17/23 18/17 23/20 23/24 24/6 26/18 28/12 32/13 35/10 36/2 36/11 45/2 46/10 48/10 49/11 49/17
become [1] 41/23
been [31] 4/2 4/9 4/13 4/18 4/22 5/7 5/10 7/3 7/13 7/19 9/23 13/10 17/12 19/4 19/20 21/1 23/4 26/1 27/16 28/4 28/5 28/6 35/14 45/15 46/19 47/24 48/2 48/5 48/18 54/2 54/6
before [11] 1/10 16/4 22/25 34/6 38/22 45/1 46/12 51/13 51/18 52/15 56/25
begin [2] 3/21 25/20
begs [1] 52/21
behalf [2] 30/23 41/13

behavior [1] 20/11
behind [just bent] [1] 57/4
being [5] 14/17 27/9 46/3 48/2 53/24
belief [1] 47/17
beliefs [4] 44/7 44/14 47/21 48/6
believe [9] 9/8 10/20 14/20 22/11 23/3 25/9 33/25 47/11 54/24
believes [1] 5/23
believing [1] 15/25
bench [1] 56/21
best [2] 39/21 41/21
between [29] 4/7 4/11 4/12 6/6 7/6 7/18 8/9 9/18 10/10 10/14 11/12 11/13 12/1 12/16 13/8 20/25 21/11 22/9 23/5 26/2 26/24 27/5 28/3 28/3 28/5 29/17 30/3 31/11 49/18
beyond [2] 7/19 8/7
biased [1] 55/19
Biden [2] 11/20 31/24
big [1] 53/14
binding [1] 19/11
blankety [1] 43/2
boat [1] 43/3
body [1] 21/1
both [13] 8/1 8/2 10/2 35/17 37/8 38/11 42/22 42/23 44/5 44/9 44/20 46/3 51/7
bound [1] 20/11
bowels [1] 34/7
Brand [4] 2/10 2/11 2/14 3/10
brandwoodwardlaw.com [1] 2/17
brief [4] 32/5 47/7 47/23 47/24
briefing [2] 7/20 34/5
briefs [3] 3/19 44/10 51/7
bring [1] 45/25
broad [1] 10/15
broader [1] 10/18
bunch [2] 26/17 26/18
burden [2] 45/19 45/23
burger [1] 33/18
busy [1] 11/21

**C**

can [28] 3/23 6/17 8/24 8/25 12/7 12/24 14/14 24/10 29/15 32/17 33/3 34/8 34/14 35/13 35/18 35/23 36/1 36/3 36/8 36/16 36/18 37/1 37/12 39/12 49/22 51/16 56/3 56/23
can't [6] 22/3 23/18 25/11 28/23 33/10 33/11
cannot [2] 18/13 46/17 47/6
career [1] 23/3

careful [1] 51/24
carried [1] 17/11
case [42] 3/6 8/7 12/14 12/22 13/21 15/14 16/4 16/22 17/6 19/25 20/10 20/12 22/2 22/6 22/12 24/18 24/18 25/12 26/21 26/22 27/7 27/8 27/15 29/12 29/18 29/19 30/5 31/20 32/5 32/8 32/12 32/14 33/6 33/17 33/22 49/7 49/8 50/12 53/17 55/15 55/15 55/15
cases [5] 17/19 21/2 51/9 51/10 51/11
casting [1] 38/2
catch [1] 49/16
categories [2] 5/22 10/25
category [1] 41/4
caveated [1] 28/8
CCed [1] 10/20
certain [1] 37/20
certainly [8] 11/5 13/2 29/19 30/24 33/1 37/1 50/21 55/12
certainty [1] 36/9
Certified [1] 2/19
certify [1] 63/2
CH [1] 2/20
challenge [1] 24/19 47/15
chances [1] 11/7
change [5] 13/7 15/18 15/19 15/21 16/6
changed [7] 12/22 13/7 16/5 16/5 19/1 19/14 19/17
changing [1] 29/7
charge [1] 52/22
charged [2] 22/7 31/18
charging [2] 49/21 49/24
chase [1] 2/7 44/1
chief [2] 24/18 53/12
chose [1] 38/20
Cipollone [2] 13/16 14/6
Circle [1] 2/7
Circuit [1] 17/4
cite [1] 15/12
cited [1] 37/14
claim [7] 18/14 20/3 43/13 43/14 46/22 48/10 56/11
claimed [1] 46/6
claims [2] 47/17 48/1
clamoring [1] 31/22
clarification [2] 10/19 29/15
class [6] 43/22 43/23 45/10 45/20 46/4 47/18
clear [6] 10/9 28/23 30/10 37/6 42/16 52/25
clearly [1] 36/15
client [1] 38/20
closed [1] 57/4

co [1] 41/19
co-counsel [1] 41/19
coincidence [1] 23/2
coincidences [1] 23/4
collar [1] 50/23
colleague [1] 40/6
COLUMBIA [2] 1/1 1/15
combination [1] 5/2
come [7] 3/25 17/9 17/10 24/3 24/12 33/16 34/25
coming [1] 32/23
commit [1] 48/11
committed [2] 44/16 48/14
committee [63] 4/6 4/8 4/13 4/22 4/24 5/1 5/17 5/23 7/12 7/18 8/10 9/19 9/20 10/5 10/10 10/15 10/20 22/15 23/1 23/14 25/2 25/7 25/8 25/16 26/6 26/6 28/4 30/3 31/1 31/11 31/16 31/22 32/1 32/18 32/19 34/9 34/9 34/14 35/25 36/10 36/16 37/8 38/16 38/19 38/23 39/21 40/11 40/12 41/3 41/6 41/7 41/8 41/12 41/16 42/4 44/17 46/4 46/16 46/17 47/5 47/25 54/3 54/13
Committee's [2] 38/14 52/13
committees [2] 22/9 34/21
committing [1] 43/23
communicate [3] 27/3 39/20 41/11
communicated [2] 5/15 5/17
communication [20] 6/6 13/8 17/15 17/16 20/14 23/16 24/1 24/1 26/1 26/5 26/5 26/24 27/23 28/2 28/5 40/4 40/20 40/21 41/1 41/16
communications [45] 4/5 4/7 4/8 4/11 4/12 7/6 7/12 7/13 7/17 7/22 8/3 8/12 9/18 10/6 10/10 11/8 12/9 12/16 18/15 20/25 21/9 21/11 21/23 22/9 27/5 27/19 27/22 27/24 28/1 28/9 28/13 28/16 28/17 28/18 29/17 29/23 29/23 30/2 31/4 36/22 36/24 37/2 38/16 38/18 41/6
comparable [1] 40/21
comparing [1] 25/19
compel [3] 3/18 34/8 43/6
compelled [6] 12/21 14/3 15/6 19/14 19/15 53/24

competent [1] 33/2
complex [1] 29/12
comply [2] 27/14 32/1
component [1] 6/18
computer [1] 2/23
computer-aided [1] 2/23
concept [1] 55/17
concern [1] 27/4
concerned [2] 51/23 51/25
conclude [1] 45/4
concluded [1] 62/25
conduct [2] 48/15 48/16
confirm [1] 34/7
confirmed [1] 28/20
confronted [1] 17/6
Congress [6] 14/4 26/25 27/3 27/5 28/21 34/9
Congress's [1] 27/14
congressional [7] 12/21 14/17 15/7 22/9 32/7 34/20 37/14
connected [1] 33/21
connection [1] 40/5
consideration [1] 50/2
constituted [2] 32/18 54/4
Constitution [2] 2/20 52/13 54/3
constitutional [3] 51/10 55/11 56/7
contact [4] 22/23 23/4 25/2 31/13
contacted [2] 16/8 16/8
contacting [1] 23/7
contacts [1] 22/20
contempt [2] 20/3 25/5 27/10
contend [1] 51/18
contests [1] 14/10
context [6] 15/11 16/25 17/20 25/6 25/7 37/25
CONTINUED [1] 2/1
continues [1] 15/3
contrary [1] 54/24
conversation [1] 23/12
conversations [2] 12/3 21/23
copied [1] 10/20
Coronavirus [10] 22/13 22/20 22/24 23/5 25/7 30/14 30/19 31/14 40/11 41/3
correct [7] 5/11 5/16 21/16 34/11 39/24 40/3 63/3
correspondence [1] 11/8
could [10] 3/25 8/10 13/9 16/13 17/12 18/18 22/8 23/20 24/5 41/22 11/18 15/3 16/7 16/8
counsel [38] 3/14 3/23 4/1 10/24 11/7 11/15 11/18 15/3 16/7 16/8

USCA Case #24-3006    Document #...    Filed: 03/25/...    Page 317 of 481

**C**

counsel... [28] 18/8
18/23 18/25 20/15 22/2
22/3 23/6 23/8 28/2
29/16 33/2 38/3 38/12
38/17 38/24 41/15
41/19 42/9 46/25 49/4
49/18 50/6 51/14 52/19
55/4 55/5 56/18 56/19
counsel's [9] 6/19 6/21
7/2 7/24 8/14 9/2 9/6
9/21 11/6
count [1] 27/11
couple [2] 44/16 49/1
course [1] 26/20
court [17] 1/1 2/11
2/18 2/19 11/6 14/12
15/10 15/14 17/6 19/8
24/13 27/20 32/6 34/3
35/12 46/12 55/8
Court's [2] 38/6 50/24
courtroom [1] 51/25
cover [1] 13/13
covered [3] 7/13 9/16
14/15
covers [1] 52/12
COVID [1] 40/5
COVID-19 [1] 40/5
CR [1] 1/4
credible [1] 43/19
crime [3] 43/23 44/16
49/5
crimes [2] 48/11 48/15
criminal [2] 3/6 46/1
critic [1] 47/24
cross [1] 24/17
cross-examination [1]
24/17
CRR [2] 63/2 63/8
crystallize [1] 51/17
curiosity [1] 4/15
curious [1] 42/20
current [1] 19/7
cursory [1] 52/14
cut [1] 44/1

**D**

D.C [5] 1/5 1/16 2/4
2/15 2/21
D.C. [1] 47/22
D.C. statute [1] 47/22
DAAGs [1] 21/25
Dan [1] 35/23
Date [1] 63/7
day [3] 27/10 31/13
37/24
deals [1] 41/3
decision [2] 19/4 49/21
decisions [2] 20/1
49/24
declined [2] 5/24 52/22
declining [2] 37/15
37/18
default [2] 54/15 54/16
defendant [23] 1/7 2/2
3/12 8/11 10/21 18/16
42/13 43/11 43/19
43/21 44/15 44/17

47/16 50/23 51/12 53/3
53/9 53/11 53/16 54/10
54/15 54/23 56/7
defendant's [4] 7/20
19/24 52/20 54/16
defense [19] 3/11 8/4
16/11 16/15 16/21
16/23 20/3 23/23 23/24
23/25 24/6 24/10 25/11
25/23 25/25 53/17
54/20 57/3 57/5
defenses [4] 27/18
32/17 49/11 56/10
defer [1] 29/13
define [1] 4/16
definitely [1] 39/25
definition [1] 29/11
degree [1] 36/9
deliberate [1] 54/17
deliberation [1] 45/25
demanding [1] 17/1
Department [39] 4/7
4/12 4/17 4/25 5/23 6/5
6/6 6/8 7/6 8/17 11/14
13/6 15/20 16/3 18/25
19/13 19/17 20/6 21/24
22/10 23/5 23/10 25/14
26/25 27/6 28/3 28/6
29/17 30/4 31/12 32/10
32/10 32/22 34/8 34/18
34/18 49/13 49/19
52/21
Department's [2] 19/25
20/9
deposition [1] 22/25
depositions [1] 43/2
Deputy [2] 11/18 16/7
describing [1] 43/6
despite [1] 46/3
determination [1]
49/14
determine [2] 19/5
38/7
determined [1] 28/18
dialogue [2] 38/23
49/18
dictate [1] 15/5
did [23] 6/21 22/15
24/24 24/24 25/9 25/9
25/17 26/4 28/21 29/23
33/5 33/17 38/15 38/23
39/5 39/20 41/11 43/3
44/18 44/22 47/7 53/15
56/4
did you [1] 24/24
didn't [13] 5/14 17/25
23/12 27/4 32/10 42/25
44/8 48/10 49/10 49/16
50/13 51/10 51/14
difference [1] 48/1
different [20] 5/21
18/23 20/5 20/19 25/2
25/12 26/17 26/18 31/6
40/12 40/12 40/19
40/20 41/4 43/19 44/22
45/7 46/3 46/5 49/6
differently [6] 18/24
44/2 44/5 45/13 45/14

49/3
53/11 55/9 55/16
difficult [1] 33/7
dig [1] 14/22
direct [1] 3/22
directed [2] 6/18 17/17
directing [2] 27/14
38/13
directly [6] 9/18 17/17
22/1 31/19 41/12 47/10
disclose [1] 28/21
disclosed [4] 10/2
10/12 17/23 28/24
disclosure [2] 51/19
53/1
disconcerting [1]
55/12
discoverable [3] 4/11
7/23 28/8
discovery [14] 3/18
16/24 23/19 24/4 25/21
35/17 38/4 42/16 43/11
44/25 46/11 46/21
48/10 56/12
discretion [2] 49/20
52/22
discriminatory [6]
17/19 43/15 43/18
46/10 48/12 50/18
discussed [2] 31/25
43/24 56/12
discussing [3] 18/3
33/24 35/14
discussion [4] 10/18
50/18 51/6 55/9
dismiss [1] 19/24
dismissal [2] 16/13
16/15
dissimilarly [1] 50/6
distill [1] 51/16
DISTRICT [1] 1/1 1/1
1/10 1/15
do [27] 4/15 4/16 7/16
7/19 14/4 17/14 18/2
19/12 20/2 20/5 20/24
25/2 26/15 29/2 33/16
34/14 39/3 40/10 41/2
46/13 47/7 49/8 50/1
50/22 52/6 53/15 55/16
do you [4] 4/15 19/12
20/5 52/6
do you have [1] 20/24
document [1] 8/22
documents [7] 6/10
8/16 8/22 28/25 29/10
38/17 42/24
does [12] 12/8 12/10
13/24 14/13 15/17
16/23 18/17 23/16
23/20 23/20 25/1 56/13
doesn't [7] 23/11 30/24
33/14 41/3 45/18 49/10
49/20
doing [1] 41/21
DOJ [4] 12/3 27/2 27/2
29/1
DOJ-wide [1] 27/2
don't [23] 10/24 11/24
15/19 19/19 20/9 23/3

25/15 26/3 27/19 33/11
38/21 39/24 41/17 42/7
45/1 47/13 48/8 50/20
50/24
door [1] 32/22
dots [2] 33/20 33/20
doubt [1] 27/12
Dr. [13] 11/3 11/19
12/6 13/3 13/9 22/20
22/24 30/22 33/21 37/7
39/20 41/21 49/9
Dr. Navarro [11] 11/3
11/19 12/6 13/9 22/24
30/22 33/21 37/7 39/20
41/21 49/9
Dr. Navarro's [2] 13/3
22/20
duck [4] 38/5 38/6 38/7
56/1
due [4] 51/23 52/1 52/3
52/8
due-process [4] 51/23
52/1 52/3 52/8
during [1] 15/8

**E**

each [1] 27/11
earlier [3] 23/23 30/2
40/6
early [1] 12/3
EARTH [1] 2/2
echo [1] 38/1
ed [2] 44/11 46/25
Edmund [2] 2/14
effect [4] 24/22 43/15
43/18 46/16
ego [1] 12/20
either [9] 8/11 9/19
19/7 28/21 37/18 41/15
47/1 56/10 56/24
element [1] 52/10
elements [8] 9/9 20/3
43/13 43/14 54/9 54/21
54/25 56/6
Elizabeth [2] 1/13 3/8
Elizabeth Aloi [1] 3/8
elizabeth.aloi [1] 1/17
else [12] 9/12 17/20
23/11 28/14 37/10
37/19 42/4 45/8 52/17
55/2 55/5 56/24
email [10] 1/17 1/18
2/5 2/9 2/13 2/16 5/15
5/17 10/10 26/5
emails [5] 4/14 4/16
11/25 17/24 18/2
employees [1] 27/2
end [3] 35/21 35/22
37/23
engaged [3] 12/2 38/22
48/15
engagement [5] 44/22
46/3 49/6 50/7 50/8
enough [1] 38/5
ensure [2] 27/17 30/4
entitle [1] 51/19
entitled [7] 11/1 23/19

35/16 48/9 51/21 55/22
56/12
entity [1] 9/3
environment [2] 22/7
31/18
error [2] 52/25 56/9
errors [2] 51/10 56/8
escaping [1] 17/7
34/25
essential [1] 43/13
essentially [3] 8/8 48/1
50/23
establish [1] 8/14
established [1] 34/1
even [6] 18/16 19/19
20/12 23/15 31/3 56/12
event [2] 33/8 48/8
ever [3] 19/9 25/15
50/22
every [4] 28/2 28/5
54/19 54/19
everything [3] 3/20
6/10 37/10
evidence [13] 15/21
17/9 17/10 22/8 29/6
29/7 30/25 43/12 46/15
46/17 46/20 48/11 52/4
evidentiary [1] 24/3
ex [1] 57/8
exact [1] 43/3
exactly [3] 17/21 25/4
52/3
examination [1] 24/17
example [11] 4/19
11/10 12/16 17/2 22/11
23/13 28/20 31/12
36/17 50/19 53/22
exception [1] 24/23
exchanged [4] 3/19 8/9
11/25 28/16
excluded [1] 28/12
exclusively [1] 34/20
exculpatory [1] 56/15
executive [18] 9/3
11/21 14/7 14/15 15/12
19/21 19/21 22/14
30/22 31/1 39/17 41/2
41/8 41/12 42/18 44/11
46/6 52/11
exercised [1] 52/22
exist [7] 4/9 18/2 18/8
18/16 18/17 21/9 21/14
existence [1] 43/12
exists [2] 14/7 24/1
expect [1] 22/3
explain [1] 24/10
explained [1] 15/4
explicitly [1] 15/11
explored [1] 27/17
expressed [1] 24/13
extensive [2] 38/16
38/18
extent [13] 6/5 7/1 9/1
9/17 12/18 12/25 18/9
18/15 18/20 20/24
34/12 37/11 40/3
extraordinary [4] 11/7
extremely [4] 11/7

USCA Case #24-3006   Document #2069327   Filed: 04/11/2024   Page 318 of 481

**E**

extremely... **[3]** 11/21
12/5 12/14

**F**

face **[1]** 54/21
fact **[10]** 15/19 17/11
19/10 24/18 26/1 27/1
33/15 38/7 41/1 42/13
factors **[1]** 49/14
facts **[7]** 16/9 20/10
20/19 20/20 40/2 43/25
54/3
factual **[2]** 3/23 20/23
failure **[1]** 44/19
fair **[1]** 23/8
Fairfax **[1]** 2/7
fairness **[1]** 55/18
fall **[1]** 16/23
fallow **[1]** 30/24
falls **[2]** 16/20 25/3
fancy **[1]** 39/19
far **[4]** 4/3 26/4 26/22
34/15
Fast **[1]** 22/17
Fast-forward **[1]** 22/17
FBI **[5]** 12/3 26/14
29/18 29/19 30/5
February **[1]** 11/19
few **[1]** 4/1
figure **[1]** 16/19
file **[1]** 32/5
filed **[1]** 32/4
find **[3]** 22/3 34/1 48/9
finds **[1]** 26/17
fine **[2]** 25/1 31/2
firm **[1]** 29/2
firm-wide **[1]** 29/2
first **[4]** 5/21 22/12 39/1
45/17
follow **[1]** 47/13
following **[1]** 34/7
foregoing **[1]** 63/3
form **[3]** 5/14 18/13
39/18
former **[19]** 13/13
13/13 13/17 13/17
13/25 13/25 14/8 14/8
14/14 14/19 15/5 15/5
19/7 19/15 19/16 20/15
27/9 48/3 55/20
forth **[1]** 4/18
forward **[4]** 17/9 17/10
22/17 24/3
foul **[2]** 51/7 55/9
found **[1]** 51/12
Four **[1]** 22/23
framework **[1]** 3/23
frankly **[3]** 23/3 37/9
55/24
front **[1]** 56/9
frustrated **[1]** 26/9
fundamental **[1]** 55/17
fundamentally **[1]** 42/1
further **[2]** 30/12 37/5

**G**

game **[1]** 42/2

Garland **[1]** 27/1
Gaston... **[1]** 44/3
gate **[1]** 53/14
gatekeeper **[1]** 53/4
gave **[2]** 31/12 37/16
General **[1]** 11/18
15/15 27/1 27/3
generally **[1]** 47/18
gentlemen **[5]** 38/12
38/23 41/13 45/7 47/25
get **[14]** 3/23 8/20
18/24 26/2 26/7 29/4
29/15 32/11 34/6 35/11
38/15 45/11 55/16
56/23
gets **[1]** 30/25
getting **[2]** 4/19 18/1
give **[5]** 42/9 48/22
52/2 53/15 54/11
given **[2]** 31/19 54/2
gives **[1]** 42/15
Glen **[1]** 2/7
gmail.com **[1]** 2/13
go **[6]** 34/15 36/13
39/13 50/20 53/12 57/4
go ahead **[1]** 39/13
goalposts **[2]** 42/2
42/12
goes **[5]** 15/10 24/6
25/24 26/17 40/18
going **[16]** 13/3 14/4
15/17 22/3 25/22 29/1
31/20 36/13 39/14 41/9
45/1 45/24 56/20 56/21
57/3 57/4
gone **[1]** 60/16
good **[9]** 3/5 3/14 3/15
3/16 11/2 11/7 24/14
35/5 35/6
Good afternoon **[1]**
35/5
got **[7]** 17/8 17/9 24/3
25/15 31/13 36/5 53/13
gotten **[2]** 26/3 35/10
governed **[1]** 16/25
government **[33]** 1/13
3/9 3/23 3/25 9/7 13/15
14/10 17/24 17/25 18/6
18/16 22/18 24/17
26/12 26/16 28/18
29/16 33/2 36/11 38/3
42/1 42/9 42/12 45/18
45/24 49/4 49/22 50/5
51/8 53/4 55/13 56/4
56/13
government's **[5]** 7/21
16/22 44/2 49/7 55/18
grand **[31]** 5/6 5/6 34/5
35/8 38/1 48/22 50/25
51/3 51/8 51/13 51/18
51/25 52/4 52/7 52/9
52/24 52/25 53/1 53/5
53/16 53/20 54/1 54/5
54/19 54/24 55/3 55/9
55/22 56/9 56/14 56/16
grand jury **[1]** 56/16
greater **[2]** 50/7 50/8
grounds **[2]** 45/25 45/8

group **[1]** 29/18
50/5
GSA **[2]** 13/21 15/15
guess **[2]** 47/20 52/15
guilty **[1]** 51/12
guy **[1]** 50/13

**H**

had **[29]** 4/1 4/17 6/8
6/9 8/2 8/6 8/12 9/8
10/7 11/20 12/6 14/21
16/3 23/9 34/24 38/15
38/18 40/10 40/17
41/23 41/25 44/6 47/8
49/5 49/18 51/12 53/22
54/5 55/15
hamstrung **[2]** 26/11
42/14
handful **[1]** 26/13
hands **[1]** 41/10
Hang **[1]** 11/11
happened **[8]** 17/21
22/4 22/21 29/7 43/24
51/13 52/7 55/25
happening **[1]** 25/4
27/5
happy **[5]** 14/12 36/18
37/5 37/21 51/1 51/3
harder **[1]** 36/21
harm **[2]** 51/7 55/9
Harris **[1]** 55/21
has **[42]** 5/9 7/3 9/23
12/18 13/15 15/11 17/4
17/14 18/8 18/21 18/23
18/25 19/1 19/3 19/9
19/10 19/13 19/17
19/20 21/10 26/9 26/13
27/16 28/4 28/5 28/6
28/18 33/21 36/6 36/11
36/12 39/17 39/18
39/19 42/5 42/12 42/15
44/15 45/15 49/8 54/23
56/10
hasn't **[4]** 13/10 35/7
47/16 47/20
have **[86]**
haven't **[2]** 32/24 35/10
having **[3]** 8/12 41/2
50/22
he **[46]** 10/1 13/1 16/4
18/21 18/21 22/14
22/25 24/12 25/9 27/4
30/25 31/4 37/16 38/9
38/22 39/8 39/18 39/21
39/21 39/22 40/24 41/8
41/9 41/21 41/23 41/24
41/25 42/13 42/15
42/21 43/3 46/15 47/17
47/18 47/18 47/20
47/25 48/9 49/9 49/9
49/10 53/17 55/15 56/8
56/10 56/11
he didn't **[1]** 27/4
he's **[5]** 38/9 38/10
47/21 48/1 56/12
head **[1]** 41/4
hear **[5]** 22/12 26/8
44/8 51/3 55/12
heard **[3]** 20/6 48/23

50/5
hearing **[2]** 41/9 26/7
hearsay **[1]** 24/23
help **[1]** 24/10
helpful **[1]** 10/23
helps **[1]** 25/14
her **[3]** 23/10 23/11
28/8
here **[37]** 3/17 7/16 8/6
8/11 11/7 12/25 18/4
19/19 20/2 20/20 24/7
25/5 27/9 33/11 33/13
33/13 33/20 33/24
36/16 38/18 42/14 43/5
43/14 43/25 44/12
44/23 45/3 45/10 46/2
46/12 51/23 53/5 54/18
54/21 55/19 55/25 56/1
hesitate **[1]** 34/15
hey **[1]** 33/12
Hi **[1]** 11/4
high **[1]** 42/22
high-ranking **[1]** 42/22
highlighted **[1]** 28/24
highly **[4]** 18/3 22/2
22/6 30/16
him **[6]** 27/14 40/17
41/4 47/18 52/5 54/12
his **[24]** 12/22 17/17
25/12 30/25 31/5 38/21
39/22 39/23 40/18
40/19 41/15 42/19
46/14 47/1 47/2 47/21
47/23 47/23 50/20 52/7
52/7 53/16 53/23 56/8
Honor **[69]**
HONORABLE **[2]** 1/10
3/2
hours **[1]** 22/23
House **[43]** 4/6 6/4 6/6
6/10 6/18 6/19 6/21 7/2
7/7 7/12 7/18 7/23 7/24
8/2 8/6 8/10 8/14 9/3
9/5 9/19 9/21 9/25
10/14 10/21 11/13
11/18 12/17 13/6 16/7
20/15 20/25 21/11
21/13 21/25 26/24 28/6
28/22 30/3 32/4 32/22
33/3 33/15 44/19
how **[12]** 4/15 5/15 9/2
12/24 31/4 32/18 39/3
39/21 44/1 44/3 52/3
52/11
however **[1]** 11/6
hypothetically **[1]** 16/9

**I**

I admit **[1]** 36/21
I am **[2]** 42/21 57/3
I believe **[2]** 10/20
22/11
I can **[7]** 3/23 34/14
35/13 36/1 36/3 36/18
37/1
I can't **[1]** 23/18
I cannot **[1]** 47/6
I did **[1]** 43/3

I didn't **[2]** 44/8 49/16
I don't **[5]** 4/15 4/15/19 20/9
23/3 42/7 47/13
I don't have **[1]** 11/24
38/21
I gave **[1]** 31/12
I guess **[1]** 47/20
I have **[1]** 14/11
I just **[3]** 4/1 20/6 30/9
I know **[2]** 14/10 45/21
I mean **[12]** 24/9 27/21
27/22 33/10 33/11
33/13 36/5 37/2 41/7
50/5 50/14 52/7 53/18
I say **[1]** 13/5
I should **[3]** 36/15 38/9
48/23
I think **[30]** 3/24 8/1
8/16 9/16 10/23 11/6
12/13 13/4 15/18 16/12
18/2 18/22 20/8 23/4
23/19 24/5 30/16 31/16
33/5 34/11 34/24 35/15
35/22 36/19 37/6 37/23
38/3 48/21 49/22 56/20
I understand **[2]** 34/16
53/13 53/19
I wanted **[1]** 10/17
I was **[2]** 8/20 31/7
I'd **[7]** 3/21 14/12 16/16
34/15 37/20 42/20
50/25
I'll **[8]** 14/22 29/13 38/1
42/9 48/22 52/15 56/22
56/22
I'm **[38]** 5/9 8/24 11/23
14/11 15/1 16/19 17/22
18/1 19/2 21/13 22/4
24/8 24/8 24/9 25/19
25/25 26/8 30/19 31/3
33/19 33/23 34/19
36/18 36/20 37/5 37/20
38/2 38/2 44/8 45/12
48/4 49/16 50/8 51/3
51/24 56/20 56/21 57/4
I'm going **[1]** 57/4
I'm just **[1]** 48/4
I'm not **[7]** 8/24 24/8
25/19 25/25 26/8 33/23
56/21
I'm not sure **[1]** 14/11
22/4 24/9
I'm sorry **[4]** 5/9 21/13
30/19 44/8
I've **[6]** 3/19 14/6 24/13
28/2 48/1 50/22
idea **[1]** 56/4
identified **[6]** 8/14
37/13 45/6 47/8 47/17
49/15
identify **[1]** 8/25
III **[1]** 2/6
illegitimate **[2]** 50/2
50/9
immune **[3]** 14/17 15/6
53/24
immunity **[2]** 15/2
52/12

**I**

impact [3] 46/14 46/12 50/18
important [4] 12/5 38/11 45/2 46/10
improper [3] 13/5 16/12 22/8
impropriety [1] 51/18
inappropriate [1] 55/10
include [3] 26/18 30/5 43/15
included [1] 29/18
including [2] 22/19 56/15
incorrectly [1] 52/10
incredibly [3] 27/15 29/10 29/12
incremental [1] 29/5
indication [1] 23/21
indicted [2] 16/4 52/5
indictment [4] 16/13 16/15 54/20 56/10
individual [2] 9/13 21/22
individuals [2] 26/14 49/25
influence [11] 13/5 15/22 16/10 16/12 23/21 24/2 30/13 31/11 33/13 33/22 46/19
inform [1] 3/24
information [38] 4/18 4/19 5/6 5/18 6/22 7/2 8/9 9/8 11/24 17/23 22/19 22/19 26/12 29/10 32/23 34/13 34/17 39/7 41/24 51/14 51/19 51/22 52/14 52/24 53/5 53/8 53/9 53/11 53/16 53/20 54/6 54/12 54/14 55/23 56/5 56/14 56/15 56/17
informed [3] 8/10 18/18 18/21
inject [1] 32/14
inquiry [3] 10/16 54/14 54/15
insofar [2] 7/11 8/13
instruct [2] 19/3 54/18
instructed [2] 52/10 54/24
instruction [1] 42/17
instructions [2] 22/15 39/22
insufficient [2] 46/21 53/1
integrity [2] 24/7 24/19
intended [1] 22/25
intent [5] 8/11 18/19 18/20 43/15 46/18
intentional [1] 54/17
interference [1] 29/6
internal [1] 45/25
interrupt [1] 12/7
interview [3] 8/19 8/19 37/16
interviewed [3] 9/4

9/10 9/12
interviews [3] 8/24 9/6 2/9
investigate [1] 24/25 27/8
investigated [1] 29/20
investigation [5] 8/7 8/13 9/7 24/20 37/9
investigators [1] 9/8
investigatory [1] 26/12
invocation [2] 19/20 19/21
invoke [2] 38/13 42/17
invoked [3] 12/6 22/14 46/7
invokes [2] 30/22 31/1
involve [1] 51/10
involved [4] 8/14 29/22 51/11 56/9
irrelevant [2] 56/5 56/16
Irving [6] 2/2 3/10 34/4 35/3 48/21 55/5
is [131]
is there [1] 56/24
isn't [5] 25/21 32/13 42/19 43/3 56/1
issue [9] 18/22 31/10 33/1 33/9 39/4 40/19 40/20 48/9 56/20
issued [3] 27/13 32/19 54/12
issues [7] 3/24 18/3 31/6 34/4 35/9 35/17 45/21
it [75]
it would be [1] 15/21
it's [33] 8/1 10/9 13/2 15/19 19/4 20/18 20/22 23/24 25/23 26/6 26/20 28/23 32/12 34/24 36/19 37/6 40/21 42/1 42/16 45/15 45/19 47/20 48/14 48/15 49/7 49/12 52/24 53/7 55/8 55/12 55/19 55/20 55/20
its [10] 19/1 19/14 19/17 24/20 26/12 37/9 52/22 54/6 54/21 56/13
itself [2] 5/9 46/17
IV [1] 2/2

**J**

J6 [5] 23/13 31/1 31/16 31/22 32/1
J6 Committee [3] 31/1 31/16 31/22
January [2] 25/6 41/7
January 6th [2] 25/6 41/7
Jencks [2] 26/2 26/7
jirving1 [1] 2/5
John [6] 2/2 2/6 3/10 3/10 11/3 11/17
John Rowley [1] 11/3
john.rowley [1] 2/9
Jonathan [3] 11/18 12/1 13/8

JPROWLEY [1] 2/6
jprowley@jonesrowleylaw.com [1] 2/9
Jr [2] 2/14
JUDGE [4] 1/10 24/14 53/12 55/21
June [4] 22/17 22/17 22/21 22/21
jury [33] 5/6 5/6 19/3 34/5 35/8 38/1 48/22 50/25 51/3 51/8 51/11 51/13 51/19 51/25 52/4 52/7 52/9 52/24 52/25 53/1 53/5 53/16 53/20 54/1 54/5 54/19 54/24 55/3 55/9 55/22 56/9 56/14 56/16
just [49] 3/21 3/23 3/25 4/1 4/15 5/5 6/14 6/16 8/25 18/8 20/6 20/14 21/21 27/1 27/12 28/20 29/15 30/4 30/9 30/12 31/7 31/18 33/8 34/7 35/13 36/13 37/9 42/13 43/2 43/2 43/24 44/5 45/17 46/20 48/4 48/25 49/7 49/8 49/24 50/5 50/17 51/4 51/16 52/24 53/18 54/8 54/9 55/8 55/20
Justice [30] 4/7 4/25 5/23 6/5 6/7 7/6 8/17 11/14 13/6 15/20 16/2 19/1 19/13 22/10 23/5 23/9 25/15 26/24 27/6 28/4 28/6 29/17 30/4 31/12 32/9 32/10 34/8 34/18 34/18 49/11
Justice Department [2] 23/5 34/18
Justice's [2] 20/7 49/13

**K**

keep [1] 45/1
key [1] 53/14
kind [9] 16/24 24/2 24/4 38/22 49/11 51/6 55/9 55/14 54/21 56/13
knew [1] 39/21
know [43] 11/8 11/16 14/10 16/5 16/20 17/2 17/21 18/17 21/23 23/13 25/15 25/25 26/3 26/23 31/17 31/17 31/21 33/15 33/21 33/25 35/13 35/15 36/2 36/4 36/16 36/25 37/6 38/3 39/18 41/10 41/17 41/23 42/21 45/21 45/24 47/12 49/2 50/21 52/13 55/13 55/20 55/22
knowledge [7] 7/17 8/12 10/4 19/8 20/25 28/3 41/16
knows [2] 12/17 22/11

**L**

laid [1] 19/23
last [2] 11/16 31/25
later [3] 22/23 39/13 55/20
law [2] 2/2 2/6 2/11 2/14 19/9 20/22 39/18 42/14 54/19
lawyer [2] 44/7 44/10
learned [1] 11/16
least [10] 4/4 22/7 22/8 24/6 35/16 32/22 36/11 41/4 47/23 54/2
leave [1] 19/12
lectern [1] 4/1
legal [5] 3/24 11/14 19/2 54/18 54/20
lens [1] 37/7
less [1] 51/12
let [10] 5/21 9/17 18/6 18/7 18/24 19/1 20/23 34/6 35/21 53/18
let's [3] 6/4 10/25 43/13
letter [12] 5/15 5/16 9/25 10/21 11/19 22/18 31/13 38/12 38/15 39/2 39/15 39/19
letting [1] 38/6
level [6] 21/24 44/22 46/3 50/7 50/8 51/15
levels [1] 49/6
like [15] 3/21 18/8 26/16 27/4 32/21 33/17 34/4 38/5 38/5 42/10 42/13 43/2 51/2 55/6 56/24
likely [1] 17/11
limited [4] 26/12 26/13 28/25 29/10
limiting [4] 28/11 28/15 28/16 28/17
link [1] 36/12
listener [1] 24/23
LLC [1] 2/2
logistical [4] 4/14 4/16 7/7 7/9
long [1] 23/10
look [8] 12/23 24/24 27/18 33/10 33/12 37/5 42/21 50/5
looked [1] 51/9
looking [1] 33/9
looks [1] 22/2
loss [1] 31/4
lot [4] 13/18 27/23 33/12 33/20

