ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 24-3006

————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

PETER NAVARRO,                    Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
ELIZABETH ALOI
JOHN CRABB, JR.
* MARK HOBEL
D.C. Bar # 1024126
Assistant United States Attorneys
* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Mark.Hobel@usdoj.gov
(202) 252-6829

Cr. No. 22-200 (APM)

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

The parties to this appeal are appellant, Peter Navarro, and appellee, the United States of America. On June 25, 2024, the Court granted the motion of Heidi Kitrosser, Mark J. Rozell, and Mitchell A. Sollenberger to participate as amicus curiae on behalf of appellee.

## Rulings Under Review

This is an appeal from convictions for contempt of Congress, in violation of 2 U.S.C. § 192. Appellant challenges the district court's denial of his motion to dismiss the indictment based on a claimed invocation of executive privilege by former President Trump, and its grant of the government's motion in limine to preclude him from asserting a defense based on executive privilege at trial. *See United States v. Navarro*, 651 F. Supp. 3d 212 (D.D.C. 2023).

## Related Cases

On March 14, 2024, the Court denied appellant's motion for release pending appeal. *See United States v. Navarro*, 2024 WL 1110267 (D.C. Cir. March 14, 2024). Chief Justice Roberts affirmed this Court's bail determination. *See Navarro v. United States*, 144 S. Ct. 771 (2024).

On May 10, 2024, the Court affirmed the contempt of Congress convictions of Stephen Bannon, another former advisor to President Trump, in an appeal involving similar issues regarding the requisite mens rea for a contempt conviction. *See United States v. Bannon*, 101 F.4th 16 (D.C. Cir. 2024).

# Table of Contents

Introduction ........................................................................ 1

Counterstatement of the Case.......................................... 4

    Procedural History ...................................................... 4

    Relevant Facts .............................................................5

Summary of Argument...................................................... 10

Argument .......................................................................... 12

    I.    The District Court Did Not Err in Denying Navarro's Motion to Dismiss the Indictment Based on Executive Privilege and Testimonial Immunity. ....................................... 12

        A.    Additional Background .......................................... 13

        B.    Standard of Review and Applicable Legal Principles ........ 21

            1.    Executive Privilege ..................................... 22

            2.    Testimonial Immunity ................................. 26

        C.    Discussion .......................................................... 29

            1.    The District Court Did Not Clearly Err in Finding No Assertion of Executive Privilege by Former President Trump. ....................................... 29

                a.    It was not "improper" for the district court to hold an evidentiary hearing to determine whether President Trump invoked executive privilege. .............................................. 30

                b.    The district court did not err in requiring Navarro to show that President Trump affirmatively invoked privilege after personal consideration of the subpoena.............................. 31

c.  The district court's factual finding that President Trump did not assert privilege was not clearly erroneous...............................................34

2.  Even if Former President Trump Had Asserted Executive Privilege, It Would Not Have Justified Navarro's Complete Default. ........................................38

3.  Navarro Waived His Absolute Testimonial Immunity Claim, and Any Qualified Immunity He Enjoyed Did Not Justify His Complete Default. .........41

a.  Navarro waived any absolute testimonial immunity claim. ....................................................42

b.  Qualified testimonial immunity does not extend to the subpoena for documents. ................43

c.  Navarro waived any testimonial immunity claim by failing to raise it before the Committee. ............................................................45

d.  There is no evidence former President Trump ever directed Navarro to assert testimonial immunity. ............................................................47

e.  Any testimonial immunity would only have applied to Navarro's official duties, not activities undertaken "in his capacity as a private citizen" like the Navarro Report and the Green Bay Sweep. ...........................................48

f.  Navarro has waived any challenge to the district court's ruling that any qualified immunity was overcome by the Committee's need for his testimony.........................................50

4.  Navarro Was Not Entitled to Additional "Accommodation" from the Committee. ......................51

II. The District Court Did Not Err in Precluding Navarro from Presenting a Defense Based on His Mistaken Belief that Executive Privilege Justified His Default.................................54

CONCLUSION ..............................................................................59

# TABLE OF AUTHORITIES*

**Cases**

*Ansara v. Eastland*, 442 F.2d 751 (D.C. Cir. 1971) ................................53

*Cheney v. U.S. District Court*, 542 U.S. 367 (2004) .........................22, 31

*Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148 (D.D.C. 2019).......................................................................................28

*Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008) ....28

\* *Dellums v. Powell*, 660 F.2d 802 (D.C. Cir. 1981) ....................21, 24, 32

*Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1 (D.C. Cir. 2006) (en banc).......................................................................................33-34

\* *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) ................23, 31, 37, 39

*In re Twitter*, No. 23-5044, 2024 WL 158766 (D.C. Cir. Jan. 16, 2024) .52

\* *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961)........3, 12, 54, 55

\* *Nixon v. Administrator of General Services (GSA)*, 433 U.S. 425 (1977)...........................................................................................23, 51

*Sanders v. McClellan*, 463 F.2d 894 (D.C. Cir. 1972)............................53

\* *Senate Select Comm. v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) .........44, 45

\* *FTC v. Boehringer Ingelheim Pharm., Inc.*, 892 F.3d 1264 (D.C. Cir. 2018) ............................................................................21, 35

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Tobin v. United States*, 306 F.2d 270 (D.C. Cir. 1962) ........................... 53

\* *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021) ..... 20, 22-24, 40, 50-52

*Trump v. United States*, 144 S. Ct. 2312 (2024) ..................................... 49

*United States v. Bryan*, 339 U.S. 323 (1950) ................................... 12, 46

\* *United States v. Bannon*, 101 F.4th 16
    (D.C. Cir. 2024) ............................................. 3, 12, 40, 46, 54, 55, 56

*United States v. Brown*, 892 F.3d 385 (D.C. Cir. 2018) ......................... 30

*United States v. Fort*, 443 F.2d 670 (D.C. Cir. 1970) ............................. 53

*United States v. House of Representatives of the United States*,
    556 F. Supp. 150 (D.D.C. 1983) ............................................ 53

*United States v. Laslie*, 716 F.3d 612 (D.C. Cir. 2013) ........................... 43

*United States v. Navarro*, 651 F. Supp. 3d 212
    (D.D.C. 2023) ........................................................ 15, 36, 54, 55

*United States v. Navarro*, No. 24-3006, 2024 WL 1110267
    (D.C. Cir. March 14, 2024) ................................................. 5

*United States v. Nixon*, 418 U.S. 683 (1974) ................................... 23, 51

*United States v. Olejiya*, 754 F.3d 986 (D.C. Cir. 2014) ......................... 43

*United States v. Reynolds*, 345 U.S. 1 (1953) ........................................ 32

*Watkins v. United States*, 354 U.S. 178 (1957) ................................. 12, 57

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002) ............................................ 50

# OTHER AUTHORITIES

2 U.S.C. § 192 ....................................................................... 2, 3, 12, 54

18 U.S.C. § 3143(b) ...................................................................... 4

18 U.S.C. § 3143(b)(1)(B) ............................................................. 5

H. Res. 503, 117th Cong., 1st Sess. § 3(1) (2021) .................................... 5

Office of Legal Counsel (OLC), *Testimonial Immunity Before Congress of the Former Counsel to the President* ("2019 Engel Opinion"), 43 Op. O.L.C. __, Slip Op. (May 20, 2019)................... 22, 27, 41, 46, 47

OLC, *Appearance of Presidential Assistant Peter M. Flanagan Before a Congressional Committee* (March 15, 1972)..................................... 49

OLC, *Congressional Oversight of the White House* ("2021 Engel Opinion"), 45 Op. O.L.C. __, Slip Op. (Jan. 8, 2021) ............... 26, 47, 48

OLC, *Immunity of Former Counsel to the President from Compelled Congressional Testimony* ("2007 Bradbury Opinion"), 31 Op. O.L.C. 191 (2007) ............................................... 28, 41

OLC, *Immunity of the Director of the Office of Political Strategy and Outreach from Congressional Subpoena* ("Thompson Opinion"), 38 Op. O.L.C. 5 (2014) ................................. 26, 27, 41, 44, 47

OLC, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* ("Olson Opinion"), 8 Op. O.L.C. 101 (1984)................................. 24, 45

OLC, *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress* ("2008 Bradbury Opinion"), 32 Op. O.L.C. 65 (2008) ....................................................... 29

U.S. Const., art. I, § 6, cl. 1 ..................................................... 33

# ISSUES PRESENTED

I.    Did the district court clearly err in finding, after an evidentiary hearing held at Navarro's request, that former President Trump did not direct Navarro to assert executive privilege in response to a congressional subpoena for testimony and documents relating to efforts to overturn the results of the 2020 presidential election?

