ORAL ARGUMENT NOT YET SCHEDULED

APPEAL NO. 24-3006

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA,                                    APPELLEE

v.

PETER K. NAVARRO,                                    APPELLANT.

APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

APPELLANT DR. PETER K. NAVARRO'S PRINCIPAL BRIEF

Stan M. Brand
(D.C. Bar No. 213082)
Stanley E. Woodward, Jr.
(D.C. Bar No. 997320)
Brand Woodward Law, LP
400 Fifth Street, Northwest,
Suite 350
Washington, DC  20001
202-996-7447 (telephone)
202-996-0113 (facsimile)
stanley@brandwoodwardlaw.com

John P. Rowley, III
(D.C. Bar No. 392629)
SECIL Law PLLC
1701 Pennsylvania Avenue, Northwest,
Suite 200
Washington, DC 20006
703-417-8652 (telephone)
jrowley@secillaw.com

John S. Irving
(D.C. Bar No. 460068)
E&W LAW, LLC
1455 Pennsylvania Avenue, Northwest,
Suite 400
Washington, DC 20004
301-807-5670 (telephone)
John.Irving@earthandwatergroup.com

*Counsel for Appellant Dr. Peter K. Navarro*

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

## A. PARTIES

The parties in the district court include the United States of America and Dr. Peter K. Navarro.

Before this Court, Heidi Kitrosser, Mark J. Rozell, and Mitchel A. Sollenberger have been admitted to participate as *amici curiae*.

***Disclosure Statement:*** No Disclosure Statement under Federal Rule of Appellate Procedure 26.1 or under Circuit Rule 26.1 is necessary, as Appellant is not a corporation or similar entity.

## B. Rulings Under Review

The parties are before this Court on appeal from the January 25, 2024 Judgment of Conviction of the district court issued by Hon. Amit P. Mehta, D.Ct. Doc. Nos. 165, 170, in *United States v. Navarro*, No. 1:22-cr-200, App. pp. 2029-2036.

## C. Related Cases

There are no cases related to the instant matter.

# TABLE OF CONTENTS

Certificates of Parties, Rulings, and Related Cases ...............................2

Table of Contents ...............................................................................3

Table of Authorities ...........................................................................5

Jurisdictional Statement .....................................................................8

Statement of Issues ............................................................................8

Statement of the Case .........................................................................9

Summary of Argument ......................................................................13

Argument .........................................................................................14

    I.    STANDARD OF REVIEW ...........................................................18

    II.    EXECUTIVE PRIVILEGE PRECLUDES THE PROSECUTION OF A SENIOR PRESIDENTIAL ADVISOR FOR CONTEMPT OF CONGRESS AND THE PURSUIT OF INFORMATION BY CONGRESS IMPLICATING EXECUTIVE PRIVILEGE INSTEAD CONSTITUTIONAL REQUIRES THE ACCOMMODATION PROCESS ..............................................19

        a.  *Executive Privilege Precludes a Contempt of Congress Prosecution.* 24

        b.  *Congress Has a Constitutional Duty of Accommodation* ..............30

    III.    ALTHOUGH UNNECESSARY, EXECUTIVE PRIVILEGE WAS ASSERTED ...38

        a.  *It was Improper for the District Court to Delineate the Proper Exercise of Executive Branch Authority* .............................38

        b.  *Executive Privilege was Properly Invoked* ..........................43

        c.  *Executive Privilege is Presumptive* .................................47

    IV.    ANY APPLICATION OF LICAVOLI INCONSISTENT WITH THESE PRINCIPALS VITIATES THE SEPARATION OF POWERS DOCTRINE ..........51

Conclusion.........................................................................................58

Statement Regarding Oral Argument ................................................59

**Certificate of Compliance**................................................................**60**

**Certificate of Service**......................................................................**61**

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991)..................................................33

*Bryan v. United States*, 524 U.S. 184 (1998)..........................................................45

*Cheney v. United States Dist. Court*, 542 U.S. 367 (2004)................... 15, 27, 31, 32

*Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148 (D.D.C. 2019). 15, 29, 46

*Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008)............. 20, 28

*Dellums v. Powell*, ...................................................................... 13, 14, 15, 32, 41

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975).......................34

*Franklin v. Massachusetts*, 505 U.S. 788 (1992).................................. 18, 29, 44, 46

*In re Sealed Case (Espy)*, 121 F.3d 729 (D.C. Cir. 1997)................................ 13, 38

*In re Search of Info. Stored at Premises Controlled by Twitter, Inc.*, 2024 U.S. App. LEXIS 977 (D.C. Cir. Jan. 16, 2024) ....................................................................13

*Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 562 (S.D.N.Y. 2018), aff'd, 928 F.3d 226 (2d Cir. 2019), vacated and remanded, *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021), dismissed by and remanded at *Knight First Amendment Inst. at Colum. Univ. v. Biden*, No. 18-1691, 2021 U.S. App. LEXIS 35273 (2d Cir. May 26, 2021) .......................................................................................................................19

*Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961) ... 11, 12, 42, 43, 45, 46, 47

*Marbury v. Madison*, 5 U.S. 1 (Cranch) 137 (1803).......................................... 27, 32

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977)................................. 13, 14, 24

*Nixon v. Fitzgerald*, 437 U.S. 731 (1982)...............................................................33

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973)........................................ 27, 28, 41

*Powell v McCormack*, 395 U. S. 486 (1969) ..........................................................42

*Sinclair v. United States*, 279 U.S. 263 (1929)..................................................45, 46

*Tenney v Brandhove*, 341 U. S. 367 (1951) ............................................................42

*Tobin v. United States*, 306 F.2d 270 (D.C. Cir. 1962) ...........................................19

*Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020)..................... 15, 25, 27, 28, 44

*Trump v. Thompson*, 142 S. Ct. 680 (2022) ....................................................... 13, 23

*Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021)..................................................13

*Trump v. United States*, No. 23-939, 2024 U.S. LEXIS 2886 (July 1, 2024).. 14, 16, 17, 18, 22, 33

*United States v. Am. Tel. & Tel. Co. ("AT&T")*, 567 F.2d 121 (D.C. Cir. 1977)... 15, 25, 28, 38, 44

*United States v. Bannon*, 101 F. 4th 16 (D.C. Cir. 2024)........................... 37, 43, 45

*United States v. Bannon*, No. 22-3086, 2024 U.S. App. LEXIS 15093 (D.C. Cir. June 20, 2024)...................................................................................... 43, 45

*United States v. Bryan*, 339 U.S. 323 (1950)............................................................43

*United States v. Burr*, 25 F. Cas. 187 (C.C. Va. 1807)..........................................22

*United States v. Burr*, 25 F. Cas. 55 (Aug. 31, 1807) .............................................40

*United States v. Guadin*, 515 U.S. 506 (1995) .......................................................45

*United States v. Helstoski*, 442 U.S. 447 (1979)............................................ 35, 38

*United States v. Nixon*, 418 U.S. 683 (1974) .......... 13, 14, 21, 27, 31, 33, 34, 40, 43

*United States v. Reynolds*, 345 U.S. 1 (1953) ................................................. 31, 32

*Watkins v. United States*, 354 U.S. 178 (1957).......................................................46

**Statutes**

2 U.S.C. § 192 ......................................................................................... 8, 9, 45, 46

**Other Authorities**

*Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1 (2007) ...............................................................31

*Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27 (1981) (Smith, Att'y Gen.) ...................................................................27

*Congressional Oversight of the White House*, 45 Op. O.L.C., _ (Jan. 8, 2023).... 19, 20, 27, 28

*Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153 (1989) (Barr, Ass't Att'y Gen.)........................................................27

Elizabeth B. Bazan & Morton Rosenberg, Cong. Research Serv., *Congressional Oversight of Judges and Justices* (May 31, 2005) ...............................................27

*Executive Privilege—Secrecy in Government: Hearings on S. 2170, S. 2378, and S.2420 Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 87 (1975) (statement of Antonin Scalia, Assistant Attorney General, Office of Legal Counsel) ................................................ 26, 45

*Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. (July 15, 2014) ....................................................................................................................23

*Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. _ (July 15, 2014) ...................................................................................................18

*Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191 (2007) ...............................................................24

Letter from the Department of Justice to the Honorable Mike Johnson (June 14, 2024) .....................................................................................................................21

Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (July 29, 1982) ................................................................................................ 18, 21, 22, 29, 42

Pres. George Washington, Message to the House Regarding Documents Relative to the Jay Treaty (Mar. 30, 1796).......................................................................40

*Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, 43 Op. O.L.C., _ (Jul. 12, 2019)..............................25

*Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. _ (May 20, 2019) ................................................................. 18, 19

*Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953.....................24

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 over this appeal from the district court's January 25, 2024 Judgment. App., pp. 2029-36. A timely notice of appeal was filed on January 25, 2024. *Id.* at 2026.

## STATEMENT OF ISSUES

1. Prosecution of a senior presidential advisor for contempt of congress is precluded by the separation of powers where the congressional inquiry giving rise to the prosecution implicates executive privilege;

2. Instead, any such interbranch dispute must be resolved through the constitutionally mandated accommodation process;

3. This Court need not, but should, hold that executive privilege is presumptive;

4. Here, however, executive privilege was asserted and/or invoked by former President Trump obviating accommodation process;

5. It was error for the district court to direct the means or manner by which former President Trump may invoke executive privilege; and

6. To the extent the application of this Court's holding in *Licavoli* is inconsistent with these principals it should be reversed.

## STATEMENT OF THE CASE

This appeal is from the judgment of conviction and sentence entered in this case following a jury trial in the United States District Court for the District of Columbia for two misdemeanor counts of contempt of Congress in violation of 2 U.S.C. § 192.

Dr. Navarro was one of three senior presidential aides to serve for the entire term of Donald J. Trump's presidential administration. *See* App., p. 0028. On February 9, 2022, after former President Trump's tenure in the White House had concluded, the United States House of Representatives' Select Committee to Investigate the January 6th Attack on the United States Capitol issued a subpoena commanding that Dr. Navarro provide documents and testimony. *See, e.g., id.* at 0030. Dr. Navarro immediately and repeatedly asserted executive privilege in response to the subpoena, and Dr. Navarro in fact did not comply with the subpoena by providing documents or appearing for a scheduled deposition. *See, e.g., id.* at 0785. Instead, Dr. Navarro implored the Select Committee to confer with former President Trump concerning the implication of executive privilege, but the Select Committee never made any attempt to confer with former President Trump or any of his aides concerning the subpoena. *Id.* at 1740-41 ("Q: To your knowledge. . . no one at the Select Committee spoke to former President Trump about Dr. Navarro's assertion of executive privilege?" "[Dan George]: To my knowledge, nobody did

talk to President Trump's team about Mr. Navarro."). Moreover, at no point did the Select Committee ever claim that executive privilege had not properly been invoked. *See*, *e.g.*, *id.* at 2265. Consequently, the U.S. House of Representatives voted to refer Dr. Navarro for prosecution for contempt of congress pursuant to 2 U.S.C. § 192. *Id*. at 2362-545. Thereafter, the Department of Justice, despite subpoenaing former President Trump's counsel to the grand jury, also never asked whether former President Trump had asserted and/or invoked executive privilege as to the subpoena to Dr. Navarro. Following a jury trial, Dr. Navarro was convicted of willfully making default under § 192, and a judgment of conviction was entered against him. *Id*. at 2033-36.

Prior to proceeding to trial, *and for the first time ever*, on August 28, 2023, the district court held an evidentiary hearing concerning whether former President Trump invoked executive privilege in response to the subpoena issued to Dr. Navarro. *Id*. at 1014. At that evidentiary hearing, Dr. Navarro testified, *inter alia*, that: there was a specific process for obtaining a mandate from former President Trump; that in response to receiving the subpoena at issue in this case, Dr. Navarro contacted Liz Harrington to discuss the nature of the subpoena with former President Trump; that Dr. Navarro did speak with former President Trump and was instructed to invoke executive privilege over this subpoena; and that he followed the same process for this subpoena as he had followed with a prior congressional subpoena

(in response to which he asserted executive privilege, refused to comply, and was not prosecuted). *See, e.g., id*. at 1052: ("Q: Sir, what did you do upon receipt of this subpoena? A [Dr. Navarro]: I immediately initiated the protocol I had used repeatedly in the White House. I needed to get in touch with the President. I rarely did that directly. What I did was I contacted one of his top aides, which was [Liz] Harrington. . . I wanted to see whether he wanted to invoke executive privilege and testimonial immunity[.]"); *id*. at 1071 (("Q: And what did you do after receipt of this subpoena? A [Dr. Navarro]: I immediately initiated the protocol with respect to President Trump. . . I contacted [Liz Harrington] to let her know to let the President know that I had received the subpoena. And I was obviously looking for direction on this."); *id*. at 1076 ("A [Dr. Navarro]: And during that call, it was very clear that the privilege was invoked, very clear.").

In addition, the district court accepted as evidence the prior sworn testimony of former President Trump's counsel as well as a current senior aide. *Id.* at 2548-2616. On August 30, 2023, the District Court ruled that Executive Privilege had not been invoked. *Id.* at 1164. The District Court also noted that the matter ruled upon hinged upon an, "open question in the D.C. Circuit[.]" *Id.* at 1164.

On September 5, 2023, before trial commenced, Dr. Navarro filed a motion *in limine* which sought to prevent the government from presenting evidence about Executive Privilege and/or Dr. Navarro's state of mind based upon the district court's

August 30, 2023 ruling.  *Id.* at 1222.  On September 5, 2023, the Court denied Dr. Navarro's September 5, 2023 motion, concluding that the relief Dr. Navarro sought was precluded by this Court's opinion in *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961).  *Id.* at 1584.  At trial, the government repeatedly referred to Dr. Navarro's assertion of executive privilege.  In closing argument, the government argued to the jury:  ". . . Defendant gave a reason for his non-compliance: Executive privilege. . . it does not matter if the defendant refused to comply because he believed that the former President had asserted executive privilege."  *Id.* at 1875, 1878;  *Id.* at 1604 ("Mr. Navarro ignored his subpoena.  He acted as if he's above the law.  No one is.  If you defy a congressional subpoena, that's against the law.  The crime is called contempt of Congress.");  *Id*. at 1880 ("As Mr. Crabb told you, we are a nation of laws; and our system does not work if people think they are above the law.");  *Id*. at 1894 ("That man thinks he's above the law . . . .  But in this country, no one is above the law.").

## SUMMARY OF ARGUMENT

Defendant/Appellant Dr. Peter K. Navarro is the *only* senior presidential advisor ever to have been prosecuted, let alone convicted, for contempt of congress.  Before briefing in this appeal is completed, he will have served his four (4) month sentence of imprisonment (and have paid his $9,500.00 fine).  The purpose of this appeal is not to avoid the punishment Dr. Navarro will have endured, nor does this

appeal seek reprieve for the punishment he has already endured during this period – rather, its purpose is to decide an important question of federal law.  Specifically, this appeal presents a series of related questions concerning the role of executive privilege in the intersection of our separate but coequal branches of government.

