No. 24-3006
ORAL ARGUMENT NOT SCHEDULED YET

**UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT**

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

PETER NAVARRO,

*Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
No. 1:22-cr-00200 (Amit P. Mehta, J.)

_____

**BRIEF FOR *AMICI CURIAE* HEIDI KITROSSER, MARK J. ROZELL,
AND MITCHEL A. SOLLENBERGER IN SUPPORT OF AFFIRMANCE**

_____

Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for* Amici Curiae

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................... i

TABLE OF AUTHORITIES ........................................................... iii

GLOSSARY................................................................................... vii

SUMMARY OF ARGUMENT ........................................................ 1

ARGUMENT .................................................................................. 2

    I.    *AMICI CURIAE*............................................................. 2

    II.   THE DISTRICT COURT WAS CORRECT TO INSIST ON A PROPER INVOCATION OF PRIVILEGE................................. 2

        A.    A POTENT PRIVILEGE WARRANTS A STRICT STANDARD........................................................ 4

        B.    THE NEED FOR PERSONAL INVOLVEMENT OF THE PRESIDENT IS WELL ESTABLISHED ................ 5

        C.    THE DISTRICT COURT PROPERLY ESTABLISHED AN EVIDENTIARY TEST ................................ 11

    III.   PRESIDENT BIDEN WAIVED EXECUTIVE PRIVILEGE .... 14

        A.    *NIXON V. GSA* WAS DECIDED IN A SIGNIFICANTLY DIFFERENT CONTEXT................... 17

        B.    *NIXON V. GSA* IS ABOUT PRESERVING PROTECTED STATUS .................................... 24

    IV.   OFFICE OF LEGAL COUNSEL OPINIONS CARRY NO WEIGHT ..................................................... 26

CONCLUSION.... .......................................................... 30

CERTIFICATE OF COMPLIANCE............................................... 32

CERTIFICATE OF SERVICE ............................................................ 33

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Pages**

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ........................................... 12

\*Black v. Sheraton Corp. of Am.*, 371 F. Supp. 97 (D.D.C. 1974) .................. 2

*Black v. Sheraton Corp. of Am.*, 564 F.2d 531 (D.C. Cir. 1977) ...................... 2, 3

\*Ctr. on Corporate Resp., Inc. v. Shultz*, 368 F. Supp. 863 (D.D.C. 1973) ..... 11

\*Cheney v. United States Dist. Ct.*, 542 U.S. 367 (2004) ................................. 6

*Comm. on the Judiciary v. McGahn*, 415 F. Supp. 3d 148 (D.D.C. 2019) ...... 11, 30

*Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008) ............. 30

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ....................................... 19

*Dep't of the Navy v. Egan*, 484 U.S. 518 (1988) ............................................. 7

*Dep't of the Treas. v. Pension Benefit Guar. Corp.*, 351 F. Supp. 3d 140
      (D.D.C. 2018) ......................................................................................... 10

*EEOC & Murry v. Anchor Hocking Corp.*, No. 81-1, 1981 U.S. Dist. LEXIS
      10163 (S.D. Ohio Dec. 16, 1981) ............................................................ 3

*Elec. Frontier Found. v. DOJ*, 739 F.3d 1 (D.C. Cir. 2014) ........................... 28

*Fields v. Ofc. of Eddie Bernice Johnson*, 459 F.3d 1 (D.C. Cir. 2006) ........... 7

*Halkin v. Helms*, 598 F.2d 1 (D.C. Cir. 1978) ................................................. 5

*In re Nigro HQ LLC*, No. 11-21014, 2018 Bankr. LEXIS 4216 (Bankr. D.
      Nev. Sept. 14, 2018) ............................................................................... 3

\*In re Sealed Case*, 494 F.3d 139 (D.C. Cir. 2007) ......................................... 4

*In re Search of Info. Stored at Premises Controlled by Twitter, Inc.*, No.

23-5044, 2024 U.S. App. LEXIS 977 (D.C. Cir. Jan. 16, 2024)............ 9

*Int'l Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88 (D. Del. 1974) ................ 3

*Jabara v. Kelley*, 75 F.R.D. 475 (E.D. Mich. 1977)......................................... 3

*Kingsley v. Lawrence Cnty., Mo.*, No. 17-5007, 2018 U.S. Dist. LEXIS 247032 (W.D. Mo. Mar. 23, 2018).......................................................... 3

\**Kinoy v. Mitchell*, 67 F.R.D. 1 (S.D.N.Y. 1975) ........................................... 5, 8

\**Lardner v. DOJ*, No. 03-180, 2005 U.S. Dist. LEXIS 5465 (D.D.C. Mar. 31, 2005) ..................................................................................................... 10

*Little v. Barreme*, 6 U.S. 170 (1804) ................................................................ 18

*Marks v. CIA*, 590 F.2d 997 (D.C. Cir. 1978) ................................................. 18

*Medellin v. Texas*, 552 U.S. 491 (2008) .......................................................... 14

*N.Y. Times v. DOJ*, 806 F.3d 682 (2d Cir. 2015)............. ......... ........ ........ 29

\**Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425 (1977) ..... ......... ........ 16, 20, 21, 22, 23, 25, 26

*Nixon v. Freeman*, 670 F.2d 346 (D.C. Cir. 1982) .......................................... 21

*Pa. v. Union Gas Co.*, 491 U.S. 1 (1989) ........................................................ 20

\**Pierson v. United States*, 428 F. Supp. 384 (D. Del. 1977)............................. 8, 14

\**Public Citizen v. Burke*, 843 F.2d 1473 (D.C. Cir. 1988).............................. 17, 24

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989)...... 24

*Sun Oil Co. v. United States*, 206 Ct. Cl. 742 (1975) ...................................... 11

