ORAL ARGUMENT HELD DECEMBER 18, 2025

No. 24-3006

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

v.

PETER K. NAVARRO,

*Appellant.*

**APPELLANT'S PETITION FOR REHEARING EN BANC**
(Fed. R. App. P. 40; D.C. Cir. Rule 40)

Appeal from the United States District Court for the
District of Columbia (Crim No. 1:22-cr-00200-APM)

Abhishek Kambli
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
1325 Avenue of the Americas, Suite 2843
New York, NY 10019
Phone: (646) 792-9288
Email: akambli@holtzmanvogel.com

*Counsel for Appellant Peter K. Navarro*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ......................................................................i

TABLE OF AUTHORITIES......................................................................ii

INTRODUCTION AND RULE 40(b)(2) STATEMENT...........................1

BACKGROUND ......................................................................4

REASON FOR GRANTING THE PETITION .........................................6

  I. *Licavoli* wrongly contravened both Supreme Court precedent and the plain text of Section 192 .........................................................6

    A) *Licavoli* is contradicted by Supreme Court precedent .................8

      i) Decades of Supreme Court precedent set the default rule that willfulness requires evil intent ...............................................8

      ii) *Licavoli* departed from the default rule ...................................9

      iii) Other cases this Court has relied on to sustain *Licavoli* are inapposite ...........................................................................10

      iv) Subsequent decades of Supreme Court precedent support the default rule, not *Licavoli*....................................................12

    B) Canons of Statutory Interpretation Undercut *Licavoli* .............13

      i) *Licavoli* fails under basic statutory canons.............................13

      ii) The Rule of Lenity.................................................................15

      iii) Congress' Intent .................................................................16

    C) Navarro was entitled to introduce evidence of willfulness, regardless of what the panel thought of his odds ......................17

CONCLUSION ......................................................................19

CERTIFICATE OF COMPLIANCE......................................................20

CERTIFICATE OF SERVICE............................................................21

ADDENEDUM............................................................... Add. 1

# TABLE OF AUTHORITIES

**Cases**

*Azima v. RAK Inv. Auth.*,
　926 F.3d 870 (D.C. Cir. 2019)................................................................13

*Bondi v. VanDerStok*,
　604 U.S. 458 (2025) ...............................................................................13

*Browder v. United States*,
　312 U.S. 335 (1941) ......................................................................... 10, 11

*Bryan v. United States*,
　174 F.2d 525 (D.C. Cir. 1949).................................................................11

*Bryan v. United States*,
　524 U.S. 184 (1998) ............................................................. 6, 8, 12, 18

*Cheek v. United States*,
　498 U.S. 192 (1991) ...............................................................................12

*Crane v. Kentucky*,
　476 U.S. 683 (1986) ...............................................................................17

*Dean v. United States*,
　556 U.S. 568 (2009) ...............................................................................16

*Felton v. United States*,
　96 U.S. 699 (1877) ...................................................................................8

*Gojack v. United States*,
　384 U.S. 702 (1966) .......................................................................... 7, 17

*Henson v. Santander Consumer USA Inc.*,
　582 U.S. 79 (2017) ........................................................................... 15, 17

*Jones v. Hendrix*,
　599 U.S. 466 (2023) .................................................................................6

*Licavoli v. United States*,
　294 F.2d 207 (D.C. Cir. 1961)........................................ 1, 2, 7, 9, 10, 14

*Parker Drilling Mgmt. Servs. v. Newton*,
　587 U.S. 601 (2019) ...............................................................................13

ii

*Potter v. United States*,
155 U.S. 438 (1894) ........................................................................... 14

*Quinn v. United States*,
349 U.S. 155 (1955) ........................................................................... 10

*Ratzlaf v. United States*,
510 U.S. 135 (1994) ........................................................................... 12

*Russell v. United States*,
369 U.S. 749 (1962) ............................................................................. 6

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) ............................................................................. 12

*Sinclair v. United States*,
279 U.S. 263 (1929) ............................................................. 10, 14, 15

*Spurr v. United States*,
174 U.S. 728 (1899) ............................................................................. 8

*United States v. Bannon*,
No. 22-3086, 2025 U.S. App. LEXIS 12819 (D.C. Cir. May 27, 2025).. 1, 2, 3, 7, 11, 12, 15, 16, 18

*United States v. Bryan*,
339 U.S. 323 (1950) ..................................................................... 11, 12

*United States v. Cano-Flores*,
796 F.3d 83 (D.C. Cir. 2015) ........................................................... 15

*United States v. Murdock*,
290 U.S. 389 (1933) ............................................................. 8, 9, 10, 11

*United States v. Navarro*,
651 F. Supp. 3d 212 (D.D.C. 2023) ................................... 2, 5, 7, 17, 18

*Watkins v. United States*,
354 U.S. 178 (1957) ........................................................................... 10

*Wooden v. United States*,
595 U.S. 360 (2022) ........................................................................... 13

**Statutes**

2 U.S.C. § 192 ....................................... 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 14, 16

## Other Authorities

Br. for United States, *Bannon v. United States*, No. 25-453, 224 L. Ed. 2d 378 (U.S. Feb. 9, 2026) ...........................................................................2

Cong. Globe, 34th Cong., 3d Sess. 405 (1857).........................................20

Reply Br., *Bannon v. United States*, No. 25-453, 224 L. Ed. 2d 378 (U.S. Feb 12, 2026) ...................................................................................2

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

Rehearing is warranted because the definition of "willfully" under 2 U.S.C. § 192 presents a question of exceptional importance.[1] The panel below relied on this circuit's precedent in *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), which grievously misconstrues the text of 2 U.S.C. § 192 and flouts decades of Supreme Court precedent in doing so.

This has become a serious problem as "the prosecution of former Executive Branch officials for good-faith but mistaken privilege assertions raises questions that are troubling, important, and likely to recur." *United States v. Bannon*, No. 22-3086, 2025 U.S. App. LEXIS 12819, at *2–3 (D.C. Cir. May 27, 2025), (Katsas, J., statement respecting denial of reh'g en banc), vacated, 146 S. Ct. 2155 (2026). Judge Katsas was right, this issue has already reoccurred about a year after Bannon.[2] Given the politically charged climate, it promises not to be the last time.

---

[1] While *Licavoli*'s misinterpretation of Section 192 is the only subject of this petition, Navarro preserves the arguments made before the panel below for any subsequent appeal.

[2] *Bannon* was vacated because the Government moved to dismiss the indictment, *see* Br. for United States 3–4, *Bannon v. United States*, No. 25-453, 224 L. Ed. 2d 378 (U.S. Feb. 9, 2026) and the defendant supported the motion, *see* Reply Br. 1–3, *Bannon*, No. 25-453 (U.S. Feb 12, 2026).

1

Section 192 prohibits anyone who has been "summoned as a witness" by Congress "to give testimony or to produce papers" from either (1) "willfully mak[ing] default" or (2) "having appeared, refus[ing] to answer" any relevant question. 2 U.S.C. § 192. Eight judges on this Court have already acknowledged that "in criminal statutes the word 'willful' is usually construed to require bad faith." *See Bannon*, 2025 U.S. App. LEXIS 12819, at *4–5 (Garcia, J., concurring in denial of reh'g en banc); *id.* at *2 (Katsas, J., statement respecting denial of reh'g en banc); *id.* at *14–15 (Rao, J., dissenting from denial of reh'g en banc).

But this Court's aberrant opinion in *Licavoli* said otherwise, holding that the willfulness requirement in § 192 just requires intentionality, not evil intent. 294 F.2d at 208–09. *Licavoli* "read the willfulness requirement out of the statue." *Bannon*, 2025 U.S. App. LEXIS 12819, at *9 (Rao, J., dissenting from denial of reh'g en banc). Relying on *Licavoli*, both the district court and the panel absolved the prosecution of needing to prove the default meaning of willfulness and prohibited Navarro from making his argument to the jury. *United States v. Navarro*, 651 F. Supp. 3d 212, 238–39 (D.D.C. 2023); Add. 33–37.

2

*Licavoli* remains binding precedent in this Circuit, but just barely. The last time the Circuit sitting together had the opportunity to reconsider *Licavoli*, it declined to do so only after judges registered serious concerns. *See Bannon*, 2025 U.S. App. LEXIS 12819, at *2–3 (Katsas, J., statement respecting denial of reh'g en banc) (recognizing that *Licavoli*'s inconsistency with recent Supreme Court precedent and its troubling outcomes support a "plausible case for rehearing en banc.").

These concerns were well founded: *Licavoli* was wrong. It conflicts with decades of Supreme Court precedent and misreads the plain text of § 192. The temperature is elevated due to the unique "serious separation of powers concerns" in this case. *Bannon*, 2025 U.S. App. LEXIS 12819, at *9 (Rao, J., dissenting from denial of reh'g en banc). Previously, Congress recommended criminal contempt of a former Executive Branch official only six times between 1980 and 2017. *Id.* at *28–29. But now "the floodgates have opened," and a surge of constitutional controversy will continue unless this error is addressed. *Id.* at 29. This Court should grant a rehearing en banc to finally revisit *Licavoli* and correct its errors.

3

## BACKGROUND

Dr. Peter Navarro served as a senior presidential advisor for the entirety of the first Trump administration. App. 0028. Afterwards, Navarro was served a subpoena by the House Committee investigating the events of January 6, 2021. *Id.* at 0029. The subpoena required Navarro to "produce documents" and to "appear for a deposition." *Id.* at 0046.

President Trump had already publicly directed Navarro to claim executive privilege in response to a prior subpoena from another House Committee. *Id.* at 2235. When Navarro was served the subpoena by the Select Committee just months later, he believed that President Trump had invoked executive privilege and prevented him from responding. *Id.* at 0044–45; *see id.* at 1131 (stating the court's belief that nobody in the case "would really dispute that Dr. Navarro thought he was supposed to invoke").