**M**

made [17] 4/17 6/8 6/9 8/15 8/17 9/1 9/10 10/16 14/6 20/1 35/15 35/24 36/10 37/15 37/24 47/4 54/15
make [8] 9/6 10/9 30/9 33/14 43/19 49/13 53/17 54/6
makes [1] 53/3

making [6] 26/16 31/7 38/2 49/2 49/23 51/12
mandatory [1] 27/10
many [1] 9/2
Mark [2] 35/24 49/5
material [10] 5/22 8/4 11/1 16/20 18/10 26/3 26/7 28/19 53/2 53/7
materials [5] 4/21 4/23 4/24 5/1 5/8
matter [14] 15/18 16/7 19/2 22/16 23/16 23/20 23/20 26/19 29/20 40/2 46/12 47/14 54/13 63/4
matters [8] 12/14 15/7 19/2 22/1 23/17 23/18 54/7 54/20
may [19] 3/24 4/18 7/19 11/7 13/16 14/7 17/24 17/24 18/8 20/22 21/22 24/1 24/11 24/12 26/1 34/25 47/12 48/25 56/6
maybe [3] 17/14 31/17 56/1
McKennett [1] 2/10
MD [1] 2/12
me [33] 5/21 6/17 8/25 9/17 14/11 14/21 17/7 18/6 18/7 18/24 19/1 19/2 19/11 20/23 23/7 24/4 24/10 33/18 34/6 34/25 34/25 35/21 36/5 36/25 38/22 45/4 49/12 51/16 51/17 52/2 52/2 52/3 52/22 54/7 54/23
Meadows [23] 35/24 36/9 36/17 37/11 38/10 38/15 40/22 41/5 41/14 42/24 42/25 43/1 44/2 44/6 44/17 44/24 45/4 45/6 46/5 47/1 48/5 49/5 49/19
Meadows' [1] 44/7 44/10 46/25
mean [28] 4/16 23/11 24/9 24/9 26/2 27/21 27/22 27/23 32/16 32/21 33/10 33/11 33/13 36/5 37/2 37/2 37/13 41/7 45/3 46/24 48/14 49/19 50/5 50/14 50/20 50/24 52/7 53/18
meaning [1] 54/16
mechanical [1] 2/23
media [1] 11/17
MEHTA [2] 1/10 3/3
members [1] 9/2
memo [3] 13/16 13/24 14/6 14/11 14/13 14/25 15/1 27/2 27/4
memoranda [1] 27/13
memos [9] 11/25 11/25 12/2 12/9 13/1 13/13 14/2 17/24 18/2
mens [4] 13/3 30/25 31/8 52/10
mentioned [3] 7/8

USCA Case #24-3006    Document #2066461    Filed: 04/18/2025    Page 69 of 81

**M**
mentioned... [2] 46/24 47/21
mere [1] 17/12 23/25
Merit [1] 2/18
met [1] 45/23
microphone [1] 52/15
middle [1] 42/2
might [5] 9/8 13/1 22/5 24/11 53/17
mind [4] 31/5 31/7 40/18 40/20
minimum [2] 27/10 28/23
minute [1] 54/9
misdemeanor [1] 50/23
misstating [1] 20/8
Mistake [1] 20/2
Molly [2] 1/14 3/8
molly.gaston [1] 1/18
moment [5] 8/21 31/20 35/19 45/14 49/1
months [1] 22/16
more [12] 6/14 14/12 16/24 17/1 20/7 22/12 29/15 37/12 47/24 48/2 48/22 50/24
morning [1] 3/5
most [1] 31/16
motion [9] 1/9 3/18 4/5 19/24 32/3 32/3 32/9 36/6 43/5 56/8
motivated [1] 17/11
mount [1] 25/11
move [1] 42/2
moved [1] 42/12
Mr [1] 53/22
Mr. [112]
Mr. Bannon's [2] 33/6 33/17
Mr. Irving [4] 34/4 35/3 48/21 55/5
Mr. Meadows [21] 36/9 36/17 37/11 38/10 38/15 40/22 41/5 41/14 42/24 42/25 43/1 44/2 44/6 44/17 44/20 45/4 45/6 46/5 47/1 48/5 49/19
Mr. Meadows' [1] 44/7 44/10 46/25
Mr. Navarro [35] 3/15 4/2 10/1 10/11 12/9 12/25 17/17 18/13 20/1 21/11 21/15 22/1 22/12 24/21 25/6 25/9 36/6 37/15 38/8 38/15 39/9 40/16 41/7 41/13 44/4 45/5 45/8 45/15 46/6 46/14 49/9 50/10 50/20 53/23 57/4
Mr. Navarro's [6] 3/18 10/24 12/19 16/4 18/20 52/3
Mr. Rowley [9] 11/4 20/6 20/8 21/20 29/13 30/11 35/1 35/14 38/1

Mr. Scavino [23] 36/9 36/12 36/17 37/11 38/11 39/5 40/22 41/5 41/14 42/24 42/25 43/1 44/3 44/6 44/20 45/4 46/6 47/2 47/10 47/13 48/5 49/18 52/23
Mr. Scavino's [2] 36/14 38/17
Mr. Solomon's [1] 16/6
Mr. Su [1] 12/2
Mr. Woodward [5] 14/25 24/12 24/15 39/4 39/4
much [3] 4/4 17/4 55/24
must [7] 23/4 43/11 43/19 43/21 43/22 45/9 46/19
my [11] 9/16 10/14 13/23 15/17 19/4 19/8 23/3 36/8 41/4 41/10 41/19

**N**
name [1] 17/7
names [1] 8/25
NARA [2] 12/3 16/8
narrative [1] 25/4
narrow [1] 29/11
nature [1] 7/9
NAVARRO [49] 1/6 3/7 3/15 4/2 10/1 10/11 11/3 11/19 12/6 12/9 12/25 13/9 17/17 18/13 20/1 21/11 21/15 22/1 22/12 22/24 24/21 25/6 25/9 29/3 30/22 33/21 36/6 37/7 37/15 38/8 38/15 39/9 39/20 40/16 41/7 41/13 41/21 44/4 45/5 45/8 45/15 46/6 46/14 49/9 49/9 50/10 50/20 53/23 57/4
Navarro's [8] 3/18 10/24 12/19 13/3 16/4 18/20 22/20 52/3
necessary [1] 46/11
need [2] 32/10 53/4
negative [1] 36/21
neither [6] 28/22 34/8 35/23 42/24 43/1 50/14
never [1] 31/4
nevertheless [3] 12/13 12/15 32/11
news [1] 17/22
next [1] 7/11
Nixon [2] 13/20 15/13
no [45] 1/4 3/6 5/25 6/3 6/25 7/9 7/15 8/6 8/12 9/14 10/14 19/8 19/17 20/7 21/3 21/12 21/17 21/19 23/10 27/12 29/5 29/6 29/25 31/18 36/1 39/16 39/17 39/18 41/18 41/19 42/17 45/11 45/11 48/11 51/6 51/7 52/18 53/3 53/5

54/18 54/23 55/9 55/9 56/16 57/2
no-foul [1] 55/9
no-harm [1] 55/9
non [3] 14/15 25/12 55/19
non-biased [1] 55/19
non-prosecution [1] 25/12
none [2] 13/12 19/25
normal [1] 27/7
not [107]
noted [3] 43/16 46/5 47/7
nothing [5] 20/2 33/17 34/14 42/15 56/1
novel [2] 27/15 29/12
November [1] 22/14
now [12] 10/24 12/5 15/1 16/5 17/7 23/2 23/8 31/16 31/23 32/9 33/16 34/25
number [2] 28/24 51/10
NW [4] 1/15 2/3 2/15 2/20

**O**
obligation [2] 54/18 56/15
obligations [1] 56/13
obtain [5] 43/11 44/24 46/11 46/21 53/1
obtained [2] 4/21 39/12
obvious [1] 5/13
obviously [1] 3/19
occur [1] 44/23
occurred [6] 11/9 15/7 16/6 17/16 21/23 51/18
occurring [1] 31/17
occurs [1] 22/6
offenders [1] 43/22
offense [2] 9/9 54/22 56/6
offensive [1] 56/7
offer [1] 32/6
offered [2] 46/16 54/23
office [12] 1/14 6/20 6/22 7/2 7/24 8/14 9/2 9/3 9/6 9/21 11/14 21/25
official [3] 2/19 14/19 15/7
officials [3] 42/22 42/22 48/3
Oh [1] 14/24
okay [56] 3/14 3/17 7/10 8/5 9/11 9/15 9/24 10/3 10/8 10/22 12/12 14/9 14/22 14/25 15/16 16/18 18/5 20/4 20/21 21/4 21/18 21/20 29/14 30/10 30/21 31/2 31/9 34/2 34/12 34/23 37/22 39/11 39/12 40/9 40/15 41/20 42/3 42/23 46/8

46/23 47/9 48/7 48/13 48/18 50/16 52/17 55/4 56/12 56/18 56/19 57/1
OLC [33] 11/15 12/17 12/18 13/1 13/8 13/13 13/16 13/24 14/11 16/8 18/21 19/10 19/13 20/2 20/10 20/13 20/16 20/17 20/18 20/19 20/22 21/1 21/1 21/8 21/10 21/13 21/14 21/25 27/13 41/22 41/24 53/22 56/11
OLC's [1] 19/3
one [24] 6/14 6/15 6/16 8/22 10/15 10/19 13/11 16/3 18/23 26/7 29/3 29/15 30/12 31/15 32/1 32/17 34/24 38/11 41/1 45/20 48/17 50/6 50/14 51/4
ones [1] 47/6
only [9] 8/16 8/17 11/23 27/16 33/19 36/1 45/15 46/15 50/12
op [2] 44/11 46/25
op-ed [2] 44/11 46/25
open [2] 51/25 53/14
opened [1] 32/21
opening [1] 47/23
operating [1] 41/24
opine [1] 45/24
opinion [8] 18/21 20/10 20/13 20/17 20/19 20/22 41/24 56/11
opinions [4] 20/2 21/1 21/14 41/23
opportunity [3] 42/10 48/23 49/10
opposed [1] 17/11
opposition [1] 45/22
order [3] 24/4 29/1 44/24
ordinary [3] 26/20 26/21 26/22
other [35] 6/23 7/5 7/6 7/7 7/9 9/2 9/12 10/6 12/25 17/8 17/17 21/2 21/24 28/24 29/23 31/10 31/15 31/19 34/4 34/9 34/24 37/19 38/21 42/22 44/21 45/14 46/18 47/1 47/3 47/25 48/3 48/17 49/1 49/17 50/9
otherwise [3] 6/22 15/20 51/20
our [15] 4/22 5/3 10/18 12/17 18/18 19/23 20/11 22/18 24/23 25/22 29/9 30/7 34/5 47/7 50/19
out [9] 4/15 16/10 16/19 19/23 26/17 27/2 27/4 34/1 41/9
outlier [1] 50/22
output [1] 15/22

outset [1] 19/2
outside [6] 16/23 23/24 23/25 43/22 45/9 45/20
outspoken [2] 37/8 45/16
outstanding [2] 5/20 6/1
over [12] 4/2 4/9 4/13 4/22 5/7 5/10 7/3 9/23 10/7 28/4 45/25 50/21
overall [1] 25/4
own [2] 54/6 56/8

**P**
p.m [1] 1/6 62/25
page [1] 36/13
papers [2] 12/18 32/16 37/14
Park [1] 2/15
part [6] 7/24 8/2 8/8 26/11 30/7 47/15
parte [1] 57/8
participate [1] 32/5
particular [3] 15/3 47/6 50/11
particularized [1] 53/4
particularly [1] 37/7
parties [3] 3/19 3/20 51/7
Pat [1] 13/16
pause [1] 23/10
Pebble [1] 2/11
Pennsylvania [1] 2/3
people [3] 17/17 49/2 53/23
perhaps [1] 5/13
person [5] 3/12 9/6 9/9 39/23 41/22
persons [1] 43/20
pertaining [3] 21/25 22/1 34/5
pertains [1] 32/7
pertinent [1] 54/14
PETER [2] 1/6 3/7
picture [1] 33/14
piece [1] 20/18
piecemeal [1] 29/3
Plaintiff [1] 1/4
play [1] 17/12
please [2] 3/4 34/3
PLLC [1] 2/6
point [17] 9/22 14/22 19/19 23/3 23/18 30/12 30/16 31/7 31/15 33/23 34/16 44/5 44/12 45/11 45/18 50/19 54/9
points [2] 49/1 56/8
policy [2] 13/7 13/7
political [16] 15/22 16/10 23/21 24/2 29/6 30/13 31/11 33/13 33/22 44/7 44/10 44/13 46/19 47/17 47/21 48/6
politically [2] 22/6 31/18
position [17] 7/21 15/18 15/19 15/22 16/3 16/5 16/5 17/18 19/3

USCA Case #24-3006    Document #2064276    Filed: 09/18/2024    Page 332 of 493

**P**

position... **[8]** 19/14
19/18 19/25 20/7 20/9
24/19 39/23 50/12
**possession [3]** 10/2
34/13 34/20
**possibility [1]** 23/25
**possible [3]** 23/2 32/12
54/19
**possibly [1]** 56/23
**post [2]** 44/11 56/10
**post-indictment [1]**
56/10
**posture [1]** 24/23
**potential [9]** 13/5 13/5
15/21 15/22 16/23
30/13 31/10 33/9 55/10
**potentially [2]** 22/8
24/6
**powers [1]** 15/4
**precise [1]** 6/11
**prejudice [1]** 19/22
**preliminary [1]** 10/18
**preparation [1]** 16/13
**prepared [1]** 48/4
**preparing [1]** 16/22
**prerogative [1]** 26/13
**present [2]** 56/4 56/14
**presentation [2]** 54/4
52/21
**presentations [1]**
56/20
**presented [2]** 20/19
20/20
**presenting [1]** 25/22
**president [27]** 11/20
11/20 12/19 12/20
13/17 14/8 15/4 15/8
19/7 19/16 22/15 27/12
27/13 30/23 31/24
39/16 39/16 39/22 40/4
40/8 40/17 41/2 41/10
41/11 41/15 42/17
42/23
**President Trump [1]**
27/12
**President Trump's [2]**
11/20 22/15
**President's [3]** 13/25
38/12 39/1
**Presidential [3]** 15/6
15/8 27/9
**Presidents [1]** 15/5
**presiding [1]** 3/3
**presumably [1]** 26/7
**pretty [1]** 53/14
**Prettyman [1]** 2/20
**previously [1]** 43/16
**primarily [3]** 3/22 7/23
17/22
**primary [2]** 7/25 47/23
**principle [1]** 15/11
**principles [1]** 15/5
**privilege [20]** 6/23
11/21 14/7 14/15 15/12
19/5 19/6 19/9 19/21
22/14 30/23 31/1 39/17
41/3 41/8 41/12 42/18
44/11 46/6 52/11
**privileges [2]** 38/13 38/13
38/13
**privy [1]** 29/2 31/5
**procedure [1]** 32/7
**proceedings [5]** 1/9
2/23 3/13 62/25 63/4
**process [8]** 14/4 14/18
29/5 32/7 51/23 52/1
52/3 52/8
**produce [6]** 5/24 14/14
34/10 37/19 42/25
54/11
**produced [8]** 2/23 6/7
6/11 38/16 42/24 44/17
45/6 49/5
**production [5]** 9/20
9/20 10/1 19/15 29/5
**proffer [1]** 36/16
**proper [1]** 19/21
**properly [5]** 27/17
32/19 52/22 54/4 54/21
**proposition [1]** 13/21
**propriety [1]** 32/18
**prosecutability [1]**
13/25
**prosecute [2]** 20/1
27/8
**prosecuted [7]** 25/5
27/10 32/2 39/8 48/17
50/9 50/10
**prosecution [36]** 4/12
6/9 7/25 8/3 8/9 13/9
13/10 14/5 16/25 17/3
17/7 17/11 17/20 18/14
18/17 21/10 24/7 24/20
25/12 26/13 26/18
26/20 27/8 28/17 29/11
30/7 31/17 31/22 35/8
35/19 37/25 42/4 43/7
44/25 46/1 46/21
**prosecution's [1]** 8/11
**prosecutor's [1]** 46/14
**prosecutorial [1]** 49/14
**prosecutors [2]** 21/22
26/14
**protected [7]** 28/22
43/21 43/23 45/10 46/4
47/18 51/20
**protective [1]** 45/20
**prove [1]** 54/10
**provide [3]** 25/10
46/17 56/16
**provided [7]** 4/24 5/1
5/3 5/18 10/11 36/12
52/14
**providing [1]** 32/23
**public [9]** 26/23 31/23
35/24 36/10 37/3 37/18
40/7 46/2 47/4
**publicly [1]** 36/6
**purpose [1]** 17/9
**pursuant [1]** 22/14
**pursue [1]** 22/16
**purview [1]** 49/13
**put [2]** 27/2 41/4
**puts [2]** 24/17 47/17
**putting [1]** 27/4 37/24

**Q**

**quacks [1]** 38/5
**question [15]** 5/21
7/11 9/16 10/14 13/4
13/23 15/17 17/14
20/23 30/1 31/18 34/24
36/8 47/16 52/21
**questions [7]** 3/22
3/22 4/2 10/17 19/20
35/8 42/6
**quick [1]** 30/16
**quickly [1]** 50/18
**quite [5]** 24/22 25/19
42/16 44/21 52/24
**quoting [3]** 15/1 20/13
20/14

**R**

**raise [4]** 10/18 32/17
49/11 56/25
**raised [3]** 18/23 33/1
45/21
**ranking [1]** 42/22
**rea [4]** 13/3 30/25 31/8
52/11
**reach [2]** 19/19 48/9
**read [2]** 3/19 14/23
**really [1]** 47/16
**Realtime [1]** 2/19
**reason [5]** 9/8 13/3
50/9 53/6 54/23
**reasons [6]** 5/14 19/23
35/14 44/16 45/12 50/6
**rebuttal [1]** 48/23
**receipt [2]** 5/8 9/18
**receive [1]** 51/21
**received [16]** 4/23 5/8
6/10 7/2 8/15 9/17 9/23
10/1 10/7 22/13 22/23
38/12 40/21 40/22
40/22 53/21
**recite [2]** 44/19 47/6
**recognized [3]** 15/2
15/11 19/10
**record [6]** 23/18 29/9
37/21 38/21 46/2 63/3
**recorded [1]** 2/23
**records [7]** 6/1 14/15
19/15 37/19 44/17 45/6
49/5
**reference [2]** 13/17
14/6
**referenced [4]** 7/20
17/25 34/5 37/16
**references [2]** 12/14
13/20 29/2
**referral [2]** 25/5 25/16
46/16 46/17
**referred [1]** 40/6
**referring [1]** 11/23
**reflect [1]** 24/1
**refusal [2]** 14/1 45/7
**refusals [2]** 38/21
44/21
**refuse [4]** 13/1 14/14
14/14 19/8
**refused [2]** 32/1 43/2
**refute [1]** 45/18
**regard [1]** 21/14
**Registered [1]** 2/18
**relate [2]** 12/9 38/5
**relates [1]** 16/22
**relevant [13]** 9/9 12/14
12/25 13/22 13/4 18/3
22/2 30/17 30/24 31/19
36/25 51/13 53/16
**relied [3]** 13/1 18/21
56/11
**relying [4]** 17/22 39/21
39/22 41/22
**remain [2]** 15/6 45/15
**reply [3]** 44/20 47/21
48/22
**report [1]** 37/15
**Reporter [4]** 2/18 2/18
2/19 2/19
**reporting [1]** 26/23
**reports [1]** 44/19
**represent [2]** 36/20
39/5
**representation [1]**
30/2
**representations [1]**
11/6
**representative [1]** 47/2
**representatives [5]**
32/4 32/23 33/4 33/16
47/2
**represented [1]** 38/20
**representing [1]** 39/8
**request [20]** 4/17 4/22
4/25 5/3 5/9 5/13 6/9
6/11 6/11 6/14 6/15
6/16 6/18 7/5 7/14 8/15
8/17 8/18 8/23 9/5
**requested [1]** 6/23
**requesting [1]** 22/19
**requests [6]** 5/5 5/7
5/20 9/1 26/10 28/21
**required [1]** 54/10
**requires [2]** 17/1 50/12
**requisite [2]** 35/16
37/24
**respect [10]** 19/14
23/13 29/16 30/15
31/15 37/8 37/9 38/14
49/2 52/2
**Respectfully [1]** 28/7
**respects [3]** 38/11
44/21
**respond [5]** 14/1 18/8
33/3 42/10 56/3
**response [5]** 6/10 8/23
15/18 19/24 42/20
**responsive [1]** 6/23
**result [1]** 16/13
**resulted [1]** 23/6
**results [1]** 29/4
**retaliated [1]** 48/2
**review [1]** 47/7
**Ridge [1]** 2/11
**right [40]** 10/8 10/13
13/12 16/11 16/14 17/7
25/15 25/18 26/3 28/10
29/21 30/9 30/11 33/6
33/21 34/1 34/14 34/19
34/25 36/15 38/17
38/21 39/5 40/9 40/13
40/19 40/23 40/25 43/8
43/17 45/14 48/16
48/19 48/20 50/4 52/19
55/2 55/5 56/19 57/5
**rights [4]** 52/3 52/7
52/8 56/7
**rise [2]** 3/2 51/14
**RMR [2]** 63/2 63/8
**Road [1]** 2/15
**Rockville [1]** 2/12
**role [2]** 8/6 55/18
**roughly [1]** 43/23
**Rowley [12]** 2/6 3/10
11/3 11/4 20/6 20/8
21/20 29/13 30/11 35/1
35/14 38/1
**rule [13]** 16/21 16/23
17/1 17/4 22/18 24/23
28/23 31/12 37/24
42/16 43/9 51/20 56/21
**Rule 16 [9]** 16/21 16/23
17/4 22/18 31/12 31/12
37/24 42/16 43/9
**rules [2]** 29/7 32/24
**run [2]** 32/24 32/25

**S**

**said [16]** 8/16 12/18
13/15 15/12 17/4 19/9
19/10 23/10 28/5 28/8
31/25 32/10 38/1 42/15
47/20 55/21
**same [10]** 25/3 31/13
33/5 33/16 40/16 43/3
43/23 44/16 46/4 49/4
**say [29]** 12/10 13/1
13/5 13/24 14/13 15/10
16/9 17/2 19/1 22/5
23/15 23/15 23/18
27/22 28/1 31/3 33/12
35/13 35/23 36/1 36/3
36/8 38/9 39/14 48/4
48/21 48/24 49/17
49/19
**saying [3]** 11/20 36/17
48/1
**says [9]** 11/24 13/18
13/19 14/7 14/21 39/19
41/19 42/21 47/18
**Scavino [24]** 35/23
36/9 36/12 36/17 37/11
38/11 39/5 40/22 41/5
41/14 42/24 42/25 43/1
44/3 44/6 44/20 45/4
46/6 47/2 47/10 47/13
48/5 49/18 52/23
**Scavino's [2]** 36/14
38/17
**scheduling [1]** 28/12
**scholar [1]** 41/24
**Sealed [1]** 57/8
**search [1]** 29/2
**seated [1]** 3/4
**second [1]** 37/17
**see [5]** 23/19 24/12
24/14 55/25 56/1

USCA Case #21-3006    Document #2061025    Filed: 07/21/2024    Page 1 of 1

**S**

**seeking [4]** 16/24 18/16 34/13 51/14
**seeks [1]** 53/12
**seeming [1]** 4/4
**seems [4]** 15/20 32/21 33/17 51/6
**seen [1]** 50/22
**Select [28]** 4/5 4/8 4/13 4/22 4/24 5/1 7/12 7/18 8/10 9/19 9/20 10/4 10/10 10/15 10/20 25/7 26/6 28/4 30/3 34/9 34/14 35/25 36/10 38/14 42/4 47/5 54/3 54/13
**selection [1]** 46/14
**selective [10]** 16/25 17/6 17/20 18/13 35/8 35/18 37/25 43/6 44/25 46/21
**senior [8]** 12/19 13/10 13/13 14/3 14/8 15/5 15/8 27/9
**sense [1]** 16/21
**sent [3]** 10/21 11/19 22/18
**separate [1]** 39/4
**September [1]** 63/7
**seriously [1]** 56/14
**session [2]** 57/5 57/8
**set [3]** 28/25 39/16 45/2
**setting [1]** 44/24
**seven [1]** 22/16
**several [1]** 11/25
**share [4]** 6/17 8/25 19/12 44/13
**she [8]** 23/9 23/10 28/4 28/7 28/8 28/12 28/13 28/21
**she's [5]** 28/11 28/15 28/16 28/17 28/20
**shoes [1]** 53/24
**shortly [2]** 16/4 37/17
**should [6]** 32/2 36/15 38/9 48/23 53/20 54/1
**shouldn't [2]** 36/4 54/5
**show [14]** 12/2 29/5 43/12 43/12 43/18 44/21 45/19 46/9 46/13 46/14 49/8 49/10 50/13 55/16
**showed [2]** 43/1 50/14
**showing [8]** 17/9 17/10 35/16 37/24 43/19 50/13 50/19 53/3
**shown [3]** 38/5 44/15 50/20
**shows [1]** 46/2
**side [2]** 19/12 56/24
**sign [1]** 39/18
**silent [1]** 45/15
**similar [6]** 24/22 48/11 48/14 48/15 48/16 55/21
**similarly [10]** 6/8 38/9 38/10 40/24 42/21

**simple [3]** 49/8 50/12 55/15
**simpler [1]** 30/1
**simply [5]** 14/7 33/8 33/25 39/14 53/5
**single [1]** 8/15
**sir [4]** 3/15 39/6 39/10 52/18
**sitting [1]** 38/17
**situated [15]** 38/9 38/10 40/24 42/21 43/20 43/22 44/2 44/3 45/5 45/13 45/19 49/3 49/3 49/25 50/7
**situation [2]** 55/14 55/21
**situations [1]** 51/11
**slightly [1]** 18/22
**small [1]** 27/7
**so [56]** 3/17 3/23 3/25 4/3 4/4 4/6 5/9 7/11 7/16 8/8 8/22 10/24 15/17 19/10 19/25 20/5 20/23 21/18 24/23 25/9 25/19 26/3 27/15 28/1 28/16 28/23 33/7 33/7 34/12 35/7 36/8 38/8 39/1 39/15 41/10 41/21 43/3 43/5 43/14 43/18 44/1 44/5 44/11 45/3 45/17 45/23 46/9 47/9 47/11 50/14 50/24 53/18 54/5 54/8 56/21 56/24
**so it's [1]** 28/23
**Solicitor [1]** 15/14
**Solomon [1]** 11/17
**Solomon's [1]** 16/6
**some [39]** 3/21 3/24 4/14 4/18 5/2 9/2 10/25 12/18 13/10 14/4 14/5 14/22 16/3 17/10 19/5 20/14 21/24 22/7 22/16 23/4 24/12 26/1 26/10 34/4 35/16 35/16 39/19 42/24 43/12 46/19 47/8 47/9 49/5 49/14 51/6 51/13 53/8 53/9 53/11 56/2 56/5
**somebody [1]** 23/11 26/2 26/5
**Somebody's [1]** 36/4
**somehow [5]** 12/21 49/5 54/2 55/13 56/6
**someone [1]** 12/18
**something [5]** 17/20 18/12 23/24 25/25 36/17 42/19 48/21 56/20 56/23
**Sometimes [1]** 26/19
**somewhere [1]** 34/17
**soon [1]** 56/23
**sorry [7]** 5/9 21/13 22/17 22/22 30/19 44/8 49/16
**sort [3]** 21/1 33/10 46/19

**sought [2]** 5/23 54/14
**sound [1]** 26/16
**speak [2]** 14/2 17/19
**speaks [1]** 14/16
**species [1]** 17/2
**specific [5]** 5/5 26/19 27/22 43/14 47/17
**specifically [3]** 4/25 11/14 21/7
**specify [1]** 12/8
**speculation [6]** 17/12 26/9 46/20 46/20 52/25 56/5
**spoken [2]** 23/9 36/6
**spring [1]** 12/1
**stage [1]** 38/4
**Stan [1]** 55/21
**stand [3]** 7/16 29/9 45/3
**standard [4]** 17/1 17/4 17/5 46/15
**standards [1]** 17/8
**standing [1]** 36/16
**stands [1]** 13/21
**stanley [5]** 2/10 2/14 2/17 3/10 3/11
**stanleymbrand [1]** 2/13
**start [1]** 35/21
**starting [9]** 4/6 9/22 19/19 39/1 39/15 44/5 44/12 45/18 54/9
**state [4]** 31/5 31/7 40/18 40/19
**statement [5]** 28/8 37/15 37/17 37/18 40/7
**statements [7]** 35/24 36/10 37/3 37/13 47/1 47/3 47/4
**STATES [7]** 1/1 1/3 1/10 3/6 19/7 39/17 42/23
**Station [1]** 2/7
**stature [1]** 12/19
**statute [1]** 47/22
**stay [1]** 53/0
**stenography [1]** 2/23
**step [2]** 29/3 54/8
**still [2]** 27/13 31/3
**stop [1]** 52/15
**strand [2]** 33/13 33/14
**Street [1]** 1/15
**strive [1]** 56/22
**stuff [1]** 33/12
**Su [4]** 11/18 12/1 12/2 13/8
**subcommittee [14]** 22/13 22/21 22/24 23/6 23/6 23/9 23/12 30/14 30/15 30/18 30/20 30/23 31/14 40/5
**subject [9]** 4/5 10/15 12/20 14/3 17/3 18/7 21/2 26/19 43/9
**subject-matter [1]** 26/19
**submit [2]** 14/12 55/8
**submitted [1]** 3/20

**subpoena [12]** 5/14 22/12 22/13 27/16 30/25 32/19 38/14 40/5 40/13 44/20 54/12
**subpoenaed [4]** 42/23 49/9 50/13 55/16
**subpoenas [2]** 5/6 32/2
**substance [1]** 17/15
**such [8]** 4/8 7/13 7/22 18/10 20/10 21/8 23/16 28/15
**sudden [1]** 13/11
**suffice [1]** 35/13
**suggest [3]** 20/6 32/25 38/22
**suggested [4]** 18/8 18/25 36/11 49/4
**suggesting [3]** 28/13 33/19 33/23
**Suite [1]** 2/3
**summoned [2]** 54/11 54/12
**supplement [2]** 36/18 37/21
**supposedly [1]** 55/18
**Supreme [3]** 15/10 15/14 17/6
**Supreme Court [3]** 15/10 15/14 17/6
**sure [15]** 10/9 14/11 19/2 22/4 24/8 24/9 25/19 27/21 30/9 35/20 36/23 37/4 40/1 51/22 53/15
**surprised [1]** 26/8
**suspect [3]** 52/6 52/6 52/9

**T**

**table [1]** 38/18
**take [12]** 5/13 5/14 20/5 29/3 33/13 33/13 49/20 49/22 50/24 54/1 56/13 56/22
**taken [1]** 53/0
**taking [2]** 23/10 54/8
**talk [4]** 3/18 6/4 14/5 39/13
**talked [1]** 30/13
**talking [5]** 34/19 38/4 40/23 51/8 55/10
**team [13]** 4/13 6/9 7/25 8/3 8/9 9/7 21/10 27/8 28/17 29/11 30/8 57/3 57/5
**television [1]** 37/16
**tell [3]** 17/25 36/5 52/2
**telling [1]** 41/9
**tending [1]** 43/12
**tenure [1]** 15/3
**term [1]** 16/21
**terms [5]** 4/2 8/22 8/24 14/2 14/16
**testifies [1]** 26/4
**testify [1]** 53/25
**testimonial [3]** 14/17 12/2 19/6

**testimony [5]** 12/21 15/7 19/14 25/10 54/11
**than [19]** 6/14 7/5 7/7 7/9 9/12 10/6 12/25 14/12 20/6 20/7 20/20 37/19 38/21 40/20 44/3 45/5 45/7 47/25 48/2
**thank [12]** 14/25 35/2 35/4 42/8 42/11 52/19 55/4 55/7 56/18 56/19 57/6 57/7
**thank you [8]** 14/25 35/2 35/4 42/11 55/7 56/19 57/6 57/7
**Thanks [1]** 34/25
**that [361]**
**that's [33]** 5/11 5/16 8/17 10/15 12/5 14/21 16/10 17/8 19/9 20/5 21/21 22/4 24/2 25/1 26/15 26/19 29/7 32/3 32/20 34/11 34/20 38/20 40/7 40/19 40/21 43/15 43/24 45/2 48/16 48/19 49/10 50/1 51/20 51/20
**their [18]** 15/8 24/18 28/3 32/6 32/11 38/24 43/2 44/6 44/9 44/13 44/21 45/14 45/19 48/5 50/11 53/19 54/4 54/14
**them [10]** 9/6 14/4 18/18 38/13 41/9 43/1 43/4 46/3 46/11 50/14
**themselves [1]** 5/7
**then [15]** 6/4 7/11 8/15 10/4 15/10 15/12 15/14 15/17 16/3 17/3 29/8 32/3 37/16 37/17 56/1
**then-Solicitor [1]** 15/14
**theory [3]** 16/10 49/7 53/19
**there [75]**
**there's [19]** 15/12 19/8 24/9 26/19 27/12 31/18 33/12 33/22 39/16 39/17 39/18 45/20 47/9 48/11 50/25 51/2 53/5 55/17 55/25
**thereafter [1]** 37/17
**thereby [1]** 51/12
**therefore [1]** 17/18
**these [10]** 3/12 10/25 19/20 21/22 26/10 42/22 46/18 47/25 48/2 49/2
**they [43]** 4/8 5/3 8/8 10/16 11/1 18/17 18/18 21/24 23/14 25/15 25/17 26/15 29/23 30/7 31/22 32/4 32/5 32/6 32/24 32/25 33/5 33/17 36/6 36/12 40/24 41/9 44/2 44/9 44/12 44/12 44/13 44/15 45/9 45/19 46/9 46/13 47/12 48/10 48/14 48/15 49/8 50/10 54/1

USCA Case #24-3006    Document #2123123    Filed: 04/18/2025    Page 324 of 483

**T**

they're [9] 8/2 11/7
18/3 32/11 45/13 46/20
49/21 49/23 50/6
they've [2] 45/23 49/15
thing [5] 33/5 33/17
36/25 51/4 51/25
things [2] 31/19 49/23
think [46] 3/21 3/24 8/1
8/16 9/16 10/17 10/23
11/1 11/6 12/13 13/4
15/18 15/19 15/20
16/12 16/16 18/2 18/22
20/8 20/9 23/4 23/19
24/5 30/16 31/16 32/12
32/17 33/5 33/7 33/7
34/11 34/24 35/15
35/22 36/19 37/6 37/23
37/25 38/3 45/13 47/9
48/21 49/22 50/1 51/17
56/20
this [61] 3/6 3/17 8/7
9/16 9/17 11/24 12/14
15/11 16/20 17/2 17/10
17/22 17/23 18/24 19/1
19/3 19/25 20/10 21/1
21/2 22/2 22/6 22/22
22/18 23/3 23/18 23/18
23/22 23/23 23/24
24/22 26/21 26/21
27/15 29/3 29/9 29/11
29/20 31/17 31/20 32/5
32/7 32/12 33/22 33/23
38/3 38/18 39/4 47/18
48/9 48/10 49/4 49/7
50/12 53/18 55/13
55/14 55/15 55/22
56/10 56/21
This is [1] 3/6
those [22] 3/22 4/24
6/7 7/22 8/3 8/12 10/17
12/9 13/13 18/2 27/18
28/18 28/23 33/20
35/17 38/2 38/11 38/23
45/7 51/9 54/7 54/25
though [2] 34/6 37/6
thought [1] 53/10
thoughts [1] 24/12
three [4] 20/7 37/13
37/14 41/13
through [7] 10/25
36/13 37/7 38/24 41/15
51/9 51/24
throw [1] 33/12
tied [1] 41/10
time [4] 15/8 29/4
31/25 50/25
titled [1] 63/4
today [10] 7/16 18/4
20/20 33/25 42/15 45/3
46/12 47/7 48/4 56/20
told [3] 40/17 41/7 54/2
towards [2] 17/17
50/20
transcript [3] 1/9 2/23
63/3
transcription [1] 2/23
treatment [1] 43/20

trial [11] 16/11 16/15
23/23 23/24 23/25
23/25 24/5 24/23
24/9 25/11 25/25 51/11
54/10
true [1] 26/19
Trump [2] 27/12 30/23
Trump's [2] 11/20
22/15
truth [1] 55/19
try [2] 10/25 36/18
trying [4] 16/19 32/11
32/13 51/24
turn [1] 10/24
turned [10] 4/2 4/9
4/13 4/22 5/7 5/10 7/3
9/23 10/7 28/4
tweets [1] 36/14
Twitter [4] 36/13 47/8
47/10 47/13
two [16] 5/2 18/12 20/7
25/20 31/6 38/11 38/15
38/23 43/3 45/5 45/7
45/14 47/25 48/3 48/17
50/9
type [3] 7/7 17/15
17/18

**U**

U.S [1] 1/14
U.S. [1] 55/20
U.S. Attorney [1] 55/20
ultimately [2] 3/24 19/4
unaware [1] 18/18
under [4] 37/7 47/22
54/13 56/22
understand [6] 27/7
29/1 31/4 34/16 53/13
53/19
understanding [3]
39/23 40/3 40/16
Understood [1] 17/13
undue [6] 23/21 24/2
31/11 33/12 33/22
46/19
unfair [1] 42/1
unfortunately [1] 22/6
UNITED [7] 1/1 1/3
1/10 3/6 19/7 39/17
42/23
United States [3] 19/7
39/17 42/23
United States of [1]
3/6
unjustifiable [1] 46/15
unless [5] 12/6 13/22
19/20 22/2 42/5
unrelated [1] 18/13
unrepresented [1]
41/22
unsolicited [1] 11/19
until [1] 17/21
up [12] 3/25 14/22
24/12 24/17 30/24
33/12 43/1 49/10 50/13
50/14 50/24 55/16
upon [2] 49/14 54/13
us [8] 10/11 17/23
17/25 27/17 31/13

31/16 31/17 38/6
us.doj.gov [2] 1/17
1/18
usually [2] 26/15 26/16

**V**

valid [1] 54/20
variety [2] 22/19 49/23
various [2] 12/1
Vaughn [1] 1/13 3/8
verizon.net [1] 2/5
versus [2] 3/7 5/7
13/20 15/13
very [8] 21/22 31/23
33/16 50/17 52/14
55/15 55/21 56/14
view [11] 15/14 15/23
19/1 19/13 20/5 38/8
44/3 50/19 53/23 54/1
54/4
views [1] 32/6
vindictive [1] 17/3
violated [3] 52/3 52/7
56/6
violations [3] 51/23
52/1 55/11
Virginia [1] 2/8
vocal [3] 44/6 44/9
44/13 47/24 48/2 48/5
voices [1] 31/21
voluntarily [3] 5/1 5/17
10/11
vs [1] 1/5