II.    Was Navarro entitled to dismissal of the indictment charging him with contempt of Congress based on his claims of executive privilege and qualified testimonial immunity where: (i) Navarro refused to comply with a congressional subpoena seeking both testimony and documents; (ii) he never told the congressional committee that he was asserting testimonial immunity; (iii) there is no evidence that former President Trump ever directed Navarro to assert testimonial immunity; (iv) the subpoena sought information related to Navarro's private conduct; and (v) he has not challenged the district court's finding that Congress's compelling need for his testimony would override any claimed immunity?

III.    Did the district court err in precluding Navarro from presenting a defense based on his claimed good-faith belief that executive privilege justified his refusal to comply with the subpoena, where binding

precedent establishes that the contempt of Congress requires proof of a

"deliberate and intentional" default, and that a defendant's motive for

defaulting affords no defense?

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
———————————————

No. 24-3006
———————————————

UNITED STATES OF AMERICA,                               Appellee,

      v.

PETER NAVARRO,                                          Appellant.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
———————————————

BRIEF FOR APPELLEE
———————————————

## INTRODUCTION

Peter Navarro, who served as a White House trade advisor during the Trump Administration, sought to undermine the results of the 2020 presidential election, including by releasing—avowedly "in his capacity as a private citizen" (Appendix (A.) 809)—the "Navarro Report" alleging election fraud in December 2020. In a book published after President Donald Trump left office, Navarro recounted how he helped to develop and implement a plan, dubbed the "Green Bay Sweep," to prevent

congressional certification of the election and ultimately keep President Trump in power.

When the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the U.S. Capitol (the "Committee") subpoenaed Navarro for documents and testimony related to these activities, Navarro claimed that former President Trump's "executive privilege" prevented him from complying (A.2648). Even after the Committee told Navarro that he had to assert privilege on a document-by-document and question-by-question basis, and even after the Biden Administration notified Navarro that the sitting President had "determined that an assertion of executive privilege [was] not in the national interest, and therefore [was] not justified" (A.791), Navarro still refused to provide any documents—including undisputedly non-privileged, personal materials—or to appear for his scheduled deposition.

The jury convicted Navarro on two counts of contempt of Congress in violation of 2 U.S.C. § 192. On appeal, Navarro principally claims that the district court erred in denying his motion to dismiss the indictment because executive privilege "preclude[d]" his prosecution (Brief (Br.) 13). This Court should reject his claims. The district court found, after an

evidentiary hearing requested by Navarro, that former President Trump never directed Navarro to assert testimonial immunity or executive privilege in response to the Committee subpoena. Navarro has not shown that factual finding to be clearly erroneous. Moreover, even if former President Trump had invoked executive privilege, the district court correctly concluded that the Committee's need for the requested documents and testimony would have outweighed that privilege. Finally, the district court correctly concluded that, even if Navarro had a plausible privilege claim, he properly faced contempt liability given his total failure to comply with the subpoena.

Nor did the district court err in precluding Navarro from mounting a defense at trial based on a "good faith" but mistaken belief that executive privilege justified his noncompliance. That claim is foreclosed by this Court's decisions in *United States v. Bannon*, 101 F.4th 16 (D.C. Cir. 2024), and *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), which hold that the mens rea requirement for a § 192 conviction is satisfied by a "deliberate and intentional refusal to honor a congressional subpoena," and that "a good-faith belief that [one] need not comply" is not a defense. *Bannon*, 101 F.4th at 22-23.

This Court should therefore affirm Navarro's convictions for contempt of Congress.

## COUNTERSTATEMENT OF THE CASE

### Procedural History

On June 2, 2022, a grand jury returned an indictment charging Navarro with two counts of contempt of Congress (A.27). Count One charged Navarro with refusing to comply with a Committee subpoena for documents and communications (A.32). Count Two charged him with refusing to appear to give testimony at a deposition as required by the subpoena (A.33).

On September 7, 2023, a jury found Navarro guilty as charged (A.18). On January 25, 2024, the Honorable Amit P. Mehta imposed concurrent prison sentences of four months on each count and ordered Navarro to pay a $9,500 fine and a $50 special assessment (A.2006). Navarro timely filed a notice of appeal (A.24).

The district court also denied Navarro's motion for release pending appeal under 18 U.S.C. § 3143(b) (A.24). This Court affirmed the district court, finding that Navarro "ha[d] not shown that his appeal presents substantial questions of law or fact likely to result in reversal [or] a new

4

trial[.]" Order, *United States v. Navarro*, No. 24-3006, 2024 WL 1110267 (D.C. Cir. March 14, 2024) (citing 18 U.S.C. § 3143(b)(1)(B)). Navarro then applied to the Supreme Court for release pending appeal, but the Chief Justice denied his application in chambers. *Navarro v. United States*, No. 23A843, 144 S. Ct. 771 (March 18, 2024) (Roberts, C.J., in chambers).

## Relevant Facts

On June 30, 2021, the House of Representatives adopted House Resolution 503, establishing the Committee to "investigate and report on the facts, circumstances, and causes" of the January 6, 2021, attack on the Capitol during the joint session of Congress to certify the 2020 presidential election results, including "the influencing factors that fomented such an attack on American representative democracy while engaged in a constitutional process" (A.1639, 2620). *See* H. Res. 503, 117th Cong., 1st Sess. § 3(1) (2021) (Resolution 503). Resolution 503 authorized the Committee to subpoena witnesses to provide testimony and documents (A.1646-47, 2626).

During its investigation, the Committee identified Navarro as a person with information about the events leading up to January 6

(A.1651). The Committee knew that Navarro had published a book and made other public statements about his "Green Bay Sweep" plan to delay or stop congressional certification of the election (A.1652, 1706). On February 9, 2022, Daniel George, a Committee counsel, notified Navarro by e-mail that the Committee was "seeking your deposition testimony and documents relevant to issues it is examining," and asked whether Navarro would accept e-mail service of a subpoena and whether he was represented by counsel (A.1698, 2646). Navarro responded three minutes later: "[Y]es. [N]o counsel. Executive privilege." (A.2646.) George e-mailed Navarro the subpoena (A.1702).

The February 9, 2022, subpoena included a cover letter from the Committee Chairman to Navarro, referencing the Navarro Report and the Green Bay Sweep as topics the Committee "look[ed] forward to discussing" with him (A.1704-05, 2633-34). The letter noted that Navarro had "publicly addressed" these topics, including in his "recently published book, in interviews with reporters, and, among other places, on a podcast," and had "repeat[ed] many claims of purported fraud in the election that have been discredited in public reporting, by state officials, and courts" (A.2633-34). The subpoena sought both documents and

testimony "regarding these and other matters that are within the scope of the Select Committee's inquiry" (A.2631, 2633). It ordered Navarro to produce, by February 23, 2022, "all documents and communications in [his] possession, custody, or control" relating to a list of ten topics, including the Navarro Report and the Green Bay Sweep (A.2635-36). The Committee instructed Navarro that, if he withheld any responsive documents based on a privilege assertion, he must provide a privilege log (A.1708, 2638). The subpoena also required Navarro to testify at a deposition on March 2, 2022, at the Capitol (A.2631).

The Committee received no response from Navarro prior to the document-production deadline (A.1715-16). On February 24, 2022, George e-mailed Navarro to "follow[] up" on the subpoena because the Committee "ha[d] not received any documents or an indication that [Navarro] ha[d] no documents that are responsive to the subpoena's document schedule" (A.2645). George also reminded Navarro that his deposition was scheduled for March 2, and asked him to contact George to discuss details or tell George if he did not plan to appear (*id.*). On February 27, Navarro e-mailed George in the form of a letter: "Please be advised that President Trump has invoked Executive Privilege in this

matter; and it is neither my privilege to waive or Joseph Biden's privilege to waive. Accordingly, my hands are tied. Your best course of action is to directly negotiate with President Trump and his attorneys regarding any and all things related to this matter." (A.2648.) George replied:

> There are topics, including those discussed in the Chairman's letter, that the Select Committee believes it can discuss with you without raising any executive privilege concerns at all. In any event, you must appear to assert any executive privilege objections on a question-by-question basis during the deposition. This will enable the Select Committee to better understand your objections and, if necessary, take any additional steps to address them.
>
> With that in mind, can you please let us know whether you intend to appear for deposition testimony on Wednesday, March 2, 2022, at 10:00 AM as scheduled by the subpoena? (A.2647.)