The doctrine of separation of powers precludes the prosecution of a senior presidential advisor for contempt of congress where executive privilege is implicated.  Instead, the separation of powers doctrine mandates that the branches of government engage in the implicit constitutional accommodation process where executive privilege is implicated by an interbranch dispute.  And because executive privilege is a core presidential function, neither the legislature nor the judiciary may dictate how the chief executive claims the privilege.  Regardless, Dr. Navarro asserted and/or invoked executive privilege – a privilege that is still presumptively applicable even where it is not outright invoked – rendering Dr. Navarro's prosecution unconstitutionally prohibited.  Finally, to apply this Court's holding in *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), in contravention of these principals vitiates executive privilege and, concomitantly, the separation of powers doctrine.

## ARGUMENT

"Because[,] '[a] President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in

a way many would be unwilling to express except privately,' the privilege 'safeguards the public interest in candid, confidential deliberations within the Executive Branch.'" *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 447 (1977) ("*GSA*"); *United States v. Nixon*, 418 U.S. 683, 708 (1974)). *See also In re Sealed Case*, 121 F.3d 729, 751 (D.C. Cir. 1997) (holding that, "the President's access to honest and informed advice and his ability to explore possible policy options privately are critical elements in presidential decisionmaking," and recognizing an executive privilege applicable to, "communications made by presidential advisers in the course of preparing advice of the President"). "The confidentiality of presidential communications is critical to the energetic exercise of executive power and to the independence of the Executive Branch. And it is well established that such privilege extends beyond a President's time in office. . . . Faced with a subpoena . . . the President may invoke executive privilege, and upon such invocation, the documents become 'presumptively privileged.'" *In re Search of Info. Stored at Premises Controlled by Twitter, Inc.*, 2024 U.S. App. LEXIS 977, at *8 (D.C. Cir. Jan. 16, 2024) (Rao, J., dissenting) (quoting *GSA*, 433 U.S. at 447); *Dellums v. Powell*, 561 F.2d 248, 246 (D.C. Cir. 1977) ("Obviously, the privilege does not disappear merely because the president who made or received the communication dies, resigns, or has completed his term."). *See also Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (Kavanaugh,

J., respecting denial of application for stay) ("A former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, even if the current President does not support the privilege claim.").

The proper function of executive privilege is, "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708, *quoted in Trump v. United States*, No. 23-939, 2024 U.S. LEXIS 2886, at *33-34 (July 1, 2024). The privilege flows from the vesting of all executive power in a single President and, "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *GSA*, 433 U.S. at 447. Both the Constitution and common law recognize a need to keep confidential executive communications and deliberations to allow the "fulfillment of the unique role and responsibilities of the executive branch of our government." *In re Sealed Case*, 121 F.3d at 736. Accordingly, the Supreme Court recently affirmed that, to be effective, the privilege must be presumptive. *See Trump*, 2024 U.S. LEXIS 2886, at *33-34 ("Because the President's 'need for complete candor and objectivity from advisers calls for great deference from the courts,' we held that a 'presumptive privilege' protects Presidential communications." (quoting *Nixon*, 418 U.S. at 706, 708)). *See also Dellums*, 561 F.2d at 246 ("An advisor to the President has no guarantee of confidentiality. His advice may be disclosed by

the President or a successor. As to disclosure by a court, the need for confidentiality is in large measure secured and protected by the relatively infrequent occasions when an assertion of the privilege may be overcome. *And so it is, and should be, that the 'presumptive' privilege embodies a strong presumption, and not merely a lip-service reference.*" (emphasis added)). Thus, a court in this District expressly held that the identification of sensitive information deemed subject to executive privilege by the President, "gives rise to a legal duty on the part of the aide to invoke the privilege on the President's behalf." *Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148, 213 n.34 (D.D.C. 2019). Similarly, the implication of executive privilege in an interbranch conflict requires those branches to engage in an accommodation process. *See United States v. Am. Tel. & Tel. Co. ("AT&T")*, 567 F.2d 121, 127 (D.C. Cir. 1977) ("The framers, rather than attempting to define and allocate all governmental power in minute detail, relied, we believe, on the expectation that where conflicts in scope of authority arose between the coordinate branches, a spirit of dynamic compromise would promote resolution of the dispute in the manner most likely to result in efficient and effective functioning of our governmental system."); *see also Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2035 (2020) ("[O]ccasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible." (citing *Cheney v. United States Dist. Court*, 542 U.S. 367, 389-90 (2004)).

# I.    STANDARD OF REVIEW

As a general matter, this appeal involves numerous questions of law that are subject to *de novo* review. *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) ("Because [the issue at hand] presents a question of law, we review this contention *de novo*."). This appeal also presents a substantial mixed question of law and fact regarding the district court's finding that executive privilege was not invoked by former President Trump. On review by this Court, that sole determination by the district court is entitled only to due deference. *See United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994) ("'Due deference' presumably is meant to fall somewhere between *de novo* and 'clearly erroneous,' a standard of review that reflects an apparent congressional desire to compromise between the need for uniformity in sentencing and the recognition that the district courts should be afforded some flexibility in applying the guidelines to the facts before them.").

# II.   EXECUTIVE PRIVILEGE PRECLUDES THE PROSECUTION OF A SENIOR PRESIDENTIAL ADVISOR FOR CONTEMPT OF CONGRESS AND THE PURSUIT OF INFORMATION BY CONGRESS IMPLICATING EXECUTIVE PRIVILEGE INSTEAD CONSTITUTIONALLY REQUIRES THE ACCOMMODATION PROCESS.

Dr. Navarro's prosecution is a prime example of the "factional strife" that "the Framers intended to avoid": one-sided lawfare that risks the "enfeebling of the Presidency and our Government" and the establishment of an "Executive Branch that cannibalizes itself." *Trump*, 2024 U.S. LEXIS 2886, at *75. Thus, the Supreme

Court held, "the separation of powers principles explicated in our precedent necessitate at least a presumptive immunity from criminal prosecution for a President's acts within the outer perimeter of his official responsibility. Such an immunity is required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution." *Id.* at *36. "The President stands at the head of a co-equal branch of government. Yet allowing Congress to subpoena the President to appear and testify would 'promote a perception that the President is a subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches." *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. _, at *4 (May 20, 2019) ("Cooper Mem.") (quoting *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. _, at *2 (July 15, 2014) ("Thompson Mem.")). As Assistant Attorney General Theodore Olson explained four decades ago: "[t]he President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982) ("Olson Mem."). "The President's immediate advisers are an extension of the

President and are likewise entitled to absolute immunity from compelled congressional testimony." Cooper Mem. at 4. Prosecuting a senior presidential advisor for contempt of congress is, therefore, akin to prosecuting the President himself and now unquestionably unconstitutionally prohibited. *See Trump*, 2024 U.S. LEXIS 2886, at *28 ("Neither may the courts adjudicate a criminal prosecution that examines such Presidential actions. . . the President is absolutely immune from criminal prosecution for conduct within his exclusive sphere of constitutional authority.").