\**Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021).......................................... 17

*United States ex rel. Schaengold v. Memorial Health, Inc.*, No. 11-58, 2014
U.S. Dist. LEXIS 156595 (S.D. Ga. Nov. 5, 2014)................................ 3

*United States v. Davis*, 131 F.R.D. 391 (S.D.N.Y. 1990) ............................... 3

*United States v. Nixon*, 418 U.S. 683 (1974)....................................................5, 7,
26

*United States v. O'Neill*, 619 F.2d 222 (3d Cir. 1980) .................................... 6

*\*United States v. Reynolds*, 345 U.S. 1 (1953)................................................4, 6,
7

*Upjohn Co. v. United States*, 449 U.S. 383 (1981)..........................................24

*Whitaker v. CIA*, 31 F. Supp. 3d 23 (D.D.C. 2014)..........................................24

*\*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ......... .........14, 15

**Statutes and Regulations:**

44 U.S.C. § 2204 ....................................................................................... 19

44 U.S.C. § 2208 ....................................................................................... 18, 19

Exec. Order 13233 ..................................................................................... 18

Exec. Order 13489 ..................................................................................... 18, 9

Fed. R. App. P. 29(a)(4).............................................................................. 1

U.S. Const., Art. II, § 2 .............................................................................. 7

**Other Authorities:**

8 Fed. Prac. & Proc. Civ. (3d ed.)................................................................ 2

Emily Berman, *Weaponizing the Office of Legal Counsel*, 62 B.C. L. Rev.
515 (2021)........................................................................................... 29

Adoree Kim, *The Partiality Norm: Systematic Deference in the Office of Legal Counsel*, 103 Cornell L. Rev. 757 (2018) .................................... 29, 30

## **GLOSSARY**

| | |
|---|---|
| 1/6 Committee | House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol |
| AAG-OLC | Assistant Attorney General for the Office of Legal Counsel |
| Navarro | Appellant Peter Navarro |
| OLC | Department of Justice Office of Legal Counsel |
| PRA | Presidential Records Act |

## *AMICI CURIAE* BRIEF IN SUPPORT OF AFFIRMANCE[1]

Heidi Kitrosser, Mark J. Rozell, and Mitchel A. Sollenberger (collectively "Amici") respectfully submit this *Amici Curiae* Brief in Support of Appellee. The Court authorized the filing of this Brief on 25 June 2024.

## SUMMARY OF ARGUMENT

There is no legal theory of privilege which would allow Appellant Peter Navarro ("Navarro") to prevail in this litigation, and this Court should accordingly affirm the District Court's judgment and uphold the conviction of Navarro for contempt of Congress for refusing to testify in response to a subpoena from the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol ("1/6 Committee"). Amici fully endorse the ruling of Judge Amit P. Mehta in this matter, although they respectfully maintain that the District Court did not go far enough and that this Court should explicitly affirm that no former President may successfully assert Executive Privilege over information for which the incumbent President has expressly waived it.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4), undersigned counsel states that no party's counsel authored this Brief in whole or in part. Nor did any party or party's counsel, or any other person other than *amici curiae* or their counsel, contribute money that was intended to fund preparing or submitting this Brief.

# ARGUMENT

## I.    *AMICI CURIAE*

Amici are law professors and/or scholars who teach, research, and/or write about topics related to executive privilege. They submit this brief in support of Appellee to explain why the District Court was correct to establish a three-part test for invoking executive privilege, why there is no legitimate basis for a former President or his agent to invoke executive privilege in a case in which the incumbent President has expressly waived it, and the Court should decline the parties' invitations to base its decision on opinions drafted by the Department of Justice Office of Legal Counsel ("OLC"). Their interest in this case is ensuring that a former President or his agent cannot use unsubstantiated claims of executive privilege to override the legitimate interests of the incumbent President and Congress.

## II.    THE DISTRICT COURT WAS CORRECT TO INSIST ON A PROPER INVOCATION OF PRIVILEGE

It is axiomatic that "[a]n existing privilege exemption . . . must be raised in a proper fashion to be effective." 8 Fed. Prac. & Proc. Civ. § 2016.1 (3d ed.). It is universally accepted across the country that "[a]n improperly asserted claim of privilege is no claim of privilege." *Black v. Sheraton Corp. of Am.*, 371 F. Supp.

97, 101 (D.D.C. 1974), *rev'd* 564 F.2d 531 (law enforcement privilege);[2] *In re Nigro HQ LLC*, No. 11-21014, 2018 Bankr. LEXIS 4216, at *21 (Bankr. D. Nev. Sept. 14, 2018) (attorney-client, attorney work product, and bank examiner privileges); *Kingsley v. Lawrence Cnty., Mo.*, No. 17-5007, 2018 U.S. Dist. LEXIS 247032, at *7 (W.D. Mo. Mar. 23, 2018) (attorney-client privilege); *United States ex rel. Schaengold v. Memorial Health, Inc.*, No. 11-58, 2014 U.S. Dist. LEXIS 156595, at *10 (S.D. Ga. Nov. 5, 2014) (attorney-client privilege); *United States v. Davis*, 131 F.R.D. 391, 402 (S.D.N.Y. 1990) (attorney-client and attorney work product privileges); *EEOC & Murry v. Anchor Hocking Corp.*, No. 81-1, 1981 U.S. Dist. LEXIS 10163, at *14 (S.D. Ohio Dec. 16, 1981) (deliberative process privilege); *Jabara v. Kelley*, 75 F.R.D. 475, 484 (E.D. Mich. 1977) (state secrets privilege); *Int'l Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 94 (D. Del. 1974) (attorney-client privilege).