In line with that belief, Navarro told the Select Committee that "[his] hands are tied" because "President Trump has invoked Executive Privilege in this matter." *Id.* at 0031. The Select Committee rejected this, still demanding that Navarro produce documents and testify. *See id.* Navarro continued communicating his belief that the "privilege is not [his]

to waive." *Id.* But the Select Committee "again rejected" this reason and went forward with the deposition as scheduled. *Id.* at 0032. Consistent with his understanding of privilege, Navarro did not produce documents or appear before the Committee. *Id.* The House of Representatives voted to hold Navarro in contempt of Congress. *Id.* at 2362.

A Grand Jury indicted Navarro on two charges under 2 U.S.C. § 192 for "willfully mak[ing] default" on the subpoena. *Id.* at 0027–33. Before trial, the government filed a motion *in limine* to prevent Navarro from presenting any evidence or argument that a good-faith belief that he was invoking executive privilege was the reason he defaulted. *Id.* at 0368–71. It argued that *Licavoli* precluded this defense. *Id.* Navarro opposed this motion, arguing that Section 192's willfulness element requires the prosecution to show that Navarro knew his actions were unlawful and he was thus entitled to argue that point. *Id.* at 0481–83.

The district court sided with the government, agreeing that *Licavoli* takes Section 192 out of the normal meaning of willfully and precludes good-faith defenses. *Navarro*, 651 F. Supp. 3d at 238–39. The court instructed the jury that the prosecution need only prove that the default was "deliberate and intentional." App. 1868. The jury found Navarro

5

guilty on both counts. *Id.* at 2029. He was then fined and sentenced to four months in prison. *Id.* at 2030–31.

Navarro appealed this decision to the Court of Appeals, but the panel affirmed the district court, relying on *Licavoli*. *See* Add. 33–37.

### REASON FOR GRANTING THE PETITION

**I.    *Licavoli* wrongly contravened both Supreme Court precedent and the plain text of Section 192**

Section 192 has two clauses: (1) willfully defaulting on a subpoena and (2) refusing to answer a pertinent question during testimony. 2 U.S.C. § 192. When Congress chooses to include a willfulness element, the default rule is that the prosecution "must prove that the defendant acted with knowledge that his conduct was unlawful," not just that he acted deliberately. *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) ("Sillasse Bryan").

Navarro is entitled to "every safeguard which the law accords in all other federal criminal cases." *Russell v. United States*, 369 U.S. 749, 755 (1962). One essential protection of due process is that the prosecution must "prove every element of a crime beyond reasonable doubt." *Jones v. Hendrix*, 599 U.S. 466, 487 (2023). The charge of contempt of Congress

6

does not rob Navarro of that protection given to every other criminal defendant. *See Gojack v. United States*, 384 U.S. 702, 707 (1966).

Navarro sought to present evidence and argument to the jury that he acted on a good-faith belief that executive privilege prevented him from testifying, which could have negated an element of the offense. *See* App. 0478–79. But the district court prevented him from doing that. *Navarro*, 651 F. Supp. 3d at 238–39. It relied on *Licavoli*, which held that "willfully" in Section 192 does not require the prosecution to prove that the act was undertaken with a bad purpose. 294 F.2d at 207–09. This essentially "read the willfulness requirement out of the statute." *Bannon*, 2025 U.S. App. LEXIS 12819, at *9 (Rao, J., dissenting from denial of reh'g en banc).

*Licavoli* is wrong. If Section 192 was correctly interpreted, Navarro would have been allowed to present evidence and argument that his default lacked unlawful intent. This Court should grant a rehearing en banc to reverse *Licavoli* because (1) it is contradicted by Supreme Court precedent and (2) it runs counter to canons of statutory interpretation. And contrary to what the panel believed, Navarro was entitled to present this defense regardless of his odds of success.

### A) *Licavoli* is contradicted by Supreme Court precedent

i) *Decades of Supreme Court precedent set the default rule that willfulness requires evil intent*

In criminal statutes, the default meaning of "willfully" requires proof that the defendant knew his actions were unlawful. *Sillasse Bryan*, 524 U.S. at 191–92. This default rule has a noble pedigree, supported by Supreme Court precedent tracing back nearly a century before *Licavoli*. *See Felton v. United States*, 96 U.S. 699, 702 (1877) ("[W]illfully in the ordinary sense in which it is used in statutes, means not merely voluntarily, but with a bad purpose."); *Spurr v. United States*, 174 U.S. 728, 734–35 (1899) (noting that willfully "is frequently understood … as signifying an evil intent without justifiable excuse"); *United States v. Murdock*, 290 U.S. 389, 394 (1933).

The Supreme Court has already held that Section 192's use of willfully "makes" "bad faith or evil intent … an element of the offense." *Murdock*, 290 U.S. at 397–98. The Court recognized the "disjunctive" structure of Section 192, where only the default clause has a willfulness element and the other does not. *Id.* at 397. This framework, in addition to the criminal context, supported applying the traditional rule. *Id.* at 397–98.

ii)    *Licavoli departed from the default rule*

*Licavoli* departed from this line of precedent without much meaningful engagement. *Licavoli* reasoned that *Murdock* "had no application" because the case dealt with the Internal Revenue Act (IRA) and, in any case, only said that "the content of 'willfully' depends upon context." *Licavoli*, 294 F.2d at 208–09. But both reasons fail to distinguish *Murdock*. First, while *Murdock* does deal with the IRA, it interpreted Section 192 as part of its analysis. 290 U.S. at 396–98. Second, while *Murdock* acknowledged that the meaning of willfulness can be affected by context, it expressly said Section 192's structure supports the default interpretation requiring evil intent. *Id.* at 397–98; *see also id.* at 394 ("But when used in a criminal statute [willfully] generally means an act done with a bad purpose"). *Murdock* strongly favors applying the default interpretation of willfully to Section 192 and *Licavoli* was wrong to so lightly cast it aside.

While the panel did not address *Murdock*, it reasoned that other Supreme Court cases dictated the outcome of *Licavoli*. Add. 33–35. But the panel incorrectly assessed the strength of *Licavoli*'s support in Supreme Court precedent. For example, both *Licavoli* and the panel cite

*Sinclair v. United States*, 279 U.S. 263 (1929), for the proposition that evil intent was not required for a Section 192 conviction. *Id.* at 33–34; *Licavoli*, 294 F.2d at 207–08. While *Sinclair* did rule that "[i]ntentional violation is sufficient to constitute guilt" without evil intent, it ruled so on the *second* clause of Section 192 that lacks the willfulness element. 279 U.S. at 299. *Murdock* noticed that very fact, using it to support interpreting the willfully default clause to require evil intent. 290 U.S. at 397–98. *Sinclair* cuts against the *Licavoli* rule, not in its favor.

iii) *Other cases this Court has relied on to sustain* Licavoli *are inapposite*

Other cases that members of this Court cited to support *Licavoli* fail as well. The panel below cited *Quinn v. United States*, 349 U.S. 155 (1955), and *Watkins v. United States*, 354 U.S. 178 (1957), but they offer no more help than *Sinclair*. While they both held that the only *mens rea* required was intentionality, not evil intent, they were only confirming *Sinclair*'s interpretation of the *second* clause of Section 192 that does not have the willfulness element. *See Quinn*, 349 U.S. at 165; *Watkins*, 354 U.S. at 208.

Judge Garcia relied on *Browder v. United States*, 312 U.S. 335 (1941), to argue that "willful" can *sometimes* just mean deliberate. *See*

10

*Bannon*, 2025 U.S. App. LEXIS 12819 at *5 (Garcia, J., concurring in denial of reh'g en banc) (quoting *Browder*, 312 U.S. at 342). But *Murdock* already interpreted "willful" in *this* statute, *see* 290 U.S. at 397–98, and the decades of Supreme Court precedent after *Browder* that held "willful" means what it says, *see infra* Part I.A.iv.

Judge Katsas previously considered *Helen Bryan* to necessitate the outcome in *Licavoli*, but that is also incorrect. *Bannon*, 2025 U.S. App. LEXIS 12819, at *3–4 (Katsas, J., statement respecting denial of reh'g en banc). The Supreme Court's holding in *Helen Bryan* was much narrower than the "overbroad reading" this Court has adopted. *Id.* at *16–17 (Rao, J., dissenting from denial of reh'g en banc). The opinion in the D.C. Circuit below only ruled on whether the existence of a quorum in a Congressional Committee was a question for the jury. *Bryan v. United States*, 174 F.2d 525 (D.C. Cir. 1949), rev'd by 339 U.S. 323 (1950). And while the Supreme Court opinion briefly discussed the first clause of Section 192, it clarified that it did "not decide" any questions "not passed upon by the Court of Appeals." *United States v. Bryan*, 339 U.S. 323, 343 (1950) ("Helen Bryan"). This Court should take the Supreme Court at its word and not expand *Helen Bryan* past its explicit boundaries.

11

Even if *Helen Bryan* is read more broadly, it merely says that there is "a *prima facie* case of willful default" when a person does not show up to testify. *Id.* at 330. But a defendant is still allowed to put on evidence to rebut a *prima facie* case. Navarro was prohibited from presenting *any* evidence or argument on his defense of good-faith reliance on executive privilege. Either way, *Helen Bryan* "poses no barrier to overruling *Licavoli.*" *Bannon*, 2025 U.S. App. LEXIS 12819, at *17 n.2 (Rao, J., dissenting from denial of reh'g en banc). This Circuit can clean up its own precedent without disagreeing with the Supreme Court's.

  iv) *Subsequent decades of Supreme Court precedent support the default rule, not Licavoli*

Rather than rallying to *Licavoli*'s banner, subsequent decades of Supreme Court precedent have solidified the traditional rule instead. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 n.9 (2007) (noting that "willfully" normally limits "liability to knowing violations."); *Sillasse Bryan*, 524 U.S. at 191 ("[W]hen used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'"); *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994); *Cheek v. United States*, 498 U.S. 192, 200–01 (1991).

This interpretation was reaffirmed in the past few years. *See Bondi v. VanDerStok*, 604 U.S. 458, 486–87 (2025) (Kavanaugh, J., concurring) ("To prove 'willfulness,' the Government must demonstrate that an individual knew that his conduct was unlawful, not merely that he knew the facts that made his conduct unlawful."); *see also Wooden v. United States*, 595 U.S. 360, 378 (2022) (Kavanaugh, J., concurring) ("[W]ith respect to federal crimes requiring 'willfulness,' the Court generally requires the Government to prove that the defendant was aware that his conduct was unlawful.").