**W**

waiting [1] 6/2
waived [2] 11/20 56/10
walks [1] 38/5
want [10] 27/19 32/4
32/5 32/6 33/11 35/11
39/24 45/1 45/4 48/22
wanted [4] 10/17 30/4
30/9 48/21
wants [1] 33/16
was [90]
Washington [6] 1/5
1/16 2/4 2/15 2/21
44/11
wasn't [3] 28/13 36/13
39/8
WATER [1] 2/2
way [6] 20/11 27/16
28/20 39/3 39/16 46/5
we [57] 4/19 5/5 9/22
10/1 10/2 10/6 10/12
11/16 11/16 12/23
13/11 14/24 15/2 15/4
16/5 17/21 18/17 19/19
19/23 22/2 22/18 22/23
23/13 24/19 25/19
26/11 26/23 27/9 27/17
27/19 29/1 29/3 29/4
29/9 31/21 31/23 31/24
31/24 32/3 33/1 33/2
33/25 33/25 34/6 35/10
39/3 39/12 41/2 47/7
47/8 51/22 52/14 53/15
53/15 54/9 56/15 56/25

we believe [1] 33/25
we would [2] 4/19
25/19
we'd [1] 53/12
we'll [1] 29/8
we're [5] 3/17 18/3
18/6 23/19 27/19 33/24
38/4 38/6 40/23 43/5
51/15 51/25 55/10
55/24 55/25
we've [7] 21/19 28/24
33/25 35/15 37/24 38/4
56/11
week [2] 11/16 17/22
weeks [2] 16/7 18/12
welcome [1] 3/15
well [37] 5/20 9/17
9/22 11/13 11/16 13/2
13/12 14/16 16/2 16/12
18/6 18/7 18/22 18/24
20/8 21/22 23/17 24/5
24/24 25/1 25/3 25/13
25/21 28/12 28/15 31/6
31/24 32/15 34/15
36/20 39/1 39/12 45/9
47/20 48/23 51/4 53/8
went [2] 6/19
were [45] 4/24 5/5 6/6
6/7 7/5 7/13 7/14 7/17
7/22 9/1 9/3 10/9 10/11
10/17 11/25 16/9 20/7
20/12 20/13 20/14
23/15 27/5 27/19 28/16
29/22 31/3 31/21 31/22
31/23 37/14 40/24 41/9
42/23 44/6 44/9 44/21
47/4 49/6 51/7 51/9
51/11 51/23 52/1 52/3
53/24
what [52] 4/4 4/16 7/19
13/19 13/24 14/21
15/17 16/21 16/19
16/19 17/11 17/21 18/8
19/3 20/6 20/24 21/6
22/8 23/16 23/22 24/8
24/24 24/24 25/1 25/4
25/22 26/11 26/15 27/5
27/18 27/22 29/7 29/24
31/3 35/22 38/1 40/22
42/20 43/6 43/24 47/25
50/3 51/13 51/15 51/17
51/17 52/2 52/6 52/6
52/12 54/20 55/25
what's [4] 4/2 7/21
15/25 40/19
whatever [1] 19/3
whatsoever [1] 8/7
when [16] 4/19 25/10
26/19 28/1 30/25 33/20
49/20 49/23 49/24
50/10 50/11 51/7 51/7
51/8 51/9 52/22
where [3] 32/4 51/11
55/10
whether [24] 7/17 7/22
14/3 16/14 17/16 19/5
21/8 21/24 22/25 23/9
23/19 25/24 26/3 26/6

28/2 32/18 33/21 38/7
40/21 40/23 41/23
45/25 49/2 52/1 52/1
which [27] 6/17 9/1
10/2 10/11 10/11 13/21
15/13 16/22 16/25 17/7
18/23 20/19 20/24
23/23 25/4 28/22 30/1
30/18 34/7 36/21 36/21
44/1 46/5 46/11 54/3
54/12 56/11
while [2] 18/6 39/8
white [39] 4/6 6/4 6/6
6/10 6/18 6/19 6/21 7/2
7/7 7/12 7/18 7/23 7/24
8/2 8/6 8/10 8/14 9/3
9/5 9/19 9/21 9/25
10/14 10/21 11/13
11/18 12/17 13/6 16/7
20/15 20/25 21/11
21/13 21/25 26/24 28/6
28/22 30/3 50/23
White House [33] 4/6
6/4 6/6 6/10 6/18 6/19
7/2 7/7 7/12 7/18 7/24
8/2 8/6 8/10 9/3 9/5
9/19 9/21 9/25 10/14
10/21 11/13 11/18
12/17 13/6 16/7 20/25
21/11 21/13 21/25
26/24 28/22 30/3
white-collar [1] 50/23
who [5] 11/19 29/20
31/25 32/1 58/17
whole [3] 26/17 49/7
51/24
wholly [3] 18/18 56/5
56/16
whom [3] 9/7 11/12
28/15
why [17] 10/24 20/5
23/22 25/5 25/9 25/19
27/3 28/23 32/24 38/8
39/8 43/3 45/25 52/11
53/15 54/5 56/9
wide [3] 27/2 29/2
49/23
wilfulness [2] 52/10
52/11
will [3] 22/12 29/2
51/17
willfully [1] 54/15
William [3] 2/18 63/2
63/8
willing [1] 29/3
wish [1] 14/21
withheld [1] 28/14
53/20
withhold [1] 6/22
within [2] 9/3 16/6
49/13
without [2] 13/6 33/3
witness [2] 8/8 54/11
WOODWARD [9] 2/11
2/14 2/14 3/11 14/25
24/12 24/15 39/4 39/4
word [1] 23/11
words [2] 17/8 49/17

-0314-

## W

**work [3]** 10/25 30/5
41/9
**would [24]** 4/19 5/6
7/13 7/22 15/21 20/11
24/16 24/19 24/24
25/19 27/3 27/13 28/22
30/5 34/4 36/25 38/22
46/14 50/18 51/19 55/8
55/14 55/22 56/24
**wouldn't [1]** 49/12
**writing [1]** 56/21
**written [3]** 26/5 32/16
46/25
**wrong [1]** 33/24
**wrote [1]** 44/10

## Y

**Yeah [3]** 33/7 37/5 40/1
**year [1]** 22/18
**years [9]** 12/18 13/10
14/5 16/3 19/4 19/11
20/7 41/22 53/23
**yes [15]** 4/10 7/4 14/20
15/24 18/11 27/25
28/20 30/7 38/25 39/6
39/10 40/8 40/14 47/11
50/11
**yesterday [3]** 27/1
31/24 32/3
**yet [3]** 13/11 35/10
50/21
**you [126]**
**you know [1]** 39/18
**you'd [5]** 18/7 26/7
42/10 51/2 55/6
**you'll [1]** 26/2
**you're [13]** 6/2 13/23
16/24 26/16 29/24
32/13 34/10 34/13
36/24 39/7 39/8 43/6
51/20
**you've [16]** 8/14 17/8
17/9 21/18 24/3 26/3
27/23 32/16 32/21
35/14 37/13 45/6 45/21
46/24 50/5 53/13
**your [87]**
**your Honor [66]**

## Z

**Zaremba [3]** 2/18 63/2
63/8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Criminal No. 1:22-cr-00200-APM** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

Unsurprisingly, the Government fails to meaningfully address the issue central to this action: what privileges and immunities does a former president have with respect to the official acts of his Administration? That question is central for this Court's determination of the efficacy of this prosecution because, assuming a former President does have *some* privilege, then Dr. Navarro cannot be prosecuted for refusing to waive any such privilege.

As Justice Kavanaugh recently emphasized, "[a] former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (statement of Kavanagh, J., respecting denial).

> If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of continuing confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends

*Id.* at 681. Of course, the existence of such a protection was recognized long ago by the Supreme Court. *See Nixon v. GSA*, 433 U.S. 425 (1977) ("We reject the argument that only an incumbent

1

-0316-

President may assert [the Presidential privilege of confidentiality] and hold that appellant, as former President, may also be heard to assert them."). Most recently, the United States District Court for the Southern District of Florida concluded that, "[t]hus, even if any assertion of executive privilege by [the former president] ultimately fails in this context, that possibility, even if likely, does not negate a former President's ability to raise the privilege as an initial matter." *Trump v. United States*, No. 22-81294-CIV, 2022 U.S. Dist. LEXIS 159738, at *24 (S.D. Fl. Sep. 5, 2022).

When the Select Committee subpoenaed Dr. Navarro seeking testimony and records from the time period for which he served as a senior presidential adviser, it necessarily implicated the former President's privilege. Rather than address this reality, the Government instead asserts that *Dr. Navarro* has failed to show that the former President "even attempted to [invoke the Privilege]." Gov't Opp. at 5 (Aug. 31, 2022) (ECF No. 44). Setting aside the question of what burden Dr. Navarro has to prove *anything* at this stage (and neither the indictment, nor any grand jury testimony suggest the former President chose not to assert any applicable privilege), the Government presupposes a process by which such privilege is properly invoke rather than directly addressing its implication in *this case.*

## I.  Dr. Navarro was entitled to Absolute Testimonial Immunity as a Former Senior Adviser to a Former President

The existence of an Executive Privilege is beyond dispute. Because "[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately," *United States v. Nixon*, 418 U.S. at 708, the privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch." *Mazars*, 140 S. Ct. at 2032. Thus, the Government has long held the clear position that a senior adviser to the President is absolutely

immune from congressional process. The Justice Department's Office of Legal Counsel (OLC) has explained:

> This *testimonial immunity is distinct from, and broader than, executive privilege*. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making. *See United States v. Nixon*, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process."). But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself.

*Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __ at p. 4 (May 20, 2019)(emphasis added). The purpose of testimonial immunity, OLC has explained, is threefold: (1) to avoid the "inherent and substantial risk of inadvertent or coerced disclosure of confidential information" in compelled congressional testimony; (2) to prevent "chill[ing] presidential advisers from providing unpopular advice or from fully examining an issue with the President or others;" and (3) because requiring senior aides to appear only to repeatedly assert executive privilege is unlikely "to promote any valid legislative interests." *Id*. at pp. 6-7.

The Justice Department has also consistently taken the position, as recently as 2019, that absolute immunity applies to *former* senior presidential advisers. Harriet Miers was a *former* White House Counsel when the House Judiciary Committee subpoenaed her to testify about the termination of several U.S. Attorneys. *Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (2007). Donald McGahn was also a *former* White House Counsel when the House Judiciary Committee subpoenaed him to testify about matters described in the Mueller Report. *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __ (May 20, 2019). Robert Porter was a *former* Assistant to the President and Staff Secretary, and Rick Dearborn was a *former* Assistant to the

President and Deputy Chief of Staff for Policy Implementation, when the House Judiciary Committee subpoenaed them to testify about matters described in the Mueller Report. *OLC Letters to Pat. A. Cipollone* (Sept. 16, 2019).

It clearly follows that the same "chilling" risk applies to the former advisers to *former* Presidents, where such a protection would be of little value if it evaporated when a president leaves office, leaving his confidential communications fair game for his successor and political rival and committees of Congress controlled by the opposing party. The OLC has acknowledged on at least one occasion that "testimonial immunity continues after the tenure of a particular Counsel to the President. . . . The privilege must outlast the tenure of a particular President because, absent a guarantee of lasting confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which the effective discharge of his duties depends." *Memorandum For Pat A. Cipollone Counsel To The President*, __ Op. OLC at 11 (May 20, 2019) (citing *Nixon v. Adm'r of Gen.Servs.*, 433 U.S. 425, 449 (1997); *United States v. Johnson*, 383 U.S. 169 (1966)).

Until its very recent tack into the political winds, the Justice Department wholeheartedly agreed that it was precluded from prosecuting a senior presidential aide under 2 U.S.C. §192:

> [W]hen the only alleged criminal conduct of the putative defendant consists of obedience to an assertion of executive privilege by the President from whom the defendant's governmental authority derives, the defendant is not really being prosecuted the conduct of his own. He is a defendant only because his prosecution is one way of bringing before the courts a dispute between the President and the Congress. *It is neither necessary nor fair to make him the pawn in a criminal prosecution in order to achieve judicial resolution of an interbranch dispute, at least where there is an alternative means for vindicating congressional investigative interests and forgetting the legal issues into court.*

*Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted Claim of Executive Privilege*, Op. OLC (May 30, 1984) (emphasis added). For the same reason, the Attorney General Michael Mukasey refused to prosecute former White House Counsel Harriett

Miers and former Chief of Staff Josh Bolten in 2008, stating that their noncompliance with House Judiciary subpoenas "did not constitute a crime". *Letter from Michael B. Mukasey to Speaker of the House of Representatives* (February 29, 2008).[1]/

Indeed, the Department maintained its position on testimonial immunity when the Judiciary Committee brought a *civil* enforcement action to enforce its subpoena to Ms. Miers. In the Government's Memorandum in Support of Ms. Miers's Motion to Dismiss that action, then Principal Deputy Associate Attorney General Carl J. Nichols argued that because Ms. Miers held "a constitutional immunity from compelled congressional testimony based on her position as the Counsel to the President; that immunity, without more, makes the Committee's subpoena unenforceable…," and that "[t]he President's interest in protecting the autonomy and confidentiality of his Office applies even though Ms. Miers no longer serves as his close adviser." Mot. Dismiss at 56, *Committee on the Judiciary v. Miers*, No. 1:08-cv-00409 (D.D.C. 2008) (ECF No. 17).

The Department's arguments in *Miers* were later (and recently) echoed its opposition to a similar civil enforcement action by the same Committee seeking to compel the testimony of former White House Counsel Don McGahn in 2019. In its Motion for Summary Judgment in that case, the Department stated that, as a senior advisor to the President, McGahn is "absolutely immune" from compelled congressional testimony about his official duties. Mot. Summ. J. at 47, *Committee on the Judiciary v McGahn*, No. 1:19-cv-02379 (FYP) (D.D.C. 2019) (ECF No. 32). The Government also argued that McGahn remained immune from compelled congressional testimony about his duties "even though he no longer serves as counsel to the President." *Id.* at 57.

---

[1]/   Available at https://1wh5e1460wvi1xmab2umuziv-wpengine.netdna-ssl.com/wp-content/uploads/2012/06/Mukasey-Letter-refusing-to-submit-congressional-contempt-to-grand-jury-2008.pdf.

While the issue of absolute testimonial immunity for former presidential aides in the context of a civil action remains unresolved by the D.C. Circuit,[2]/ the issue here is whether Dr. Navarro reasonably relied on the Government's own long-held position that he was immune from congressional process, and whether the Government was precluded from criminally prosecuting him for his refusal to comply with the Select Committee's subpoena. At the very least, the Government's novel posture in this case requires the Court to dismiss the indictment under the rule of lenity because he had no notice that the Government had changed its position with respect to former presidential advisers. *See Liparota v. United States*, 471 U.S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

## II. The Former President's Privilege Was Asserted as to the Select Committee.

Even were the Court to conclude, for the first time, that former Presidents do not imbue absolute testimonial immunity upon their senior advisers, it is beyond reasonable dispute that they have some privilege and the Select Committee's failure to parse the application of that privilege renders the Government's indictment fatally flawed.  Specifically, for the first time in this matter, the Government argues that Dr. Navarro has failed to sufficiently demonstrate that President Trump invoked executive privilege with respect to the Select Committee's subpoena. The Government points to the fact that President Trump issued a press release on November 20, 2021, clearly directing Dr. Navarro "to protect executive privilege and not let these unhinged Democrats

---

[2]/ Both of these civil actions were dismissed by the parties after the District Court rejected the Justice Department's argument that a President can demand that his aides ignore a subpoena that Congress issues on the basis of absolute testimonial immunity, but that issue was left undecide decided by the Court of Appeals after the parties resolved their dispute. *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008), *appeal dismissed by* 2009 U.S. App. LEXIS 29374; *Comm. On Judiciary v. McGahn*, 973 F.3d 121 (D.C. Cir. 2020) (concluding Congress lacks the ability to seek a declaratory judgment that a subpoena is valid and enforceable); *appeal dismissed by*, 2021 U.S.App. LEXIS 20759 (D.C. Cir. 2021).

discredit our great accomplishments." Although it is true that directive predates the Select Committee's subpoena, that remained President Trump's standing order to Dr. Navarro with respect to the Select Committee's subpoena irrespective of any instruction to the contrary by President Biden's White House Counsel's Office.

The Government cites *Cheney v. U.S. Dist. Ct. for Dist. Of Colum.*, 542 U.S. 367 (2004), and *United States v. Reynolds*, 345 U.S. 1 (1953), for the proposition that a President is required to make a formal invocation of executive privilege with respect to specific communications. Both of those cases involved private-party civil lawsuits against the Government and are utterly inapposite to this case. *Cheney* involved litigation against the Vice President and Government officials alleging violations of the Federal Advisory Committee Act related to a task force called the National Energy Policy Development Group, where the Supreme Court vacated and remanded the D.C. Circuit's dismissal of a writ of mandamus and attempted interlocutory appeal related to the District Court's discovery orders. *Reynolds* was a Tort Claims Act suit against the government after a B-29 airplane crashed, killing its crew and three civilians. Plaintiffs sought discovery of the Air Force's official accident investigation, which the government opposed because the aircraft was engaged in a highly secret mission. The Supreme Court ultimately agreed with the government's argument that its interest in the protection of military secrets outweighed civil litigants' "dubious showing of necessity". *Id*. at 26.

Although the ultimate holdings of neither case are remotely relevant to any of the issues presented here, the Supreme Court in *Cheney* distinguished and noted the limitations of *United States v. Nixon*, 418 U.S. 683 (1974), which required a particularized assertion of executive privilege in the context of a criminal case, where a Special Prosecutor issued a subpoena for the President's records to be used at trial against the President's indicted coconspirators – *i.e.*, where

the defendants' liberty interests needed to be weighed against the President's executive privilege.

*Id.* at 363. The Court in *Cheney* held in relevant part:

> … our precedent provides no support for the proposition that the Executive Branch "shall bear the burden" of invoking executive privilege with sufficient specificity and of making particularized objections. To be sure, *Nixon* held that the President cannot, through the assertion of a "broad [and] undifferentiated" need for confidentiality and the invocation of an "absolute, unqualified" executive privilege, withhold information in the face of subpoena orders. It did so, however, only after the party requesting the information--the special prosecutor--had satisfied his burden of showing the propriety of the requests… .  In these circumstances, Nixon does not require the Executive Branch to bear the onus of critiquing the unacceptable discovery requests line by line. Our precedents suggest just the opposite.

*Id*. at 388 (citations omitted).  While *Cheney* cites *Reynolds* for the proposition that "executive privilege is an extraordinary assertion of power 'not to be lightly invoked.'" *Id*. at 390 citing *Reynolds*, 345 U.S. at 7, that quote is immediately followed by the following statement:

> Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. *These "occasion[s] for constitutional confrontation between the two branches" should be avoided whenever possible.*

*Id*. at 389-390 quoting *United States v. Nixon* at 692 (emphasis added).

The Government appears to suggest, without elaborating, that there are formal requirements that must be followed by the President of the United States, former or incumbent, when invoking executive privilege and by presidential aides in asserting both executive privilege and absolute immunity from congressional process. It notes that other cases have involved complex OLC memoranda and analysis of whether a subpoenaed adviser rises to the level of a "senior presidential adviser." The Government refers to communications between the White House Counsel's Office and congressional committees. It quotes *Reynolds* as requiring that: "There must

be formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." Govt. Opp. at 7 (Aug. 31, 2022) (ECF No. 44). But *Reynolds*, a civil case involving the Department of Defense, should not be read to provide the standard that applies to the United States' President's assertion of his own privilege. Despite its efforts, the Government provides no authority for precluding the President himself from simply directing a senior adviser to "protect executive privilege," as was the case with Dr. Navarro; or that a President is prohibited from issuing that as a standing order that would remain in force unless and until rescinded with respect to subsequent congressional inquiries. That certainly is Dr. Navarro's understanding of the directive, which he communicated repeatedly to the Select Committee. The fact that Dr. Navarro, who was not represented at the time by counsel, repeatedly communicated that as he did, instead of through lengthy letters eloquently quoting OLC opinions and other legal authority, is of no moment.

To be sure, the Select Committee was not without recourse; To the extent that there was any question that former President Trump had directed Dr. Navarro to assert executive privilege and to invoke his absolute immunity as a former senior presidential adviser, all the Select Committee needed to do was ask and engage in the process of negotiation and accommodation, as Dr. Navarro repeatedly advised, and as the Supreme Court has repeatedly instructed. *See Cheney, Cheney*, 542 U.S. 367, at 390; *Trump v. Mazars*, LLP, 140 S. Ct. 2019, 2031 (2020) (". . . Congress and the Executive have nonetheless managed for over two centuries to resolve such disputes among themselves without the benefit of guidance from us. Such longstanding practice 'is a consideration of great weight' in cases concerning 'the allocation of power between [the] two elected branches of Government,' and it imposes on us a duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that [those] branches . . . themselves have reached.'" (internal quotations and citations omitted)).

Indeed, Dr. Navarro's assertion of executive privilege on behalf of President Trump did not occur in a vacuum. The Select Committee's February 9, 2022, subpoena directed Dr. Navarro to provide documents by February 23, 2022, and testimony on March 2, 2022. By that point, the Select Committee was certainly well accustomed to the assertion of privilege by Trump Administration officials. It subpoenaed Mark Meadows on September 23, 2021, and referred him to the Justice Department on December 13, 2021 (H. Rep. 117-216). It subpoenaed Dan Scavino on October 6, 2021. Former President Trump himself initiated litigation against the Select Committee on October 18, 2021. *See Trump v. Thompson*, 20 F. 4th 10, 33 (D.C. Cir. 2021)).

Instead of seeking to clarify Dr. Navarro's assertions, as though there was any ambiguity, and engaging in discussions with President Trump, the Select Committee, and now the Justice Department, apparently satisfied themselves with the assumption that an incumbent President can decline to assert any applicable privilege of a former President, as evidenced by the letter sent by Mr. Su of the White House Counsel's Office to Dr. Navarro. In so doing, the Legislative and Executive Branches have imposed upon the Judicial Branch – this Court – to determine the extent of a former president's privilege. At the very least, the Government's novel posture in this case requires the Court to dismiss the indictment under the rule of lenity because Dr. Navarro had no notice that the Government would require a special assertion of privilege by a former president and/or advocate for the novel position that an incumbent president can decide the extent and applicability of a former president's privilege. *Liparota*, 471 U.S. at 427.

* * *

Because it is beyond any reasonable dispute that former President's enjoy *some* privilege as to the official acts of their Administration, no prosecution for contempt of congress of a former adviser to *that* President can follow absent a resolution of the extent and scope of the privilege to the desired testimony and/or documents. To that end: "Historically, disputes over congressional

demands for presidential documents have not ended up in court. Instead, they have been hashed

out in the 'hurly-burly, the give-and-take of the political process between the legislative and the

executive.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2029 (2020). It is beyond dispute that

Dr. Navarro asserted President Trump's privilege – the application of which the Select Committee

admittedly refused to recognize. But that confluence of events, alone, ought not give rise to a

prosecution for criminal contempt and the potential deprivation of liberty. In reality, we now know

that Dr. Navarro faced a Hobson's choice: defy the former President's assertion of privilege,

*Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 213 n.34 (D.D.C. 2019) (A President's

identification of information that is subject to the executive privilege, "gives rise to a legal duty

on the part of the aide to invoke the privilege on the President's behalf . . . ."), or accept the loss

of his liberty.

### III.  Even Were Former President Trump's Privilege Not to Preclude Prosecution, the Indictment Nevertheless Violates Dr. Navarro's Due Process Rights and Must be Dismissed.

Even were the Court to conclude that former President Trump's privilege does not preclude

a prosecution of contempt of congress, the indictment nevertheless must be dismissed because it

violates Dr. Navarro's due process rights in so far as (a) the Select Committee failed to follow its

own rules such that the Government cannot state an offense for contempt of congress; (b) the

Government has selectively prosecuted Dr. Navarro; and/or (c) the Government abused the Grand

Jury process in seeking an indictment as against Dr. Navarro.

### A. Dr. Navarro Did Not Waive Objections to the Select Committee's Failure to Follow its Own Rules and Those of the U.S. House of Representatives Selective Prosecution

The Government argues that Dr. Navarro waived any objection based on the Select Committee's improper constitution – *i.e.*, that it lacks the requisite number of Members and has no Ranking Minority Member as required by its authorizing resolution – because he failed to raise those objections before the Select Committee in response to its subpoena. The Government misinterprets the law to stand for the proposition that a defendant can waive their substantive due process rights by asserting them for the first time in the only forum where their efficacy can actually be resolved – an Article III Court.

"By . . . making the federal judiciary the affirmative agency for enforcing the authority that underlies the congressional power to punish for contempt, Congress necessarily brings into play the specific provisions of the Constitution relating to the prosecution of offenses and those implied restrictions under which courts function." *Watkins v. United* States, 354 U.S. 178, 217 (1957) (Frankfurter, J., concurring). Of course, the judiciary is itself bound by the "restrictions" imposed upon it by, *inter alia*, the Due Process Clause of the Fifth Amendment to the Constitution and every defendant in a prosecution for criminal contempt of congress is entitled to, "the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense." *Watkins*, 354 U.S. at 187. *See also Russell v. United States*, 369 U.S. 749, 755 (1962) ("The obvious consequence, [in enacting 18 U.S.C. § 192], was to confer upon the federal courts the duty to accord a person prosecuted for this statutory offense every safeguard which the law accords in all other federal criminal cases."). Among the elements of any prosecution for contempt of congress include the authorization of the congressional committee to conduct the inquiry in question. *See Gojack v. United States*, 384 U.S. 702, 708 (1966) ("There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry

which was never properly authorized."). Here, Dr. Navarro has raised several challenges to the composition and functions of the Select Committee, all of which invalidate the Select Committee's authority, thus directly implicating his fundamental due process rights under the Constitution. The waiver of such rights is not a matter to be taken lightly. *Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.").

The Supreme Court's opinion in *United States v. Bryan*, 339 U.S. 323 (1950), is not inapposite although its holding should be questioned. There, the Supreme Court considered whether, in a prosecution for contempt of congress, a subpoenaed recipient could assert for the first time at trial the fact that the congressional committee in question lacked a quorum at the time the defendant refused to comply with the otherwise lawful subpoena. *Id.* at 326. The Court's opinion in *Bryan*, followed its opinion, a year earlier, in *Christoffel v. United States*, 338 U.S. 84 (1949), where the Court held that, an element of the offense of perjury includes proof that purported perjury occurred in the presence of a "competent tribunal," and that to be competent, a quorum of the committee in question was required to be present. *Id.* at 89-90. To hold otherwise, the Court concluded, would be to "den[y] [the defendant] a fundamental right[;] [t]hat right is that he be convicted of a crime only on proof of all the elements of the crime charged against him." *Id.* at 90. In *Bryan*, however, the Court concluded that the competency of the tribunal was not an element of the offense of contempt of congress and that, therefore, an objection to the committee's lack of a quorum had been waived when not lodged at the time for producing the documents in question. *Bryan*, 339 U.S. at 329-330.

It's difficult to reconcile the Court's holdings in *Christoffel* and *Bryan*, a fact noted by Justice Jackson in his concurrence: "I do not see how we can say that what was timely for

Christoffel is too late for Bryan. It is plain we are not following the Christoffel decision so I think we should candidly overrule it." *Bryan*, 339 U.S. at 344 (Jackson, J., concurring). The Court did not overrule *Christoffel*, however, and did not address the issue for another ten (10) years. In, *McPhaul v. United States*, 364 U.S. 372 (1960), the defendant did not argue until the case was before the Supreme Court, that the documents sought by an otherwise valid subpoena did not exist and that, therefore, the defendant could not be prosecuted for contempt of congress for failing to produce them. *Id.* at 378-79. Citing *Bryan*, however, the *McPhaul* Court concluded that once the Government established a *prima facie* case of willful failure to comply with the subpoena – by proving that the defendant had failed to produce any records in response to the subpoena – "[t]he burden shifted to the [defendant] to present some evidence to explain or justify his refusal." *Id.* at 379.

Contrary to the Government's suggestion, any so-called "*Bryan-McPhaul* rule" does not stand for the proposition that an objection to a congressional committee's subpoena or procedures is waived, "where the basis for the objection was apparent at the time of default." Govt. Opp. Mot. Compel at 4 (Aug. 15, 2022) (ECF No. 26) (citing *Liveright v. United States*, 347 F.2d 473, 475-76 (D.C. Cir. 1965)). Rather, the only way to reconcile *Christoffel* and *Bryan-McPhaul* is to recognize the distinction between the substantive due process guarantees afforded every defendant, *see Estelle v. Williams*, 425 U.S. 501, 503, (1976) ("The right to a fair trial is a fundamental liberty secured by the due process guarantee of the Fifth and Fourteenth Amendments."), with those objections that are waivable if not otherwise asserted. *See, e.g.*, *Ruhrgas Ag. v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . represents a restriction on judicial powers . . . as a matter of individual liberty. Therefore, a party may insist that the limitation be observed, or he may forego that right, effectively consenting to the court's exercise of adjudicatory authority." (internal quotations omitted)). Thus, where a congressional committee fails to adhere to its own

rules in such a manner that gives rise to a violation of substantive due process rights, because the federal courts tasked with overseeing any prosecution for contempt arising from any such failure must "safeguard" all due process guarantees, any waiver must be knowing and explicit. *See Brady*, 397 U.S. at 748 ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."). *See also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("It has been pointed out that courts indulge every reasonable presumption against waiver of fundamental constitutional rights and that we do not presume acquiescence in the loss of fundamental rights. A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." (internal quotations marks omitted). It is thus completely proper for a defendant to raise such an objection, even if for the first time, with the only body that can properly resolve such an objection, an Article III Court.

Indeed, three (3) years after *McPhaul*, the Court held in *Yellin v. United States*, 374 U.S. 109 (1963), that a conviction for contempt of congress must be reversed where the committee in question failed to, "adhere to its own rules." *Id.* at 123. *Without reference either to Bryan or McPhaul*, the Court concluded that it would prejudice the defendant to require him to have known, at the time of his alleged contempt, that the committee had failed to adhere to its own rules: "It was not until petitioner's trial, *when his attorney for the first time had an opportunity for searching examination*, that it became apparent the Committee was violating its rules." *Id.* at 123. (emphasis added). Thus, although the D.C. Circuit in *Liveright*, did reference, two years after *Yellin*, a so-called *Bryan-McPhaul* rule, it did so while holding that the rule was inapplicable where the committee in question had failed to comply with its authorizing resolution concerning the issuance of subpoenas because, "there is nothing in the record to suggest that, at the time of his appearance,

appellant was aware, or had any reason to be aware, of the improper issuance of his subpoena."

*Liveright*, 347 F.2d at 475-76.[3]/

   In summary, the Government would have the Court conclude that Dr. Navarro has waived any challenge to the congressional process and/or the validity congressional subpoena giving rise to this prosecution. Contrary to the Government's assertion, *Bryan*, does *not* stand for the proposition that a defendant can waive their substantive due process rights by asserting them for the first time in the only forum where their efficacy can actually be resolved – an Article III Court. To the extent *Bryan* remains the law following *Yellin*, at most the Court's decision stands for the proposition that non-procedural due process rights may be waived if not asserted at the time for appearance pursuant to the subpoena in question prior to any prosecution for contempt of congress.[4]/ Here, Dr. Navarro challenges the Select Committee's failure to follow its own rules as well as its pertinence – challenges that directly implicate his procedural due process rights and

---

[3]/ It's unclear precisely what the "record" revealed about Liveright's knowledge of the committee's compliance with its own rules. Of note, the prosecution of *Liveright*, like that of Dr. Navarro, involved multiple individuals who were referred and ultimately prosecuted for contempt of congress. At least one such defendant did raise the question of the committee's compliance with its own rules.

[4]/ The remaining cases cited directly, or indirectly, by the government are similarly inapposite. The footnote in *Yellin* cited by the government observed, "[a]lthough, *as a matter of due process*, a witness is entitled to an explanation of the pertinency of a question, if he asks for it, *it appears* he may lose that right if he fails to make a timely objection." 374 U.S. at 122 n.8 (emphasis added) (citing *Deutch v. United States*, 367 U.S. 456, 468-469 (1961); *Barenblatt v. United States*, 360 U.S. 109, 123-124 (1959); *Watkins v. United States*, 354 U.S. 178, 214-215 (1957)). In *Deutch*, the Supreme Court held that the government's failure to affirmatively establish the pertinency of the subjects under inquiry, irrespective of whether the defendant objected to the same, gave rise to a violation of the defendant's due process rights pursuant to *Watkins*. *Deutch*, 367 U.S. at 468-469 (*citing Wilkinson v. United States*, 365 U.S. 399, 407 (1961)). In *Barenblatt*, the Court, *in dicta*, questioned whether the defendant had properly lodged a pertinency objection but nevertheless concluded that the pertinency of the matter under inquiry had been sufficiently established so as to not infringe upon the defendant's due process rights. *Barenblatt*, 360 U.S. at 123-124. And in *Watkins*, of course, the Court concluded that to prevail in a prosecution for contempt of congress, it is necessary to establish the pertinence of an inquiry. *Watkins*, 354 U.S. at 214-215. The government's reliance on *Hutcheson v. United States*, 369 U.S. 599 (1962), is similarly distinguishable. There, the defendant, "with counsel at his side, unequivocally and repeatedly disclaimed any reliance on the Fifth Amendment privilege" – a right that he later claimed barred the inquiry at hand. *Id.* at 609-611. Here, the government does not point to any such unequivocal waiver. It does not, because it can not.

thus challenges that may be lodged with this Court and that may result in the dismissal of the indictment against him.

**B. The Court Must Require the House of Representatives to Adhere to its Own Rules**

The reason Dr. Navarro has not waived any objection is because the Select Committee's failure to adhere to its own rules necessarily violates his due process rights, *see Barenblatt v. United States*, 360 U.S. 109, 112 (1959) ("Congress, in common with all branches of Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action, more particularly in the context of this case the relevant limitations of the Bill of Rights."), for which no knowing or voluntary waiver was obtained. *See Brady*, 397 U.S. at 748.

For this reason, both the Government and the House General Counsel are incorrect in asserting that, Dr. Navarro's "attacks on the validity of the Select Committee's subpoena ignore the deference a court owes the House regarding the meaning and application of its own rules and procedures, and the presumption of regularity due Congress." Brief of *Amicus Curiae* at 3 (Sep. 9, 2022) (ECF No. 49-2).  To that end, the judicial scrutiny of "what rules the House has established and whether they have followed them," *Christoffel v. United States*, 338 U.S. 84, 88-89 (1949), including those rules conferring the lawful authorization of any inquiry, *Gojack v. United States*, 384 U.S. 702, 708 (1966) ("There is no basis for invoking criminal sanctions to punish a witness for refusal to cooperate in an inquiry which was never properly authorized."), is permissible where said rules are "sufficiently clear." *United States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C. Cir. 1995). See *Christoffel*, 338 at 88-89 ("The question is neither what rules Congress may establish for its own governance, nor whether presumptions of continuity may protect the validity of its legislative conduct. The question is rather what rules the House has established and whether they have followed them."). *See also Yellin v. United States*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to

require that the Committee be equally as meticulous in obeying its own rules."). However, "[w]here . . . a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that Rulemaking Clause reserves to each House alone." *Rostenkowski*, 59 F.3d at 1306-1307.

The House General Counsel turns this doctrine on its head and asserts, incorrectly, that, "a defendant may [not] identify [an ambiguous] rule, unrelated to the elements of the offense, and claim that it shields him from prosecution." Brief of *Amicus Curiae* at 13 (Sep. 6, 2022) (ECF No. 49-2). As the Supreme Court acknowledged in *Gojack*, when a rule relates to the lawful authorization for an inquiry, it "must be strictly observed." *Gojack*, 384 U.S. at 708.  Nor does the Government dispute that the authority to investigate is an element of the offense. *See* Opp. Mot. Dismiss at 21 (Aug. 31, 2022) (ECF No. 44). Nor can it reasonably be challenged that the validity of the subpoena is a necessary element of the offense.

At best, Dr. Navarro has identified two areas where the House rules are vague and/or ambiguous and thus not subject to interpretation. *Rostenkowski*, 59 F.3d at 1306.  The word "shall" in House Resolution 503 § 2(a) is not permissive; it does not mean "may." And House Resolution 503 similarly expressly refers to the need for consultation with, "the ranking minority member," a term that is undisputedly nowhere defined within the House rules.

Despite this ambiguity, both the Government and the House General Counsel suggest that the House may offer post-hac interpretation of its rules, whether "after a full review of its applicable rules," or otherwise, is of no bearing here. Were the standard otherwise, then future House General Counsels, for example after a change in control of the House from one political party to another, could submit briefs altering "the House's" interpretation of a given rule to suit the political whims of that Party. Indeed, what would prevent a Republican House from submitting

a subsequent brief of *amicus curiae* to a hypothetical Circuit Court reviewing a determination in this case that takes a contrary view from the House General Counsel now? It is precisely this potential conflict in interpretation that led to the D.C. Circuit in *Rostenkowski* to conclude that *only when* a rule is unambiguous – "sufficiently clear" – may the Court conclude that an otherwise valid prosecution for contempt of congress is permissible insofar as the House properly followed its own Rules in pursuing the contempt referral giving rise to the prosecution for contempt. *See Yellin v. United States*, 374 U.S. 109, 124 (1963) ("The Committee prepared the groundwork for prosecution in Yellin's case meticulously. It is not too exacting to require that the Committee be equally as meticulous in obeying its own rules.").