Navarro then asked whether the deposition would be public; George responded that it would not and told Navarro:

> If you have a scheduling conflict with that date, please let me know and we would be happy to work with [you] to find a date to be scheduled within a reasonable time. Also, please let me know when you anticipate providing documents that are responsive to the subpoena schedule, or a log of specific documents that you are withholding and the basis for withholding, such as executive privilege. (A.2647.)

On February 28, 2022, Navarro replied that he had "been clear in [his] communications on this matter," and reproduced his "letter"

8

response from the previous day stating that "President Trump has invoked Executive Privilege" (A.2649). On March 1, George told Navarro:

> [T]here are topics that the Select Committee believes it can discuss with you without raising any executive privilege concerns at all, including, but not limited to, questions related to your public three-part report about purported fraud in the November 2020 election and the plan you described in your book called the "Green Bay Sweep." If there are specific questions that raise executive privilege concerns, you can assert your objections on the record and on a question-by-question basis. (A.2649.)

George warned Navarro that the Committee "plan[ned] to proceed" with the deposition, and that his attendance was "required by the subpoena" (*id.*).

Separately, on February 28, 2022, Jonathan Su, a Deputy Counsel to President Biden, sent Navarro a letter by e-mail detailing President Biden's position on the Committee subpoena (A.791). Su told Navarro that President Biden had "determined that an assertion of executive privilege is not in the national interest, and therefore is not justified, with respect to particular subjects within the purview of the Select Committee," and therefore that President Biden had "decided not to assert executive privilege as [to] your testimony regarding those subjects, or any documents you may possess that bear on them," and had also

"determined that he will not assert immunity to preclude you from testifying before the Select Committee" (*id.*).

Navarro did not appear for his scheduled deposition, and he did not communicate further with the Committee (A.1726-27, 1754, 2651). On March 28, 2022, the Committee voted unanimously to recommend to the House that Navarro be found in contempt of Congress (A.2394).

## SUMMARY OF ARGUMENT

Navarro claims that he was not required to comply with the Committee subpoena because President Trump told him to assert executive privilege (Brief (Br.) 31-43). But the district court found—after an evidentiary hearing Navarro requested—that President Trump did not assert executive privilege. Navarro cannot show that the court's factual finding is clearly erroneous. Moreover, even if President Trump had asserted executive privilege over presidential communications, it would not have justified Navarro's complete default; Navarro would still have been required to produce non-privileged documents and appear for his deposition to answer questions about unprivileged matters.

Navarro also claims that, as a former "senior presidential advisor," he was entitled to absolute immunity from the Committee subpoena and

therefore could not be prosecuted for failing to comply with it (Br.17-31). But Navarro waived any absolute immunity claim by agreeing in the district court that, as a former advisor to a former President, he was entitled at best to only qualified testimonial immunity. That doctrine does not help Navarro in challenging his convictions for multiple reasons, including: (1) it would not apply to his conviction on Count One, for refusing to provide documents; (2) he waived it by failing to claim testimonial immunity before the Committee; (3) there is no evidence that President Trump ever directed Navarro to assert testimonial immunity; (4) such immunity would only apply to testimony about Navarro's official duties, not to matters undertaken as a "private citizen" like the Navarro Report and Green Bay Sweep; and (5) Navarro does not challenge the district court's determination that the Committee's compelling need for Navarro's testimony outweighed any qualified immunity.

Finally, Navarro claims that the district court erred in precluding him from presenting as a defense at trial his good-faith belief that he was not required to comply with the subpoena because of executive privilege (Br. 43-48). As Navarro has essentially acknowledged in a petition for initial hearing en banc filed with his brief, such a defense is foreclosed by

11

this Court's decisions in *United States v. Bannon*, 101 F.4th 16 (D.C. Cir. 2024), and *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961).

**ARGUMENT**

I.    **The District Court Did Not Err in Denying Navarro's Motion to Dismiss the Indictment Based on Executive Privilege and Testimonial Immunity.**

Pursuant to 2 U.S.C. § 192, "*every* person who having been summoned as a witness by the authority of . . . any committee of either House of Congress, willfully makes default," is guilty of contempt. *Id.* (emphasis added). "It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of Congress and its committees and to testify fully with respect to matters within the province of proper investigation." *Watkins v. United States*, 354 U.S. 178, 187-88 (1957). *See also United States v. Bryan*, 339 U.S. 323, 331 (1950) ("We have often reiterated the importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned.").

12

Navarro, however, claims that this "duty of all citizens" does not apply to him, because he was immune from Congress's subpoena power as an advisor to a former president (Br. 17-31), and because former President Trump asserted executive privilege in response to the subpoena (*id.* 31-43). As set forth below, Navarro's arguments are both legally and factually unsupported, and do not justify his blanket refusal to provide documents or appear for his deposition. Accordingly, the district court did not err in denying Navarro's motion to dismiss the indictment.

## A. Additional Background

On August 17, 2022, Navarro moved to dismiss the indictment, claiming that he was "immune from congressional process" as a "senior advisor to a President," and that "[a] prosecution for Contempt of Congress following a legitimate assertion of Executive Privilege" by President Trump "necessarily violates the doctrine of Separation of Powers and is unconstitutional" (A.108, 116-17). Navarro relied heavily on a series of opinions issued by the Department of Justice's Office of Legal Counsel (OLC) (A.119-22).

In its opposition, the government acknowledged that "executive privilege can provide a defense to contempt of Congress in certain circumstances," but explained that the doctrine was inapplicable here because "there is no evidence it was ever invoked, in any way, with respect to the subpoena the Committee issued to" Navarro (A.179-80). The government also noted that, even if President Trump had invoked executive privilege, it would not have provided "'absolute immunity' to simply ignore congressional subpoenas wholesale" (A.186).

At a motions hearing on November 4, 2022, Navarro clarified his position: "Where the former President has invoked executive privilege with respect to the testimony of a senior advisor, then, as a matter of law, that senior advisor need not appear in response to the subpoena that he or she has received by Congress" (A.515). Navarro agreed, however, that it would have been "entirely ineffective for [him] to invoke privilege without an instruction [from President Trump] to do it," and acknowledged that "the linchpin" of his arguments was "whether or not President Trump instructed [him] to invoke executive privilege" (A.529-30, 582).

14

On January 19, 2023, the district court denied Navarro's motion to dismiss the indictment, finding that his "testimonial immunity defense rests on an unsupported factual premise: that President Trump invoked executive privilege with regard to the Select Committee's subpoena." *United States v. Navarro*, 651 F. Supp. 3d 212 (D.D.C. 2023). Because Navarro "ha[d] failed to come forward with any evidence to support the claimed assertion of privilege," he could not "avoid prosecution for contempt." *Id.*

On January 24, 2023, Navarro moved for reconsideration, arguing that "he should have the opportunity to present evidence of President Trump's invocation of privilege at an evidentiary hearing" (A.601). Navarro provided a letter from Evan Corcoran, former President Trump's counsel, dated January 23, 2023, "confirm[ing] President Trump's position that, as one of his senior advisors, [Navarro] had an obligation to assert executive privilege on his behalf" in responding to the Committee's subpoena (A.622-23). The court questioned, however, what the legal consequence would be if Navarro could demonstrate that President Trump invoked privilege, and whether it would present a complete defense to contempt (A.701-03).

In response, the government provided additional briefing on Navarro's "unsupported claims of executive privilege and testimonial immunity" (A.725-50). The government explained that, "even had former President Trump purported to invoke executive privilege or testimonial immunity[,] . . . those assertions would not have justified [Navarro's] categorical non-compliance with the subpoena as to either the documents in his possession or his appearance at the deposition" (A.725). The government acknowledged "the Department of Justice's longstanding view that when the *incumbent* President asserts executive privilege or testimonial immunity and directs an official to act in accord with that assertion, the official cannot be convicted [of contempt of Congress] for complying with the President's directive" (A.733). But the government clarified that "the Department of Justice has not previously taken the position and its existing [OLC] opinions do not state that if a former president invokes executive privilege as to a subpoena to an aide, in the face of a contrary assertion by a sitting President, that the aide's refusal to appear would not be subject to prosecution" (A.734). Rather, the government argued, "when a congressional committee demands testimony from an immediate presidential advisor after a president's

term of office has ended, at most, a form of qualified immunity applies"
(A.734-35). Here, any such qualified immunity or privilege would have
been overcome by the Committee's showing of need for Navarro's
testimony and documents, and by the sitting President's conclusion that
executive privilege and testimonial immunity were not warranted
(A.734-35). Moreover, the government argued, Navarro waived any
testimonial immunity claim by failing to raise it with the Committee
(A.737). In any event, neither executive privilege nor testimonial
immunity could "justify a complete default on the Committee's
subpoena," because "the Committee informed [Navarro] that most of the
information it was seeking did not concern communications he took in his
capacity as presidential advisor at all, but instead related to matters
undertaken in his personal capacity with persons outside the
government" and "did not concern matters that occurred in the course of
[Navarro's] discharge of his governmental duties" (A.739-40). Finally, the
government noted, testimonial immunity would not be available as a
defense to Count One, because "the doctrine does not apply to subpoenas
for documents" and "do[es] not provide a defense for [Navarro's] complete
failure to produce a single document" to the Committee (A.741-42).