Instead, when conflicts between our coordinate branches arise, the constitution implicitly mandates an accommodation process resolve such disputes. Cooper Mem. at 12. As Assistant Attorney General Steven A. Engel observed, "[a] congressional committee may not avoid its obligation to participate in this constitutionally mandated process by issuing or seeking to enforce a subpoena *before* the accommodation process has run it course." *Congressional Oversight of the White House*, 45 Op. O.L.C., _ at *56 (Jan. 8, 2023) ("Engel Mem.") (emphasis added). Resolution of the accommodation process necessarily obviates the need for prosecution because, "[t]he accommodation process encompasses the exhaustion principle[.]" *Id.* at 57. *See also Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (""[W]e may assume it is substantially likely that the President and other executive . . . officials would abide by an authoritative interpretation of [a] . . . constitutional

provision by the District Court, even though they would not be directly bound by such a determination.") (plurality opinion), *quoted in Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 562 (S.D.N.Y. 2018), aff'd, 928 F.3d 226 (2d Cir. 2019), vacated and remanded, *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021), dismissed by and remanded at *Knight First Amendment Inst. at Colum. Univ. v. Biden*, No. 18-1691, 2021 U.S. App. LEXIS 35273 (2d Cir. May 26, 2021).

Accordingly, "[w]here a committee declines to honor its obligation to accommodate the legitimate needs of the White House, the committee may not lawfully begin the contempt process based upon good faith objections raised by White House officials." Engel Mem. at 57. This outcome tracks logically insofar as to hold otherwise would force senior presidential advisors to risk imprisonment or betray their duty to their President. *See Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir. 1962) ("Especially where the contest is between different governmental units, the representative of one unit in conflict with another should not have to risk jail to vindicate his constituency's rights.").

*a. Executive Privilege Precludes a Contempt of Congress Prosecution.*

The Executive Branch has asserted for more than seventy-five years that senior presidential advisors may decline to testify before Congress, and has formally asserted immunity for nearly fifty years, concluding that, "[t]he balancing required

by the separation of powers demonstrates that the contempt of Congress statute *cannot be constitutionally applied* to an executive branch official. . . ." Olson Mem. at 139. (emphasis added). The Olson Memorandum further advises: "[w]e believe that the courts, if presented the issue in a context similar to that discussed in this memorandum, *would surely conclude* that a criminal prosecution for the exercise of a presumptively valid, constitutionally based privilege *is not consistent with the Constitution.*" *Id.* at 141 (emphasis added). The Department affirmed this position within the last month. Letter from the Department of Justice to the Honorable Mike Johnson (June 14, 2024) ("The longstanding position of the Department is that we will not prosecute an official for contempt of Congress for declining to provide subpoenaed information subject to a presidential assertion of executive privilege[.]"). And a court in this District affirmed this view. *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 75-76 (D.D.C. 2008) ("When the respondent is a member of the executive branch who refuses to comply on the basis of executive privilege, however, OLC stated that the 'contempt of Congress statute does not require and could not constitutionally require a prosecution of that official, or even, we believe, a referral to a grand jury of the facts relating to the alleged contempt.' Instead, 'Congress [can] obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a *civil action* for

enforcement of a congressional subpoena.'" (quoting Olson Mem. at 137, 142) (emphasis added)).

Because the privilege seeks to ensure that, "[a] President and those who assist him [remain] free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately," the Supreme Court has recognized that, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705, 708. This chilling effect is exacerbated if close Presidential advisors were to, "face criminal liability[] simply for obeying a Presidential command to assert the President's constitutionally based and presumptively valid privilege against disclosures that would impair [the President's] ability to enforce the law." Olson Mem. at 137.

Notably, as the Olson Memorandum clearly articulates, the constitutional bar to prosecutions of executive branch officials is necessary because otherwise, "the President [would be] deter[red] from asserting executive privilege," resulting in a "significant *in terrorem effect*" inconsistent with the "constitutionally prescribed separation of powers, [which] precludes Congress's use against the Executive of coercive measures that might be permissible with respect to private citizens." Olson Mem. at 137-138 (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (C.C. Va.

1807)). Subsequently, the Department has opined that senior Presidential advisors are *immune* from compulsory subpoenas by Congress: "Absent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committees disliked, or embarrass and weaken the President for partisan gain." Thompson Mem., at \*5 (July 15, 2014). "[A] presidential adviser's immunity is derivative of the President's." *Id.* That immunity is not only presumptive, but absolute: "immunity [of a former president] from criminal prosecution for official acts during [a President's] tenure in office for official acts during his tenure in office . . . must be absolute." *Trump*, 2024 U.S. LEXIS 2886, at \*24.

Nor does the constitutional bar against the prosecution of senior presidential advisors who assert executive privilege depend upon the invocation of privilege by the incumbent President. President Truman succinctly explained how important it was for immunity to continue after a President's term in office nearly 70 years ago:

> '[I]f the doctrine of separation of powers and the independence of the Presidency is to have any validity at all, it must be equally applicable to a President after his term of office has expired when he is sought to be examined with respect to any acts occurring while he is President. The doctrine would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purposes.'

*Immunity of the Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. 191, 193 (2007) ("Bradbury Mem.") (quoting *Texts of Truman Letter and Velde Reply*, N.Y. Times, Nov. 13, 1953, at 14). Thus, it is beyond dispute that the important considerations which give rise to a constitutionally based and presumptively valid privilege apply equally to incumbent as well as to former Presidents. "A former President must be able to successfully invoke the Presidential communications privilege for communications that occurred during his Presidency, even if the current President does not support the privilege claim." *Trump v. Thompson*, 142 S. Ct. 680, 680 (2022) (Kavanaugh, J., respecting denial of application for stay). Neither can an incumbent President override the privilege assertion of a former President. As Justice Kavanaugh opined:

> If Presidents and their advisers thought that the privilege's protections would terminate at the end of the Presidency and that their privileged communications could be disclosed when the President left office (or were subject to the absolute control of a subsequent President who could be a political opponent of a former President), the consequences for the Presidency would be severe. Without sufficient assurances of *continuing* confidentiality, Presidents and their advisers would be chilled from engaging in the full and frank deliberations upon which effective discharge of the President's duties depends.

*Id.* at 681. The Department conceded as much before the district court here. *See e.g.*, App., p. 824 ("The [executive] privilege may be asserted by both current and

former Presidents to withhold communications 'made in the process of arriving at *presidential* decisions.'" (emphasis in original)).

Again, this view is consistent with decades of Department precedential opinions: "Separation of powers principles dictate that former presidents and former senior presidential advisers remain immune from compelled congressional testimony about official matters that occurred during their time as President or senior presidential advisers." Bradbury Mem. at 192-93. *See also Testimonial Immunity Before Congress of the Assistant to the President and Senior Counselor to the President*, 43 Op. O.L.C., _ at *2 (Jul. 12, 2019). ("This Office recently addressed in detail the testimonial immunity of senior presidential advisers in an opinion concerning the former Counsel to the President. Recognizing that the Executive Branch has invoked this immunity for nearly fifty years, we reaffirmed that Congress may not constitutionally compel the President's senior advisers to testify about their official duties." (internal quotations omitted)). Without a guarantee of continuing confidentiality, "a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *GSA*, 433 U.S. at 449.

In summary, where an interbranch dispute implicates executive privilege, any prosecution of a senior presidential advisor for contempt of congress is constitutionally precluded by the separation of powers doctrine.

### b. Congress Has a Constitutional Duty of Accommodation.

It is difficult to discern an interbranch conflict implicating greater intrusion on executive branch authority than the case at bar: the prosecution by an incumbent President of a former President's senior presidential advisor for refusing to honor a congressional inquiry based on the purportedly insufficient exercise of an exclusive executive branch prerogative pursuant to a standard retroactively concocted by the Judiciary.