Against this backdrop, Navarro's claims to the contrary are, at best, misguided, for three primary reasons: (1) Executive privilege is such a potent claim that it warrants a strict evidentiary standard; (2) the prevailing view of executive privilege requires the personal involvement of the President; and (3) the District

---

[2] The district court opinion used the term "executive privilege," which was used by the Department of Justice, but this Court took issue with that terminology and clarified that the privilege in question was better described as the "law enforcement evidentiary privilege." 564 F.2d at 541.

Court did not, as Navarro alleges, find that Mr. Trump had waived the privilege, but instead found that Mr. Trump had simply not properly asserted it, which are completely different statements.

## A.    A POTENT PRIVILEGE WARRANTS A STRICT STANDARD

As an initial note, it is important to clarify one point which is misrepresented by both parties. The state secrets privilege established in *United States v. Reynolds*, 345 U.S. 1 (1953), is not "another species of executive privilege." (Br. for Appellee, Dkt. #2074490, at 31 (filed Sept. 12, 2024) [hereinafter Gov't Br.].) This is a common misconception due to imprecise language used in some post-*Reynolds* opinions, but it is significant here. "The state secrets privilege is a common law evidentiary rule that protects information from discovery when disclosure would be inimical to the national security." *In re Sealed Case*, 494 F.3d 139, 142 (D.C. Cir. 2007) (citations omitted) (quotations omitted). Most relevantly, if a court finds that it attaches, "the privilege is absolute and cannot be compromised by any showing of need on the part of the party seeking the information." *Id.* at 144 (citations omitted) (quotations omitted).

In contrast, the Supreme Court identified in dicta a narrow subcategory of executive privilege which pertains to "military or diplomatic secrets" which is purely constitutional in nature:

> Absent a claim of need to protect military, diplomatic, or sensitive
> national security secrets, we find it difficult to accept the argument that

even the very important interest in confidentiality of Presidential communications is significantly diminished by production of such material for in camera inspection with all the protection that a district court will be obliged to provide.

\*    \*    \*

[The President] does not place his claim of privilege on the ground they are military or diplomatic secrets. As to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities.

\*    \*    \*

Nowhere in the Constitution, as we have noted earlier, is there any explicit reference to a privilege of confidentiality, yet to the extent this interest relates to the effective discharge of a President's powers, it is constitutionally based.

*United States v. Nixon*, 418 U.S. 683, 710-11 (1974). This Court has since clarified this distinction, stating, "[T]he Court in *United States v. Nixon* strongly indicates that state secrets are not analogous to the Presidential communications at issue there." *Halkin v. Helms*, 598 F.2d 1, 7 (D.C. Cir. 1978). Similarly, even this species of executive privilege which deals with confidential national security matters is only a *qualified* privilege, as the parties recognize, compared to the state secrets privilege. *See Kinoy v. Mitchell*, 67 F.R.D. 1, 10 (S.D.N.Y. 1975) ("This is not an assertion of the well established and absolute military or state secrets privilege discussed above.").

The District Court, like several other courts to consider executive privilege questions (including those which used the term broadly to include several distinct

privileges, *see*, *e.g.*, *United States v. O'Neill*, 619 F.2d 222, 228-29 (3d Cir. 1980)),

borrowed a significant portion of its test from *Reynolds*, even though that case did

not implicate executive privilege as it is commonly understood. It was likely

inspired to do so by the Supreme Court's rhetorical conflation of the issues in

*Cheney v. United States Dist. Ct.*, 542 U.S. 367 (2004): "Executive privilege is an

extraordinary assertion of power 'not to be lightly invoked.'" *Id.* at 389 (quoting

*Reynolds*, 345 U.S. at 7). The phrase "not to be lightly invoked" was referring to

the absolute, common law state secrets privilege in *Reynolds*, 345 U.S. at 7, and by

stating that executive privilege *too* is not to be lightly invoked and citing to that

particular case, the Supreme Court created the impression that the two privileges

are the same, when they are not.

However, it is that very difference which proves fatal to Navarro's

argument. The core of Navarro's argument on this point—and in the case writ

large—is his assertion that the District Court's establishment of its three-part test

"completely disregards the impropriety of the Judicial Branch dictating the Chief

Executive's utilization of core Executive Branch powers." (Appellant Dr. Peter K.

Navarro's Principal Br., Dkt. #2064275, at 33 (filed July 11, 2024) [hereinafter

Navarro's Br.].) This assertion is completely refuted if the Court accepts that a

judge has the authority to dictate the form in which a co-equal branch of the

Government can assert privileges related to their core powers. The Government

has already demonstrated that "this Court has required the Speech or Debate Clause to be asserted 'in a particular way'" (Gov't Br. at 33 (quoting *Fields v. Ofc. of Eddie Bernice Johnson*, 459 F.3d 1, 16 (D.C. Cir. 2006) (en banc))), but the state secrets privilege regime is even more damning. The Supreme Court has held that the President's "authority to classify and control access to information bearing on national security . . . flows primarily from the constitutional investment of power in the President [as Commander in Chief of the Army and Navy of the United States] and exists quite apart from any explicit congressional grant," *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988) (citing U.S. Const., Art. II, § 2), and that, "[a]s to these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." *Id.* at 529-530 (quoting *Nixon*, 418 U.S. at 710). If, then, the Supreme Court had no problem establishing a formal procedure for the invocation of the state secrets privilege, requiring that "[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer," *Reynolds*, 345 U.S. at 7-8, which numerous courts have held implicates the very core of Article II duties, then any objection to any test based on judicial intrusion into Executive Branch decisionmaking must automatically fail.