All told, 150 years of Supreme Court precedent have left *Licavoli* on an island. *Licavoli* did not adhere to Supreme Court precedent but departed from it. And it was wrong to do so, especially when the Supreme Court continues to confirm the default rule instead of casting it aside.

### B) Canons of Statutory Interpretation Undercut *Licavoli*

#### i)    *Licavoli fails under basic statutory canons*

The "cardinal principle of interpretation" is that "every clause and word of a statute" is given independent effect. *Parker Drilling Mgmt. Servs. v. Newton*, 587 U.S. 601, 611 (2019) (internal quotation marks removed); *see Azima v. RAK Inv. Auth.*, 926 F.3d 870, 878 (D.C. Cir. 2019)

13

("we must do our best to give meaning to every word" that Congress used). The refusal to answer questions clause, which lacks a willfulness element, already requires deliberate conduct. *See Sinclair*, 279 U.S. at 299. A basic application of the canon against surplusage thus requires willfulness to mean something more than mere intentionality.

But *Licavoli* departed from this cardinal rule, claiming that it cannot interpret the clauses differently because of "the presence or omission of the word" willfully. 294 F.2d at 208. That betrays the basic principle that "it means something" when Congress uses a word in one place and but not in another. *Potter v. United States*, 155 U.S. 438, 446 (1894) ("The word 'wilful' is omitted from the description of offences in the latter part of this section. Its presence in the first cannot be regarded as mere surplusage; it means something.").

Under *Licavoli*'s interpretation, "willfully" adds nothing to Section 192 because intentionality was already required in the second clause. *See Sinclair*, 279 U.S. at 299. *Licavoli* tries to explain this away by asserting that the willfulness element of a refusal to answer is already implicit in the second clause. 294 F.2d at 208. But that still makes the inclusion of "willfully" in the first clause superfluous. It is the Court's duty to give

14

effect to the words Congress chose, not to work around them with speculation. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) ("[I]t is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation.").

Judge Garcia argued that *Licavoli* does give "willfully" independent effect because it distinguishes from defaults due to accident or illness. *Bannon*, 2025 U.S. App. LEXIS 12819, at *7 (Garcia, J., concurring in denial of reh'g en banc). But that still ignores its redundancy because there was already an intentionality requirement in clause two. *Sinclair*, 279 U.S. at 299. Congress chose to include a willfulness element for the first clause and not for the second, and the court must give that effect instead of explaining it away.

ii)    *The Rule of Lenity*

At an absolute minimum, there is ambiguity in the term "willful," and the rule of lenity should apply. As this Court has said, "the rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants." *United States v. Cano-Flores*, 796 F.3d 83, 93 (D.C. Cir. 2015). If this Court does not believe that "willfully" clearly denotes a

requirement that the defendant act with evil intent, it is at least grievously ambiguous. The ambiguity should accordingly be resolved in favor of Navarro. This is especially true since the statute requires a mandatory prison sentence. 2 U.S.C. § 192. *Dean v. United States*, 556 U.S. 568, 585 (2009) (Breyer, J., dissenting) ("[T]he rule of lenity [has] special force in the context of mandatory minimum provisions.").

### iii)  *Congress' Intent*

To the extent the Court needs to look beyond the text and consider what Congress intended, there are good reasons to believe Congress intended the default definition of "willfully". A prime example is that Congress initially doubted that it had the power to proceed against someone in default at all. *See* Cong. Globe, 34th Cong., 3d Sess. 405 (1857). This reflects that the statute required willful conduct rather than just intentional conduct to make up for that hesitation. Judge Garcia thought otherwise, remaining skeptical that Congress intended to punish someone who flatly refuses to appear in front of Congress more harshly than someone who shows up but refuses to answer. *Bannon*, 2025 U.S. App. LEXIS 12819, at \*6 (Garcia, J., concurring in denial of reh'g en banc). But that ignores the legislative record and the possibility that Congress

16

considered that refusing to answer in the hearing is worse than not showing up, as this harms decorum and risks turning the hearing into a wild spectacle. Regardless, it is the role of the court to give effect to the words Congress chose, not to speculate about Congress' unexpressed intentions. *Henson*, 582 U.S. at 89.

### C) Navarro was entitled to introduce evidence of willfulness, regardless of what the panel thought of his odds

Navarro was entitled to every defense normally guaranteed to criminal defendants. *See Gojack*, 384 U.S. at 707. One of the most important safeguards in criminal law is that the prosecution is required to prove every element of the crime and the defendant is entitled to make a "complete defense" to refute it. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).

Navarro sought to put on evidence for the jury regarding his lack of unlawful intent in defaulting on the subpoena. *See* App. 0478–79. But the Government filed a Motion in Limine to bar Navarro from presenting such evidence before a jury, relying on *Licavoli* to argue that good faith is irrelevant to the crime of willful default. *Id.* at 369–71. The court agreed and prevented Navarro from arguing that point at all, *Navarro*, 651 F. Supp. 3d at 239, leaving Navarro to fight with one hand tied behind his back.

17

Rightly construed, Section 192 requires the Government to "prove that the defendant acted with knowledge that his conduct was unlawful." *Sillasse Bryan*, 524 U.S. at 191–92. The district court prevented Navarro from putting on evidence or argument about willfulness and absolved the prosecution from needing to prove it. *Navarro*, 651 F. Supp. 3d at 239. Navarro was denied a defense he was entitled to.

The panel below prematurely assessed this defense's likelihood of success. *See* Add. 33. It is beyond dispute that the court's reliance on *Licavoli* hamstrung Navarro's defense dramatically. But "this court need not decide whether [Navarro's] claim of executive privilege … would have ultimately prevailed," just whether he was prevented from making a defense that he was entitled to make. *Bannon*, 2025 U.S. App. LEXIS 12819, at *18 (Rao, J., dissenting from denial of reh'g en banc). Navarro was prevented from putting on that defense and was thus deprived of one of the fundamental guarantees to criminal defendants. That is enough to grant a rehearing and vacate the decision below.

## CONCLUSION

No one doubts that the current political climate is heated. In this environment, the problems presented in this case and *Bannon* will only continue. And criminal defendants, regardless of political party, will be denied the full rights afforded by criminal law because of *Licavoli*. This Court should fix that by granting rehearing of the panel's July 21 opinion.

Dated: August 4, 2026

Respectfully submitted,

*/s/ Abhishek Kambli*
Abhishek Kambli
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC
1325 Avenue of the Americas, Suite 2843, New York, NY 10019
Phone: (646) 792-9288
Email: akambli@holtzmanvogel.com

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This petition complies with the type-volume limitation of Fed. R. App. P. 40(d)(3)(A) because it contains 3,787 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f). It complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)–(6) because it has been prepared in a proportionally spaced serif typeface using 14-point Century Schoolbook.

*/s/ Abhishek Kambli*
Abhishek Kambli
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I certify that on August 4, 2026, I electronically filed the foregoing petition with the Clerk of Court by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Abhishek Kambli*
Abhishek Kambli
*Counsel for Appellant*

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 18, 2025         Decided July 21, 2026

No. 24-3006

UNITED STATES OF AMERICA,
APPELLEE

v.

PETER K. NAVARRO,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cr-00200-1)

———

*Stanley M. Brand* argued the cause for appellant. With him on the briefs were *John S. Irving IV* and *John P. Rowley III*.

*Kelly B. McClanahan* was on the brief for amici curiae Heidi Kitrosser, et al. in support of affirmance.

Before: MILLETT, PILLARD, and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

**Add.1**

USCA Case #24-3006    Document #2184223    Filed: 07/21/2026    Page 2 of 37

2

MILLETT, *Circuit Judge*:  In 2021, Peter K. Navarro, a former aide to then-former President Donald J. Trump, published a book about his stint in politics.  In that book and in promotional interviews, Dr. Navarro took credit for devising a plan to "leverage" the Vice President's authority under the Electoral Count Act of 1887 to "delay certification" of the results of the 2020 presidential election on January 6, 2021.

Dr. Navarro's public statements caught the attention of the U.S. House of Representatives' Select Committee to Investigate the January 6th Attack on the U.S. Capitol.  The Select Committee sent a subpoena to Dr. Navarro that sought documents related to his book and public statements and that ordered him to appear for a deposition on those topics.  Dr. Navarro claimed executive privilege before even seeing the subpoena and refused to turn over documents, appear for his deposition, or engage with the Select Committee's efforts to accommodate his privilege claim.

After the deadline for compliance passed, the House of Representatives voted to hold Dr. Navarro in contempt, and a federal grand jury indicted Dr. Navarro on two counts of contempt of Congress.

Dr. Navarro moved to dismiss the indictment on the ground that President Trump had invoked executive privilege.  After an evidentiary hearing, the district court concluded that no such invocation of privilege had occurred and declined to dismiss the indictment.  The district court also granted the government's motion *in limine* to preclude Dr. Navarro from arguing to the jury that he mistakenly believed he was not required to respond to the Select Committee's subpoena.  A jury subsequently found Dr. Navarro guilty on both counts of contempt.  Dr. Navarro appealed.  We affirm.

**Add.2**

3

**I**

**A**

Congress's "power to secure needed information" through subpoenas "has long been treated as an attribute of the power to legislate." *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927). "Without information, Congress would be shooting in the dark, unable to legislate 'wisely or effectively.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *McGrain*, 273 U.S. at 175). For that reason, both "the power of inquiry" and "process to enforce it" are "essential and appropriate auxiliar[ies] to the legislative function." *McGrain*, 273 U.S. at 174; *see also Quinn v. United States*, 349 U.S. 155, 160–161 (1955) ("Without the power to investigate—including of course the authority to compel testimony, either through its own processes or through judicial trial—Congress could be seriously handicapped in its efforts to exercise its constitutional function[.]") (footnotes omitted).

Each House of Congress can delegate its full subpoena power to "committees and subcommittees[.]" *Watkins v. United States*, 354 U.S. 178, 200–201 (1957). The House of Representatives made such a delegation to the January 6th Select Committee. *See* H.R. Res. 503, 117th Cong., 1st Sess. § 5(c)(4) (2021).