### C.  The Government Cannot Establish Pertinence

Dr. Navarro's challenge to the Government's ability to establish pertinence is not precluded by the fact that the Government believes pertinence may be established at trial.  To the contrary, the Government cannot establish the requisite pertinence because the Select Committee failed to establish any nexus as between the information sought from Dr. Navarro and the purported legitimate legislative purpose of its inquiry. *See Deutch v. United States*, 367 U.S. 456, 467-469 (1961) ("As our cases make clear, two quite different issues regarding pertinency may be involved in prosecution under 2 U.S.C. § 192.  One issue reflects the requirement of the Due Process Clause of the Fifth Amendment that the pertinency of the interrogation to the topic under the congressional committee's inquiry must be brought home to the witness at the time the questions are put to him. . . . . The other and different pertinency issue stems from the prosecution's duty at the trial to prove that the questions propounded by the congressional committee were in fact 'pertinent to the question under inquiry' by the committee. . . . These two basically different issues must not be blurred by treating them as a single question of 'pertinency'"). The Government submits that as pertinency is an element of the alleged offense, *see Russell*, 369 U.S. at 755, it can prove at trial

that subjects of inquiry propounded to Dr. Navarro sought information pertinent to Select Committee's purported legitimate legislative purpose.  to address whether the Select Committee properly put Dr. Navaro on notice of the nexus between the information it sought from him and the stated pertinency of its investigation.  This position, however, is irreconcilable with the Government's failure to produce any discovery – indisputably material – concerning what information the Select Committee sought from Dr. Navarro and its nexus to the stated pertinency of the Select Committee's investigation.  Indeed, for more than a century, the validity of an indictment has required a finding that the accused: "know the nature and cause of the accusation against him, and that a charge must be sufficiently definite to enable him to make his defense . . . and the elements of the offense must be set forth in the indictment with reasonable particularity of the time, place and circumstances." *Armour Packing Co. v. United States*, 209 U.S. 56, 83 (1908). Put more simply, it is not uncommon for congressional committees to seek information under the guise of a legitimate legislative purpose while failing to aver how the information sought has any nexus as to that legitimate legislative purpose.  And yet it is irrefutable that there are limitations on what information congress may seek as part of its legislative function.  *See Mazars*, 140 S. Ct. at 2031 ("Because [the power to issue subpoenas] is 'justified solely as an adjunct to the legislative process,' it is subject to several limitations." (*Watkins*, 354 U.S. at 187)).

### D.  The Government's Selective Prosecution of Dr. Navarro Requires Dismissal

The Government argues in its opposition that Dr. Navarro has failed to meet the high standard of demonstrating discriminatory effect and purpose necessary to dismiss the indictment on Due Process grounds due to selective prosecution and undue political influence. On this, we agree, which is precisely why Dr. Navarro has asked the Court to order the Government to provide additional discovery beyond the Government's narrow reading of the "prosecution team" in order to obtain the information that would be necessary to support such a claim.

As explained in his Motion to Compel Discovery and Reply to the Government's Opposition thereto, the Government's decision to indict Dr. Navarro, but not to indict Mark Meadows and Dan Scavino, is evidence of a discriminatory effect, where those individuals are not just similarly, but identically, situated. None of the three men complied with the Select Committee's demand for testimony. Mr. Meadows produced some documents to the Select Committee but asserted Executive Privilege over others, and Mr. Scavino produced none. The fact that their attorneys engaged in a letter-writing campaign with the Select Committee is not, in and of itself, sufficient to explain the disparate treatment Dr. Navarro faced. To that end, if something in their correspondence triggered some inability of the Department of Justice to charge either individual, it should not require much effort for the Government to establish as much.

The Government's  position is particularly tenuous given its position that the "willfully" *mens rea* requirement under 2 U.S.C. §192 means only that a defendant was aware of the fact that he failed to comply with a congressional subpoena and requires no evidence that he knew that he was violating the statute when he did so. The Government cannot have it both ways – either its refusal to indict Mr. Meadows and Mr. Scavino amounts to a discriminatory effect, or the statute requires a defendant's specific intent to violate the law.

Dr. Navarro likewise has articulated a basis to believe that the Government acted with discriminatory purpose, *i.e.*, that he was prosecuted on the impermissible basis that he vocally exercised his First Amendment rights in his criticism of the Select Committee, and he has asked the Court will provide him access to the information necessary to determine whether that is the case. Dr. Navarro has explained that he was far more outspoken than Mr. Meadows and Mr.

Scavino in his criticism of the Select Committee.[5]/ As additional circumstantial evidence of animus and discriminatory purpose, Dr. Navarro pointed to the circumstances of his arrest, President Biden's October 2021 call for the criminal prosecution of individuals who defy the Select Committee's subpoenas, the White House Counsel's Office's unsolicited letter to Dr. Navarro informing him of President Biden's decision not to invoke executive privilege, and other evidence of improper communications between the Select Committee, the White House, and Justice Department officials beyond the Government's narrowly defined "prosecution team." To dismiss those circumstances as "fantasy" (Opp. at p. 32), especially where the Government refuses to provide Dr. Navarro access to the information he seeks, strains credulity.

**E. The Grand Jury Could Not have been Properly Instructed.**

As with selective prosecution, Dr. Navarro has sought additional discovery in order to determine whether there were constitutional deficiencies with respect to the Government's presentation of evidence and instructions on the law to the Grand Jury that returned the indictment in this matter. As further evidence that might well be the case, the Government asserts that the "willfully" *mens rea* requirement of 2 U.S.C. §192 simply means that he was aware of the fact he was not complying, and that "[t]he Defendant's belief – even if held in good faith – that he could refuse to comply based on executive privilege or the Department's interpretation of it does not provide a defense." (Opp. at p. 35).

The Government's reliance on *Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961) (and, thus, the Court's Orders in *United States v. Bannon*, 21-CR-670 (CJN) (D.D.C. 2022)) is misplaced. To start, this case does not involve a defense of advice of counsel, as was the case in

---

[5]/ As promised in the hearing on Defendant's Motion to Compel Discovery on August 31, 2022, Dr. Navarro is filing a supplement to his Motion to Dismiss on the issue of the extent of his criticisms of the Select Committee compared to public statements by Mark Meadows and Dan Scavino.

*Licavoli* and *Bannon*, and neither of those cases involved an assertion of executive privilege or testimonial immunity with respect to a senior presidential adviser at the time of the events being investigated by the Select Committee. Unlike attorney-client privilege, where a witness has a choice whether to follow the advice of his lawyer, Dr. Navarro had no such choice in light of President Trump's instruction that he protect executive privilege – which is precisely why decades of OLC opinions confirm that a person in Dr. Navarro's situation cannot be criminally prosecuted. Indeed, we are unaware of a single reference to the 1961 *Licavoli* decision in any of the more than a dozen OLC opinions stretching back to 1982. That presumably is because *Licavoli* has nothing to do with executive privilege or testimonial immunity, and not simply because Theodore Olsen and his successors at OLC failed to notice the case.

If, as Dr. Navarro argues consistent with six decades of jurisprudence in this Circuit and elsewhere, the statute requires specific intent to violate the law, then it is the Government's burden under the circumstances to demonstrate to the Grand Jury and at trial that he did not reasonably rely on President Trump's exercise of executive privilege or the Justice Department's decades-old position that senior presidential advisers are absolutely immune from congressional process.

Even if those facts are, instead, defenses that Dr. Navarro would need to assert, the Grand Jury should have been advised of them and properly instructed as to the statute's *mens rea* element. Consistent with what appears to be a pattern of ignoring its own guidance, the Government seeks to avoid this issue altogether by arguing that it is not required to present exculpatory information to the Grand Jury. That is inconsistent with the Justice Manual's directive that "When a prosecutor conducting a Grant Jury inquiry is personally aware of substantial evidence that directly negates the guilt of the subject of the investigation, he or she must present or otherwise disclose such evidence to the Grand Jury before seeking an indictment against such a person." Justice Manual § 9-11.23. It also amounts to a situation where "the structural protections of the Grand Jury have

been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). If, in fact, the Government failed to advise the Grand Jury of Dr. Navarro's reasonable reliance on President Trump's assertion of executive privilege and the Justice Department's own legal positions, and it improperly instructed the Grand Jury on the element of *mens rea*, those are Due Process violations, where prejudice is presumed and that do not require the harmless error analysis, as suggested by the Government in its Opposition.

## CONCLUSION

Wherefore, for the reasons set forth above and in his Motion to Dismiss the Indictment, Dr. Navarro respectfully requests an Order dismissing the indictment with prejudice.

Dated: September 9, 2022                      Respectfully Submitted,

E&W LAW, LLC

_____*/s/ John S. Irving*_____
John S. Irving (D.C. Bar No. 460068)
1455 Pennsylvania Avenue, N.W., Suite 400
Washington, D.C. 20004
Telephone: (301) 807-5670
Email: john.irving@earthandwatergroup.com

SECIL LAW PLLC

_____*/s/ John P. Rowley, III*_____
John P. Rowley, III (D.C. Bar No. 392629)
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
Telephone: (202) 417-8652
Email: jrowley@secillaw.com

BRAND WOODWARD LAW, LP

_____*/s/ Stanley E. Woodward, Jr.*_____
Stan M. Brand (D.C. Bar No. 213082)
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
1808 Park Road NW

Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel to Dr. Peter K. Navarro*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| ) | **Criminal No. 1:23-cr-00200-APM** |
| **v.** ) | |
| ) | |
| **PETER K. NAVARRO,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## CERTIFICATE OF SERVICE

On September 9, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed and copies were provided to all registered parties via the CM/ECF system.

_____/s/ John S. Irving_____
John S. Irving (D.C. Bar No. 460068)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:22-cr-00200-APM** |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S SUPPLEMENT TO MOTION TO COMPEL DISCOVERY
## REGARDING POSSIBLE SELECTIVE PROSECUTION

Defendant Peter K. Navarro, by and through the undersigned counsel, hereby supplements his Motion to Compel Discovery regarding the possibility that the Government is engaging in selective prosecution by prosecuting him with criminal Contempt of Congress, in violation of Title 2 U.S.C. § 192.

### I. PROCEDURAL BACKGROUND

On August 31, 2022, this Court held a hearing on Defendant's Motion to Compel Discovery wherein it considered, among other things, Dr. Navarro's request that the Government provide discovery regarding his claim that it is selectively prosecuting him in retaliation for his public expression of constitutionally protected political beliefs. The Court considered the parties' argument and asked questions to counsel for the parties about whether the Government's disparate treatment may have been caused by improper discriminatory intent.

This case involves the disparate treatment by the Department of Justice of three similarly situated individuals (Mark Meadows, Dan Scavino and Dr. Navarro)[1]/whom the House of

---

[1]/ Actually, all three are *identically* situated according to the Government's view of the elements it must prove to establish a violation of 2 U.S.C. § 192. According to the Government, the offense is completed when a defendant "received a subpoena, ignored the subpoena's document demand, and refused to appear for testimony despite the admonition that he must." Govt. Opp. to Def. Mot. to Compel, at 1. Under that erroneous standard, Mark Meadows

Representatives referred to the Department for prosecution. Of the three, the Department is prosecuting only Dr. Navarro. Although the Government insists that it is acting properly and without discriminatory motive, it has never persuasively explained the disparity in its treatment of Dr. Navarro or the reasons for its publicly humiliating arrest of him, and its subsequent strip search and shackling for his initial court appearance. Defending this outrageous behavior, the Government claims – with straight faces, no less – that this is the way things are normally done when a 73-year-old person with no criminal record is arrested for two nonviolent misdemeanor violations.[2]/

Dr. Navarro knows that the Court is well aware of the sequence of events, but it bears repeating here. On December 13, 2021, the House of Representatives voted to refer former White House Chief of Staff Mark Meadows to the Department of Justice for prosecution based on his refusal to appear for deposition before the Select Committee and answer questions about the January 6th riot at the U.S. Capitol. Four months later, in April 2022, the House referred Dan Scavino and Dr. Navarro in the same report (and vote) for prosecution by the Department of Justice based on their refusal to comply with Select Committee subpoenas directing them to produce documents and appear for deposition.

The House made its criminal referrals for all three men for essentially the same reason: they had asserted executive privilege on behalf of President Donald J. Trump and refused to appear for deposition.[3]/ On June 2, 2022, a Grand Jury indicted Dr. Navarro for Contempt of Congress.

---

and Dan Scavino violated § 192 when they refused to appear for deposition by the Select Committee – just as Dr. Navarro did when he complied with the instructions he received from President Trump as one of his former senior advisors.

[2]/  Govt. Opp. to Def. Mot. to Compel, at 16 ("Contrary to the Defendant's claims … it is not law enforcement's normal practice to ask combative, unrepresented subjects to self-surrender.")

[3]/  Mr. Meadows produced documents to the Committee but declined to appear for deposition. Mr. Scavino, like Dr. Navarro, neither produced documents nor appeared for deposition. In referring Mr. Scavino and Mr. Navarro for

The next day, June 3, 2022, without explanation, the Department of Justice announced that would not prosecute either Mr. Meadows or Mr. Scavino.[4]/

The parties agree that a defendant who alleges he is being selectively prosecuted must show two things.[5]/ *First,* he must establish that the prosecutorial policy "had a discriminatory *effect*" on him. *Second,* he must show that the policy had "a discriminatory *purpose*." *United States v. Armstrong,* 517 U.S. 456, 465 (1996). This can be established by showing that the Government based its decision to prosecute on a defendant's "exercise of constitutional rights through participation in political activity." *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 21 (D.D.C .1999), *aff'd* 211 F. 3d 137 (D.C. Cir. 2000).[6]/

A defendant must present some evidence of selective prosecution, but he need not prove his case. *See United States v. Jones,* 159 F.3d 969, 978 (6th Cir. 1998) (concluding that the defendant had met his burden of presenting "some evidence tending to show the essential elements" of selective prosecution, even though he was unable to establish a prima facie case of discriminatory effect). Upon establishing a *prima facie* case of selective prosecution, the burden shifts to the Government to try to prove that the filing of charges did not arise from discriminatory motives. *Att'y Gen. v. Irish People, Inc.,* 684 F. 2d at 932 n. 11.

---

prosecution, Chairman Thompson said, "Both of these men have refused to comply with the Select Committee subpoenas in any way." *See* Def. Mot. To Compel, at 31, n. 22.

[4]/ To be clear, Dr. Navarro believes that no President advisor should be prosecuted for complying with the President's instructions to invoke executive privilege in response to a congressional subpoena.

[5]/ Excerpts of Transcript of August 31, 2022, hearing ("Trans.") at 43, attached as Exhibit A.

[6]/  A prosecutor may, of course, exercise discretion in making charging decisions. But that discretion is "subject to constitutional constraints" including those imposed by the equal protection component of the Due Process Clause. *United States v. Batchelder,* 442 U.S. 114, 125 (1979).

## II.  THE AUGUST 31, 2022, HEARING

During the August 31, 2022, hearing on Defendant's Motion to Compel Discovery, the

Court asked Government counsel about Dr. Navarro's assertion that the prosecution had a

discriminatory purpose and smacked of retaliation for his public statements about the Biden

Administration and the Select Committee. In response, the Government claimed that Mr. Meadows

and Mr. Scavino made *comparable* public criticisms of the Committee based on their political

beliefs.

COURT:      So to cut to the chase, which is how is Mr. Meadows differently situated, in
            the Government's view, and how is Mr. Scavino differently situated than
            Mr. Navarro?[7]/

MS. ALOI:   So just as a starting point, both Mr. Meadows and Mr. Scavino … were
            both vocal about their political beliefs, and Mr. Meadow's lawyer actually
            wrote an op-ed in *The Washington Post* about executive privilege. So the
            starting point here is that they are all -- they all share that; they are all
            vocal about their political beliefs.[8]/

                              *      *      *

COURT:      … But I'm asking you about the reasons that you think they're differently
            situated. Let's assume for a moment that their argument is right that the
            other two remain[ed] silent and it's only Mr. Navarro that has been
            outspoken.[9]/

                              *      *      *

COURT:      Are you aware of – I mean, you've mentioned the op-ed that was written
            by Mr. Meadow's counsel. Are you aware of any other statements, either
            by Mr. Meadows, his representative, or Mr. Scavino and his
            representatives?[10]/

MS. ALOI:   Am I aware of any other statements?

---

[7]/  Trans. at 44.

[8]/  *Id.*

[9]/  Trans. at 45.

[10]/  Trans. at 46-47.

COURT:      Public statements that were made about the Select Committee?

MS. ALOI:   I cannot recite any particular ones today. But we did do a review, and
            as noted in our brief, we had identified some on Twitter.[11]

COURT:      So you think there's some on Twitter from Mr. Scavino directly?

MS. ALOI:   Yes, I believe so.[12]

                              *       *       *

MS. ALOI:   And today I'm just prepared to say that Mr. Meadows and Mr. Scavino have
            also been vocal about the political beliefs.[13]

Counsel for Dr. Navarro has conducted a further review of public statements by Mr.
Meadows and Mr. Scavino that were critical of the Select Committee. *The Washington Post* op-ed
was the only specific "statement" the Government could attribute to Mr. Meadows. However, it
was written, not by him, but by former Deputy Attorney General George Terwilliger. In any event,
it was a scholarly criticism of the Biden Administration for being "the first in history not to resist
a Congressional subpoena for testimony from a senior White House aide"[14] -- and not comparable
to Dr. Navarro's expressions of political frustration with the Committee and the Biden
Administration.

Other than that, the only public criticisms the Government was able to identify, either
during the hearing or in its brief by Mr. Meadows and Mr. Scavino, were postings they allegedly
made on Twitter. However, the Government failed to identify any specific Twitter references
whether at the hearing or in its opposition. *See* Govt. Opp. to Def. Mot. to Compel, at 13, n. 4.

---

[11]  Trans. at 47

[12]  *Id.*

[13]  Trans. at 48

[14]  Mr. Terwilliger's *Washington Post* op-ed is attached as <u>Exhibit B</u>.

Counsel for Dr. Navarro has reviewed the Twitter account references and found only two posts by Mr. Meadows, the main one of which announced on December 10, 2021, the lawsuit his counsel had filed against the Select Committee and its members.[15] We found *no* Twitter postings whatsoever by Mr. Scavino or his representatives.

Any attempt by the Government to negate Dr. Navarro's showing of discriminatory purpose by comparing his public expressions of political beliefs to those of Mr. Meadows and Mr. Scavino cannot withstand even minimal scrutiny.

### III.   EXAMPLES OF DR. NAVARRO'S PUBLIC CRITICISM OF THE BIDEN ADMINISTRATION AND THE SELECT COMMITTEE

For purposes of comparison, the following is a partial and noncomprehensive list of the public statements[16] that Dr. Navarro has made in criticism of the Biden Administration and the Select Committee during the time before the Department of Justice obtained an indictment against him on June 2, 2022, for Contempt of Congress:

---

**Date:** June 1, 2022
**Media Source:** *The Washington Times (Op-ed)*
**Link:**https://www.washingtontimes.com/news/2022/jun/1/jan-6-committee-is-a-kangaroo-committee/

Op-ed in *The Washington Times* published the day before Dr. Navarro was indicted.

*Dr. Navarro:* "…Mrs. Pelosi's kangaroos are clearly seeking to punish Mr. Trump and his most senior advisers by subjecting us to the shame, humiliation, ostracization, banishment and possible imprisonment that comes with false accusations of being insurrectionists seeking to overturn a fair election."

---

[15] *See* https://twitter.com/newsmax/status/1469304739548569604?s=20&t=SIJblLlaG_OY_ybGiBkwog.

[16] The Select Committee report that referred Dr. Navarro to the Department for prosecution refers to several of his additional public criticisms of the Committee. *See* Def. Mot. To Compel, at 34. .

**Date:** May 31, 2022
**Media Source:** *The Hill (Statement)*
**Link:**https://thehill.com/policy/national-security/3507152-navarro-formally-sues-jan-6-committee-doj/

Article in *The Hill* about the *pro se* lawsuit Dr. Navarro filed against the Select Committee.

*Dr. Navarro:* "It is 99 percent aimed at the kangaroo committee that [House Speaker Nancy] Pelosi [D-Calif.] formed."

---

**Date:** May 30, 2022
**Media Source:** *USA Today (Statement)*
**Link:**https://www.usatoday.com/story/news/politics/2022/05/31/house-jan-6-subpoena-navarro/9985924002/

Article in *USA Today* discussing the lawsuit that Dr. Navarro planned to file against the Select Committee.

*Dr. Navarro:* "This case ultimately is about whether partisans in Congress are free to weaponize their investigatory powers – I think not – as well as the critical role that executive privilege and testimonial immunity play in ensuring effective presidential decision-making."

---

**Date:** March 28, 2022
**Media Source:** *The Washington Times (Statement)*
**Link:**https://www.washingtontimes.com/news/2022/mar/28/peter-navarro-ex-trump-aide-decries-jan-6-panels-w/

Article in *The Washington Times* in which Dr. Navarro slammed the House Jan. 6 committee for pursuing what he called a "witch hunt" against him and other Trump-connected officials ahead of their vote to hold him in contempt. He said that the Democratic-led panel is acting like a "partisan appeals court" for President Biden …."

---

**Date:** March 28, 2022
**Media Source:** *The Washington Times (Op-ed)*
**Link:**https://www.washingtontimes.com/news/2022/mar/8/capitol-hills-dangerous-kangaroo-court/

Op-ed in *The Washington Times:* "Capitol Hill's Dangerous Kangaroo Court"

*Dr. Navarro:* "The U.S. House Select Committee … should get to the bottom of why the attack occurred, who may have instigated that attack (including possible ANTIFA anarchists, FBI informants and left-wing agitators), and why the Capitol Hill Police and National Guard failed to protect the Capitol perimeter despite ample warnings from the White House and intelligence community. Instead, this rabidly partisan committee has weaponized its subpoena powers and is pursuing a mission that, with no small irony, severely threatens the election integrity of the 2024 presidential race."

---

**Date:** December 11, 2021
**Media Source:** *Steve Bannon's War Room*
**Link:** https://rumble.com/vql6l9-the-fishing-expedition-to-wrap-blame-around-trumps-neck.html

*War Room* Podcast: *"The Fishing Expedition to Wrap Around Trump's Neck"*

---

**Date:** November 27, 2021
**Media Source:** *Steve Bannon's War Room*
**Link:** https://rumble.com/vpvqvf-navarro-pelosi-committed-treason.html

*War Room* Podcast: *"Pelosi Committed Treason"*

---

**Date:** November 15, 2021 (Pt. 2)
**Media Source:** *Steve Bannon's War Room*
**Link:** https://rumble.com/vp8x8t-the-true-mission-of-january-6.htm

*War Room* Podcast: *"The True Mission of January 6"*

---

**Date:** November 15, 2021 (Pt. 1)
**Media Source:** *Steve Bannon's War Room*
**Link:** https://rumble.com/vp8x3t-congress-doesnt-legislate-they-investigate.html

*War Room* Podcast: *"Congress Doesn't Legislate, They Investigate"*

---

**Date:** July 23, 2021
**Media Source:** *Steve Bannon's War Room*
**Link:** https://rumble.com/vk8rvg-dc-is-being-turned-into-guantanamo-bay.html

*War Room* Podcast: *"DC Is Being Turned Into Guantanamo Bay"*

**Date:** July 1, 2021
**Media Source:** *Steve Bannon's War Room*
**Link:** https://rumble.com/vjb88v-subpoenas-are-coming-from-election-investigation.html

*War Room* Podcast: *"Subpoenas Are Coming From Election Investigation"*

## CONCLUSION

Dr. Navarro submits that he has satisfied the showing required by *United States v. Armstrong* to obtain discovery from the Government in support of his claim of selective prosecution. He has established the Government afforded disparate treatment to persons similarly situated and circumstantially shown by "some evidence" (*Armstrong,* at 469), that this prosecution is in retaliation for his public expression of political views about the Biden Administration and the Select Committee. Although the Government has asserted that Mr. Meadows and Mr. Scavino also were both "vocal about the political beliefs", it has failed to identify any comparable evidence supporting that position. Dr. Navarro respectfully submits that he is entitled to discover whether he is being prosecuted in violation of the equal protection component of the Due Process Clause. He requests that this Court order the Government to assemble from its files documents which might corroborate or refute that possibility.

Dated: September 9, 2022                    Respectfully Submitted,

                                            E&W LAW, LLC

                                                    */s/ John S. Irving*
                                            John S. Irving (D.C. Bar No. 460068)
                                            1455 Pennsylvania Avenue, N.W., Suite 400
                                            Washington, D.C. 20004
                                            Telephone: (301) 807-5670
                                            Email: john.irving@earthandwatergroup.com

SECIL LAW PLLC


_____ /s/ John P. Rowley, III _____
John P. Rowley, III  (D.C. Bar No. 392629)
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
Telephone: (202) 417-8652
Email: jrowley@secillaw.com


BRAND WOODWARD LAW, LP


_____ /s/ Stanley E. Woodward, Jr. _____
Stan M. Brand (D.C. Bar No. 213082)
Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
1808 Park Road NW
Washington, DC  20010
202-996-7447 (telephone)
202-996-0113 (facsimile)
Stanley@BrandWoodwardLaw.com

*Counsel to Dr. Peter K. Navarro*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | **Criminal No. 1:23-cr-00200-APM** |
| **v.** | ) | |
| | ) | |
| **PETER K. NAVARRO,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>CERTIFICATE OF SERVICE</u>

On September 9, 2022, the undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed and copies were provided to all registered parties via the CM/ECF system.

_____*/s/ John S. Irving*_____
John S. Irving (D.C. Bar No. 460068)

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
                                    )      CR No. 22-200
                                    )      Washington, D.C.
            vs.                     )      August 31, 2022
                                    )      2:07 p.m.
PETER K. NAVARRO,                   )
                                    )
            Defendant.              )
                                    )

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE AMIT P. MEHTA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          Amanda Vaughn
                             Elizabeth Ann Aloi
                             Molly Gaston
                             U.S. ATTORNEY'S OFFICE
                             DISTRICT OF COLUMBIA
                             555 4th Street, NW
                             Washington, D.C. 20003
                             (202) 252-7212
                             Email:
                             elizabeth.aloi@usdoj.gov
                             Email: molly.gaston@usdoj.gov

2

APPEARANCES CONTINUED:

For the Defendant:          John S. Irving, IV
                            EARTH & WATER LAW LLC
                            1455 Pennsylvania Avenue, NW
                            Suite 400
                            Washington, D.C. 20004
                            (301) 807-5670
                            Email: jirving1@verizon.net

                            John P. Rowley, III
                            JPROWLEY LAW PLLC
                            8639 Chase Glen Circle
                            Fairfax Station,
                            Virginia 22039
                            (703) 402-8800
                            Email:
                            john.rowley@jprowleylaw.com

                            Stanley McKennett Brand
                            BRAND WOODWARD LAW
                            3 Pebble Ridge Court
                            Rockville, MD 20854
                            (202) 258-6597
                            Email: stanleymbrand@gmail.com

                            Stanley Edmund Woodward, Jr.
                            BRAND WOODWARD LAW
                            1808 Park Road NW
                            Washington, D.C. 20010
                            (202) 996-7447
                            Email:
                            stanley@brandwoodwardlaw.com

Court Reporter:             William P. Zaremba
                            Registered Merit Reporter
                            Certified Realtime Reporter
                            Official Court Reporter
                            E. Barrett Prettyman CH
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

Case 1:22-cr-00200-APM   Document 53-1   Filed 09/09/22   Page 3 of 9
USCA Case #24-3006    Document #2064276       Filed: 07/12/2024    Page 364 of 481

3

| 1  | PROCEEDINGS |
|----|-------------|

2          COURTROOM DEPUTY: All rise. The Honorable

3    Amit P. Mehta presiding.

4          THE COURT: Please be seated.

5          COURTROOM DEPUTY: Good morning, Your Honor.

6    This is criminal case No. 22-200, United States of America

7    versus Peter K. Navarro.

8          Amanda Vaughn, Elizabeth Aloi, and Molly Gaston

9    for the government.

10          John Irving, John Rowley, Stanley Brand, and

11   Stanley Woodward for the defense.

12          The defendant is appearing in person for these

13   proceedings.

14          THE COURT: Okay, Counsel. Good afternoon.

15          Mr. Navarro, welcome. Good afternoon to you, sir.

16          THE DEFENDANT: Good afternoon to you.

17          THE COURT: Okay. So we're here this afternoon to

18   talk about Mr. Navarro's motion to compel discovery. The

19   parties have exchanged briefs and I've obviously read

20   everything the parties have submitted.

21          I think I'd like to begin with just some

22   questions, and primarily direct those questions to

23   government counsel, just so I can get the factual framework

24   that I think may ultimately inform some of the legal issues

25   that have come up. So if I could just have government

43

```
 1   Mr. Scavino and Mr. Meadows, neither of them showed up for
 2   their depositions, they just blanketly refused just like
 3   I did.  So why isn't he in the exact same boat as the two of
 4   them?
 5             MS. ALOI:  So, Your Honor, we're here on a motion
 6   to compel and what you're describing is a selective
 7   prosecution argument.
 8             THE COURT:  Right.
 9             MS. ALOI:  It is not subject to Rule 16.
10             THE COURT:  Agreed.
11             MS. ALOI:  To obtain discovery, the defendant must
12   show some evidence tending to show the existence of the
13   essential elements of that claim.
14             And so here, the elements of that specific claim
15   include discriminatory effect and intent, and that's
16   Armstrong, as you previously noted.
17             THE COURT:  Right.
18             MS. ALOI:  So to show discriminatory effect, the
19   defendant must make a credible showing of different
20   treatment of similarly situated persons.
21             And the defendant also must be in a protected
22   class and the similarly situated offenders must be outside
23   that protected class and committing roughly the same crime.
24   And as was discussed, that's actually just not what happened
25   on the facts here.
```

-0356-

Case 1:22-cr-00200-APM   Document 53-1   Filed 09/09/22   Page 5 of 9
USCA Case #24-3006   Document #2064276      Filed: 07/12/2024   Page 366 of 481

44

1    THE COURT:  So to cut to the chase, which is how

2  is Mr. Meadows differently situated, in the government's

3  view, and how is Mr. Scavino differently situated than

4  Mr. Navarro?

5    MS. ALOI:  So just as starting point, both

6  Mr. Meadows and Mr. Scavino had -- were vocal about their

7  political beliefs.  Mr. Meadows' lawyer --

8    THE COURT:  I'm sorry, I didn't hear you.

9    MS. ALOI:  They were both vocal about their

10  political briefs, and Mr. Meadows' lawyer actually wrote an

11  op-ed in *The Washington Post* about executive privilege.  So

12  the starting point here is that they are all -- they all

13  share that; they all are vocal about their political

14  beliefs.

15    But the defendant has not shown that they

16  committed the same crime for a couple of reasons.

17  Mr. Meadows produced records to the Committee, the defendant

18  did not.

19    And the House reports that recite the failure of

20  both Mr. Meadows and Mr. Scavino to reply to the subpoena in

21  other respects show that their refusals were quite

22  different; there was a level of engagement that did not

23  occur here.

24    But setting that aside, in order to obtain

25  discovery on a selective prosecution --

Case 1:22-cr-00200-APM  Document 53-1  Filed 09/09/22  Page 6 of 9
USCA Case #24-3006    Document #2064276      Filed: 07/12/2024    Page 367 of 481

45

 1           THE COURT:  Before you keep going, I don't want to
 2     set that aside, because that's important.
 3           So is that -- I mean, as you stand here today and
 4     you want me to conclude that Mr. Meadows and Mr. Scavino are
 5     differently situated than Mr. Navarro, and the two grounds
 6     you've identified is that Mr. Meadows produced records and
 7     that the refusal was different for those two gentlemen than
 8     it was for Mr. Navarro.  Is there anything else?
 9           MS. ALOI:  Well, they also must be outside the
10     protected class.  And here --
11           THE COURT:  No, no, I get that point.
12           But I'm asking you about the reasons that you
13     think they're differently situated.  Let's assume for a
14     moment that their argument is right that the other two
15     remain silent and it's only Mr. Navarro that has been
16     outspoken.
17           MS. ALOI:  So, Your Honor, first, just as a
18     starting point, the government doesn't have to refute that,
19     it's their burden to show that they are similarly situated
20     and that there's one outside the protective class --
21           THE COURT:  I know, but you've raised issues in
22     your opposition.
23           MS. ALOI:  -- so they've not met that burden.
24           You know, the government is not going to opine on
25     the internal deliberation over whether and why to bring a

46

1    criminal prosecution.

2            But here the public record shows that there was a

3    different level of engagement despite them both being in the

4    same protected class with the Committee, and, as you have

5    noted, there was a different way in which Mr. Meadows,

6    Mr. Navarro, Mr. Scavino, claimed that executive privilege

7    was invoked.

8            THE COURT:  Okay.

9            MS. ALOI:  So they also have to show

10   discriminatory impact, and that is important because it is

11   necessary for them to obtain additional discovery, which is

12   the matter before the Court here today.

13           And to do that, they have to show that --

14   Mr. Navarro would have to show that his selection was based

15   on an unjustifiable standard.  And the only evidence he

16   offered to that effect is the committee referral, and the

17   committee referral cannot itself provide evidence of the

18   prosecutor's intent.  These other allegations that there

19   must have been some sort of undue political influence are

20   just speculation, they're not evidence, and speculation is

21   insufficient to obtain discovery on a selective prosecution

22   claim.

23           THE COURT:  Okay.

24           Are you aware of -- I mean, you've mentioned the

25   op-ed that was written by Mr. Meadows' counsel.  Are you

-0359-

Case 1:22-cr-00200-APM  Document 53-1  Filed 09/09/22  Page 8 of 9
USCA Case #24-3006    Document #2064276      Filed: 07/12/2024    Page 369 of 481

47

1   aware of any other statements, either by Mr. Meadows, his

2   representative, or Mr. Scavino and his representatives?

3              MS. ALOI:  Am I aware of any other statements?

4              THE COURT:  Public statements that were made about

5   the Select Committee?

6              MS. ALOI:  I cannot recite any particular ones

7   today.  But we did do a review, and as noted in our brief,

8   we had identified some on Twitter.

9              THE COURT:  Okay.  So you think there's some on

10  Twitter from Mr. Scavino directly?

11             MS. ALOI:  Yes, I believe so.

12             You know, they may not be --

13             THE COURT:  I don't follow Mr. Scavino on Twitter

14  or anyone, for that matter.

15             MS. ALOI:  Your Honor, part of the challenge of

16  answering that question is that the defendant really hasn't

17  identified a specific political belief that he claims puts

18  him in this protected class.  He says generally that he

19  is --

20             THE COURT:  Well, he hasn't said it's -- I guess

21  in his reply, he's mentioned or alluded to political beliefs

22  under the D.C. statute.

23             But at least in his primary brief, in his opening

24  brief, it was that, I have been a more vocal critic of the

25  Committee than these other two gentlemen.  That is what he

Case 1:22-cr-00200-APM   Document 53-1   Filed 09/09/22   Page 9 of 9
USCA Case #24-3006   Document #2064276      Filed: 07/12/2024   Page 370 of 481

48

1   claims is the difference. And essentially he's saying, I've

2   been retaliated against for being more vocal than these

3   other two former officials.

4        MS. ALOI: And today I'm just prepared to say that

5   Mr. Meadows and Mr. Scavino have also been vocal about their

6   political beliefs.

7        THE COURT: Okay.

8        MS. ALOI: But in any event, you don't have to

9   reach this issue to find that he is not entitled to

10  additional discovery on this claim, because they didn't

11  commit similar crimes and there's no evidence of

12  discriminatory impact.

13       THE COURT: Okay.

14       I mean, it's not that they committed similar

15  crimes, it's that they engaged in similar conduct.

16       MS. ALOI: Similar conduct, that's right.

17       THE COURT: One was prosecuted and the other two

18  have not been. Okay.

19       MS. ALOI: That's right.

20       THE COURT: All right.

21       Mr. Irving, I think you wanted to say something

22  more about grand jury. And if you want to reply, I'll give

23  you an opportunity to be heard as well, or rebuttal I should

24  say.

25       MR. IRVING: Your Honor, if I may just address a

## The Washington Post

*Democracy Dies in Darkness*

# Opinion   In abandoning executive privilege, Biden rejects 200 years of history

By George J. Terwilliger III

November 13, 2021 at 3:30 p.m. EST

*George J. Terwilliger III is a partner at McGuireWoods LLP in Washington and previously served as deputy attorney general.*

As counsel for former White House chief of staff Mark Meadows, I was surprised and disappointed to receive a letter Thursday informing me that the Biden administration will be the first in history not to resist a congressional subpoena for testimony from a senior White House aide.

That move follows weeks of fruitless negotiation with the House Select committee on Jan. 6 in which we sought a compromise to satisfy the committee's demands for information from Meadows. Congress's refusal to work out an accommodation and the Biden administration's acquiescence fly in the face of 200 years of history — a history of dealing with these disputes by finding a middle ground.

Under Supreme Court precedent, President Donald Trump also has a voice to be heard on claims of executive privilege arising from his tenure, and he has instructed Meadows to maintain the privilege. My client thus finds himself caught between two rocks (Congress and the Biden administration) and a hard place (instructions from the president he served.)

Moreover, he knows from experience how critical it is for senior aides to be able to communicate freely with the president — and how dangerous a precedent he would set for presidents of both parties were he to appear and answer questions without limitation.

There are two separate but equally vital components to this issue. The first is the long-standing recognition that senior presidential aides, present and past, cannot be compelled to appear before Congress. The second is the issue of executive privilege, and the importance of protecting communications among presidential advisers and with the president himself.

The history of executive privilege began with President George Washington, who in 1796 refused to comply with a House request for information about his treaty negotiations with Britain, explaining that "the boundaries fixed by the Constitution between the different departments should be preserved."

In more recent times, the Justice Department has taken the position, consistent with parties, that the most senior presidential aides — evidenced in aides to presidents no longer in office — cannot be compelled to provide testimony before Congress.

These authoritative legal opinions explain that protecting senior aides from compelled testimony is vitally important because it helps to ensure, both now and in the future, that the president can benefit from the most candid advice. In a 1999 opinion issued by the Justice Department's Office of Legal Counsel, Attorney General Janet Reno likened such compulsion "to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions."

Both the executive branch *and* the judiciary have long recognized the related protections of executive privilege. These protections are also grounded in the separation of powers and help to preserve the critical balance among the branches.

While executive privilege disputes between Congress and the executive occur often, the need for judicial involvement has been rare, until recently. As Chief Justice John G. Roberts Jr. recently indicated in the dispute over Trump's tax returns, the federal courts have a strong preference for allowing the other two branches to reach accommodation when conflicts arise from executive privilege claims. Most unfortunately, Biden's decision to abandon executive privilege in this instance has eradicated any incentive for Congress to pursue accommodation.