17

At a hearing on June 21, 2023, Navarro abandoned his absolute testimonial immunity claim, claiming instead that he enjoyed only "qualified immunity" from compelled congressional testimony (A.884, 911). In a July 12, 2023, pleading, Navarro agreed that the subpoena sought both "non-official/personal documents" and "official documents relating to his tenure in the Executive Branch" (A.962).

On July 28, 2023, the district court granted Navarro's motion for an evidentiary hearing to permit him "to establish the factual predicate for the actual, proper invocation of executive privilege or testimonial immunity, or both, by the former President" (ECF 96 at 3). The court noted that "the parties now agree that a former senior aide to a former President enjoys only a qualified immunity against compelled congressional testimony," and explained that "the claimed assertion of *testimonial immunity* is relevant only to Count Two—contempt of Congress for refusing to provide testimony. . . . The rationale for such immunity simply does not apply to the production of records." (*Id.*)

At the August 28, 2023, evidentiary hearing, Navarro testified that, after receiving the Committee subpoena, he contacted President Trump's assistant "to let the President know" that he "was obviously looking for

direction on this" (A.1071). Eleven days later, on February 20, 2022, Navarro spoke to President Trump on the phone for three minutes (A.1075). Navarro testified that, "during that call, it was very clear that the privilege was invoked, very clear" (A.1076). Navarro also presented evidence that, in response to an earlier subpoena issued by the House Select Subcommittee on the Coronavirus Crisis (the "COVID Subcommittee") (A.2041), President Trump had issued a press release on November 20, 2021, stating, "I'm telling Peter Navarro to protect executive privilege and not let these unhinged Democrats discredit our great accomplishments" (A.1059, 2235). Following the hearing, however, Navarro's counsel acknowledged, "I don't think anyone would disagree . . . that we wish there was more here from former President Trump" (A.1107). Counsel also agreed that there could not be "a blanket assertion" of executive privilege and that President Trump's "assertion of privilege with respect to the COVID Subcommittee" did not "apply to the January 6th Committee" (A.1109).

Based on the evidence at the hearing, the district court found that "there was no formal invocation of executive privilege after personal consideration [by President Trump] with respect to the Select

Committee's subpoena to Dr. Navarro, nor any authorization to Dr. Navarro to invoke the privilege on the President's behalf" (A.1187). The court found that the January 23, 2023, letter from former President Trump's counsel was the "most compelling evidence," because "[t]his was an opportunity to clearly state that the President had formally invoked or claimed executive privilege, but that is not what the letter says" (A.1185). The letter "outweigh[ed] Dr. Navarro's nondescript testimony regarding a three-minute phone call with" former President Trump (*id.*). The court found that "the lack of detail" in Navarro's testimony was "telling," because "[i]f it was truly clear, as Dr. Navarro claims, then he should not have had any trouble conveying what President Trump actually told him" (A.1186).

Moreover, even if "executive privilege or testimonial immunity had been properly invoked," the district court found "as an alternative ground" that any such qualified immunity or privilege "would have been pierced by Congress's and President Biden's express interest in the documents and testimony that were sought by the Select Committee from" Navarro (A.1190, 1198). The court relied on this Court's decision in *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), which applied "a

balancing test looking at the interests of Congress, the sitting President, and the former President" to "circumstances much akin to the facts at hand" (A.1193-94). The court noted that, as in *Thompson*, the result would be the same "under any test, even one that affords greater deference or weight to the interests of a former President" (A.1198). In light of these findings, the court considered it unnecessary to determine whether Navarro did not "properly raise[] the defense of testimonial immunity before the Select Committee and, therefore, waived it in these proceedings" (A.1198).

## B.  Standard of Review and Applicable Legal Principles

"[T]he burden is on the official claiming immunity to demonstrate his entitlement." *Dellums v. Powell*, 660 F.2d 802, 807 (D.C. Cir. 1981). Similarly, "[t]he burden is on the proponent of the privilege to demonstrate that it applies." *FTC v. Boehringer Ingelheim Pharm., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018). "To the extent [Navarro] challenges the legal test employed by the district court, [this Court's] review is de novo. To the extent [he] challenges the facts found by the district court, [this Court's] review is for clear error." *Id.*

21

Navarro's brief repeatedly conflates the "distinct" concepts of executive privilege and testimonial immunity. *See* Office of Legal Counsel (OLC), *Testimonial Immunity Before Congress of the Former Counsel to the President* ("2019 Engel Opinion"), 43 Op. O.L.C. __, Slip Op. at *4 (May 20, 2019) ("[T]estimonial immunity is distinct from, and broader than, executive privilege."). Therefore, the government provides a brief overview of each doctrine below.

## 1. Executive Privilege

"Executive privilege is an extraordinary assertion of power not to be lightly invoked." *Cheney v. U.S. District Court*, 542 U.S. 367, 389 (2004). "The canonical form of executive privilege"—the presidential communications privilege—"allows a President to protect from disclosure documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *Thompson*, 20 F.4th at 25.[1] But executive privilege is not absolute; it is only qualified or "presumptive," *United States v. Nixon*, 418

---

[1] Because the presidential communications privilege is the only strand of executive privilege at issue in this case, references to executive privilege in this brief should be understood as references to the presidential communications privilege unless otherwise indicated.

U.S. 683, 707-08 (1974), meaning it "may be overcome by a strong showing of need by another institution of government." *Thompson*, 20 F.4th at 26. This Court summarized the "contours" of executive privilege in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997):

> The President can invoke the privilege when asked to produce documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential. If the President does so, the documents become presumptively privileged. However, the privilege is qualified, not absolute, and can be overcome by an adequate showing of need.

*Id.* at 744-45.

Executive privilege "survives the individual President's tenure." *Nixon v. Administrator of General Services (GSA)*, 433 U.S. 425, 449 (1977). A former President "may legitimately assert the Presidential privilege," but "only as to those materials whose contents fall within the scope of the privilege": "communications in performance of a President's responsibilities of his office and made in the process of shaping policies and making decisions." *Id.* (cleaned up). Moreover, because "only the incumbent [President] is charged with the executive duty under the Constitution," the incumbent President's failure to support a former President's executive-privilege assertion "detracts from the weight of [the

former President's] contention that [an information request] impermissibly intrudes into the executive function and the needs of the Executive Branch." *Id.* at 448-49. "This necessarily follows, for it must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support invocation accordingly." *Id.* at 449. *See also Thompson*, 20 F.4th at 73-74 ("[I]t is only [the incumbent] who can make a fully informed and circumspect assessment of all the competing needs and interests of the Executive Branch."); *Dellums*, 561 F.2d at 249 ("It is of cardinal significance . . . that the claim of privilege is now being urged solely by a former president, and there has been no assertion of privilege by an incumbent president . . . . [A former President's] claim is not as forceful as one raised by an incumbent.").

OLC has opined that "the contempt of Congress statute does not apply to an executive official who carries out the President's claim of executive privilege." OLC, *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege* ("Olson Opinion"), 8 Op. O.L.C. 101, 140 (1984). The Olson Opinion arose out of a confrontation between a congressional

subcommittee and the Environmental Protection Agency (EPA) during the Reagan Administration. *Id.* at 101. The subcommittee subpoenaed the EPA for "a wide range of documents concerning enforcement of the Superfund Act"; the EPA provided numerous documents but withheld "a limited number" of sensitive documents involving ongoing enforcement efforts. *Id.* at 106. President Reagan "ultimately determined to assert a claim of executive privilege with respect to 64 documents from open enforcement files," and "implemented this decision in a memorandum . . . to the EPA Administrator, which instructed her to withhold the particularly sensitive documents from disclosure outside the Executive Branch as long as the documents remained critical to ongoing or developing enforcement actions." *Id.* at 106-07. The House of Representatives voted to hold the Administrator in contempt and referred the matter to the United States Attorney for the District of Columbia. *Id.* at 107-08. OLC opined, however, that "[i]n the narrow and unprecedented circumstances presented here, in which an Executive Branch official has acted to assert the President's privilege to withhold information from a congressional committee concerning open law enforcement files, based upon written legal advice of the Attorney

General, the contempt of Congress statute does not require and could not constitutionally require a prosecution of that official[.]" *Id.* at 142.