To avoid this conflict, the accommodation process requires that, "each branch . . . take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *AT&T*, 567 F.2d at 127. The Supreme Court recently recognized what has long been the practice of our coordinate branches: ordinarily disputes over congressional demands for executive documents, "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 140 S. Ct. at 2029 (quoting *Executive Privilege—Secrecy in Government: Hearings on S. 2170, S. 2378, and S.2420 Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 87 (1975) (statement of Antonin Scalia, Assistant Attorney General, Office of Legal Counsel)).

Both the Executive and Legislative Branches have recognized their respective constitutional obligations to seek accommodation through good faith negotiations over their respective interests. *See, e.g.*, Elizabeth B. Bazan & Morton Rosenberg, Cong. Research Serv., *Congressional Oversight of Judges and Justices* 10 (May 31, 2005) ("Although the accommodation process between Congress and the Executive Branch is conducted in a highly political atmosphere, the arguments made by each side are usually grounded in legal doctrine and rely heavily on their interpretations and past experiences. At times, the Executive Branch is able to persuade Congress that a particular request is insufficiently weighty[.]"); *Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 159 (1989) (Barr, Ass't Att'y Gen.) ("The process of accommodation requires that each branch explain to the other why it believes its needs to be legitimate. Without such an explanation, it may be difficult or impossible to assess the needs of one branch and relate them to those of the other."); *Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981) (Smith, Att'y Gen.) ("The accommodation required is not simply an exchange of concessions or a test of political strength. It is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch."); Congressional Oversight of the White House, at 39 (January 8, 2021) (slip opinion) ("The accommodation process has usually proved successful in reconciling

congressional informational needs with the Executive Branch's interests, and so congressional committees rarely pursue citing executive branch officials for contempt of Congress to enforce their document and testimonial subpoenas . . . .").

An important feature of the accommodation process is the dialogue that takes place between coordinate branches to ensure that information requests are not, "unnecessarily broad." *Cheney*, 542 U.S. at 390. "The specificity of [a Congressional] request 'serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.'" *Mazars*, 140 S. Ct. at 2036 (quoting *Cheney*, 542 U.S. at 387)). In recognition of this constitutionally required process, "the White House typically seeks to accommodate congressional requests by providing written responses or oral briefings on relevant activities or policies, supplemented sometimes by the production of specific non-privileged documents." Engel Mem. at 42.

Finally, where no agreement is reached, only the judiciary can resolve disputes as to the exercise of authority by the other coordinate branches. Put differently, Congress, let alone any individual Member, cannot determine whether executive privilege trumps a Congressional prerogative. Specifically, the Supreme Court has recognized: "it is the province and duty of this Court 'to say what the law is' with respect to the claim of [executive] privilege.'" *Nixon*, 418 U.S. at 705 (quoting *Marbury v. Madison*, 5 U.S. 1 (Cranch) 137, 177 (1803)). *See also Nixon v. Sirica*,

487 F.2d 700, 715 (D.C. Cir. 1973) ("That the privilege is being asserted by the President against a grand jury does not make the task of resolving the conflicting claims any less judicial in nature. Throughout our history, there have frequently been conflicts between independent organs of the federal government, as well as between the state and federal governments. When such conflicts arise in justiciable cases, our constitutional system provides a means for resolving them – one Supreme Court."). As a court in this District observed, following a disputed assertion of executive privilege: "'Congress [can] obtain a judicial resolution of the underlying privilege claim and vindicate its asserted right to obtain any documents by a civil action for enforcement of a congressional subpoena.'" *Miers*, 558 F. Supp. 2d at 75-76 (quoting Olson Mem. at 137, 142)).

Importantly, accommodation resolves the necessity of a prosecution for contempt of congress. Once the Judiciary has resolved any dispute, *see AT&T*, 567 F.2d at 126 n. 13 ("[D]isputes concerning the allocation of power between the branches have often been judicially resolved); *see also Mazars*, 140 S. Ct. at 2031 ("Congressional subpoenas for information from the President, however, implicate special concerns regarding the separation of powers. The courts below did not take adequate account of those concerns. . . and the cases are remanded for further proceedings consistent with this opinion."), "[w]e may assume it is substantially likely that the President and other executive . . . officials would abide by an

authoritative interpretation of [a] . . . constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Franklin*, 505 U.S. 803.

Here, literally no accommodation was attempted, let alone contemplated. Despite Dr. Navarro's unequivocal assertion of executive privilege, App., pp. 2374-80, the Select Committee fastidiously refused to contact former President Trump or his representatives. Nor did the incumbent President's Department of Justice make any effort to contact former President Trump, let alone reconcile Dr. Navarro's reasonable belief that former President Trump had instructed Dr. Navarro to assert executive privilege, App., pp. 0876-0877 ("The Court: Let's say these are the facts of Dr. Navarro's case. President Trump sends him a letter. Says, you need to invoke qualified immunity. He uses all the right magic words. Dr. Navarro [refuses to testify]. Congress does nothing [other than] pass[] a contempt resolution and we want you to prosecute. Is Dr. Navarro prosecutable for contempt in those circumstances?" "Mr. Crabb: If in the Department's estimation there was not valid testimonial immunity or the qualified immunity was overcome, yes."), leaving him only with, "a legal duty. . . to invoke the privilege on the President's behalf[.]" *McGahn*, 415 F. Supp. 3d at 213 n.34. As the Supreme Court recognized, this accommodation process is necessitated by the implication of the interbranch conflict implicating the separation of powers doctrine.

That the Select Committee and the incumbent president refused to engage in, let alone conclude, the constitutionally required accommodation process does not alleviate the separation of powers concerns that arise from a contempt of congress prosecution of a senior presidential advisor. Rather, the necessity of accommodation reaffirms the bar against prosecution of senior presidential advisors for contempt of congress pursuant to the separation of powers doctrine." *See Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1, 8 (2007) (As the Department has emphasized, the accommodation process should and does, "encourage, rather than punish, such accommodation by recognizing that Congress's need for such documents is reduced to the extent similar materials have been provided voluntarily as part of the accommodation process.").

## III.    ALTHOUGH UNNECESSARY, EXECUTIVE PRIVILEGE WAS ASSERTED.

This Court should, but need not, decide that the implication of executive privilege presumptively requires the resolution of an inherent interbranch conflict and no assertion and/or invocation of executive privilege, let alone a formal or "proper" one, is required. Here, Dr. Navarro clearly and unequivocally confirmed former President Trump's assertion and/or invocation of executive privilege as to the congressional subpoena at issue and it was improper for the district court to question the means or manner of a president's utilization of core Executive Branch power. Indeed, never before has any court required a, "proper" assertion, let alone, an

"invocation," of executive privilege before considering its implication in an interbranch conflict. However, even were executive privilege not asserted, given that it is, "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution," *Nixon*, 418 U.S. at 708, its application arises presumptively.

      a.  *It was Improper for the District Court to Delineate the Proper Exercise of Executive Branch Authority.*

The district court here recognized the novelty of requiring a "proper invocation" of executive privilege before consideration of its implication in an interbranch conflict could be considered. App., p. 1167. Ultimately, the standard for a, "proper invocation" of executive privilege adopted by the district court was:

> . . . Presidential privilege, must be claimed by the President or an official authorized to speak for the President, in my view, means three things. The terms "claimed" or invoked" with respect to privilege [] require an act of some affirmative conduct [] by either the President or someone who the President has designated and authorize to make the claim on the President's behalf. It also does require personal consideration. . . . And, third, what I think it means is that the privilege cannot be validly asserted by mere acquiescence; rather, again, it has to be the product of some affirmative act or conduct.