The importance of a formal test requiring personal involvement by the relevant senior official serves important policy concerns as well. "Because the

Court must rely so heavily upon the judgment of the responsible executive officer in a case such as this, it must be clear that the judgment was properly exercised. At a minimum there must be an explicit representation to this effect." *Kinoy*, 67 F.R.D. at 9. The District Court of Delaware best summarized the need for such a framework almost fifty years ago:

> Executive privilege permits one branch of government to ban disclosure of documents ordinarily discoverable and as such it is "a phase of release from requirements common to private citizens or organizations." Thus, the privilege should be invoked with consistency and only after careful consideration. To permit any government attorney to assert the privilege would derogate both of those interests. It would be extremely difficult to develop a consistent policy of claiming the privilege. Moreover, the judgment of attorneys engaged in litigation is very likely to be affected by their interest in the outcome of the case. It is of the greatest importance that the privilege be invoked only when the policies it seeks to encourage are seriously threatened. Requiring the agency head to review the documents sought and to claim the privilege where appropriate is the most effective method available to assure consistency and prudence.

*Pierson v. United States*, 428 F. Supp. 384, 395 (D. Del. 1977) (citations omitted).

Furthermore, the District Court effectively accounted for the fact that executive privilege is a qualified privilege and the state secrets privilege is an absolute privilege by reducing the burden Navarro would have to meet. Because a judicial finding that information is protected by the state secrets privilege cannot be overcome by *any* showing of need, such an invocation absolutely requires the personal sworn attestation of the head of the department that controls it. In this case, in contrast, the District Court made it clear that it would accept a less formal

acknowledgment that former President Trump had authorized Navarro to invoke

executive privilege to withhold information from the 1/6 Committee. A.1116

(stating that a press release like the one issued in response to the November 2021

COVID Subcommittee would have sufficed). As a result, the District Court

effectively recognized that the strict test established by *Reynolds* and its progeny

was not necessarily required in this case.

In the final analysis, Navarro's key argument that the District Court's

establishment of a three-part test was *per se* erroneous cannot stand, and without it,

much of his case lacks any foundation.

## B.   THE NEED FOR PERSONAL INVOLVEMENT OF THE PRESIDENT IS WELL ESTABLISHED

Before proceeding to another issue, it is important to first note how

widespread the understanding is in the legal community that the subcategory of

executive privilege pertaining to presidential communications is held by *the*

*President* and not by *the President's advisors*, to the point of being implicitly

assumed in many cases. In the interest of simplicity, Amici will simply list some

cases on point so that the Court can reach its own conclusions:

- "Faced with a subpoena . . . *the President* may invoke executive privilege." *In re Search of Info. Stored at Premises Controlled by Twitter, Inc.*, No. 23-5044, 2024 U.S. App. LEXIS 977, at *8 (D.C. Cir. Jan. 16, 2024) (Rao, J., dissenting) (emphasis added);

- "In this case, no President—past or present—has invoked the privilege for these documents, and the incumbent has not indicated support for this claim of privilege. Rather the former Deputy Counsel to President Obama invoked the privilege on 'behalf of the Office of the President.' This invocation stands on different ground than the invocations made in other presidential communications privileges cases which were expressly made either by a President, past or current, or made on behalf of the President, rather than one made on behalf of the Office of the President generally." *Dep't of the Treas. v. Pension Benefit Guar. Corp.*, 351 F. Supp. 3d 140, 153 (D.D.C. 2018) (footnote omitted) (citations omitted);

- "[T]he personal invocation of the presidential communications privilege is [] a civil discovery rule that should not be imported into the FOIA analysis." *Lardner v. DOJ*, No. 03-180, 2005 U.S. Dist. LEXIS 5465, at *7 (D.D.C. Mar. 31, 2005);

- "The trial judge entered an order on May 16, 1974, ruling that the claim of executive privilege made by the President's counsel was insufficient and that it must be made by the President personally or else the contested documents would have to be produced for

inspection by plaintiffs." *Sun Oil Co. v. United States*, 206 Ct. Cl. 742, 753 (1975); and

- "The President, as head of the 'agency,' the White House, must make the formal claim. A mere statement by Mr. Buzhardt that he is authorized to advise the Court that the White House is claiming executive privilege is wholly insufficient to activate a formal claim of executive privilege." *Ctr. on Corporate Resp., Inc. v. Shultz*, 368 F. Supp. 863, 873 (D.D.C. 1973).

In short, while it is accurate to say that, as a matter of controlling precedent, the President's personal involvement remains an open question in this Circuit, it is very much not an open question in the eyes of courts who have wrestled with it, and this Court should memorialize that prevailing understanding.

## C.   THE DISTRICT COURT PROPERLY ESTABLISHED AN EVIDENTIARY TEST

The above recitation describes the backdrop against which Judge Ketanji Brown Jackson's opinion in *Committee on the Judiciary v. McGahn* must be considered. In that case, as Navarro mentions three times in his brief, Judge Jackson stated that "the identification of sensitive information deemed subject to executive privilege by the President[] 'gives rise to a legal duty on the part of the aide to invoke the privilege on the President's behalf.'" (Navarro's Br. at 16 (quoting 415 F. Supp. 3d 148, 213 n.34 (D.D.C. 2019)).) This statement is

conditioned on a finding that "the President" "identifi[ed] . . . sensitive information subject to executive privilege," which would be a fact that the "aide" in question would have to prove to the Court's satisfaction. In this case, the District Court established a three-part evidentiary test for how someone could meet their burden.

In other words, the District Court did *not* do the two things that Navarro claims it did. It did not "dictat[e] the Chief Executive's utilization of core Executive Branch powers" (*id.* at 33) akin to "interfer[ing] with White House recordkeeping practices" (*id.* at 34 (citing *Armstrong v. Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991))); it simply established criteria for how an aide claiming executive privilege on behalf of a President or former President could *prove* that the "Chief Executive's utilization of core Executive Branch powers" was as the aide alleged.