Federal law mandates compliance with congressional subpoenas. Under Section 192 of Title 2, "[e]very person" subpoenaed "by the authority of either House of Congress to give testimony or to produce papers" on a "matter under inquiry" before "any committee of either House" must comply with that subpoena. 2 U.S.C. § 192. Any person who "willfully makes default" on the subpoena or, "having appeared, refuses to answer any question pertinent to the

**Add.3**

4

question under inquiry, shall be deemed guilty of a misdemeanor[.]" *Id.*

A congressional committee may refer a report finding a witness's default to the full House or Senate. 2 U.S.C. § 194. If the full body approves a contempt citation, the Speaker of the House or President of the Senate, as the case may be, must refer that citation to the appropriate United States Attorney's Office for prosecution. *Id.*

**B**

Recipients of congressional subpoenas "retain common law and constitutional privileges" against governmental demands for the disclosure of requested information. *Mazars*, 140 S. Ct. at 2032. As relevant here, a subpoena recipient may resist the disclosure of specific "governmental communications protected by executive privilege." *Id.*

"Executive privilege is an extraordinary assertion of power 'not to be lightly invoked.'" *Cheney v. United States Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004) (quoting *United States v. Reynolds*, 345 U.S. 1, 7 (1953)). This case concerns two types of executive privileges: the presidential communications privilege and testimonial immunity. This opinion uses the term "executive privilege" to refer to both.

**1**

The presidential communications privilege is the "canonical form of executive privilege[.]" *Trump v. Thompson*, 20 F.4th 10, 25 (D.C. Cir. 2021). It permits the President to shield from disclosure "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain

**Add.4**

5

confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997).

The presidential communications privilege arises implicitly "from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities[.]" *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 447 (1977) ("*Nixon v. GSA*"). The confidentiality afforded by the presidential communications privilege protects "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *United States v. Nixon*, 418 U.S. 683, 708 (1974). Without such protection, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705. In addition, because that confidentiality would have little value if it dissolved the moment a president's time in office ended, the presidential communications privilege "survives the individual President's tenure." *Nixon v. GSA*, 433 U.S. at 449.

The presidential communications privilege, however, is not absolute. *See Trump v. United States*, 144 S. Ct. 2312, 2330 (2024). Its protection is only "presumptive[,]" *United States v. Nixon*, 418 U.S. at 708, and "qualified[,]" subject to being outweighed by competing interests, *Thomspon*, 20 F.4th at 26. The privilege's protection "may be overcome by 'a strong showing of need by another institution of government[.]'" *Thompson*, 20 F.4th at 26 (alteration in original) (quoting *Senate Select Comm. on Presidential Campaign Activity v. Nixon*, 498 F.2d 725, 730 (D.C. Cir. 1974) (en banc)). And it applies narrowly to "records solicited and received by the President or the President's immediate White House advisers who have broad and significant responsibility for advising the President." *Id.* at 25–26 (formatting modified); *see also*

**Add.5**

6

*Mazars*, 140 S. Ct. at 2032–2033 (declining to "transplant that protection root and branch to * * * [information] which by definition does not implicate sensitive Executive branch deliberations").

**2**

This case also involves a claim of "testimonial immunity." No court has ever recognized this privilege. The Office of Legal Counsel ("OLC") has issued multiple opinions on the topic in which it reasons that the President's "immediate advisers are absolutely immune from testimonial compulsion by a Congressional committee on matters related to their official duties" during their tenure. *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. 108, 110 (2019) ("*Testimonial Immunity*") (quotation marks omitted); *see also Congressional Oversight of the White House*, 45 Op. O.L.C. ---, 2021 WL 222744, at *35 (Jan. 8, 2021); Memorandum from William H. Rehnquist, Assistant Att'y Gen., Off. of Legal Counsel, to John D. Ehrlichman, Assistant to the President for Domestic Affs., Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff" 7 (Feb. 5, 1971), https://perma.cc/TK7J-WHKH ("[T]hose who customarily meet with the President on a regular or frequent basis" cannot "be compelled to appear before a congressional committee.").[1]

OLC has further opined that this testimonial immunity "continues after" an adviser leaves the White House such that the *sitting* "President may lawfully direct [a former adviser] not

---

[1] This court referenced, but did not ultimately address, testimonial immunity in *Committee on the Judiciary, U.S. House of Representatives v. McGahn*, 951 F.3d 510, 518 (D.C. Cir. 2020), *rev'd en banc*, 968 F.3d 755 (D.C. Cir. 2020), *on reh'g*, 973 F.3d 121 (D.C. Cir. 2020).

**Add.6**

7

to appear in response to" a congressional subpoena. *Testimonial Immunity*, 43 Op. O.L.C. at 123, 128. But when a *former* President directs a former adviser not to testify, that adviser enjoys only "a qualified, rather than absolute, testimonial immunity." *See* Statement of Interest of the United States at 8, *Meadows v. Pelosi*, 639 F. Supp. 3d 62 (D.D.C. 2022) (No. 21-cv-3217) (citing *Testimonial Immunity*, 43 Op. O.L.C. at 110–120).

For purposes of this appeal, we assume without deciding that testimonial immunity is a valid privilege and that it can apply when invoked by a former President.

**II**

**A**

On January 6, 2021, both Houses of Congress convened in a joint session to certify the votes of the Electoral College in the 2020 presidential election. During that session, a mob of rioters overwhelmed the security perimeter around the Capitol, breached the Capitol itself, and delayed the certification process. *See Fischer v. United States*, 144 S. Ct. 2176, 2182 (2024); *Thompson*, 20 F.4th at 17–18.

Six months later, the House of Representatives adopted House Resolution 503 and established the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the U.S. Capitol. H.R. Res. 503, 117th Cong., 1st Sess. (2021). Resolution 503 directed the Select Committee to "investigate and report upon the facts, circumstances, and causes" of the events of January 6th. *Id.* § 3(1). Resolution 503 also empowered the Chairman of the Select Committee to issue subpoenas for relevant documents and testimony. *Id.* § 5(c)(4).

**Add.7**

8

From 2017 to 2021, Peter Navarro served in various roles in the first Trump administration as a self-described "senior White House adviser[.]" J.A. 394. After the House of Representatives impeached then-President Trump on January 13, 2021, Dr. Navarro published the "Navarro Report"—a three-volume compendium designed as an "evidentiary handbook" for the Senate's impending impeachment trial that purported to show that the 2020 election results were "the poisonous fruit of widespread fraud[.]" J.A. 397–398. Dr. Navarro publicly promoted the Report and discussed his findings "in his capacity as a private citizen[,]" not as a government employee. J.A. 809.

In November 2021, having left the government, Dr. Navarro published a book titled *In Trump Time: My Journal of America's Plague Year*. In those pages, Dr. Navarro claimed to have devised a "strategy called the Green Bay Sweep which sought to leverage Vice President Mike Pence's constitutional power under the Electoral Count Act of 1887" to delay Congress's certification of the Electoral College vote on January 6th. J.A. 401. In interviews promoting his book, Dr. Navarro elaborated on the contours of his envisioned Green Bay Sweep.

After learning of Dr. Navarro's public pronouncements about the 2020 election and the events leading up to the January 6th riot, counsel to the Select Committee informed Dr. Navarro in writing that the Select Committee would seek his deposition testimony and documents relevant to the Committee's inquiry. Counsel asked Dr. Navarro whether he would accept email service of a subpoena and whether he was represented by counsel. Three minutes later, and without even seeing the content of the subpoena, Dr. Navarro replied: "Yes. No counsel. Executive privilege." J.A. 2646 (formatting modified).

**Add.8**

9

Hours later, the Select Committee served its subpoena. The cover letter explained that the subpoena sought documents and testimony related to, among other things, the contents of the Navarro Report and his Green Bay Sweep theory. The letter also noted that Dr. Navarro had "already discussed these and other relevant issues in his recently published book, in interviews with reporters, and, among other places, on a podcast." J.A. 2634 (formatting modified).

The Select Committee's subpoena ordered Dr. Navarro to appear for a deposition on March 2, 2022, and to produce a schedule of documents by February 23, 2022. That schedule included documents related to the Navarro Report, Green Bay Sweep, claims of fraud in the 2020 election, efforts to contest the results of that election, efforts to organize rallies in Washington, D.C., and the January 6th attack on the Capitol. Instructions attached to the schedule directed Dr. Navarro to compile a privilege log for any documents he intended to withhold from the Select Committee.

Dr. Navarro did not produce any documents, submit a privilege log, or otherwise respond to the subpoena by February 23rd.

On February 24th, the Select Committee wrote to Dr. Navarro advising him of his default and inquiring whether he planned to disregard his obligation to appear for a deposition as well. Days later, Dr. Navarro told the Select Committee that "President Trump has invoked Executive Privilege in this matter" and that his "hands [were] tied." J.A. 2648. The Select Committee responded that its subpoena concerned topics Dr. Navarro could discuss "without raising any executive privilege concerns at all[,]" and that the Select Committee could take "additional steps to address" Dr. Navarro's privilege assertion

**Add.9**

10

if he stated it "on a question-by-question basis during the deposition." J.A. 2647.

Dr. Navarro's only response was to inquire whether his deposition would "be open to the public and press[.]" J.A. 2647. When the Select Committee informed him that the deposition would be closed, but that it "would be happy to work with" Dr. Navarro to schedule the deposition at his convenience and tailor any inquiry to his assertions of privilege, Dr. Navarro simply copied and pasted his earlier message asserting executive privilege. J.A. 2647.

On February 28th, the Deputy White House Counsel to then-President Joseph R. Biden Jr. wrote Dr. Navarro regarding the Select Committee's subpoena. That letter informed Dr. Navarro that, in President Biden's view, an assertion of executive privilege in response to the subpoena was "not justified," and that President Biden had "decided not to assert executive privilege as [to Dr. Navarro's] testimony regarding those subjects, or any documents" bearing on them. J.A. 791. The letter also advised that President Biden had decided not to "assert immunity to preclude [Dr. Navarro] from testifying before the Select Committee." J.A. 791.