The Biden administration has tried to justify this unprecedented step by categorizing the events of Jan. 6 as "unique and extraordinary circumstances." But as a standard to compel wholesale abandonment of executive privilege, that assessment draws an arbitrary and dangerous line — one that can and will be invoked in the future when the political shoe is on the other foot.

How should this all be resolved? Ideally, all involved would take a deep breath and reconsider ending the tradition of accommodation between the executive and Congress. They would look for other ways to resolve the conflict. Perhaps yet, a politically independent Justice Department will try to do so.

Solutions might include, as we proposed to the committee, withdrawal of the subpoena and agreement on written questions, the answers to which could be parsed as to whether privileged or not, a far better means of addressing privilege issues than the back and forth inherent in a compelled and likely hostile deposition. But if no compromise can be had, it cannot be that my client should have to end the conflict unilaterally — either by risking contempt or by surrendering privilege and agreeing to testify without restriction.

Thus, the only path to resolution may run through the courts. I gave up a long time ago predicting what courts will rule. I am confident, though, that the courts will see a lot more at stake here than seems apparent to the House Select committee or the White House thus far.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| | : | **CRIMINAL NO. 22-cr-200** |
| **v.** | : | |
| | : | |
| **PETER K. NAVARRO,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF HIS MOTION TO COMPEL

The Defendant, Peter K. Navarro, has filed a supplemental brief suggesting that his own public statements are evidence of the Government's discriminatory intent. That argument is unsound, and his supplement does nothing to cure his previous failure to meet the rigorous threshold showing necessary to obtain discovery on a selective prosecution claim.

The Defendant concedes, as he must, that to obtain discovery regarding selective prosecution, he must establish some evidence of both discriminatory effect and discriminatory purpose. ECF No. 53 at 3. The Defendant has provided no evidence of either in his original briefing or in his supplement, and his demand for discovery regarding selective prosecution should be denied.

First, at no point has the Defendant provided any proof of the Government's discriminatory purpose or intent. In his original motion, the Defendant tried to suggest that the Select Committee's reference in its criminal contempt report to the Defendant's public statements evidenced the Government's intent. ECF No. 31 at 34. Apparently recognizing that this fails— the Committee is not part of the prosecution team and has no role in the Government's prosecutorial decision-making—the Defendant's new claim, advanced in his supplement, is that

his own statements are somehow evidence of the Government's intent. That is, the Defendant's supplement lists multiple examples of the Defendant's public criticisms of the Committee and the Biden Administration, ECF No. 53 at 6-9, and asserts without explanation that these statements are evidence of the Government's discriminatory purpose. *Id*. at 6. But the Defendant's own statements say nothing of the prosecutors' intent without proof that the Government was aware of and acted because of them. *See United States v. Stone*, 394 F. Supp. 3d 1, 36 (2019) ("If one seeks permission to embark on discovery related to selective prosecution, it is not enough to simply state that the prosecutor was biased. Defendant must *show* that in his case, the decisionmaker acted with a discriminatory purpose." (emphasis in original)). The Defendant has presented no such evidence.

Second, the Defendant similarly fails to bolster his claims of discriminatory effect. In fact, the Defendant's supplement shows instead that one of the individuals whom he argues was treated differently only because he did not engage in speech against the Committee and presidency—Mark Meadows—also publicly criticized the Committee and the Biden Administration, in the form of an op-ed written by his attorney. *See* ECF No. 53 at 5; ECF No. 53-2 (op-ed by George J. Terwilliger, writing "[a]s counsel for former White House chief of staff Mark Meadows," and criticizing both the Committee and the Biden Administration). Just as the Defendant's claim about discriminatory purpose fails, so too does his speculation, rather than evidence, regarding discriminatory effect. *See Stone*, 394 F. Supp. 3d at 31 ("[A] defendant must provide something more than mere speculation or 'personal conclusions based on anecdotal evidence.'") (quoting *United States v. Armstrong*, 517 U.S. 456, 470 (1996)).

It is the Defendant's burden to make the rigorous showing that his entitled to discovery on a selective prosecution claim. Having tried three times and provided no evidence of discriminatory

effect or intent on the part of the prosecutorial decisionmakers in his case, the Defendant has failed

to make the requisite showing. For the reasons set forth here and in the Government's opposition

brief, ECF No. 33, Defendant's motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Elizabeth Aloi*
Molly Gaston (VA 78506)
Amanda R. Vaughn (MD)
Elizabeth Aloi (D.C. 1015864)
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7212 (Aloi)
elizabeth.aloi@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| | : | **CRIMINAL NO. 22-cr-200** |
| **v.** | : | |
| | : | |
| **PETER K. NAVARRO,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' OMNIBUS MOTION IN LIMINE

The jury in Defendant Peter K. Navarro's trial will be charged with deciding one thing: whether the Defendant knew he had been subpoenaed by the Select Committee to Investigate the January 6th Attack on the United States Capitol ("the Committee") to produce documents and appear for a deposition, and nonetheless made a deliberate decision not to do either. Throughout the pre-trial stage of this case, however, the Defendant has sought to overcomplicate the issues, advance defenses that he has waived or that are unavailable to him under the facts or the law, and levy unsupported allegations of Government misconduct. These claims lack merit, and they are not matters to be considered by the jury. The Court should exclude evidence and argument regarding all of them at trial.

I.     <u>**Unavailable Defenses and Irrelevant Evidence and Argument Have No Place At Trial**</u>

"To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Fed. R. Evid. 103(d); *see also United States v. Young*, 470 U.S. 1, 10 (1985) ("[T]he trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.") (internal quotation omitted)). In service of

this responsibility, the Court has broad discretion to determine whether evidence or argument can properly be presented at trial.  *See United States v. Morgan*, 581 F.2d 933, 936 (D.C. Cir. 1978) ("The district court has wide discretion to admit or exclude evidence where the question is one of relevancy or materiality"); *United States v. Tarantino*, 846 F.2d 1384, 1410 (D.C. Cir. 1988) (finding it was within trial court's discretion to exclude testimony sought only to impeach witness's credibility).  This includes excluding evidence or argument whose only purpose is to encourage the jury to nullify.  *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975) (affirming exclusion of evidence relevant only to jury nullification) (citing *Sparf v. United States*, 156 U.S. 51, 106 (1895)); *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006) ("[A] juror . . . who commits jury nullification violates the sworn jury oath and prevents the jury from fulfilling its constitutional role.").

Motions in limine assist the Court in serving its gate-keeping function to keep incompetent evidence or improper argument from the jury by permitting the Court to exclude such things in advance of trial.  *United States v. Zeese*, 437 F. Supp. 3d 86, 92 (D.D.C. 2020) (quoting *United States v. Jackson*, 627 F.2d 1198, 1209 (D.C. Cir. 1980) ("Pretrial motions *in limine* effectuate [Rule 103(d)'s] directive" that inadmissible evidence not be suggested to the jury by any means, and a "'pre-trial ruling, if possible, may generally be the better practice, for it permits counsel to make the necessary strategic determinations.'")).  Here, the Court has a sufficient basis to rule in advance of trial to exclude improper evidence and argument so that it is not suggested to the jury in any way.

## II.   The Defendant Cannot Present Evidence or Argument in Support of Invalid or Waived Defenses

Before the Court to date, the Defendant has advanced multiple potential legal and trial defenses, including that executive privilege excused his total non-compliance with the

Committee's subpoena, ECF No. 31 at 4-8; that he was entrapped or authorized in his violation of the law, ECF No. 36; and that the Committee that issued him the subpoena was improperly constituted, ECF No. 34 at 17-27.  Neither the law nor the facts of this case support any of the Defendant's claims of these defenses, and the Court should not permit him to present evidence or make argument to the jury in support of them.

      **a.**   **<u>The Defendant's Reliance on an Alleged Executive Privilege Assertion is Not a Valid Trial Defense.</u>**

As set forth in the Government's opposition to the Defendant's motion to dismiss, the Defendant is wrong when he claims that there was an invocation of executive privilege that excused his noncompliance with the subpoena.  *See* ECF No. 44 at 5-12.  Indeed, as the Court has noted, no President—sitting or former—invoked executive privilege with respect to the subpoena that the Committee issued to the Defendant, or directed the Defendant not to appear for a deposition or provide documents.  *See* Order, ECF No. 55 at 5 ("Defendant . . . received no written or oral direction from the former President to invoke any privileges or immunities with respect to the Select Committee subpoena.").  Thus, regardless of whether the Defendant's claimed reliance on executive privilege in the face of the subpoena was a mistake of law or a pretext for a strategic effort to evade the requirements of the subpoena, it does not matter: erroneous reliance on executive privilege, and by extension testimonial immunity, is not a defense to contempt of Congress, and the Defendant should not be permitted to present evidence or argument in support of such a claim.

At trial, with respect to the Defendant's state of mind for the charged conduct, the Government must prove that his default on the subpoena was willful.  2 U.S.C. § 192.  Contrary to the Defendant's claim in a filed notice that "'willfully' requires specific intent," ECF No. 36 at 1, binding precedent makes clear that in the contempt of Congress statute, willful means a

deliberate and intentional failure to appear or produce records.  *Licavoli v. United States*, 294 F.2d 207, 208 (D.C. Cir. 1961) ("[H]e who deliberately and intentionally fails to respond to a subpoena 'willfully makes default.'") (citing *United States v. Bryan*, 339 U.S. 323 (1950); *United States v. Fleischman*, 339 U.S. 349 (1950)); *see also Bryan*, 339 U.S. at 330. ("[W]hen the Government introduced evidence in this case that respondent had been validly served with a lawful subpoena directing her to produce records within her custody and control, and that on the day set out in the subpoena she intentionally failed to comply, it made out a prima facie case of wilful default.").  It does not matter if the Defendant's deliberate and intentional failure was in good faith; the Government does not have to show "evil motive"—"[a] deliberate intention not to appear is sufficient." *Licavoli*, 294 F.2d at 208.

A defendant's mistaken belief that the law excused his compliance—here, for the Defendant, based on executive privilege—is not a valid defense to contempt of Congress.  *See id.* at 209 ("[T]here can be no serious dispute about the deliberate intention of [the defendant] not to appear before the Committee pursuant to its subpoena.  That he meant to stay away was made abundantly clear.  That he did so upon the advice of a lawyer is no defense."); *Yellin v. United States*, 374 U.S. 109, 123 (1963) (regarding defendant's refusal to answer congressional committee's questions, "[o]f course, should Yellin have refused to answer in the mistaken but good-faith belief that his rights had been violated, his mistake of law would be no defense.") (citing *Watkins v. United States*, 354 U.S. 178, 208 (1957); *Sinclair v. United States*, 279 U.S. 263, 299 (1929), *overruled on other grounds*, *United States v. Gaudin*, 515 U.S. 506 (1995)); *Watkins*, 354 U.S. at 208 (regarding a defendant's refusal to answer a question because he did not believe it was pertinent, "[a]n erroneous determination on his part, even if made in the utmost good faith, does not exculpate him if the court should later rule that the questions were pertinent to the question

under inquiry"); Order, *United States v. Bannon*, 2022 WL 2900620, at *1 (D.D.C. Apr. 6, 2022)

(excluding defendant's advice-of-counsel defense to contempt of Congress because it is

unavailable under *Licavoli*); *United States v. Bannon*, D.D.C. Case No. 1:21-cr-670, Hrg. Tr.

7/11/22 at 115-116 (oral ruling granting motion in limine; "[defendant] cannot present evidence

regarding [OLC opinions and DOJ writing] to demonstrate that he believed he was not required to

comply with the Subpoena, since that question is irrelevant to whether [defendant] deliberately

and intentionally failed to comply with the Subpoenas. So too with his assertions of privilege. As

a general matter, none of that evidence can justify his failure to appear or produce documents under

*Licavoli*."); *id*. at 121 ("Evidence regarding the reasons that [defendant] did not comply with the

Subpoena here, for example, because he didn't believe the Subpoena was valid or because he was

-- he believed he was legally excused from showing up as a result of the former President's

implication of executive privilege or because he relied on his lawyers' advice on these topics, these

are [ir]relevant to the criminal charges here and therefore inadmissible.").

At trial, the Government will prove that the Defendant acted willfully in his default of the

subpoena because he accepted service of it and then made an intentional and deliberate choice not

to comply with its demands in any way.  Because it would not be a valid defense for the Defendant

to respond that he did so out of a reliance on executive privilege, the Defendant should not be

permitted to present argument or evidence in support of such a claim to the jury.

> **b.   The Defendant Cannot Make the Required Threshold Showings for the Affirmative Defenses of Entrapment by Estoppel or Public Authority.**

The Defendant provided notice that he intends to assert public authority and entrapment-

by-estoppel defenses at trial.  *See* ECF No. 36.  These are affirmative defenses for which a

defendant bears the burden. *See, e.g.*, *United States v. Theunick*, 651 F.3d 578, 590 (6th Cir. 2011)

("the defendant bears the burden of proving the affirmative public authority defense"); *United*

*States v. Khanu*, 664 F. Supp. 2d 35, 41 (D.D.C. 2009) (stating entrapment by estoppel defense applies where defendant establishes elements by preponderance of the evidence).  Before he can present them to the jury, the Defendant must make a threshold showing of the elements of each defense.  *See*, *e.g.*, *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015) ("[A] defendant will not be allowed to assert the [public-authority] defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites."); *United States v. Pardue*, 385 F.3d 101, 108 (1st Cir. 2004) (affirming exclusion of entrapment-by-estoppel defense at trial where defendant could not make prima facie case).  Because the Defendant has not made—and on the facts in this case, cannot make—the required showing for either defense, he should not be permitted to present evidence or argument regarding them at trial.

### i.  Entrapment by Estoppel

An entrapment-by-estoppel defense "arises when an individual criminally prosecuted for an offense reasonably relied on statements made by a government official charged with 'interpreting, administering, or enforcing the law defining the offense' and those statements actively misled the individual to believe that his or her conduct was legal." *United States v. Chrestman*, 525 F. Supp. 3d 14, 29–30 (D.D.C. 2021) (quoting *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)).  A defendant seeking to raise it must furnish proof: "(1) that a government agent actively misled [the defendant] about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Id*. at 31.

The Defendant cannot make out any of these elements, and has not articulated facts that would support an entrapment defense.  In his notice, the Defendant suggests, without elaboration, that the statements that he relied upon in choosing to default on the Committee's subpoena were those of the former President.  *See* ECF No. 36 at 1-2 ("At all times relevant, Dr. Navarro operated with respect to the Select Committee's subpoena at the direction of former President Donald J. Trump.").  But as the Court has observed, the Defendant has conceded that he did not receive any direction from the former President with respect to the Committee's subpoena, as opposed to one issued by a separate Committee for unrelated materials several months earlier.  *See* Order, ECF No. 55 at 5 n.2.  Even if he had received instructions as to the subpoena from the former President in February 2022, however, it would not suffice; at that time, the former President was a private citizen, not a government official responsible for interpreting, administering, or enforcing the law.  Another court in this District has held similarly.  *See United States v. Bannon*, D.D.C. Case No. 1:21-cr-670, Hrg. Tr. 7/11/22 at 122-126 (granting motion in limine); 122 ("defenses of entrapment by estoppel or public authority" cannot "go to the jury"); *id.* at 125 (court "will therefore not instruct the jury on a defense of public authority" and "will exclude the evidence that would go to that defense," nor for "apparent authority" defense).

### ii.   Public Authority

A public authority defense is, essentially, a defendant's claim that the Government specifically authorized him to commit an illegal act.  *Alvarado*, 808 F.3d at 485 (the defense concerns a defendant "who knows the conduct he has been authorized to commit is illegal" but acts on the belief that he is an agent of a government official who had authority to order it).  The defense is typically raised in the context of covert investigative activity that is undertaken during a criminal investigation, and it has no application in the circumstances presented in this case.  To

establish the threshold showing for a public authority defense, the Defendant must establish that 1) a law enforcement officer must have actually authorized his conduct; 2) that he reasonably relied on that authorization when engaging in the conduct; and, 3) that official must have actually had the authority to permit him to engage in the criminal conduct in question. *Id*. at 484.

Here, too, the Defendant cannot provide any support for such a defense. In his notice, the Defendant claims that he "acted with public authority when he notified the Select Committee in February 2022, and thereafter, that he could not comply with the Committee's subpoena due to President Trump's direction to assert Executive Privilege." ECF No. 36 at 2. Again, however, this claim is at odds with the facts that the defendant has conceded: former President Trump never gave him a direction not to comply with the Committee's subpoena. In any event, the former President was not then a law enforcement officer with authority to permit the Defendant to engage in criminal conduct.

At bottom, the Defendant's effort to assert entrapment-by-estoppel and public authority defenses is an attempt to admit through the back door evidence in support of his invalid defense that executive privilege, or his mistaken reliance on it, excused his compliance with the subpoena. ECF No. 36 at 2-3 ("Alternatively, Dr. Navarro intends to assert that his actions did not violate the statute because he lacked criminal intent due to a mistake of fact – i.e., that he honestly, albeit mistakenly, believed that he performed the charged offenses in cooperation with the government.") No such defense is permitted, *see Licavoli*, 294 F.2d at 208, and the Court should not allow it.

### c. **The Defendant Waived His Objections to the Constitution of the Committee, and He Cannot Make Them at Trial.**

For the first time in his pleadings before this Court, the Defendant raised objections to the composition of the Committee that issued his subpoena. ECF No. 31 at 21-25; ECF No. 34 at 17-27. However, because he failed to raise such objections before the Committee at the time of his

non-compliance, he cannot raise them now before the Court or before the jury.  As the Court has already noted about the Defendant's claims on this front, "[i]t would appear that Defendant has waived any such challenges to the Committee's composition, as he did not raise them first before the Committee itself."  *See* Order, ECF No. 55 at 11 (citing *Liveright v. United States*, 347 F.2d 473, 475–76 (D.C. Cir. 1965)).

As set forth in the Government's Opposition to the Defendant's Motion to Dismiss, ECF No. 44 at 14-25, the law is clear that in the contempt of Congress context, a defendant who fails to raise an evident privilege or objection to a congressional subpoena with the Committee that issued the subpoena waives his ability to make the claim later in court.  *See Bryan*, 339 U.S. at 332-33 ("[I]f respondent had legitimate reasons for failing to produce the records of the association, a decent respect for the House of Representatives, by whose authority the subpoenas issued, would have required that she state her reasons to noncompliance upon the return of the writ. . . . To deny the Committee the opportunity to consider the objection or remedy it is in itself a contempt of authority and an obstruction of its processes." (citation omitted); *Hutcheson v. United States*, 369 U.S. 599, 608-611 (1962) (stating that a constitutional objection "must be adequately raised before the inquiring committee if [it] is to be fully preserved for review in this Court.  To hold otherwise would enable a witness to toy with a congressional committee in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the grounds on which a witness asserts a right of refusal to answer." (internal citations omitted).  *See also United States v. Bannon*, D.D.C. Case No. 1:21-cr-670, Hrg. Tr. 7/11/22 at 126-133; 128 (granting motion in limine to exclude evidence about whether the composition of the Select Committee and its leadership complied with House Rules; such "evidence is excludable and will not be presented to the jury").

Here, the Defendant waived the objections he is now trying to make by failing to raise them before the Committee at a time during which the Committee could have addressed them. Both matters that he now raises as objections—that the Committee operated with fewer than 13 members, and that the Committee's ranking minority member used instead the title of "Vice Chair"—were matters of public record at the time of his default, but he did not raise them before the Committee as a basis for his noncompliance. Accordingly, because he waived these objections, the Defendant should not be permitted to introduce evidence or argument regarding these alleged violations of Committee rules.

### III. __The Defendant Cannot Make Claims of Selective Prosecution or Government Misconduct at Trial.__

In his Motion to Dismiss and other filings, the Defendant has claimed that the Government selectively prosecuted him, ECF No. 34 at 32-36, abused the grand jury process, ECF No. 34 at 40-43, and mistreated him at the time of his arrest, ECF No. 31 at 27-28. None of these issues concern the elements of the offense or go to the Defendant's guilt or innocence, and there is thus no place for them at trial.

The Defendant cannot raise his unavailing claims of selective prosecution in front of the jury. "[T]he issue of selective prosecution is one to be determined by the court, as it relates to an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged." *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983) (internal citations omitted); *see also United States v. Abboud,* 438 F.3d 554, 579 (6th Cir. 2006) ("[T]he defense of selective prosecution is a matter that is independent of a defendant's guilt or innocence, so it is not a matter for the jury."). Here, the Defendant should not be permitted to present evidence or make arguments before the jury that he was selectively prosecuted or that he was prosecuted because of his speech or political beliefs. Similarly, the Court should not allow

the Defendant to argue that contempt of Congress prosecutions are infrequent, that his prosecution is unprecedented, or that other individuals referred by Congress were not ultimately charged.  *See United States v. Young,* 20 F.3d 758, 765 (7th Cir. 1994) (finding that whether another individual was charged with the same crime as the defendant did "not make the facts relating to [defendant's] knowledge and participation in the [crime] more or less probable" and affirming exclusion of such argument at trial).  None of these arguments go toward any of the elements of the offenses charged, and they are not matters for the jury's consideration.

The Defendant also drew attention to the misdemeanor nature of the charges in his selective prosecution claim.  *See* ECF No. 31 at 28, Hrg. Tr. 7/15/22 at 11.  The Defendant should be foreclosed from suggesting to the jury that his crimes do not matter, that they are misdemeanors, or what the potential punishment would be should he be convicted.  The potential penalties or severity of the charged offenses are irrelevant to guilt or innocence and thus also inadmissible at trial.  *Shannon v. United States*, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is therefore irrelevant to the jury's task."); *United States v. Wade*, 962 F.3d 1004, 1012 (7th Cir. 2020) (finding arguments aimed at suggesting the charged crime was not serious or harmful were improper nullification claims).

Likewise, the Defendant should not be permitted to make any claims before the jury regarding alleged government misconduct—including regarding the circumstances of his arrest.  A claim of government misconduct "is, like a claim of selective prosecution, ultimately separate from the issue of [a defendant's] factual guilt," and is accordingly not an issue for the jury.  *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997); *see also United States v. Wylie*, 625 F.2d 1371, 1378-79 (9th Cir. 1980) (holding that "outrageous involvement by the government agents" is a matter for the court, not the jury).  Nothing about the circumstances of the Defendant's arrest

are relevant to the elements of the contempt of Congress charges; the only possible purpose for which the Defendant could attempt to raise them would be to evoke sympathy from and encourage improper nullification by the jury.  He should be precluded from doing so.

## IV.    The Court Should Not Permit Politicization of the Trial

Partisan politics have no place in a criminal trial.  *See United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (identifying claims by defendants that they were victims of political persecution as "matters far beyond the scope of legitimate issues in a criminal trial").  The Court should carefully guard against politicization during trial.  For instance, the Court should not permit general commentary on the political affiliation of Members of Congress, or to suggest that they had particular motives for referring him to the Department of Justice.  *See Barenblatt v. United States*, 360 U.S. 109, 133 (1959) (motives of individual committee members irrelevant to the Committee's legislative purpose).  The Defendant should not be permitted to introduce evidence or make arguments about the Congressional vote count on the Defendant's contempt resolution, or otherwise raise extraneous political issues; none of these issues go to the elements of the offenses charged, and serve only to invite the jury to make improper political considerations during their deliberations.

To the extent that the Government calls as witnesses individuals on the Committee's staff, the Defendant will have the right to cross-examine them.  The Court retains, and should exercise, broad discretion to limit the Defendant's cross-examinations. *See Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (finding that the Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish" (emphasis in original)); *United States v. Derr,* 990 F.2d 1330, 1334 (D.C. Cir. 1993) ("The Confrontation Clause does not bar a judge from imposing reasonable

limits on a defense counsel's inquiries.").  The Defendant should not be permitted to cross-examine Committee witnesses about their personal political beliefs or affiliations, or about irrelevant political dynamics within the Committee.  Although the Defendant is entitled to explore whether any witness at trial has a bias, bias is "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Spencer*, 25 F.3d 1105, 1109 (D.C. Cir. 1994) (internal quotation omitted).  The political beliefs or affiliations of a witness, by themselves, do not go to the witness's truthfulness about the basic facts—such as, in this case, whether a witness emailed a subpoena to the Defendant, engaged in communications with him, or whether the defendant produced any records or presented himself for a deposition.  "Membership in a political party, by itself, does not necessarily signify anything about a person's truthfulness."  *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1180 (11th Cir. 2006).  Similarly, it would be improper for the Defendant to cross-examine a testifying Committee witness about the political beliefs, or even perceived biases, of non-testifying individuals; because non-testifying individuals' credibility is not an assessment for the jury to make, the only purpose in doing so would be improper nullification.

## V.    **The Exhibits the Defendant Has Proposed Are Irrelevant and Inadmissible.**

On September 14, 2022, the Defendant notified the Government of several exhibits that he intends to introduce at trial.  The exhibits are: (1) a February 9, 2022 email from the Defendant to Elizabeth Shew Harrington, a spokesperson for former President Trump, informing her that he had been subpoenaed by the Committee; sharing with her public statements he had prepared suggesting that executive privilege exempted his compliance; and asking Harrington to share with the former President (attached as Ex. 1); (2) a May 23, 2022 email to the Defendant from an individual named Joanna Miller, who in the email appears to be assisting the Defendant in drafting a lawsuit, and

the attachment to the email, which consists of a draft 87-page complaint the Defendant ultimately filed (attached as Ex. 2); and (3) his own phone records for the period from November 2021 through June 2022.

All of the Defendant's proposed exhibits are irrelevant and inadmissible, and should be excluded. First, the Defendant's February 9, 2022, email to Harrington is plainly hearsay, because it is his own out-of-court statement that he is offering for the truth of the matter asserted in his prepared statement. "While the Federal Rules of Evidence set forth various exceptions to hearsay, self-serving hearsay is not one of those." *United States v. Michael Jabaar Wilkins*, No. CR 19-390 (RC), 2021 WL 1894990, at *5 (D.D.C. May 11, 2021) (citing *United States v. Rivera-Hernandez*, 497 F.3d 71, 82 n.5 (1st Cir. 2007)) ("To be received in evidence an admission . . . must be contrary to that party's position at the time of the trial.")

To the extent that the Defendant offers this evidence to establish his own state of mind regarding executive privilege, it is another effort to introduce an improper defense. As explained above, the Defendant's claimed mistaken belief on this front is not a defense. *Licavoli*, 294 F.2d at 208-9. Second, the Defendant's email from an unrelated third party, and the attached draft legal brief, are inadmissible and irrelevant. A self-serving draft document that the Defendant compiled several months after the charged conduct, after being notified that he was under investigation, has no bearing on the issues properly before the jury at trial. Furthermore, the document is 87 pages of inadmissible hearsay, as it is the Defendant's own statement offered for the truth of the statements within it. Finally, the Defendant has not explained for what purpose he intends to introduce his own phone records at trial, but if he intends to do so to support of any of the improper arguments described in this motion, he should not be permitted to do so—and the Court should inquire into the relevance of the phone records before allowing the Defendant to proceed.

**VI.     Conclusion**

So that the forthcoming trial may proceed in a fair and expeditious manner, the Government

requests the Court enter an order precluding the Defendant from offering inadmissible evidence

and argument.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Raymond Hulser*
Elizabeth Aloi (D.C. 1015864)
Raymond Hulser (MA 551350)
Amanda Vaughn (MD)
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7212 (Aloi)
elizabeth.aloi@usdoj.gov

# EXHIBIT 1

**To:**     lizshew⬛⬛⬛⬛⬛⬛.com]
**From:**   pknavarro⬛⬛⬛⬛⬛.com]
**Sent:**   Wed 2/9/2022 5:06:53 PM (UTC-05:00)
**Subject:** Navarro subpoena

Got subpoenad for Jan 6. Herre's my statement

Please share this with the Boss:

## STATEMENT OF PETER NAVARRO  [use all or none]

As the domestic terrorists running the January 6 partisan witch hunt are well aware, President Trump has invoked Executive Privilege; and it is not my privilege to waive.  They should negotiate any waiver of the privilege with the president and his attorneys directly, not through me.  I refer this tribunal to Chapter 21 of _In Trump Time_ for what is in the public record about the Green Bay Sweep plan to insure election integrity – the last three people on God's good earth who wanted chaos and violence on Capitol Hill were President Trump, Steve Bannon, and I.  Why did Pelosi, the Capitol Hill police, and the Pentagon leave the perimeter unguarded?

Use this is you like:

Pence betrayed Trump.  Marc Short is a Koch Network dog.  Meadows is a fool and a coward.  Cheney and Kinzinger are useful idiots for Nancy Pelosi and the woke Left.

Use this if you like

I note for the record, the subpoena was leaked to key members of the press well before I received it.  This was a screwjob to every reporter who didn't get the leak and it underscores the political and partisan nature of an inquiry which discredits itself on a daily basis.

Sent with ProtonMail Secure Email.

# EXHIBIT 2

| | |
|---|---|
| **To:** | pknavarro _____ .com] |
| **From:** | JoannaMiller _____ .com] |
| **Sent:** | Mon 5/23/2022 7:15:29 AM (UTC-04:00) |
| **Subject:** | Looks good - finishing formatting of hyperlinks |

JOANNA_00 Final Navarro Suit 5.17.22 3.0 blackline.docx

Peter,

Went through line-by-line on this lawsuit, made a few more very minor grammar edits, and everything looks great! Christina has no more comments.

I am going through now finalizing the formatting of your links in end notes - if I don't finish by 9 AM, I will send back around 6 pm today. Won't take me long!

Best,
 Joanna

Sent with ProtonMail secure email.

-0385-

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| PETER NAVARRO, | ) | |
| ████████████████ | ) | |
| Washington, DC, 20004 | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| NANCY PELOSI, in her official | ) | |
| capacity as Speaker of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| BENNIE G. THOMPSON, in his official | ) | |
| capacity as Chair of the Select Committee | ) to | |
| Investigate the January 6th Attack on the | ) | |
| United States Capitol; | ) | |
| | ) | |
| ELIZABETH L. CHENEY, in her official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| ADAM B. SCHIFF, in his official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| JAMIE B. RASKIN, in his official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| SUSAN E LOFGREN, in her official | ) | |
| ) capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| ELAINE G. LURIA, in her official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |
| | ) | |
| PETER R. AGUILAR, in his official | ) | |
| capacity as a member of the United States | ) | |
| House of Representatives; | ) | |

**-0386-**

STEPHANIE MURPHY, in her official )
capacity as a member of the United States )
House of Representatives; )
)
ADAM D KINZINGER, in his official )
capacity as a member of the United States )
House of Representatives; )
)
SELECT COMMITTEE TO )
INVESTIGATE THE JANUARY 6TH )
ATTACK ON THE UNITED STATES )
CAPITOL;) )

UNITED STATES HOUSE OF

REPRESENTATIVES )

*Defendants*. )

_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.     I, the Plaintiff, Dr. Peter Navarro, am a private citizen who previously served as

a senior White House advisor during the four years of Donald John Trump's presidency.  I

bring this complaint *pro se*, request a jury trial, and seek declaratory and injunctive relief to:

(1) declare that the Select Committee To Investigate the January 6th Attack on the United

States Capital (Committee) is neither duly authorized nor properly constituted and therefore its

legislative acts, including its subpoena issued to me and Committee Report 117-284 of the 2nd

session of the 117th Congress are therefore ultra vires, unlawful, and unenforceable; (2)

declare that the Committee's subpoena, the Committee's Report 117-284, and House

Resolution 1037 117th Congress (2021-2022) all represent <u>legislative acts</u> that violate the

principle of separation of powers in their unlawful simultaneous pursuit of a judicial function under the flag, and behind the shield, of a facially valid legislative function and are therefore ultra vires, unlawful, and unenforceable; (3) declare that the Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore ultra vires, unlawful, and unenforceable; (4) enjoin the U.S. Attorney for the District of Columbia from proceeding against me "in the manner and form provided by law" as  H.Res. 1037 recommends; (5) declare that the subpoena issued to me improperly compels testimony of a senior executive official; and (6) declare that President Joe Biden does not have the legal authority to waive the executive privilege or testimonial immunity invoked by his predecessor in this civil case.

2.     Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not, however, a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Congress (2021)[1] and with its own authorizing resolution, House Resolution 503 117th Cong. Therefore, the subpoena it has issued to me is invalid and unenforceable.

3.     For a Congressional Committee to duly issue valid and enforceable subpoenas during an investigation — and by extension, seek criminal contempt charges against those who fail to comply with such subpoenas — that investigation must have a valid "legislative function."[2]  The *Comm. On Ways & Means v. U.S. Dep't of Treasury*  notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021).  [emphasis added][3]

4.     *United States v. Brown* makes clear that "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."   *United States v. Brown, 381 U.S. 437, 448 (1965)*.   The Committee's subpoena and the Committee's Report to Congress 117-284 recommending that I be held in contempt of Congress along with H. Res. 1037 all represent "legislative acts."

5.     While the unwillingness of the courts to look beyond "facially valid" congressional investigations may have been correct law within the context of the balance of power within the three branches of government in prior times, over time, the setting of this low "facially valid" bar has been an open invitation for legislators to simultaneously pursue an unconstitutional judicial function under the false flag, and behind the shield of, their legislative function.   It should be clear here that a pursuit of a facially valid legislative function does not preclude the unconstitutional and unlawful simultaneous pursuit of judicial function.

6.     The result of the courts' silence in this matter is now clear: Repeated abuses by Congress in using its investigatory powers to simultaneously serve both facially valid legislative and unconstitutional judicial functions have institutionalized a partisan weaponization of Congress' investigatory powers that now threatens the delicate balance of powers – and the separation thereof — between the legislative, judicial, and executive branches of our government.   In this case, the legislative history of the Committee and its members broadly viewed over a more than five-year period reveals an undeniable and overwhelming pattern of the weaponization of Congress' investigatory powers to pursue a judicial, and by implication, a political function.

3

7.      In this case, the legislative acts of the Committee and its members together with H.Res 1037 constitute an unlawful exercise of the judicial function over and above the Committee's "facially valid" legislative function, thereby violate the principle of the separation of powers, and cannot advance a legal contempt of Congress charge against me through the United States Attorney's office.

8.      The Committee's subpoena, the Committee's Report 117-284, and H.Res. 1037 constitute legislative acts that violate the constitutional proscription against bills of attainder, and each should be invalidated and declared unenforceable.  These legislative acts violate the Constitutional proscription against bills of attainder because: (1) they seek to determine guilt and inflict punishment on me in the forms of shame, humiliation, banishment, ostracization, incitement of public hate, possible imprisonment, and the confiscation of my property, all without adequate provision of the protections of a judicial trial, and (2) the Committee, contrary to the court's guidance, failed to pursue less burdensome alternatives to achieve its alleged "legitimate nonpunitive objectives." *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). The set of deprivations which the Committee and its members and which the Democrat-controlled House have inflicted and seek to inflict on me are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably … fall within the proscription of Art. I, § 9. *Nixon v. Administrator of General Services*, 433 U.S. 425, 473 (1977).  At my age of seventy-two, with the average life expectancy in America for males at seventy-six, a one-year prison term would constitute over 25% of my remaining expected life while a $100,000 fine would be equivalent to a significant fraction of my wealth for retirement.

9       Rather than pursuing the less burdensome alternatives of negotiating a waiver of

4

executive privilege and testimonial immunity from President Trump and his attorneys or a civil suit as *Nixon v. Administrator of General Services* and *Committee on Judiciary v. Miers* guides, the Committee and Congress with its passage of H.Res. 1037 have pursued the most burdensome and punitive alternative with a potential criminal prosecution in their naked effort to threaten and coerce me into turning my back on my duty to my country and appearing before their kangaroo court. By the Committee's refusal to negotiate directly with President Trump and his attorneys on the issue of executive privilege and testimonial immunity – the least burdensome alternative – and by failing to pursue the second least burdensome alternative of a civil suit, my due process has been violated, the legislative acts of the Committee and House of Representatives against me have been exposed as bills of attainder, and these legislative acts of the Committee and Congress in this case must be invalidated. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977).   *Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008).*

10.   There is no settled law to support the absurd, fanciful, and extremely dangerous proposition that an incumbent president can waive the executive privilege invoked by his predecessor or waive the testimonial immunity of the senior advisers serving under that predecessor.

11.   Executive privilege is an institution dating back to the days of George Washington that has been deemed critical to effective presidential decision-making; executive privilege, together with testimonial immunity for senior White House advisers provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

12.    I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension for which there is no settled law.  Allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the false flag of the national interest – represents the most extreme and dangerous form of qualifying the privilege and the testimonial immunity. If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn deal a mortal blow to the critical functions that executive privilege and testimonial immunity are supposed to serve in our Republic. These functions are to: (1) help ensure the separation of powers; and (2) provide for optimum candor in presidential decision-making.  Any settled law that institutionalizes a revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making.

13.    The Committee's members along with House Speaker Nancy Pelosi over a more than five year period have been engaged in a "repeatable strategic game" of "gotcha" and punishment that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic ping pong game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office or serve in government.

14.    The time is ripe for the court to address this controversy and the question of whether an incumbent president can strip his predecessor of executive privilege and

testimonial immunity.  Here, if the Committee and Joe Biden manage to pull this deadly game off now and effectively establish the principle in settled law that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.

15.   Congress cannot lawfully hold me in contempt of Congress for failure to comply with a subpoena that compels me to testify before the Committee because, under long-standing Department of Justice Office of Legal Counsel (OLC) policy, I have absolute testimonial immunity as a senior White House official. As OLC notes: "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet with the President on a regular or frequent basis-should be deemed absolutely immune from testimonial compulsion by a congressional committee.'  Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations."  Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

16.   If the testimonial immunity of senior White House officials is absolute as decades of OLC opinions have deemed it, I thereby have a duty to my country to fail to comply with said Committee subpoena and cannot be held in contempt for this failure to comply; and I have no other choice but to follow the OLC and Counsel's opinion.