## 2.    Testimonial Immunity

OLC has also opined that, "in addition to invoking executive privilege over particular questions, the President 'can . . . direct [advisors] not even to appear before the committee.'" OLC, *Congressional Oversight of the White House* ("2021 Engel Opinion"), 45 Op. O.L.C. __, Slip Op. at *54 (Jan. 8, 2021). "[T]he White House has consistently resisted subpoenas that seek to compel the President's immediate advisors to testify before congressional committees. . . . [F]or almost 50 years, [OLC] has articulated this position as a legal immunity—that 'the President and his immediate advisors are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties.'" *Id.* at *53. OLC has traced the doctrine of absolute testimonial immunity for immediate presidential advisors to "the constitutional separation of powers," and "the immunity of the President himself from congressional compulsion to testify." OLC, *Immunity of the Director of the Office of Political Strategy and Outreach from Congressional Subpoena* ("Thompson Opinion"), 38 Op. O.L.C. 5, 6

26

(2014). "For the President's absolute immunity to be fully meaningful, and for these separation of powers principles to be adequately protected, the President's immediate advisers must likewise have absolute immunity from congressional compulsion to testify about matters that occur during the course of discharging their official duties." *Id.* at 7. "This testimonial immunity is distinct from, and broader than, executive privilege. . . . [T]he immunity extends beyond answers to particular questions, precluding Congress from compelling even the appearance of a senior presidential advisor[.]" 2019 Engel Opinion, at *4. *See also* Thompson Opinion, 38 Op. O.L.C. at 9 ("To be sure, the President's advisers could invoke executive privilege to decline to answer specific questions if they were required to testify. But the ability to assert executive privilege during live testimony in response to hostile questioning would not remove the threat to the confidentiality of presidential communications.").

OLC has extended the doctrine of absolute testimonial immunity to the former senior advisors of sitting presidents. 2019 Engel Opinion, at *2 ("We have also recognized that the immunity continues to apply after the Counsel leaves the White House."). *See also* OLC, *Immunity of*

*Former Counsel to the President from Compelled Congressional Testimony* ("2007 Bradbury Opinion"), 31 Op. O.L.C. 191, 192 (2007).[2] Importantly, however, no OLC opinion has yet addressed whether a *former* President's senior advisors retain absolute testimonial immunity. *See* Statement of Interest of the United States, *Meadows v. Pelosi*, Case No. 21-cv-3217 (CJN) (D.D.C. July 15, 2022) (A.792-808). But the Department of Justice has taken the position—in litigation arising from a subpoena issued by the Committee to former White House Chief of Staff Mark Meadows—that "[w]hen a congressional committee demands testimony from an immediate presidential adviser after the President's term of office has ended, the relevant constitutional concerns are lessened" and "a form of *qualified* immunity is appropriate to address" separation-of-powers concerns. *Id.* (A.793). Accordingly, "Congress's implied authority to investigate does not extend to compelling immediate advisers to a former President to testify about their official

---

[2] Two district courts have disagreed with the government's position that a sitting president may direct his senior advisors to assert absolute immunity from compelled congressional testimony. *See Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 200-14 (D.D.C. 2019); *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 105-06 (D.D.C. 2008).

duties . . . unless Congress has made a sufficient showing of need or the immunity has been waived." *Id.* (A.793-94).

Finally, OLC has opined that "[t]he principles that protect an Executive Branch official from prosecution for declining to comply with a congressional subpoena based on a directive from the President asserting executive privilege similarly shield a current or former senior advisor to the President from prosecution for lawfully invoking his or her immunity from compelled congressional testimony." OLC, *Whether the Department of Justice May Prosecute White House Officials for Contempt of Congress* ("2008 Bradbury Opinion"), 32 Op. O.L.C. 65, 68 (2008).

## C.    Discussion

### 1.    The District Court Did Not Clearly Err in Finding No Assertion of Executive Privilege by Former President Trump.

Navarro challenges the district court's finding that former President Trump did not assert executive privilege in response to the Committee subpoena (Br.31-43). The district court did not commit legal or factual error.

### a. It was not "improper" for the district court to hold an evidentiary hearing to determine whether President Trump invoked executive privilege.

Navarro accuses the district court of "impropriety" in determining whether the former President asserted privilege (Br.33-34). This claim utterly fails. Navarro himself framed the question of "whether or not President Trump instructed [him] to invoke executive privilege" as "the linchpin" of his arguments (A.582). Indeed, Navarro specifically requested "an evidentiary hearing on the question of what evidence supports a finding that former President Trump invoked privilege" (A.599), and asked the court to "make a factual determination— supported by findings on the record—with respect to former President Trump's invocation of his presidential privilege" (A.819). Navarro cannot now claim that the district court acted "improper[ly]" in holding such a hearing and making such findings (Br.34). *See United States v. Brown*, 892 F.3d 385, 393 (D.C. Cir. 2018) ("A defendant may not complain about invited error.").

### b. The district court did not err in requiring Navarro to show that President Trump affirmatively invoked privilege after personal consideration of the subpoena.

Navarro also argues that the district court erred in requiring evidence that either former President Trump or "someone who the President has designated" asserted executive privilege through "some affirmative act or conduct" after "personal consideration" of the matter (Br.32 (quoting A.1167)). But—as Navarro acknowledges (*id.*32-33)—the district court based its analysis of this issue on governing precedent. Specifically, the district court relied on the Supreme Court's caution that "[e]xecutive privilege is an extraordinary assertion of power 'not to be lightly invoked,'" because "once [it] is asserted, coequal branches of the Government are set on a collision course." *Cheney*, 542 U.S. at 389. The district court logically followed the Court's analysis in the context of the state secrets privilege—another species of executive privilege, *Sealed Case*, 121 F.3d at 736-38—in concluding that the privilege "belongs to the Government and must be asserted by it," through a "formal claim of privilege, lodged by the head of the department which has control of the matter, after actual personal consideration by that officer." *United States*

31

*v. Reynolds*, 345 U.S. 1, 7-8 (1953). *See also Dellums*, 561 F.2d at 248 (dicta) (noting that "[a]nalytically, there is much to be said for the proposition that . . . the presidential privilege must be claimed by the president or an official authorized to speak for the president."). Thus, the district court stood on firm legal ground in requiring Navarro to show that President Trump (or a designee) asserted privilege in some affirmative manner after personal consideration of the subpoena.[3]

Contrary to Navarro's claims, the district court did not adopt an unduly "stringent test" (Br.36). As the court pointed out, it was "looking for something from [President Trump], any sentence, fragment of a sentence, public, private, whatever, that utters the words 'executive privilege' or 'testimonial immunity'" in connection with the Committee subpoena, but "the record is barren of that" (A.1112). The court pointed to President Trump's press release in response to the November 2021

---

[3] Notably, Navarro has never proposed any alternative standard—as the district court observed in denying his motion for release pending appeal (ECF 169 at 7 ("Yet, after over a year of litigation, [Navarro] still has not offered what he thinks is required for a proper invocation of executive privilege.")).

32

COVID Subcommittee subpoena as an example of an assertion and did not require the degree of formality that Navarro now claims (*id.*).

Analogizing to the Speech or Debate Clause, U.S. Const., art. I, § 6, cl. 1, Navarro asserts that the applicability of executive privilege should be "almost automatic" without any "specific judicial requirement that its assertion be framed in any particular way" (Br.35). Of course, Navarro forgets that the Constitution itself articulates and enforces the Speech or Debate Clause. *See* U.S. Const. art. I, § 6, cl. 1 ("Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place."). The Constitution does not speak directly to executive privilege in the same way. And, in at least one context, this Court has required the Speech or Debate Clause to be asserted "in a particular way." *See Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 16 (D.C. Cir. 2006) (en banc) ("To invoke the Speech or Debate Clause, the employing office should include . . . an affidavit from an individual eligible to invoke the Speech or Debate Clause

recounting facts sufficient to show that the challenged personnel decision was taken because of the plaintiff's performance of conduct protected by the Speech or Debate Clause."). And the opposing party "may challenge a defendant's eligibility [to assert immunity] by arguing that the predicates for doing so . . . are not satisfied." *Id.* at 16 n.26. In any event, to be effective as a shield, Speech or Debate Clause immunity plainly must be asserted by a Member of Congress or an eligible staff member in response to a challenged action by another branch of government. *See id.* at 16 ("The affiant . . . must be able to assert a Member's Speech or Debate Clause immunity.").