*Id*. (citing *Cheney v. United States District Court*, 542 U.S. 367, 398 (2004); *United States v. Reynolds*, 345 U.S. 1, 8 (1953); *Dellums v. Powell*, 561 F.2d 242 (D.C. Cir. 1977)). In reaching this conclusion, the district court relied on the Supreme Court's opinions in *Cheney* and *Reynolds* and this Court's opinion in *Dellums*. Specifically,

for the requirement that either the President or one authorized to act on behalf of the President, the district court relied on *dicta* in *Dellums*: "[T]he presidential privilege must be claimed by the president or an official authorized to speak for the president." 561 F.2d at 248. For the requirement that there be an affirmative "claim," assertion, or "invocation" of executive privilege, the district court relied on the Supreme Court's consideration of the state secrets privilege in *Reynolds*: "There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." 345 U.S. at 7-8. And for the requirement that executive privilege requires personal consideration, the district court relied on the Supreme Court's consideration of executive privilege in *Cheney*: "Executive privilege is an extraordinary assertion of power 'not to be lightly invoked.'" 542 U.S. at 389 (citing *Reynolds*, 345 U.S. at 7).

This reasoning is flawed insofar as it completely ignores the necessity of the constitutional accommodation process in any executive privilege assertion. More problematic, however, is that it completely disregards the impropriety of the Judicial Branch dictating the Chief Executive's utilization of core Executive Branch powers. "By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Marbury*, 5 U.S. (1 Cranch) at 165-66. Moreover, "Congress was also

keenly aware of the separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations." *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991). And thus, in "declining to give outsiders the right to interfere with White House recordkeeping practices, Congress presumably relied on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations." *Id.* at 290-91.

Relevant here, the proper function of executive privilege is, "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Nixon*, 418 U.S. at 708, *quoted in Trump*, 2024 U.S. LEXIS 2886, at *33-34. Accordingly, it was improper for the district court to delineate, *post hoc*, the means by which some "proper" invocation and/or assertion of executive privilege was to be made. Similarly instructive, is the Supreme Court, analogization of presidential privilege to the speech or debate immunity which protects members of Congress from intimidation by the Executive or accountability before a hostile Judiciary. Although speech or debate immunity is textually based, *see Nixon v. Fitzgerald*, 437 U.S. 731, 750 n.31 (1982) ("Noting that the Speech and Debate Clause provides a textual basis for congressional immunity, respondent argues that the Framers must be assumed to have rejected any similar grant of executive immunity. This argument is unpersuasive. First, a specific textual basis has not been considered a prerequisite to the recognition of immunity."), while executive

privilege is not, the latter has nevertheless long been considered constitutionally derived. *Nixon*, 418 U.S. at 705 ("Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art. II powers, the privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinnings."). Relevant here, under the speech or debate clause, there is no specific judicial requirement that its assertion be framed in any particular way. Indeed, its applicability is almost automatic – presumptive – if the activity subject to it is part of the "legitimate legislative sphere" or involves conduct typically performed by Members in relation to the functions which the Constitution assigns to the Legislature. *See Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 509 n.16 (1975) ("Where we are presented with an attempt to interfere with an ongoing activity by Congress, and that activity is found to be within the legitimate legislative sphere, balancing plays no part. The speech or debate protection provides an absolute immunity from judicial interference."). By way of example, in the prosecution of a Member for bribery, a district court concluded that once the activities engaged by the member are "apparently" legislative, that is a sufficient showing to preclude "questioning" of that conduct anywhere but before Congress. *United States v. Helstoski*, 442 U.S.

447, 489 (1979) ("The Speech or Debate Clause does not refer to the prosecutor's purpose in offering evidence. The Clause does not simply state, 'No proof of a legislative act shall be offered'; the prohibition of the Clause is far broader. It provides that Members 'shall not be *questioned* in any other Place.'" (emphasis in original)).

Since both the speech or debate immunity and executive privilege derive from the separation of powers and draw their vitality from that source there is no reason to require a higher showing of applicability of presidential privilege by imposing a judicially crafted formal requirement for its assertion.

### b. Executive Privilege was Properly Invoked

Even were the judicial branch not precluded from dictating how a president exercises executive branch authority, Dr. Navarro satisfied the stringent test imposed by the district court to establish a "proper" invocation of executive privilege. Again, to "properly" invoke executive privilege, the district court held that the following three-part criteria must be met – first, that the privilege be claimed or invoked by the President *or* someone authorized and designated to make such a claim or invocation; second, that that claim or invocation be made after personal consideration by the President or his authorized designee; and lastly, through "an act of affirmative conduct," to be distinguished from "mere acquiescence." *See* App., p. 1175.

Here, Dr. Navarro testified:

And during the course of that conversation [with former President Trump], I got the very clear message from the President that I would not talk to these people, meaning these Congressional Committees, these partisan Congressional Committees, or provide them documents. And that included anything I might receive from the J6 Committee, because . . . [a]t that point, I was one of the few people they hadn't yet gone after. . . . There was no doubt in my mind or the President's mind that I would be next on that list at one point.

*Id.* at 1061.

Further, Dr. Navarro explained the protocol for confirming any mandate of the former President. Dr. Navarro explained former President Trump's common practice. A congressional outreach to an aide; the aide requesting a meeting with former President Trump, a directive for the assertion of executive privilege; and a follow up after the directive had been completed. *See* App., p. 1052: ("Q: Sir, what did you do upon receipt of this subpoena? A [Dr. Navarro]: I immediately initiated the protocol I had used repeatedly in the White House. I needed to get in touch with the President. I rarely did that directly. What I did was I contacted one of his top aides, which was [Liz] Harrington. . . I wanted to see whether he wanted to invoke executive privilege and testimonial immunity[.]"). *See also id.* at 1071 ("Q: And what did you do after receipt of this subpoena? A [Dr. Navarro]: I immediately initiated the protocol with respect to President Trump. . . I contacted [Liz Harrington] to let her know to let the President know that I had received the subpoena. And I was obviously looking for direction on this."). All three prongs were satisfied here with

Dr. Navarro reasonably understanding he was to assert executive privilege, *Id.* at 1076 ("A [Dr. Navarro]: And during that call, it was very clear that the privilege was invoked, very clear."); and neither former President Trump nor any of his aides advised Dr. Navarro that he had failed to properly carry out that mandate. *See e.g., id.* at 1080 ("A [Dr. Navarro]: The privilege was never questioned. The only correspondence I had on several occasions from Mr. George was an acknowledgement that the privilege had been invoked."). *See also United States v. Bannon*, 101 F. 4th 16, 20 (D.C. Cir. 2024) ("[O]n October 16, after learning of Bannon's continued claim to the Committee that he was justified in not responding to the subpoena, [former President Trump's lawyer] Clark repeated that his previous letter 'didn't indicate that we believe there is immunity from testimony for your client. As I indicated the other day, we don't believe there is.'").

Moreover, the testimony of Dr. Navarro was buttressed by the prior sworn testimony admitted by the district court. For example, former President Trump's attorney Justin Clark testified that he, "suspect[ed]" someone spoke with Dr. Navarro on behalf of former President Trump about responding to the subpoena at issue based on former President Trump's practice of doing the same with other former members of his administration and given that he did not interact with Dr. Navarro. App., pp. 2577-78. Further, Elizabeth Harrington testified that she was, "the spokesperson for President Donald J. Trump[,]" that she spoke with Dr.