In a similar vein, the District Court also did not "[e]ssentially[] . . . conclude[] that there had been a privilege waiver." (*Id.* at 39.) Instead, it concluded that no privilege had been properly claimed in the first place. Those are two completely different scenarios. In the former, the party seeking information must overcome an otherwise legitimate privilege claim, while in the latter there is no legitimate privilege claim to overcome in the first place. The former scenario requires a close review of the competing interests, imposing a significant burden on the party seeking information, while the latter simply involves a finding that the party asserting the privilege did not satisfy the evidentiary test—that he "failed to

come forward with any evidence to support the claimed assertion of privilege."

*United States v. Navarro*, 651 F. Supp. 3d 212 (D.D.C. 2023).

Navarro posits two scenarios in which, according to him, a court should find *sua sponte* that executive privilege attaches: (1) "a President is either incapable or doing so himself, as in the case of death or disability"; and (2) "the individual subpoenaed attempts to circumvent or thwart the privilege by refusing to assert it unbeknownst to the President." (*Id.* at 42.) Without impugning Navarro's character or veracity, it is important to note that there is a third possible scenario that this evidentiary test is designed to preclude. In that scenario, the individual subpoenaed attempts to assert the privilege unbeknownst to the President. If the Court were to accept Navarro's interpretation of the law, such an individual could assert executive privilege on his own and falsely claim that the President authorized it, and the Court would be powerless to require further evidence. Or, put another way, no matter how "entirely ineffective [it might be] for a former senior advisor to invoke privilege without an instruction to do it," A.529, there would be no way for the Court to determine if that were the case, making such a gambit entirely effective.

This is the reason why, for instance, criminal defendants who assert an advice of counsel defense are required to waive attorney-client privilege, so that the Court can ascertain for itself whether their counsel really provided the alleged

advice. Without an evidentiary standard, courts would be required to simply take the word of individuals charged with contempt of Congress that the privilege was authorized. If "the judgment of attorneys engaged in litigation is very likely to be affected by their interest in the outcome of the case," *Pierson*, 428 F. Supp. at 395, the same must be said for defendants in a criminal trial.

## III.    PRESIDENT BIDEN WAIVED EXECUTIVE PRIVILEGE

While the District Court did not decide if former President Trump waived executive privilege in this case, this Court should find that President Biden *did* waive executive privilege, which would effectively yield the same final result.

"The President's authority to act, as with the exercise of any governmental power, 'must stem either from an act of Congress or from the Constitution itself.'" *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). "Justice Jackson's familiar tripartite scheme provides the accepted framework for evaluating executive action." *Id*. Simply put, this test is as follows:

1.    When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, *and in these only*, may he be said (for what it may be worth) to personify the federal sovereignty. . . .

2.    When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he

and Congress may have concurrent authority, or in which its
distribution is uncertain. . . .

3.     When the President takes measures incompatible with the
expressed or implied will of Congress, his power is at its lowest
ebb, for then he can rely only upon his own constitutional powers
minus any constitutional powers of Congress over the matter.
Courts can sustain exclusive presidential control in such a case
only by disabling the Congress from acting upon the subject.

*Youngstown*, 343 U.S. at 635-38 (Jackson, J., concurring) (emphasis added). On

this point, this case boils down to a dispute over how Justice Jackson would

classify a former President's ability to control information after the end of his

Administration.

In order for a former President to unequivocally assert a personal ability to

invoke any privilege held by the Office of the President over the objections of the

incumbent President, he would have to "personify the federal sovereignty." *Id.* at

636. In other words, he would need to act "pursuant to an express or implied

authorization of Congress." *Id.* at 635. This is the category Navarro attempts to lay

claim to on behalf of former President Trump. However, not only does this claim

not fit within the first category, it does not even fit within the framework. In order

to explain this case in terms of *Youngstown*, the Court would need to create a

fourth, even weaker category:

4.     When a former President takes measures incompatible with the
expressed or implied will of both Congress and the incumbent
President, his power is virtually nonexistent, for then he can rely
only upon his own constitutional powers minus any

constitutional powers of Congress over the matter and minus any constitutional powers of the incumbent President over the matter. Courts can sustain exclusive control by a former President in such a case *only by disabling both the Congress and the incumbent President* from acting upon the subject.

To the extent that the Court recognizes some form of presidential communications privilege that can be invoked by a former President over the objection of an incumbent President—which, notwithstanding *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425 (1977) ("*Nixon v. GSA*"), it should not, as explained below—it is this fourth category into which such an assertion would fall. As a practical concern, however, it is impossible to imagine a scenario where such authority could be held to exist, where a court would nonetheless choose to itself "intrude[] into the executive function and the needs of the Executive Branch," *id.* at 449, simply because it believed that the duly elected head of the Executive Branch was not properly safeguarding his own branch's institutional interests.

In order to do so, a court would have to ignore: (1) the fact that "[i]t is true that only the incumbent is charged with performance of the executive duty under the Constitution," *id.* at 448; (2) the observation that "the fact that [the incumbent does not] support[] [the former President]'s claim detracts from the weight of his contention," *id.* at 449; (3) the fact that "the incumbent President is not constitutionally obliged to honor [a] former President['s] invocation of executive

privilege," *Public Citizen v. Burke*, 843 F.2d 1473, 1479 (D.C. Cir. 1988); and (4) the fact that "it is only [the incumbent] who can make a fully informed and circumspect assessment of all the competing needs and interests of the Executive Branch, *Trump v. Thompson*, 20 F.4th 10, 73-74 (D.C. Cir. 2021). This framing may sound like hyperbole, but that is exactly what Navarro is asking this Court to do, and the Court should forcefully decline.