Dr. Navarro did not respond. Dr. Navarro did not cure his earlier default on the subpoena's demand for documents. And Dr. Navarro did not appear for his scheduled deposition on March 2nd.

Weeks later, the Select Committee issued a report on its interactions with Dr. Navarro. H.R. REP. No. 284, 117th Cong., 2d Sess. (2022). In relevant part, the Select Committee reported that Dr. Navarro had defaulted on its subpoena regarding topics "as to which there can be no conceivable privilege claim" based solely "on a blanket assertion of executive privilege purportedly asserted by former-President

**Add.10**

11

Trump." *Id.* at 14. The report added that there was "no evidence that former-President Trump ha[d] asserted executive privilege," and that the sitting President had expressly declined to assert the privilege. *Id.*

On March 28, 2022, the Select Committee unanimously recommended to the full House that it hold Dr. Navarro in contempt. A week later, the full House found Dr. Navarro in contempt and referred the matter to the U.S. Attorney for the District of Columbia for prosecution under Section 192. H.R. Res. 1037, 117th Cong., 2d Sess. (2022).

**B**

In June 2022, a grand jury indicted Dr. Navarro on two counts of contempt of Congress, in violation of Section 192. Count 1 concerns Dr. Navarro's refusal to produce subpoenaed materials. Count 2 concerns Dr. Navarro's refusal to appear for his deposition.

**1**

Dr. Navarro moved to dismiss both counts of the indictment on the ground that "when a former president invokes Executive Privilege as to a senior presidential advisor, that advisor cannot thereafter be prosecuted for contempt of Congress" because a contrary rule would amount to "unconstitutional interference with the doctrine of separation of powers." J.A. 122. The district court initially denied the motion on the ground that Dr. Navarro had not offered any factual support for his claim that President Trump had invoked executive privilege for his subpoena. *United States v. Navarro*, 651 F. Supp. 3d 212, 222–223 (D.D.C. 2023) ("*Navarro I*").

In response, Dr. Navarro repeatedly requested that the court hold an evidentiary hearing to determine whether

**Add.11**

12

President Trump had invoked executive privilege. The district court subsequently conducted the requested hearing. *See United States v. Navarro*, No. 22-cr-200, 2023 WL 4846715, at *1 (D.D.C. July 28, 2023).

Dr. Navarro testified to an informal "protocol" of directing inquiries regarding whether to assert executive privilege to a personal aide to former President Trump, Elizabeth Harrington, who would relay those requests to the President. Dr. Navarro claimed to have "initiated the protocol" by contacting Ms. Harrington after receiving the Select Committee's subpoena. Aug. 28, 2023, Hr'g Tr., ECF No. 148, at 59:8–17. He also testified that he subsequently had a three-minute phone conversation with President Trump in which "it was very clear that the privilege was invoked, very clear." *Id.* at 63:25–64:16. Dr. Navarro submitted phone records corroborating the phone call's timeline, but he failed to produce any document establishing that President Trump had directed him to assert executive privilege and could not recall whether such a document existed. *See id.* at 91:6–16. Dr. Navarro also submitted a letter, written after the district court had initially denied his motion to dismiss, from Evan Corcoran, counsel to President Trump, "confirm[ing] President Trump's position that, as one of his senior advisors, [Dr. Navarro] had an obligation to assert executive privilege on his behalf[.]" J.A. 2360–2361.

Other documentary evidence showed that when Dr. Navarro had received a different subpoena from a different committee, counsel to President Trump had sent emails stating that "POTUS wants to exert executive privilege over this subpoena[,]" J.A. 2233; President Trump also had publicly directed "Peter Navarro to protect executive privilege" in response to that other subpoena, J.A. 2235; and Dr. Navarro had relayed that written directive to the relevant committee.

**Add.12**

13

The government submitted transcripts of Ms. Harrington's grand jury testimony in which she recalled Dr. Navarro contacting her about the possibility of asserting executive privilege in response to the Select Committee's subpoena, but she could not recall ever bringing the matter to President Trump's attention or directing Dr. Navarro to invoke the privilege. Justin Clark, another attorney to President Trump, also testified to the grand jury that, although he was personally involved in sending letters formally asserting executive privilege for other Select Committee subpoenas, he was aware of no such formal assertion as to the Select Committee's subpoena to Dr. Navarro.

The district court denied Dr. Navarro's motion to dismiss. The court concluded, as a matter of law, that an assertion of executive privilege requires the following: (1) The "privilege must be claimed by the President or an official authorized to speak for the President"; (2) the privilege assertion must come after "some level of personal consideration" by the President; and (3) the assertion must be "by some affirmative act or conduct" rather than "by mere acquiescence[.]" Aug. 30, 2023, Hr'g Tr., ECF No. 149, at 11:2–13:6.

The court then found, as a matter of fact, that Dr. Navarro had not come forward with evidence showing that any such claim of privilege regarding the Select Committee's subpoena had been made by the President or a designee. *See* Aug. 30, Hr'g Tr. at 14:7–25:20. Finally, the court concluded that because President Trump had not invoked executive privilege, Dr. Navarro's separation-of-powers defense premised on that invocation necessarily failed.

Separately, the government moved *in limine* to preclude Dr. Navarro from presenting at trial any argument or evidence that he believed in good faith that executive privilege shielded

**Add.13**

14

his noncompliance with the Select Committee's subpoena. The district court granted that motion over Dr. Navarro's objection, concluding that this court's precedent "forecloses a defense premised solely on [Dr. Navarro's] claimed belief that President Trump's invocation of executive privilege excused" his default. *Navarro I*, 651 F. Supp. 3d at 238 (citing *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961)). Consistent with that ruling, and over Dr. Navarro's objection, the district court instructed the jury that Dr. Navarro's "understanding or belief that executive privilege excused him from complying" with the Select Committee's subpoena was "not a defense to contempt of Congress[.]" Jury Instr., ECF No. 133, at 10.

**2**

In September 2023, after a two-day trial, a jury found Dr. Navarro guilty on both counts of contempt of Congress. The district court subsequently sentenced Dr. Navarro to concurrent four-month terms of imprisonment on each count. Dr. Navarro promptly noticed his appeal.

This court denied Dr. Navarro's motion for release pending appeal. Per Curiam Order, No. 24-3006, Dkt. 2044905 (March 14, 2024). The Supreme Court did the same. *Navarro v. United States*, 144 S. Ct. 771 (2024) (Roberts, C.J., in chambers). Dr. Navarro completed his sentence in July 2024.

Meanwhile, Dr. Navarro continued to press his appeal challenging his conviction. After the appeal had been fully briefed, and after granting the government's unopposed request for a lengthy extension of time to reconsider its position following a change in administrations, this court directed the government to report whether it "wishe[d] to continue to prosecute this criminal appeal or to have it dismissed." Per

**Add.14**

15

Curiam Order, No. 24-3006, Dkt. 2109960 (Apr. 8, 2025). The government chose neither option and, instead, moved to strike its own brief on the ground "that it is no longer taking the same position as the prior administration in this case." Gov't's Mot., No. 24-3006, Dkt. 2132720 (Aug. 29, 2025). It did not move to dismiss the appeal or to file a different brief. We granted the government's motion, struck its brief from the record, and proceeded to oral argument with Dr. Navarro alone, explaining that "the government is deemed to have withdrawn from any further participation in this appeal." Per Curiam Order, No. 24-3006, Dkt. 2137545 (Sept. 29, 2025).

## III

The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over Dr. Navarro's timely appeal under 28 U.S.C. § 1291. Dr. Navarro's completion of his sentence does not moot his appeal. *See United States v. Juvenile Male*, 564 U.S. 932, 936 (2011).

## IV

Dr. Navarro first challenges the district court's denial of his motion to dismiss the indictment on separation-of-powers grounds. We review questions of constitutional law *de novo*. *United States v. Nassif*, 97 F.4th 968, 973 (D.C. Cir. 2024). We review the district court's factual findings for clear error. *United States v. Bryant*, 111 F.4th 105, 108 (D.C. Cir. 2024).

Dr. Navarro contends that the district court's factual findings resolved "mixed questions" of law and fact such that we owe the district court's decision only due deference. *See United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994). That is incorrect. The district court's factual findings and legal conclusions are analytically distinct and were announced

**Add.15**

16

separately.  Dr. Navarro recognized as much before the district court.  In seeking an evidentiary hearing, he argued expressly that "whether the former President in fact directed Dr. Navarro to assert the presidential privilege on his behalf is a question of fact[.]"  J.A. 819.  This court reviews factual findings relevant to an asserted claim of privilege for clear error.  *See FTC v. Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018).

**A**

The questions before this court are narrowed considerably due to three admissions made by Dr. Navarro.

*First*, Dr. Navarro concedes that the district court, rather than a jury, was responsible for deciding whether executive privilege had been invoked and whether such invocation excused his default.  *See* Nov. 4, 2022, Hr'g Tr., ECF No. 64, at 10:11–12 ("[T]here needs to be an evidentiary proceeding[.]"); J.A. 608–609 (moving the district court to "hold an evidentiary hearing"); *see generally* Opening Br. (raising no challenge to the district court's procedure).

*Second*, Dr. Navarro agrees that executive privilege must be affirmatively invoked on a subpoena-by-subpoena basis and does not arise automatically or by implication.  *See* Nov. 4, Hr'g Tr. at 73:6–9 ("[T]his does come down to whether or not President Trump instructed Dr. Navarro to invoke executive privilege."); Aug. 28, Hr'g Tr. at 97:1–8 (agreeing that "an invocation as to one subpoena does not apply to a different subpoena"); Oral Arg. Tr. 9:22–10:12 (reaffirming before this court that his "position in district court" was that there must be a "subpoena specific invocation of privilege," and stating that "still is" his position on appeal).

**Add.16**

17

*Third*, Dr. Navarro admits that at least some of the information sought by the subpoena pertains to statements in his privately published and publicly released three-volume Navarro Report, his book published after he left the government, and his multiple public talks, none of which are protected by executive privilege.  *See* J.A. 962 (conceding before the district court that the Select Committee's subpoena sought "non-official/personal documents"); Oral Arg. Tr. 23:20–24:1 (conceding before this court that he could not make "any argument" that information about his public statements or publications are privileged).