17.   If testimonial immunity exists as an institution to provide for unconstrained

candor in communications between an adviser and the president or other advisers, as set forth in Counsel Pat A. Cipollone's memo, then it can't be waived by the adviser and certainly not by an incumbent president under which the adviser did not serve.  Only the courts have the power to waive such absolute testimonial immunity on a case-by-case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly.  If the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers and thereby promote the most efficient and effective presidential decision-making, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such candor and therefore less optimal decisions.

18.    I come to this case far exceeding ""the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).  I will demonstrate substantial injury through punishment from Speaker Pelosi, the Committee, and Democrat-controlled House of Representatives responsible for passage of H.Res. 1037 along with possible imminent, existential injury through punishment and the threat of punishment from the U.S. Attorney of the District of Columbia. Only a set of favorable rulings by this court will clearly redress these injuries and prevent further injury.

### PARTIES

1.    Plaintiff  Peter Navarro served as a senior White House adviser during all four years of the Trump administration.  He is currently a professor *emeritus* at the University of California-Irvine.

2.    Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the U.S. House of Representatives and Speaker of the House.

3.      Defendant Bennie G. Thompson ("Chairman Thompson") is a Democrat member of the U.S. House of Representatives and Chairman of the Committee to Investigate the January 6th Attack on the United States Capitol. Subpoenas challenged herein were issued with his authority as Chair.  Thompson also introduced H. Res. 1037 – 117th Congress (2021-2022) with zero cosponsors.

4.      Defendant Elizabeth L. Cheney is a Republican member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

5.      Defendant Adam B. Schiff is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

6.      Defendant Jamie B. Raskin is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

7.      Defendant Susan E. Lofgren is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

8.      Defendant Elaine G. Luria is a Democrat member of the U.S. House of Representatives and members of the Committee to Investigate the January 6th Attack on the United States Capitol.

9.      Defendant Peter R. Aguilar is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

10.     Defendant Stephanie Murphy is a Democrat member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

11.     Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and members of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

12.     Defendant Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee") is a select committee created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

13.     Defendant House of Representatives passed H. Res. 1037 by the yeas and nays 220-203 along party lines (with two Republican votes) on April 6, 2022.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

2.     This Court has personal jurisdiction over Speaker Pelosi because she sponsored H. Res. 503 and oversaw its passage in the House.

3.     This Court has personal jurisdiction over Chairman Thompson because he presides over the Committee and introduced H. Res. 1037.

4.     This court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, Adam

D. Kinzinger because they serve as members of the Committee that issued the Navarro subpoena from Washington, D.C.

5.      This Court has personal jurisdiction over the Committee because it is located and operates in Washington, D.C.

6.      Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred in Washington, DC.

## RELEVANT FACTS

1.      On August 3, 2020, the Democrat-funded Transition Integrity Project publicly released a detailed plan to skew the 2020 presidential election in favor of Joe Biden using a combination of lawfare and grassroots tactics. Their overarching purpose was to stuff the ballot box in key battleground states with absentee ballots, many of which would, under the lax, and often illegal, rules they sought to impose, would be illegal votes, and therefore unlawful to count.[4]

2.      In a *Time* magazine cover story, journalist Molly Ball published an article after the election entitled "The Secret History of the Shadow Campaign That Saved the 2020 Election" which confirmed many of the strategies and tactics the Democrats had used to tilt the election in favor of Joe Biden as had been set forth in the TIP plan. Notes Ball: "Their work touched every aspect of the election. They got states to change voting systems and laws and helped secure hundreds of millions in public and private funding."[5]

3.      In the wake of the November 3, 2020 election, numerous analyses emerged revealing the elaborate strategies and tactics the Democrats had indeed used to skew the election and that the Transition Integrity Project had foreshadowed.  This set of analyses included the Plaintiff's "Navarro Report;"[6] and as noted in that report:

On January 13, 2021, the Democrat-controlled House of Representatives passed House Resolution 24 "impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors." A primary justification for this overwhelmingly partisan impeachment is that "President Trump repeatedly issued false statements asserting that the Presidential election results were the product of widespread fraud and should not be accepted by the American people or certified by State or Federal officials."

If it can be demonstrated that President Trump had a good faith belief that the November 3, 2020 Presidential election results were, indeed, the poisonous fruit of widespread fraud and election irregularities, POTUS45 must not only be found Not Guilty. The U.S. Senate must also call for a prompt investigation of these alleged irregularities.

The three volumes of the Navarro Report provide just such a demonstration. These three volumes have been consolidated herein into a single document explicitly designed as a useful evidentiary handbook and reference guide for the upcoming Senate impeachment trial.

Evidence used in the preparation of the Navarro Report includes more than 50 lawsuits and judicial rulings, thousands of affidavits and declarations, testimony in a variety of state venues, published analyses by think tanks and legal centers, videos and photos, public comments, and extensive press coverage.

Volume One finds significant election irregularities across six key battleground states – Arizona, Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin. These irregularities range from outright voter fraud, ballot mishandling, and contestable process fouls to Equal Protection Clause violations, voting machine irregularities, and significant statistical anomalies.

Volume Two examines a two-pronged Grand "Stuff the Ballot Box" Strategy used by the Democrat Party and its political operatives to flood the

12

*battleground states with enough illegal absentee and mail-in ballots to turn a decisive Trump victory into a narrow, and arguably illegitimate, Biden "win." To strategically game the Presidential election, the Democrats and their operatives were found to have at times bent or broken both election rules and laws.*

*Volume Three provides the most up-to-date statistical "receipts" with respect to the potential number of illegal votes cast in each battleground state. Volume III thereby provides investigators with a well-documented tally of potentially illegal votes on a state-by-state and category-by-category basis. A key finding is that the number of potentially illegal votes dwarfs the very thin alleged Biden "victory" margins across all six battleground states.*

4.      Public opinion polls today indicate that a significant fraction of the American electorate believes the 2020 presidential election was rigged or stolen.[7]

5.      There is no definitive proof offered by the Committee or available in the public square that the November 3, 2020 presidential election was a fair election unmarred by election irregularities.

6.      In the Committee's letter of February 9, 2022 transmitting a subpoena electronically to me, the Committee accuses me of making "many claims of fraud in the election" but also insists that these claims have been discredited by "public reporting, by state officials, and courts."[8] Yet, the only "proof" the Committee's Chair Bennie Thompson offers is a laughable footnote citing an article in the long-discredited Forbes magazine – Forbes is owned by Chinese investors and has been turned largely into a propaganda organ for the Chinese Communist Party.[9]

7.      On January 6, 2020, a large group of Trump supporters gathered in Washington

in the American tradition of peaceful protest to support the president in his peaceful bid to get a legal counting of the vote. At this point in time, President Trump had a strong presumption that the election was likely rigged and stolen from him based on the data and analyses available to him, including the "Navarro Report."

8.      Among a large crowd of Trump supporters, there were small pockets of extremists likely seeking to instigate violence that could be blamed on President Trump. These extremists ranged from members of the Marxist group Black Lives Matter and the anarchist Antifa group to far right militia groups.[10]

9.      There is likewise evidence that among the crowd were individuals serving as informants to the FBI who may have possibly instigated the violence.[11]

10.     The Committee was formed against the backdrop of this January 6 history. In justifying its investigation, the Committee and its members refer repeatedly to the role of President Trump and his advisors, including the Plaintiff, in instigating an unlawful insurrection and promoting an unlawful attempt to overturn the 2020 election while insisting that the election was fair – again, despite no definitive evidence proving the election was fair.[12]

11.     For the four years of the Trump administration, I, the Plaintiff, served as a senior White House adviser to President Donald J. Trump.  While I would carry several titles during my term of service – Director of the National Trade Council, Director of the Office of Trade and Manufacturing Policy, Defense Production Act Policy Coordinator – my duties and responsibilities in the White House as an Assistant to the President during the relevant times here spanned a far broader spectrum of economic, trade, border security, and national security issues.

12.     During my service, President Trump would regularly seek my candid advice on matters that might seem far outside my "official" duties; and a narrow construction of my role in the White House as the Committee has done based merely on my titles fundamentally misunderstands how the Trump White House worked.

13.     In the aftermath of the November 3rd, 2020 election, I began an investigation that would quickly lead to deep national and economic security concerns about election integrity. In a series of previously referenced analyses titled collectively "The Navarro Report," I identified not just an abundance of fraud and election irregularities.  I exposed how the Democrat Party and its operatives effectively made what should have been a landslide win by President Trump into an election close enough to steal.

14.     Given the economic and national security ramifications of a possibly stolen election, I worked diligently in my official capacity as a government official within the White House and as a senior White House adviser to help the president and other senior advisers navigate what appeared to me to be the most sophisticated assault on American democracy ever perpetrated.

15.     In the days leading up to January 6, and as reported in my book *In Trump Time: My Journal of America's Plague Year* referenced by the Committee,[13] I described a legal and constitutional strategy called the Green Bay Sweep which sought to leverage Vice President Mike Pence's constitutional power under the Electoral Count Act of 1887.[14]   The goal was to delay certification of the election for at least another several weeks "while Congress and the various state legislatures involved investigate[d] all of the fraud and election irregularities" that would be raised that day on Capitol Hill.

16.     As noted in *In Trump Time,* the goal of this strategy was "*not* to get the election

overturned" as the Committee would insist. Rather, the goal was "to subject the ballots – the *legal* votes of American citizens along what we believed to be a flood of ballots – to careful scrutiny and investigation."

17.     Finally, as noted in *In Trump Time,* because implementation of the Green Bay Sweep strategy required "only peace and calm on Capitol Hill," the last thing President Trump and I wanted was "to hand Congress an excuse to abort the operation" with an outbreak of violence and chaos and the last people "who wanted to see violence erupt that January 6 day on Capitol Hill" included both myself and President Trump (along with Stephen K. Bannon).

18.     To date, the Committee has offered no significant or conclusive proof that the November 3 election was fair or that the Navarro Report was in any way inaccurate or misleading.  Nor has the Committee offered any significant or conclusive proof that either I or President Trump or any of the senior advisors sought to <u>illegally</u> overturn the election.

19.     To recap, the Committee asserts without facts and evidence that "many claims of purported fraud in the election...have been discredited in public reporting, by state officials, and courts." This is but one of many pieces of evidence that the Committee is operating upon under the flawed assumption that the 2020 presidential election was fair and without reasonable controversy. From this flawed assumption, this kangaroo court of a Committee is pursuing a judicial function in seeking to punish President Trump and any of his senior advisors who publicly reject the unproven claim that the election was indeed fair.

20.     Against this stark backdrop of lack of evidence for its allegations, the Committee continues to subject President Trump and senior advisors such as myself to the punishment of shame, humiliation, banishment, ostracization, and the incitement of public hatred by portraying us as insurrectionists rather than as patriots seeking to get the bottom of what looks

to be, just as with the Nixon-Kennedy 1960 election, a likely stolen election.[15]

21.     The Committee's efforts are also geared at inflicting equally traditional forms of punishment such as imprisonment and the confiscation of the property of Trump's most senior advisors who dare to defy the Committee's unlawful subpoenas and investigation using the U.S. Attorney and the vast resources of a Democrat-controlled Department of Justice as its cudgels.  In seeking to build a criminal case against President Trump and his most senior advisors for their alleged roles in seeking to overturn a fair election, the Committee is clearly venturing far beyond its facially valid legislative function into the realm of the unconstitutional pursuit of a judicial *cum* political function.

22.     On February 9, 2022, I received the Committee's subpoena in which I was "commanded to be and appear before the Select Committee to Investigate the January 6th Attack on the United States Capitol" (Committee) and "to testify at a deposition touching matters of inquiry committed to said committee or subcommittee" on March 2, 2022 at 10 00 am and further to "not to depart without leave of said committee or subcommittee."[16]

23.     I was also commanded under this subpoena "to produce the things identified on the attached schedule."[17]  I found the breadth and invasiveness of this subpoena and its attachment to be breathtaking and a direct frontal assault on both executive privilege and testimonial immunity while it also gave the appearance of a criminal investigation, not a fact-finding mission.

24.     Upon receipt of this subpoena, as a former senior White House adviser to President Donald J. Trump clearly covered by testimonial immunity, I was faced with three broad choices:[18] (1) respect President Trump's invoking of executive privilege in the Committee's investigation and fail to comply with the subpoena; (2) unilaterally waive

President Trump's Executive Privilege and my own testimonial immunity by providing all of the requested documents and testifying before the Committee as commanded; or (3) preserve President Trump's executive privilege while at least superficially meeting the requirements of the subpoena by appearing before the Committee to testify but invoking my Fifth Amendment rights during such testimony.

25.    After considerable reflection and a broad overview of the law – both settled and unsettled – I chose Choice #1: fail to comply with the subpoena while preserving the executive privilege asserted by President Trump.  I was swayed both by my own personal experience within the White House as one of the president's most senior and trusted advisors and by the wisdom of *United States v. Nixon* that opines that "[a] President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately," *United States v. Nixon, 418 U.S. 638 at 708.*

26.    Further, as noted in *Trump v. Mazars, 140 S. Ct. 2019 at 2032***, executive privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends."  *Mazars, 140 S. Ct. at 2032* at 448–449.

27.    From this vantage point, I believed at the time of my receipt of the Committee's subpoena – and also keenly mindful of the absolute testimonial immunity historically granted to senior White House officials --  it was my duty to President Trump, the Constitution, and

the Republic that I had pledged to serve and defend to honor the executive privilege that President Trump had invoked.

28.    I made Choice #1 knowing that it would put me in an untenable position, and I did so despite the obvious risks to my freedom and my financial position that might come with a criminal contempt prosecution.[19]  That I might face criminal charges was no idle speculation as one such criminal prosecution was already in progress against another former Trump advisor Stephen K. Bannon and another criminal contempt charge was possibly pending against former Trump Chief of Staff Mark Meadows.  Yet, in making Choice #1, I believed that duty and honor must come first.

29.    Regarding Choice #2, comply with the Committee's subpoena, there is settled law that dictates the executive privilege in this matter was not mine to waive, e.g., the Supreme Court has held that executive privilege "can neither be claimed nor waived by a private party." *United States v. Reynolds, 345 U.S. 1, 7–8 (1953).*  If I were to ignore President Trump's invocation of privilege by opting for Choice #2, I would be engaging in an act contrary to settled law while violating due process.  This would be an act of betrayal both of the president I served and of my country.  I would be violating constitutional law by waiving the privilege myself and fully cooperating with the Committee.

30.    With Choice #2, to the extent that I was choosing it "to save my own skin," as the saying goes, I would be committing an act of cowardice under partisan Congressional fire – the exact opposite of the honorable and patriotic choice epitomized by Choice #1.  I note here in this regard that several high-ranking Trump White House officials, including President Trump's son-in-law Jared Kushner, chose to ignore the critical privilege and immunity issues at stake and testify before the Committee.  Predictably, their cowardly actions would be used

to criticize both my principled position as well as President Trump himself, as illustrated in this news coverage of a comment from the Committee's Chair Bennie Thompson: "A person close to the Trump family told CNN the former President's children never saw a reason not to cooperate with the committee because none of them felt appearing before the panel put them at any risk.[20]...In his interview with CNN, Thompson questioned why the former President did not object to his family members testifying while key White House aides are now being held in contempt of Congress by the House after refusing to testify, saying they had been instructed by the President to claim executive privilege over their conversations. "'Now we have four individuals who are being held in contempt of Congress because they were directed by the President not to come. So they are under the bus, but his children are not. They came," Thompson said. "Now to me, that's Donald Trump that we are discovering. It's 'do as I say, but not do as I do.' Do you understand? I say don't go and testify, but when my children or my in-laws are involved, you can go testify.'"[21]

31.    As for Choice #3, complying with the subpoena but invoking my Fifth Amendment rights, I believed that by doing so I would be undermining executive privilege in a way every bit as dishonorable as Choice #2. To wit: I would be invoking the Fifth Amendment rather than staunchly defending Executive Privilege.

32.    With Choice #3, I also was keenly aware of the reputational harm that would come because far too many Americans wrongly associate guilt with invoking the Fifth Amendment.    As just one data point, a Morning Consult poll of 1993 registered voters conducted May 10-14, 2018 found that 36% of respondents believed that invoking the Fifth Amendment "usually implies the person is guilty."[22]   Here, Justice Felix Frankfurter has famously criticized those who believe the Fifth Amendment implies guilt: "Such a view does

scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States. The Founders of the Nation were not naive or disregardful of the interests of justice. " Of course, no such admonition by Frankfurter would have been necessary if the problem didn't exist. *United States v. Chase*, 281 F.2d 225, 228 (7th Cir. 1960).

33.     In this case, Justice Frankfurter might just as well have been criticizing the Chair of the Committee Bennie Thompson for unlawfully judging – and publicly branding -- anyone who invoked the Fifth Amendment during testimony before his Committee as guilty indeed. In a public statement on December 2nd, 2021 illustrating the unconstitutional punitive nature of a Committee that is supposed to be pursuing a non-punitive legislative agenda and exposing the "judge, jury, and executioner" judicial function mindset of the Committee, Thompson baldly asserted that those who appear before his Committee and invoke their Fifth Amendment privilege against self-incrimination are "part and parcel guilty to what occurred." Tim Hains, *Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're "Part & Parcel Guilty*, Real Clear Politics, Dec. 2, 2021.[23]

34.     Having worked hard my entire life to live honorably with a reputation for honesty, I was not inclined to invoke the Fifth Amendment in a demonstration of gamesmanship to avoid a contempt charge. Nor was I going to be tainted with the charge of "guilty until testifying" in the ugly game Thompson and the Committee were obviously playing.

35.     Finally, I note that I was aware at this time of a critical decision I would have to make that if I were to bend to the Committee's coercive will.  To wit, I would not only be undermining the institution of executive privilege and its critical role in the separation of

21

powers.  I would be weakening the companion institution of testimonial immunity for senior White House advisers.

36.      While there has been at least some case law arguing for a qualified rather than absolute executive privilege – the law remains unsettled – history and the law on testimonial immunity has leaned far closer to the absolute end of the spectrum.  For example, the Office of Legal Counsel in the Department of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is absolute; and there is no settled law to the contrary.  "Since the 1970s, this Office has consistently advised that 'the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee' on matters related to their official duties'" and "[t]he President and his immediate advisers-that is, those who customarily meet with the President on a regular or frequent basis-should be deemed absolutely immune from testimonial compulsion by a congressional committee.' Indeed, this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations."  Memorandum For Pat A. Cipollone Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.

37.      Having made Choice #1 to honor the executive privilege invoked by President Trump (and cognizant of the sanctity of absolute testimonial immunity), I responded to the subpoena I had received in an email dated February 27, 2022 addressed to   Senior Investigative Counsel for the  Committee, Dan George as follows: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied.  Your best course of action is to directly negotiate with President Trump and his attorneys regarding any

22

and all things related to this matter."

38.    Note that I clearly assert in this email that the privilege is not my to waive, and I clearly indicate the Committee should "directly negotiate with President Trump and his attorneys."

39.    The court can also see in my response that I am anticipating a possible assault on President Trump's privilege by Joe Biden by clearly indicating that the privilege is not Biden's to waive either.  In fact, the very next day, on February 28, 2022 I received a letter by email from Deputy Counsel to the President Jonathan Su of the White House Legal Counsel's office advising me that President Biden "has decided not to assert executive privilege" as regards to either my "testimony" or "documents" commanded by the Committee."[24]

40.    Even a cursory view of the case law, Executive Orders, and OLC opinions indicates that Su's bold assertion that Joe Biden has the legal authority to waive the privilege of his immediate predecessor and the immunity of that's predecessor's senior advisers within a matter of mere months of the transition of power is anything but settled law.

41.    Upon receipt of the Su letter, I immediately wondered whether the Committee had had somehow signaled to Su and the White House to take this action as a way of further coercing me into bending to their will.    Here, it has been said that there are no conspiracies, but there are also no coincidences while Occam's Razor teaches us that the simplest explanation is also the most likely.  In this instance, the simplest explanation for the Su/Biden correspondence is not that it was a coincidence but rather that the Committee either <u>tacitly or explicitly colluded</u> with the White House to elicit this correspondence in a blatant attempt to do an end run around due process and the law.  If Joe Biden could strip Donald Trump of executive privilege and me of testimonial immunity, then neither I nor any Trump senior

White House adviser would have an excuse not to appear before the Committee – or so their illegal and indefensible position would become.

42.    My second thought upon receiving the Su letter was that no court of law would find it reasonable to allow an incumbent president to strip his predecessor of executive privilege within months of taking office no matter what fig leaf of a broader national interest the incumbent might seek to cover its assault in.  The chilling effect of such an action, if upheld by the courts, would be tantamount to destroying executive privilege and testimonial immunity as we know them as no future White House senior advisor or president would have confidence in the privilege.

43.    To make this point early, and it shall be made often, whatever vague "extraordinary" "national interest" the Su letter cites in support of its half-baked assertions, these concerns pale in comparison to the transformation of executive privilege and testimonial immunity into partisan ping pong balls that provide no real assurances to future White House advisers or presidents of the kind of confidentiality necessary to make sound decisions.

44.    Within the context of strategic game theory, if the assault on Executive Privilege and testimonial immunity by the Committee and the White House in this case are allowed by this court, it will spell the end of both Executive Privilege and testimonial immunity as this Republic has known them because we will quickly bear witness to a "repeatable game" in which whichever party controls <u>both</u> the House of Representatives and White House, that party will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office.  Of course, this will all be done under the false flags of national emergency and national security.

45.     If, in this case, the Committee and Joe Biden are able to effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.  In fact, <u>I don't need to imagine this repeat of the strategic game.  If I'm not dead or in prison, I will lead the charge</u>.

46.     On February 28th, after receiving Mr. Su's correspondence and additional correspondence from Mr. George, I reaffirmed to Mr. George that: "President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied."

47.     I would further subsequently note in a press release on March 26, 2021 that I would honor whatever decision President Trump made in the matter and assist the Committee in expediting the matter to the Supreme Court to settle the law on this controversy: "This is an unprecedented partisan assault on executive privilege. The committee knows full well that President Trump has invoked executive privilege and it is not my privilege to waive.  If President Trump waives  the privilege, I would be happy to testify. It is premature for the  committee to pursue criminal charges against an individual of the highest rank within the White House for whom executive privilege undeniably applies.   Until this matter has been settled at the Supreme Court, where it is inevitably headed, the Committee should cease its tactics of harassment and intimidation. I would be happy to cooperate with the committee in expediting a review of this matter by the Supreme Court and look forward to arguing the case."[25]

48.     After a more careful reading of the Su letter, it is clear, if not altogether obvious, that the Biden White House does not directly seek to waive President Trump's privilege in the

25

matter.  All Mr. Su is informing me of is that President Biden "has decided not to assert executive privilege."  To believe that this waives the privilege invoked by President Trump, <u>one must make the leap that the decision by Biden not to invoke privilege is equivalent to waiving the privilege invoked by Trump.  This is not at all clear from the Su letter</u>.  In fact, Su may be purposely opaque knowing the quicksand of unsettled law he has waded into.  And it may be useful to note as well that Su makes no reference to any case law that would indicate Biden is seeking to hijack the Trump privilege.  Yet, the Committee would be more than eager to make this leap.

49.    On March 28, 2022, the Committee voted unanimously (9-0) to recommend that I, along with former Trump senior White House adviser Dan Scavino, be held in contempt of Congress.

50.    On April 4, the House Rules Committee voted along party lines, 9 Democrats for to 4 Republicans against, to advance the contempt charge against me.[26]

51.    On April 6, the House of Representatives passed H.Res. 1037 virtually along party lines by a vote of 220-203, with only two Republicans voting in the affirmative.[27]  This Resolution recommends  to the United States Attorney for the District of Columbia  that the Plaintive "be proceeded against in the manner and form provided by law"  for criminal contempt of Congress, whereby this contempt charge  carries with it a prison term of up to one year  and the confiscation of the Plaintiff's  of up to $100,000.

52.    The Supreme Court has long recognized that due process protections apply to all congressional investigations.  *Watkins v. United States*, 354 U.S. 178,188 (1957); *Quinn v. United States*, 349 U.S. 155,161 (1955).   The Committee had its own duty to honor due process and attempt such negotiations with President Trump in good faith – and thereby avoid

obvious bill of attainder complications.   Negotiations was the least burdensome (punitive) alternative at the Committee's disposal while a civil suit was the next least burdensome alternative.   Instead, the Committee pursued the most burdensome (punitive) alternative of a criminal contempt of Congress charge.

## My Subpoena Was Not Issued by a Duly Authorized and Properly Constituted Committee and is Unenforceable

1.     Duly authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Committee is not a duly authorized or properly constituted congressional committee because it fails to comport with House Resolution 8 117th Cong. (2021)[28] and its own authorizing resolution, House Resolution 503 117th Cong. (2021).[29]

2.     Section 3(b)(1) of H.Res. 8 provides: "During the One Hundred Seventeenth Congress, the chair of a standing committee…upon consultation with the ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee."   [emphasis added]   By H.Res 8, consultation with the ranking minority member is therefore a necessary condition for the issuance of any subpoena by the Committee.

3.     Section 5 (c) (6)(A) of H. Res. 503 states: "The chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress." By H.Res 1037, consultation with the ranking minority member is likewise a necessary condition for the issuance of any subpoena by the Committee.

27

4.      Section 2(a) of H. Res. 503 states that "The Speaker shall appoint 13 Members to the Committee, 5 of whom shall be appointed after consultation with the minority leader."

5.      Presumably, the minority leader would propose five members of his own party under Section 2(a) of H. Res. 503 so that the partisan balance would reflect an albeit still partisanly skewed 13-5, near three-to-one Democrat majority on the Committee.

6.      Upon passage of H.R. 503, Speaker Pelosi appointed Bennie Thompson to serve as Chair of the Select Committee along with six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Pete Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia.[30]

7.      Following the instructions of H.R. 503, House Minority Leader Kevin McCarthy recommended Rep. Jim Banks of Indiana, to serve as minority ranking member of the Committee.[31]  However, Pelosi refused to seat Banks; and the Committee has no ranking minority member despite the requirement of H.Res. 503 that it should and the requirements imposed by H.Res 8 for the issuance of valid subpoenas.

8.      Minority Leader McCarthy also recommended to Pelosi the appointment of four additional  Republican members to serve as minority members on the Select Committee – Illinois' Rodney Davis: Ohio's Jim Jordan,  North Dakota's Kelly Armstrong, and Texas' Troy Nehls.  None were appointed by Pelosi.

9.      If Pelosi had simply appointed the members recommended by McCarthy along with Banks as ranking minority member, this would have met the requirements of H.Res. 503 to have a 13-member commission with five minority representatives and a ranking minority member.[32]  Instead, without the consultation of McCarthy, again in contradiction to H.Res.

28

503, Pelosi appointed Illinois' Adam Kinzinger and Wyoming Liz Cheney—two Republicans with clear animus against President Trump.

10.     The Committee's failure to comport with Section 2(a) of H.Res. 503 is evident in: (1) the failure of House Speaker Nancy Pelosi to appoint the proper number of members (9 instead of 13); (2) an even more skewed 7-2 ratio of Democrats to Republicans instead of the 8-5 ratio called for by H.Res. 503; (3) the failure of Pelosi to consult with Minority Leader Kevin McCarthy prior to the seating of the two titular Republicans on the Committee, neither of which were proposed by McCarthy; (4) the absence of a ranking minority member; and (5) the rejection by Pelosi of all five members, including a ranking minority member, proposed by McCarthy.

11.     The Committee's failure to comport with Section 3(b)(1) of H. Res. 8 as well as Section 2(a) of H. Res. 503 is evident in the fact that of those nine members Speaker Pelosi appointed to the Committee, none were appointed after consultation with the ranking minority member as required by the authorizing resolutions.

12.     Since Speaker Pelosi allowed no ranking minority member on the Committee there is no ranking minority member to "consult" with and therefore the Chair may not "order the taking of depositions" "pursuant to subpoena."

13.     Absent a ranking minority member, the Committee has no legal authority to duly issue, much less legally enforce subpoenas and advance resolutions finding private citizens in contempt of Congress for refusal to comply with the illegal subpoenas issued by the Select Committee.

14.     The absence of a ranking minority member on the Committee alone is sufficient for this court to rule that all of the Committee's subpoenas are invalid.   Chairman Thompson

derives the authority to issue subpoenas from both H.Res. 8 and H.Res. 503 Section 5(C)(6)(A) of the Committee's authorizing statute, but these authorities are qualified, not absolute. The Committee chairman may not order the taking of depositions without consultation with the ranking minority member of the Committee.

15.     As the Committee has no ranking minority member, Chairman Thompson failed to make the requisite consultation before issuing the subpoena to me. The subpoena thus runs afoul of the Committee's authorizing resolution as well as H.Res. 8, making it invalid and unenforceable; and my failure to comply with the Committee's subpoena cannot be grounds in H. Res. 1037 for holding me in contempt of Congress.

16.     In a public statement, Pelosi acknowledged she had taken an "unprecedented decision"[33] in establishing what amounts to nothing more than a highly partisan and score-settling kangaroo court of a Committee with a fig leaf of Republican membership, no ranking minority member, and <u>four empty seats</u> in clear violation of the specifications of H R  503 for a duly authorized and properly constituted committee.

17.     Congress' failure to act in accordance with its own rules is judicially cognizable. *Yellin v. United States*, 374 U.S. 109, 114 (1963). This is particularly significant where a person's fundamental rights are involved.

18.     In this case, former senior White House officials, including myself, have been held in contempt of Congress on the basis of invalid and unenforceable subpoenas from a Committee that is neither duly authorized nor properly constituted yet we face possible imprisonment of up to one year and a significant confiscation of personal property in the forms of up to $100,000 in fines and the substantial cost burden of legal representation.

**The Legislative Acts of the Committee and H.Res 1037 Violate the Principle of Separation of Powers Because They Also Seek To Fulfill a Judicial Function**

1.      A key controversy before this court in this case for which there is no settled law is this  If a Congressional entity such as the Committee is pursuing an investigation under the Constitutional flag, and behind the shield of, what appears to be a facially valid legislative function, is it also then free to use that investigation and its subpoena powers to simultaneously pursue an illegitimate judicial function that violates the principle of separation of powers?      Here, it should be obvious that the presence of a facially valid legislative function does <u>not</u> rule out the presence of a punitive judicial function    the pursuit of these legitimate legislative and illegal judicial functions can occur simultaneously.

2.      The Constitution contains no provision explicitly declaring that the powers of the three branches of the federal government shall be separated yet the principle of separation of powers is implicit in its construction: Article I vests all legislative powers in the Congress; Article II vests executive power in the president, and Article III vests judicial power in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish.

3.      Congress has no enumerated constitutional power to conduct investigations or issue subpoenas.    For a Congressional Committee to duly issue valid and enforceable subpoenas in the course of an investigation – and by extension, seek contempt charges against those who fail to comply with such subpoenas -- that investigation must have a valid and <u>non-punitive</u> "legislative function."[34]

4.      Congress' power to investigate is limited because it is "justified <u>solely</u> as an adjunct to the legislative process."[35] *McGrain v. Daugherty*, 273 U.S. 135 (1927).   (emphasis

added).

5.     A hallmark of the judicial function is the power to punish.   "The power to punish is inherent in the courts."  *United States v. Landes*, 97 F.2d 378, 381 (2d Cir. 1938).

6.     To ensure the principle of separation of powers, Congress has no judicial power and therefore does not have the power to investigate in pursuit of a judicial function and "inflict punishment."  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

7.     The Committee and its members have "no Congressional power to expose for the sake of exposure" *Watkins v. United States*, 354 U.S. 178, 200 (1957).   Exposing for the sake of exposure represents an unlawful exercise of judicial power and seeks to perform a judicial function because, in causing such results as shame, banishment, humiliation, or ostracization, such exposure administers various forms of punishment.  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).  Justice Black notes "There is nothing strange or novel about this kind of punishment. It is in fact one of the oldest forms of <u>governmental punishment</u> known to mankind; branding, the pillory, ostracism and <u>subjection to public hatred</u> being but a few examples of it. <u>Nor is there anything strange about a court's reviewing the power of a congressional committee to inflict punishment</u>.  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959)  [emphasis added]

8.     The courts have never firmly addressed the controversy of whether a Congressional investigation should be invalidated if that investigation represents a simultaneous exercise of <u>both</u> a facially valid legislative function and an unconstitutional and unlawful judicial function. Yet, as the frequency and intensity of overtly partisan and weaponized Congressional investigations have accelerated in the vacuum of settled law in this matter, it is a question and controversy that begs for this court's wisdom. To borrow a phrase

from *Trump v. Mazars*, this case, the hallmark of which is Speaker Pelosi's frank admission of the overtly partisan construction of an "unprecedented" Committee, "represents a significant departure from historical practice." *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2031 (2020). Accordingly, this case and controversy by Pelosi's own words invites the court to settle the law and thereby set precedent.

9.    Historically, the courts have been reluctant to dive into the deep end of this separation of powers pool in their relatively few rulings on the subpoena power of Congress. For example, the *Comm. On Ways & Means v. U.S. Dep't of Treasury* notes that "[a] long line of Supreme Court cases requires great deference to <u>facially valid</u> congressional inquiries." *Comm. On Ways & Means v. U.S. Dep't of Treasury*, 1:19-cv-01974 (TNM), at *1 (D.D.C. Dec. 14, 2021). [emphasis added][36]

10.    The reluctance of the courts to pierce the veil of a facially valid legislative function and find a companion unconstitutional judicial function has been attributed in part to the 'hurly burly' nature of politics. As *Trump v. Mazurs* notes: "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel). *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020)

11.    The unwillingness of the Courts to look beyond facially valid congressional investigations may have been tolerable within the context of the balance of power within the

three branches of government in prior times.  However, over time, the setting of this low, facially valid legislative function bar to the exclusion of the possibility that a judicial function is simultaneously and unconstitutionally being pursued has been an open invitation for legislators to pursue just such a judicial function under the false flag, and behind the shield of, their legislative function.

12.     The result of the court's silence in this matter is now clear: Repeated abuses by partisans and political score settlers like those on the Committee have institutionalized a partisan weaponization of Congress' investigatory powers that now threatens the delicate balance and separation of powers between the legislative, judicial, and executive branches of our government.

13.     In considering whether to address this controversy in this case, the court should indeed take Speaker Pelosi at her word when she describes the formation of the Committee as "unprecedented."  It is indeed unprecedented for Congress to form a rabidly partisan and score-settling congressional committee that has no minority ranking member and fails to abide by its own authorizing resolution.  It is equally unprecedented to allow this Committee to wield such powerful investigatory powers in pursuit of a judicial function behind the flag and shield of a facially valid legislative function.

14.     While the courts have been loathe to address the controversy before us, they have not been entirely silent on the matter.  For example, *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951) opens the door to new precedent when it opines "To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive."  In *Tenney v. Brandhove*, such usurpation was not "obvious."  However, as shall be demonstrated with a

review of the legislative history of the Committee and its members below, this is a case where such an usurpation is overwhelmingly and painfully obvious.[37]

15.     With regard to the importance of "legislative history," the courts have deemed the "legislative history" of any given investigation to be a critical factor in assessing the validity of a Committee's investigatory powers.  In *Barenblatt v. United States*, for example, the court references "[i]n the light of the Committee's history" to rule "legislative authority" "unassailable".[38]   The case likewise refers to the "persuasive gloss of legislative history"[39] and also uses the phrase "In light of the legislative history."  *Barenblatt v. United States*, 360 U.S. 109, 153-54 (1959).

16.     Building on *Barenblatt*, *Nixon v. Administrator of General Services* establishes a "legislative history" test to probe for the unconstitutional presence of the judicial function. It urges us to ask in that case whether the "legislative history" indicates if "the Act before us is regulatory [legislative] and not punitive in character?" 408 F. Supp., at 373 *Nixon v. Administrator of General Services, 433 U.S. 425, 478 (1977).*

17.     In this case, the legislative history of the Committee and its members reveals an overwhelmingly "obvious" pattern of the weaponization of Congress' investigatory powers to pursue a punishing judicial, and by implication, a political function.  As Justice Black might say today "It seems to me that the proof that the ... Committee is here undertaking a purely judicial function is overwhelming" *Barenblatt v. United States*, 360 U.S. 109, 154 (1959).

18.     The "overwhelming" and "obvious" proof in this case is embodied a legislative history dating back more than five years that demonstrates the repeated attempts of the Speaker of the House and the members of the Committee to publicly shame, humiliate, banish, ostracize, and possibly even imprison President Trump by trying him in their various kangaroo

courts and legislative acts. Through such exposure for the sake of exposure, they have incited public hatred and thereby punished Trump by harming his re-election chances in 2020 even as they have sought repeatedly to remove him outright from office and prevent him from either legally or practically from ever occupying the Oval Office again by running in, and winning, the 2024 election. This sordid record of the Committee and its members has been nothing more and nothing less than the pursuit of a judicial function behind the mask and shield of a facially valid legislative function. As *McGrain v. Daugherty* once warned in another context "[t]he committee has assumed all of the functions of prosecutor, judge and jury with apparently none of the customary rules governing evidence and procedure." *McGrain v. Daugherty*, 273 U.S. 135, 145 (1927).

19.    The <u>legislative history of the Committee itself</u> reveals its clear partisan and score-settling intent to punish and humiliate President Trump in the course of its investigation and in pursuit of a judicial function.

20.    On May 14, 2021, Democrat Congressman Bennie Thompson introduced H.R. 3233, a *bicameral* bill to establish a ten-member commission to investigate the January 6th assault on the Capitol requiring approval of both the House and Senate.[40]   This commission, by legislative design, would have struck a very clear bipartisan 5-5 balance. It was to consist of five members appointed by Democrats, five members appointed by Republicans, a Democrat Chair and a Republican Vice-Chair.[41]

21.    While H.R. 3233 passed the House on May 19, 2021 by a 252 – 175 vote , it failed in the Senate when a cloture motion failed by a vote of 54 yeas to 35 nays.[42]   In response, on June 28, 2021, Speaker Pelosi took the Senate out of the equation – and therefore a <u>bicameral</u> approach to the proposed investigation – by next introducing a simple House

Resolution requiring only the approval of the House she controlled.