> **c.    The district court's factual finding that President Trump did not assert privilege was not clearly erroneous.**

The district court did not clearly err in finding that there was no assertion of executive privilege by President Trump in response to the Committee subpoena.[4] The court permissibly inferred that President

---

[4] Navarro suggests that this Court should review the district court's factual finding under a novel "due deference" standard apparently borrowed from the sentencing context (Br.17). But Navarro agreed below that "whether the former President in fact directed [him] to assert the

(continued . . . )

Trump did not actually assert privilege based on "two key pieces of evidence," which "directly had the potential to establish a claim of executive privilege" but did not do so (A.1187): (1) the January 2023 letter from President Trump's lawyer, which notably did not state that President Trump told Navarro to assert privilege (A.1186); and (2) Navarro's testimony about his three-minute call with President Trump, which was "telling" in its "lack of detail" about what President Trump actually said (A.1187). It was reasonable for the court to infer that, "[i]f it was truly clear, as Dr. Navarro claims [that President Trump asserted privilege], then he should not have had any trouble conveying to the [c]ourt what President Trump actually told him" (*id.*).

Navarro claims that President Trump "properly invoked" executive privilege, pointing to his testimony about a different phone call with President Trump in fall 2021, in connection with the subpoena from the COVID Subcommittee (Br.36-37 (quoting A.1061)). President Trump subsequently issued the press release attacking the COVID

---

presidential privilege on his behalf" was "a question of fact" requiring "a factual determination" by the district court (A.819 & n.7). This Court reviews a district court's privilege-related factual findings for clear error only. *Boehringer Ingelheim Pharm.*, 892 F.3d at 1267.

Subcommittee as a "Witch Hunt" and stating that he was "telling Peter Navarro to protect executive privilege" in connection with its investigation (A.2235). At the time of that call, however, Navarro had not yet been subpoenaed by the January 6 Committee. Moreover, Navarro has conceded that "an invocation as to one subpoena does not apply to a different subpoena" (A.1109). In fact, as the district court pointed out, the "record evidence that President Trump directed [Navarro] to invoke executive privilege" in response to "an entirely different subpoena" makes the "absence of [such] evidence" in connection with the Committee subpoena even more striking. *Navarro*, 651 F. Supp. 3d at 224-25. Navarro also suggests that he followed "protocol" for seeking direction from the former President in whether to assert executive privilege (Br.37-38). That simply confirms that President Trump had the opportunity to assert executive privilege, but he did not.[5]

Navarro argues that the district court "[e]ssentially" concluded that former President Trump waived the privilege by focusing "on what

---

[5] Navarro also points to grand jury testimony from two aides to President Trump, Justin Clark and Elizabeth Harrington (Br.38-39), but neither Clark nor Harrington testified that President Trump asserted executive privilege, or authorized Navarro to do so on his behalf (A.2578; A.2608).

former President Trump did not say" (Br. 39). Claiming that executive privilege is "presumptive," Navarro argues that he could rely on the doctrine in refusing to comply with a congressional subpoena unless and until former President Trump expressly waived the privilege (Br.39-43). Navarro misapprehends what the "presumptive" privilege means. The President must first assert privilege over presidential communications; "[i]f the President does so," the communications then "become presumptively privileged." *Sealed Case*, 121 F.3d at 744. The essence of a "presumptive" privilege, moreover, is that it is "a qualified one" that "must give way when necessary to protect overriding interests." *Thompson*, 20 F.4th at 48. But the "linchpin"—as Navarro aptly put it in the district court (A.582)—is missing here, because President Trump did not assert executive privilege. As this Court recognized in denying Navarro's motion for release pending appeal, his "argument that the assertion of executive privilege is . . . presumptive . . . presupposes that privilege has actually been invoked in this case in some manner by the

President. That did not happen here." Order, *United States v. Navarro*, No. 24-3006 (D.C. Cir. March 14, 2024).[6]

> ### 2. Even if Former President Trump Had Asserted Executive Privilege, It Would Not Have Justified Navarro's Complete Default.

In any event, the government also agrees with Navarro—albeit for different reasons—that it is "unnecessary" to reach his claim that President Trump asserted executive privilege (Br.31). Even if former President Trump had asserted privilege as to any presidential communications within the subpoena's scope, that would not justify Navarro's complete default. Executive privilege "only applies to communications that [presidential] advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters," and "should never serve

---

[6] Navarro argues that executive privilege "must be presumptive . . . where a President is incapable of doing so himself, as in the case of death or disability, or where the individual subpoenaed attempts to circumvent or thwart the privilege by refusing to assert it unbeknownst to the President" (Br.42). Whatever complications those circumstances may present were not present here. After Navarro received the subpoena, he spoke directly with President Trump, but the former President did not assert executive privilege.

as a means of shielding information regarding governmental operations that do not call ultimately for direct decisionmaking by the President." *Sealed Case*, 121 F.3d at 299.

Here, Navarro conceded that the subpoena sought "non-official personal documents" in addition to "official documents" (A.962), and any executive privilege assertion plainly could not include the former. Many topics covered by the subpoena—which included Navarro's personal writings and communications with individuals outside the White House—could not possibly have implicated executive privilege, as the Committee explained to Navarro when it rejected his blanket privilege claim. Indeed, Navarro had not been shy about publicizing claims of "purported fraud in the election" and his own role in efforts "to develop and implement a plan to delay Congress's certification of, and ultimately change the outcome of, the November 2020 presidential election," including "in [his] recently published book, in interviews with reporters, and . . . on a podcast" (A.2634). The fact that Navarro was—as the district court observed at sentencing—"more than happy talk to the press about what [he] did, [and] write about it in [his] book" (A.2003), is incompatible with a claim of privilege. In any event, the Committee

repeatedly instructed Navarro on its privilege protocols: if he withheld documents, he should provide a detailed log; and he could assert executive privilege objections on a question-by-question basis during the deposition. Even if Navarro believed President Trump invoked executive privilege, Navarro offered no justification for failing to use these channels rather than stonewalling the Committee. *Cf. Bannon*, 101 F.4th at 22 ("As the Supreme Court has colorfully put it, a 'subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase.'").

Moreover, the district court found (A.1190-98) that any assertion of executive privilege by former President Trump would have been pierced by "the hydraulic constitutional force" of Congress's "uniquely weighty interest in investigating the causes and circumstances of the January 6th attack," supported by the sitting President's determination that disclosure "is in the interests of the United States." *Thompson*, 20 F.4th at 35-37. Navarro does not challenge the district court's alternative finding that the Committee's need for the information outweighed the interests protected by executive privilege. Accordingly, this Court can deny his executive-privilege claim on this ground alone.

### 3. Navarro Waived His Absolute Testimonial Immunity Claim, and Any Qualified Immunity He Enjoyed Did Not Justify His Complete Default.

Navarro also claims that, even if former President Trump did not assert executive privilege, a contempt prosecution was nevertheless "constitutionally precluded" because, as "a senior presidential advisor," he had "absolute" immunity "from compulsory subpoenas by Congress" (Br.23, 25). Although Navarro refers imprecisely to "executive privilege" (Br.20 ("Executive Privilege Precludes a Contempt of Congress Prosecution")), he relies principally on the line of OLC opinions stating that a sitting President may direct his senior advisors to assert absolute testimonial immunity in response to a congressional subpoena, and that such advisors may not be prosecuted for contempt for carrying out the President's lawful directive (Br.20 ("The Executive Branch has asserted for more than seventy-five years that senior presidential advisors may decline to testify before Congress, and has formally asserted immunity for nearly fifty years[.]"); Br.23 (citing Thompson Opinion); Br. 23-24 (citing 2007 Bradbury Opinion); Br.25 (citing 2019 Engel Opinion)).

The Court should reject Navarro's claims. Navarro waived his absolute testimonial immunity claim in the district court. As the district court explained, the parties agreed that Navarro, as "a former senior aide to a former President," enjoyed at most "only a qualified immunity against compelled congressional testimony" (ECF 96 at 3). The court correctly concluded that the doctrine of qualified testimonial immunity did not justify Navarro's complete default or preclude a contempt prosecution.

### a.    Navarro waived any absolute testimonial immunity claim.

The premise of Navarro's claim that he cannot be prosecuted for contempt of Congress is that, as a former "senior presidential advisor," he is "*immune* from compulsory subpoenas by Congress" (Br.23). According to Navarro, that immunity is "absolute" (*id*.). Navarro waived any absolute immunity claim in the district court, however.