Navarro, that she reviewed the subpoena at issue, and that she and Dr. Navarro discussed executive privilege in relation to that subpoena. App., pp. 2593, 2600, 2602-3. Ms. Harrington never testified that Dr. Navarro should not have asserted former President Trump's executive privilege.

Rather than acknowledge the evidence of the executive privilege invocation and/or assertion by former President Trump, the district court focused on what former President Trump did not say. Essentially, the district court concluded that there had been a privilege waiver. However, it is well established that in the executive privilege context, "waiver should not be lightly inferred." *In re Sealed Case*, 121 F.3d at 741 (quotation marks omitted). Finding that a waiver occurred by way of an insufficient "invocation" of privilege would incentivize less Executive Branch cooperation and broader privilege assertions, undermining each branch's, "constitutional mandate to seek optimal accommodation" of each other's legitimate interests. *AT&T*, 567 F.2d at 127. Yet, like speech or debate immunity, executive privilege may not lightly be waived. Indeed, in *Helstoski*, the Supreme Court held the defendant / Member had not waived immunity despite his testimony on ten (10) occasions before the grand jury on the subject of his private immigration bills, concluding that: "[W]aiver can be found only after explicit and unequivocal renunciation of the protection. The ordinary rules for determining the appropriate standard of waiver do not apply in this setting." *Helstoski*, 442 U.S. at 491 (1979).

Accordingly, it would be anomalous to require more from a President and his closest advisors given the identical source of these privileges and the manner in which the courts have accursed them equal deference.

        *c. Executive Privilege is Presumptive.*

Even were this Court to conclude that Dr. Navarro failed to assert and/or "properly" invoke executive privilege, it should nevertheless hold that executive privilege is presumptive and, accordingly, the separation of powers doctrine precluded any prosecution of Dr. Navarro for contempt of congress.

Since the Administration of our first President, the principle of Executive Privilege has served to protect the Constitutional doctrine of Separation of Powers. As then-President George Washington explained in refusing to provide information to Congress, "the boundaries fixed by the Constitution between the different departments should be preserved." Pres. George Washington, Message to the House Regarding Documents Relative to the Jay Treaty (Mar. 30, 1796), *available at* Yale Law School, Lillian Goldman Law Library, The Avalon Project https://avalon.law.yale.edu/18th_century/gw003.asp. Congress – with its inherent contempt power – did not then require President Washington to utter some magic words to benefit from the privilege, and nothing requires otherwise now.

Accordingly, when then-President Thomas Jefferson relied on the privilege, during the trial for treason of former Vice President Aaron Burr, he simply refused

to acknowledge a subpoena for certain correspondence deemed material to Burr's defense. Chief Justice John Marshall, presiding over Burr's trial (and the issuer of the subpoena in question) recognized that executive privilege excused President Jefferson from compliance. *See Nixon*, 418 U.S. at 708 ("We agree with Mr. Chief Justice Marshall's observation, therefore, that '[in] no case of this kind would a court be required to proceed against the president as against an ordinary individual.'" (quoting *United States v. Burr*, 25 F. Cas. 55 (Aug. 31, 1807), at 192)).

More recently, the Supreme Court has affirmed that, "Presidential communications" are "presumptively privileged." *Trump*, U.S. LEXIS 2886, at *5 (quoting *Nixon*, 418 U.S. at 708). *See also Marbury*, 5 U.S. (1 Cranch) at 144 (implicitly recognizing a presumptive privilege: "There was nothing confidential required to be disclosed [by the Attorney General]. If there had been he was not obligated to answer it; and if he thought that anything was communicated to him in confidence he was not bound to disclose it."); 17 Cong. Rec. 2618 (quoting former Treasury Secretary John Sherman's correspondence to Congress in refusing to produce requested information: "To answer in an official way the questions put to me would not only compel me to violate that trust and confidence reposed in me by the President, necessary for the transaction of the business of this Department, but to disclose papers of a confidential character filed in the Department.").

In Burr's trial, as here, the privilege must be presumptive insofar as it cannot depend on the privilege-holder to assert it where a President is either incapable of doing so himself, as in the case of death or disability, or where the individual subpoenaed attempts to circumvent or thwart the privilege by refusing to assert it unbeknownst to the President. *See Dellums*, 561 F.2d at 248 ("Obviously, the privilege does not disappear merely because the president who made or received the communication died, resigns, or has completed his term."). Judge Wilkey's seminal review of historical assertions of executive privilege is particularly illustrative insofar as there is little to no consistency in the means or manner in which the privilege has historically been invoked. *See Nixon v. Sirica*, 487 F.2d 700, 733 n.9 (D.C. Cir. 1973) (Wilkey, J., dissenting).

Accordingly, when first called upon to memorialize its position with respect to the prosecution of a senior presidential advisor for contempt of congress, more than forty years ago the Department of Justice concluded so doing violated the separation of powers doctrine: "The President is a separate branch of government. He may not compel congressmen to appear before him. As a matter of separation of powers, Congress may not compel him to appear before it." Olson Mem. at 2.

The presumptiveness of executive privilege is again analogous to the proper function of a Legislative Member's speech or debate immunity. Once the latter is implicated, its applicability is joined and no further evidence of its invocation is

required. *See Powell v McCormack*, 395 U. S. 486, 505 n.25 (1969) ("A congressman is not, by virtue of the Speech or Debate Clause absolved of the responsibility of filing a motion to dismiss and the trial court must still determine its applicability of the Clause to the plaintiff's action" (citing *Tenney v Brandhove*, 341 U. S. 367, 377 (1951)). It is beyond dispute that the district court recognized the applicability of executive privilege here: for the first time ever an evidentiary hearing concerning its invocation was held.

It follows that where Congress issues a subpoena to a senior presidential advisor, the application of executive privilege is presumptive and must be resolved through the constitutionally mandated accommodation process.

## IV. ANY APPLICATION OF *LICAVOLI* INCONSISTENT WITH THESE PRINCIPALS VITIATES THE SEPARATION OF POWERS DOCTRINE.

Dr. Navarro's prosecution was also fatally tainted by the district court's reliance on this Court's opinion in *Licavoli*, 294 F.2d 207. There, the recipient of a congressional subpoena failed to appear – "willfully ma[de] default" – before the Senate Select Committee on Improper Activities in the Labor or Management Field. *Id.* at 207. The issue on appeal was whether the district court erred in not instructing the jury, "that if the accused acted upon the advice of counsel they should acquit." *Id.* This Court concluded that "willfully" in § 192, "requires that any failure to appear in response to a congressional subpoena be only 'deliberate' and 'intentional' [and] does not require bad faith, evil motive, or unlawful purpose." *United States v.*

*Bannon* ("*Bannon I*"), 101 F. 4th 16, 21 (D.C. Cir. 2024) (quoting *Licavoli*, 294 F.2d at 207-9).

In recently reaffirming the *Licavoli* panel's holding that, "an advice of counsel defense—which ultimately seeks to show the defendant acted in good faith—is unavailable under this statute," the *Bannon* panel reasoned:

> [E]ffectively enforcing congressional subpoenas would be exceedingly difficult if contempt charges required showing that a failure to appear . . . was not just deliberate and intentional, but also done in bad faith. Otherwise, any subpoenaed witness could decline to respond and claim they had a good-faith belief that they need not comply, regardless of how idiosyncratic or misguided that belief may be.