### A.    *NIXON V. GSA* WAS DECIDED IN A SIGNIFICANTLY DIFFERENT CONTEXT

Regarding this issue, Navarro's entire case can be decided by interpreting *Nixon v. GSA*. That case, however, does not actually support Navarro's position, for two reasons. First, to the extent that it stated that a former President still retained a residual privilege, it should be read to hold that a former President still retained a residual privilege *in 1977* before Congress unequivocally made its will known in 2014 with the passage of the Presidential and Federal Records Act Amendments of 2014, Pub. L. 113-187. When the Presidential Records Act ("PRA") was initially passed in 1978, it remained silent on the question of the interplay between a former President and an incumbent President in the context of a request for former Presidential records. *Nixon v. GSA* had just been decided the previous year, and the parameters of a hypothetical meritorious claim of a former President were unknown. Accordingly, Presidents were left to their own devices to answer this question, and they did so in a series of Executive Orders which ranged

from "the Archivist shall not permit access to the records by a requester unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records," Exec. Order 13233 § 3(d)(1)(ii), to "the Archivist shall abide by any instructions given him by the incumbent President or his designee," Exec. Order 13489 § 4(b). Had this case arisen in 2004, Navarro's claim would have been classified into Justice Jackson's zone of twilight, if not the first category, because there were insufficient clues to allow a court to ascertain the will of Congress.

However, in 2014, Congress amended the PRA to permanently and unequivocally give the incumbent President the final say. *See* 44 U.S.C. § 2208(c)(2)(C) ("If the incumbent President determines not to uphold the claim of privilege asserted by the former President, . . . the Archivist shall release the Presidential record subject to the claim at the end of the 90-day period beginning on the date on which the Archivist received notification of the claim."). Simply put, Congress passed a statute which superseded the relevant Executive Orders: a phenomenon that courts have uniformly recognized since the Supreme Court's holding in *Little v. Barreme* in 1804. 6 U.S. 170, 179 (1804); *accord Marks v. CIA*, 590 F.2d 997, 1003 (D.C. Cir. 1978) ("Of course, an executive order cannot supersede a statute."). And, of course, the "cardinal canon" of statutory interpretation is that "courts must presume that a legislature says in a statute what

it means and means in a statute what it says there," *Conn. Nat'l Bank v. Germain*,

503 U.S. 249, 253-54 (1992), so there can be no question that this statute was an

unambiguous reflection of the will of Congress.[3] Whatever Congressional silence

allowed the President to establish the terms of this relationship and bring disputes

like this one into the zone of twilight was irretrievably broken when President

Obama signed Pub. L. 113-187, and the Court need not spend any significant time

or energy considering that question.

Furthermore, the PRA makes mention twice of the potential for a former

President to file a lawsuit to prevent the disclosure of information. First the law

states that this Court "shall have jurisdiction over any action initiated by the former

President asserting that a determination made by the Archivist violates the former

President's rights or privileges," 44 U.S.C. § 2204(e), and it then explicitly

incorporates this possibility into the timeline the process may take, *see id.* §

2208(c)(2)(C) (directing the Archivist to release information "unless otherwise

directed by a court order in an action initiated by the former President under

section 2204(e) of this title or by a court order in another action in any Federal

court"). However, a statutory provision merely providing for the possibility of a

---

[3] It is of little importance in the context of this case that the PRA pertained solely
to physical Presidential records. It would be illogical to accept the premise that
Congress intended to give the incumbent President the final say with respect to
*written* information but not with respect to *oral* information.

lawsuit cannot be read to imply that any such lawsuit would be meritorious, and the Court should not read into these provisions an implicit recognition that such a valid claim would exist.

As noted above, the PRA was written one year after *Nixon v. GSA* was decided by the Supreme Court. In that case, the Court allowed for the possibility that a former President "*may* legitimately assert the Presidential privilege," 433 U.S. at 449 (emphasis added), but gave no indication of what such a legitimate assertion would look like. It is no surprise, then, that Congress incorporated this hypothetical possibility into the PRA a year later, but there is no support in either the statute itself or the legislative history that any Member of Congress held any belief that such a case would be meritorious. Justice Scalia rather colorfully characterized this phenomenon as "[M]embers of Congress . . . need have nothing in mind in order for their votes to be both lawful and effective." *Pa. v. Union Gas Co.*, 491 U.S. 1, 30 (1989) (Scalia, J., partially dissenting).

When Congress amended the PRA in 2014, it simply incorporated a reference to the existing provision into the new framework, and there is no reason to believe that any Member of Congress harbored any belief that such a claim would be meritorious that time either. At most, Congress can be understood to simply believe that "those who see in disclosure a threat to the privilege must be given a meaningful opportunity to contest disclosure on that basis," *Nixon v.*

*Freeman*, 670 F.2d 346, 359 (D.C. Cir. 1982). The Court should accordingly read these provisions as what they are on their face: an allowance that the Supreme Court stated in 1977 that a former President might sue, not that he would ever *win*.

Second, it is not accurate to read *Nixon v. GSA* to mean that, even in 1977, a former President held a residual privilege personally that he could assert over the incumbent President's objection in a specific dispute over specific records. A better reading would be an interpretation in which the Court is understood to merely have held that the presidential communications privilege *still protects* information created by previous administrations—as opposed to, for instance, an incumbent President being unable to assert the privilege to protect records created by his predecessor—and that a former President simply had *standing* to assert them if the incumbent President remained silent. Therefore, the Court should hold that *Nixon v. GSA* is only loosely applicable to the instant case, and that, to the extent it is applicable, it supports the Government.