Dr. Navarro's concessions are well founded.  To start, this court has long recognized that a "trial court faced with a pretrial motion to dismiss the indictment because of immunity granted by Federal or State Governments * * * can hold a pretrial evidentiary hearing" to resolve that claim.  *United States v. De Diego*, 511 F.2d 818, 823–824 (D.C. Cir. 1975); *see also United States v. Bulger*, 816 F.3d 137, 146 (1st Cir. 2016) ("[O]ur across-the-board research suggests that resolving a defendant's claim that he is immune from prosecution pretrial, as opposed to at trial, is more the norm than the exception.").

In addition, the Supreme Court has said directly that executive privilege must be invoked.  *See, e.g.*, *Cheney*, 542 U.S. at 389 ("Executive privilege is an extraordinary assertion of power not to be lightly invoked.  Once executive privilege is asserted, coequal branches of government are set on a collision course.") (formatting modified); *United States v. Nixon*, 418 U.S. at 713 ("If a President concludes that compliance with a subpoena would be injurious to the public interest[,] he may * * * invoke a claim of privilege[.]").  This court has too.  *In re Sealed Case*, 121 F.3d at 744 ("The President can invoke the [presidential communications] privilege when asked to produce documents[.]"); *Thompson*,

**Add.17**

18

20 F.4th at 26 (describing the President's "right to assert executive privilege").

To be sure, we have referred to the presidential communications privilege as a "presumptive" protection. *E.g.*, *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977). But the term "presumptive" denotes only that the privilege is qualified and may be overcome—not that it springs into effect immediately and spontaneously regardless of what a President might choose. *See United States v. Nixon*, 418 U.S. at 713–714 (Once the President "invoke[s] a claim of privilege on the return of [a] subpoena[,]" a court must determine whether the party seeking the information has "made a sufficient showing to rebut the presumption" of privilege.); *In re Sealed Case*, 121 F.3d at 744 ("If the President [invokes the privilege], the documents become presumptively privileged.").

Finally, the law is settled that executive privilege extends only to the provision of confidential advice by select presidential advisers; it does not apply to public statements or matters discussed in a personal capacity. *See*, *e.g.*, *Mazars*, 140 S. Ct. at 2032–2033; *In re Sealed Case*, 121 F.3d at 752.

**B**

Against that backdrop, we reject Dr. Navarro's separation-of-powers defense. The separation-of-powers problem that Dr. Navarro asserts depends on there being a clash between the Executive's invocation of privilege and Congress's enforcement of its subpoena for the assertedly privileged material. *See* Opening Br. 13. No such clash occurred here.

We hold that the authority to invoke executive privilege rests with a president or his designee. In that regard, the district court did not clearly err in finding as a matter of fact that neither President Trump nor a designee invoked executive privilege as

**Add.18**

19

to the Select Committee's subpoena to Dr. Navarro. Dr. Navarro's executive-privilege claim also fails for the independent reason that he defaulted on his obligation to produce documents and testimony that could not have been subject to executive privilege at all. As a result, Dr. Navarro's separation-of-powers defense falls apart.

**1**

The district court had authority to resolve whether executive privilege had been invoked as to the Select Committee's subpoena to Dr. Navarro. And it correctly concluded that only the President or his designee could invoke the privilege.

**a**

Dr. Navarro mounts two threshold challenges to the district court's authority to resolve the privilege issues in this case, both of which reason that the Judicial Branch's involvement in this suit itself amounts to a violation of the separation of powers. Those arguments fail.

*First*, Dr. Navarro argues that federal courts cannot decide at all whether executive privilege has been invoked. Opening Br. 36. Not so. As the Supreme Court has held, "it is the province and duty of this Court 'to say what the law is' with respect to the claim of privilege presented[.]" *United States v. Nixon*, 418 U.S. at 705 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)); *accord Committee on the Judiciary, U.S. House of Representatives v. McGahn*, 968 F.3d 755, 769 (D.C. Cir. 2020) (en banc) (In adjudicating a claim of testimonial immunity, the court "does not arrogate any new power to itself at the expense of either of the other branches but rather plays its appropriate constitutional role[.]").

**Add.19**

20

To get around that precedent, Dr. Navarro retreats to arguing that a court cannot prescribe *how* executive privilege may be invoked.  Opening Br. 33.  That cannot be right.

To start, there is no relevant daylight between deciding whether privilege has been invoked (which our precedent allows) and how its invocation can be evidenced.  A court, after all, could never hold that privilege was not invoked without identifying a basis for that conclusion grounded in what the law requires for an invocation of privilege and whether such an invocation was demonstrated as a factual matter.

Anyhow, drawing the line at the "how" of privilege invocations would be an odd result.  The Judiciary is no stranger to disputes over executive privilege.  When necessary, this court has repeatedly established criteria pertaining to the who, what, and when of executive privilege invocations before. *See, e.g.*, *In re Sealed Case*, 121 F.3d at 751–752 (holding that "communications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President"); *Judicial Watch, Inc. v. Department of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004) (holding that "the principles underlying the presidential communications privilege limit its reach to documents and other communications 'solicited and received' by the Office of the President, and thus do not extend to agency documents that are not submitted for Presidential consideration").  Likewise, the Supreme Court has intervened to determine whether even an indisputably valid assertion of executive privilege can prevail over the competing need for privileged material in a criminal case.  *See United States v. Nixon*, 418 U.S. at 713 (An "assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial.").

**Add.20**

21

Nor does judicial scrutiny of the *form* of executive privilege's invocation carry any distinct separation-of-powers baggage. The Supreme Court has prescribed the terms under which the Executive can invoke the analogous state secrets privilege. *See Reynolds*, 345 U.S. at 7–8 ("There must be [a] formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.") (footnotes omitted). So too for how Congress can invoke its legislative subpoena power. *See Mazars*, 140 S. Ct. at 2031–2032.

Courts, after all, could not discharge their Article III adjudicatory function if forced to accept at face value mere claims of executive privilege put forth by any employee with some asserted presidential advisory role. *See United States v. Nixon*, 418 U.S. at 712 ("[T]he allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would * * * gravely impair the basic function of the courts.").

Equally problematically, without setting terms on how a claim of privilege can be substantiated, courts could mistakenly apply the privilege against the will of the President based solely on a defendant's say-so. But an Article III court cannot exercise an authority to invoke privilege that is vested exclusively in the President. And without requiring proof of the privilege's proper assertion, a court would risk stepping into the Executive's domain. A court, in other words, cannot simply take a defendant at his word that the President invoked privilege because doing so would impermissibly tangle separation-of-powers lines.

*Second*, Dr. Navarro objects that, at a minimum, courts must require the Political Branches "to seek accommodation

**Add.21**

22

through good faith negotiations" over a privilege claim before weighing in. Opening Br. 27. That contention is to no avail.

To be sure, efforts at accommodation are the preferred approach in interbranch disputes. *See Mazars*, 140 S. Ct. at 2031 (extolling the "tradition of negotiation and compromise" between Congress and the President over subpoenas for the President's personal papers); *United States v. American Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977) ("[E]ach branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation.").

But as it turns out, the Political Branches are entirely in accord this time. Congress held Dr. Navarro in contempt. And the Executive both informed Dr. Navarro that his assertion of executive privilege was unjustified and exercised its exclusive authority to bring this prosecution. So this case does not confront the court with an interbranch conflict. *See Thompson*, 20 F.4th at 37.

In addition, extensive efforts at accommodation occurred. The Select Committee afforded then-former President Trump ample opportunity to invoke executive privilege if he so chose. The district court found that, before this case began, President Trump had notice both of the Select Committee's subpoena to Dr. Navarro and the Committee's determination that he was not protected by executive privilege. Then-former President Trump chose to remain silent on the subject. *Contrast Nixon v. GSA*, 433 U.S. at 430 (former president filed affirmative civil suit); *Thompson*, 20 F.4th at 22 (same); *Dellums*, 561 F.2d at 244 (former president filed motion to quash); J.A. 2235 (then-former President Trump publicly directing Dr. Navarro "to

**Add.22**

23

protect executive privilege" in response to a different subpoena).

The district court also found as fact that the Select Committee repeatedly tried to accommodate Dr. Navarro's assertion of privilege, seeking clarification on the nature and scope of his claims and offering to discuss ways to preserve his ability to assert any appropriate privilege in response to specific questions. *See Navarro I*, 651 F. Supp. 3d at 226. It was Dr. Navarro who flatly refused to engage. And nothing in the separation of powers requires rewarding that behavior.

Finally, this court afforded the Executive a long extension of time to reconsider the government's position in this case and to decide whether it wished to dismiss the appeal. The government did not ask for additional time, and it chose only to strike its brief. Again, no claim of privilege was asserted.

For all those reasons, we conclude the district court had the legal authority in this case, consistent with the separation of powers, to determine whether, under the facts and law, executive privilege had been invoked for the Select Committee's subpoena.

**b**

In deciding that executive privilege had not been asserted in Dr. Navarro's case, the district court ruled that the privilege (1) must be claimed by the President (current or former) or an official authorized by the President to claim it (2) after some level of personal consideration by the President and (3) by some affirmative act or conduct by the President or his designee. *See* Aug. 30 Hr'g Tr. at 11:2–13:6. We agree that the first prong of the test is required. And because Dr. Navarro never satisfied even that requirement, *see* Part IV.B.2, *infra*, we

**Add.23**

24

need not address whether the second and third factors are required.

This court has not yet definitively determined the criteria for an invocation of executive privilege. In *Dellums v. Powell*, 561 F.2d 242 (D.C. Cir. 1977), we observed that "there is much to be said for the proposition that * * * the presidential privilege must be claimed by the president or an official" designee, *id.* at 248. But it was "not necessary for us to decide that issue" in *Dellums*. *Id.* So this court's *dictum* has remained just that. *See Protect Democracy Project, Inc. v. NSA*, 10 F.4th 879, 886 n.1 (D.C. Cir. 2021) ("The issue of whether a president must personally invoke the presidential communications privilege remains an open question.") (formatting modified).