22.     Pelosi's Democrat-controlled House passed H. Res. 503 on May 21, 2021 on a virtually party-line 222-190 vote.[43] Only two Republicans, Rep. Liz Cheney of Wyoming and Rep. Adam Kinzinger of Illinois – both with scores to settle against Donald Trump – voted in favor of H. Res. 503.  Each would wind up on the Committee as the only two titular Republicans.

23.     H. Res. 503 offers a very sharp <u>partisan</u>, one-legislative-chamber contrast to the bipartisan, bicameral construction of H R  3233  As has been demonstrated, instead of a <u>commission</u> evenly split between Democrats and Republicans,  H. Res. 503 specifies the creation of a highly partisan and score-settling <u>Committee</u> intent on punishing and humiliating President Trump, inciting public hatred, and ensuring he never becomes president again through the exercise of an illegitimate and unconstitutional judicial function.

24.     Just as this Committee has a sordid legislative history offering obvious and overwhelming proof that it "is undertaking a purely judicial function," *Barenblatt v. United States*, 360 U.S. 109, 154 (1959), so, too, does <u>the far broader legislative history</u> of the Committee <u>members</u> reveal a clear intent to simultaneously pursue a judicial *cum* political function rather than a purely legislative function.  This legislative history spanning a period of more than five years reveals at least seven additional legislative acts along with a "Russia Hoax" perpetrated by Committee members seeking to shame, humiliate, and banish President Trump from office while inciting public hatred of Trump and, by implication, Trump's advisers.  These seven legislative acts include:

a.  H.Res. 1987, introduced on April 6, 2017 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch an Oversight

Commission on Presidential Capacity to determine whether the President is mentally or physically unable to discharge the powers and duties of office.[44]  Its clear target was Trump, and the clear goal was to remove him from office;

b.  H.Res. 496, introduced on August 18, 2017, "censures and condemns President Trump for his inadequate response to the violence in Charlottesville, Virginia, on August 12, 2017, for his failure to condemn the White supremacist groups responsible for actions of domestic terrorism, for asserting that "both sides" were to blame and excusing the violent behavior of participants in the Unite the Right rally, and for employing people with ties to White supremacist movements in the White House. [45]  It also urges President Trump to fire all White House advisors who have urged him to cater to the White supremacist movement;"[46]

c.  H.Res. 660, introduced on October 29, 2019 as part of the first impeachment trial of President Trump,[47] directed "certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes;"[48]

d.  H.Res. 755, introduced on December 10, 2019, impeaches President Donald J. Trump for high crimes and misdemeanors.  The resolution sets forth two articles of impeachment of the President: (1) abuse of power by soliciting the interference of Ukraine in the 2020 U.S. presidential election, and (2) obstruction of Congress by directing defiance of certain subpoenas issued by the House of Representatives;[49]

e.  H.Res. 8548, introduced on October 9, 2020 and sponsored by Committee member Jamie Raskin, would have established in the legislative branch a Commission on Presidential Capacity to Discharge the Powers and Duties of the Office to determine whether the President is mentally or physically unable to discharge the powers and duties of office;[50]

f.  H.Res.24, introduced on January 11, 2021, impeaches President Donald John Trump for high crimes and misdemeanors.  It sets forth an article of impeachment stating that President Trump incited an insurrection against the government of the United States;[51] and

g.  H. Res. 21, introduced on January 11, 2021 by Committee member Jamie Raskin, calls upon Vice President Michael R. Pence (1) to immediately use his powers under section 4 of the Twenty-fifth Amendment to convene and mobilize the principal officers of the executive departments to declare that the President is unable to successfully discharge the duties and powers of his office, and (2) to transmit to the President pro tempore of the Senate and the Speaker of the House notice that he will be immediately assuming the powers and duties of the office as Acting President.[52]

25.  As to how each of the members of the Committee participated in one or more of these legislative acts (and otherwise demonstrated anti-Trump behavior), the Chair of the Committee, Bennie Thompson, voted "yes" on H. Res. 660,[53] he cosponsored H. Res. 496[54] condemning and censuring President Donald Trump, voted yes on both impeachment trials[55] and did not show up at President Trump's inauguration in 2016.[56] Indicating his desire to punish the president with his removal from office, Thompson has described President Trump

39

as "racist and unfit to serve."[57]

26.    Committee member Jamie Raskin cosponsored both H. Res. 660[58] and H. Res. 496,[59] voted "yes" on both impeachment trials, [60] and was the lead House Impeachment Manager for the second impeachment trial.[61]   Raskin also authored H. Res. 21,[62] H.Res 1987,[63] and H.Res. 8548.[64] In 2018, Raskin set up a panel of mental health experts to publicly discuss the president's mental fitness,[65] has referred to Trump as "a barbarian,"[66] consistently questioned Trump's mental capacity,[67] repeatedly pushed the phony Russia hoax,[68] and, revealing his clear intent to use Congress' investigatory powers for a judicial function, publicly stated that "We have to come up with a legislative mechanism for calling a president to account if he decides to turn the White House into a for-profit enterprise. We cannot allow that precedent to stand."[69]

27.    Committee member Adam Schiff voted "yes" on H.Res. 660,[70] was the lead investigator for the first Trump impeachment trial of President Trump,[71] and voted yes for both impeachments.[72] He also cosponsored H. Res. 21.[73]

28.    Committee member Zoe Lofgren voted "yes" on H. Res. 660, [74] cosponsored H. Res. 24,[75] and H.R. 1987, [76] and voted "yes" on both impeachment trials. [77]   In 2017, Lofgren served as a member of the Democracy Reform Taskforce that claimed President Trump had "shown blatant disregard for the laws and norms in place to prevent public corruption."[78] Lofgren also boycotted the inauguration of President Trump in 2017.[79]   In revealing her desire for Congress to wield more judicial power, she opined that Congress needs "more enforcement authority."[80] She also introduced a resolution urging a "medical and psychiatric evaluation of US President Donald Trump."[81] Illustrating her desire to publicly humiliate and shame the president and incite public hatred, Lofgren stated that "POTUS is an ignorant bigot trying to

40

delegitimize duly elected Members of Congress based on ethnicity and gender. President Trump shames our country."[82] That Lofgren wants to use the investigatory and impeachment powers of Congress to serve a judicial function and thereby, in the ultimate punishment, end the political career of President Trump is evident in her saying that it "was both constitutional and necessary to impeach and convict former President Trump...and to disqualify him from holding future office.[83]

29.    Committee member Elaine Luria voted "yes" on H.Res. 660,[84]  cosponsored H.Res. 24,[85] voted "yes" on both Trump impeachments, [86] and boycotted Trump's 2020 State of the Union address.[87]  That she has not hesitated to sit as both judge and jury of President Trump in her quest to inflict punishment upon the president is evident in remarks about Trump such as ""It is clear to me that he has betrayed the public trust and abandoned his obligations to the Constitution by elevating his own interests over the national interest. Allegations of this gross misconduct meet the threshold of high crimes and misdemeanors set by the Constitution."[88]

30.    Committee member Pete Aguilar likewise voted "yes" on both impeachments[89] and cosponsored H.Res. 24[90] which initiated the second impeachment.  He also voted "yes" on H.Res. 660. [91]  In acting as judge and jury in the second impeachment trial, Aguilar insisted as if it were fact that "The fact is that President Trump attempted to use the power of his office to coerce a foreign government to interfere in an American election."[92]  This was not a fact at all; it was merely an accusation designed to punish and humiliate.

31.    Committee member Stephanie Murphy voted "yes" on H.Res. 660[93] and both impeachments[94] while cosponsoring H Res 24 [95]  In a May 22, 2019 letter "My Thoughts on Impeachment," Murphy clearly expresses her intention to use the investigatory powers of

Congress in a judicial function to coerce and punish not just President Trump but "anyone in his administration" that dares to defy a congressional subpoena: "Should President Trump or anyone in his Administration ignore a final federal court order to turn over information that Congress has requested, I would consider it a threat to our careful system of checks and balances and would therefore <u>support an impeachment inquiry on that individual</u>—the first step in the impeachment process and one that <u>better empowers</u> congressional investigators to attain documents and testimony."[96]   [emphasis added]

32.     Key Committee members were also instrumental in perpetrating a now deeply discredited "Russia Hoax."[97]   This was the spurious and now discredited claim that the 2016 Trump Campaign colluded with Russia to defeat Hillary Clinton and that Russia preferred Trump over Clinton because Russian intelligence operatives had damning evidence they could use to blackmail Trump once he ascended to the Oval Office.[98]

33.     The alleged "facts" of the Russia Hoax turned out to be a fiction ginned up by Democrat operatives paid by the Clinton campaign. These operatives, most prominently former British intelligence officer Christopher Steele, created a phony "Steele Dossier"[99] that created the false Russia Hoax narrative. The FBI would then use this dossier to bogusly obtain Foreign Intelligence Surveillance Warrants (FISA) warrants to spy on members of the Trump campaign.  As events unfolded, the whole hoax itself would be given institutional credence by a series of false statements.[100]

34.     Committee member Adam Schiff was the *de facto* leader in Congress pushing the Russia hoax and a primary source of false statements, to the point of being caught repeatedly in lies during his public appearances.[101]   Upon becoming House Intelligence Committee Chairman in 2019, Schiff hired investigators and other

personnel to launch the Russia Hoax investigation, and later expanded a probe into President Trump "beyond Russia" to investigate Trump's connections to other foreign countries.[102]

35.    The Chair of the Committee, Bennie Thompson created a task force in 2017 as part of the perpetuation of the Russia hoax.[103]

36.    This lengthy legislative history likewise illustrates how Speaker Pelosi has sought to weaponize the investigatory powers of Congress in pursuit of a judicial function aimed at the punishment of Donald Trump and senior advisers such as myself.  Pelosi called for an FBI probe in February 2017 into President Trump's alleged financial and personal ties to the Russian government as part of the perpetuation of the Russia hoax and called for a second investigation in October 2017.[104] She endorsed the push to censure President Trump after events in Charlottesville.[105] She voted yes to impeach President Trump twice and oversaw the second impeachment trial  In 2020, Pelosi backed H  R  8548[106] and is the chief architect of and catalyst for her own "unprecedented" Committee now seeking to punish and humiliate President Trump and incite public hatred against Trump, and by implication, Trump advisers such as myself.[107]

37.    As perhaps the most graphic illustration of how Pelosi and committees such as the Committee in this case are pursuing a highly punitive judicial *cum* political function, Pelosi was caught in a private meeting saying that "I do not want to see him impeached, I want to see him in prison."[108]  She has described the President, himself, as "a hoax."[109] [emphasis added]

38.    From this broad, dynamic review of the legislative history, it should be clear that for more than five years, the American Republic has been cursed with various Democrat

kangaroo courts and legislative acts in pursuit of a judicial *cum* political function often with the same Democrat kangaroos running those courts and sponsoring those acts.

39.    In this case, Speaker Pelosi, along with all seven Democrat members of the Committee, have yet again established a kangaroo court that has empowered them to act as judge, jury, and executioner through a judicial function replete with (1) multiple forms of punishment aimed at shaming, humiliating, banishing, ostracizing, and inciting public hatred; (2) the removal of President Trump from office; and (3)  the punishing, including possible imprisonment, of his most trusted senior advisors.   This is all being done through the unconstitutional weaponization of Congress' subpoena power and resultant punishment, coercion, and threats.

40.    The two Republican members of the Committee have a similar, albeit shorter, legislative history that reveals the score-settling nature of their assaults on President Trump and his advisors through the weaponization of the Committee's investigatory powers  Both Liz Cheney and Adam Kinzinger voted "yes" on the second impeachment trial of Donald Trump while Kinzinger repeatedly sided with the Democrats on the Russia hoax.  Kinzinger also publicly issued a statement asking President Trump to delete his Twitter account in December 2020 after President Trump was calling for investigations into the 2020 election.

41.    For his anti-Trump activities, Kinzinger was forced out of running for reelection by the subsequent backlash, holds Trump responsible and clearly has a score to settle with Trump.   In addition, Kinzinger is also considering a run for president so the elimination of the frontrunner Trump in the 2024 election through punishment and humiliation would be in Kinzinger's self-interest.[110]

42.    Liz Cheney is a long-term foe of President Trump because of Trump's perennial criticism of Cheney's father; Vice President Dick Cheney.   According to Trump, Vice President Cheney played a major role in prosecuting the "endless wars" of Afghanistan and Iraq, wars that killed hundreds of thousands of people and drained trillions of dollars of treasure from our Republic.[111]

43.    That Cheney, along with the Chair Bennie Thompson, seek to use the Committee's subpoena power in a judicial function in violation of the principle of separation of powers is evident in their public statements that the purpose of their investigation is to ensure "those responsible are held accountable,"[112] to "tell the complete story of the unprecedented and extraordinary events of January 6th,"[113] and to "get answers for the American people about what happened on January 6th."[114] The Law Enforcement Experience on January 6th: Hearing Before the H. Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Cong. (2021) Statement of Elizabeth Cheney, Vice-Chair); Press Release, Thompson & Cheney Statement on Pentagon Officials' Reported Actions After January 6th (Sept. 16, 2021); Press Release, Thompson Statement on Cooperation of Witnesses (Oct. 14, 2021).

44.    This lengthy legislative history spanning a period of nearly five years reveals obvious, overwhelming, and indisputable proof that Speaker Pelosi and members of the Committee have a well-established pattern of seeking to weaponize the investigatory powers of Congress behind the mask and shield of facially valid legislative acts while simultaneously pursuing punitive, unconstitutional judicial agendas.   In this case, the clear arc of the Committee's investigation has to been to build a criminal case against President Trump while four of the president's most senior advisers have been held in contempt and face possible

45

prison terms and fines.

45.    Given that this Committee and its members been so clearly flushed out in the open in its pursuit of a judicial function by their legislative history, it is incumbent upon this court to address the controversy presented in this case.  To put this in a more textured, policy-analytic way, a clear controversy to be settled in this case by this court is whether there is a threshold above which the simultaneous exercise of a judicial function is sufficient to render illegal any legislative acts taken under the flag, and behind the shield of, the facially valid legislative function. Considering the facts presented in this case, no reasonable court would deny the need for such a threshold balancing test.  Nor, upon review of an abundance of evidence of a judicial *cum* political function of the Committee, would a reasonable court deny that in this case, that threshold has been more than exceeded.

46.    It is incumbent upon this court therefore to take Speaker Pelosi at her word. To recap, Pelosi has described the formation of this kangaroo court of a Committee as "unprecedented";[115] and it is indeed unprecedented for a rabidly partisan and score-settling congressional Committee that lacks no ranking minority member and fails to abide even by its own authorizing resolution to wield such powerful investigatory powers in pursuit of a judicial function behind the mask and shield of a facially valid legislative function.  With her "unprecedented" pronouncement, Pelosi thereby has invited this court to establish new precedent in a new time where the weaponization of Congress' investigatory powers for judicial ends threatens to become  the new norm , thereby upsetting  balance of power among the three major branches of government.

47.    As a private citizen and a former senior advisor to President Trump, I stand as collateral damage from the unlawful and unconstitutional efforts of Speaker Pelosi and the

Committee members to incite public hatred, punish through shame, humiliation, ostracization, and banishment, and perhaps even imprison Donald Trump and many of those like me associated closely with him.

48.   I am seventy-two years old.  I have spent my entire career in some form of public service – from the Peace Corps and more than twenty-five years as a professor at the University of California to my years in the White House.  Through my White House service, I can lay claim to saving thousands of American lives during the pandemic, helping President Trump create millions of jobs, and addressing numerous national and economic security issues related to the economic aggression of Communist China.  At this stage in my career, I should be allowed to retire with all of the thanks and honors and dignity and grace normally afforded people with such a resume.  Instead, I have been hauled before the Committee's kangaroo court, subjected to public hatred, and been forced to endure all the other punishments they can muster with their false accusations and threats of criminal prosecution.  Only by squarely addressing the controversies in this case and by granting the declaratory and injunctive relief that I seek will this punishment cease and be redressed.

### The Committee's Subpoena and Report 117-284 and H.Res. 1037 Violate the Constitutional Proscription Against Bills of Attainder

1.   Article I, Section 9, Clause 3 of the Constitution states that "No Bill of Attainder … Law shall be passed."

2.   *Nixon v. Administrator of General Services* defines a bill of attainder as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  See *United States* v. *Brown*, 381 U.S. 437, 445, 447 (1965); *United States* v. *Lovett*, 328 U.S. 303, 315-316 (1946); *Ex*

47

*parte Garland*, 4 Wall. 333, 377 (1867); *Cummings* v. *Missouri*, 4 Wall. 277, 323 (1867).   *Nixon v. Administrator of General Services*, 433 U.S. 425, 468-69 (1977).

3. *United States* v. *Lovett* notes the need for a <u>liberal interpretation</u> of what constitutes a bill of attainder: "(a) The Bill of Attainder Clause , Art. I, § 9, cl. 3, was intended to implement the separation of powers among the three branches of the Government by guarding against the legislative exercise of judicial power . Pp. 441-446.  (b) The Bill of Attainder Clause is to be <u>liberally construed</u> in the light of its purpose to prevent legislative punishment of designated persons or groups. *Cummings* v. *Missouri*, 4 Wall. 277; *Ex parte Garland*, 4 Wall. 333; *United States* v. *Lovett*, <u>328 U.S. 303</u>. Pp. 447-449."  [emphasis added]

4. *United States v. Brown* makes clear that "[l]egislative acts, <u>no matter what their form</u>, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."  *United States v. Brown, 381 U.S. 437, 448 (1965)*. [emphasis added]

5. The Committee's subpoena and along with the Committee's Report 117-284 and H. Res. 1037 all represent forms of "legislative acts" under settled law. *United States v. Brown*, 381 U.S. 437, 448 (1965).  Each of these legislative acts identifies me as a named individual; and each violates the Constitutional proscription against bills of attainder.

6. Historically,   common   bill   of   attainder   punishments   have   included "imprisonment, banishment, and the punitive confiscation of property by the sovereign." *Bellsouth Corporation v. F.C.C*, 162 F.3d 678, 685 (D.C. Cir. 1998).[116]  In this case, I

face possible imprisonment of up to one year – more than one-fourth of my remaining expected life as well as the confiscation of up to $100,000 of my retirement savings, a significant share of those savings.

7.  In this case, a Democrat-controlled House of Representatives has voted overwhelmingly along party lines[117] on the basis of the Committee's subpoena and the Committee's Report 117-284 to hold me in contempt of Congress without the benefit of addressing Congress on this Resolution and without the benefit of a judicial trial.  Furthermore, this legislative act has been taken based on an invalid and unenforceable subpoena that violates the principle of separation of powers and thereby falsely associates me with unpatriotic and treasonous efforts to overturn what Committee members insist was a fair election despite abundant evidence to the contrary, thereby inciting public hatred of me. Through these legislative acts, the Democrat-controlled House has thereby subjected me to the punishments of shame, humiliation, ridicule, banishment, public hatred, and ostracization at great reputational cost.

8.  If the U.S. Attorney for the District of Columbia chooses to act on H.Res. 1037 and charge me with contempt of Congress – as has already been done in a similar case involving a former Trump senior adviser[118] – I face significant additional punitive consequences in the forms of both imprisonment for up to one year and the punitive confiscation of my property, i.e., up to a $100,000 fine.

9.  Even prior to, or absent any, any move to imprison and fine me by the U.S. Attorney, H.Res. 1037 is a punitive act of economic coercion and psychological terror designed to bully me into bending to the will of an illegally constituted Committee in unconstitutional pursuit of a judicial function.

10. H.Res. 1037, in and of itself, represents economic coercion and a de facto confiscation of my personal property because in order to defend myself against this bill of attainder, I must either spend what may well add up to more than $100,000 on legal representation. Alternatively, as I have chosen, I must do the legal work *pro se* and thereby pay the substantial opportunity costs of the time I must use by writing this brief and representing myself.

11. In addition, the stigma and public hatred that has come from a contempt charge implying a treasonous attempt to overthrow an allegedly fair election has turned me into a pariah in many academic and corporate quarters and thereby cost me remunerative opportunities ranging from teaching, lecturing, and public speaking to appearing on otherwise Republican-friendly networks like Fox News, e.g., Fox has adopted a cancel culture policy of refusing to put pro-Trump people like me on the air  who question the results of the November 3 and are associated, falsely or otherwise, with the events of January 6.   The loss of these remunerative opportunities has significant financial implications as teaching stipends and speaking fees have historically been important sources of my income stream while appearances on networks like Fox help promote the books and articles I write and thereby generate sales and royalties.  Most broadly, the harm to my reputation has been incalculable.

12. It is well worth noting that a common political tactic used on both sides of the aisle is to engage in "lawfare" to tie up the time and resources of political rivals and possibly put them in jail.  In this case, the Committee is simultaneously pursuing a judicial, rather than a purely legislative, function and brazenly violating the Bill of Attainder Clause in its efforts to ensnare Donald Trump and his most senior advisers in their tar pit of false

allegations, endless litigation, possible imprisonment, and the de facto confiscation of my personal property by necessitating expenditures on legal representation or incurring the opportunity costs of representing myself.

13. H.Res. 1037 as a legislative act represents a punitive psychological terror as well.  At 72 years old, a one-year prison sentence would indeed take more than a quarter of my remaining expected life – the average expected life of a male in America is 76 years[119] -- while a $100,000 fine would confiscate a significant slice of my retirement nest egg.  I do not look forward either to a prison cell or to having to choose between food or medicine as far too many American senior citizens must do just because an uber-partisan and score-settling kangaroo court decided to slap me with a bill of attainder and drain my pockets.

14. The set of deprivations that I face from the legislative acts of the Committee and H.Res. 1037 are "so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably … fall within the proscription of Art. I, § 9.  *Nixon v. Administrator of General Services*, 433 U.S. 425, 473 (1977).

15. In reviewing whether the legislative acts of the Committee and H.Res. 1037 constitute bills of attainder,  *Nixon v. Administrator of General Services* provides this court with a number of possible tests, including most pertinently: (1) "the law plainly must be held to be an act of nonpunitive legislative policymaking" for it not to be considered a Bill of Attainder; (2) the "legislative history" must indicate that "the acts are "regulatory and not punitive in character?" 408 F. Supp., at 373;" and (3) any given legislative act must use the "less burdensome alternative" to achieve "its legitimate nonpunitive objectives."  *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977).

51

16. In the Nixon case, the Court found no evidence of a punitive component in the regulatory act in question and therefore no bill of attainer issue.[120] In this case, however, the Committee's subpoena, its recommendation to hold me in contempt of Congress, and the passage of H.Res. 1037 clearly fail Test One.  With all the threats of imprisonment and confiscation of my property along with the reputational harm, banishment, and ostracization these legislative acts carry, they each and together have an undeniable strong punitive objective.  That punitive objective is to bully and coerce me into violating what I believe to be my patriotic duty and obligation under the traditional institutions of executive privilege and testimonial immunity.  The presence of such a strong punitive objective, in turn, points to a clear violation of the bill of attainder clause according to Test One.

17. With Test Two, and as noted in *Doe v. Selective Service System,* the court in the Nixon case analyzed whether the law, viewed through the lens of its <u>legislative history</u>, reasonably could be said to "further nonpunitive legislative purposes" and concluded in the affirmative, thereby rejecting the bill of attainder claim by Nixon. *Doe v. Selective Service System*, 557 F. Supp. 937, 944 (D. Minn. 1983).

18. In this case, however, we clearly and firmly must reach the opposite conclusion as the legislative history of the Committee, together with the legislative history of Speaker Pelosi and the Committee members over a period spanning more than five years, points clearly to a punitive exercise of legislative power – and therefore the pursuit of a judicial function.

19. To recap, we reviewed the legislative history of the Committee, its members, and Speaker Pelosi at length in the previous section of this brief; and it provided this court

with an undeniable spectacle of a series of kangaroo legislative acts and kangaroo courts formed with many of the same "kangaroos" populating the Committee all seeking to punish President Trump and his advisers.  From this legislative history, we must conclude that Test Two in this case points clearly to bills of attainder in the legislative acts of the Committee and Democrat-controlled House that specifically identify me by name.

20. It is worth noting here that *U.S. v. Brown* calls for such a full and dynamic analysis of the relevant legislative history when parsing bill of attainder issues, which is why in this case, we must provide such a legislative history analysis <u>not just of the Committee but its individual members as well as Speaker Pelosi.</u>  Notes *U.S. v. Brown:*

> *The Bill of Attainder Clause was not to be given a narrow historical reading ... but was instead to be read in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups.  United States v. Brown, 381 U.S. 437, 442-43 (1965)*

> *The proper scope of the Bill of Attainder Clause, and its relevance to contemporary problems, must ultimately be sought by attempting to discern the reasons for its inclusion in the Constitution, and the evils it was designed to eliminate. The best available evidence, the writings of the architects of our constitutional system, indicates that the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature.  United States v. Brown, 381 U.S. 437, 442-43 (1965)*

> *[T]he Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of*

*the judicial function, or more simply — trial by legislature. United States v. Brown, 381 U.S. 437, 442 (1965)*

21. <u>It is Test Three offered in Nixon v. GSA that should remove any legal doubt that the legislative acts of the Committee and H.Res. 1037 represent bills of attainder</u>. To recap, this test speaks to the need to "inquire into the existence of <u>less burdensome alternatives</u>" by which a "legislature could have achieved its legitimate nonpunitive objectives. *Nixon v. Administrator of General Services*, 433 U.S. 425, 482 (1977). [emphasis added]

22. Clearly, if the Committee in this case has failed to rely on "less burdensome alternatives" to achieve its alleged "legitimate nonpunitive objectives," that furthers the case that the legislative acts of both the Committee and House of Representatives to pursue contempt of Congress charges against me constitute bills of attainders.

23. In this case, there surely was, as a matter of both fairness and due process, <u>two</u> far less burdensome alternatives available to the Committee to achieve its putatively "legitimate nonpunitive objectives": (1) negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and/or testimonial immunity; and (2) a civil suit to enforce compliance with the subpoena rather using coercion and terror through a threatened criminal prosecution.

24. In my email response to the Committee on March 1, 2022, I indicated: "Please be advised that President Trump has invoked Executive Privilege in this matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied. Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter." That was the

Committee's least burdensome alternative; yet, it appears to make no effort pursuit this alternative.

25. As a matter of due process and to avoid bill of attainder complications, the Committee could and should have pursued this far less burdensome alternative of negotiation than the one it chose. Instead, either by coincidence or explicit or tacit collusion, the Committee made an end run around Trump's invocation of executive privilege and testimonial immunity through the attempted stripping of that privilege and immunity by the incumbent president Joe Biden.

26. To recap, this end run is evident in Deputy Counsel to the President Jonathan Su's letter to me of February 28, 2022. Su notified me that "President Biden has determined that an assertion of executive privilege is not in the national interest" and that "[f]or the same reasons...President Biden...will not assert immunity to preclude you from testifying before the Select Committee." Yet, as this brief will address further in the next section, in the absence of criminal conduct, there is no settled law in support of such a fanciful and absurd action by an incumbent president to strip either executive privilege or testimonial immunity from a predecessor and those senior advisers like me who may have served that predecessor.

27. As a matter of fairness and due process and <u>in the clear absence of settled law</u> in support of the dubious right of an incumbent president to strip a predecessor of both privilege and immunity, it was incumbent upon the Committee to pursue the least burdensome alternative by directly negotiating with President Trump and his attorneys a full or partial waiver of executive privilege and related testimonial immunity. This was particular true because I made it clear publicly that I would abide by any decision made

by President Trump in this matter: "If President Trump waives the privilege, I would be happy to testify."[121] Clearly, I am indicating to the Committee my full cooperation pending the outcome of their negotiation.  Instead of pursuing such a negotiation, this kangaroo court of a Committee chose to dive right into the deep end of the pool of unsettled law on the rights of incumbent versus former presidents as regards the invoking or waiving of executive privilege and the related testimonial immunity of senior White House advisors.

28. If the right of an incumbent president to strip his immediate predecessor of executive privilege and testimonial immunity were settled law, the Committee might have a leg to stand on in defending itself against the "failure to pursue the less burdensome alternative" charge I make in this brief.  But for the Committee to proceed with the far more burdensome alternative of holding me in criminal contempt of Congress against the backdrop of a far from resolved controversy for which there is no settled law smacks of a purely partisan and punitive measure and exercise of the judicial function and further solidifies the bill of attainder case.

29. I include further in this record that in my email response of March 1, 2022 to the Committee, I also point out the following: "In closing, I note that the United States government is in possession of all my official White House communications which your committee has requested. While I do not give my permission for your Select Committee to access this information as it involves privilege, I am at least advising you of this fact."  Clearly, much of the documentary material that the Committee with its subpoena was insisting that I provide was in the hands of the government itself.  One wonders if the Committee has sought to obtain this material as a "less burdensome alternative."   If

so, the only remaining documentary material seemingly in play in their subpoena would be that of phone messages and email on my private accounts.  Here, the less burdensome alternative would have been to simply subpoena such information from the service providers as they did with, for example, former Trump Chief of Staff Mark Meadows.[122]  If the Committee did so, then they would have needed nothing from me and the contempt charge would have been all but moot.

30.  To recap, negotiating directly with President Trump and his attorneys over a full or partial waiver in my case of executive privilege and/or testimonial immunity would clearly have been the least burdensome alternative the Committee could have pursued to achieve its alleged nonpunitive legislative end.   Yet, <u>there was also a second least burdensome alternative available to the Committee and the House well short of a criminal prosecution</u>.

31.  As the opinion of District Judge John D. Bates in *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008) makes clear, the second least burdensome alternative would have been to pursue a civil suit rather than a criminal prosecution.  As OLC put it in a memorandum, a civil action would be superior because "Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, <u>not at inflicting punishment on an individual who failed to produce them</u>." *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 76-77 (D.D.C. 2008).   [emphasis added]

32. In *Committee on Judiciary v. Miers, "*[t]he Committee on the Judiciary ("Committee"), acting on behalf of the entire House of Representatives, ask[ed] the Court to declare that

57

**-0443-**

former White House Counsel Harriet Miers must comply with a subpoena and appear

before the Committee to testify regarding an investigation into the forced resignation of

nine United States Attorneys in late 2006, and that current White House Chief of Staff

Joshua Bolten must produce a privilege log in response to a congressional subpoena.

*Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 55-56 (D.D.C. 2008).

33. *Miers* was a situation where Democrats controlled the House of Representatives as in
this case but, unlike in this case, the Democrats faced an uncooperative Republican
president and Attorney General.  This effectively foreclosed the far most burdensome
alternative of the highly punitive criminal prosecution Democrats originally sought.

34. After the Democrat-controlled House passed a resolution recommending criminal
contempt charges against both Miers and Bolten – as the House has done against me in
this case – the Republican Attorney General declined to prosecute. At that point,
illustrating the viability of the less burdensome civil suit option while acknowledging
the partisan nature of the battle, the Judiciary Committee filed the suit against Miers.
As noted in this lengthy passage from the *Miers* opinion:

> *Frustrated by the Executive's actions, the full Committee met on July 25, 2007*
> *and adopted a resolution "recommending that the House of Representatives*
> *find that former White House Counsel Harriet Miers and White House Chief of*
> *Staff Joshua Bolten be cited for contempt of Congress for refusal to comply*
> *with subpoenas issued by the Committee." See 153 Cong. Rec. D1051-01*
> *(2007). Chairman Conyers provided Mr. Fielding with a copy of the*
> *Committee's report in the hope that it might prompt the White House*
> *voluntarily to change its position. See Pl.'s Stmt. of Facts ¶ 52. He received no*
> *response. So, on November 5, 2007, the Committee filed its report with the full*
> *House of Representatives Id ¶ 54  Once again, Chairman Conyers wrote to*

*Mr. Fielding to inform him of that development and to reiterate that the Committee still hoped "to resolve the issue on a cooperative basis"; Chairman Conyers even included "a proposal for resolving the dispute." Id. ¶ 55. This time, Mr. Fielding responded by rejecting Chairman Conyers's offer, explicitly noting that "[w]e are therefore at a most regrettable impasse." Pl.'s Mot. Ex. 34. He urged the Committee to "reconsider its proposed actions" and to accept the President's initial proposal. Id.*

*The next day, however, the Attorney General responded that because Ms. Miers and Mr. Bolten were acting pursuant to the direct orders of the President, "the Department has determined that non compliance      with the Judiciary Committee subpoenas did not constitute a crime, and therefore the Department will not bring the congressional contempt citations before a grand jury or take any other action to prosecute Mr. Bolten or Ms. Miers." Pl.'s Mot. Ex. 40. With criminal enforcement of its subpoenas foreclosed, the Committee — invoking Resolution 980 — filed this action seeking a declaratory judgment and other injunctive relief. See Pl.'s Mot. at 14.*

*In support of the case before being "a justiciable controversy" and therefore a viable less burdensome alternative – not the reference to "not inflicting punishment" -- the opinion of District Judge John D. Bates cites "[t]wo significant OLC [Office of Legal Counsel] opinions issued during the Reagan administration" germane to this case.*

*In 1984, an opinion by Acting Assistant Attorney General Theodore Olson confirmed the viability of a federal civil suit brought by a House of Congress to enforce subpoenas issued to executive officials. See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 U.S. Op. Off. Legal Counsel 101, 137 (1984) (hereinafter "Olson OLC Opinion"). As OLC opined, Congress has three options available to enforce a subpoena against a recalcitrant respondent: (1) referral to the U.S. Attorney for prosecution of a criminal contempt of*

59

**-0445-**

*Congress charge; (2) detention and prosecution pursuant to Congress's inherent contempt authority; or (3) a civil action to enforce the subpoena in a federal district court. When the respondent is a member of the executive branch who refuses to comply on the basis of executive privilege, however, OLC stated that the "contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt." Id. at 142 (emphasis added). That conclusion is rooted in concerns over both the Executive's traditional prosecutorial discretion, see id. at 140, as well as the "concomitant chilling effect" that might impair presidential advice if the possibility of criminal prosecution loomed over the President's close advisors, see id. at 142. Significantly, OLC also determined that "the same reasoning that suggests that the statute could not constitutionally be applied against a Presidential assertion of privilege applies to Congress' inherent contempt powers as well." Id. at n. 42. Thus, neither criminal prosecution nor inherent contempt could be employed against a recalcitrant executive branch official, as OLC saw it.*

*Instead, "Congress [can] obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena." Id. at 137  As OLC put it, a civil action would be superior because:*

*Congress has a legitimate and powerful interest in obtaining any unprivileged documents necessary to assist it in its lawmaking function . . . [and] [a] civil suit to enforce the subpoena would be aimed at the congressional objective of obtaining the documents, not at inflicting punishment on an individual who failed to produce them. Thus, even if criminal sanctions were not available against an executive official who asserted the President's claim of privilege, Congress would be able to vindicate its legitimate desire to obtain documents if it could establish that its*

*need for the records outweighed the Executive's interest in preserving confidentiality.* <u>Id.</u> ...

*A 1986 OLC opinion authored by Assistant Attorney General Charles Cooper reached the same conclusion.* <u>See Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act</u>, *10 U.S. Op. Off. Legal Counsel 68 (1986) (hereinafter "Cooper OLC Opinion"). In that opinion, OLC restated its position that Congress may institute "a civil suit seeking declaratory enforcement of [a] subpoena."* <u>Id.</u> *at 83. Likewise, OLC indicated that although inherent contempt is theoretically available to Congress and could ultimately be challenged by the executive branch through a writ of habeas corpus brought by the detained official, "it seems most unlikely that Congress could dispatch the Sergeant at-Arms to arrest and imprison an Executive Branch official who claimed executive privilege."* <u>Id.</u> *at 86.  Committee on Judiciary v. Miers, 558 F. Supp. 2d 53, 75-77 (D.D.C. 2008).*

35. In this case, the highly partisan Committee and Democrat-controlled Congress in all likelihood believe they have a friend in a Democrat Attorney General who will help them use the criminal prosecution alternative to apply maximum coercive pressure in support of their punitive ends.  Yet, this is clearly not the less burdensome alternative.

36. *Miers* makes clear that a civil suit in this case does indeed represent a justiciable controversy and a far less burdensome alternative than a criminal prosecution involving a contempt of Congress charge against me, with all its accompanying economic coercion, psychological terror, and other punishments. That the Committee and its members and the Democrat majority in the House instead <u>pursued the single most burdensome option of criminal prosecution</u> confirms the bill of attainder nature and punitive objective of their coercive tactics.  In this way, the Committee and its members

along with the Democrat-controlled House miserably fails Test Three of *Nixon v. Administrator of General Services* and thereby confirms their legislative acts represent bills of attainder.

37. In summary, H. Res. 1037 and the Committee's Report along with the subpoena issued by the Committee that constitutes the basis for its contempt charge, together and separately violate the Bills of Attainder Clause of the Constitution. H. Res. 1037 should thereby be ruled by this Court as an invalid legislative act, both the Committee subpoena and Committee Report should likewise be ruled illegal and unconstitutional, and the U.S. Attorney for the District of Columbia should be enjoined from any further action in this matter.

## An Incumbent President Cannot Waive the Executive Privilege of His Predecessor or Testimonial Immunity of Senior Advisers Not Serving that Incumbent

1. We come now to more squarely address the third major controversy in this case: What rights, if any, does an incumbent president have to strip away executive privilege from a predecessor or other former presidents and/or to waive testimonial immunity for the senior advisors of a predecessor or other former presidents? Because this controversy is so central to this case, because there is no settled law, and because it has such broader implications for the future viability of executive privilege and testimonial immunity as positive forces for effective presidential decision-making, it is a controversy ripe for judicial review.