Navarro originally claimed that he was entitled to absolute testimonial immunity (A.106). But, after the government pointed out that no OLC opinion has extended the doctrine of absolute testimonial immunity to advisors of former presidents, and argued that, "at most, a form of qualified immunity applies" (A.734-35), Navarro abandoned his

42

absolute immunity argument and argued that he was entitled to "qualified immunity" (A.884, 911). The district court noted Navarro's changed position (ECF 96 at 3; ECF 169 at 9 ("[B]y the end of these proceedings, [Navarro] had backed off his claim of absolute testimonial immunity. He agreed instead that a former aide to a *former* president, at most, enjoys a qualified immunity."). Navarro has thus waived any claim that he had absolute immunity from testimonial compulsion by Congress. *See United States v. Olejiya*, 754 F.3d 986, 992-94 (D.C. Cir. 2014) (holding that "knowing and intentional decision" to withdraw argument constitutes waiver and "extinguishes an error so there is no review," and noting that "an initial objection"—subsequently withdrawn—"is significant because it demonstrates that the defendant did not simply overlook the issue"); *United States v. Laslie*, 716 F.3d 612, 614 (D.C. Cir. 2013) (finding waiver though "deliberate" concession).

### b.   Qualified testimonial immunity does not extend to the subpoena for documents.

As the district court correctly found, Navarro's "claimed assertion of *testimonial immunity* is relevant only to Count Two—contempt of Congress for refusing to provide testimony. It does not extend to Count

43

One—contempt of Congress for refusing to produce records." (ECF 96 at 3 (citation omitted).) Navarro has never claimed that he enjoyed immunity from the subpoena's demand for documents and communications. Nor could he. This Court has held that not even a sitting President has blanket immunity from a congressional subpoena for records. *Senate Select Comm. v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc) ("[T]he Executive cannot . . . invoke a general confidentiality privilege to shield its officials and employees from investigations by the proper governmental institutions into possible criminal wrongdoing.").

A Congressional subpoena for documents differs markedly from a subpoena for testimony from Executive Branch officials. OLC's recognition of testimonial immunity for senior presidential advisors is predicated upon the "inherent and substantial risk of inadvertent or coerced disclosure of confidential information" during "live testimony," where, "[i]n the heat of the moment, without the opportunity for careful reflection, the adviser might have difficulty confining his remarks to those that do not reveal such sensitive information." Thompson Opinion, 38 Op. O.L.C. at 9. But the same concerns do not apply to a congressional subpoena for documents. As OLC has acknowledged, "when Congress

issues a subpoena for documents, the Executive Branch may take time to review the request and object to any demands that encroach on privileged areas. Any documents that are produced may be redacted where necessary." *Id.* at 15.[7]

### c. Navarro waived any testimonial immunity claim by failing to raise it before the Committee.

As to Count Two—Navarro's refusal to provide testimony—Navarro failed to advise the Committee that he was asserting testimonial immunity in response to the subpoena for testimony. That failure operates as a separate waiver of any testimonial immunity defense. "A witness cannot defend against contempt of Congress charge based on an affirmative defense that they were able, but failed, to raise at the time

---

[7] As Navarro points out (Br.21-22), an official may assert executive privilege over documents if directed to do so by the President, and OLC has "conclude[d] that the contempt of Congress statute does not apply to an executive official who carries out the President's claim of executive privilege." Olson Opinion, 8 Op. O.L.C. at 140. But the official must still comply with the subpoena in all other respects and provide any non-privileged documents. *See id.* at 106 (noting that EPA Administrator provided congressional subcommittee "with access to an estimated 787,000 pages of documents within the scope of the subpoena"). In other words, even a valid executive privilege assertion does not provide blanket immunity from a document subpoena. *Senate Select Comm.*, 498 F.2d at 731.

they were ordered to produce documents or appear." *United States v. Bannon*, 101 F.4th 16, 26 (D.C. Cir. 2024).

To be sure, Navarro raised executive privilege with the Committee (A.2648 ("Please be advised that President Trump has invoked Executive Privilege in this matter[.]")). The Committee responded appropriately, advising Navarro that there were "topics, including those discussed in the Chairman's letter, that the Select Committee believe[d] it [could] discuss with [Navarro] without raising any executive privilege concerns at all," and admonished that he was required to appear and "assert any executive privilege objections on a question-by-question basis during the deposition," which would enable the Committee to "better understand [Navarro's] objections" and "take any additional steps to address them" (A.2647). But Navarro never suggested to the Committee that he was entitled to testimonial immunity, which "is distinct from, and broader than, executive privilege." 2019 Engel Opinion, 43 Op. O.L.C. __, at *4. "To deny the Committee the opportunity to consider the objection or remedy is in itself a contempt of its authority and an obstruction of its processes." *Bannon*, 101 F.4th at 26 (quoting *Bryan*, 339 U.S. at 333). Having failed to raise his testimonial immunity claim before the

46

Committee, Navarro cannot rely on the doctrine to defend against a contempt prosecution. *Id.*

### d.  There is no evidence former President Trump ever directed Navarro to assert testimonial immunity.

Navarro also may not rely on testimonial immunity because there is no evidence that President Trump directed Navarro to assert it in response to the Committee subpoena. As Navarro acknowledged in connection with the doctrine of executive privilege, his own assertion would be "entirely ineffective . . . absent the direction or instruction" of President Trump (A.529-30). The same holds for testimonial immunity, because any immunity for senior presidential advisors derives directly from "the immunity of the President himself from congressional compulsion to testify." Thompson Opinion, 38 Op. O.L.C. at 6. "Consequently, . . . the President can also direct [immediate advisors] not even to appear before the committee." 2021 Engel Opinion, at \*54. *See also* 2019 Engel Opinion, at \*12 (describing "the many instances where [sitting] Presidents have successfully asserted immunity and affirmatively directed their immediate aides not to testify before

Congress"). There is no indication in the OLC opinions (the source of the testimonial immunity doctrine) that a former presidential advisor may invoke testimonial immunity without authorization from the President—let alone without direction from a former President, where the sitting President has explicitly disclaimed testimonial immunity.

> **e. Any testimonial immunity would only have applied to Navarro's official duties, not activities undertaken "in his capacity as a private citizen" like the Navarro Report and the Green Bay Sweep.**

The doctrine of testimonial immunity for senior presidential advisors extends only to "matters related to their official duties." 2021 Engel Opinion, at *53. *See also id.* at *54 ("Immediate advisers to the President remain immune from compelled testimony about their official duties in that capacity even after they leave the White House."). But, as the Committee made clear to Navarro (A.2633-34, 2649), it did not principally seek testimony about Navarro's "official duties" relating to trade policy and the pandemic response. Rather, its focus was on Navarro's unofficial activities to overturn the election, including the Green Bay Sweep and the Navarro Report—which Navarro himself

avowed was written "in his capacity as a private citizen" (A.809). Any testimonial immunity would not extend to such "private conduct." OLC, *Appearance of Presidential Assistant Peter M. Flanagan Before a Congressional Committee* (March 15, 1972)[8]  ("[T]he doctrine of the separation of powers precludes Presidential Assistants from appearing before congressional committees unless the inquiry is related to their private conduct.").[9] Navarro was required to attend his deposition and assert any applicable privileges on a question-by-question basis, as the Committee advised him. His failure to do so subjected him to prosecution for contempt.

---

[8] Available at https://www.justice.gov/olc/page/file/1225966/dl?inline.

[9] The distinction between official and unofficial conduct exists in other presidential immunity contexts. For example, the Supreme Court recently held that a President is entitled to "at least a *presumptive* immunity from criminal prosecution for [his] acts within the outer perimeter of his official responsibility," but "[a]s for a President's unofficial acts, there is no immunity." *Trump v. United States*, 144 S. Ct. 2312, 2331-32 (2024).

### f. Navarro has waived any challenge to the district court's ruling that any qualified immunity was overcome by the Committee's need for his testimony.

Navarro has not challenged the district court's "alternative" ruling that Congress's "compelling" need for Navarro's testimony and documents—as recognized by the incumbent President—outweighed and overcame any qualified executive privilege or testimonial immunity claim asserted by the former President (A.1190-98). *Cf. Thompson*, 20 F.4th at 32 ("In cases concerning a claim of executive privilege, the bottom-line question has been whether a sufficient showing of need for disclosure has been made so that the claim of presidential privilege 'must yield.'"). "As [this Court] ha[s] said many times before, a party waives its right to challenge a ruling of the district court if it fails to make that challenge in its opening brief." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1160 (D.C. Cir. 2002). Navarro has thus waived any challenge to the district court's alternative ground for denying his motion to dismiss the indictment.