*Id.* at 22.

*First*, the implication of executive privilege implicates different principles than any "good faith" reliance on advice of counsel. *See United States v. Bannon* ("*Bannon II*"), No. 22-3086, 2024 U.S. App. LEXIS 15093, at *4 (D.C. Cir. June 20, 2024) ("If an assertion of good-faith reliance on advice of counsel excused a witness's wholesale noncompliance . . . Congress's power of inquiry would be "nulli[fied]." (citing *United States v. Bryan*, 339 U.S. 323, 331 (1950)). An advice of counsel defense is not presumed and can be waived, whereas executive privilege is presumptive, *see. e.g. Nixon*, 418 U.S. at 708 (noting a "presumptive privilege for Presidential conversations[,]" because the privilege is, "fundamental to the operation of Government and inextricably rooted in the separation of powers under the

Constitution."), and subject to a Constitutional accommodation process. *Mazars*, 140 S. Ct. at 2029 ("Historically, disputes over congressional demands for presidential documents have not ended up in court. Instead, they have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" (quoting Hearings on S. 2170 *et al.* before the Subcommittee on Intergovernmental Relations of the Senate Committee on Government Operations, 94th Cong., 1st Sess., 87 (1975) (A. Scalia, Assistant Attorney General, Office of Legal Counsel)); *AT&T*, 567 F.2d at 127 ("Rather, each branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation. This aspect of our constitutional scheme avoids the mischief of polarization of disputes.").  The accommodation mandate avoids any concern that "wholesale noncompliance" would be excused based on a good faith reliance on the applicability of executive privilege because resolution of the interbranch dispute would give rise to an assumption that,  "it is substantially likely that the President and other executive . . . officials would abide by an authoritative interpretation of [a] . . . constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Franklin*, 505 U.S. at 803.

*Second*, that any defense of "good faith" reliance on counsel is barred, is a conclusion in conflict with the plain text of § 192. It is beyond dispute that § 192 precludes two separate types of conduct: (a) "willfully mak[ing] default," and (b) "refus[ing] to answer [a pertinent] question" after, "having appeared." The first of the proscribed conduct specifically requires, as an element of the offense, that it be, "willful." While this Court's *Licavoli* panel concluded willful must necessarily mean "deliberate[] and intentional[]" because the Supreme Court had previously held that the refusal to answer a question requires proof only of an, "[i]ntentional violation," and that, "act[ing] in good faith on the advice of competent counsel" is "no defense," *Sinclair v. United States*, 279 U.S. 263, 299 (1929), *overruled on other grounds by United States v. Guadin*, 515 U.S. 506 (1995), this conclusion is in conflict with the "general rule" that "willfully" requires proof of "bad purpose," or, "knowledge that . . . conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191-192 (1998)). *See also Bannon II*, 2024 U.S. App. LEXIS 15093, at *5-6 ("[S]ubsequent Supreme Court decisions arguably establish 'a "general" rule' in some tension with this circuit's earlier decision in *Licavoli*." (citing *Bannon I*, 101 F. 4th at 22)) (Walker, J., dissenting).

Moreover, the implication of executive privilege, and the Constitutional accommodation process that must follow, presents a wholly different posture within

which to consider the elements of the first clause of § 192.  As the Supreme Court

explained in *Watkins v. United States*, 354 U.S. 178 (1957):

> The [implication of due process protections] attains proportion
> when viewed from the standpoint of the witness who appears
> before a congressional committee.  He must decide at the time
> the questions are propounded whether or not to answer.  As the
> Court said in *Sinclair*, the witness acts at his peril.  He is '. . .
> bound rightly to construe the statute.'  An erroneous
> determination on his part, even if made in the utmost good faith,
> does not exculpate him if the court should later rule that the
> questions were pertinent to the question under inquiry.

*Id.* at 208 (citing *Sinclair*, 279 U.S. at 299), *cited in Licavoli*, 294 F.2d at 207 n.2.  A

senior presidential advisor is duty-bound to assert executive privilege and as a result,

is otherwise immune from prosecution.  *See McGahn*, 415 F. Supp. 3d at 213 n.34

(the identification of "sensitive information" "deem[ed] subject to the executive

privilege," "gives rise to a legal duty on the part of the aide to invoke the privilege

on the President's behalf"); *Id.* at 213-14 ("such officials (including senior-level

presidential aides) still enjoy the full measure of freedom that the Constitution

affords[]").  Accordingly, a senior presidential advisor's appearance in response to a

congressional subpoena reasonably presumes completion of the constitutionally

mandated accommodation process.  *See Franklin*, 505 U.S. at 803 (holding that, "it

is substantially likely that the President and other executive and congressional

officials would abide by an authoritative interpretation of [a]. . . statute and

constitutional provision by the District Court, even though they would not be directly bound by such a determination.").

Nor can it reasonably be disputed that the district court's reliance on *Licavoli* in precluding Dr. Navarro from raising executive privilege as a defense at his trial adversely affected the result. As the district court observed, "I recognize and appreciate it puts you in a bind . . . that's created by the law and what the Circuit has held and what the Supreme Court . . . has . . . held about . . . state of mind not being a defense to contempt[,]" App., p. 1540. *See also id.* at 1529 ("The Court: I understand I've hamstrung you dramatically."). And after precluding Dr. Navarro from offering any explanation for why he failed to appear in response to the subpoena, the district court concomitantly permitted the government to explain that reliance on executive privilege is no defense. *Id.* at 1540. Which it did gratuitously. *Id.* at 1604 ("Mr. Navarro ignored his subpoena. He acted as if he's above the law. No one is. If you defy a congressional subpoena, that's against the law. The crime is called contempt of Congress."); *Id.* at 1880 ("As Mr. Crabb told you, we are a nation of laws; and our system does not work if people think they are above the law."); *Id.* at 1894 ("That man thinks he's above the law . . . . But in this country, no one is above the law.").

\* \* \*

Dr. Navarro is the *only* senior presidential advisor ever to have been prosecuted, let alone convicted, for contempt of congress. A series of errors permitted this unjust result. This Court must hold that senior presidential advisors are immune from prosecution for contempt of congress insofar as the congressional inquiry giving rise to such a prosecution implicates executive privilege. Failure to reverse Dr. Navarro's conviction will forever cripple the critical role executive privilege plays in effective presidential decisionmaking; significantly erode the longstanding separation of powers between our coordinate branches; eliminate the necessity of accommodation in interbranch disputes; and enable the constitutional congressional prerogative to serve as a partisan sword without the protective shield our Framers intended the Chief Executive.

## CONCLUSION

For the foregoing reasons, Dr. Navarro respectfully requests this Court reverse his convictions for contempt of congress.

## STATEMENT REGARDING ORAL ARGUMENT

Dr. Navarro, through counsel, respectfully contends that oral arguments are necessary in this matter. This appeal involves numerous novel and important constitutional questions, including but not limited to, the scope of executive privilege and whether this Court can distinguish this case from its holding in *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961). As such, Dr. Navarro respectfully requests oral arguments in this matter be held.

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 32(g) and Fed. R. App. P. 32(a)(7)(B), that the foregoing brief complies with the page and type-volume limitation because it contains 10,025 words, and thus not more than 13,000 words, excluding those exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

/s/
Stanley E. Woodward Jr.

**CERTIFICATE OF SERVICE**

I hereby certify, pursuant to Fed. R. App. P. 25(c), that on July 11, 2024, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

/s/
_____

Stanley E. Woodward Jr.