It is important to note that *Nixon v. GSA* was a facial challenge to the PRA's predecessor statute, specifically the provision directing the GSA Administrator to promulgate regulations governing the handling of former President Nixon's papers; the Court made clear that its review was limited to the facial validity of the statute in question. *Nixon v. GSA*, 433 U.S. at 455. Furthermore, much of the Court's analysis hinged on the fact that the records were *not* being provided to anyone

outside the Executive Branch. *Id.* at 441. Both of these facts counsel against a strict application of *Nixon v. GSA* to the instant case. It did not involve a scenario in which a former President's papers were being given to Congress or disclosed publicly, and it most importantly did not involve the incumbent President's express agreement to such a disclosure.

In *Nixon v. GSA*, the Court made special note of the fact that "[t]he Executive Branch became a party to the Act's regulation when President Ford signed the Act into law, and the administration of President Carter, acting through the Solicitor General, vigorously supports affirmance of the District Court's judgment sustaining its constitutionality." *Id.* However, legally speaking, supporting a statute's constitutionality is not the same as expressly waiving a privilege, and neither former President Ford's signing of the statute nor then-incumbent President Carter's support of the statute are comparable to President Biden's express direction to the Archivist to release the relevant records. Supporting a statute generally is a political decision, while expressly waiving a privilege is a *legally binding* decision.

"[T]he privilege of confidentiality of Presidential communications derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities." *Id.* at 447. It is, however, just a privilege, and it follows the same rules of any other privilege; most importantly, *once it is expressly*

*waived, it no longer applies*. Simply put, once a privilege is expressly waived by the party with the authority to do so, the information in question cannot be withheld.

The question then becomes, who is the party with the authority to waive the presidential communications privilege? Generally, a privilege is held by the party to whom its benefit accrues. A client benefits from the attorney-client privilege because it allows the client to candidly seek and obtain legal advice. A patient benefits from the psychotherapist-patient privilege for much the same reason. With this in mind, it is clear that *Nixon v. GSA* already answered this question: "the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." 433 U.S. at 449. In other words, it is a *Governmental* privilege, not a personal privilege.

It naturally follows, then, that because the presidential communications privilege is a Governmental privilege, it can only be expressly waived by a representative of the Government. Therefore, even if it may be *asserted* by a former President, it can be *waived* by the incumbent President, and that waiver means that the information in question cannot be withheld from disclosure by any other interested party. Just as a former Chief Executive Officer lacks the legal authority to prohibit a corporation's in-house counsel from releasing information if the current CEO expressly waives the attorney-client privilege on behalf of the

corporation, *accord Upjohn Co. v. United States*, 449 U.S. 383, 389-90 (1981), a former President lacks the legal authority to prohibit an Executive Branch official from releasing information if the incumbent President expressly waives the presidential communications privilege on behalf of the Executive Branch.

This question of waiver was not before the *Nixon v. GSA* Court, and so its opinion should not be read to counsel otherwise. Moreover, such a reading would place *Nixon v. GSA* directly at odds with this Court's controlling precedent, since the Circuit has held that "the incumbent President is not constitutionally obliged to honor [a] former President['s] invocation of executive privilege with respect to [the former President's] papers." *Public Citizen*, 843 F.2d at 1479. In such a case, this Court is bound by its controlling precedent unless it is reversed by an *en banc* court or the Supreme Court. *Cf. Whitaker v. CIA*, 31 F. Supp. 3d 23, 48 (D.D.C. 2014) (discussing a comparable scenario in which D.C. Circuit and Supreme Court opinions were difficult to reconcile) (citing *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

**B.   *NIXON V. GSA* IS ABOUT PRESERVING PROTECTED STATUS**

The *Nixon v. GSA* Court specifically endorsed the position of the U.S. Solicitor General:

> Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties

> depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic. Therefore the privilege survives the individual President's tenure.

*Nixon v. GSA*, 433 U.S. at 448-49. However, it does not necessarily follow that an individual President's ability to unilaterally assert the privilege "survives the individual President's tenure." In context, this opinion is more harmoniously read to say that the *information* protected by the presidential communications privilege continues to be protected beyond the individual President's tenure, because of the compelling reasons for the privilege's existence and the chilling effect it would cause if his advisers believed that their "full and frank submissions of facts and opinions" would completely lose their privileged status in eight years, if not fewer. While the "chilling effect" is a controversial topic in transparency circles, one cannot deny that current jurisprudence fully embraces it, and until that changes, this Court is bound to treat it as a valid concern. As such, the Court's endorsement of the Solicitor General's position on this count was unremarkable; it simply held that such information could still be protected. This statement, however, carries with it an implicit caveat: the information can still be protected by someone with the authority to do so. In other words, it can be protected—or waived—by the lawful head of the Executive Branch, and nobody else.

On this note, it is important to return to the relief that Navarro is effectively asking this Court to grant: he is asking this Court to substitute its own judgment for that of the head of a co-equal branch regarding whether or not that branch is appropriately protecting its interests. This is constitutionally disfavored, if not outright prohibited. "[E]ach branch of the Government has the duty initially to interpret the Constitution for itself, and . . . its interpretation of its powers is due great respect from the other branches." *Id.* at 442-43 (citing *United States v. Nixon*, 418 U.S. 683, 703 (1974)). Regarding the *current* Executive Branch's "interpretation of its powers," this Court is required to afford it "great respect." This respect extends to the determination of whether or not the public interest is served by potentially chilling Government advisors. In order to find that former President Trump—or Navarro as his agent—has *any* authority to *successfully* invoke executive privilege, the Court will have to, as noted above, disable *both the Congress and the incumbent President* from acting upon the subject. This it cannot do.