We agree with the district court that, at a minimum, the privilege must be claimed by the President (current or former) or an official authorized by the President to claim it. That is because executive privilege belongs to the Presidency. The privilege is "necessary to provide the confidentiality required for *the President*'s conduct of office." *Nixon v. GSA*, 433 U.S. at 448 (emphasis added) (quotation marks omitted). It facilitates "the effective discharge of *a President*'s powers[.]" *United States v. Nixon*, 418 U.S. at 711 (emphasis added). And it arises by implication "from the nature of enumerated powers" under Article II. *Id.* at 705–706. Those powers, of course, are vested in the President and no one else. *See* U.S. CONST. ART. II, § 1, cl. 1. As a result, executive privilege is the President's to invoke or not.

Further, executive privilege is not just an Article II accoutrement. Its invocation is "an extraordinary assertion of power" that can set the coequal branches "on a collision course." *Cheney*, 542 U.S. at 389. It follows from the

**Add.24**

25

simultaneous delicacy and potency of such invocations that the power to assert the privilege must reside with the politically accountable and constitutionally empowered President. *See also* Oral Arg. Tr. 12:24–13:1 (counsel for Dr. Navarro agreeing that executive "privilege belongs to the President to invoke or not").

To be sure, executive privilege's protection extends beyond the President himself to his immediate advisers. *See Judicial Watch*, 365 F.3d at 1123. But that is not because those advisers have any claim of privilege in their own right. Rather, executive privilege may attach to their documents and testimony only when the President decides that doing so is necessary to avoid "imped[ing] the President's ability" to obtain the information and advice necessary "to perform his constitutional duty." *In re Sealed Case*, 121 F.3d at 751 (quotation marks omitted). That is why proximity to "sensitive Executive Branch deliberations[,]" *Mazars*, 140 S. Ct. at 2032–2033, within the Office of the President is a prerequisite for the privilege's protection. *Judicial Watch*, 365 F.3d at 1116–1117 (rejecting as "unprecedented and unwarranted" the proposition that the presidential communications privilege would extend to communications among persons "twice removed from the President" that "were never received by immediate White House advisers in the Office of the President"). Resting the power to invoke the privilege in the hands of the President, whose functioning that confidentiality protects, keeps the privilege within its proper constitutional bounds.[2]

---

[2] While the Executive Branch has decamped from this case, previous Executive Branch statements presume presidential invocation of the privilege. *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 129 (1984) (discussing

**Add.25**

26

Because executive privilege belongs to the Presidency, arises from the President's Article II powers, singularly protects the President's ability to perform his assigned constitutional functions, and so extends only to those within the Office of the President who directly support the President's exercise of those powers, we hold that only a President or his designee may invoke executive privilege.

**2**

Having settled that the district court (1) had both the authority and duty to determine whether executive privilege had been invoked and (2) correctly held that only the President or his designee could invoke the privilege, the only remaining question is whether the district court clearly erred in finding that no such invocation occurred.  Dr. Navarro has never argued that a designee authorized to invoke executive privilege on President Trump's behalf instructed him to assert executive privilege for the Select Committee's subpoena.  So we review only the district court's factual finding that President Trump did not invoke executive privilege for that subpoena.

Dr. Navarro bears the heavy burden of persuading this court that the district court's factual finding that privilege had not been invoked was clearly erroneous.  *Bryant*, 111 F.4th at 108.  "This standard of review is highly deferential."  *United States v. Hale-Cusanelli*, 3 F.4th 449, 455 (D.C. Cir. 2021).  Dr.

---

"executive officials who assert claims of [presidential communications] privilege *at the direction of the President*") (emphasis added); *Congressional Oversight of the White House*, 2021 WL 222744, at *35 ("[I]n addition to invoking executive privilege over particular questions, *the President can also direct*" subordinates to assert testimonial immunity.) (emphasis added) (quotation marks omitted).

27

Navarro has not overcome that deference because the record in this case does not come close to leaving us with a "definite and firm conviction that a mistake has been committed." *Bryant*, 111 F.4th at 108–109 (quotation marks omitted).

To begin, the district court correctly concluded that Dr. Navarro first asserted executive privilege unilaterally without consulting with or receiving direction from President Trump. Dr. Navarro, in fact, asserted executive privilege within three minutes of learning that the Select Committee intended to subpoena him and before he had even seen the subpoena's content. Dr. Navarro also concedes that he did not communicate with President Trump or anyone close to President Trump during those three minutes. *See* Oral Arg. Tr. 13:15–18 (Q: "Did he talk to the President?" A: "Not in those three minutes."); *id.* at 13:19–13:23 (conceding that nothing in the record suggests "the President was alerted to the existence of the subpoena in those three minutes").

Dr. Navarro instead contends that President Trump later directed him to assert executive privilege in a brief phone call before the subpoena's deadlines. At the evidentiary hearing, Dr. Navarro testified that, "during that call, it was very clear that the privilege was invoked, very clear." Aug. 28, Hr'g Tr. at 64:15–16.

But as the district court observed, Dr. Navarro "provided no details" or other factual substantiation at all about the content of that conversation to show what supposedly made the matter so clear. Aug. 30, Hr'g Tr. at 20:5. Dr. Navarro's empty record gives this court no basis to second-guess the district court's decision to assign little weight to his self-serving, "conclusory[,]" and "nondescript" live testimony. *Id.* at 19:20, 24:24.

**Add.27**

28

All of the other evidence before the district court undercuts Dr. Navarro's contention that executive privilege was invoked.

For example, Dr. Navarro testified that there was an official "protocol" under which questions about the privilege were routed to President Trump through Elizabeth Harrington. Tellingly, Dr. Navarro's evidence of how that protocol worked was based on what happened when he had previously received a different subpoena from a different congressional committee on a different subject matter. The result was an extensive paper trail of communications with attorneys and aides to former President Trump confirming that "POTUS wants to exert executive privilege over this subpoena[,]" J.A. 2233, as well as a public statement from President Trump saying as much, J.A. 2235. Dr. Navarro produced no such paper trail, public statement, or anything similar with respect to the Select Committee's subpoena. Furthermore, grand jury transcripts submitted by the government show that, while Ms. Harrington spoke to Dr. Navarro about the Select Committee's subpoena, she "d[oes]n't believe [she] even brought it up to" President Trump. J.A. 2604.

The "protocol" also played out quite differently for other aides to former President Trump who received subpoenas from the Select Committee. Justin Clark, one of President Trump's attorneys, testified to the grand jury about his role in responding to the Select Committee's subpoenas. Mr. Clark testified that he would send a subpoena recipient "a letter on the former president's behalf" explaining President Trump's view that the requested information was "protected from disclosure by * * * the presidential communications" privilege and that "President Trump believes that [the recipient] is immune from compelled Congressional testimony on matters related to [their] official responsibilities." J.A. 2554–2556. Mr. Clark was explicit that he sent no such letter to Dr.

**Add.28**

29

Navarro, never spoke to Dr. Navarro about the Select Committee's subpoena, and was "not aware of anybody" else communicating with Dr. Navarro on the subject.  J.A. 2577.

Finally, before the district court, Dr. Navarro relied heavily on a letter from Evan Corcoran, another attorney to President Trump.  But the district court regarded that letter as the "most compelling evidence" that President Trump had *not* invoked executive privilege as to the Select Committee's subpoena.  Aug. 30, Hr'g Tr. at 24:8–9.  That letter—which was drafted after Dr. Navarro had failed to comply with the subpoena, after the House of Representatives had held him in contempt, and after the district court first denied Dr. Navarro's motion to dismiss the indictment—states only that Dr. Navarro and President Trump had "discussed matters of critical importance" regarding "trade and manufacturing policy and a wide variety of other subjects[.]"  J.A. 2360.  The letter then "confirms President Trump's position that, as one of his senior advisors, [Dr. Navarro] had an obligation to assert executive privilege on [President Trump's] behalf[.]"  J.A. 2361.

Notably, the letter does not state that President Trump ever directed Dr. Navarro to assert executive privilege with respect to the Select Committee's subpoena in their earlier phone call, or at any other time.  Nor does the letter state that Dr. Navarro was a confidential adviser to the President with respect to the 2020 election, the Electoral College vote, or the events of January 6th.  *See* J.A. 809 (Dr. Navarro promoting the Navarro Report "in his capacity as a private citizen").  Because Mr. Corcoran wrote the letter after the court had held that Dr. Navarro needed to come forward with evidence that President Trump directed him to invoke executive privilege, the letter's critical omissions carried weight with the district court:  "This was an opportunity to clearly state that the President had

**Add.29**

30

formally invoked or claimed executive privilege, but that is not what the letter says." Aug. 30, Hr'g Tr. at 24:16–18.

Weighing all that evidence, the district court concluded as a matter of fact "that there was no formal invocation of executive privilege" as to the Select Committee's subpoena to Dr. Navarro by President Trump, "nor any authorization to Dr. Navarro to invoke the privilege on the President's behalf." Aug. 30, Hr'g Tr. at 25:11–18. That finding was well-grounded in the record Dr. Navarro presented. We accordingly sustain the district court's factual finding that executive privilege was never invoked by President Trump or a designee as to Dr. Navarro's subpoena from the Select Committee.[3]

Because President Trump did not, in fact, invoke executive privilege, neither the Select Committee's subpoena nor the prosecution for Dr. Navarro's contumacy in the face of that subpoena presents the separation-of-powers concerns of which Dr. Navarro complains. We accordingly affirm the district court's denial of his motion to dismiss on separation-of-powers grounds.

**3**

Dr. Navarro has failed to establish his executive-privilege claim for another, independent reason: Because Dr. Navarro admits that some of the subpoenaed documents and testimony pertain to information not subject to executive privilege at all,

---

[3] Notably, Dr. Navarro admitted at oral argument before this court that he could not identify a single instance in which executive privilege had protected a subpoena recipient "with as little to show for his assertion that the President had invoked" the privilege as in this case. Oral Arg. Tr. 18:25–20:4.

**Add.30**

31

no invocation of executive privilege could have excused Dr. Navarro's wholesale default.