2. That this controversy is even a controversy stunned me when I first heard of it. While I am not a lawyer, I'm not without legal expertise. One of my areas of expertise in economics for which I have a Ph.D. in is regulatory economics; and this sub-field requires a keen understanding of regulatory law. I am therefore not without experience in reading case

law and parsing legal arguments, and I have also published numerous articles in law journals.[123]  When I was made aware that the Committee was going to try to circumvent my duties and obligations under the executive privilege invoked by President Trump and deny me the protections of testimonial immunity by having President Biden strip Trump and myself of these bulwarks of presidential decision-making, I began reading what little case law there is about the viability of such a blatant end run around due process. *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-or-less ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power.").

3.     Upon review of this sparse and anything but settled law, I didn't know whether to laugh at the absurdity of the attempted legal end run of the Committee and White House or cry at how low the Democrats appeared to be willing to stoop that they would be willing to wreck both executive privilege and testimonial immunity as their means to achieve the end of Donald Trump and advisers like me.

4.     The tradition and institution of executive privilege dates back to the days of George Washington, who saw immediately the separation of powers dangers inherent in a legislative branch given free reign to meddle in the affairs of the executive branch.

5.     The *Legal Information Institute* defines executive privilege as "the power of the President and other officials in the executive branch to withhold certain forms of confidential communication from the courts and the legislative branch[124] while Senate.gov sees executive

63

privilege "as a collection of different rights, united by the general principle that the president and key advisers must be able to have internal discussions without fear of exposure."[125]

6.    *Ala. Educ. Ass'n v. Bentley* likewise notes: "Executive privilege "refers to a doctrine under which "documents from a former or an incumbent President [or, arguably, the chief executive of a state government] are presumptively privileged." *United States v. Poindexter,* 727 F. Supp. 1501, 1505 (D.D.C. 1989) (citing *United States v. Nixon,* 418 U.S. 683, 708-13 (1974)  *Ala. Educ. Ass'n v. Bentley*, Civil Action No. CV-11-S-761-NE, at *26 (N.D. Ala. Jan. 7, 2013).  However, this definition is too limiting as it excludes the private conversations between and among presidents and advisers for which there are no "documentary materials," as defined by the Presidential Records Act.[126]  [emphasis added]

7.    The common legal thread in each of these definitions is that that the institution of executive privilege is critical to effective presidential decision-making as executive privilege (along with the companion institution of testimonial immunity) provide necessary shields to foster the kind of candor that must exist among the president and his most senior advisors to promote the most effective presidential and executive branch decision-making possible.

8.    As *United States v. Nixon* notes: "A President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to express except privately."  *Mazars, 140 S. Ct. at 2032* further notes that the privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch" while *Nixon v. Administrator of General Services* opines that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of

confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Nixon v. Administrator of General Services*, 433 U.S. 425, 448-49 (1977)

9.     It follows from this principle that the more executive privilege (and testimonial immunity) are <u>qualified,</u> the less  candor there is likely to be in the conduct of official White House business and the less optimal presidential decision-making will likely be.  Yet settled law is sparse as regards how executive privilege should be qualified. This is partly a function of the relatively few cases that have addressed matters of executive privilege. As *Comm. on Judiciary v. McGahn* notes: "To be sure, there was an uptick in Congress' use of its investigative power in the late nineteenth century, and yet, as DOJ emphasizes, 'there were [still] very few cases dealing with the investigative power.'" *Id.* at 194, <u>77 S.Ct. 1173</u>. *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 181 (D.D.C. 2019).

10.     As previously noted in *Trump v. Mazurs*, much of the time, disputes over executive privilege between the executive and legislative branches have been negotiated in the "hurly-burly" of the political arena and therefore case law on this subject is sparse:  "The question presented is whether the subpoenas exceed the authority of the House under the Constitution. Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." Hearings on S. 2170 et al. before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel).  *Trump v. Mazars U.S., LLP*, 140 S. Ct. 2019, 2029 (2020).

11.     The few generally accepted principles considered to be settled law date back to

the *United States v. Nixon* a.k.a. the Watergate scandal and *Nixon v. Administrator of General Services*.

12.    The Watergate Scandal opened the door to the qualification of privilege <u>in the presence of criminal conduct</u>, e.g., the privilege is waived if the communications are criminal in nature.  Yet, this qualification would indeed quickly be "cabined" to the criminal sphere. *Committee on Judiciary v. Miers* notes: "*Nixon* involved a criminal proceeding but we soon rejected a generalized claim of absolute executive privilege in civil litigation as well. *See Dellums* , <u>561   F.2d   at   245–46</u>." *Comm.   On   Judiciary   of   U.S.   House   of Representatives v. McGahn*, 951 F.3d 510, 540 n.11 (D.C. Cir. 2020)

13.    *United States v. Nixon* also helped confirm that "the Judiciary is the ultimate arbiter when it comes to claims of executive privilege" while "the *Miers* opinion stands for the proposition that   courts   have   federal   jurisdiction   over subpoena enforcement disputes between the Legislature and the Executive branch, and that such disputes are justiciable…." *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 173 (D.D.C. 2019).

14.    Note that *Comm. on Judiciary v. McGahn* is a highly flawed opinion that was overturned on appeal.  Comm. On Judiciary of U.S. House of Representatives v. McGahn, 951 F.3d 510 (D.C. Cir. 2020).  Nothing in it qualifies as precedent.

15.    *Nixon v. Administrator of General Services* likewise makes clear that incumbent presidents are not the only ones who can claim executive privilege: "We reject the argument that only an incumbent President may assert such claims and hold that appellant, as a former President, may also be heard to assert them." *Nixon v. Administrator of General Services*, 433 U.S. 425, 439 (1977).  Yet this case also put forth the dubious proposition based on a District Court ruling – and again cast within the shadow of possible criminal activity -- that the claims

of a former president "carries much less weight than a claim asserted by the incumbent himself." *Id.*, at 345." *Nixon v. Administrator of General Services*, 433 U.S. 425, 448 (1977).

16.    *United States v. Nixon* also helped set the precedent that the applicability of executive privilege should be decided on a case-by-case basis by weighing the need to protect confidentiality and preserve executive privilege against the need for the administration of justice.[127] Yet, as previously noted with the "cabined" reference, this principle itself was again limited by the context of the case itself with respect to the criminality involved.   "[T]he Supreme Court in United States v. Nixon explicitly cabined its opinion to the criminal arena. See 418 U.S. at 711 n. 19 ("We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials.")." *Committee on Judiciary v. Miers*, 558 F. Supp. 2d 53, 72 (D.D.C. 2008).  [emphasis added]

17.    Of course, it may be arguable that neither presidents nor their advisors should be shielded in ways that would allow criminal conduct to flourish. But it must be at this criminal water's edge where the qualification of executive privilege and testimonial immunity by both the Committee and the White House must stop if these two important bulwarks of effective presidential decision-making are to be maintained.  At this water's edge, there is not a scintilla of settled law over the controversy as to whether an incumbent president can waive the privilege of his or her predecessor and/or the testimonial immunity of that predecessor's senior advisers.  To recap, *Comm. On Judiciary of U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020) ("In such disputes, we would have few authorities to guide us—sparse constitutional text, no statute, a handful of out-of-context cases, and a set of more-

*or-less* ambiguous historical sources. *Cf. Youngstown*, 343 U.S. at 634, 72 S.Ct. 863 (Jackson, J., concurring) ("A judge ... may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power.").

18.     While the Committee and its lawyers are free to make whatever arguments they might want in support Joe Biden's actions in this case, the ideas that a sitting president can strip his predecessor or former presidents of executive privilege and the president's most senior advisors of testimonial immunity are both fanciful and absurd on their face. It is even more fanciful and absurd in this case when the sitting president, a Democrat, is seeking to strip the executive privilege of the man he allegedly beat in the 2020 presidential election, Republican Donald Trump, even as both Biden and the Democrat Party are doing everything within their substantial political powers not just to end the presidential career of Donald Trump but to bury any challenges to the fairness and integrity of a 2020 election that remains hotly disputed.

19.     Stripped of rhetoric, allowing a sitting president of one political party to strip a predecessor of another political party of executive privilege and likewise strip senior White House advisors serving that predecessor of their testimonial immunity – regardless of whether this is done under the alluring banner of the national interest – is arguably the most extreme and dangerous form of qualifying executive privilege and testimonial immunity.  If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would turn executive privilege and testimonial immunity into partisan ping-pong balls and deal a mortal blow to the critical functions each are supposed to serve in our Republic: (1) help uphold the principle of separation of powers; and (2) provide for optimum candor in presidential decision-making.

20.     Even if such instances of an incumbent president waiving the privilege of his predecessor were seen as rare and occurring in only extreme circumstances as *Dellums v. Powell* alludes to, if this were settled law, it would be enough to mortally wound privilege as an essential ingredient of effective presidential decision-making. This is particularly so within the context of this case where it is clear that the Committee has, as previously noted, in all probability either explicitly or tacitly colluded with the incumbent president to have the Trump privilege waived so the Committee can then have its judicial function and bill of attainder ways with President Trump and his most senior advisors.  Here, *Dellums v. Powell* has it right when it opines: [T]hose on whom a President relies for advice <u>would be foolish indeed</u> to discuss the demands of executive decision-making with candor, when every proposal would be subject to public disclosure through civil discovery. *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977).  [emphasis added]

21.     Here, however, *Dellums v. Powell* has it wrong when it argues that it is such a rare "infrequent" occurrence in which privilege and immunity might be waived that it would not materially affect the risk calculus of future senior White House advisers: "We cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for <u>in the context of a criminal prosecution</u>." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977) [emphasis added] and "[T]he need for confidentiality is in large measure secured and protected by the relatively infrequent occasions when an assertion of the privilege may be overcome." *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977).

22.     The clear problem with this "relatively infrequent occasions" argument in the context of this case is that the current situation clearly indicates <u>a long term "repeatable game"</u>

69

pattern of partisan abuse of the House's investigatory powers over more than five-year period rather than a "one and done" rare event based on extraordinary circumstances occurring in, as *Dellums v. Powell* qualifies it, the "context of a criminal prosecution." *Dellums v. Powell*, 561 F.2d 242, 247 n.12 (D.C. Cir. 1977).   (To recap, this pattern of partisan abuse by the Committee and its members along with Speaker Pelosi was firmly established in a previous section of this brief.)

23.     From my perspective as a trained economist, and through the lens of strategic game theory, I see the punitive legislative acts and chronic pattern of partisan abuses associated with the Committee and its members over a more than five-year period indeed as a "repeatable game" of gotcha and punishment rather than a one-off rare event that that threatens to reduce the institutions of executive privilege and testimonial immunity to ping pong balls of partisan politics.  In this strategic game, whichever party controls both the House of Representatives and White House will effectively weaponize Congress's investigatory powers in ways designed to: (1) punish political rivals and (2) deny individuals the opportunity to effectively run for political office.

24.     As partisans in the Congress wield their investigatory powers, they will enlist whatever friendly president might be in the White House to strip the executive privilege of former presidents and the testimonial immunity of former senior White House advisors; and it will all be done under the false flags of national emergency and national security. In this case, if the Committee and Joe Biden are able to pull this deadly game off and effectively establish the principle that an incumbent can strip his predecessor of both executive privilege and testimonial immunity, just imagine what will happen to Joe Biden and his advisers if Republicans win both the White House and House in 2024.  In fact, I don't need to imagine

70

this repeat of the strategic game.  If I'm not dead or in prison, I will "tit for tat" lead the charge.

25.    In summary, if the goal is to preserve executive privilege and testimonial immunity to promote optimal presidential decision-making through maximum candor, than the idea that a former president's entitlement to such privilege is somehow of a "lesser weight" than a present president is indeed fanciful and absurd  Any settled law that institutionalizes a revolving partisan door for the waiving of testimonial immunity and executive privilege will end both immunity and privilege as essential elements of effective presidential decision-making.  Because this is so, the time is ripe for this court to address this controversy.  By ruling in my favor, the court will lift the burdensome punishments now being inflicted upon me and provide the appropriate relief.

26.    I note in closing that as I came to this particular controversy, it was settled law that executive privilege is not my privilege to waive. Absent a waiver of that privilege by President Trump, it was – and remains -- my duty not to comply with the Committee's subpoena.  Importantly, and I repeat, I have also made it clear publicly that I would abide by any decision made by President Trump in this matter.[128]

27.    Instead of negotiating directly with President Trump and his attorneys as settled law demanded, the Committee and its members used the Biden unsettled law waiver of privilege and immunity to try to effectively strip me of any legal right, duty, or constitutional obligation I might have had to fail to comply with their subpoena and, after I failed to comply with what I believed their unlawful subpoena, the Committee and Democrat-controlled House pursued the most burdensome and punitive alternative of a criminal contempt charge rather than the less burdensome options of negotiating the privilege with President Trump or filing a

71

civil suit.

28.     As a result, I was put in the untenable position in which the president I served

under has invoked a privilege that a president that I did <u>not</u> serve under has appeared to waive.

Given that it was my sworn duty to uphold the law and abide by the Constitution and that it

remains my belief that there is no settled law to support the acts of the Biden White House and

Committee and given that I believe the law strongly leans in my favor, I had – and have -- no

other honorable choice than to fail to comply with the Committee's subpoena.  In the absence

of even a scintilla of settled law in this matter, it would be both unlawful and dishonorable for

me to consider President Trump's privilege and my own testimonial immunity waived just

because Joe Biden says they are.

29.     I therefore ask this court to dive into the deep end of this pool and firmly address

a controversy that is ripe for adjudication and thereby settle the law in this matter.

**The Plaintiff's Testimonial Immunity is Absolute and His Failure to Comply With a Congressional Subpoena Cannot Be the Legal Basis for a Contempt of Congress Charge.**

1.     Congress cannot lawfully hold the Plaintiff in contempt of Congress for failure

to comply with a subpoena that compels him to testify before the Committee because, under

long-standing Department of Justice policy, the Plaintiff has absolute testimonial immunity as

a senior White House official and has a duty to his country and the executive branch not to

comply with said subpoena.

2.     The right of a senior White House official to testimonial immunity is conceptual

and legally distinct from executive privilege.  The Office of Legal Counsel in the Department

of Justice (OLC) has long contended, dating back more than 50 years, that such immunity is

absolute; and there is no settled law to the contrary.  Memorandum For Pat A. Cipollone

Counsel To The President Re: Testimonial Immunity Before Congress of the Former Counsel to the President, May 20, 2019.  As OLC notes:

> *This testimonial immunity is distinct from, and broader than, executive privilege. Like executive privilege, the immunity protects confidentiality within the Executive Branch and the candid advice that the Supreme Court has acknowledged is essential to presidential decision-making... But the immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential adviser—as a function of the independence and autonomy of the President himself. In this regard, the President's immediate advisers are constitutionally distinct from the heads of executive departments and agencies, whose offices are created by acts of Congress, whose appointments require the Senate's advice and consent, and whose responsibilities entail the administration of federal statutes. Those officers can and do testify before Congress. The President's immediate advisers, however, exercise no statutory authority and instead act solely to advise and assist the President. Their independence from Congress reflects that of the President.*
>
> *Since the 1970s, this Office has consistently advised that "the President and his immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee" on matters related to their official duties. Memorandum for All Heads of Offices, Divisions, Bureaus and Boards of the Department of Justice, from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel, Re: Executive Privilege at 5 (May 23, 1977) ("Harmon Memorandum"); see also Rehnquist Memorandum at 7 ("The President and his immediate advisers—that is, those who customarily meet with the President on a regular or frequent basis—should*

73

**-0459-**

*be deemed absolutely immune from testimonial compulsion by a congressional committee.").* Indeed, *this Office has endorsed that legal principle on more than a dozen occasions, over the course of the last eight presidential administrations.*[129]

3.      If the testimonial immunity of senior White House officials is absolute and exists as an institution to provide for unconstrained candor in communications between an adviser and the president or other advisers, then it can't be waived by the adviser and certainly not by an incumbent president seeking to unlawfully strip his predecessor of both executive privilege and the right to grant testimonial immunity.

4.      Only the courts have the power to waive testimonial immunity on a case by case basis and, given the high stakes for the Republic involved, the courts should tread extremely lightly.  Indeed, if the purpose of testimonial immunity is to provide the confidence senior White House advisers need to speak in complete candor to the president and other senior advisers, then any erosion of such testimonial immunity protection must inevitably lead to a reduction in such candor and therefore less optimal decision-making.

5.      I propose the following test for this court to consider: Would a current White House adviser be significantly less likely to engage in the kind of candor necessary for effective presidential decision-making as recognized under *Nixon v. Administrator of General Services* if that adviser understands that any claim to testimonial immunity by that adviser may be waived by a president that adviser did not serve under?  If the answer is yes, then testimonial immunity must be considered absolute in this circumstance or, alternatively, waived only on a case by case basis by the courts with extreme caution.

6.      I have been put in the untenable position of choosing between conflicting privilege claims that are of constitutional origin and dimension and for which there is no

74

settled law. Allowing a sitting president of one political party to strip a predecessor of another political party of the testimonial immunity afforded to that predecessor's senior White House advisors in the absence of possible criminal conduct – regardless of whether this is done under the flag of the national interest – is arguably the most extreme and dangerous form of qualifying testimonial immunity.  If this fanciful and absurd idea were turned into settled law, imbuing an incumbent president with such power would deal a mortal blow to the critical functions that testimonial immunity are supposed to serve in our Republic.

## PRAYER FOR RELIEF

Wherefore, Plaintiff asks the Court to enter judgment in his favor and against Defendants and to order the following relief:

a. A declaratory judgment that the Committee is neither duly authorized nor properly constituted and therefore its legislative acts, including the subpoena issued to the Plaintiff and Committee Report 117-284, are therefore ultra vires, unlawful, and unenforceable;

b. A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 all represent legislative acts that, as revealed by the legislative history, violate the principle of separation of powers in their simultaneous and unlawful pursuit of a judicial function over and above a facially valid legislative function and are therefore ultra vires, unlawful, and unenforceable;

c. A declaratory judgment that the Committee's subpoena issued to the Plaintiff, the Committee's Report 117-284, and H.Res. 1037 violate the constitutional proscription against bills of attainder and are therefore ultra vires, unlawful, and unenforceable;

d.  An injunction against the U.S. Attorney for the District of Columbia enjoining him from proceeding against the Plaintiff "in the manner and form provided by law" as  H.Res. 1037 recommends;

e.  A declaratory judgment that the Committee subpoena issued to the Plaintiff improperly compels testimony of a senior executive official; and

f.  A declaratory judgment against President Joe Biden that he does not have the legal authority to waive any executive privilege or testimonial immunity invoked by his predecessor in this case.

**ENDNOTES**

---

[1] H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress. Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive, and continues requirements to protect congressional employees from harassment and discrimination. The resolution also implements measures to protect whistle-blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[2] The "power of inquiry—with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty* , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[3] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served. *Watkins v. United States*, 354 U.S. 178 (1957). Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served." *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959). "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959).  As recently as

77

2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081. *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D.C. Cir. 2019)

[4] Preventing a Disrupted Presidential Election and pdf (documentcloud org)

[5] The Secret Bipartisan Campaign That Saved the 2020 Election | Time

[6] The Navarro Report – PETER NAVARRO

[7] https://www.surveymonkey.com/curiosity/axios-january-6-revisited/

https://www.ipsos.com/sites/default/files/ct/news/documents/2022-01/Topline-NPR-Ipsos-poll pdf

[8] Electronic email from Bennie Thompson to Peter Navarro, February 9, 2022 transmitting subpoena

[9] 10 iconic American companies owned by Chinese investors (cnbc.com)

[10] https://www.thegatewaypundit.com/2022/01/jan-6-remembered-ignored-media-fbi-antifa-blm-activists posting photos bragging online storming us capitol jan 6/

[11] FBI had informant in crowd during Capitol riot: report | The Hill

[12] ""In short: [Dan Scavino and Peter Navarro] played key roles in the ex-President's efforts to overturn the results of the 2020 election…" (Thompson) https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

"He hasn't been shy about his role in efforts to overturn the results of the 2020 election and has even discussed the former President's support for those plans…" (Thompson) https://apnews.com/article/capitol-siege-steve-bannon-subpoenas-dan-scavino-peter-navarro-3247f6b7a644ff3e2c6f14d41f6cd0c8

[13] In Trump Time: My Journal of America's Plague Year: Navarro, Peter: 9781737478508: Books  Amazon com

[14] 3 U.S. Code § 15 - Counting electoral votes in Congress | U.S. Code | US Law | LII / Legal Information Institute (cornell.edu)

[15] https://chicago.suntimes.com/2020/12/16/22176920/jfk-stolen-1960-election-chicago-illinois

[16] https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002 pdf

[17] https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HMTG-117-IJ00-20220328-SD002.pdf

[18] A fourth choice would have been piecemeal negotiation over what the Committee wanted but after watching the spectacle with Meadows, I wanted no part of that.

78

[19] https://docs.house.gov/meetings/IJ/IJ00/20220328/114565/HRPT-117-NA.pdf

25 The prison term for this offense makes it a Class A misdemeanor. 18 U.S.C. § 3559(a)(6). By that classification, the penalty for contempt § 192 increased from $1,000 to $100,000. 18 U.S.C. § 3571(b)(5).

[20] CNN Exclusive  Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says | CNN Politics

[21] CNN Exclusive: Ivanka Trump talked to January 6 committee about what was happening inside White House that day, panel chairman says - KVIA

[22] https://morningconsult.com/2018/05/16/voters-dont-necessarily-think-pleading-the-fifth-implies_guilt_but_it_varies_by_party/#:~:text=51%25%20of%20registered%20voters%20said,independents%20who%20said%20the%20same.

[23] https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_parcel_guilty.html .

[24] Su Letter of Feb 28, 2022

[25] See, for example, Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies - The New York Times (nytimes.com).

[26] https://www.cbsnews.com/news/peter-navarro-dan-scavino-contempt-motion-advances-to-full-house/

[27] https //clerk house gov/Votes/2022118

[28] H.Res.8 - 117th Congress (2021-2022): Adopting the Rules of the House of Representatives for the One Hundred Seventeenth Congress, and for other purposes. | Congress.gov | Library of Congress.

"This resolution establishes the rules of the House of Representatives for the 117th Congress by adopting and modifying the House rules from the 116th Congress  Changes from the rules for the previous Congress include measures to facilitate the operation of Congress during the ongoing COVID-19 (i.e., coronavirus disease 2019) pandemic.

The resolution makes the Office of Diversity and Inclusion permanent, revises language in the rules to be gender-inclusive, and continues requirements to protect congressional employees from harassment and discrimination  The resolution also implements measures to protect whistle blowers and increase congressional transparency.

The resolution authorizes necessary amounts for the Committee on House Administration to resolve contested elections. Additionally, the Clerk of the House of Representative must establish a process for House Members to indicate their support for Senate-passed measures that have been received by the House, including maintaining a publicly available list of Members supporting each measure.

The chair of the Committee on the Budget may adjust an estimate concerning the fiscal impact of legislation to exempt the budgetary effects of measures to prevent, prepare for, or respond to economic or public health consequences resulting from the COVID-19 pandemic, as well as measures to prevent, prepare for, or respond to economic, environmental, or public health consequences resulting from climate change.

Until the Committee on Oversight and Reform has adopted rules, the chair of the Select Subcommittee on the Coronavirus Crisis may issue subpoenas related to its investigation into political interference in the response to the coronavirus pandemic at the Department of Health and Human Services and the Centers for Disease Control and Prevention.

The resolution also reauthorizes specified commissions, offices, and committees, and establishes a Select Committee on Economic Disparity and Fairness in Growth."

[29] H.Res.503 - 117th Congress (2021-2022): Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol. | Congress.gov | Library of Congress

[30] https://www.npr.org/2021/07/27/1020713409/here-are-the-9-lawmakers-investigating-the-jan-6 capitol attack
[31] https://www.politico.com/news/2021/07/19/mccarthy-zeroes-in-on-five-gop-members-for-jan-6-select-committee-500201

[32] The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503 117th Cong. (2021).

[33] Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2

[34] The "power of inquiry   with process to enforce it" is "an essential and appropriate auxiliary to the legislative function." *McGrain v. Daugherty* , 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927), at 174, 47 S.Ct. 319.

[35] *McGrain v. Daugherty*, 273 U.S. 135 (1927).  Each house of Congress has power, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution. P. 160. 7

[36] For example, *Watkins v. United States* insists that "testing the motives of committee members...is not our function" and furthermore, "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served  *Watkins v  United States*, 354 U S  178 (1957)  Barenblatt asserts "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose [function] is being served." *Barenblatt v. United States*, 360 U.S. 109, 132-33 (1959).  "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the

exercise of that power." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959).   As recently as 2019, Trump v Mazur opines "[s]o long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Id.* at 127, 132, 79 S.Ct. 1081.  *Trump v. Mazars U.S., LLP*, 940 F.3d 710, 721 (D C  Cir  2019)

[37] "Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province. To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive. The present case does not present such a situation. *Tenney v. Brandhove*, 341 U.S. 367, 377-78 (1951).  In this case, it is painfully and glaringly obvious the Speaker and the Committee and its members have persistently sought to exercise judicial power.

[38] In the light of the Committee's history and the repeated extensions of its life, as well as the successive appropriations by the House of Representatives for the conduct of its activities, its legislative authority and that of the Subcommittee to conduct the inquiry under consideration here is unassailable; and House Rule XI, 83d Congress, which defines the Committee's authority, cannot be said to be constitutionally infirm on the score of vagueness. *Watkins* v. *United States*, 354 U.S. 178, distinguished.  Pp. 116-123.

[39] (a) Rule XI has a "persuasive gloss of legislative history" which shows beyond doubt that, in pursuance of its legislative concerns in the domain of "national security," the House of Representatives has clothed the Committee with pervasive authority to investigate Communist activities in this country. Pp. 117-121.

[40] https://www.govinfo.gov/content/pkg/BILLS-117hr3233ih/pdf/BILLS-117hr3233ih.pdf

[41] (1) a "Chairperson" "appointed jointly by the Speaker of the House of Representatives and the majority leader of the Senate"; (2) a "Vice Chairperson" "appointed jointly by the minority leader of the House of Representatives and the minority leader of the Senate"; (3) "two members . . . appointed by the Speaker of the House of Representatives"; (4) "two members . . . appointed by the minority leader of the House of Representatives"; (5) "two members . . . appointed by the majority leader of the Senate"; and (6) "two members . . . appointed by the minority leader of the Senate." Because Democrats control both chambers in the current Congress, the Commission would have included five members appointed by Democrats and five members appointed by Republicans.

[42] https://www.congress.gov/bill/117th-congress/house-bill/3233/all-actions?overview=closed&q=%7B%22roll-call-vote%22%3A%22all%22%7D

[43] https //clerk house gov/Votes/2021197

[44] H.R.1987 - 115th Congress (2017-2018): Oversight Commission on Presidential Capacity Act | Congress.gov | Library of Congress

[45] H.Res.496 - 115th Congress (2017-2018): Condemning and censuring President Donald

Trump. | Congress.gov | Library of Congress

[46] H.Res.496 - 115th Congress (2017-2018): Condemning and censuring President Donald Trump. | Congress.gov | Library of Congress

[47] https://www.congress.gov/bill/116th-congress/house-resolution/660

[48] Text - H Res 660 - 116th Congress (2019 2020) Directing certain committees to continue their ongoing investigations as part of the existing House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Donald John Trump, President of the United States of America, and for other purposes. | Congress.gov | Library of Congress

[49] https://www.congress.gov/bill/116th-congress/house-resolution/755#:~:text=The%20resolution%20sets%20forth%20two,by%20the%20House%20of%20Representatives

[50] H.R.8548 - 116th Congress (2019-2020): Commission on Presidential Capacity to Discharge the Powers and Duties of the Office Act | Congress.gov | Library of Congress

[51] H Res 24 - 117th Congress (2021 2022) Impeaching Donald John Trump, President of the United States, for high crimes and misdemeanors. | Congress.gov | Library of Congress

[52] https://www.congress.gov/bill/117th-congress/house-resolution/21

[53] https://clerk.house.gov/Votes/2019604

[54] https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[55] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[56] https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[57] https://www.clarionledger.com/story/news/2017/01/17/thompson-not-atten-trumps-inauguration/96655990/

[58] https://www.congress.gov/bill/116th-congress/house-resolution/660/cosponsors

[59] https://www.congress.gov/bill/115th-congress/house-resolution/496/cosponsors?r=87&s=1

[60] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[61] https://www.npr.org/sections/trump-impeachment-trial-live-updates/2021/02/09/965914210/meet-the-house-managers-laying-out-the-case-to-impeach-donald-trump

[62] https://www.congress.gov/bill/117th-congress/house-resolution/21

[63] https://www.congress.gov/bill/115th-congress/house-bill/1987/text

[64] https://www.congress.gov/bill/116th-congress/house-bill/8548?s=1&r=2

[65] https://abcnews.go.com/Politics/pelosi-propose-experts-review-presidents-mental-fitness-25th/story?id=73507849

[66] https://www.facebook.com/raskin.jamie/photos/donald-trump-is-a-barbarian-a-bigot-a-lout-a-narcissistic-bully-and-a-serial-vio/10154554019399763/

[67] https://twitter.com/repraskin/status/863212423083417600

[68] https://twitter.com/repraskin/status/1018987611791282177

[69] https://bethesdamagazine.com/bethesda-beat/government/after-senate-trial-raskin-reflects-on-his-role-in-trump-impeachment-process/

[70] https://clerk.house.gov/Votes/2019604

[71] https://www.youtube.com/watch?v=JW_aZiVk6Pg

[72] https //clerk house gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[73] https://www.congress.gov/bill/117th-congress/house-resolution/21/cosponsors

[74] https://clerk.house.gov/Votes/2019604

[75] https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[76] https //www congress gov/bill/115th congress/house bill/1987/text

[77] https://clerk.house.gov/Votes/2019696 https://clerk.house.gov/Votes/202117

[78] https://lofgren.house.gov/about/democracy-reform-task-force

[79] https://time.com/4635411/democrats-boycotting-donald-trumps-inauguration/

[80] https://lofgren.house.gov/about/democracy-reform-task-force

[81] https //lofgren house gov/media/press releases/lofgren introduces resolution urging vice president-and-cabinet-fulfill-duties

[82] https://twitter.com/repzoelofgren/status/1150523317482184705

[83] https://cha.house.gov/media/press-releases/lofgren-opening-statement-hearing-oversight-us-capitol-police-and-preparations

[84] https //clerk house gov/Votes/2019604

[85] https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[86] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[87] https://www.kerrydougherty.com/allposts/2020/2/11/state-of-the-union-where-was-rep-elaine-luria

[88] https://luria.house.gov/media/press-releases/congresswoman-elaine-luria-calls-impeachment

[89] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[90] https://www.congress.gov/bill/117th-congress/house-resolution/24/cosponsors

[91] https //clerk house gov/Votes/2019604

[92] https://aguilar.house.gov/2019/12/18/aguilar-issues-statement-ahead-house-impeachment-vote/

[93] https://clerk.house.gov/Votes/2019604

[94] https://clerk.house.gov/Votes/2019696
https://clerk.house.gov/Votes/202117

[95] https //www congress gov/bill/117th congress/house resolution/24/cosponsors

[96] https://murphy.house.gov/news/documentsingle.aspx?DocumentID=1042

[97] https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf

[98] https://fingfx.thomsonreuters.com/gfx/legaldocs/lbpgnwxdyvq/Sussmann-response-Durham-2022-02-14.pdf

[99]

https://archive.org/stream/TheSteelDossierTrumpIntelligenceAllegations/The%20Steele%20Dossier%20-%20Trump-Intelligence-Allegations_djvu.txt

[100] See, for example, Gregg Jarrett: 'Russia hoax' was lie created by Hillary Clinton and one of the dirtiest political tricks ever | Fox News

[101] https //www wsj com/articles/what are the consequences for adam schiffs lies 11590174358

[102] https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=447

[103] https://homeland.house.gov/news/press-releases/thompson-brady-announce-election-security-task-force-members

[104] https://www.politico.com/story/2017/02/pelosi-trump-russia-23466 and https //www speaker gov/newsroom/103017

[105] https://pelosi.house.gov/news/press-releases/pelosi-statement-on-censure-resolution-against-president-trump

[106] https://www.heritage.org/the-constitution/commentary/pelosi-bill-remove-president-office-needless-political-stunt

[107] https //www speaker gov/newsroom/7121 0

[108] https://www.politico.com/story/2019/06/05/pelosi-impeachment-1355435

[109] https://thehill.com/homenews/house/505679-pelosi-hits-trump-for-calling-russian-bounty-controversy-a-hoax-trump-himself/

[110] Adam Kinzinger isn't ruling out a 2024 presidential bid as he considers his future after the House | CNN Politics

[111] https://www.foxnews.com/politics/trump-says-liz-cheney-is-only-upset-because-hes-getting-the-us-out-of-ridiculous-and-costly-endless-wars

[112] https://twitter.com/liz_cheney/status/1422381255807705091

[113] https://january6th.house.gov/news/press-releases/thompson-cheney-statement-pentagon-officials-reported-actions-after-january-6th

[114] https://www.justsecurity.org/wp-content/uploads/2021/12/january-6-clearinghouse-John-Eastman-v-Select-Committee-Verizon-Complaint-Case-1-21-cv-03273.pdf

[115] https://www.speaker.gov/newsroom/72121-2

[116] "Bills of pains and penalties "historically consisted of a wide array of punishments: commonly included were imprisonment, banishment, and the punitive confiscation of property by a sovereign.""

[117] As noted, both Liz Cheney and Adam Kinzinger have been censured by the Republican Party for their actions in this matter.

[118] Stephen K. Bannon Indicted for Contempt of Congress | OPA | Department of Justice

[119] Products   Data Briefs   Number 427   December 2021 (cdc gov)

[120] This finding was also leavened by the fact that the Nixon case involved "the fair administration of criminal justice." *Nixon v. Administrator of General Services*, 433 U.S. 425, 477-78 (1977) Legislation designed to guarantee the availability of evidence for use at criminal trials is a fair exercise of Congress' responsibility to the "due process of law in the fair administration of criminal justice," *United States v Nixon*, 418 U S , at 713, and to the functioning of our adversary legal system which depends upon the availability of relevant evidence in carrying out its commitments both to fair play and to the discovery of truth within the bounds set by law. *Branzburg* v. *Hayes*, 408 U.S. 665, 688 (1972); *Blackmer* v. *United States*, 284 U.S. 421, 438 (1932); *Blair* v. *United States*, 250 U.S. 273, 281 (1919). Similarly, Congress' interest in and expansive authority to act in preservation of monuments and records of historical value to our national heritage are fully established.

[121] See, for example, Jan. 6 Panel Warns of Contempt Charges Against Two More Trump Allies - The New York Times (nytimes.com).

[122] MSN

[123] See  The Future of Electricity Deregulation  Lessons Learned From the California Crisis Energy Law Journal, Summer 2003 . . "The Restructuring Regulator: A Guidebook and Research Agenda For the Electricity Industry," Energy Law Journal, Fall, 1995.  "Fundamental Issues in Natural Resource Damage Assessments," with Richard Carson, Natural Resource Law Journal, Fall, 1988. . "How Markets For Impure Public Goods Organize," with Jeffery Dubin, Journal of Law, Economics, and Organization, Fall, 1988. . "The Legal History and Economic Implications of Oil Pipeline Regulation," Energy Law Journal, Fall, 1981, with T. Stauffer.  "Financing U.S. Energy Development: An Economist's Perspective," Energy Law Journal, May 1981, Vol. 2, No. 1p

[124] Executive Privilege | Wex | US Law | LII / Legal Information Institute (cornell.edu)

[125] Defining the Limits of Executive Privilege (senate gov)

[126] "The term "documentary material" means all books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form. *44 U.S. Code § 2201 – Definitions."* While official written documents are generally in the possession of the National Archivist and governed by the PRA, the PRA is silent about conversations for which there are no electronic recordings or transcripts.

[127] Executive Privilege | Wex | US Law | LII / Legal Information Institute (cornell.edu)  and "Neither the doctrine of separation of powers nor the generalized need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances. See, *e. g., Marbury* v. *Madison*, 1 Cranch 137, 177; *Baker* v. *Carr*, 369 U.S. 186, 211.  *United States v. Nixon*, 418 U.S. 683, 684 (1974)"

128 https://www.cbsnews.com/news/peter-navarro-dan-scavino-house-january-6-committee-refers-contempt-charge/

129 See Immunity of the Assistant to the President, 38 Op. O.L.C. at *1; Letter for Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel at 1  2 (Aug  1, 2007) ("Bradbury Letter"); Immunity of the Former Counsel, 31 Op. O.L.C. at 191; Reno Opinion, 23 Op. O.L.C. at 4; Immunity of the Counsel to the President from Compelled Congressional Testimony, 20 Op. O.L.C. 308, 308 (1996) ("Immunity of the Counsel to the President "); Letter for Jack Brooks, Chairman, Committee on the Judiciary, U.S. House of Representatives, from Nicholas E. Calio, Assistant to the President for Legislative Affairs at 1 (June 16, 1992) ("Calio Letter"); Olson Memorandum at 2; Memorandum for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Demand for Deposition of Counsel to the President Fred F. Fielding at 2 (July 23, 1982) ("Congressional Demand for Deposition of Counsel "); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, Re: Congressional Testimony by Presidential Assistants at 1 (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, Re: Dual-Purpose Presidential Advisers at 5 (Aug. 11, 1977); Harmon Memorandum at 5; Letter to Phillip E. Areeda, Counsel to the President, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel (Sept. 25, 1974) (enclosing a memorandum, hereinafter "Scalia Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Roger C. Cramton, Assistant Attorney General, Office of Legal Counsel, Re: Availability of Executive Privilege Where Congressional Committee Seeks Testimony of Former White House Official on Advice Given President on Official Matters at 6 (Dec. 21, 1972) ("Cramton Memorandum"); Memorandum for John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee at 1 (Mar. 15, 1972) ("Erickson Memorandum"); Rehnquist Memorandum at 7.