### 4. Navarro Was Not Entitled to Additional "Accommodation" from the Committee.

Navarro claims that the Committee "refused to engage" in a "constitutionally required accommodation process" between Congress and the Executive Branch to resolve privilege concerns, leading to unacceptable "interbranch conflict" and "intrusion on executive branch authority" (Br.26-31). These are puzzling assertions, because the Executive Branch did not oppose the subpoena to Navarro. President Biden declined to assert executive privilege or testimonial immunity "in light of the unique and extraordinary nature of the matters under investigation" by the Committee (A.791). As the incumbent, President Biden "sp[oke] authoritatively for the interests of the Executive Branch. Under our Constitution, we have one President at a time. . . . As between a former and an incumbent President, 'only the incumbent is charged with performance of the executive duty under the Constitution.'" *Thompson*, 20 F.4th at 33 (quoting *Nixon v. GSA*, 433 U.S. at 448). There was no interbranch conflict; this was a dispute between a congressional committee and a private citizen who refused to comply with compulsory process. Navarro is the one who sought to "derail and ongoing process of

accommodation between the President and Congress, and instigate an interbranch dispute." *Id.* at 37.

To be sure, former Presidents may assert executive privilege over their presidential communications. *Thompson*, 20 F.4th at 32. Former President Trump had the opportunity to assert executive privilege. *Cf. In re Twitter*, No. 23-5044, 2024 WL 158766, at *4 (D.C. Cir. Jan. 16, 2024) (Rao, J., statement respecting denial of rehearing en banc). According to Navarro, he notified the former President's staff, and even spoke with President Trump about the subpoena. But, as the district court found, President Trump did not assert privilege.

Navarro also claims, inaccurately, that "literally no accommodation was attempted" by the Committee (Br.30). The Committee did seek to accommodate any legitimate executive privilege concerns. It repeatedly advised Navarro that executive privilege could be asserted on a document-by-document and question-by-question basis, and that its focus was topics, like the Navarro Report and Green Bay Sweep, that were unlikely to "rais[e] any executive privilege concerns at all" (A.2647). It was Navarro who refused any accommodation, claiming "executive privilege" three minutes after first being contacted by the Committee,

and obstinately refusing to produce any documents or answer any questions.

Navarro also appears to argue that the Committee was required to "obtain a judicial resolution" of his privilege claim before he could be prosecuted for contempt (Br.21, 28-30). This Court has long recognized, however, that a defendant is not entitled to a judicial determination of contested assertions of rights and privileges before the initiation of a contempt of Congress prosecution. *Ansara v. Eastland*, 442 F.2d 751, 754 (D.C. Cir. 1971) ("We are aware that the protections within the legislative branch or elsewhere do not provide a conclusive determination for plaintiffs, as to their constitutional rights, before there are exposed to the risk of criminal prosecution."). *See also Sanders v. McClellan*, 463 F.2d 894, 899 (D.C. Cir. 1972); *United States v. Fort*, 443 F.2d 670, 677-78 (D.C. Cir. 1970); *Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir. 1962). Rather, as in this case, "constitutional claims and other objections to congressional investigatory procedures may be raised as defenses in a criminal prosecution." *United States v. House of Representatives of the United States*, 556 F. Supp. 150, 152 (D.D.C. 1983). Navarro received a

full and fair opportunity to raise his executive privilege claim in the district court.

## II. The District Court Did Not Err in Precluding Navarro from Presenting a Defense Based on His Mistaken Belief that Executive Privilege Justified His Default.

Navarro also claims (Br.43-49) that the district court erred in granting the government's motion in limine and precluding him from presenting a defense at trial based on his belief that executive privilege justified his total noncompliance with a congressional subpoena. *Navarro*, 651 F. Supp. 3d at 238-39. The district court did not err, however, because Navarro's mistaken belief (even if held in good faith) that he was not legally required to comply with the subpoena is not a defense in a prosecution for contempt of Congress. *See United States v. Bannon*, 101 F.4th 16, 21-23 (D.C. Cir. 2024); *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961).

Under 2 U.S.C. § 192, a defendant who "willfully makes default" on a congressional subpoena is guilty of contempt. Section 192's mens rea of "willfully" requires that a defendant's failure to respond to a subpoena be "deliberate" and "intentional," "without more." *Licavoli*, 294 F.2d at 208.

Therefore, contempt "does not require bad faith, evil motive, or an unlawful purpose." *Bannon*, 101 F.4th at 21. And because proof of bad faith is not required, a defense premised on a defendant's good faith belief in the legality of his actions—such as advice of counsel—is not available in a contempt prosecution. *Bannon*, 101 F.4th at 21-22; *Licavoli*, 294 F.2d at 208-09. Navarro argues that *Bannon* and *Licavoli* were wrongly decided (Br.46). But those precedents are binding; moreover, as *Bannon* noted, "every case that addresses the mental state required for a contempt of Congress conviction firmly supports *Licavoli*'s holding." 101 F.4th at 21.

The district court correctly applied these principles. Just as Stephen Bannon was not permitted to argue that he did not comply with a Committee subpoena because "his counsel's advice was that then-former President Trump had asserted executive privilege," *Bannon*, 101 F.4th at 23, Navarro was not allowed to "argue that his failure to appear [or provide documents] was unintentional or not deliberate because he believed in good faith that President Trump's purported invocation of executive privilege excused his [compliance]." *Navarro*, 651 F. Supp. 3d at 238-39.

Navarro has effectively acknowledged, in his petition for initial en banc review, that his claim is foreclosed by *Bannon* and *Licavoli*. *See* Petition for En Banc Review, *United States v. Navarro*, No. 24-3006 (July 22, 2024) ("[I]t stands to reason that any three-judge panel to consider Dr. Navarro's appeal would similarly conclude it was precluded from departing from *Licavoli* . . . or otherwise conclude it was bound by the *Bannon* panel's decision[.]"). He nevertheless attempts to distinguish these precedents, arguing that "the implication of executive privilege implicates different principles than any 'good faith' reliance on advice of counsel" (Br.44). Whether the doctrine of executive privilege (and the related but distinct doctrine of testimonial immunity) *in fact* justified Navarro's noncompliance is a separate issue, however, from whether his good faith but mistaken belief that President Trump asserted privilege could negate the mens rea for contempt. *Bannon* did not address the underlying merits of the privilege claims. 101 F.4th at 23 ("This case, however, provides no occasion to address any questions regarding the scope of executive privilege or whether it could have excused Bannon's noncompliance in these circumstances."). But *Bannon* forecloses the mens rea argument. It would make no sense to preclude Bannon from

asserting an advice of counsel defense based on "his counsel's advice . . . that then-former President Trump had asserted executive privilege," but to permit Navarro to argue that he had "a good-faith belief that [he] need not comply" based on his own "idiosyncratic [and] misguided" views on executive privilege. *Id.* at 22. No matter how lofty a principle a defendant erroneously believes that they are defending, "a deliberate and intentional refusal to honor a congressional subpoena violates federal law." *Id.* at 23. *See also Watkins v. United States*, 354 U.S. 178, 208 (1957) ("An erroneous determination on [the witness's] part, even if made in the utmost good faith, does not exculpate him if the court should later rule that the questions were pertinent to the question under inquiry.").

Finally, even if *Bannon* and *Licavoli* were ultimately overturned, any error in precluding Navarro from arguing executive privilege to the jury would be harmless. Major topics covered by the subpoena, including the Navarro Report and the Green Bay Sweep, plainly fell outside the legitimate scope of any conceivable executive privilege assertion by President Trump. While Navarro clearly believed that President Trump did not want him to cooperate with the Committee for political reasons,

57

it strains credulity to suggest that Navarro acted in good faith in asserting executive privilege over matters such as the Navarro Report and the Green Bay Sweep that Navarro himself had previously publicized so enthusiastically "in [his] recently published book, in interviews with reporters, and . . . on a podcast" (A.2634).

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
ELIZABETH ALOI
JOHN CRABB, JR.
Assistant United States Attorneys

_____ /s/ _____
MARK HOBEL
D.C. Bar # 1024126
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Mark.Hobel@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 10,918 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

_____
/s/
MARK HOBEL
Assistant United States Attorney


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Stanley Woodward, Esq., stanley@brandwoodwardlaw.com, on this 12th day of September 2024.

_____
/s/
MARK HOBEL
Assistant United States Attorney