## IV.    OFFICE OF LEGAL COUNSEL OPINIONS CARRY NO WEIGHT

As a final note, Amici respectfully urge the Court to disregard the frequent citations by both parties to opinions drafted by OLC. Both Navarro and the Government liberally pepper their respective briefs with citations to these opinions, and they are entitled to no more weight than any other memorandum drafted by an

attorney. The fact that attorneys employed by the Department of Justice have drafted memos supporting the Executive Branch's positions regarding executive privilege and Congressional subpoenas is meaningless, and while the Court may find the reasoning in such opinions persuasive, it should evaluate them with the same critical eye that it uses to evaluate the briefs filed by the parties and Amici.

One need only consider the manner in which OLC opinions are reversed to understand the role that office plays in the Government. In order for OLC to draft an opinion reversing its position on a question, it simply needs to be asked to do so, and if the Assistant Attorney General overseeing OLC ("AAG-OLC") agrees that the previous opinion should be reversed, it is reversed without further ado. Notwithstanding Navarro's characterization of these opinions as "precedential" (Navarro's Br. at 25), these opinions are only precedential until a new AAG-OLC decides to change them.

To illustrate the degree to which OLC opinions are treated as simple legal advice, free to be ignored or followed as each individual office sees fit, one need only consider the arguments made by the Government to that effect when a plaintiff attempts to obtain such opinions through the Freedom of Information Act. The following excerpts are drawn from a representative brief filed in such a case, and this Court should take note of these characterizations each time one of the parties cites to an OLC opinion to support its position:

- "OLC advice documents are ordinarily privileged." Mem. Supp. Def.'s Mot. Dismiss, Dkt. #8-1, at 2 (filed May 3, 2017), *Citizens for Resp. & Ethics in Wash.*, No. 17-432 (D.D.C.) [hereinafter *CREW Br.*].

- "OLC provides confidential legal advice within the Executive Branch." *Id.* at 5.

- "[OLC opinions are] confidential and pre-decisional legal advice." *Id.*

- "[A] formal OLC opinion that the D.C. Circuit described as 'controlling' and 'precedential' . . . was properly withheld as confidential legal advice." *Id.* at 8 (citing *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 8-10 (D.C. Cir. 2014)).

- "OLC merely provides legal advice to other Executive Branch actors, who then make policy decisions within the legal framework articulated by OLC." *CREW* Br. at 15.

- "It is the client agencies ultimately responsible for making policy decisions that may, after receiving OLC's deliberative and pre-decisional legal advice, choose to adopt a statement of interpretation or policy." *Id.* at 16.

- "OLC's advice is ordinarily just one input into its client agencies' ongoing deliberations about how to conduct or implement their policy goals." *Id.* at 18.

- "[OLC's] advice is not the law of an agency unless the agency adopts it." *Id.* at 21 (quoting *N.Y. Times v. DOJ*, 806 F.3d 682, 687 (2d Cir. 2015)).

- "[OLC's] advice [is] *generally* . . . treated as authoritative throughout the Executive Branch." *CREW* Br. at 23 (emphasis added).

On issues of executive prerogatives vis-à-vis Congress, OLC opinions are additionally unworthy of any degree of deference from this Court. "A close analysis of OLC's separation-of-powers opinions demonstrates that, when it comes to questions of executive power, OLC's reputation for providing credible, authoritative, thorough and objective legal analysis—rather than merely justifying executive branch policies—may not be fully warranted. Indeed, instead of simply calling balls and strikes, OLC's separation-of-powers opinions articulate a decidedly pro-executive vision of the law." Emily Berman, *Weaponizing the Office of Legal Counsel*, 62 B.C. L. Rev. 515, 519 (2021) (citation and quotation omitted). *See also* Adoree Kim, *The Partiality Norm: Systematic Deference in the Office of Legal Counsel*, 103 Cornell L. Rev. 757, 765 (2018) ("Over the past three decades, an overwhelming 92% of OLC written legal opinions to the President

supported the expansion of presidential action.") [hereinafter *Partiality Norm*]; *id.*
at 775 ("[T]he data seems to validate Lund's observation that while the OLC
behaves similarly to an independent court in formulating advice for the agencies, it
acts as a private attorney for the President.").

It is unsurprising, then, that, as the Government notes, "[t]wo district courts
have disagreed with the government's position that a sitting president may direct
his senior advisors to assert absolute immunity from compelled congressional
testimony." (Gov't Br. at 28 n.2 (citing *McGahn*, 415 F. Supp. 3d at 200-14, and
*Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 105-06 (D.D.C. 2008)).) As
Kim explains, "Of the 113 OLC memos supporting presidential action over the
past three decades, nearly a quarter of memos supported actions that were
challenged and litigated in the courts. Of the litigated actions, half were eventually
overruled." *Partiality Norm*, 103 Cornell L. Rev. at 772. In other words, OLC
opinions can be the source of persuasive arguments, but the Court should make it
clear that, if it agrees with one, it is *agreeing with the analysis* and not *relying on
the opinion*.

## CONCLUSION

For the reasons provided above, Navarro has no legal basis to prevail in this
suit, and the Court should accordingly affirm the District Court's Order.

Date:  September 20, 2024

Respectfully submitted,

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for* Amici Curiae

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing filing contains 7272 words, and was prepared in 14-point Times New Roman font using Microsoft Word 2016.

Date: September 20, 2024

<div style="margin-left: 50%;">

 /s/ Kelly B. McClanahan

Kelly B. McClanahan, Esq.

*Counsel for* Amici Curiae

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on 20 September 2024, I served the foregoing

document on all counsel of record by filing it using this Court's CM/ECF system.

Date: September 20, 2024

                    /s/ Kelly B. McClanahan
                    Kelly B. McClanahan, Esq.
                    *Counsel for* Amici Curiae