The presidential communications privilege "only applies to communications that [presidential] advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters." *In re Sealed Case*, 121 F.3d at 752. It "should never serve as a means of shielding information" beyond that narrow remit. *Id.* The Supreme Court has held specifically that the presidential communications privilege does not apply to subpoenas for "private information, which by definition do[] not implicate sensitive Executive Branch deliberations." *Mazars*, 140 S. Ct. at 2032–2033. A broader view of the privilege that disregarded the "distinctions between privileged and nonprivileged information, between official and personal information" would "risk seriously impeding Congress in carrying out its responsibilities." *Id.* at 2033.[4]

Much if not all of the information sought by the Select Committee's subpoena targeted information falling outside of Dr. Navarro's official bailiwick. As Mr. Corcoran's letter and

---

[4]    The Executive Branch understands a similar limitation to apply to its claimed testimonial immunity of presidential advisers. That immunity, in OLC's view, applies only against a presidential adviser's "compelled testimony about their official duties in that capacity." *Congressional Oversight of the White House*, 2021 WL 222744, at \*36; *see also Testimonial Immunity*, 43 Op. O.L.C. at 129 (opining that former White House Counsel could not be compelled to testify "on matters related to their official responsibilities"); OLC, *Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* 3 (March 15, 1972), https://perma.cc/CB2D-RTBW ("[T]he separation of powers precludes Presidential Assistants from appearing before the congressional committees unless the inquiry is related to their private conduct.").

32

other record evidence established, Dr. Navarro's official duties and communications with President Trump principally "pertained to trade and manufacturing policy" during his stints as Director of Trade and Manufacturing Policy, Director of the White House Trade Council, and National Defense Product Act Policy Coordinator. J.A. 2360; *see also* Aug. 28, Hr'g Tr. at 24:15–25:23 (Dr. Navarro testifying to his responsibilities coordinating manufacturing response to COVID-19 pandemic).

The Select Committee's subpoena had nothing to do with any of that. It principally concerned Dr. Navarro's public writings and communications about the Navarro Report and Green Bay Sweep made after he returned to private life. Dr. Navarro published and promoted his Report "in his capacity as a private citizen[.]" J.A. 809. He likewise published and promoted his book about the proposed Green Bay Sweep after he had left the White House and had no official duties at all. And Dr. Navarro's own response to the Select Committee's correspondence implicitly recognized that the requested evidence in his possession was distinct from his "official White House communications[,]" of which "the United States government [was] in possession[.]" J.A. 2648. Dr. Navarro, in fact, does not dispute that the subpoena sought "non-official/personal documents." J.A. 962; *see also* J.A. 1970 ("I'm not suggesting that every single paper in his possession, custody or control would have been subject to executive privilege."). Instead, he admitted to this court at oral argument that he had no argument to support his default as to the subpoena's requests for information about public statements made in his private capacity. *See* Oral Arg. Tr. 23:20–24:1 (Q: "I'm asking you whether there's any argument" such information and statements are privileged? A: "No.").

**Add.32**

33

In short, Dr. Navarro has acknowledged that even if executive privilege had been invoked, that would not have excused his categorical failure to comply with the Select Committee's subpoena.

**V**

Dr. Navarro separately challenges the district court's ruling, in granting the government's motion *in limine* and in charging the jury, that a good-faith mistaken belief that executive privilege had been asserted was no defense to the charges of willful default. We review *de novo* the district court's interpretation of Section 192. *See United States v. Sheehan*, 512 F.3d 621, 629 (D.C. Cir. 2008). For the record, Dr. Navarro has not argued to this court that he ever had a good faith belief that the subpoenaed materials he created as a private citizen, published to the world, and spoke about publicly were subject to executive privilege.

As to the rest, Dr. Navarro's argument is foreclosed by Supreme Court and circuit precedent. Section 192 assigns criminal liability to those who "willfully" default on a subpoena to produce records or refuse to answer a question in a hearing. 2 U.S.C. § 192. Binding precedent from the Supreme Court and this court establishes that a defendant acts willfully within the meaning of Section 192 when he deliberately and intentionally defaults on a subpoena, even if he subjectively and mistakenly believed his default was lawful.

Almost a century ago, the Supreme Court unanimously affirmed a Section 192 conviction over a defendant's objection that the trial court had erroneously "excluded evidence that in refusing to answer [a question at a hearing] he acted in good faith on the advice of competent counsel." *Sinclair v. United States*, 279 U.S. 263, 299 (1929), *overruled in part on other*

**Add.33**

34

*grounds by United States v. Gaudin*, 515 U.S. 506 (1995). The Court ruled that the defendant's subjective and "mistaken view of the law [was] no defense." *Id.* Faced with a congressional subpoena, the defendant "was bound rightly to construe the statute." *Id.* And his "deliberate" and "[i]ntentional" "refusal to answer" the questions was "sufficient to constitute guilt" whatever his subjective belief about what the law required. *Id.*

The Supreme Court has repeatedly reaffirmed that holding. *See United States v. Bryan*, 339 U.S. 323, 325–326, 330 (1950) (affirming conviction over defendant's objection that her conclusion, on advice of counsel, "that the subpoena was not valid because the Committee had no constitutional right to" issue it excused her default, and holding that the government had established "a *prima facie* case of wil[l]ful default" by showing that the defendant "intentionally failed to comply" with the subpoena) (quotation marks omitted); *Quinn*, 349 U.S. at 165–166 (Once an asserted claim of privilege is rejected, "a deliberate, intentional refusal to answer" a question during subpoenaed testimony will "la[y]" the "foundation" for "a finding of criminal intent to violate" Section 192.); *Watkins*, 354 U.S. at 185, 208 (A witness who refuses to comply with a congressional subpoena for testimony on the ground that the committee lacks authority to seek it "acts at his peril" because an "erroneous determination on his part, even if made in the utmost good faith, does not exculpate him if the court should later rule" that his defense was invalid.).

This court followed the Supreme Court's lead in *Licavoli v. United States*, 294 F.2d 207 (D.C. Cir. 1961), holding expressly that "[e]vil motive is not a necessary ingredient of willfulness" under Section 192, *id.* at 208. Rather, a "deliberate, intentional failure, without more," to comply with a subpoena is "sufficient." *Id.* As a result, a defendant's subjective belief that he was not required to respond to a

**Add.34**

35

congressional subpoena "cannot immunize a deliberate, intentional failure to appear[.]" *Id.* at 209.

The district court relied expressly on *Licavoli* and the Supreme Court opinions that preceded it in granting the government's motion *in limine*. *See Navarro I*, 651 F. Supp. 3d at 238–239. Contrary to Dr. Navarro's assertions, adhering to that binding precedent was not error. Indeed, we reaffirmed *Licavoli*'s holding just two years ago in *United States v. Bannon*, 101 F.4th 16 (D.C. Cir. 2024). *See id.* at 21 ("[E]very case that addresses the mental state required for a contempt of Congress conviction firmly supports *Licavoli*'s holding."), *reh'g denied*, No. 22-3086, 2025 WL 1503223 (D.C. Cir. May 27, 2025), *vacated on other grounds Bannon v. United States*, --- S. Ct. ----, 2026 WL 922515, at *1 (Apr. 6, 2026).

Dr. Navarro's attempts to distinguish that precedent are unpersuasive.

He suggests that, because *Licavoli* and *Bannon* both arose in the context of advice-of-counsel defenses, their holdings are cabined to those defenses alone. Of course, the advice on which Mr. Bannon claimed to rely "was that then-former President Trump had asserted executive privilege" that prevented his compliance with the subpoena, *Bannon*, 101 F.4th at 23, while Dr. Navarro's defense is his belief "that President Trump's purported invocation of executive privilege excused hi[m]" from complying with the subpoena, *Navarro I*, 651 F. Supp. 3d at 238–239. So the gap between this case and *Bannon* is vanishingly small.

Nor has Dr. Navarro proffered a plausible basis for his proposed distinction. To start, he contends that an "advice of counsel defense is not presumed and can be waived, whereas executive privilege is presumptive[.]" Opening Br. 44. But as explained above in Part IV.A, and as Dr. Navarro conceded

**Add.35**

36

below and before this court, executive privilege does not arise presumptively and must be invoked. *See* Nov. 4, Hr'g Tr. at 73:5–9; Aug. 28, Hr'g Tr. at 97:1–8; Oral Arg. Tr. 9:22–10:12. The privilege is "presumptive" only in the sense that it can be overcome even after being invoked. *See United States v. Nixon*, 418 U.S. at 714; *In re Sealed Case*, 121 F.3d at 744. That distinction is of no help to Dr. Navarro.

The constitutional underpinnings of executive privilege do not take it outside binding precedent either. "[S]ection 192 authorizes criminal liability for good-faith but mistaken assertions of unconstitutionality," *Bannon*, 2025 WL 1503223, at *1 (statement of Katsas, J.), as Supreme Court decisions confirm, *see Sinclair*, 279 U.S. at 295 (defendant believed the committee lacked constitutional authority to issue subpoena); *Bryan*, 339 U.S. at 325 (defendant believed "the Committee had no constitutional right to demand the books and records").

The only difference, then, between an advice-of-counsel defense and Dr. Navarro's individual mistake is that Dr. Navarro immediately and categorically asserted executive privilege without consulting anyone, whether counsel or the President to whom the privilege belongs. And he did so before even seeing the subpoena and its cover letter that made clear the subpoena sought some information that Dr. Navarro concedes is not privileged because he had discussed it publicly "in [his] recently published book, in interviews with reporters, and * * * on a podcast[.]" J.A. 2634. That all cuts against Dr. Navarro's purported good-faith defense, not in favor of it.

**Add.36**

37

**VI**

For the foregoing reasons, we affirm the district court's judgment.

*So ordered.*

**Certificate of Parties and Amici Curiae**

The parties are the United States of America, Appellee, and Peter K. Navarro, Appellant. The United States House of Representatives was *amicus curiae* before the U.S. District Court for the District of Columbia. *Amici curiae* before the U.S. Court of Appeals for the District of Columbia panel below were Heidi Kitrosser, Mark J. Rozell, and Mitchel A. Sollenberger in support of Appellee.

**Disclosure Statement**

Appellant Peter K. Navarro is an individual. No disclosure statement is required under Fed. R. App. P. 26.1 or D.C. Cir. Rule 26.1.